1    **PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

2    Name  STAICH          IVAN          V.
         (Last)          (First)        (Initial)

3    Prisoner Number #E-10079.                              *FILED*

4    Institutional Address P.O.Box 689, Soledad, Ca. 93960     FEB - 7 2008

5                                                    RICHARD W. WIEKING
                                                    CLERK U.S. DISTRICT COURT
6    ══════════════════════════════════════════════════ NORTHERN DISTRICT OF CALIFORNIA

7                    **UNITED STATES DISTRICT COURT**
                    **NORTHERN DISTRICT OF CALIFORNIA**

8    IVAN VON STAICH,                                        **PJH**

9    (Enter the full name of plaintiff in this action.)     )
                                                            )   CV) 08 No.    0848
10                       vs.                                 )   (To be provided by the clerk of court)
                                                            )
11   Ben Curry, et al.,                                      )   **PETITION FOR A WRIT**   **(PR)**
                                                            )   **OF HABEAS CORPUS**
12   _____                            )   **FILED IN ACCORDANCE WITH**
                                                            )   **28 U.S.C. §2254 AND THE**
13   _____                            )   **RECENT NINTH CIRCUIT**
                                                            )   **DECISION OF HAYWARD V.**
14   (Enter the full name of respondent(s) or jailor in this action)  )  **MARSHALL, Friday Jan. 4,**
                                                            )   **2008 DJDAR 93.**
15   See Exhibit "AA" for Cal. Supreme Court denial.

16                   Read Comments Carefully Before Filling In

17   **When and Where to File**

18        You should file in the Northern District if you were convicted and sentenced in one of these

19   counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20   San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in

21   this district if you are challenging the manner in which your sentence is being executed, such as loss of

22   good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

23        If you are challenging your conviction or sentence and you were not convicted and sentenced in

24   one of the above-named fifteen counties, your petition will likely be transferred to the United States

25   District Court for the district in which the state court that convicted and sentenced you is located. If

26   you are challenging the execution of your sentence and you are not in prison in one of these counties,

27   your petition will likely be transferred to the district court for the district that includes the institution

28   where you are confined. Habeas L.R. 2254-3(b).

1 | Who to Name as Respondent

2 | You must name the person in whose actual custody you are. This usually means the Warden or

3 | jailor. Do not name the State of California, a city, a county or the superior court of the county in which

4 | you are imprisoned or by whom you were convicted and sentenced. These are not proper

5 | respondents.

6 | If you are not presently in custody pursuant to the state judgment against which you seek relief

7 | but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8 | custody you are now and the Attorney General of the state in which the judgment you seek to attack

9 | was entered.

10 | A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

11 | 1. What sentence are you challenging in this petition?

12 | (a) Name and location of court that imposed sentence (for example; Alameda

13 | County Superior Court, Oakland):

14 | 700 Civic Center Dr. West
Santa Ana, Ca. 92701

15 | Orange County Superior Court
Court                              Location

16 | (b) Case number, if known ___C-53851.___

17 | (c) Date and terms of sentence _____

18 | (d) Are you now in custody serving this term? (Custody means being in jail, on

19 | parole or probation, etc.) Yes _X_ No _____

20 | Where?

21 | Name of Institution: _C.T.F. SOLEDAD STATE PRISON_

22 | Address: _____P.O.BOX 690,SOLEDAD,CAL,93960-0690_

23 | 2. For what crime were you given this sentence? (If your petition challenges a sentence for

24 | more than one crime, list each crime separately using Penal Code numbers if known. If you are

25 | challenging more than one sentence, you should file a different petition for each sentence.)

26 | Currently serving One Count Second Degree Murder Cal. Penal Code §190.

27 | _____

28 | _____

PET. FOR WRIT OF HAB. CORPUS      - 2 -

1       3. Did you have any of the following?

2           Arraignment:                              Yes __X__    No _____

3           Preliminary Hearing:                      Yes __X__    No _____

4           Motion to Suppress:                       Yes _____    No __X__

5       4. How did you plead?

6           Guilty _____   Not Guilty __X__   Nolo Contendere _____

7           Any other plea (specify) _____

8       5. If you went to trial, what kind of trial did you have?

9           Jury __X__      Judge alone_____   Judge alone on a transcript _____

10      6. Did you testify at your trial?                      Yes _____    No __X__

11      7. Did you have an attorney at the following proceedings:

12          (a)    Arraignment                        Yes __X__    No _____

13          (b)    Preliminary hearing                Yes __X__    No _____

14          (c)    Time of plea                       Yes _____    No _____

15          (d)    Trial                              Yes __x__    No _____

16          (e)    Sentencing                         Yes __X__    No _____

17          (f)    Appeal                             Yes __X__    No _____

18          (g)    Other post-conviction proceeding   Yes __X__    No _____

19      8. Did you appeal your conviction?                     Yes __X__    No _____

20          (a)    If you did, to what court(s) did you appeal?

21                 Court of Appeal                    Yes __X__    No _____

22                 Year: 1989.      Result:THE VERDICT AND SENTENCE ARE AFFIRMED

23                 Supreme Court of California        Yes __X__    No _____

24                 Year: 1989.      Result: PETITION FOR REVIEW DENIED.

25                 Any other court                    Yes _____    No _____

26                 Year: _____   Result:_____

27

28          (b)    If you appealed, were the grounds the same as those that you are raising in this

PET. FOR WRIT OF HAB. CORPUS        - 3 -

1     petition?                              Yes _____     No  X

2           (c)     Was there an opinion?              Yes  X      No_____

3           (d)     Did you seek permission to file a late appeal under Rule 31(a)?

4                                              Yes _____     No X

5                   If you did, give the name of the court and the result:

6     _____

7     _____

8     9.  Other than appeals, have you previously filed any petitions, applications or motions with respect to

9     this conviction in any court, state or federal?              Yes _____     No  X

10         [Note:  If you previously filed a petition for a writ of habeas corpus in federal court that

11    challenged the same conviction you are challenging now and if that petition was denied or dismissed

12    with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

13    for an order authorizing the district court to consider this petition.  You may not file a second or

14    subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit.  28

15    U.S.C. §§ 2244(b).]

16         (a)     If you sought relief in any proceeding other than an appeal, answer the following

17                 questions for each proceeding.  Attach extra paper if you need more space.

18                 I.     Name of Court: _" N/A   DIRECT APPEAL FROM JURY TRIAL."_

19                        Type of Proceeding: _____

20                        Grounds raised (Be brief but specific):

21                        a._____

22                        b._____

23                        c._____

24                        d._____

25                        Result: _____ Date of Result:_____

26                 II.    Name of Court: _____

27                        Type of Proceeding: _____

28                        Grounds raised (Be brief but specific):

PET. FOR WRIT OF HAB. CORPUS          - 4 -

```
                    N/A
1                       a._____
2                       b._____
3                       c._____
4                       d._____
5                       Result: _____ Date of Result:_____
6         III.    Name of Court: _____
7                 Type of Proceeding: _____
8                 Grounds raised (Be brief but specific):
9                       a._____
10                      b._____
11                      c._____
12                      d._____
13                Result: _____ Date of Result:_____
14        IV.     Name of Court: _____
15                Type of Proceeding: _____
16                Grounds raised (Be brief but specific):
17                      a._____
18                      b._____
19                      c._____
20                      d._____
21                Result: _____ Date of Result:_____
```

22    (b)    Is any petition, appeal or other post-conviction proceeding now pending in any court?

23  **No petitions on my conviction.**    Yes ____   No _X_

24         Name and location of court: _____

25  B. GROUNDS FOR RELIEF

26  State briefly every reason that you believe you are being confined unlawfully. Give facts to

27  support each claim. For example, what legal right or privilege were you denied? What happened?

28  Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

1  need more space. Answer the same questions for each claim.

2     [Note: You must present ALL your claims in your first federal habeas petition. Subsequent

3  petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4  499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5     Claim One: Petitioner Incorporates the attached Habeas Petition

6          Setting Forth Grounds For Relief As If Fully Set Forth Herein.

7     Supporting Facts: See Attached Habeas Petition.

8

9

10

11    Claim Two: Petitioner Incorporates the attached Habeas Petition

12          Setting Forth Grounds For Relief As If Fully Set Forth Herein.

13    Supporting Facts: See Attached Habeas Petition.

14

15

16

17    Claim Three: All grounds are attached hereto for reference.

18

19    Supporting Facts:

20

21

22

23    If any of these grounds was not previously presented to any other court, state briefly which

24  grounds were not presented and why:

25  All grounds presented to all 3 state courts and the Cal.

26  Supreme Court denied the petition without citation.

27  (See Exhibit "AA" for reference to post card denial from

28  Cal. Supreme Court.)

PET. FOR WRIT OF HAB. CORPUS     - 6 -

1        List, by name and citation only, any cases that you think are close factually to yours so that they

2 are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning

3 of these cases:

4       Please See Attached Habeas Petition, ___ ___

5 _____

6 _____

7 Do you have an attorney for this petition?                Yes____      No_X__

8 If you do, give the name and address of your attorney:

9 **Petitioner presents his petition in Pro Se.**

10       WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11 this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

12

13 Executed on __1-30-08__                        Ivan Von Staich

14            Date                   **IVAN VON STAICH**
Signature of Petitioner

15                                         **Without Bar Licensed Counsel**

16

17

18

19

20 (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS     - 7 -

1  IVAN VON STAICH
   Prison No. E-10079 (CW-137L)
2  Central Training Facility
   Post Office Box 689
3  Soledad, Ca. 93960-0689

4  (Petitioner In Pro Se)

5

6                    UNITED STATES DISTRICT COURT

7                   NORTHERN DISTRICT OF CALIFORNIA

8                       San Francisco Division

9                            * * *

10 _____
                                   )
11 IVAN VON STAICH,                )    Case No._____
                                   )
12              Petitioner,        )
                                   )    **PETITION FOR WRIT OF HABEAS
13    vs.                          )    CORPUS FILED UNDER 28 U.S.C.
                                   )    §2254 et seq;**
14 Ben Curry, Warden, et al.,      )
                                   )    **MEMORANDUM OF POINTS AND
15              Respondent.        )    IN SUPPORT OF PETITION**
                                   )
16 _____)

17 **TO: THE HONORABLE PRESIDING JUDGE OF THE NORTHERN DISTRICT
       FEDERAL COURT, Please Take Notice:**

18                         INTRODUCTION

19      Petitioner, Ivan Von Staich, hereby moves this Court

20 to evaluate this petition based on the facts set forth in

21 **Hayward v. Marshall,** Friday January 4, 2008 DJDAR 93.

22 Petitioner asserts that all his arguments are similar to that

23 of Hayward and that the Cal. BPH Commissioners are using

24 immutable factors to endlessly deny parole, which has resulted

25 in Petitioner serving the punishments mandated for first degree

26 murderers.    Wherefore, Petitioner presents the following

27 grounds supporting this 28 U.S.C. §2254 petition.

28                    GROUNDS PRESENTED PAGE 1

GROUNDS

## MEMORANDUM OF POINTS AND AUTHORITIES
### IN SUPPORT OF GROUNDS PRESENTED

1

2   A. The Board Commissioners refused to accept Petitioner's Correctional Psychologist Report written by M. Macomber Ph.D., dated Feburary 3, 2006.
3   The Board Commissioners gave Petitioner's Confidential 2006 Psychological Report to the Deputy District Attorney in violation of Cal. Penal Code
4   §1543(a)(1), who during the "Court Ordered" late hearing used the Psychological Report as the sole basis for recommending denial of parole
5   and stated the 2006 Psych Report was written in error and the report was nothing more then rubbish, and also suggested that his layman opinion in
6   Psychology should be accepted over the professional state licensed Correctional Psychologist M. Macomber, Ph.D., which recommended Petitioner
7   be released on parole; and the end result from the May 10, 2007 parole hearing was Petitioner being denied parole for four (4) years; and that
8   Petitioner must be given a new Psychological evaluation by the Board's own personal Board Psychologist, which violates Petitioner's right to have
9   the 2006 Psych Report fairly considered by an impartial panel.

10   Petitioner absolutely maintains that his "Court Ordered"

11   late parole hearing held on May 10, 2007 was nothing more then

12   a pro forma predetermined retaliatory hearing, resulting in

13   a unsubstantiated four (4) year parole denial. The Board

14   Commissioners completely failed to assess any weight to the

15   State licensed Correctional Psychologist M. Macomber, Ph.D.,

16   and his report dated Feburary 3, 2006. This report rendered

17   by Dr. Macomber was based upon 2 separate 2 hour-interviews

18   plus review of all the information in Petitioner's C-File and

19   separate medical file. The evaluation was conducted due to

20   Petitioner filing a CDC 602 appeal, which after a thorough

21   review of all the evidence by the Senior Psychologist B. Zika,

22   Ph. D., it was ordered that Petitioner receive a NEW

23   Psychological Evaluation and based solely on these facts the

24   previously written report based on false information was

25   overruled, and the reevaluation by M. Macomber, Ph.D. was

26   conducted. The ordered reevaluation involved extensive specify

27   testing within the functioning ranges set forth under the

28   GROUNDS PRESENTED PAGE 2

1 | Minnesota Multiphasic Personality Inventory test, which
2 | consisted of 500 question, multi-choice questionnaire.

3 |     Petitioner was also required to submit several written
4 | documents regarding all areas of his prison life and his future
5 | plans for release into the community. After M. Macomber
6 | evaluated all the evidence he rendered his psychological
7 | evaluation report dated February 3, 2006. However, during
8 | the May 10, 2007 late "Court Ordered" subsequent parole hearing
9 | the Board Commissioners totally disregarded this extensive
10 | psychologist report from this State licensed professional with
11 | nearly 40 years of prior experience and the Board stated that
12 | Petitioner needs a new Psych Report, which the Board
13 | Commissioners have expressed in a written document that
14 | improperly dictates exactly what the new board psychologist
15 | must write about when conducting the new evaluation report.
16 | The reason the Board Commissioners want a new Psych Report
17 | is because the previous mentioned report recommends Petitioner
18 | should be released. However, Petitioner maintains that
19 | allowing the Board Commissioners to order a new evaluation
20 | report conducted exclusively by their own psychologist is
21 | nothing more than a oligarchy and does violate the principles
22 | of due process during the administrative hearing process.
23 | The Board Commissioners sole purpose for ordering a new
24 | psychological evaluation is to obtaining an unfavorable report
25 | that can be used at Petitioner's next parole hearing to justify
26 | keeping Petitioner in prison for the rest of his life, thereby,
27 | changing Petitioner's jury verdict from second degree murder
28 |

1  to first degree murder special circumstances under Cal. Penal

2  Code §190.2., which violates the mandate set forth in the

3  United States Supreme Court decision of <u>Green v. United States</u>,

4  355 U.S. 184, 190 (1957); <u>also see</u> <u>Herron v. Straub</u>, 138

5  Fed.Appx. 753, 756 (6th Cir.2005) ("More specifically, the

6  Supreme Court has held that an implicit acquittal can be

7  determined by jury silence; when a jury is instructed to find

8  a defendant guilty of either first or second degree murder,

9  a defendant will be implicitly acquitted of first degree murder."

10 (Quoting Green).)

11      This action by the Board Commissioners was in the purist

12 form arbitrary and capricious which reveals a pattern by the

13 Board Commissioners who are ex-prosecutors to use the parole

14 hearing as a second trial where the inmate is now convicted

15 of first degree murder. The end result of the "Court Ordered"

16 late hearing was a four (4) year parole denial showing a

17 prepensed outcome. By the Board Commissioners refusal to

18 accept the 2006 extensively detailed Psychological Report

19 and the Commissioners ordering a new Psychological Report

20 by their own Psychologist is prejudicial per se and absolutely

21 violates Petitioner's due process right to a fair and impartial

22 parole hearing. The Commissioners have set forth a written

23 document alluding to precisely what areas in Petitioner's

24 C-file their own Board appointed Psychologist must consider.

25 The current Board Commissioners tyrannical power is endless.

26 (See Exhibit "A" for reference to Board document dated May

27 10, 2007). Petitioner asserts the Board Commissioners are

28                    GROUNDS PRESENTED PAGE 4

effectively controling the evaluation outcome process. This extramural action shows beyond a shadow of a doubt that Petitioner's "Court Ordered" late hearing was nothing more then a sham.

This incongruous action does not comport with Petitioner's federal liberty interest due process requirements exspoused in the United States Supreme Court decision of **Greenholtz v. Inmates of Nebraska Penal and Correctional Complex**, 442 U.S. 1, 12 (1979). See **In re SANDRA DAVIS LAWRENCE** (2007) 59 Cal.Rptr.3d 537, 2007 WL 1475283 (Cal.App. 2 Dist.) at page 16: "Two United States Supreme Court decisions Greenholtz v. Inmate of Nebraska Penal and Correctional Complex decided in 1979 and Board of Pardons v. Allen decided in 1987, held the federal due process clause creates a constitutional liberty interest for convicted persons in certain juridictions. The existence of this right depends on whether the state employs "mandatory language" indicating parole will be granted if certain findings are made. In 2002, the Ninth Circuit examined the California parole scheme in McQuillion v. Duncan, 306 F.3d 895, 901-903 and found it "uses mandatory language and is largely parallel to the schemes found in Greenholtz and Allen." Accordingly, the McQuillion court found a "liberty interest" was created under the federal Constitution for state prisoners in California." Id. Lawrence (2007).

When the Board Commissioners refused to accept the professional findings of state Correctional Psychologist Macomber and decided to side with the Deputy District Attorney

GROUNDS PRESENTED PAGE 5

1 │ who extensively argued against the 2006 Psych Report, they
2 │ violated several areas of state and federal statutory law.
3 │ First, the Board Commissioners gave Petitioner's 2006
4 │ Psychological Report to the "Deputy District Attorney" from
5 │ Orange County without any State statutory authorization under
6 │ the California Penal Code, Evidence Code, Bus. & Profession
7 │ Code, Welfare & Institutional Code or the State Government
8 │ Code. The Board Commissioners had no legal right to turnover
9 │ Petitioner's 2006 Psychological Report to the Deputy District
10 │ Attorney, but did so anyway. Cal. Penal Code §1543(a)(1)
11 │ requires: "Records of the identity, diagnosis, prognosis,
12 │ or ... treatment of any patient maintained by the health care
13 │ facility which are not privileged records required to be
14 │ secured by the special master procedure in §1524, or records
15 │ required by law enforcement agencies pursuant to this section:
16 │ (1) In accordance **with** **the** **prior** **written** **consent** **of** **the**
17 │ **patient.** (In relevant part, emphasis added.)

18 │     The California Orange County Deputy District Attorney
19 │ is part of law enforcement and needed my concent before
20 │ obtaining my 2006 Psychological Report and, therefore, the
21 │ Board Commissioners had no legal authority to override Cal.
22 │ Penal Code §1543(a)(1), which they have deliberately done
23 │ in this case. Furthermore, Petitioner's 2006 Psychological
24 │ Report was secured in Petitioner's medical file. Obviously
25 │ the Board Commissioners are authorized to review Petitioner's
26 │ 2006 Psychological Report, however, the Deputy District
27 │ Attorney is not a Board Commissioner and should have never
28 │                     GROUNDS PRESENTED PAGE 6

seen Petitioner's 2006 Psychological Report. Moreover, the Deputy District Attorney is not a licensed Psychologist and had no professional background in Psychology to analyze the 2006 Psychological Report and by the Board Commissioners allowing him to do so during the May 10, 2007 parole hearing violates well-established principles set forth in **Packer v. Board of Medical Examiners** (1974) 112 Cal.Rptr. 76, 80 "The purpose of the Psychology Licensing Law (Bus. & Prof. Code §§2900-2996.9), as declared by the Legislature, is "to protect the public from the unauthorized and unqualified practice of psychology." Id.

Furthermore, the Deputy District Attorney or the Board Commissioners are not Licensed Psychologist and had no legal authority to override the 2006 Psychological Report written by M. Macomber Ph.D. Correctional Psychologist or the authority to disregard the professional opinion for that of their own. See **Kelley v. Callahan**, 133 F.3d 583, 589 (8th Cir.1998) ("The Commissioner is encouraged to give more weight to the opinion of a specialist about medical issues related to his or her area of specialty **than to the opinion of a source who is not a specialist**") citing Metz v. Shalala, 49 F.3d 374, 377 (8th Cir.1995). Also the treating physician rule, is codified at 20 C.F.R. §404.1527(d)(2), and is widely accepted. See **Mason v. Shalala**, 994 F.2d 1058 (3d Cir.1993). These federal regulations have been applied to state actions which address the weight to be given a treating source's opinion on the issue(s) and when there is **no** other **substantial evidence** in

GROUNDS PRESENTED PAGE 7

1  the case, the court will give it controlling weight. 20 C.F.R.
2  §416.927(d)(2).    The    judge    [in    this    case    the    Board
3  Commissioners and the Deputy District Attorney] may not make
4  "speculative  inferences  from  medical  reports  and  may  only
5  disregard a medical opinion based on **substantial** contradictory
6  evidence and may not due to his own credibility judgments,
7  speculation or lay opinion." **Morales v. Apfel**, 225 F.3d 310,
8  317 **(3rd Cir.**2000**)**.

9      Furthermore, this is not the first time the Board
10  Commissioners refused to follow the recommandations of the
11  Correctional Psychologist, as set forth in the recent case
12  of **In re DAVID BARKER**, May 29, 2007 DJDAR 7548, at 7555 we
13  read: "More on point is Dr. Glines assessment in her September
14  15, 2005 report, which could not be clearer: "[t]here are
15  no therapeutic recommendations at this time." And, as noted,
16  she concluded that the risk Barker would commit another violent
17  crime is low"; **see also In re BERNARD JOHN WEIDER**, December
18  6, 2006 DJDAR 15795, at page 15798 "The "Life Prisoner
19  Evaluation Report," dated May 2004, concluded that Weider
20  had satisfactory post-release plans and a circle of family
21  and friends outside of prison for support. The report stated
22  that the seriousness of the crime could not be over emphasized.
23  "Today, however, Weider appears to be a low risk to society
24  if he were released from prison."

25      However, in both Barker and Weider the Board Commissioners
26  refused to follow the Correctional Psychologist findings in
27  the reports which stated that the inmate would not pose a
28                           GROUNDS PRESENTED PAGE 8

1   threat to the community and that the inmate should be released.
2   In both cases the state appellate courts reversed the Board's
3   denial of parole and ordered the Board Commissioners to grant
4   a parole date. Likewise, in the recent federal district court
5   case of **Willis v. Kane**, 485 F.Supp.2d 1135, April 26, 2007 WL
6   1232060 (N.D.Cal.) at page *5 we read: "In light of the
7   favorable psychological reports and the absence of any mention
8   therein of a need for further self-help or therapy programming,
9   there was not some evidence to support the BPH's determination
10  that Willis had not sufficiently participated in beneficial
11  self-help and therapy programming." In the Willis case the
12  federal court ordered the BPH to set a parole date within
13  30 days. Id. at page *8. (See Exhibit "B" for reference to
14  Petitioner's 2006 Psychological Report.)

15      Bottom line, the Board Commissioners retaliated against
16  Petitioner because he file a habeas corpus in this Court
17  forcing the Board to hold a late hearing. However, during
18  that hearing the Deputy District Attorney was allowed to
19  extensively argue against Petitioner's favorable Psychological
20  evaluation, when Petitioner did not consent or authorize the
21  Deputy District Attorney to have a copy of his confidential
22  Psychological examination dated Feburary 3, 2006 and,
23  therefore, the Deputy District Attorney had no just cause
24  to argue against this favorable report. Furthermore, by giving
25  the Deputy District Attorney this medical report positively
26  violates the confidential medical information requirements
27  set forth in Cal. Penal Code §1543(a)(1). See **Burkert v.**
28

GROUNDS PRESENTED PAGE 9

1  Equitable Life Assur. Soc. of America, 287 F.3d 293, 299 (3rd
2  Cir.2003).  The end result was Petitioner received a four
3  year denial without just cause, Petitioner has now served
4  nearly 24 straight years and with all presentence and post-
5  sentence "Court Ordered" credits applied, total credits add
6  up to over 33 years in prison for the one count second degree
7  murder.  Petitioner absolutely maintains that his May 10,
8  2007 "Court Ordered" late parole hearing was nothing more
9  then a sham and did violate Petitioner's due process rights
10  to a fair and impartial hearing and does violate the arbitrary
11  and capricious standard set forth in Superintendent v. Hill,
12  472 U.S. 445, 455-56 (1985).  As stated in Sass v. California
13  Board of Prison Terms, 461 F.3d 1123 (9th Cir.2006) ("The
14  'Some Evidence' standard is minimal, and assures that the
15  record is not so devoid of evidence that the fidings of the
16  . . . board were without support or otherwise arbitrary."
17  Id. at 1129 (quoting Superintendent v. Hill, 472 U.S. at 457).
18  (See Exhibit "C" for reference to four year denial).

19      In addition, as stated in In re Lawrence, supra, 59
20  Cal.Rptr.3d at 543 ("The rationale for these findings gave
21  primary credence to the earlier psychological reports and
22  tests reflecting various psychological disorders as opposed
23  to the more recent reports finding no current evidence Lawrence
24  still was subject to those problems.")  As in Lawrence
25  Petitioner was dissatisfied with the earlier written 2002
26  psychological report based on unsupported evidence and filed
27  his appeal, which was granted by the Senior Psychologist.

28                    GROUNDS PRESENTED PAGE 10

1

2

## GROUND TWO

3    B. Petitioner was denied dual "Court Ordered" credit by the
     BPH, Commissioners during his recent May 10, 2007 parole
4    sentencing hearing.

5    Petitioner, Ivan Von Staich, hereby notifies this Honorable

6    District Court, that on May 30, 1986 during his sentencing

7    hearing the Court granted dual presentence credits on both

8    counts, which is fully reflected on page 2, Judgment of

9    Commitment. Petitioner was granted 1097 days of presentence

10   credit on his one count second degree murder sentence. (See

11   Exhibit "D" for reference to Judgment of Commitment, page

12   2.) Petitioner maintains that in addition to the 1097 days

13   of presentence credit he served 997 actual days in the Orange

14   County Jail before he was transferred to Chino State Prison

15   on Febuary 21, 1989. This post-sentence credit must also

16   be applied to Petitioner's one count second degree murder.

17   However, during the May 10, 2007 parole hearing the BPH

18   Commissioners refused to apply this dual "Court Ordered" credit

19   to Petitioner's indeterminate term. (See Exhibit "E" for

20   reference to 997 days served in the Orange County Jail.)

21   Petitioner argues that dual credit is authorized under

22   Cal. Penal Code §2900.5 (b) and that the sentencing Court

23   on May 30, 1986 was following the statutory law when the Court

24   granted Petitioner 1097 days of presentence credit on his

25   separately calculated indeterminate second degree murder

26   sentence in accordance with Cal. Rules of Court, Rule

27   451(a)(1983). Furthermore, dual credit is warranted when

28

1  the defendant seeks credit which is attributable to the same
2  conduct which is the basis of the criminal conviction.    In
3  this case Petitioner was convicted of second degree murder
4  and attempted murder, when the two crimes occurred within
5  seconds of each other and are the sole basis for Petitioner's
6  incarceration.

7      As stated in **People v. Rutledge** (1983) 88 Cal.Rptr. 846,
8  849 we read: "The prerequisite for dual credit is that the
9  custody must relate to both matters.  Time served on a sentence
10 in one case while awaiting trial on [139 Cal.App.3d 626]
11 another [case] cannot be the basis for dual credit.    Time
12 spent in custody prior to commencement of sentence is credited
13 only where the custody is attributable to proceedings relating
14 to the same conduct for which the defendant has been
15 convicted." ·(Quoting In re Rojas (1979) 23 Cal.3d 152, 155-
16 157, 151 Cal.Rptr. 649.)

17     Indeed the sentencing judge was right to grant Petitioner
18 dual credit on his two crimes which occurred within seconds
19 of each other.   In accordance with **People v. Brown** (1980)
20 166 Cal.Rptr. 144, 148, "Penal Code section 2900.5 requires
21 credit against the San Bernardino sentence only where the
22 Los Angeles custody is attributable to San Bernardino
23 proceedings.   We are satisfied that the statute requires a
24 relationship between the custody and the proceedings in which
25 credit is sought"; **also** **see** **In re Jordan** (1975) 50 Cal.App.3d
26 155, 157-58 ("The dual status of the act may be said to provide
27 the required "reasonable relationship" which would permit

28

1  [dual] presentence credits"); **and** **In re Smith** (1978) 146

2  Cal.Rptr. 304, 306 ("It seems obvious to us that in this case

3  Smith's custody in the Los Angeles county jail was on a dual

4  basis and that one of the two **bases** qualified under the

5  aforementioned Penal Code section 2900.5, subdivision (b).

6  As our Supreme Court stated in In re Watson (1977) 19 Cal.3d

7  646, 651, 131 Cal.Rptr. 609, 612, 566 P.2d 243, 246, the

8  crucial element of the statute is not where or under what

9  conditions the defendant has been deprived of his liberty

10 but rather whether the custody to which he has been subjected

11 is attributable to the charges arising from the same criminal

12 [181 Cal.App.3d 328] act or acts for which the defendant has

13 been convicted. ([Penal Code §] 2900.5, subd. (b).) We believe

14 that **Smith's** custody was in part so attributed.")

15 Petitioner maintains that on May 10, 2007 the BPH

16 Commissioners refused to consider any of Petitioner's

17 presentence credits on his one count second degree murder

18 conviction and, therefore, did violate his due process right

19 to have this presentence credit applied to his one count second

20 degree murder sentence.

### GROUND THREE

21 C. The BPH Commissioners have effectively ~~resentenced~~ Petitioner
   to life in prison for his one count second degree murder
22 when they refused to calculate his minimum sentence under
   the matrix guidelines for second degree murder and this
23 refusal to act was unreasonable under **United v. Booker**,
   543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005)
24 considering Petitioner has now served nearly 24 straight
   years.
25

26 The Supreme Court extended the holding of Blakely v.

27 Washington, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403

28

1   (2004), to the Federal Sentencing Guidelines, concluding that
2   the Sixth Amendment requires that "[a]ny fact (other than
3   a prior conviction) which is necessary to support a sentence
4   exceeding the maximum authorized by the facts established
5   by a plea of guilty or jury verdict must be admitted by the
6   defendant or proved to a jury beyond a reasonable doubt."
7   Booker at p. 243-244.   Petitioner has not yet had his sentence
8   calculated by the BPH Commissioners and, therefore, the Supreme
9   Court decision in Booker which mandates sentencing review
10  for reasonableness based on factors used to extend or enhance
11  a prisoner punishment for the set degree of the crime
12  committed, would apply in this case. See Booker at 261.   As
13  stated in **U.S. v. Maese**, 146 Fed.Appx. 276, 279 (10th Cir.2005)
14  we read: "However, both before and after Booker, the degree
15  of departure from the applicable guidelines range is reviewed
16  for reasonableness." Likewise in **U.S. v. Carlton**, 442 F.3d
17  802, 809 (2nd Cir.2006) we read: "Such proceeding arise after
18  the end of the criminal prosecution, **including the imposition**
19  **of sentence** . . . Revocation deprives an individual, not of
20  the absolute liberty to which every citizen is entitled, but
21  only of the conditional liberty properly dependent on
22  observence of special parole restriction," Gagnon, 411 U.S.
23  at 781, 93 S.Ct. 1756 (quoting Morrissey, 408 U.S. 480, 92
24  S.Ct. 2593); **see also** Knights, 534 U.S. at 119, 122 S.Ct.
25  587.) (Emphasis added.)

26      Petitioner has not been sentenced yet by the BPH
27  Commissioners and, therefore, is entitled to the full canopy
28                      GROUNDS PRESENTED PAGE 14

of sentencing due process rights under the constitution as set forth in Booker and the recent United States Supreme Court case of **Cunningham v. California**, 127 S.Ct. 856, 857-859 (2007), which **reaffirmed** those rights to apply in California **prisoner's** cases that have not had their sentence calculated. These constitutional rights are applicable to Petitioner's May 10, 2007 parole sentencing hearing where the Commissioners relied on the alleged factors from old prison non-violent misconduct to extend Petitioner's parole sentencing hearing for four more years. Petitioner's jury did not hear the prison misconduct violations under the reasonable doubt standard and, therefore, the BPH Commissioners had no legal right to enhance Petitioner's sentence to first degree murder punishments based on this evidence. The Board Commissioners refused to set any minimum matrix guidelines to the second degree murder crime for four (4) more years, thereby forcing Petitioner to serve an illegal first degree murder sentence.

We must now review the legal landscape in California regarding undetermined sentences. The California Supreme Court in **In re Roberts** (2005) 36 Cal.4th 575, 589-590, ruled that parole is an integral part of the overall process of sentencing. (See **also In re Sena** (2002) 94 Cal.App.4th 836, at 839. Under California Law, the sentencing process is not complete until the term is set and the inmate released. Roberts, supra, 36 Cal.4th at 589-590; Sena, supra, 94 Cal.App.4th at 839.) As such, the Board is an entity that wears two (2) hats, serving as part of the executive branch,

GROUNDS PRESENTED PAGE 15

1    but discharging certain judicial functions as an extension
2    of the sentencing process. This was precisely the conclusion
3    of the court of appeal in the case of **In re Hogan** (1986) 187
4    Cal.App.3d 819, 824 ["Board, in setting a release date for
5    an indeterminate sentence, performs the same function as does
6    the trial court in ordering a determinate sentence - it fixes
7    a term of definite duration."] See **also People v. Enriquez**
8    (1977) 137 Cal.Rptr. 171, 177 (The Superior Court has delegated
9    its responsibility of sentencing to the Board Commissioners.)

10       The effect of these cases is to hold that the Board is
11   still discharging part of the sentencing function, acting
12   in the place of the trial court in determining minimum parole
13   date guideline setting. This required duty leaves the BPH
14   Commissioners no room for refusal to set Petitioner's second
15   degree murder within the applicable matrix guidelines. When
16   the Board engages in the fact finding process and makes a
17   determination that "public safety" exception of Cal. Penal
18   Code §3041 subd. (b) applies, they must consider all the unless
19   factors, such as only misconduct within the last six months.
20   See Greenholtz, 99 S.Ct. at 2109. Moreover, when those facts
21   are new disciplinary reports which the jury did not hear in
22   their deliberation finding, the crime committed by Petitioner
23   cannot be enhanced from second degree murder to first degree
24   murder. The Board Commissioners in this case have illegally
25   delegated themselves as a second jury and have effectively
26   changed Petitioner's parole hearing into a mini-trial and
27   have used the alleged misconduct evidence to render a new

28                          GROUNDS PRESENTED PAGE 16

1  verdict in violation of the Sixth Amendment of the United States
2  Constitution.   Using  the  old  prison  misconduct  facts  which
3  the Board determines relevant removes the jury verdict process
4  and  places  Petitioner's  second  degree  murder  outside  the
5  appropriate matrix guideline range,thereby violating the Booker
6  jury trial requirements, recently reaffirmed in Cunningham.
7  Thus, under California Law, the fact - finding does impact
8  the right to a term under the appropriate sentencing matrix
9  guidelines.   This is clearly the type of delegated judicial
10  fact  -  finding  "beyond  a  reasonable  doubt"  jury  trial
11  requirement that Justice Scalia was addressing in Blakely,
12  which was found to contravene the right to a jury trial.
13  As such, the Board on May 10, 2007 deliberately refused to
14  set  any  matrix  guideline  range  and  in  doing  so  set off
15  Petitioner's parole sentencing hearing for four (4) years,
16  which will force Petitioner to serve over 28 straight years
17  of incarceration without any added A-1-A prison credits, which
18  is absolutely beyond the minimum 10 year sentence set forth
19  in proposition 7 (1978) voters initiative for one count second
20  degree murder.  (See **People v. Duran** (1983) 140 Cal.App.3d
21  485, 503.)

22      The sole factors found by the Board Commissioners on
23  May 10, 2007 to set off the parole sentencing hearing process
24  under the matrix guidelines was 6 disciplinary reports for
25  violating the prison grooming standards in 2001, which occurred
26  before Petitioner's first parole hearing held on November
27  5, 2002, which was one of the factors used to set off the

GROUNDS PRESENTED PAGE 17

28

November 5, 2002 sentencing hearing for four (4) years. The other disciplinary report used by the Board was from 1996 and now is 11 years old and was for sending a somewhat threatening letter to Petitioner's ex-wife. These disciplinary reports were fully discussed in the February 3, 2006 Correctional Psychological Report and are now fully discussed below.

### GROUND FOUR

D. Petitioner's May 10, 2007 parole sentencing hearing was illegally set off for four (4) years based on old non-violent prison disciplinary reports, which violates the mandates set forth in the United States Supreme Court citation of <u>Greenholtz</u> <u>v. Inmates of the Nebraska Penal & Correctional Complex</u>, 442 <u>U.S. 1</u>, 99 S.Ct. 2100, 2109 (1979) and <u>Martin v. Marshall</u>, 431 F.Supp. 2d 1049, 1045 (N.D.Cal.2006).

Petitioner maintains that the United States Supreme Court citation of Greenholtz, 99 S.Ct. at 2109 must be followed by California Board Commissioners during all liberty interest parole sentencing hearings under Cal. Penal Code §3041(b). Indeed this evidence is supportive of Petitioner's contention that he is a Nazarite Christian prisoner following his religious vow in accordance with the Holy Bible Numbers ch. 6, verse 5. The Board Commissioners on May 10, 2007 disregarded these factors and that another prisoner convicted of second degree murder who was denied parole for following his religious beliefs was later ordered to be released by the federal Eastern District Court.[1] See <u>Saif'ullah v. Carey</u>, 2005 WL 1555389 (E.D.Cal.2005). Also see <u>Rosenkrantz v.</u> <u>Marshall</u>, 444 F.Supp.2d 1063, 1087 (C.D.Cal.2006), which quotes Saif'ullah as follows: "Saif'ullah, 2005 WL 1555389 at *13-16 (granting habeas relief where the record contained no evidence supporting the BPT's decision that petitioner was a danger

[1] In <u>Martin</u>, this Court found inappropriate the use of an 8 year old CDC disciplinary report when the evidence shows the inmate institution behavior was positive. Id. Martin, at 1045.

1  to society and unsuitable for parole based upon (a) his
2  commitment offense, (b) his prior criminal history, and (c)
3  a <u>rules violation which resulted when, based upon his regilious</u>
4  <u>beliefs, petitioner refused to cut his hair</u>)." Also the United
5  States Supreme Court set forth in **Cutter v. Wilkinson**, 125
6  S.Ct. 2113, 2117 (2005), that prisoners are allowed to practice
7  their individual religious beliefs in the institutional
8  setting. The United States Supreme Court Cutter decision
9  reenforces the federal statutory provisions of Title 42 U.S.C.
10 §2000cc 1-7 (RLUIPA), which applys equally to all religions
11 throughout the United States. The Ninth Circuit in 2005
12 reenforced these same religious rights for California State
13 Prisoners in the case of **Warsoldier v. Woodford**, 418 F.3d
14 1062 (9th Cir.2005).

15 Bottom line the BPH Commissioners on May 10, 2007 during
16 the late parole sentencing hearing had no legal right to use
17 Petitioner's disciplinary reports for violating the prison
18 grooming standards, when the Board Commissioners knew
19 Petitioner was following his vow of the Nazarite in accordance
20 with the Holy Bible Numbers ch. 6, verse 5. In addition,
21 the Board Commissioners used an eleven (11) year old
22 disciplinary report where Petitioner was punished for writing
23 a somewhat threatening letter to his wife at that time, who
24 Petitioner divorced in February of 1997 for irreconcilable
25 differences. Petitioner wrote this letter after he found
26 out that his supposed loving wife was actually a prostitute
27 and a drug addict. Petitioner met this woman from another

28

GROUNDS PRESENTED PAGE 20

1  prisoner and had no background knowledge of her drug and
2  promiscuity before he married her in 1990.   Petitioner has
3  had no further communications with his ex-wife and has been
4  with a new girlfriend for the last 7 years.   Petitioner is
5  happily engaged to marry this beautiful christian woman, who
6  does support my release back to the community.   (See Exhibit
7  "F" for reference to letter from Petitioner's fiance Shelley
8  Woods and other documents supporting parole after 24 straight
9  years.)  ·

10     Moreover, several inmates with serious disciplinary
11 reports have recently been ordered released by the state and
12 federal courts.   See **Willis v. Kane,**[485] F.Supp.2d [1126], 2007
13 WL 1232060 (N.D.Cal.) where second degree "baby" murderer
14 Willis was ordered released after he received a serious CDC-
15 115 for refusing to transfer to another prison yard and also
16 received three CDC-128s (i.e., counselling memoranda) Willis
17 at *7; **also see Martin v. Marshall,** 431 F.Supp.2d 1038, 1042
18 (N.D.Cal.2006) where inmate Martin was convicted of two murders
19 and one attempted murder and received twenty (20) serious
20 CDC-115 disciplinary reports, which included possession of
21 drugs; weapons materials and gambling paraphernalia and that
22 inmate Martin was involved an a altercation with another inmate
23 who supposedly stabbed Martin. See Martin at p.1042.   However,
24 after Martin's Attorney filed a modification order, Martin
25 was ordered released; **see In re Elkins** (Cal.App.1 Dist.2006)
26 50 Cal.Rptr.3d 503, 508 where inmate Elkins was convicted
27 of first degree murder and robbery, for beating a man to death
28

1  with a baseball bat and dumping his body in the remote area
2  of Truckee, California.  Inmate Elkins also received two
3  serious CDC-115 disciplinary report were he was charged with
4  force and violence.  The state court ordered the Board to
5  release Elkins forthwith. Id. Elkins at 523; **see Sandra Davis**
6  **Lawrence**, $^{59}$ Cal.Rptr.3d $^{537}$, 2007 WL 1475283 (Cal.App.2 Dist.)
7  at *6 where first degree murder Lawrence received a CDC-115
8  for stealing excess food from the kitchen, however, the State
9  Court of Appeals ordered the Board to release Lawrence
10 forthwith.  Id. Lawrence at *43; **and In re David Barker**,
11 Tuesday, May 29, 2007 DJDAR 7548, at pp. 7549-50 where inmate
12 Barker was convicted of three (3) murders two (2) second degree
13 murders and one first degree murder.  Inmate Barker also
14 received six (6) CDC-115s, which consist of possessing 12
15 marijuana joints; having another inmate in his cell; possessing
16 contraband; manipulating staff; for smoking in bed; possession
17 of contraband (pornography, sugar, and a bottle of unidentified
18 "flammable liquid substance"); and the State Court of Appeals
19 ordered the Board to find Petitioner suitable for parole under
20 the current regulations. Id. at p. 7560.

21      Petitioner maintains that in accordance with Greenholtz,
22 99 S.Ct. at 2109 subsection (K)(1) that prison misconduct
23 which is within the last **six months should be considered during**
24 **the initial or subsequent protected liberty interest parole**
25 **hearing**.  Therefore, the old immutable CDC-115s should not
26 be used by the Board Commissioners to refuse suitability
27 indefinitely.

28                    GROUNDS PRESENTED PAGE 22

1

## GROUND FIVE

2  E. The Board Commissioners denied parole for four (4) years
3  stating that Petitioner needed more self-help and that he
   needed to get this self-help by reading some books in the
   prison library, but failed to state why Petitioner cannot
4  attain this self-help by reading books in the prison library
   in one year and therefore, have violated Petitioner's due
5  process and the failure of the BPH Commissioners to present
   "some evidence" to support the four year denial as set forth
6  in **In re Lozano**, C.A.3 no. C051792, 2007 WL 117709; also the
   four (4) year denial violates the Ex Post Facto Clause as
7  stated in **Brown v. Palmateer**, 379 F.3d 1089, 1094-95 (9th
   Cir.2004) and that only a limited class of inmates convicted
8  of multiple murders can receive up to 5 year denials in
   accordance with **Garner v. Jones**, 529 U.S. 244, 257, 120 S.Ct.
9  1362, 1371, 146 L.Ed.2d 236 (2000).

10       Petitioner maintains the Board Commissioners on May 10,

11  2007 during the "court ordered" late parole hearing denied

12  parole for 4 more years, after Petitioner has already served

13  24 years of incarceration. The principle reason for denying

14  parole was that Petitioner needed more self-help and that

15  Petitioner could obtain this self-help by reading books in

16  the old prison library. (See attached transcripts for reference

17  to self-help in the prison library.)[2/] See **In re Lozano**, C.A.

18  3 no. C051792, 2007 WL 117709 *5, where the Third State

19  Appellate District Court granted habeas relief to Fidel Jessie

20  Lozano's claim that the panel's reasons for a three year

21  deferral on his subsequent parole hearing denied due process

22  and failed to satisfy the "some evidence" standard because

23  the panel cited no evidence suggesting that Lozano could not

24  be found parole suitable in one year. Id. Petitioner asserts

25  that his May 10, 2007 panel failed to present any evidence

26  showing why Petitioner could not read some self-help books

27  in one year and be found parole suitable. Furthermore, the
                    GROUNDS PRESENTED PAGE 23

28

[2/] See Exhibit "G" for May 9-10, 2007 BPH transcripts p. 90, where
Petitioner ask the panel where he would receive additional progress and
see p. 94, where the Commissioner tell Petitioner to go to the prison
library.

1  BPH Commissioners will just keep finding some reason to
2  continuously deny parole until this Petitioner dies from prison
3  stress or infirmities. Also if Petitioner really does have
4  a federal protected liberty interest in parole, how many
5  multi-year denials does he need to serve before this Court
6  will enforce that liberty by ordering the BPH Commissioners
7  to set a parole release date. Petitioner has now served over
8  24 straight years and with credits over 33 years. If the
9  BPH Commissioners can simply deny parole for 4 years for any
10 reason they want, until the inmate is ready to die from old
11 age and has served will beyond the sentencing matrices for
12 second degree murder, what kind of liberty is this? Answer:
13 "no liberty."

14    Petitioner further asserts that the 4 year denial violates
15 the United States Supreme Court decision of **California Dept.**
16 **of Corrections v. Morales**, 514 U.S. 499, 509, 115 S.Ct. 1597,
17 1600 fn. 1, 131 L.Ed.2d 588 (1995). In accordance Morales
18 **prisoners convicted of two murders can be denied parole up**
19 **to five years, not inmates convicted of one second degree**
20 **murder.** Id. Morales, 115 S.Ct. at 1600 fn. 1. Also, when
21 Petitioner was arrested on this one second degree murder in
22 1983, the law in California required only one year denials
23 for single murder. See **In re Jackson** (1985) 39 Cal.3d 464,
24 469 fn. 4. In **Doe v. Pataki**, 904 F.Supp. 603, 619 (1996),
25 this court reaffirmed the mandate of Morales that inmates
26 convicted of more then one murder can receive up to 5 year
27 parole deferrals. However, because this Petitioner now has

GROUNDS PRESENTED PAGE 24

28

a liberty interest in receiving a set parole date, to allow the BPH Commissioners to endless deny parole at up to five year deferrals would violate the Ex Post Facto Clause as set forth in **Brown v. Palmateer**, 379 F.3d at 1094-95; also see **Akins v. Snow**, 992 F.2d 1558 (11th Cir.), cert. denied 501 U.S. 1260 (1991), which found a new regulation changing annual parole hearings to every 8 years constituted a violation of the Ex Post Facto Clause. Id. Akins, at 1563.

In addition, other circuit courts have upheld the Ex Post Facto Clause against the arbitrary change in the state law requiring biannual parole hearings rather than annual parole hearings. See **Roller v. Cavanaugh**, 984 F.2d 120, 124 (4th Cir.1993); **Schwartz v. Muncy**, 834 F.2d 396, 398 fn. 8 (4th Cir. 1987), and also **Fender v. Thompson**, 883 F.2d 303, 305-06 (4th Cir.1989) (noting that courts have "invariably refused to permit the retrospective application of new or amended statutes or administrative rules which purported, for example, to alter pre-existing criteria for determination of parole eligibility"); **see also U.S. v. Paskow**, 11 F.3d 873 (9th Cir.1993) ("Without exception they have based their holdings on the axiom that, as the Second Circuit phrased it, "parole eligibility is considered an integral part of any sentence.") Id. Paskow, at 879, quoting Shepard v. Taylar, 566 F.2d 648, 654 (2nd Cir.1977) ("holding that standards in effect at the time of the defendants original sentence must be applied at his revocation hearing.")

Petitioner asserts that he was arrested in 1983 and during

GROUNDS PRESENTED PAGE 25

this time frame M2d defendants had a statutory right to one
(1) year parole denials as stated above in **In re Jackson,**
supra, 39 Cal.3d at 469 fn. 4. If Petitioner is to retain
his mandatory liberty interest in receiving a set parole date,
this Court should not allow the BPH Commissioners to deny
parole for up to 5 years for any reason they want. Surely
after serving 24 straight years of incarceration Petitioner
should not be subjected to a 4 year parole denial based on
the need to read some unknown self-help book in the prison
library and therefore, the 4 year denial in this case violated
Petitioner's due process and ex post facto rights. See **Sash**
**v. Zenk,** 439 F.3d 61, 65 (2nd Cir.2006) ("The application
of the ex post facto doctrine is broader in scope than the
application of the rule of lenity. The ex post facto doctrine
applies to any penal enactment that retrospectively
disadvantages a criminal offender, whether or not it increases
a criminal sentence, see Weaver, 450 U.S. at 29, 32 n. 17,
101 S.Ct. 960, and applies to regulations governing the
conditions of imprisonment as well as to the length of
sentence"); **see also Fletcher v. Reilly,** 433 F.3d 867, 877
(C.A.D.C.2006) ("because the District Court proceeded on the
basis of faulty assumptions about the difference between
"guidelines" and "regulation," and the "discretion" purportedly
exercised by the Board and the Commission, the Court failed
to give full effect to **Garner.** Under **Garner,** the retroactively
applied parole or reparole regulation or guideline violates
the Ex Post Facto Clause if it "creates a significant risk

of prolonging [an inmate's] incarceration." 529 U.S. at 251, 120 S.Ct. 1362.")   In this case, allowing the BPH Commissioners to repeatedly deny parole to a M2d Cal. prisoner at 4 year intervals and to retroactively apply the 1994 amended "up to 5 year parole hearing denial law," who in 1983 had the statutory right to a one year parole suitability deferral and that prisoner has a guaranteed liberty interest in receiving a parole release date, absolutely violates the ex post facto doctrine and does subject Petitioner to unwarranted first degree murder punishment for his one count second degree murder sentence.

///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
//
/

GROUNDS PRESENTED PAGE 27

## Ground Six

F. Petitioner has been **illegally** resentenced to life in Prison.

Petitioner is currently serving a one count second degree murder based on his 1983 arrest and jury conviction for one count second degree murder. (See Exhibit "F" for reference to Judgment of Commitment second degree murder.) Petitioner was received by the California Department of Corrections (heretoafter CDC&R) on February 21, 1989 and granted presentence credits by the superior court as set forth on page two of the Judgment of Commitment. Petitioner also served an additional 997 days in the county jail before being transferred to CDC&R to serve his sentence.

On May 10, 2007, Petitioner received a subsequent parole hearing and was denied parole for four more years. (See Exhibit "G" for reference to four (4) year denial.) Petitioner maintains that he has now served 33 years with 1/3 credit and has now served over the minimum for first degree murder. Keeping Petitioner in prison for 33 years violates the principles set forth in In re Weider (Cal.App. 6 Dist 2006) 52 Cal.Rptr.3d 147, 155, which states:

> "The court noted that Weider "has served so much time that, with custody credits, he is within the matrix for first degree murder . . . It should be self evident that an inmate has served the equivalent of 25 years, whether his actions were more than minimally necessary for second degree conviction . . . is no longer the appropriate question. The Board position, that inmates who were only convicted of second degree [murder] may forever be denied parole based on modicum of evidence that their acts rose to the level of a first degree [murder], without acknowledging the fact that they have already served the time [145 Cal.App.4th 583] for a first [degree murder], should be seen as so ridiculous that simply to state it is to refute it." Id. at 155.

Petitioner absolutely maintains that he has served more than enough time for this one count second degree murder and that he has exceeded the time limits for this indeterminate crime. As stated in U.S. v. Martin, 63 F.3d 1422, 1433 (7th Cir.1995) we read: "Although the judge and not the jury ultimately sentences the defendant, the judge may only impose life imprisonment "if the jury so direct." If the jury does not so direct, the sentence is limited to a term of years." Also in Lynch v. U.S. Parole Com'n, 768 F.2d 491, 496 (2nd Cir.1985), which states: "It has been held that the Commission may not confine a prisoner beyond the applicable guideline range is based upon the severity of the offense, because that factor was used to select the guideline in the first place." See also United States v. Nono-Para, 887 F.2d 1409, 1412 (9th Cir.1989).

Petitioner asserts that he is now serving a sentence beyond the guideline matrices for second degree murder and that CDC&R officials and the BPH Commissioners have violated his due process rights. Moreover, state officials are forcing Petitioner to serve life in prison based on the multi-year denial process. However, as stated in U.S. v. Paster, 173 F.3d 206, 218 (3rd Cir.1999) we read: "Yet the sentence levied in this second degree murder case is equal to what would be a heavy first degree murder sentence. This aspect of the sentence here imposed gives us pause." The Paster case also states: "Second degree murder has a base offense level 33, produces an incarceration range of 135-168 months; the range

GROUNDS PRESENTED PAGE 29

1  drops to 108-135 months when the offense level is adjusted
2  two levels for acceptance of responsibility. Id at fn. 8 pg.
3  218.

4  Moreover, "the term "maximum" ordinarily means the upper
5  end of the range. Where a statute provides two tiers of
6  punishment, common sense dictates that the maximum must fall
7  at the high end of the two tiers. U.S. v. Fountain, 83 F.3d
8  946, 952 (8th Cir.1996); and U.S. v. Quinonez, 86 F.3d 382,
9  383 (5th Cir.1996) ("We begin by noting an indeterminate
10 sentence is defined as, "A sentence to imprisonment for the
11 maximum period defined by law, subject to termination . .
12 . at any time after service of the minimum period").

13 Indeed, the recent Ninth Circuit decision in IRONS v.
14 CAREY, (9th Cir. Mar. 6, 2007) 479 F.3d 658, Lexis 5198, at
15 *11 support Petitioner's contentions when the Court stated:
16 "We hope that the Board will come to recognize that in some
17 cases, indefinite detention based on an inmate's commitment
18 offense, regardless of the extent of his rehabilitation, will
19 at some point violate due process, given the liberty interest
20 in parole that flows from the relevant California statutes."
21 Id.   In addition the case of Jones v. Smith, 231 F.3d 1227,
22 1232-33 (9th Cir.2001) is supportive of Petitioner contentions
23 as follow: "Since the ruling in Apprendi, supra, the Court
24 has made it clear that any fact that increases the penalty
25 for a crime beyond a reasonable doubt, as set forth Apprendi,
26 expands the range of discrepancies that will amount to a
27 constructive amendment.   Such a change is a constructive
28                    GROUNDS PRESENTED PAGE 30

amendment and is prejudicial per se." Likewise, "we do note, however, that principles of due process require an agency to follow its own regulation, which have the force of law." **Marshall v. Lansing**, 839 F.2d 933, 943 (3rd Cir.1988). See Government Code §11342.2, all regulations must strictly follow the enabling statute. California Penal Code §3041.5 states that parole hearings are for suitability or term setting and does not specify whether second degree murder is under suitability or term setting.

In all other states and federal courts second degree murder time limits are evaluated under the appropriate guideline matrices. See **U.S. v. Smith**, 5 F.3d 259, (7th Cir.1993) (the appropriately set inmate Smith's second degree murder was assessed under guideline §2A1.2 which requires Smith to serve from 135 to 168 months in prison.) Also in **Jackson v. Virginia**, 433 U.S. 307, 310, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (second degree murder is a class 3 felony and requires the inmate to serve a set term of 5 to 20 years maximum.) The Ninth Circuit in **United States v. Brady**, 928 F.2d 844, concluded that defendant was acquitted of first murder but convicted of voluntary manslaughter. The sentencing court upwardly departed from the guidelines based in part on the defendant's state of mind. The Ninth Circuit rejected the sentencing court's rationale in upwardly departing. In invalidating the departure, the Brady court relied primarily on the notion that the guidelines do not permit the sentencing court to reconsider facts rejected by a jury's acquittal.

GROUNDS PRESENTED PAGE 31

Id. at 851. Petitioner maintains that allowing the BPH Commissioners unlimited discretion to use any factor they want, such as unsubstantiated statements in the Probation Officer's Report (POR) or old disciplinary reports, or the commitment offense would allow the Commissioners to act as an unauthorized second jury. However, Board Commissioners cannot conduct second trials where the court and jury have already completed that process therefore, mini-trials are not allowed. See **U.S. ex rel. Schiano v. Luther**, 954 F.2d 910, 918 (3rd Cir.1992). Also see **U.S. v. Robbins**, 197 F.3d 829, 852 fn. 17 (7th Cir.1999) ("In Martin, the question of a life sentence was submitted to the jury, and the jury refused to impose a life sentence. See 63 F.3d at 1432. Because the district court gave the 45 year old defendant a sentence of 50 years, our court held that, in light of the jury's rejection of a life sentence, the district court could not sentence the defendant to what is in effect a life sentence. In **Prevatte**, the sentencing court considered the sentencing range of 360 months to life and sentenced the defendant to life imprisonment. In both cases, we remanded so that the district court could adjust the sentence to ensure that the life expectancy of each of the defendants was appropriately considered. **Prevatte**, 66 F.3d at 864; **Martin**, 63 F.3d at 1435.

In addition, in **United states v. Gullett**, "under law in effect when offense was committed, sentencing court could not impose sentence for term of years that equaled or exceeded defendant's life expectancy in absence of the jury directive

GROUNDS PRESENTED PAGE 32

or jury approval of life sentence for arson causing death; ex post facto doctrine prohibited application of stautory amendments eliminating need for jury approval of a straight life sentence, without any parole granting." Id. 75 F.3d 941, 951 (4th Cir.1996)). Moreover, States must properly establish a threshold below which the penalty cannot be imposed. **McCleskey v. Kemp**, 481 U.S. 279, 305, 107 S.Ct. 1756, 1774, 95 L.Ed.2d 262 (1987). In this respect, "a state's sentencing procedure must suitably direct and limit the decisionermaker's discretion so as to minimize the risk of wholly arbitrary and capricious action." **Zant v. Stephens**, 462 U.S. 862, 874, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) (quoting Gregg v. Georgia, 428 U.S. 153, 189, 96 S.Ct. 2909, 2932-33, 49 L.Ed.2d 859 (1976)). In California the BPH Commissioners are responsible for sentencing inmates convicted of second degree murder. See **People v. Enriquez** (1977) 137 Cal.Rptr. 171, 176-177; **Strum v. California Adult Authority**, 395 F.2d 446, 449 (9th Cir.1967).

Petitioner maintains that after 24 years of straight incarceration for his crimes he has not received any definitive term on his M2d conviction and sentence and is now serving an illegal first degree murder sentence, however, the parole commissioners cannot alter terms of any judicially imposed sentence or penalty provision of criminal law upon which such sentence is based. **Farkas v. United States**, 744 F.2d 37, 39-40 (1984). This Court should stop the Cal. BPH Commissioners found enforcing the illegal straight life sentence for old

GROUNDS PRESENTED PAGE 33

1   disciplinary reports, Petitioner's commitment offense or any
2   other unsubstantiated immutable factor, as was recently done
3   by the Ninth Circuit in th published case of **Hayward v.**
4   **Marshall**, Friday January 4, 2008 DJDAR 93, at 96 ((1) reliance
5   on 75 to 120 alleged felony crimes not support by record of
6   conviction; (2) Hayward's unstable social history, including
7   gang involvement; and (3) the nature of Hayward's commitment
8   offense. The Ninth Circuit also rejected the reliance old
9   disciplinary reports. Id. at 93. The Ninth Circuit also relied
10   on the favorable psychological report. Id. at 94. Also, the
11   Ninth Circuit criticized the district court and governor for
12   reliance on **any** unchanging factor runs contrary to the
13   rehabilitative goals espoused by the prison system and could
14   result in a due process violation." Id. at 96-97. Also the
15   Ninth Circuit stated that the minimum term is served after
16   15 year minimum. Id. at 98.) Like Hayward, Petitioner has
17   served beyond his minimum 15 year term and should be granted
18   relief.

19

### Conclusion

20     Petitioner has presented ample evidence that his due
21   process and ex post facto rights were violated by the May
22   10, 2007 Board Commissioners and May 10, 2007 parole hearing
23   was not conducted within the any established case mandates,
24   such as Sass, Biggs, Irons and now Hayward. Wherefore, this
25   petition should be granted in its entirety.
26   Dated this 1st day of January, 2008. Respectfully Submitted,

27

28                  IVAN VON STAICH
                  Petitioner In Pro Se
                  Without Bar Licensed Counsel

EXHIBIT "AA"

Court of Appeal, Fourth Appellate District, Div. 3 - No. G039495
**S158383**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re IVAN VON STAICH on Habeas Corpus

The petition for review is denied.

SUPREME COURT
FILED

JAN 2 3 2008

Frederick K. Ohlrich Clerk

Deputy

**GEORGE**

Chief Justice

EXHIBIT "A"

BOARD OF PAROLE HEARINGS
LIFE PRISONER HEARING DECISION FACE SHEET

STATE OF CALIFORNIA

| | Records Use Only |
|---|---|

☐ PAROLE GRANTED – (YES)
☐ CDC: Do not release prisoner before
Governor's Review

Parole Release Date

YR   MO   DAY

☒ PAROLE DENIED – (NO)  4  Y oms

Attach Prison Calculation Sheet

☐ AGREED UNSUITABLE (Attach 1001A Form) FOR: _____ YEAR(S)
☐ HEARING POSTPONED/REASON: _____

## PANEL RECOMMENDATIONS AND REQUESTS

The Board Recommends:
☐ No more 115's or 128A's          ☒ Stay discipline free
☐ Work to reduce custody level     ☐ Learn a trade*          ☒ Earn positive chronos
☒ Get self-help*                   ☐ Get therapy*            ☐ Get a GED*

☐ Recommend transfer to
☒ Other   NOW PSYCH EVAL Few Next Hearing
*These programs are recommended if they are offered at your prison and you are eligible / able to participate.

| Penal Code 3042 Notices | ☒ Sent | Date: | 03-22-07 | |
|---|---|---|---|---|

Commitment Offense(s)

| P187 2ND | MURDER 2ND |
|---|---|
| Code(s) | Crime(s) |
| C53851 | 01, 02 |
| Case(s) | Count(s) |

| Date Inmate Came to CDC | Date Life Term Began | Minimum Eligible Parole Date |
|---|---|---|
| 02-21-1989 | 05-25-1993 | 09-11-2003 |

☐ Initial Hearing          ☒ Subsequent (Hearing No,) #1          Date of Last Hearing
11-05-2002

| CDC Representative | D. S. LEVORSE, C&PR |
|---|---|

| Attorney for Prisoner | | Address | |
|---|---|---|---|
| D.A. Representative | | County | ORANGE |

This form and the Board's decision at the end of the hearing on only proposed and NOT FINAL. It will not become final until it is reviewed.

Chair                                        Date   5-10-07

Panel Member                                 Date   5-10-07

Panel Member                                 Date

| NAME | CDC# | PRISON | CALENDAR | DATE |
|---|---|---|---|---|
| STAICH, IVAN | E-10079 | CTF-SOLEDAD | NOV. 2006 | 05-11-2007 |

BPT 1001 (Rev. 08/03)

E X H I B I T   "B"

## PSYCHOLOGICAL EVALUATION FOR
## THE BOARD OF PRISON TERMS UPDATE CLINICAL EVALUATION
### February 2006

## CORRECTIONAL TRAINING FACILITY SOLEDAD
### FEBRUARY 4, 2006

NAME: STAICH, IVAN
CDC#: E-10079
DOB: 6-30-56
OFFENSE: PC 187 MURDER SECOND DEGREE
SENTENCE: 15 YEARS TO LIFE, ORANGE COUNTY
EVALUATION DATE: 2/3/06

### I. IDENTIFYING INFORMATION:

Mr. Ivan Staich is a 49 year old, Caucasian, single, first term male from Orange County that is serving a 15 year to life sentence for murder second degree. He has 23 years in custody.

### SOURCES OF INFORMATION:

This evaluation is based upon 2 separate 2 hour-interviews plus review of the central file and medical file.

This evaluation is being conducted at the request of the Senior Psychologist. Mr. Staich submitted a 602 appeal requesting that his last psychological evaluation by William Gamard, PhD at CTF Soledad dated 2/25/02 be corrected. On page 7 of that evaluation, Dr. Gamard had stated that Mr. Staich has, "a pattern" of possessive jealousy towards girlfriends and an inability to tolerate being rejected by them or to allow them to be possessed by any other man. Mr. Staich stated that Mr. Gamard was not aware of the true facts of his relationship with women and as a result erroneously concluded that there's a pattern there when the facts do not substantiate this. His appeal was considered and a new psychological evaluation was ordered.

In order to analyze Mr. Staich's relationship with former girlfriends, his version is listed. Mr. Staich has been found guilty by the court. This is not to retry his case, just to document his explanation of the events.

Staich            E-10079        CTF-Soledad        2/3/06        ML

STAICH, IVAN
CDC# E-10079
2/3/06
PAGE 2

Mr. Staich reports that the first girlfriend that he was accused of threatening was Cindi Sue Dustin. He was living with her for two years. He was employed as a tree trimmer. Someone burned Cindi Sue's aunt and uncle's building where they were manufacturing trailers. Since they did not like Ivan living with their niece Cindi Sue, they blamed Ivan for this arson. Cindi Sue joined them and also blamed him. Ivan was arrested and placed in the Riverside Jail. While in the holding cell Ivan Staich was questioned by men in the cell that were members of the Arian Brotherhood about why he was there. After explaining this and also explaining that he was innocent, the Arian Brotherhood inmates became upset with Cindi and so they wrote a letter to her telling her to leave Ivan Staich alone and not have anything to do with him. He agreed to this letter. However, the District Attorney found this letter in the mail and planned to charge all of the Arian Brotherhood individuals in the cell with threatening Cindi Sue. Mr. Staich realized that if he allowed this to happen he would become an enemy of the Arian Brotherhood and his life would be in jeopardy, especially because he was in custody with them and had no way to avoid contact with them. As a result, Mr. Staich reports the District Attorney stated that if he did not plead guilty to this threatening letter written by the Arian Brotherhood that he would go ahead and charge all of the individuals involved. As a result Mr. Staich accepted responsibility for the letter, plead guilty, and received a five year sentence in Federal Prison for this letter. He was later found innocent of the charge of arson.

He goes on to report that he then met and developed a relationship with the victim in the commitment offense. This victim, Cynthia, wrote him love letters and sent nude photographs to him while he was in Federal custody. She professed to love Mr. Staich and would visit him in his Federal halfway house where they had a sexual relationship. Mr. Staich says he kept these nude photos and love letters as evidence. Mr. Staich stated that he was very infatuated with Cynthia and when he learned she had a boyfriend he called the boyfriend on 6/26/83. The boyfriend, the victim in the commitment offense, lied to him and stated that he did not have a relationship that was serious with Cynthia. He denied that he had threatened the boyfriend or Cynthia at that point. He had written a letter to Cynthia asking her to not play games with him and to be straight with him. He stated, "You better run for the hills if you don't give me an answer." When he was released from custody he tried to see Cynthia at her home. She had invited him over to the house. He had no idea that the male victim had married Cynthia at that time and he had no idea that he was in the home. He stated that he rang the doorbell, cut telephone

STAICH, IVAN
CDC# E-10079
2/3/06
PAGE 3

lines in case his visit would be interrupted with an unwelcome phone call, made the bad mistake of kicking through the door, and discovered that the male victim was armed with a loaded weapon and then began shooting at Mr. Staich. Mr. Staich was shot three times. Thinking that he was going to die, he struggled with the victim and during this struggle the victim was shot twice. During this struggle Mr. Staich was badly wounded and was fighting for his life. He stated that he did hit the victim in the head with a hammer that he had because he was trying to stop him from shooting at him during their struggle. When the victim fell down Mr. Staich stated that he tried to get out of the house and he was shot at by Cynthia who unknown to him was firing the pistol at him with blanks in it. He tried to stop her by hitting her in the head with the gun that the male victim had used on him. He denies that she had serious brain damage as a result of this. In fact he stated that she continued to write love letters and nude photos to him after he was placed in custody for this charge.

Mr. Staich while in custody married Paula. He married Paula in 1990 and she would come and visit him at Folsom Prison. He remained married to Paula for 4 years and 'he stated he loved her very much. They had a good relationship until he learned from other inmates that she was promiscuous and that she was using drugs. He admitted that he wrote Paula angry letters about this situation but he denied threatening her or using any kind of violence against her.

Mr. Staich stated that he is engaged to be married now and that he has a very loving relationship with his fiancé that he plans to live with as soon as he is released from custody.

Mr. Staich claims that in view of the detailed explanation of his relationship with women noted above, there is insufficient evidence to support the conclusion that he has a "pattern of possessive jealousy towards girlfriends" that is related to his behavior. He stated that the District Attorney that was assigned to his murder second degree trial was determined to get a murder first conviction. He says that as a result, he was falsely accused of threats toward the victim that he never made.

STAICH, IVAN
CDC# E-10079
2/3/06
PAGE 4

## CLINICAL ASSESSMENT

II. ## CURRENT MENTAL STATUS/TREATMENT NEEDS

Mr. Staich was alert and well oriented throughout the interviews. He does wear a
beard that is associated with his Nazarite religious beliefs that requires that he not
cut his beard. His thinking was thinking, rational, and coherent. His speech was
normal, fluent and goal oriented. Eye contact was very good. Intellectually he's
functioning in the average ranges. Affect was appropriate. There's no evidence
of anxiety or depression. He related during the interviews in an earnest, sincere,
concerned manner because he wanted to get the facts of his case straight. His
judgment was intact. His memory was intact. His insight and self awareness
appears to be very good.

In order to understand Mr. Staich's current level of functioning the Minnesota
Multiphasic Personality Inventory-II was administered. The validity indicators
were all in the normal range, except defensiveness. He described himself in a
very positive way. Mr. Staich was somewhat defensive in his response pattern.
He did not obtain any scores in the clinical range. All of his scores were in the
average range. Looking at his pattern of scores he was described as being an
extroverted, sometimes superficial naive individual. He's very optimistic and he
attempts to avoid unpleasant situations. He does have genuine concern about
social problems. He has normal masculine interests. He is a sensitive person who
thinks clearly and rationally. He is gregarious and outgoing. There's no evidence
of antisocial thinking or values in the test results although this needs to be
interpreted with caution due to elevated scores on the L and K scales. There's no
evidence of drug or alcohol abuse tendencies.

## CURRENT DIAGNOSTIC IMPRESSIONS:

Axis I:    No mental disorder
Axis II:   No personality disorder
Axis III:  History of gun shot wounds and lower back and neck pain
Axis IV:   Life term incarceration
Axis V:    Current GAF: 90

Staich                E-10079         CTF-Soledad      2/3/06        ML

STAICH, IVAN
CDC# E-10079
2/3/06
PAGE 5

III.     REVIEW OF LIFE CRIME

Mr. Staich accepts full responsibility for the victim's death. He openly
accepts the fact that he has been irresponsible and impulsive and that this has
caused hurt, pain and the death of the victim. He is very remorseful about his
past behavior. He stated that since he was incarcerated on this offense he has
accepted Jesus Christ as his Lord and Savior. He's very aware of bible
principles and he tries to live according to biblical standards, pleasing God by
his dedication and behavior. His faith in Christianity appears to be very
sincere and genuine. His feelings of remorse about his life before he became
a Christian as well the commitment offense appear to be very sincere and
genuine also. He openly admitted that he used very poor judgment in his
selection of girlfriends and that he is determined not to make these kinds of
mistakes in the future.

The description of the commitment offense in the probation officer's report
describes an attack on the male victim while he was laying on the floor, being
shot in the head five times. Mr. Staich stated he has court transcripts showing
this is not at all true. He said some of the jury saw this offense as self defense
and wanted a manslaughter conviction. The victim was shot during the
struggle for the gun while Mr. Staich was severely wounded. This is not to try
to diminish his responsibility at all but to simply clarify the record and tell the
truth about the commitment offense.

STAICH, IVAN
CDC# E-10079
2/3/06
PAGE 6

## IV.  ASSESSMENT OF DANGEROUSNESS

A.  In considering potential for dangerous behavior in the institution, there is no evidence of any participation in, violence, possession of weapons, or assaults on others. His disciplinaries only have to do with wearing his hair and beard long in violation of institutional grooming standards. He did receive a SHU term in 1996 for mailing a threatening sounding letter to his wife. Mr. Staich has matured socially, morally, and spiritually since his incarceration. He is a much different individual now than at the time of the commitment offense. His potential for violence in the institution is definitely below average in comparison to other inmates.

B.  His potential for dangerous behavior if released to the community is estimated to be no higher than the average citizen in the community. This is based on the fact that his recent MMPI-II shows him to be a very nonaggressive, thoughtful, prosocial individual who does not have any evidence of personality disorder or antisocial thinking or values although again; this needs to be interpreted with some caution. He openly admits making mistakes when he was younger and he is very remorseful for them.

Level of Service Inventory-Revised was administered. This is an actuarial measure that accesses criminal history, disciplinary record, substance abuse history and other factors to access risk level. His score places him at the 1.8 cumulative frequency for prison inmates. This means that if 100 men are released on parole, he would do better than 98 of them. This is an extremely low risk level.

C.  While there are no significant risk factors in this case, he does not have a substance abuse problem.

Staich            E-10079        CTF-Soledad        2/3/06        ML

STAICH, IVAN
CDC#.E-10079
2/3/06
PAGE 7

## V.    CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS

There are no mental or emotional problems in this case that would interfere
with parole planning. He has obtained vocational training in vocational
motorcycle repair, vocational welding and vocational woodshop. He has
worked throughout his life and he has a very strong work ethic. He currently
has some physical problems due to his gunshot wound and the bullet
fragments that he still carries as well as his back problems. However, he is
very interested in working when he is released from parole. He does have
strong family support as well as a fiancé that is waiting for him to be released.
He does have valid residence placement as well as job offers. The prognosis
for successful adjustment in the community in this case is excellent.

M. Macomber, Ph.D.
Correctional Psychologist
Correctional Training Facility, Soledad

B. ZIKA, Ph.D.
Senior Psychologist
Correctional Training Facility, Soledad

MM/ml

D: 2/3/06
T: 2/23/06

Staich            E-10079.        CTF-Soledad        2/3/06        ML

E X H I B I T    " C "

BOARD OF PRISON TERMS                                    STATE OF CALIFORNIA
LIFE PRISONER: PAROLE CONSIDERATION PROPOSED DECISION:
                          DENY PAROLE

---

[✗] PAROLE DENIED FOR:         1      2      3     ④     5      YEARS

Place the prisoner on the **MAY 2011** calendar for his next subsequent hearing.

If this decision is final, you WILL NOT get paroled. The Board will send you a copy of the decision. It will indicate the reasons you did not get paroled. If this decision is not final, the Board will set up another hearing. You can read the laws about your hearing. You can find the laws at California Code of Regulations, Title 15, section 2041.

## RECOMMENDATIONS

**The Board Recommends:**
[ ] No more 115's or 128A's                    [ ] Learn a trade*
[ ] Work to reduce custody level               [ ] Get therapy*
[✗] Get self-help*                             [✗] Earn positive chronos
[✗] Stay discipline free                       [ ] Get a GED*

[ ] Recommend transfer to _____
[✗] Other
        NEW PSYCH REPORT FOR NEXT PANEL

---

\* These programs are recommended if they are offered at your prison and you are eligible/able to participate.

## HEARING PANEL

Name _____         Date    5-10-07

Name _____         Date    5-10-07

Name _____         Date

| NAME | CDC# | PRISON | DATE |
|------|------|--------|------|
| IVAN STAICH | E10079 | CTF | 5-10-07 |

BPT 1005(b)                                   Distribution: White-C File
(REV 04/04)                                                Canary-BPT
                                                           Pink-Prisoner

E X H.I B I T  "D"

Insert name of court, branch court, if any, and mailing address
SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE

FOR COURT USE ONLY

# FILED

MAY 30 1986

GARY L. GRANVILLE, County Clerk

By _____ DEPUTY

PEOPLE OF THE STATE OF CALIFORNIA

DEFENDANT: STAICH, Ivan            [x] Present      [ ] Not Present

[X] JUDGMENT OF COMMITMENT TO:  [X] STATE PRISON  [ ] COUNTY JAIL
[ ] ORDER GRANTING PROBATION  [ ] AND MINUTE ORDER

CASE NUMBER
C-53851

| Date of hearing: MAY 30, 1986 | Dept. No.: 39 | Judge: ROBERT R. FITZGERALD | Clerk: R. Weisman | Reporter: Armella Martin |
| Counsel for People: Rick King, DDA | | Counsel for defendant: Jack Earley | | Probation Officer: Louise Pritchard |

1. Defendant was convicted of the commission of the following crime on (Date) 12/3/85

| Count | Code Section | Crime | Degree | By Jury, Court or Plea (Specify) |
|-------|-------------|-------|--------|-------------------------------|
| 1 | 187 PC | Murder | 2nd | Jury |

Court Order see page 2!

2. Defendant [ ] was arraigned [X] waived arraignment for judgment.

3. The court, having read and considered the probation report and no legal cause having been shown why judgment should not be pronounced

a. [X] Sentences defendant to State Prison for the term prescribed by law. 15 years to life + 2 years for the
b. [ ] Specifies pursuant to Pen. C. 1202b, the minimum term of imprisonment shall be 6 months on Count 12022.5 P.C.
c. [ ] Sentences defendant to County Jail for the period of (Specify number of days):
d. [ ] Suspends imposition of sentence and defendant is placed on probation for the period of:
    [ ] upon conditions set forth in attachment 3d.

4. [X] Defendant, convicted of more than one count, shall

a. [X] serve the sentence as to each count as follows (See attached Abstract of Judgment DSL 290.):

Consecutive With                    Concurrent with
[ ] enhancement        Count 2 + enhancement
                       and prior

b. [X] serve the counts made consecutive in the following order:

5. [ ] shall serve this sentence with respect to any prior uncompleted sentence  a. [X] concurrently  [ ] consecutively
    as set forth below or in attachment 5c

6. Execution of sentence is
a. [ ] stayed on the following count _____ pending appeal, with the stay to become permanent when the sentence is completed as to count: _____
b. [ ] suspended and defendant is placed on probation for the period of: _____
    [ ] upon conditions set forth in attachment 6b
7. [ ] No allegation to enhance punishment was made in count _____
8. [X] It was alleged

a. [ ] Defendant was armed with a deadly weapon at the time of the commission or attempted commission of the crime charged
    in count _____  [ ] and allegation stricken as to count _____

(Continued on reverse side)

This form satisfies the requirements of Penal Code 1213.5 (Abstract of Judgment and Commitment). Singular includes the plural. This form is to be used in judgments other than death. A copy of probation report shall accompany this form pursuant to Penal Code 1203c and a copy of any supplementary probation report shall be transmitted to the Department of Corrections. Attachments may be used but must be incorporated by reference.

b. [X] Defendant used a firearm in count: 1 [ ] and allegation stricken as to count:
c. [ ] Defendant was armed at the time of arrest with a concealed deadly weapon within the meaning of Pen. C. 3024
[ ] and allegation stricken.
d. [ ] Other (Specify and indicate if stricken):

9. [X] The Court finds the defendant
a. [ ] was armed at the time of commission or attempted commission of the crime with a deadly weapon within the meaning of
(1) [ ] Pen C. 3024 as to count: [ ] but strikes the finding as to count:
(2) [ ] Pen C. 12022 as to count: [ ] but strikes the finding as to count:
(3) [ ] Pen C. 1203 (Specify weapon):
as to count: [ ] but strikes the finding as to count:
b. [ ] was *not* armed at the time of commission or attempted commission of the crime within the meaning of
(1) [ ] Pen C. 3024 as to count:
(2) [ ] Pen C. 12022 as to count:
(3) [ ] Pen C. 1203 as to count:
c. [X] *did* use a firearm as to count: 1 [ ] but strikes the finding as to count:
(1) [X] The use was one use for the following counts: 1 The additional penalty shall run consecutively to the sentence on the last count to be served.
d. [ ] did *not* use a firearm as to count:
e. [ ] was armed at the time of arrest with a concealed deadly weapon within the meaning of Pen. C. 3024 [ ] but strikes the finding.
f. [ ] was *not* armed at the time of arrest with a concealed deadly weapon within the meaning of Pen. C. 3024.
g. [ ] Other (Specify and indicate if stricken):

10. [X] Prior convictions which affect defendant's sentence were alleged and disposed of [ ] as follows [X] as set forth in attachment 10. XXX (See Abstract of Judgment and Information)

| Conviction date | Jurisdiction | Crime and code Section | Applies to Count | Disposition |
| --- | --- | --- | --- | --- |

11. The court finds defendant a. [ ] is [X] is not an habitual criminal under Pen C. 644a.
b. [ ] is [X] is not an habitual criminal under Pen C. 644b.

12. The court pronounced sentence on (Date): 5/30/86 , and defendant was held in custody, through and including the date of pronouncement of sentence for (Total no. of days): 1,097 as follows.

| Count | Time other than Dept. of Corrections | Dept. of Corrections Time |
| --- | --- | --- |
| | 878 days<br>219 work time credit | |

13. Defendant is remanded to the custody of the sheriff
a. [ ] For the period of (Specify no. of days). [ ] upon conditions and recommendations set forth in attachment 13a.
b. [X] To be delivered [X] at the earliest convenient time [ ] after 48 hours, excluding Saturdays, Sundays and holidays [Pen C. 1203c] into the custody of the Director of Corrections at
(1) [ ] California Institution for Women—Frontera (3) [X] California Institution for Men—Chino
(2) [ ] California Men's Facility—Vacaville (4) [ ] Other:

14. [ ] The court requests a copy of the diagnostic study and recommendations as provided in Pen C. 1168.
15. The court advised defendant of all appeal rights as required in CRC Rule 250 and defendant acknowledged understanding them.
16. [ ] Other (See attachment 16)

Dated: 5/30/86 ROBERT R. FITZGERALD
(Type or print name) (Signature of Judge of the Superior Court)

TOTAL NO. of boxes checked: 20

## CLERK'S CERTIFICATE

I hereby certify that the foregoing is a correct copy of the original on file in my office.

Clerk of the superior Court

[Seal] By [signature] Deputy

MAY 30 1986

SUPERIOR COURT OF ... COUNTY, CALIFORNIA

EXHIBIT "E"

5-6-89

Inst Staff:—

re: E-10079 STAICH

We have verified the post sentence - 997 days - via phone conversation with Orange County. He was in custody from 4/86 — 2/89 (arrested on escape charges 4/86). He appears to have been pending trial on his escape - he was pro per - therefore, it took a long time. The Orange County Deputy (Hyatt) - 714-647-6090 stated he was found not guilty on escape charges. He wrote from S. Lane, CCR Sup, LPU - attached:

√ - full          3-14-89                    R. Dardin
Post-sent verified                          CCR Sup.
w/ Orange County
Subj. was in cust
from 4/86 — 2/89 (arr. from) (esc. 4/86)
looks like he was
pending trial on his
escape — he was
pro-per — therefore took
a long time - found N.G.
on escape chgs.
                    S.L. cpu

**E X H I B I T   " G "**

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life          )·       CDC Number:   E-10079
Term Parole Consideration          )
Hearing of:                        )
                                   )
IVAN STAICH                        )         **INMATE COPY**
                                   )
_____    )

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

MAY 9 & 10, 2007

12:58 P.M.

PANEL PRESENT:

STAN KUBOCHI, Presiding Commissioner
ED ALVORD, Deputy Commissioner

OTHERS PRESENT:

IVAN STAICH, Inmate
MATTHEW LOCKHART, Deputy District Attorney

CORRECTIONS TO THE DECISION HAVE BEEN MADE

    _____No      See Review of Hearing
    _____Yes     Transcript Memorandum

Sarah M. Collins, Capitol Electronic Reporting

## I N D E X

|  | Page |
|---|---|
| Proceedings........................................... | 3 |
| Case Factors......................................... | 18 |
| Pre-Commitment Factors............................... | 20 |
| Post-Commitment Factors.............................. | 25 |
| Parole Plans......................................... | 45 |
| Closing Statements................................... | 64 |
| Recess............................................... | 78 |
| Decision............................................. | 79 |
| Adjournment.......................................... | 95 |
| Transcript Certification............................. | 96 |

1           P R O C E E D I N G S

2           **PRESIDING COMMISSIONER KUBOCHI:**  How you doing,

3     Mr. Staich?

4           **DEPUTY COMMISSIONER ALVORD:**  We are on the

5     record.

6           **INMATE STAICH:**  Okay.  How about you?

7           **PRESIDING COMMISSIONER KUBOCHI:**  Fine, thank you.

8     Thank you for asking.  We're on record for the matter of

9     Ivan Staich, last name is spelled S-T-A-I-C-H, CDC

10    number E-10079.  Mr. Staich, my name is Stan Kubochi,

11    Commissioner, K-U-B-O-C-H-I.  Could you speak, I'll move

12    it over for you.  Could you please state your name and

13    spell your last name?

14          **INMATE STAICH:**  My name is Ivan Staich,

15    S-T-A-I-C-H.

16          **PRESIDING COMMISSIONER KUBOCHI:**  Thank you.  In

17    the room is Matthew Lockhart, a representative of the

18    Orange County District Attorney's Office, and also

19    Deputy Commissioner Ed Alvord, A-L-V-O-R-D.  And the

20    purpose of calling your case at this time, sir, is that

21    your Parole Consideration Hearing is scheduled this

22    week.  And I note in looking at the records of your case

23    that you have declined the appointment of a state

24    appointed attorney; is that correct?

25          **INMATE STAICH:**  That's correct.

1      **PRESIDING COMMISSIONER KUBOCHI:**  And that it is

2    your desire, I would surmise from that, since there is

3    no retained attorney, that you wish to represent

4    yourself at the Parole Consideration Hearing; is that

5    correct?

6          **INMATE STAICH:**  That's correct.

7          **PRESIDING COMMISSIONER KUBOCHI:**  And that is your

8    right.  And the only reason that I called you at this

9    time is to confirm what I call your pro per status.  And

10   it is a right that you are entitled.  And we will

11   proceed tomorrow on the hearing, not Friday.

12         **INMATE STAICH:**  Could I ask a question?

13         **PRESIDING COMMISSIONER KUBOCHI:**  Yes, you could

14   ask a question.

15         **INMATE STAICH:**  Title 15, Division 2, Section

16   2030 --

17         **PRESIDING COMMISSIONER KUBOCHI:**  Yes.

18         **INMATE STAICH:**  -- specifically says that when a

19   guy is in pro per that the District Attorney's Office

20   will not be present.

21         **PRESIDING COMMISSIONER KUBOCHI:**  They are going

22   to make a statement under 3043.5 that allows any member

23   of the public to give a statement.  Under the

24   circumstances I don't allow questions by the DA.

25         **INMATE STAICH:**  Okay.  And the other thing I

1   could put another little thing on there is 3043.5 was

2   enacted, it's the Gary Condit Bill.

3        **PRESIDING COMMISSIONER KUBOCHI:**  Yes, that's

4   correct.

5        **INMATE STAICH:**  That was enacted in 1984.

6        **PRESIDING COMMISSIONER KUBOCHI:**  That's correct.

7        **INMATE STAICH:**  Hines versus Gomez out of the

8   Ninth Circuit says that any regulation that comes in

9   after the effect of the prisoner's incarceration is a

10  violation of ex post facto.  So as far as that area of

11  law is concerned, I just wanted to put that on the

12  record.

13       **PRESIDING COMMISSIONER KUBOCHI:**  You have put it

14  on the record, sir.  But any member of the public may

15  give an opinion at a Parole Suitability Hearing.  And

16  that's the sole purpose of the --

17       **INMATE STAICH:**  Yes, but the statutory law,

18  though, went into effect in 1984.

19       **PRESIDING COMMISSIONER KUBOCHI:**  I understand

20  that.

21       **INMATE STAICH:**  I was arrested in '83 on this

22  crime.

23       **PRESIDING COMMISSIONER KUBOCHI:**  I understand

24  that.

25       **INMATE STAICH:**  You know, it's just, I know

1   you're going to do it, but you know, if I'm pro per, I

2   have to represent myself. So I have to put things on

3   the record.

4        **PRESIDING COMMISSIONER KUBOCHI:** You are entitled

5   to make your record. So we will see you tomorrow.

6        **INMATE STAICH:** Okay.

7        **PRESIDING COMMISSIONER KUBOCHI:** Thank you very

8   much.

9        **INMATE STAICH:** Thank you.

10       **PRESIDING COMMISSIONER KUBOCHI:** It's now 1:05.

11  And this matter is concluded until tomorrow, May 10th.

12       **INMATE STAICH:** Okay. All right. Thank you.

13       **PRESIDING COMMISSIONER KUBOCHI:** Thank you.

14       **DEPUTY COMMISSIONER ALVORD:** We're now going off

15  the record.

16              (Thereupon, a recess was

17              held off the record.)

18       **PRESIDING COMMISSIONER KUBOCHI:** -- in that

19  chair.

20       **DEPUTY COMMISSIONER ALVORD:** Now we're on the

21  record.

22       **PRESIDING COMMISSIONER KUBOCHI:** We're on record

23  for the Subsequent Parole Consideration Hearing for Ivan

24  Staich, last name is spelled S-T-A-I-C-H, CDC number E-

25  10079. Today's date is May 10th, 2007. The time is

7

1   about 12:58 p.m.  We are located at Correctional

2   Training Facility at Soledad, California.  The record

3   should reflect at the outset that Mr. Staich has

4   previously been advised by Correctional Counselor

5   Verdesoto, V-E-R-D-E-S-O-T-O, concerning his rights for

6   a parole suitability hearing.  And that Mr. Staich has

7   elected to represent himself for today's proceedings.

8        Mr. Staich, we're going to go around the room and

9   identify ourselves.  When it is your turn, you're going

10  to state your name, spell your last and give us your CDC

11  number.  And we will start the preliminary issues in

12  regard to your hearing.  My name is Stan Kubochi,

13  K-U-B-O-C-H-I.

14       **DEPUTY COMMISSIONER ALVORD:**  My name is Ed

15  Alvord, A-L-V-O-R-D, Deputy Commissioner.

16       **DEPUTY DISTRICT ATTORNEY LOCKHART:**  Matt

17  Lockhart, L-O-C-K-H-A-R-T, Deputy District Attorney

18  Orange County.

19       **INMATE STAICH:**  Ivan Staich, S-T-A-I-C-H.

20       **PRESIDING COMMISSIONER KUBOCHI:**  And your CDC

21  number is E-10079?

22       **INMATE STAICH:**  That's correct.

23       **PRESIDING COMMISSIONER KUBOCHI:**  And Mr. Staich,

24  I want to review a few preliminary matters with you in

25  that you are acting in your own capacity as a lawyer.

1    And that term, I call as pro per status.  And you have
2    been previously advised of your right to have a state
3    appointed attorney and that an attorney would be
4    appointed to you at no cost if you were indigent; is
5    that correct?

6        **INMATE STAICH:**  That's correct, Sir.

7        **PRESIDING COMMISSIONER KUBOCHI:**  And you have
8    waived having an attorney.  And you wish to represent
9    yourself?

10        **INMATE STAICH:**  Yes, Sir.

11        **PRESIDING COMMISSIONER KUBOCHI:**  And you have
12    also been noticed, given notice of the week of this
13    hearing by your correctional counselor?

14        **INMATE STAICH:**  Yes, Sir.

15        **PRESIDING COMMISSIONER KUBOCHI:**  And you, could
16    you tell me about your review of your central file,
17    whether you have reviewed your central file?

18        **INMATE STAICH:**  Yes, I have reviewed the central
19    file.

20        **PRESIDING COMMISSIONER KUBOCHI:**  Okay.

21        **INMATE STAICH:**  Except for anything that was not
22    allowed to be reviewed.  There are restricted materials
23    under the 1030 I believe it is.

24        **PRESIDING COMMISSIONER KUBOCHI:**  I assure you,
25    Mr. Staich, I don't have anything that you don't have

1  because I don't get any restricted material.

2        **INMATE STAICH:**  Okay.

3        **PRESIDING COMMISSIONER KUBOCHI:**  In other words,

4  you get a copy of the Board report package.  That's what

5  I have.  That's what the DA has.  In fact, what I'm

6  going to do here is because we're going over preliminary

7  matters, right at the top of that Board packet, sir, you

8  will see a document checklist.  And from, take for a

9  moment a review of that checklist because these are the

10  documents that I have and the DA has been provided.  I

11  don't have anything more than what has been indicated.

12  And you should have the same form in the first page of

13  your packet.

14        **INMATE STAICH:**  Let the record reflect that that

15  is 100 percent true.

16        **PRESIDING COMMISSIONER KUBOCHI:**  Thank you very

17  much, Mr. Staich.  And that is the correct

18  pronunciation, Staich?

19        **INMATE STAICH:**  Yes, that is.

20        **PRESIDING COMMISSIONER KUBOCHI:**  I want to assure

21  you that --

22        **INMATE STAICH:**  It's good that you are able to do

23  that.  Not many people can.

24        **PRESIDING COMMISSIONER KUBOCHI:**  -- proper

25  respect.  If I slip, it's not out of lack of respect.

1    The correct pronunciation of your name is very important

2    to me.

3        **INMATE STAICH:**  Okay.  Thank you.

4        **PRESIDING COMMISSIONER KUBOCHI:**  Mr. Staich, in

5    regard to further rights that you had in regard to this

6    hearing, you have been afforded a copy of the same

7    material that I have and the District Attorney has been

8    presented.  And that's called the Board report.  And are

9    you prepared to proceed with your Parole Suitability

10   Hearing today?

11       **INMATE STAICH:**  Yes, I am, Sir.

12       **PRESIDING COMMISSIONER KUBOCHI:**  Sir, I would

13   like to discuss with you your rights pursuant to the

14   American with Disabilities Act.  And I would note that

15   in reviewing your personal and social history before

16   this hearing that you have had different and numerous

17   physical injuries and ailments.  I believe you have an

18   ongoing problem with your back; is that correct?

19       **INMATE STAICH:**  Yes, that's true, Sir.

20       **PRESIDING COMMISSIONER KUBOCHI:**  And that your

21   Correctional Counselor Verdesoto, as I've referred to

22   before, reviewed your central file.  And Correctional

23   Counselor Verdesoto noted on a BPT 1073 form, that is

24   commonly known as a notice and request for assistance at

25   Parole Hearings, that you have physical limitations

1  caused by the various injuries and physical problems

2  that you have had.  And that those injuries and medical

3  procedures have been documented in what they call a CDC

4  128-C.  As you sit here now, are you in any physical

5  pain that would interfere with your ability to

6  communicate effectively with this Panel?

7       INMATE STAICH:  Not to effectively communicate.

8  I do have problems, though, I have to stretch a lot.

9  Other than that, that's all that is really needed to be

10 required.

11      PRESIDING COMMISSIONER KUBOCHI:  We will let you

12 stretch if you give us any indication that you need to

13 do so.

14      INMATE STAICH:  Okay.  Thank you.

15      PRESIDING COMMISSIONER KUBOCHI:  Have you taken

16 any medications that interfere with your ability to

17 think clearly, sir?

18      INMATE STAICH:  No, ibuprofen 600 is all that

19 they prescribe for this type of spinal injury, you know.

20 It's prison.  They don't give out any hard type drugs

21 for --

22      PRESIDING COMMISSIONER KUBOCHI:  Central nervous

23 type drugs?

24      INMATE STAICH:  Yeah, you just have to live with

25 it, you know, pretty much.

1           **PRESIDING COMMISSIONER KUBOCHI:**  And were you

2    able to review your central file?

3           **INMATE STAICH:**  Yes.

4           **PRESIDING COMMISSIONER KUBOCHI:**  I note, sir,

5    that on the most recent BPT 1073 that you have a grade

6    point average of 12.9 on reading; is that correct?

7           **INMATE STAICH:**  Yes, that's probably about right.

8           **PRESIDING COMMISSIONER KUBOCHI:**  And you have

9    received your GED while in an institution; is that

10   correct?

11          **INMATE STAICH:**  Yes, previously, yeah, I did

12   receive that in the CYA when I was 16 years old.

13          **PRESIDING COMMISSIONER KUBOCHI:**  Good, that's

14   good.  Do you believe that you're thinking clearly

15   today?

16          **INMATE STAICH:**  Yes, I am, 100 percent.

17          **PRESIDING COMMISSIONER KUBOCHI:**  Do you have any

18   hearing problems?

19          **INMATE STAICH:**  No, Sir.

20          **PRESIDING COMMISSIONER KUBOCHI:**  I notice you're

21   not wearing any glasses.  You can read and see clearly

22   without glasses?

23          **INMATE STAICH:**  Yeah, I can see and read pretty

24   good.  I do have eye problems, but not enough that would

25   warrant me not to be able to read something or you know,

1   any problems to that degree.

2         **PRESIDING COMMISSIONER KUBOCHI:**  Good, good, sir.

3   Now this may sound like a silly question, but in the

4   last 24 hours have you ingested or consumed anything

5   that could affect your ability to think clearly today?

6         **INMATE STAICH:**  No, I have not, Sir.

7         **PRESIDING COMMISSIONER KUBOCHI:**  Thank you very

8   much.  And could you briefly state the physical

9   disabilities that you have?

10        **INMATE STAICH:**  The physical disabilities I have

11  is I sustained a 357 magnum colt round through the left

12  side of my body, which entered the left bicep area, went

13  into the shoulder, the copper jacket and that blew

14  apart.  The main round bounced off my neck, went down

15  and blew a hole through my lung, shattered 11 ribs.  And

16  it's stuck down here.  All the pieces of metal that

17  broke apart are all up in the upper chest.  So I have

18  problems with gripping, you know, due to the nervous

19  damage and real bad neck problems.

20        And also, because of all that, it related to my

21  spinal column.  And there is severe damage down there,

22  herniated disc, four bulging discs, herniations in

23  there.  You name it, as far as the back is concerned,

24  it's pretty bad shape.

25        **PRESIDING COMMISSIONER KUBOCHI:**  Okay.  Thank you

1    for clarifying these things and explaining.  I just want

2    to reiterate, if you're in any pain or if you feel the

3    need to stretch to get more comfortable, just let us

4    know.

5         **INMATE STAICH:**  Okay.  Thank you, Sir.

6         **PRESIDING COMMISSIONER KUBOCHI:**  Okay.  These are

7    not formal judicial proceedings.  It's a hearing simply

8    to gather facts and discuss your suitability for parole

9    at this time.  Sir, this is a Subsequent Parole

10   Suitability Hearing.  And this hearing is being

11   conducted pursuant to the Penal Code and the Rules and

12   Regulations of Title 15 of the California Code of

13   Regulations.

14        The purpose of today's hearing is to, once again,

15   consider your suitability for parole.  In doing so, we

16   will consider the number and nature of the crimes for

17   which you were committed.  I will be discussing your

18   prior criminal history, your prior personal and social

19   history before incarceration and your parole plans.

20        Commissioner Alvord will be discussing your

21   behavior and programming since your commitment.  And I

22   would like to advise you that if at any time during

23   these proceedings, if you have documents that you

24   believe would support a finding of suitability, you have

25   a right to present those documents for consideration.

1        We will reach a decision today, sir, and inform

2 you of whether or not we find you suitable for parole

3 and the reasons for our decision.  If you are found

4 suitable for parole, the length of your confinement will

5 be explained to you.  Before we recess for

6 deliberations, the Panel may ask you questions.

7        And as I indicated to you yesterday, and I will

8 go into that a little bit further, I'm going to restrict

9 the District Attorney's participation today to giving us

10 a closing statement.  And you will be allowed to make a

11 statement on your behalf telling us why you believe you

12 are suitable for parole.

13        We will then recess, clear the room and

14 deliberate.  Once we have completed our deliberations,

15 we will resume the hearing and announce our decision.

16 Sir, the record should reflect that yesterday on May

17 9th, the Panel noted that you were representing yourself

18 and that we called you into the hearing room to discuss

19 what I call reconsideration of the right to represent

20 yourself, that is the reconsideration that you wished a

21 state appointed attorney at no cost if you were

22 indigent.  And during yesterday's brief proceedings, you

23 clarified that it is your continued wish to represent

24 yourself.  It is a right that these Panel honors because

25 that is a right that you are entitled to.  And therefore

1   we will proceed as indicated.

2          The California Code of Regulations states that,

3   regardless of time served, a life inmate shall be found

4   unsuitable for and denied parole if, in the judgment of

5   the Panel, the inmate would pose an unreasonable risk of

6   danger to society.  Parole may be denied if you, excuse

7   me.  You have certain rights.  We discussed notice of

8   this hearing.  We have also discussed your right to

9   central file.  You have a right, sir, to have your case

10. heard by an impartial Panel.  Are you prepared to

11  proceed this afternoon?

12          **INMATE STAICH:**  Yes, I am, Sir.

13          **PRESIDING COMMISSIONER KUBOCHI:**  Sir, we will

14  reach a decision today, as I've indicated.  We will give

15  you a copy of that decision in writing.  That decision

16  becomes final within 120 days.  A copy of the decision

17  and a copy of the transcript will be given to you.

18  Since you are acting as your own attorney, you are

19  responsible for any issues in regard to appeal.  The

20  Panel does not give any advice on your appeal rights.

21  So you are not required to admit or discuss your

22  offense.  However, this Panel does accept as true the

23  findings of the Orange County Superior Court.  Do you

24  understand that?

25          **INMATE STAICH:**  Yes, I do.

17

1    **PRESIDING COMMISSIONER KUBOCHI:** Commissioner

2   Alvord, is there any confidential material that will be

3   relied upon by this Panel in reaching a decision today?

4    **DEPUTY COMMISSIONER ALVORD:** There is

5   confidential material. We will not be using it today.

6    **PRESIDING COMMISSIONER KUBOCHI:** We have reviewed

7   the hearing checklist of documents. And you have

8   acknowledged the fact that I have what you have,

9   Mr. Staich.

10    **INMATE STAICH:** Okay.

11    **PRESIDING COMMISSIONER KUBOCHI:** I don't have

12   anything else. Will you be discussing the facts of the

13   homicide with us today?

14    **INMATE STAICH:** I will discuss any facts that is

15   written in the Appellate Court Decision out of the

16   Fourth Appellate District.

17    **PRESIDING COMMISSIONER KUBOCHI:** Yes, I was going

18   to read those are the facts of the case and nothing

19   more.

20    **INMATE STAICH:** I have no problem with discussing

21   those facts.

22    **PRESIDING COMMISSIONER KUBOCHI:** Okay. Will you

23   raise your right hand please? Do you solemnly swear or

24   affirm that the testimony that you give in this hearing

25   will be the truth, the whole truth and nothing but the

1   truth?

2          **INMATE STAICH:**  I do, Sir, 100 percent.

3          **PRESIDING COMMISSIONER KUBOCHI:**  Thank you very

4   much.  Based on the Appellate Decision in this case,

5   starting at page two, and I will interweave those facts.

6          A jury convicted Ivan Staich of second degree

7   murder and attempted murder.  A firearm use allegation

8   was found true as to the murder.  And a great bodily

9   injury allegation was sustained as to the attempted

10   murder in violation of Penal Code 664/187 the murder

11   charge would have been PC, Penal Code, 187.  That was

12   murder in the second degree.

13          There was a prior felony conviction alleged on

14   that information that bifurcated and heard separately

15   and considered separately.  And as a result of that

16   conviction in docket number C-53851, you received a

17   sentence of 30 years to life for the violations I have

18   noted, that your life term began on or about September

19   11th, 1983.  And that your minimum eligible parole date

20   was September 11th, 2003.  And I'm just reading right

21   out of the Appellate Decision.

22          "Staich's relationship with Cynthia Bess,

23          B-E-S-S, was interrupted in 1980 when he was

24          convicted of a federal offense and imprisoned in

25          the Terminal Island Federal Penitentiary.  The

1        pair communicated by telephone and mail until

2        1983.  Staich was released to a halfway house in

3        Long Beach on June 9th of that year.  When Bess

4        visited him there on several occasions, she was

5        affectionate.  But in the meantime she had met

6        Robert Topper, spelled T-O-P-P-E-R.

7              "And as her interest in," and I'm going to

8        just state this, paraphrase this for clearer

9        understanding, as her interest in Topper grew,

10       she communicated less frequently with Staich.

11       "He was returned to prison on June 29th after

12       breaking into Bess' former residence in search of

13       her and lost direct contact while serving the

14       balance of his sentence.

15             "Frustrated with the uncertainty of the

16       situation, Staich sent Bess letters in which he

17       alternately professed his love and threatened to

18       harm her if she left him for another man.  He

19       made at least 67 collect telephone calls to Bess'

20       father in July and August, 1983 in a fruitless

21       effort to locate her.  He also telephoned Topper

22       on numerous occasions and repeated threatened

23       him, warning him to stay away from Bess.  He did

24       not discover Bess' whereabouts during this time.

25             "Staich was released from Terminal Island

20

1                on November 14th, 1983 and learned Bess was

2                staying at her grandparents' home.  Although he

3                was apparently unaware she had married Topper.

4                In the early morning hours of December 8th, 1983

5                Staich went to the grandparents' house armed with

6                a hammer.  He cut the telephone wires to the

7                residence and then kicked in the front door.

8                      "Topper was brutally slain.  Numerous

9                hammer blows were inflicted to Topper's head.

10              And he was shot four times at close range in the

11              back in the neck.  Bess survived multiple blows,

12              probably with a handgun to her head.  Her skull

13              was crushed, however.  And the resulting brain

14              damage left her incompetent to testify.  Staich

15              himself was shot once or twice suffering wounds

16              to a hand and arm and the ribcage.  He went to a

17              nearby home for help."

18        Mr. Staich, according to the probation report,

19  Cynthia Bess underwent two lobotomy surgeries after this

20  incident.  And in regard to your prior record, I'm

21  looking at the probation report filed in Orange County

22  January 11th, 1974, a peace disturbance.  You were given

23  a fine.  There was summary probation.  There is an entry

24  for December 13th, 1977, escape from Riverside County

25  Jail.  That docket number was CR-15566.  It was a

1    conviction for 4532, Subdivision B of the Penal Code,

2    escape from jail.

3           An entry for July 21st, 1978, there was a

4    diagnostic evaluation ordered to be conducted by the

5    Department of Corrections pursuant to Penal Code Section

6    120303. And that subsequently you received a two-year

7    state prison sentence. And you were paroled on or about

8    October 29th, 1979. In April, 1980 your parole was

9    revoked. On April, excuse me, August 5th, 1980 you were

10   paroled again.

11          There is an entry dated March 6th, 1980, a

12   federal offense, 18 US Code Section 876, mailing

13   threatening communications, Federal Court Eastern

14   District docket 80-00027-01. There is an entry that

15   shows July 2nd, 1980, five years state prison, five

16   years imprisonment. That wouldn't be a state

17   imprisonment. That's imprisonment.

18          There is a caption in the probation report that

19   says on or about November 21st, 1978 Ms. Anna Buckman of

20   Vacaville received a threatening letter addressed to her

21   daughter, Cindy Dustin. In the letter the defendant,

22   Staich, threatened to kill Cindy Dustin because she

23   intended to testify.

24          It was determined that the letter had been mailed

25   from a jail facility. And that Staich ultimately

1   escaped from the Riverside County Jail.  The defendant

2   continued to send threatening letters to the Buckmans,

3   that Mr. Staich was ultimately arrested in the Vacaville

4   area on the campus of a high school where Cindy Dustin

5   was enrolled.  Probation notes that you received your

6   GED while in the Youth Authority.

7        In the Board report of 2202, and I only selected

8   that, sir, because it has personal factors that you were

9   one of six children raised by your parents in Lake

10  Ellsinore, that you had told a correctional counselor

11  that your parents were abusive towards you as you became

12  older.  That you were in a series of foster homes since

13  about the age of 11 until you were committed to the

14  Youth Authority when you were 16 years old.  Sir, as of

15  this date, have you ever been married?

16        **INMATE STAICH:**  Yes, I have.

17        **PRESIDING COMMISSIONER KUBOCHI:**  Okay.  And could

18  you tell me whether or not you're currently married?

19        **INMATE STAICH:**  No, I'm not.  I'm engaged to be

20  married.

21        **PRESIDING COMMISSIONER KUBOCHI:**  That's my

22  understanding.  But I would rather just converse with

23  you to fill in everything.

24        **INMATE STAICH:**  Yeah.

25        **PRESIDING COMMISSIONER KUBOCHI:**  When were you

1    married, sir?

2         **INMATE STAICH:**  I was married on April 14th, 1990

3    in Folsom State Prison to Paula Rowlin.

4         **PRESIDING COMMISSIONER KUBOCHI:**  And when did

5    that marriage terminate?

6         **INMATE STAICH:**  January 27th, 1997.

7         **PRESIDING COMMISSIONER KUBOCHI:**  And how long

8    have you had your current relationship with your fiancé?

9         **INMATE STAICH:**  Since 1999 to present date.

10        **PRESIDING COMMISSIONER KUBOCHI:**  And are you the

11   father of any children?

12        **INMATE STAICH:**  Not that I'm aware of.

13        **PRESIDING COMMISSIONER KUBOCHI:**  Okay.  And

14   before the life crime in this case, that would have been

15   in 1983, would you characterize yourself as having a

16   substance abuse problem or no substance abuse problem?

17        **INMATE STAICH:**  No substance abuse problem.

18        **PRESIDING COMMISSIONER KUBOCHI:**  Okay.  Thank

19   you.  At this time I'm going to have Commissioner Alvord

20   discuss your post-commitment factors.

21        **INMATE STAICH:**  Could I put one objection after

22   that statement, though?

23        **PRESIDING COMMISSIONER KUBOCHI:**  Yes, you may.

24        **INMATE STAICH:**  People versus Johnson, '83 Cal

25   Reporter 2nd, 4/23/1999, page 425, probation officer's

1   reports are only discretionary.  It can't be used as the

2   actual factual basis for denying parole.  There has to

3   be other evidence to substantiate it besides the

4   probation officer's report.

5        **PRESIDING COMMISSIONER KUBOCHI:**  We're just

6   noting facts surrounding the conviction.

7        **INMATE STAICH:**  I know.

8        **PRESIDING COMMISSIONER KUBOCHI:**  Convictions

9   without facts mean very little, Mr. Staich.  It could

10  work both ways.

11       **INMATE STAICH:**  I understand.  I just wanted to

12  put that on the record.

13       **PRESIDING COMMISSIONER KUBOCHI:**  Yes, you may.

14       **INMATE STAICH:**  That's the basis of some type of

15  a long denial.

16       **PRESIDING COMMISSIONER KUBOCHI:**  Yes, you may.

17       **INMATE STAICH:**  Okay.

18       **PRESIDING COMMISSIONER KUBOCHI:**  I'm simply

19  indicating to you that for instance, if there was a ADW

20  245, the facts of the case could be real innocuous or

21  they could be real serious.  Sometimes lack of facts are

22  adverse.  Sometimes they are positive.

23       **INMATE STAICH:**  That's correct.

24       **DEPUTY COMMISSIONER ALVORD:**  Good morning,

25  Mr. Staich, once again, good afternoon.

*Capitol Electronic Reporting*

1      **INMATE STAICH:** Good afternoon, Sir.

2      **DEPUTY COMMISSIONER ALVORD:** We're here to

3  discuss your post-conviction factors as well as some of

4  your prior events, but primarily your post-conviction

5  factors.  I would ask you to listen very carefully.  If

6  I miss something, you be sure to let me know.

7      **INMATE STAICH:** Okay.

8      **DEPUTY COMMISSIONER ALVORD:** I have tried to go

9  through your C file, but sometimes I don't find

10 everything that is in there.  Okay?

11     **INMATE STAICH:** I know, it's kind of thick.

12     **DEPUTY COMMISSIONER ALVORD:** Yes.  First of all,

13 let me tell you that you apparently are in custody

14 medium A; is that correct, sir?

15     **INMATE STAICH:** That's correct.

16     **DEPUTY COMMISSIONER ALVORD:** And your

17 classification score is 19?

18     **INMATE STAICH:** Yeah, that's based on the new

19 classification system that anybody with a life top

20 sentence is only allowed to be in a level two prison.

21     **DEPUTY COMMISSIONER ALVORD:** Right.  You have a

22 life override of 19 points.

23     **INMATE STAICH:** Yeah.

24     **DEPUTY COMMISSIONER ALVORD:** You have had that

25 life override since 2002.  I would commend you, sir.

1   That's very good.  We strive to have inmates who get to

2   the minimum eligible point level, which you have done.

3   So that is commendable for you.  This is a Subsequent

4   Hearing.  Apparently you did have a previous hearing on

5   November 5th, 2005 that resulted in a four-year denial.

6   There is also an indication in the file that you

7   received a GED.  And I note today that you said you

8   received it in YA?

9        **INMATE STAICH:**  That's correct.

10       **DEPUTY COMMISSIONER ALVORD:**  I don't find a copy

11  of that.  Did you happen to see a copy when you did your

12  Olson review?  You may not have cared, but --

13       **INMATE STAICH:**  It was probably written in some

14  other document, the actual reference to that.  But I

15  have given that to the counselor before.  Where she

16  placed it, you know, as far as, you know how that goes.

17       **DEPUTY COMMISSIONER ALVORD:**  Yes.

18       **INMATE STAICH:**  There is a lot of inmates in

19  here.  And the counselors' desks are just backed up with

20  papers.  So --

21       **DEPUTY COMMISSIONER ALVORD:**  There is

22  reference --

23       **INMATE STAICH:**  -- sometimes it don't get to

24  where it's supposed to.  But you know, that's just part

25  of our system.

1    **DEPUTY COMMISSIONER ALVORD:**  There is enough

2    reference in here that I don't doubt for a moment that

3    you obtained that.  You might try to, next time you see

4    your counselor, give it again.

5    **INMATE STAICH:**  I got a copy if it, yeah.  I'll

6    give her another one.

7    **DEPUTY COMMISSIONER ALVORD:**  Yes.  All right.

8    You also have a TABE score of 12.9.  That's the highest

9    level one can reach in a TABE score as far as your

10   reading ability and comprehension.  So that's very good.

11   Now you also have a global assessment of functioning at

12   80.  And again, that's rather high.  You have two prior

13   prison terms.  The Chair went into some of those.  You

14   also had a revocation apparently in 1977, I'm sorry,

15   1979.  And I wasn't sure, what was that revocation for?

16   **INMATE STAICH:**  In '79?

17   **DEPUTY COMMISSIONER ALVORD:**  Yes.

18   **INMATE STAICH:**  That was based on a walk away

19   escape from the county jail, Riverside County Jail.

20   **DEPUTY COMMISSIONER ALVORD:**  Well that was how

21   you, that was one of your prison terms.

22   **INMATE STAICH:**  That was the only prison term

23   I've had.

24   **DEPUTY COMMISSIONER ALVORD:**  Right.  And then you

25   were on parole.

1      **INMATE STAICH:** Yeah, I was on parole.

2      **DEPUTY COMMISSIONER ALVORD:** And your parole was

3  revoked.

4      **INMATE STAICH:** Correct. That's what I'm saying.

5  The parole was revoked based on communication with my

6  other fiancé supposedly at the time.

7      **DEPUTY COMMISSIONER ALVORD:** All right.

8  That's --

9      **INMATE STAICH:** Those charges were subsequently

10 dismissed.

11      **DEPUTY COMMISSIONER ALVORD:** All right. I wasn't

12 sure what that was, but I did note in the file that it

13 indicated that there was a revocation. And you did

14 about six months on that revocation.

15      **INMATE STAICH:** Yeah.

16      **DEPUTY COMMISSIONER ALVORD:** And then you were

17 paroled in 1980. And you remained free until 1983,

18 which is when the life crime occurred.

19      **INMATE STAICH:** Yeah.

20      **DEPUTY COMMISSIONER ALVORD:** All right. I just

21 wanted to make sure I had that correct.

22      **INMATE STAICH:** Okay.

23      **DEPUTY COMMISSIONER ALVORD:** I also had an

24 opportunity to review a current status report. This was

25 a staff report prepared on 3/26/2007 by Correctional

1   Counsel Juan Lopez.  That indicates again, that your
2   custody level is medium A, that you have been assigned
3   as a porter from November 14th, 2006 to the present
4   time.  I could find no CDC 101s for that time period.
5   Is that correct, sir?

6        **INMATE STAICH:**  Yeah, that's correct.

7        **DEPUTY COMMISSIONER ALVORD:**  Thank you.  It also
8   didn't indicate that at least from the last time period
9   of the last year that you had participated in any self-
10  help programs.  But I will tell you that then I found in
11  April of 2007 apparently you did participate in a two-
12  week seminar on how to become a sober father and not get
13  angry; is that correct?

14       **INMATE STAICH:**  There has been way more than
15  that.  But that's correct, too.

16       **DEPUTY COMMISSIONER ALVORD:**  Okay.

17       **INMATE STAICH:**  Yeah, there has been --

18       **DEPUTY COMMISSIONER ALVORD:**  I'll get to all your
19  chronos.

20       **INMATE STAICH:**  Yeah, there is several of those.

21       **DEPUTY COMMISSIONER ALVORD:**  All right.  I will
22  get to those.  Then going on with the staff report, and
23  this was the staff report of November, 2006.  And this
24  report was prepared by Correctional Counselor Verdesoto,
25  V-E-R-D-E-S-O-T-O.  And that was done September 1st,

1    2006.  And on that report it indicates that for the most

2    part all of your self-help has remained the same since

3    the previous Board, and that was the Board of 2002, with

4    the exception that you have participated in Anger

5    Management.

6         The report goes on to indicate that you continue

7    to remain disciplinary free.  And pursuant to that, I

8    had an opportunity then to go back and take a look at

9    your discipline history.  And what I found, sir, I found

10   eight 128s.  The most recent being violation of grooming

11   standards.  And I found nine 115s, the most recent being

12   2001.  I will tell you, sir, that of the nine 115s that

13   I found, six were for grooming standards.  And I know

14   that that tends to be in a state of flux within the

15   institution.  And we consider that as such.  I did find

16   three 115s, one in 1999 for disobeying an order, one in

17   1996, which was for threats.  And apparently for that

18   one you received a SHU term?

19        **INMATE STAICH:**  The SHU term was overturned later

20   on.  And it was reduced down on a modification order.

21        **DEPUTY COMMISSIONER ALVORD:**  Correct, it stayed

22   as a 115 as I understand it.

23        **INMATE STAICH:**  Yeah, it did.

24        **DEPUTY COMMISSIONER ALVORD:**  All right.  I wanted

25   to make sure, because that's what I saw in the file.

1          **INMATE STAICH:**  Yes.

2          **DEPUTY COMMISSIONER ALVORD:**  And then there was a

3   1993 for possession of dangerous property.  And those

4   were the only disciplines that I was able to find.  I

5   then went and reviewed your most recent psychological

6   evaluation.  That was performed on February 4th, 2006 by

7   Dr. McComber.  And again, I'll point out those portions

8   that I thought were particularly salient.

9          **INMATE STAICH:**  Okay.

10          **DEPUTY COMMISSIONER ALVORD:**  One thing that was

11  somewhat interesting is there was an introduction by the

12  doctor which described why the, that particular

13  evaluation was being done.  And it was being done

14  apparently as a result of a 602 that you filed

15  requesting that your last psychological evaluation by

16  Dr. and it's Gamard, G-A-M-A-R-D, at CTF Soledad, dated

17  2/25/02 be corrected.

18          Apparently on page seven of that evaluation,

19  Dr. Gamard stated that you had a pattern of possessive

20  jealousy towards girlfriends and an inability to

21  tolerate being rejected by them or to allow them to be

22  possessed by any other man.  You stated that the

23  psychologist was not aware of the true facts of your

24  relationship with women.  And as a result, he

25  erroneously concluded that there is a pattern there when

1    the facts do not substantiate that. And as a result,

2    that appeal was granted in part. And a new

3    psychological evaluation was ordered.

4         **INMATE STAICH:** Correct.

5         **DEPUTY COMMISSIONER ALVORD:** All right. I'm not

6    going to go through all of the facts and materials that

7    were provided to the psychologist. You have that report

8    as does the Board.

9         **INMATE STAICH:** Yeah.

10        **DEPUTY COMMISSIONER ALVORD:** I will go on though,

11   to the psychologist's assessment. He first of all found

12   that you were well oriented throughout the interview.

13   He says you do wear a beard. Is this the same beard?

14        **INMATE STAICH:** Yeah.

15        **DEPUTY COMMISSIONER ALVORD:** Okay.

16        **PRESIDING COMMISSIONER KUBOCHI:** I hope so. It's

17   the same person.

18        **DEPUTY COMMISSIONER ALVORD:** Yes, but it doesn't,

19   the reason I say that is that is it looks more to me

20   like a goatee. But he makes reference to a beard.

21        **INMATE STAICH:** Well, you know, he, I don't know.

22   This is the way I've had it.

23        **DEPUTY COMMISSIONER ALVORD:** So it's the same?

24        **INMATE STAICH:** This is the way that I've had it.

25   You can look at my ID. It's been like that for years.

1       **DEPUTY COMMISSIONER ALVORD:** Okay. I certainly

2 believe you. I just was curious because when I read it,

3 it says, that you wear a beard.

4       **INMATE STAICH:** Yeah.

5       **DEPUTY COMMISSIONER ALVORD:** And when you came in

6 here today, well that didn't look like a beard to me.

7 But anyway, so be it.

8       **INMATE STAICH:** Yeah.

9       **DEPUTY COMMISSIONER ALVORD:** All right.

10       **PRESIDING COMMISSIONER KUBOCHI:** Let's call it a

11 difference in grammar.

12       **INMATE STAICH:** It's pretty much close to the one

13 that you're wearing.

14       **DEPUTY COMMISSIONER ALVORD:** Yes, yes.

15       **INMATE STAICH:** Let's put it that way.

16       **PRESIDING COMMISSIONER KUBOCHI:** Facial hair.

17       **DEPUTY COMMISSIONER ALVORD:** I thought it was a

18 goatee.

19       **INMATE STAICH:** Maybe a little bit longer.

20       **PRESIDING COMMISSIONER KUBOCHI:** Facial hair.

21       **DEPUTY COMMISSIONER ALVORD:** And he said that you

22 wear that as a result of your Nazarite religious beliefs

23 that require that you not cut your beard. He said that

24 your thinking was rational and coherent. Your speech

25 was normal, fluent and goal oriented. Eye contact was

1  very good.  Intellectually he found you functioning in

2  the average range.  Affect was appropriate.  He found no

3  evidence of anxiety or depression.

4       He, meaning you, related during the interview in

5  an earnest, sincere, concerned matter because you wanted

6  to get the facts of your case straight.  Your judgment

7  was intact.  Your memory was intact.  Your insight and

8  self-awareness appears to be very good.  He then

9  performed a Minnesota Multi-phasic Personality Inventory

10 and found that all of your scores were in the average

11 range.

12      He then noted his diagnostic impressions.  Axis

13 I, he found no mental disorder.  Axis II, no personality

14 disorder.  Axis III, there is a history of gunshot

15 wounds and lower back and neck pain.  Axis V, IV, I'm

16 sorry, his life term incarceration.  And he found a

17 global assessment of functioning at 90, higher than the

18 previous one, which was at 80.

19      He went on then to discuss your life crime.  And

20 he found that you fully accepted responsibility for the

21 victim's death.  You openly accepted the fact that you

22 had acted irresponsibly and impulsively and that you

23 caused hurt, pain and the death of the victim.  He felt

24 you were very remorseful about your past behavior.

25      He then did an assessment.  He did note that you

1  received the SHU term in 1996 for mailing a threatening

2  letter, a threatening sounding letter, excuse me,

3  threatening sounding letter to your wife.  That you have

4  matured socially, morally and spiritually since your

5  incarceration.  You are a much different individual now

6  than at the time of the commitment offense.

7        Your potential for violence in the institution is

8  definitely below average in comparison to other inmates.

9  In dealing with your violence potential in a free

10  community, he states your potential for dangerous

11  behavior if released to the community is estimated to be

12  no higher to the average citizen in the community.  This

13  is based on the fact that his recent MMPI-Two, shows him

14  to be a very non-aggressive, thoughtful, pro-social

15  individual who does not have any evidence of personality

16  disorder or antisocial thinking or values.

17        Although again, this needs to be interpreted with

18  some caution, as you openly admit making mistakes when

19  you were younger and have been remorseful for them.  He

20  then performed a Level of Service Inventory revised

21  test.  He goes on to describe that basically what he

22  found was that your score places you in the 1.8

23  cumulative frequency for prison inmates.  What that

24  means is if 100 men are released from parole, it is

25  anticipated that you would do better than 98 of them.

1   And that he feels, is an extremely low risk level.

2       He goes on to conclude that there is no mental or

3   emotional problems in this case that would interfere

4   with parole planning.  You have obtained vocational

5   training in vocational motorcycle repair, vocational

6   welding and vocational woodshop.  He has worked

7   throughout his life and has a strong work ethic.

8       You currently have some physical problems due to

9   your gunshot wound and the bullet fragment that you

10  still carry in your back.  He felt you were very

11  interested in working when you are released and you have

12  strong family support as well as a fiancé.  And he felt

13  that you have valid residence placement as well as some

14  job offers.

15      The prognosis for successful adjustment in the

16  community is excellent.  I went on then, and as I

17  indicated to you, I did review your disciplinary history

18  within the institution.  And we discussed that.  I also

19  found in February 23rd, 2006 there is a laudatory chrono

20  that you have completed Healing for the Angry Heart

21  video series.  I found another chrono dated for December

22  8th, 2005 that you completed a 12-week Anger Management

23  class that was conducted in the Protestant chapel.

24      And then I found a certificate for your

25  completion of the Anger Management program and another

1   certificate.  I should distinguish those two.  One is

2   dated February, 2006.  And the other was dated December

3   22nd, 2005, both for Anger Management.  And then there

4   was one dated October 1st, 2005 also for participation

5   in Anger Management.

6        And then I found a certificate for apparently

7   volunteering in a tutoring program.  It's the Volunteer

8   Tutor Workshop.  You did a 12-hour workshop with an

9   emphasis on tutoring and literacy.  And that is dated

10  June 7th, 2001.  That's actually before your last Board.

11  But I did see that.  And I wanted to bring that up.

12       And then I found a Set Free Prison Ministries

13  certificate that you have completed 32 units of study.

14  And that was in October of 2002.  And then there is a,

15  not really a certificate, but a document I should say,

16  from the University of California at Los Angeles that

17  certifies that you successfully participated in the Art

18  Search class called Creative Writing.  And you completed

19  that apparently in October 10th of 1996.

20       I found, and I think I may have mentioned this

21  chrono already, that, yes, I did.  This is the April

22  9th, 2007, the chrono from the Muslim chaplain when you

23  took the class, two-week seminar on how to become a

24  sober father and not get angry.  And then the Healing

25  Heart, I covered that.  I covered the Anger Management.

1   And I believe those were all of the laudatory chronos

2   that I could find going back at least to the early '90s.

3          I did not find, and I noted that the psychologist

4   in his report, let me just find that, one moment please.

5   I was unable to locate vocational certifications in this

6   file.  Do you have vocational certifications?

7          **INMATE STAICH:**  No, I don't have, not the ones

8   that I previously done before I became disabled.  I do

9   not have any verification other than the records to

10  where I have taken those, which are federal records, you

11  know --

12         **DEPUTY COMMISSIONER ALVORD:**  Okay.

13         **INMATE STAICH:**  -- that I don't have a copy of.

14  I tried to obtain them before I came in here.  But

15  getting through the bureaucracy and red tape of getting

16  a federal, you know, all these courses that I took when

17  I was young and that I was a certified mechanic in two

18  different areas, I wasn't able to obtain them.  So other

19  than what is documented in the file that you have read

20  is all we have to work with on that area.

21         **DEPUTY COMMISSIONER ALVORD:**  Okay.

22         **INMATE STAICH:**  But that is before the

23  disabilities had occurred.

24         **DEPUTY COMMISSIONER ALVORD:**  And that's what I

25  was looking for.  Is because when he mentioned that you

1    had vocational training in motorcycle repair, welding

2    and woodshop and I couldn't find that in here, but

3    obviously he had something that led him to believe that.

4        **INMATE STAICH:**  Yes.

5        **DEPUTY COMMISSIONER ALVORD:**  So apparently you

6    did have some training in the '80s.

7        **INMATE STAICH:**  Well the counselor verified this

8    before, when I first came into the system by contacting

9    the federal parole people that had my file.  So that's

10   how that got placed into the file.

11       **DEPUTY COMMISSIONER ALVORD:**  So those are

12   vocational trainings that you did, would have been

13   between 1978 probably and 1980.

14       **INMATE STAICH:**  That's correct.

15       **DEPUTY COMMISSIONER ALVORD:**  All right.

16       **INMATE STAICH:**  Actually 1982, up to 1982.

17       **DEPUTY COMMISSIONER ALVORD:**  Okay.  I thought you

18   were let free in '82.  But whatever it is, in the '80s.

19       **INMATE STAICH:**  Yeah, right there is when I got

20   out.  But that was before I got released.

21       **DEPUTY COMMISSIONER ALVORD:**  And those were

22   obviously vocational trainings that you obtained prior

23   to this life crime?

24       **INMATE STAICH:**  Prior to the injuries I've

25   sustained here and the disabilities, correct.

40

1    **DEPUTY COMMISSIONER ALVORD:** All right. So am I
2    correct that since the life crime I didn't see any
3    vocational chronos.

4    **INMATE STAICH:** No.

5    **DEPUTY COMMISSIONER ALVORD:** All right.

6    **INMATE STAICH:** But I can explain that if you
7    would like.

8    **DEPUTY COMMISSIONER ALVORD:** Sure. I just wanted
9    to make sure that I wasn't missing something in the
10   file.

11   **INMATE STAICH:** Okay. Well when you come into
12   the prison system, you're assessed point scales. And
13   for every year it's three points. So any inmate that
14   comes in with a second degree murder, something in that
15   range right there, you're automatically going to be 45
16   points. That inmate is going to be housed in a level
17   four housing.

18       Now the particular one that I was sent to was new
19   Folsom. That prison right there, I mean, the first day
20   I was on the yard out there they had a riot, I mean,
21   just nothing but chaos, guys being shot, stabbed. It
22   was just horrible to be in that environment. But that
23   limits your access because the guards are more worried
24   about security and trying to take care of all the
25   problems inside the prison. And inmates ain't getting

1 | out to do anything.

2 | It wasn't until I actually got to this prison
3 | here that I've been able to do anything, you know, just
4 | to be honest with you, because after that, when I
5 | finally got level three points and went to Corcoran,
6 | Corcoran isn't any better. I mean, you guys know some
7 | of the statistics on that place. And you're never
8 | getting out of your cell.

9 | They got these north and south guys that just
10 | every time they open up the doors, they go at each
11 | other. And the white guys just try to stay out of the
12 | way. So pretty much, you are very limited on what you
13 | get to do inside the prison system.

14 | And even at this prison here, which can be
15 | verified through all the documentation is they have had
16 | a lot of problems here with these inmates filing or
17 | filling in the mailboxes kites that threaten the
18 | officers. And the officers have to protect themselves.
19 | So they lock down the prison to investigate this. This
20 | goes on constantly. It's maybe within the last six
21 | months that we haven't had that problem in a while,
22 | luckily.

23 | But because this occurs inside the prison system,
24 | there is nothing that we can do. Our hands are tied,
25 | the lifers. We sit in here, you know, wanting to do as

*Capitol Electronic Reporting*

1    much as we can.  I've gotten all these stress
2    management, I've done everything possible that I could
3    do within the boundaries of my limitations.  And the
4    problems that go on inside the prison, I mean, even
5    these guards that are in here know that this is
6    occurring all the time.

7         And so they have to protect themselves.  They
8    lock the prison down.  This goes on.  They have to
9    search every wing, go through everybody's property.
10   This takes, you know, maybe a month's time. There is a
11   lot of people in here.  It's overcrowded.  So that's
12   part of the reason why we don't get much access to doing
13   things and being able to bring more to you guys that
14   would show that we're suitable for parole, you know, in
15   that particular area.

16        But that doesn't mean that I've been inactive as
17   far as doing things that are productive towards my
18   release into the community.  And I have other things
19   that I do that I wanted to show you here that go along
20   with that same line right here.  In the prison system I
21   have become an artist.

22        **DEPUTY COMMISSIONER ALVORD:**  If you will give
23   that to --

24        **INMATE STAICH:**  Yeah.

25        **DEPUTY COMMISSIONER ALVORD:**  -- correctional

1   staff, we will certainly take a look at that.

2          **INMATE STAICH:**  Okay.

3          **DEPUTY COMMISSIONER ALVORD:**  Anything you have

4   that indicates --

5          **INMATE STAICH:**  Yeah.

6          **DEPUTY COMMISSIONER ALVORD:**  -- that you·have

7   done positive things, we definitely want to look at it.

8   I will tell you, sir, that I'm looking at --

9          **INMATE STAICH:**  Also --

10          **DEPUTY COMMISSIONER ALVORD:**  Go ahead.

11          **INMATE STAICH:**  I have a letter here for you that

12   was sent to me directly from the counselor.  And here is

13   her envelope that she sent it to me so it is in the file

14   somewhere indicating that I'm going to be working at as

15   a custom painter in a new business that is opening up in

16   the Riverside area.  And that I've already been working

17   with these people here.  I do a lot of patterns and

18   stuff for motorcycles, cars.  It's all custom stuff,

19   whatever they want done on there.  I do pin striping

20   work.

21          And I have a lot of talent when it comes to

22   artwork.  And so pretty much I haven't been inactive

23   just because, so I guess you can call me an autodidact,

24   which is a person that is self-taught.  So I have no

25   been completely inactive because of what the security

1  | problems here in the prison.

2  | And so I wanted you to know that, reflect that on
3  | to the record, too, as well. A lot of things that we do
4  | in here, you know, is stuff that we do in our cell area
5  | that you guys really don't ever really get to know about
6  | because they're not through the institution. They're
7  | not sanctioned. And there is no chronos written on
8  | them. So basically it's just stuff that you do in the
9  | presence of your cell are on these long lockdowns.

10 | **DEPUTY COMMISSIONER ALVORD:** I will say, sir,
11 | that I have reviewed your classification. And I did
12 | note that you reduced from 29 points down to double 2
13 | points in 1995. And you have been that level since that
14 | date.

15 | **INMATE STAICH:** Yeah, also that it has been
16 | mentioned by the Ninth Circuit in the Johnson Decision
17 | that level two is the lowest position that an inmate can
18 | get himself to inside the prison system. And the
19 | inmates that stay in this environment right here are
20 | considered non-violent as far as the prison setting is
21 | concerned. They're not causing any problems with the
22 | other inmates.

23 | **DEPUTY COMMISSIONER ALVORD:** Right. We are well
24 | aware of the override.

25 | **INMATE STAICH:** Okay.

1          **DEPUTY COMMISSIONER ALVORD:**  Well aware, believe

2     me.

3          **INMATE STAICH:**  All right.

4          **DEPUTY COMMISSIONER ALVORD:**  All right.  Did I

5     miss anything, sir?

6          **INMATE STAICH:**  No.  That's all I wanted to bring

7     up on that area right there.

8          **DEPUTY COMMISSIONER ALVORD:**  All right.  That

9     being the case, we will turn it back over to the Chair.

10    Thank you.

11         **PRESIDING COMMISSIONER KUBOCHI:**  Thank you.

12         **INMATE STAICH:**  Okay.

13         **PRESIDING COMMISSIONER KUBOCHI:**  Mr. Staich, in

14    November, 1983 you were, excuse me, let's back up a

15    little bit.  Could you tell me what your parole plans

16    are right now in regards to residence?

17         **INMATE STAICH:**  I will be living with my fiancé.

18    And I also have a documentation in there that I can live

19    with my mother as well if you don't feel that's

20    suitable.  But --

21         **PRESIDING COMMISSIONER KUBOCHI:**  We don't make

22    those determinations.

23         **INMATE STAICH:**  I know there is two places there

24    that I could go.

25         **PRESIDING COMMISSIONER KUBOCHI:**  And that would

46

1   be Shelley Wood?

2       **INMATE STAICH:**  Yes.  And the other one is my

3   mother.

4       **PRESIDING COMMISSIONER KUBOCHI:**  Right.  I

5   remember seeing that.

6       **INMATE STAICH:**  So, yeah, so I have two

7   residences to go to, you know.  I realize you guys do

8   have a lot to do with Penal Code Section 3003, which has

9   all different areas on parole and special restrictions.

10  And the Board has the right to do stuff like that.  So I

11  only bring that up in that context right there.

12      **PRESIDING COMMISSIONER KUBOCHI:**  What city does

13  Ms. Wood live in today?

14      **INMATE STAICH:**  She lives in Mira Loma.

15      **PRESIDING COMMISSIONER KUBOCHI:**  And what does

16  she do for a living?

17      **INMATE STAICH:**  She works at Lowe's in the, she

18  works, well different areas, but basically she's in the

19  nursery.

20      **PRESIDING COMMISSIONER KUBOCHI:**  And how long has

21  she worked at that establishment?

22      **INMATE STAICH:**  It's brand new.  She just started

23  working there from her last employment.

24      **PRESIDING COMMISSIONER KUBOCHI:**  What type of

25  residence, does she rent or own?

1      **INMATE STAICH:**  She owns a double-wide mobile

2  home on a two-acre lot that's pretty large.  It's nice.

3  It's well equipped.

4      **PRESIDING COMMISSIONER KUBOCHI:**  Who else resides

5  with her?

6      **INMATE STAICH:**  She resides with her and her

7  daughter is living there right now with her new baby.

8      **PRESIDING COMMISSIONER KUBOCHI:**  And how old is

9  the daughter?

10      **INMATE STAICH:**  The daughter is 21 years old and

11  is engaged to be married and will be moving out soon

12  with her husband.

13      **PRESIDING COMMISSIONER KUBOCHI:**  And you have

14  indicated that your employment plans are to work in some

15  type of art-related field that may ultimately be·

16  connected to vehicles?

17      **INMATE STAICH:**  Yeah, just auto spraying stuff

18  because I'm limited with what I can do as far as my

19  disabilities.  So that's something that is not really

20  too strenuous on the body as far as spray guns and

21  mixing paints.  You just have to have the right

22  apparatus, the breathing apparatus.  And I've studied up

23  on all this right here.  And I've done this before I

24  came in here.  My dad was an auto mechanic.  And he has

25  owned quite a few different little shops in that area

1   there.  So I've learned a lot about painting and how to

2   spray.

3        **PRESIDING COMMISSIONER KUBOCHI:**  You were 27 at

4   the time of the homicide?

5        **INMATE STAICH:**  Uh-hmm.

6        **PRESIDING COMMISSIONER KUBOCHI:**  And then you had

7   been sent to federal prison in what was that, '79?

8        **INMATE STAICH:**  In 1980.

9        **PRESIDING COMMISSIONER KUBOCHI:**  In 1980?  And so

10  that would have been, and then you had also this escape

11  in '77, you were in jail.  So the escape you were about

12  21 years old back in Riverside County?

13       **INMATE STAICH:**  Twenty.

14       **PRESIDING COMMISSIONER KUBOCHI:**  Twenty.  Then

15  you went to prison.  And then you later got this, you

16  later got this federal charge.  What periods were you

17  employed from the time of turning 20?

18       **INMATE STAICH:**  Anytime that I was released, I

19  worked the whole time at different, I either worked for

20  my father directly or I worked for Eddy's Tree Service

21  in Orange County.

22       **PRESIDING COMMISSIONER KUBOCHI:**  In 1983,

23  November specifically, when you were paroled on the

24  federal charge, what city were you paroled to?

25       **INMATE STAICH:**  I was paroled to Orange County.

1  I was staying at my brother-in-law's house in Silverado

2  Canyon.  That's where I was working when this crime

3  occurred.

4      **PRESIDING COMMISSIONER KUBOCHI:**  And then you,

5  when you were paroled, you contacted your federal parole

6  officer?

7      **INMATE STAICH:**  Yeah.

8      **PRESIDING COMMISSIONER KUBOCHI:**  And that would

9  have been in Orange County?

10      **INMATE STAICH:**  Actually I think they had me in,

11  because of my mother's residence, they had put me, but

12  they allowed me to live in Orange County because that's

13  where my employment was.

14      **PRESIDING COMMISSIONER KUBOCHI:**  Okay.

15      **INMATE STAICH:**  So the parole agent was out of

16  the, I think he was even further out than that because

17  they don't have the regions back then.  He was in San

18  Bernardino.

19      **PRESIDING COMMISSIONER KUBOCHI:**  By my

20  mathematics, and tell me if I'm wrong, is the murder

21  happened about a month after you were paroled?

22      **INMATE STAICH:**  Twenty-one days.

23      **PRESIDING COMMISSIONER KUBOCHI:**  Twenty-one days.

24  And how did you find out where Cynthia was living?

25      **INMATE STAICH:**  My brother saw her at a gas

1   station about a week before that.  And he had testified

2   this to the trial.  It's part of the transcripts.  That

3   she told him that we were still engaged to be married at

4   that time and that the relationship was still going.

5       **PRESIDING COMMISSIONER KUBOCHI:**  Now I just want

6   to ask you a real simple question, would you have been

7   in violation of parole if your parole officer knew that

8   you had went to where Ms. Bess was living once you were

9   paroled in November of '83?

10      **INMATE STAICH:**  Well probably yes, but there is a

11  little bit of a question here.  He testified at the

12  trial that when he saw me and interviewed me, I asked

13  him about my fiancé at the time.  And he told me that he

14  didn't want me to go around her.  He wasn't ordering me

15  not to.  But he told me he didn't want me to go around

16  her.  And he wouldn't tell me anything else.  And she

17  had my car, all my clothes, everything.  A lot of my

18  stuff was with her.  So plus I was young, you know.

19      **PRESIDING COMMISSIONER KUBOCHI:**  This was all

20  covered in your trial.  But why did you --

21      **INMATE STAICH:**  Yeah.

22      **PRESIDING COMMISSIONER KUBOCHI:**  -- go over

23  there?  What time did you go over there to that

24  grandparent's place?

25      **INMATE STAICH:**  I went over there at, well I

1    lived up in the mountains.  So it took about, I left

2    after work and everything and cleaning up and

3    everything.  We don't get done until about 10 o'clock

4    and put all the stuff back in the sheds.  And so it was

5    probably approximately 11 o'clock when I took off.  And

6    I didn't get over there until 12 o'clock at night.

7         **PRESIDING COMMISSIONER KUBOCHI:**  Twelve p.m.?

8         **INMATE STAICH:**  Yeah.

9         **PRESIDING COMMISSIONER KUBOCHI:**  Twelve a.m.  And

10   then who was your employer?

11        **INMATE STAICH:**  Eddy.

12        **PRESIDING COMMISSIONER KUBOCHI:**  Ed?

13        **INMATE STAICH:**  Bill Eddy.

14        **PRESIDING COMMISSIONER KUBOCHI:**  Bill Edny?  And

15   that was --

16        **INMATE STAICH:**  Eddy's Tree Service.

17        **PRESIDING COMMISSIONER KUBOCHI:**  Edny's Tree

18   Service?

19        **INMATE STAICH:**  Yeah, E-D-D-Y.

20        **PRESIDING COMMISSIONER KUBOCHI:**  E-D-D-Y, oh,

21   Eddy's Tree Service.

22        **INMATE STAICH:**  Yeah, Eddy's Tree Service.

23        **PRESIDING COMMISSIONER KUBOCHI:**  Okay.  And what

24   county was that?

25        **INMATE STAICH:**  That's Orange County in Silverado

52

1   Canyon.

2       **PRESIDING COMMISSIONER KUBOCHI:**  And you claim

3   that you worked on the day of December 7th, 1983?

4       **INMATE STAICH:**  That's correct.

5       **PRESIDING COMMISSIONER KUBOCHI:**  Okay.  And as

6   far as you knew, Eddy's Tree Service was a business that

7   was in the yellow pages and --

8       **INMATE STAICH:**  It is in the yellow pages.

9   They're contracted with the city of Orange County to do

10  all the high wire, when the winds blow, the Santa Ana

11  winds down there and the trees get all caught up in

12  there.  The city contacts them to do most of their major

13  work for removing trees and hot wires.

14      **PRESIDING COMMISSIONER KUBOCHI:**  And what was

15  your reason in kicking, cutting the phone wires?

16      **INMATE STAICH:**  Because I never got along before,

17  the grandparents didn't like me because I had long hair.

18      **PRESIDING COMMISSIONER KUBOCHI:**  Well how old

19  were they?

20      **INMATE STAICH:**  Probably in their 60s.

21      **PRESIDING COMMISSIONER KUBOCHI:**  Couldn't have

22  been much of a threat to you as a 27 year old man, could

23  they?

24      **INMATE STAICH:**  They weren't no threat to me at

25  all.  But they didn't want me associating with her.

1    **PRESIDING COMMISSIONER KUBOCHI:**   And then why did

2    you kick in the door?

3         **INMATE STAICH:**   Well as part of the transcripts

4    show that, me and that man had an argument at the door.

5    I rang the doorbell.

6         **PRESIDING COMMISSIONER KUBOCHI:**   You and the

7    grandfather?

8         **INMATE STAICH:**   No, I didn't have nothing to do

9    with the grandfather.   There is none of that in there.

10        **PRESIDING COMMISSIONER KUBOCHI:**   You and

11   Mr. Topper?

12        **INMATE STAICH:**   Me and Mr. Topper had an argument

13   at the front door.   That's when I found out.   I didn't

14   even know he was over there.

15        **PRESIDING COMMISSIONER KUBOCHI:**   And what was

16   your reason in having a hammer at the door after you,

17   because you kicked it in, what was your reasoning for

18   having a hammer?

19        **INMATE STAICH:**   The only reason I took a small

20   hammer with me is because I used it to pull the phone

21   line off the wall.   They got little metal brackets that

22   fit into the wall.   It holds a phone line down.   I used

23   the back of the claw hammer and pulled the wire loose

24   from the wall.   But they don't talk about it, I had

25   black electrical tape with me, too, in my truck to put

54

1   the wires back together.  I thought that maybe after I

2   went to the door and everything that she would come and

3   answer it.  And we would talk.  And I would get my

4   little bit of property or whatever, everything would

5   have went smooth.  But it didn't work out that way

6   unfortunately.

7       PRESIDING COMMISSIONER KUBOCHI:  Well isn't it

8   unexpected to not be smooth when you kick in somebody's

9   door at 12 a.m.?

10      INMATE STAICH:  But you're not taking into

11  consideration that me and him argued at the door before

12  the door got kicked in.  There was a verbal

13  confrontation back and forth where he threatened me.

14      PRESIDING COMMISSIONER KUBOCHI:  Well wouldn't it

15  be pretty foreseeable that if somebody kicked in your

16  door at 12 a.m., you would respond and be a little upset

17  at whoever was at the front door, who kicked it in?

18      INMATE STAICH:  Yeah, but if you were engaged to

19  be married to somebody that was living in that house and

20  you had not had any information from that party that

21  they were severing that relationship with you --

22      PRESIDING COMMISSIONER KUBOCHI:  No, I'm putting

23  you on the guy who responded to the door.  You're the

24  guy at the door.

25      INMATE STAICH:  I'm at the door and he is at the

1   door.  Okay.  But you got to look at the reasoning why
2   an individual went to the door to begin with and what he
3   was doing.

4   **PRESIDING COMMISSIONER KUBOCHI:**  Do you think
5   that the homeowner had, and you're the guy at the door
6   now --

7   **INMATE STAICH:**  Well I'm going to tell you this,
8   and they changed the law in 1984.  Up until then the law
9   stated that the homeowner had to show just cause to use
10  aggressive force against anybody that broke into the
11  home.  That was later changed in a 1984 amendment.  But
12  this crime happened in '83.  So the law that would apply
13  at that time, the homeowner had to show that I was
14  trying to harm him.

15       Now, if he, if you want to say because the door
16  got kicked in, that doesn't mean I was going to harm
17  him.  He threatened me through the door.  He had the
18  gun.  I didn't have no gun.  And it should be taken into
19  consideration that my brother-in-law at the tree service
20  in the room that I was staying in, that they found this
21  out later, that he is a bear hunter and that he had over
22  30 guns in that room loaded.  There was handguns and
23  everything in the same area where I was staying at that
24  house.

25       All this evidence came out at the trial.  I

1  wasn't planning on harming anybody that night.  I didn't
2  have any, you know, sure there is stuff in there like I
3  had said I would talk about anything that was in there
4  as far as the second degree murder is concerned.  But
5  you know, I didn't know that guy had a loaded 357
6  magnum.

7      **PRESIDING COMMISSIONER KUBOCHI:**  Well if you --
8      **INMATE STAICH:**  It came out that he had been
9  shooting it at the range.  Why are you out shooting a
10 gun at the range and getting ready for somebody?

11     **PRESIDING COMMISSIONER KUBOCHI:**  If you, if
12 you --

13     **INMATE STAICH:**  He did a lot of things, too, that
14 led up to the situation.

15     **PRESIDING COMMISSIONER KUBOCHI:**  If you --
16     **INMATE STAICH:**  I'm not saying that I'm not
17 remorseful.  I'm very remorseful.  This should have
18 never happened.

19     **PRESIDING COMMISSIONER KUBOCHI:**  Well tell us
20 about your remorse then.

21     **INMATE STAICH:**  I am remorseful.  And I have
22 insight into this crime.  And it's a sad situation that
23 this man had to die.  Nobody should die over a
24 relationship with a female.  But I can't take back time.
25 It has been almost 25 years I've been in here, you know.

*Capitol Electronic Reporting*

1  I'm very remorseful for this.  If there is anything I

2  could do to make that person's family or anybody better

3  off, if there was any way when I get into the community

4  and I start making a lot of money that I could do

5  something to some type of victim's rights group to help

6  out so this never occurs again, I would do it.

7      **PRESIDING COMMISSIONER KUBOCHI:**  One final

8  question.  If you went over there not to intend any

9  harm, got in an argument, why didn't you just leave?

10      **INMATE STAICH:**  And that's the key question.  Why

11  didn't I leave?  Okay.  And that's where the passion

12  comes in.  I was so in love with this woman.  She sent

13  photographs to me the whole time I was incarcerated.

14  This all came out at the trial.  She sent nude

15  photographs, stating and professing her love for me.

16      I had already been with this woman, had a sexual

17  relationship with her before I was incarcerated.  So as

18  far as I was knowing that at the time, that this woman

19  wanted to be with me and that he was the intruder.  And

20  she didn't really want to be with him.  You know, so I

21  didn't really, you know, I had a lot of emotions.  And I

22  was young.  I made a mistake.

23      I shouldn't have kicked the door open.  But after

24  I kicked the door open, he made another statement that

25  I'm down.  And that's when I entered into the home.  He

1  goes I'm down here.  And when I went down there, he

2  didn't pull a bible on me.  He came right around the

3  corner and he opened fire.  He blew this finger off

4  first.  That's a defensive wound that I had to block the

5  gun like that.

6      **PRESIDING COMMISSIONER KUBOCHI:**  Clarify one

7  thing for me.  Where were you when that first shot was

8  fired?

9      **INMATE STAICH:**  I was in the hallway, at the very

10  end of the hallway where he had called me that he was

11  down there.

12      **PRESIDING COMMISSIONER KUBOCHI:**  Okay.

13      **INMATE STAICH:**  So he is luring me deep into the

14  house.  Okay.  So I went down there.  And when I got

15  down there, he came right around the corner.  And he

16  fired.  He didn't say one word to me.  And I just went

17  like that, the natural reaction, and the finger was

18  blown off.  Blood, meat, everything went into my face.

19  The next thing I know he shoots again.  He catches me in

20  this arm.  Okay.

21      Out of a natural reaction, yeah I had the hammer

22  in my back pocket.  I pulled the hammer out of my

23  pocket.  And I started waling on him, everything I could

24  do to save my life because this man was trying to kill

25  me.  And I pushed him.  And we fought through that whole

1   time.

2           And the hammer slipped out of the thing, which

3   came in part of the trial, the hammer flew out. So I

4   had nothing. And he still got control of the gun. And

5   we're fighting. During that whole wrestling match is

6   when that gun went off. And then the third one, another

7   one went through and just barely skinned between the

8   middle of my legs, which they showed bruising and

9   everything. So I was barely missed by another round

10  during the wrestling match when the gun went off.

11          He was never, this whole, every wound that he

12  sustained was during the wrestling match with me during

13  this whole confrontation. After that, I was in such a

14  state of shock because first of all, this vein is blown

15  open, your main artery. And there is blood squirting

16  out everywhere. You know, I feel like I'm dying. A

17  bullet just went through my chest. My lungs collapsed.

18          And I come around the corner and come down and

19  there she is waiting with a, she had a pistol, a starter

20  pistol. And instead of just telling me to get out of

21  there or whatever, she fires at me. Unbeknownst to me,

22  it's a zephyr starter pistol, some kind of a, for

23  scaring birds. But it shot a flame out the end of it.

24          So I thought she was shooting me in the face or

25  you know. And I just reacted to it. And I reacted

*Capitol Electronic Reporting*

1   wrong and I took the but of the gun after the wrestling

2   match with him, I got the gun.  I was running out just

3   to get rid of it.  And that's when I waled on her.

4   There is no excuse for it.

5        **PRESIDING COMMISSIONER KUBOCHI:**  And then what

6   happened next?

7        **INMATE STAICH:**  She fell down in the kitchen.  I

8   obtained the gun that she was firing.  And I just tried

9   to go get help.  I was in shock.  I was bleeding.  I

10   mean, I don't know if you guys can understand that.  But

11   you know, that's what happened.

12        **PRESIDING COMMISSIONER KUBOCHI:**  Now after all of

13   this was done, what property was returned to you?

14        **INMATE STAICH:**  From this whole situation,

15   nothing.

16        **PRESIDING COMMISSIONER KUBOCHI:**  Nothing, okay.

17        **INMATE STAICH:**  I got a life sentence for it.

18   And I've been in here 25 years.

19        **PRESIDING COMMISSIONER KUBOCHI:**  Okay.

20        **INMATE STAICH:**  A very bad mistake on my part,

21   you know.

22        **PRESIDING COMMISSIONER KUBOCHI:**  Okay.

23        **INMATE STAICH:**  But I can't change what has

24   occurred.  And I'm very remorseful for it happening.

25   And I wish it never did happen.

1    **PRESIDING COMMISSIONER KUBOCHI:** Okay.  Thank

2   you.  Commissioner, do you have any questions?

3    **DEPUTY COMMISSIONER ALVORD:** Just two that I

4   wanted to make sure that I have clarification on the

5   record.  Since '78, that's when you went and did two

6   years for the escape, correct?

7    **INMATE STAICH:** Uh-hmm.

8    **DEPUTY COMMISSIONER ALVORD:** Then you were out

9   six months on parole.  And then you were revoked for the

10   threats.  Then you went back into custody.  You were

11   released in the first part of 1980.  And then you went

12   into the federal system.  So it appears to me that

13   between 1978, I'm sorry, I left out this, the life

14   crime.  You were paroled then in 1983 from the federal

15   system.  And 23 days later the life crime occurs.  So

16   from '78 to '83 it appears you were only loose or on the

17   streets for six months.

18    **INMATE STAICH:** That's probably a correct

19   prognosis there.

20    **DEPUTY COMMISSIONER ALVORD:** Okay.  And that's

21   the time period when you were doing the motorcycle

22   mechanic and the landscaping?

23    **INMATE STAICH:** Whatever, yeah, I never really

24   got to really utilize all that, you know, because of the

25   problems I had with the, you know, look guys.  I didn't

62

```
 1   know this was going to happen.

 2        DEPUTY COMMISSIONER ALVORD:  Of course.

 3        INMATE STAICH:  I'm just being honest with you.

 4        DEPUTY COMMISSIONER ALVORD:  And the other

 5   question I simply had is I'm not sure that I fully

 6   understand why you were at the house at midnight.

 7        INMATE STAICH:  And as I told him, I was working

 8   at the time.  And we didn't get the yard cleaned up

 9   until 10 o'clock.  It's a tree business, chainsaws,

10   climbing ropes, all those apparatus.

11        DEPUTY COMMISSIONER ALVORD:  Sure, but there are

12   other days.

13        INMATE STAICH:  What?

14        DEPUTY COMMISSIONER ALVORD:  There are other

15   days.  That's what I don't understand, frankly, is it

16   didn't have to be that day.  Midnight is a strange

17   hour --

18        INMATE STAICH:  I know.  I understand that.

19        DEPUTY COMMISSIONER ALVORD:  No, no.  Let me

20   finish.

21        INMATE STAICH:  Okay.

22        DEPUTY COMMISSIONER ALVORD:  Midnight is a very

23   strange hour to go calling.  And I was wondering why you

24   chose to go that late.

25        INMATE STAICH:  Okay.  Here is another thing,
```

1   too, is my fiancé at that time that is the victim in

2   this crime worked graveyard shift at the Roadrunner

3   Restaurant. And she stayed up on those days that were

4   off. And according to what my brother told me, those

5   were her days off. So she is a graveyard shift worker,

6   though, you know, that's still not an excuse for what

7   happened. But that's part of the reasoning why I went

8   late at night is because that's when her days are off

9   and she is up all night because she sleeps during the

10  day.

11       **DEPUTY COMMISSIONER ALVORD:** Okay. That's all I

12  had.

13       **PRESIDING COMMISSIONER KUBOCHI:** Well I have one

14  question. Your trial transcript indicates that there

15  were 67 collect calls to Bess' father in July and August

16  of '83 in an attempt to locate her. Okay. That's in

17  your Appellate transcript. Didn't the 67 calls kind of

18  tell you that she didn't want to be in the relationship

19  anymore when none of that, none of those calls resulted

20  in affirmative response by her?

21       **INMATE STAICH:** Well when you're having a sexual

22  relationship with someone and you're still receiving

23  mail inside the prison up through those calls right

24  there and she tells me that I can contact her at her

25  father's house, and those letters are part of the

1  evidence in the trial, I think there is mitigating

2  factors there on that issue right there, Sir.

3       **PRESIDING COMMISSIONER KUBOCHI:**  Okay.  Thank

4  you.  At this time, sir, we are going to have closing

5  statements by the District Attorney's representative

6  followed by your opportunity to tell us why you believe

7  you are suitable for parole at this time.

8       **INMATE STAICH:**  Okay.

9       **PRESIDING COMMISSIONER KUBOCHI:**  Mr. Lockhart?

10       **DEPUTY DISTRICT ATTORNEY LOCKHART:**  Thank you.

11  The circumstances of this crime do not warrant release.

12  The simple fact is I'm not saying that the inmate

13  intended to shoot Mr. Topper when he went over there.

14  However, something was going to go down.  It indicates

15  planning and calculation.  He armed himself with a

16  hammer.  It was in the middle of the night.  We have

17  been discussing these at great, well, the Board has been

18  discussing these at great length in the last several

19  minutes.

20       He cut the phone wires, broke the door down,

21  attacked his ex-girlfriend and her husband.  What I find

22  interesting is there seems to be so many, just in the

23  last couple of minutes that the inmate has been talking

24  about the crime, it just seems that there was so many

25  times when this crime could have been averted.

1         What just jumped out in my head about 90 seconds

2  ago is when he said she worked graveyards at this

3  restaurant. Well if he just wanted to get his property

4  back and you know, kind of resolve things, why not go to

5  the restaurant during one her graveyard shifts at a

6  neutral site when he knows that he is not gaining access

7  to this girl through her grandfather as the 67

8  unanswered phone calls indicate. Why not go to this

9  neutral location?

10         The crime indicates overkill, the multiple blows

11  to the husband's head. He was shot three times

12  including once in the back. There was brain damage to

13  his ex-girlfriend because of the multiple blows. It

14  seems that the motive for the crime is extremely

15  trivial. He was obsessed with this woman. He was

16  stalking her. He threatened her. He threatened her

17  husband.

18         The file indicates that he had called Robert

19  Topper. He knew, the inmate knew that Robert Topper was

20  in the picture. He had called him and threatened him as

21  well. It's obvious that the inmate has longstanding

22  issues with women given the many times he has threatened

23  women including the woman for which he, the woman he

24  threatened for which he was serving the federal

25  commitment. And even after he was committed for this

1  crime in 1996 he threatened his ex-wife as well.

2       Moreover, the prior grants of parole and

3  probation have been failures for the inmate.  He was on

4  that federal parole for the crime that I just talked

5  about when he began his obsession with Cynthia Bess.

6  That parole was revoked because of his obsessive and

7  threatening behavior.  And he was paroled again with the

8  promise, the file indicates, that he would stay away

9  from Cynthia Bess.

10       In other words, he was ordered by as a condition

11  of parole to stay away from her, which is why he told

12  the Board that it would have been a violation of his

13  parole to even go and talk to her.  Obviously, he did

14  not obey that promise when he committed the instant or

15  excuse me, the commitment offense while on parole.

16       There is a huge, the inmate says he has insight.

17  I would respectfully disagree.  I think there is a huge

18  lack of insight and a lack of acceptance of

19  responsibility.  When I was reviewing the file last

20  night, as the Board knows, I wasn't planning on doing

21  this hearing.  So I reviewed the file last night.  The

22  2006 Board report says, which is the most current Board

23  report, says that the inmate's version of the crime is

24  the same as in the last Board report, which was the 2002

25  report.

1        And in that 2002 report the inmate is quoted as

2   saying that his case is quote, not egregious due to the

3   fact that he was found guilty of second degree murder

4   and the fact that Robert Topper was the original

5   aggressor by firing the weapon at the inmate.  He also

6   said that Cynthia was in possession of a handgun and

7   fired two rounds at the inmate before he defended

8   himself against her aggressive assault.

9        The inmate stalks this woman, breaks into her

10  house in the middle of the night, kills her husband and

11  suddenly she is the aggressor.  He says today that he

12  didn't know that she didn't want him.  And as the Board

13  astutely questioned the inmate, how could those 67 phone

14  calls not indicate that she didn't want him.  How could

15  the fact that she's the one that called his parole

16  officer, his federal parole officer in 1983, and it was

17  that call where she said, I'm being threatened by the

18  inmate and he had threatened Robert Topper by that

19  point.  And therefore his federal parole was revoked

20  because she ratted him out for what was going on at the

21  halfway house.

22        So I don't understand how, there is a huge chasm

23  of understanding, at least from my perspective, where I

24  don't get how he can say I didn't understand that she

25  didn't want to be with me.  She is getting his parole

1  revoked. She is ignoring 67 phone calls. And then
2  suddenly because they are, when he breaks down the door,
3  cuts the phone wires, and they are defending themselves
4  and their property, suddenly they are the aggressors. I
5  mean, how can the inmate under these facts of this crime
6  claim the mantle of victim-hood? I mean, it's kind of
7  outrageous.

8      Moreover, the Board talked about the, I think
9  this was Deputy Commissioner Alvord, talked about the
10 psychological evaluations and the huge difference
11 between the 2002 psych evaluation and the 2006. I don't
12 understand what was wrong with Dr. Gamard's assessment
13 that the inmate is possessive of women and that he does,
14 he becomes jealous when they're with someone else. I
15 don't understand how the facts of the long sordid
16 history of this case do not support that assessment.

17     The 2006 evaluation by Dr. McComber is
18 problematic for a number of reasons. Number one, how
19 can anyone say that a convicted murderer is no more
20 likely to be violent than any other member of society?
21 That is a ridiculous statement. Number two,
22 Dr. McComber uses no critical analysis and accepts what
23 the inmate tells him as gospel. And I wonder why.
24     He claims that the inmate's prognosis for
25 successful adjustment is excellent. However, he accepts

1  the inmate's version of what happened in spite of what

2  the record of the case is.  Dr. McComber talks about the

3  inmate, quote, trying to set the record straight and

4  tell a story.  But no questions are asked by

5  Dr. McComber, no discussion of how the inmate's version

6  is not supported by the evidence.

7       Dr. Gamard, on the other hand has an opposite

8  assessment.  This evaluator is critical of the inmate's

9  version of the events.  He says that the inmate's

10  potential for violence is high.  What has changed about

11  the inmate between 2002 and 2006 to warrant

12  Dr. McComber's change from Dr. Gamard's opinion.  And

13  that is nothing.

14       One doctor, Dr. McComber, believes the inmate

15  hook, line and sinker.  And the other, Dr. Gamard, is

16  rightfully skeptical of what the inmate is telling him.

17  For all the reasons stated, for the, especially for the

18  fact that there seems to be a disconnect between the

19  objective facts of this case and what the inmate says

20  occurred showing a lack of insight into the crime, for

21  all those reasons, the inmate is not suitable for parole

22  and would be an unreasonable risk to the community.  And

23  I would urge the Board to deny him a parole date at this

24  time.  Thank you.

25       **PRESIDING COMMISSIONER KUBOCHI:**  Thank you.

70

1    Mr. Staich, before giving your statement, you are not

2    obligated to respond to anything the DA says. As I

3    indicated at the outset, this is not an adversarial

4    proceeding. We are not here to retry your guilt or

5    innocence. We are here to gather facts as to why you

6    are suitable for parole.

7         And I want you to address us and tell us why you

8    are suitable for parole. Not responding to anything the

9    DA says is not held against you because you are

10    representing yourself. And we want to hear why you

11    believe you are suitable for parole.

12    **INMATE STAICH:** Well not objecting on the record

13    to something leaves the record without any objection,

14    you know. And --

15    **PRESIDING COMMISSIONER KUBOCHI:** No, you can make

16    your record.

17    **INMATE STAICH:** I just can't go like that because

18    everything he is stating right there goes totally

19    against what I'm about.

20    **PRESIDING COMMISSIONER KUBOCHI:** You can make

21    your record. But then in telling us why you believe you

22    are suitable for parole, there is no need to respond to

23    what he says.

24    **INMATE STAICH:** That's fine. If you don't want

25    me to, I won't.

 1          **PRESIDING COMMISSIONER KUBOCHI:**  No, I'm not

 2   saying --

 3          **INMATE STAICH:**  You're conducting this.

 4          **PRESIDING COMMISSIONER KUBOCHI:**  I'm not saying I

 5   don't want you to.  I'm just saying don't feel

 6   obligated.  You could make your record because you're

 7   representing yourself.

 8          **INMATE STAICH:**  Yeah.

 9          **PRESIDING COMMISSIONER KUBOCHI:**  You make your

10   record and then you go on to tell us why you believe you

11   are suitable for parole.  This is not a retrial.  This

12   is not a judicial proceeding.

13          **INMATE STAICH:**  Yeah, I understand that.  And

14   that's why I put in an objection to begin with under

15   2030 of the Title 15, Division Two to his presence in

16   here because this is a boiler plate statement that comes

17   from every District Attorney on anybody convicted of

18   murder.  They do this every time.  It's nothing but a

19   pro form of hearing to them.  It's a sub rosa.  They're

20   involved in this constantly.

21          They're probably taught or go through some kind

22   of course to learn to go after the inmates, make all

23   these adverse statements against them regardless of the

24   amount of time that has been served and the

25   accomplishments by the inmate inside the prison.  And I

1 | will leave it at that on that issue.

2 |     **PRESIDING COMMISSIONER KUBOCHI:** Yes. Thank you

3 | very much.

4 |     **INMATE STAICH:** Okay. All right. Now as far as

5 | me being suitable for parole, I feel that I have

6 | accomplished a lot on my own with my disabilities, what

7 | I could do in this environment. I've been in prison for

8 | 25 years. You have made a lot of statements on the

9 | record here that I have never really been a part of the

10 | community for very long. So I've never really had a

11 | chance to be a productive citizen because when I was

12 | young I got involved with women. And things didn't go

13 | the right way. And it led to this. So that's where

14 | we're at right now.

15 |     But during all these years, you know, there is

16 | insight into this crime whether anyone wants to believe

17 | it or not. I know it's wrong. It should have never

18 | occurred. You know, it's just so hard when you're that

19 | young at the time and you just don't see things when you

20 | get older that you would see when you're younger. And

21 | on that aspect right there I still think I'm suitable,

22 | that I could be a productive citizen in the community.

23 | I have a lot of good qualities about me.

24 |     Other than this crime right here I have no prior

25 | violence inside the prison system. I've conducted

1  myself with respect. I give all the officers in the

2  prison respect. And they give me respect back. I've

3  never had any problems with anybody. I've been in this

4  prison for several years. And I obey the rules to the

5  best of my ability with the exception of the one where

6  I'm a Nazarite. And I do have religious beliefs that

7  have conflicted with the system a little bit. But other

8  than that I've caused no major disturbances.

9       I think that I've earned my parole after nearly

10 25 years in here. This was a crime that occurred when a

11 person was very young. And the other person was young.

12 And I made a lot of wrong decisions that you have

13 brought out on the record. You can't change those

14 things. They happened. They occurred. They're

15 history, not that we are going to leave them in the past

16 and not reflect upon them to make our self better in the

17 future. That's what we do when we do things wrong. We

18 look at the wrongs and we have to evaluate the future so

19 that we don't have this happen again.

20      My fiancé now is 50 something years old, you

21 know, close to my age. And she doesn't take drugs like

22 any of these other women I've been involved with. She's

23 a productive citizen in the community. She works at the

24 animal shelter as well. She takes in stray animals that

25 are going to be, you know, euthanized. She does a lot

| | |
|---|---|
| 1 | of things, everything that she can. And I just want to |
| 2 | go out there and try to be a part of that and help her |
| 3 | in her life and get on with mine and be a good, |
| 4 | productive citizen in the community and do everything I |
| 5 | can to help people. |
| 6 | I never wanted to turn out this way. And I |
| 7 | wasn't born to be some kind of a killer. And I never |
| 8 | wanted to kill nobody that night. I don't know what |
| 9 | happened after that man shot me. Yes, I made a big |
| 10 | mistake cutting the phone line, kicking the door open |
| 11 | and confronting the situation that way. I was young. |
| 12 | Before all these injuries happened, I used to be a |
| 13 | weightlifter and I was real big. You know, but I've had |
| 14 | a lot of damage to my body. |
| 15 | And I've learned, you know, that being that kind |
| 16 | of an aggressive individual is not the way that you get |
| 17 | through in life. You just can't do that. You don't use |
| 18 | physical violence or anything like that. And I think |
| 19 | these 25 years have shown that, that I do have remorse |
| 20 | in me and that I don't want to hurt people or do |
| 21 | anything bad to anyone. |
| 22 | I haven't touched any person in this prison |
| 23 | system. Remember I'm living amongst all kinds of gangs, |
| 24 | every kind of corruption you can think that is going on |
| 25 | in here, gambling and everything else. And it goes on |

1   in all these prisons.  I've kept myself away from all of
2   it.  I don't take drugs.  I don't do anything wrong at
3   all.  I just do my artwork that I've showed you there.
4   And I mind my own business.

5          I've seen several cases, though I realize this is
6   me, where the same situation has occurred where the
7   District Attorney is opposed and other people.  And
8   these crimes, you know, not to say that my crime is not
9   a bad crime, it is, but when you see other people out on
10  the streets that only served 20 years and they took an
11  armed, you know, they had a machine gun and shot a man
12  10 times.

13         This Rosenkrantz case where he is free now
14  because his father is a big trial attorney.  He has a
15  lot of money behind him.  He spent over a million
16  dollars on his different writs throughout the courts.
17  There is five different Rosenkrantz decisions, I mean,
18  just hundreds and hundreds of hours of people being
19  involved in this including Board members that have had
20  to make statements and depositions to different Attorney
21  Generals based on the case.

22         I mean, there is just so much effort that goes in
23  that opposes these things, but in the end, even inmates
24  like that have been released back into the community.
25  And he has been doing fine out there.  And this man went

1    to a shooting range a week before, fired that gun, did
2    everything he could to plan this murder.  But he's
3    walking the streets right now.  And he's doing good out
4    there from what I understand.

5        I'm just showing you that there is other people
6    that have committed these kinds of crimes that are back
7    in the community.  Another one is an Asian man that went
8    into a restaurant here, Mr. Lee, and had a problem with
9    the guy because he wouldn't pay him for his restaurant.
10   He opened fire in there and one of the bullets went
11   through the owner of the restaurant's wife's head,
12   killing her instantly.  He shot a couple of people in
13   there, too, as well.  He had attempted murders, guns,
14   all kinds of stuff.  This man was released back into the
15   community.

16       Now they have made some interesting
17   determinations in here as far as the law in being
18   suitable to the parole issues as far as some evidence is
19   concerned.  And basically what they're saying is the sum
20   evidence has to be something that was received or it's
21   part of what you have done in here that would reflect
22   that you're a threat to the community now.

23       I mean, we can go back into the crime that the
24   District Attorney has expressed his views about here.
25   And we can find all kinds of little things to tear it

1  apart and make me look like the big bad guy again.

2  Whether you consider that a retrial or not, it's still,

3  that's the same type of evidence that was put on at the

4  trial by the prosecution.  So, I mean, this can just go

5  on forever.

6         And we can spend millions of dollars on

7  taxpayers' money and having these hearings or we can let

8  a guy that's not a threat to the community get on with

9  his life.  It's costing taxpayers 53,000 dollars a year

10 for us to be in here.  The lifers are getting older.

11 There is lots of us in here.  The medical, you know, I

12 need all kinds of surgeries right now.  You know, it's

13 going to cost thousands of dollars.

14        I would rather go out in the community with my

15 artwork and make money and pay for my own stuff.  Why

16 should the taxpayers have to keep paying for me?

17 Everybody knows it's overcrowded.  They're trying all

18 these ways to effectively fix it.  There is hardly any,

19 you can't go to anything here, even these Anger

20 Management classes.

21        If I had a camera and took pictures, the lifers

22 are just stuffed in there.  It's hot.  You go through a

23 lot sitting in there.  But I went through all this

24 because that's what the last Board asked me to do.  I've

25 done everything that I could possibly do to show respect

78

1    for that Board and what they asked me to do.

2         And I'm not taking away that this crime was

3    committed by saying I done that.  I'm not trading that

4    for what I did.  What I did was what I did.  And it was

5    wrong.  And it's never going to occur again.  I can tell

6    you that.  Whether you keep me in here or not, I'm still

7    going to be a good person inside this prison or out on

8    the streets.  So I will leave it at that.

9         **PRESIDING COMMISSIONER KUBOCHI:**  Thank you very

10   much, sir.  It is now 2:27.  We're going to be in

11   recess.

12        **DEPUTY COMMISSIONER ALVORD:**  And we are off the

13   record.

14                         **R E C E S S**

15                           --oOo--

16

17

18

19

20

21

22

23

24

25

| 1 | **CALIFORNIA BOARD OF PAROLE HEARINGS** |

2          **D E C I S I O N**

3          **DEPUTY COMMISSIONER ALVORD:** Okay. We're back on

4    the record. The time is 3:12.

5          **PRESIDING COMMISSIONER KUBOCHI:** We're back on

6    record on the Subsequent Parole Consideration Hearing of

7    Ivan Staich. And Mr. Staich, I want to advise you that

8    we reviewed all information received from the public.

9    And before giving our decision I want you to know that

10   we seriously considered all the facts that you have told

11   us. And in reviewing Section 2281, I think it's

12   informative in regard to the factors that we consider

13   because you have repeatedly indicated the static nature

14   of the crime that happened in 1983. And you are correct

15   in that those facts could never change.

16         And it has been many, many years since your

17   commitment to state prison. And I'm sure that that time

18   has weighed heavily on you. And Section 2281 talks

19   about and describes determination of suitability in

20   Subdivision A it says, regardless of the length of time

21   served, a life prisoner shall be found unsuitable for

22   and denied parole if, in the judgment of the Panel, the

23   prisoner will pose an unreasonable risk of danger to

24   society if released from prison.

25   **IVAN STAICH    E-10079    DECISION PAGE 1    5/9-10/07**

*Capitol Electronic Reporting*

1          Subdivision B talks about information considered.

2     And we have honored all of your objections.  And we

3     believe that we have only relied on relevant, reliable

4     information.  And that in looking at the information

5     considered the ending sentence of that paragraph says

6     that circumstances, which taken along may not firmly

7     establish unsuitability for parole, may contribute to a

8     pattern which results in a finding of unsuitability.

9          And Subdivision C lists factors in a specifically

10    designated circumstances tending to show unsuitability.

11    And before getting into that Section and all the

12    subdivisions under Subdivision C or subsections,

13    Subdivision D is entitled Circumstances Tending to Show

14    Suitability.  And we have, you have talked about how

15    many years have gone by and how since 2001 you have not

16    had a 115.  And institutional behavior is but one of

17    eight factors listed, in fact, circumstances tending to

18    show suitability.

19         But even in looking at the institutional behavior

20    there have been 115s as recently as 2001.  Albeit you

21    have explanations for that because they were a series of

22    115s, the most recent of which was in 2001 for grooming

23    violations that this Panel is aware of federal

24    decisions.  But at the time of those 115s the

25    **IVAN STAICH    E-10079    DECISION PAGE 2    5/9-10/07**

1   regulations did support findings by staff here of the

2   violation of institutional rules.  And it is your lack

3   of 115s commence from 2001.

4        Of significant importance to this Panel is a 115

5   in 1996 that involved threats to your former wife or

6   girlfriend who is not the victim of the assault in this

7   case.  It's a very serious assault.  And if we look

8   back, throughout your, all of your brushes with the law,

9   you have had several different violations of the law

10  including a federal convictions for making threats by

11  the U.S. mail

12       And I would also like to point out that in 1977

13  the victims in that case received a threatening letter.

14  And that ultimately you received a prison sentence for

15  escape.  Now although the escape has nothing to do with

16  threatening letters, it is documented that you were

17  making threats as early as 1977 against either the

18  family of women or women.

19       That this, the life crime involved threats to

20  Ms. Bess, whose married name was Topper.  And that the

21  crime, that murder was in 1983.  And then, if we go

22  further in more recent time, you had a 115 for

23  threatening letters.

24       **INMATE STAICH:**  Yeah, but the psych indicated all

25  **IVAN STAICH     E-10079        DECISION PAGE 3      5/9-10/07**

*Capitol Electronic Reporting*

1   through there, he went through every little of area that

2   you're talking about.

3          **PRESIDING COMMISSIONER KUBOCHI:**  Sir --

4          **INMATE STAICH:**  And he discussed all that in the

5   psych report.

6          **PRESIDING COMMISSIONER KUBOCHI:**  Sir, I'm talking

7   about, I'm not talking about the psych report.

8          **INMATE STAICH:**  I know.  But he went through all

9   that.  And he's the only professional that has evaluated

10  me.  And he has recommended released.

11         **PRESIDING COMMISSIONER KUBOCHI:**  I'm not talking

12  about the psychological impact, sir.  What I'm finding

13  is that in 1978 you got a conviction for escape.  And

14  you received a prison, state prison sentence.  Later you

15  got a federal commitment.  This crime resulted in a

16  commitment in 1983 --

17         **INMATE STAICH:**  Yeah, I understand.

18         **PRESIDING COMMISSIONER KUBOCHI:**  -- to state

19  prison.  And in 1996 you received a 115 for making a

20  threat.  And there is a long pattern of violations

21  involving threats to women or members of their family

22  since your involvement in the criminal justice system in

23  1978 that had the prison commitment to your last 115 in

24  2001.  That's 23 years.

25  **IVAN STAICH   E-10079   DECISION PAGE 4   5/9-10/07**

85

1          **INMATE STAICH:**  Anyway I've never threatened

2   anybody's family.  Anything that was directly related to

3   a threat was within the person itself.  And there is

4   explanations for that as well in the psych report as

5   well if you would have read the whole thing.

6          **PRESIDING COMMISSIONER KUBOCHI:**  Mr. Topper was

7   threatened by you.  He was the wife (sic) of the woman,

8   Cynthia.  By your own admission you had an argument at

9   the door, sir.

10         **INMATE STAICH:**  There is no, I had an argument at

11  the door.  And he threatened me.

12         **PRESIDING COMMISSIONER KUBOCHI:**  And he's dead.

13         **INMATE STAICH:**  He threatened to kill me.

14         **PRESIDING COMMISSIONER KUBOCHI:**  We find --

15         **INMATE STAICH:**  He initiated a threat towards me

16  first.

17         **PRESIDING COMMISSIONER KUBOCHI:**  We find over the

18  period of your first state prison sentence in '78 all

19  the way through your life commitment that included the

20  series of 115s, that's a period of 23 years.  That's a

21  long time.  And so your institutional behavior has not

22  been that good.  And that's in a factor of suitability.

23         Going back over the factors of suitability, you

24  have no juvenile record.  That has been deleted by court

25  **IVAN STAICH    E-10079    DECISION PAGE 5    5/9-10/07**

1   order.  We don't know what that record is.  So that's

2   kind of an even thing.  We're not holding anything

3   against you.  But it was deleted by court order.  So

4   that's kind of not in the mix.

5       Stable social history, I find that your, all of

6   your involvement with the law involved women.  And I

7   would find that you have a very unstable history of

8   relationships with others.  In this particular case, an

9   example of the 67 calls you made while incarcerated to

10  the father of Ms. Bess.

11      In regard to motivation for the crime, which is

12  in the factors of suitability, there is not motivation

13  for you to have been involved in this murder and

14  attempted murder on Ms. Bess that could be within the

15  realms of society.  So the motivation for the crime is

16  not in your favor.  Lack of criminal history is not in

17  your favor because you have been in, you have two

18  separate imprisonments.  You have all --

19      **INMATE STAICH:**  Those are unchanging factors that

20  are never ever going to change.

21      **PRESIDING COMMISSIONER KUBOCHI:**  You have all had

22  violations of parole, sir.

23      **INMATE STAICH:**  I know.  But they're, those

24  things you are talking are ancient history that are

25  **IVAN STAICH    E-10079    DECISION PAGE 6    5/9-10/07**

*Capitol Electronic Reporting*

1   never ever going to change.

2        **PRESIDING COMMISSIONER KUBOCHI:**  Understanding --

3        **INMATE STAICH:**  So what you're doing is changing

4   the crime to first degree murder.

5        **PRESIDING COMMISSIONER KUBOCHI:**  -- and plans for

6   the future, well we have considered that and --

7        **INMATE STAICH:**  Well the federal courts have

8   already said in Biggs that you have a limit.  It's a

9   second degree murder.  And you're not going to get away

10  with this.  I know what you're doing.  You're trying to

11  set the record to establish that there is some kind of a

12  jealousy pattern.  That was already overruled in the

13  psych report.  And he is the only professional person

14  that has evaluated me in this whole case.

15       **PRESIDING COMMISSIONER KUBOCHI:**  Sir, you're

16  arguing.  I'm announcing the decision.  There is a

17  factor --

18       **INMATE STAICH:**  I know that.  But I can see where

19  you're going with it.

20       **PRESIDING COMMISSIONER KUBOCHI:**  -- and

21  circumstances tending to show suitability and signs of

22  remorse.  In that regard, the factor there is whether

23  you have given indication that you understand the nature

24  and the magnitude of the offenses.  Although, you

25  **IVAN STAICH    E-10079    DECISION PAGE 7    5/9-10/07**

1   verbally state that you're sorry for the crime you

2   committed, the insights as to your involvement, the

3   justifications for your involvement, the statements as

4   to the causation factors lack credibility at this time,

5   sir.  We feel that you need more time to consider why

6   you would have such a fixation on this woman.  Once

7   again, the calls --

8           **INMATE STAICH:**  That's ancient history.  I've had

9   several, I've been with over 10 women inside the prison

10  system since then.  So how can you even say that?

11          **PRESIDING COMMISSIONER KUBOCHI:**  I'm talking --

12          **INMATE STAICH:**  One woman?

13          **PRESIDING COMMISSIONER KUBOCHI:**  I'm talking

14  about before the life crime.

15          **INMATE STAICH:**  Well this is almost 25 years ago.

16          **PRESIDING COMMISSIONER KUBOCHI:**  In regards to

17  the circumstances tending to show unsuitability, factor

18  one, the commitment of the crime.  The prisoner

19  committed the offense in an especially cruel manner.  In

20  this case here, the two victims were asleep inside

21  Cynthia Bess' grandfather's home.  You kicked in the

22  door.  You had cut the phone lines.  And one person

23  ended up shot and killed after being struck with a

24  hammer.

25  **IVAN STAICH    E-10079    DECISION PAGE 8    5/9-10/07**

*Capitol Electronic Reporting*

1        **INMATE STAICH:**   That's why I was shot because he

2   was sleeping.   The gun just got up and pointed at me and

3   shot me.

4        **PRESIDING COMMISSIONER KUBOCHI:**   Ms. Bess was

5   struck by you in such a vicious manner that she has two

6   brain surgeries and suffered irreparable brain damage.

7   Multiple victims were attacked in this particular case,

8   one killed, one seriously injured by you.   The jury

9   verdict was attempted murder on the second victim.

10  Another factor, whether the offense was carried out in a

11  calculated manner, in this particular case, you had made

12  calls while incarcerated.

13       **INMATE STAICH:**   Over 25 years ago.

14       **PRESIDING COMMISSIONER KUBOCHI:**   You were

15  released on parole in November.   Less than 22 days

16  later, one person ended up dead.   And one person ended

17  up with irreparable brain damage.   You went over there.

18  You had a, you brought a hammer.   You cut the phone

19  lines.   This was all calculated, sir.   The victim was

20  abused or mutilated during the offense.   There was no

21  justification to leave Ms. Bess in such a damaged

22  condition.   You could have easily stopped.   You could

23  have easily ceased after kicking in the door.

24       **INMATE STAICH:**   I was all shot up at the time in

25  **IVAN STAICH     E-10079     DECISION PAGE 9     5/9-10/07**

*Capitol Electronic Reporting*

1  complete disarray of my own life and my survival.

2          **PRESIDING COMMISSIONER KUBOCHI:**  And kicking

3  in --

4          **INMATE STAICH:**  And I was being shot at again.

5          **PRESIDING COMMISSIONER KUBOCHI:**  After kicking in

6  the door of a house, after cutting the phone lines,

7  sir --

8          **INMATE STAICH:**  You can keep saying that, 25

9  years ago, go ahead.

10         **PRESIDING COMMISSIONER KUBOCHI:**  The offense was

11 carried out in a manner which demonstrates a callous

12 disregard for human suffering.  There is no doubt that

13 Ms. Bess suffered horrible, horrible pain and damage.

14         **INMATE STAICH:**  That's what happened in the

15 Weider Decision right here.

16         **PRESIDING COMMISSIONER KUBOCHI:**  The motive --

17         **INMATE STAICH:**  The Board did the same to him.

18         **PRESIDING COMMISSIONER KUBOCHI:**  The motive for

19 your crime was inexplicable and very trivial in relation

20 to the commitment offense.  Two, previous record of

21 violence, though in this case here you had threats of

22 violence that resulted in a federal prison --

23         **INMATE STAICH:**  I served my time for that.

24         **PRESIDING COMMISSIONER KUBOCHI:**  Unstable social

25 **IVAN STAICH    E-10079    DECISION PAGE 10    5/9-10/07**

1  relationships again.  You have demonstrated that with

2  the women in your life you have had very unstable

3  relationships prior to your incarceration and conviction

4  for the murder charge.  And as far as institutional

5  behavior, we find 115s as recently as 2001.

6        **INMATE STAICH:**  I'm a Nazarite.  We won that in

7  the United States Supreme Court, the Cutter Decision.

8        **PRESIDING COMMISSIONER KUBOCHI:**  Back to the

9  decision, sir, I've listed the factors.  And clearly,

10  the factors that tend to show unsuitability far outweigh

11  the factors of suitability.  The factors of suitability

12  do include many dynamic factors.  And we find that in

13  regard to your signs of remorse, we find the words

14  lacking in credibility and meaning on your part.  We

15  find them superficial in regard to the causative factors

16  in this case and the way that this crime was committed.

17  These are dynamic factors that you control, sir.

18        In regard to your prior record, as I've indicated

19  you have had a record of threats of violence to other

20  people.  You have an escalating pattern of criminal

21  conduct before the life crime.  You have a history --

22        **INMATE STAICH:**  So you're going to change my

23  crime to life without because you're making these

24  statements?

25  **IVAN STAICH      E-10079      DECISION PAGE 11    5/9-10/07**

*Capitol Electronic Reporting*

1      **PRESIDING COMMISSIONER KUBOCHI:**  --' of unstable

2    and tumultuous relationships with others.  And you

3    failed to profit from society's previous attempts to

4    correct your criminality --

5      **INMATE STAICH:**  (Indiscernible.) -

6      **PRESIDING COMMISSIONER KUBOCHI:**  -- especially in

7    the federal parole and the federal conviction for making

8    threats.  Your institutional behavior includes 115s,

9    especially the 1996 threat to your threat to a woman.

10      **INMATE STAICH:**  That's over 11 years ago.  That's

11   ancient history.

12      **PRESIDING COMMISSIONER KUBOCHI:**  And you have

13   participated in a limited manner in group therapy, self-

14   help, self-study.

15      **INMATE STAICH:**  I've taken every program that's

16   available in this prison.

17      **PRESIDING COMMISSIONER KUBOCHI:**  We make a

18   finding that you need therapy in order to face, discuss,

19   understand and cope with stress in a non-destructive

20   manner as well as relationships with women.  Until

21   progress is made, you continue to be unpredictable and a

22   threat to others.

23      **INMATE STAICH:**  How you going to gain this

24   progress?

25   **IVAN STAICH     E-10079     DECISION PAGE 12     5/9-10/07**

1    **PRESIDING COMMISSIONER KUBOCHI:**  Therapy in a

2    controlled setting is needed.  But motivation and

3    amenability are questionable.  In a separate decision,

4    the Hearing Panel finds that the prisoner has been

5    convicted of a very serious murder and attempted murder

6    that involved multiple victims.  And therefore, it is

7    unreasonable to expect that parole would be granted in

8    the next four years.

9         In this particular instance the crime was carried

10   out in a calculated manner.  You had made 67 calls

11   during your incarceration for the federal offense that

12   involved making threats --

13        **INMATE STAICH:**  Over 25 years ago.

14        **PRESIDING COMMISSIONER KUBOCHI:**  -- through the

15   U.S. Postal Service, notwithstanding those collect

16   calls.  Upon your release in November, you immediately

17   implemented a plan to go over, locate this woman --

18        **INMATE STAICH:**  I've not been convicted of making

19   no plan.

20        **PRESIDING COMMISSIONER KUBOCHI:**  You cut --

21        **INMATE STAICH:**  Of second degree murder, no

22   premeditation.

23        **PRESIDING COMMISSIONER KUBOCHI:**  You cut the

24   phone lines.  You kicked in the door.  And thereafter,

25   **IVAN STAICH    E-10079    DECISION PAGE 13    5/9-10/07**

1  one person ended up murdered.  One person ended up with
2  permanent brain damage.

3      **INMATE STAICH:**  After they opened fire with a gun
4  on me first.

5      **PRESIDING COMMISSIONER KUBOCHI:**  The second
6  victim was mutilated in that you --

7      **INMATE STAICH:**  Nobody was mutilated.  They were
8  firing a gun at me.

9      **PRESIDING COMMISSIONER KUBOCHI:**  -- struck her
10  repeatedly with --

11      **INMATE STAICH:**  In self-defense.

12      **PRESIDING COMMISSIONER KUBOCHI:**  -- one of the
13  handguns with such veracity that she suffered
14  irreparable brain damage.  The offense was carried out
15  in a manner that demonstrates a callous disregard for
16  human suffering in that you had many opportunities to
17  cease your involvement with the entire conduct and
18  refused to do so.

19      Your motive for the crimes was inexplicable or
20  very trivial in relation to the offense.  We have also
21  considered the 1996 115 as well as the series of 115s
22  that demonstrate an attitude toward following
23  institutional rules and behavior, the most recent of
24  which was in 2001.  Sir, that is the decision of this
25  **IVAN STAICH    E-10079    DECISION PAGE 14    5/9-10/07**

1   Panel.  And we're denying parole for four 'years.

2   Commissioner?

3         **DEPUTY COMMISSIONER ALVORD:**  Very briefly.  Sir,

4   it's readily apparent to me that you think that the key

5   to being released from this facility lies within the

6   courts through some type of legal means.

7         **INMATE STAICH:**  It does.  You can't keep second

8   degree murder in for life without.  That's what you're

9   doing.

10        **DEPUTY COMMISSIONER ALVORD:**  Sir, I'm going to

11  put my statement on the record either --

12        **INMATE STAICH:**  You are using this as a court

13  trial.

14        **DEPUTY COMMISSIONER ALVORD:**  -- with you here or

15  without you here.

16        **INMATE STAICH:**  I know.  That's fine.  Go ahead.

17        **DEPUTY COMMISSIONER ALVORD:**  Well I'm not going

18  to do it if you interrupt me.

19        **INMATE STAICH:**  I won't.  Go ahead.

20        **DEPUTY COMMISSIONER ALVORD:**  Quite frankly, I

21  feel you would be far better served by taking more self-

22  help classes.  What I see is a very bright fellow who

23  has adjusted to the prison environment.  And that's

24  clear by the fact that your disciplines have been fairly

25  **IVAN STAICH    E-10079    DECISION PAGE 15    5/9-10/07**

*Capitol Electronic Reporting*

1   good within the facility.  The problem is 'I also see in

2   the same fellow that committed the life crime 25 years

3   ago.  I don't see any change in you.  What I see is a

4   complete lack of insight.  And that's reinforced, in my

5   mind at least, through the 1996 115 that's almost

6   identical to the events of 25 years ago.

7         **INMATE STAICH:**  Yeah, but you're --

8         **DEPUTY COMMISSIONER ALVORD:**  I would --

9         **INMATE STAICH:**  -- not letting me expound on

10  that.  You guys --

11        **DEPUTY COMMISSIONER ALVORD:**  I thought you

12  weren't going to interrupt me.

13        **INMATE STAICH:**  I'm not.  I'm just telling, I

14  have to put facts --

15        **DEPUTY COMMISSIONER ALVORD:**  I thought what, what

16  I would suggest you do --

17        **INMATE STAICH:**  -- for my own attorney.

18        **DEPUTY COMMISSIONER ALVORD:**  What I would

19  suggest, I strongly suggest that what you should do is

20  get self-help.  Go to the library.  Get as many books as

21  you can on self-help to try to change who you are

22  within.  I think that's the key to your eventual

23  release.

24        **INMATE STAICH:**  I have done that, Sir, whether

25  **IVAN STAICH    E-10079    DECISION PAGE 16    5/9-10/07**

1   you want to recognize that or not, that's up to you.

2         **DEPUTY COMMISSIONER ALVORD:**  With that I wish you

3   good luck.

4         **INMATE STAICH:**  Can I put some stuff on the

5   record here?

6         **DEPUTY COMMISSIONER ALVORD:**  It's 3:30 p.m.  This

7   hearing is concluded.

8         **INMATE STAICH:**  That's what I thought.

9         **DEPUTY COMMISSIONER ALVORD:**  And we are off the

10  record.

11        **INMATE STAICH:**  You never gave me a chance to put

12  any objection on the record, did you?  We'll see how the

13  Court likes that.

14                         --oOo--

15

16

17

18

19

20

21  **PAROLE DENIED FOUR YEARS**

22  **THIS DECISION WILL BE FINAL ON:     SEP 0 6 2007**

23  **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT**

24  **DATE, THE DECISION IS MODIFIED.**

25  **IVAN STAICH     E-10079     DECISION PAGE 17     5/9-10/07**

*Capitol Electronic Reporting*

E X H I B I T   " F "

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS AND REHABILITATION

CDC-128B (8/87)

Name and Number:    STAICH, I.            E10079            CW-137U       5/11/07

Inmate STAICH, CDC# E10079, has successfully completed 2 weeks seminar series entitled, How To Become A Sober Father and Not Get Angry, sponsored by CTF's Muslim Development Center. The series is designed to enlighten participants regrading the ever changing role of father's in the American Society and how, despite social pressure, the fundamtnetal responsiblities of the fathers have not changed. The primary goal of this program is to eliminate anger as a response and remove the desire for intoxicants (drugs, alcohol, etc.) from individuals who have within themselves the potential to become model fathers and community leaders. Inmate STAICH participation in the program entitles him to this chrono.

Ori  C-File
     Writer
     Inmate

Date    4/9/2007            Informational

Antar Jannah
Muslim Chaplain
Correctional Training Facility

General Chrono

# Certificate Of Completion

*Awarded To*

## Ivan Von Stoich

*On this Thursday, December 22, 2005 for faithfully completing 12 weeks of prescribed studies in the class for:*

## ANGER MANAGEMENT

He has acquired life skills based on Christian principles taken from Scripture.

These skills will help him to handle anger in all forms.

He has mastered the 13-step interactive program.

He is to be congratulated for his outstanding effort in this course.

David Ewart, Instructor

Judge C. Lindsey, Protestant Chaplain

STATE OF CALIFORNIA                                                    DEPARTMENT OF CORRECTIONS AND REHAE

NAME and NUMBER:    STAICH, I.              E10079              CW-137U                    CDC-I:

This inmate has completed the 12-week Anger Management Class conducted in the Protestant Chapel. He now knows: the ways to handles anger; understanding how pride, fear, lonliness and inferiority feed your anger; uncovering the myths that perpetuate anger; identifying learned patterns of relating, thinking, and behaving in y life that influence your anger. The 13-step interactive program was accomplished by the student. He now has th knowledge and understanding to deal with stress in a non-destructive manner. He is to be congradulated for his outstanding effort.

ORIG    : C-File
cc      : Chaplain
        : Inmate

Judge C. Lindsey
Protestant Chaplain
CTF-Soledad

DATE  December 8, 2005          LAUDATORY CHRONO                    INFORMATIONAL CHR(



# Certificate of Completion

*Awarded to:*

## Ivan Von Staich

On this 23rd day of February 2006, for faithfully completing
the "Healing For The Angry Heart" video series in.

# ANGER MANAGEMENT

He has acquired these skills through practical biblical insights
to deal with heart issues, discovered the secret to being heard,
learned to release guilt, trust again and break habit cycles.

Richard Mireles
Education Deacon
CTF Central Chapel

Judge C. Lindsey
Protestant Chaplain
CTF Triplex Facility

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS AND REHABILITATION

CDC-128 B (6-87)

NAME and NUMBER:    STAICH, I.    E10079    CW-137U

This inmate has completed Lisa Bevere's "Healing for the Angry Heart" video series.  This series provides practical, biblical insights to help deal with the past and move forward in life.  It does this by teaching how to deal with heart issues, discover the secret to being heard, release yourself of the guilt, learn to trust again, and break habit cycles.  He is to be commended for his diligent efforts in completing this series and applying its concepts to his everyday life.

Judge C. Lindsey
Protestant Chaplain
CTF-Soledad

ORIG    : C-File
cc      : Chaplain
        : Inmate

DATE:  February 23, 2006        LAUDATORY CHRONO        INFORMATIONAL CHRONO

# Certificate of Completion

This document certifies that

## Ivan Von Staich

has successfully completed

## Anger Management/Fatherhood

awarded this ___1___ day of ___October___ ___2005___

_(Instructor)_



Name and Number:          Staich, I          E10079          CW-137U          CDC-128B (Rev.4/74)

Inmate Staich has successfully participated in and completed the Muslim Development Center's - (Twelve-week) Anger Management Course. The course is based on principles rooted in Interfaith Religious Scripture and spiritual models of exemplary social behavior. Inmate Staich is commended for his outstanding participation and completion of the Interfaith based Anger Management Course and was awarded a Certificate of Completion.

Date: 11/19/2005

Original: C-File
cc:  Chaplain File
      Inmate

Imam Antar Jarridah
Muslim Chaplain
Correctional Training Facility - Central

(Anger Management Course Completion)          GENERAL CHRONO

# LAUBACH LITERACY ACTION

## VOLUNTEER TUTOR WORKSHOP
### CERTIFICATE OF COMPLETION

This is to recognize that ___Ivan Von Staich___

has satisfactorily completed a ___12___ hour workshop with emphasis on tutoring

___Literacy___ sponsored by a Laubach Literacy Action member program,
(Literacy/ESL)

and/or conducted by an LLA certified trainer.



U.S. PROGRAM OF
LAUBACH LITERACY INTERNATIONAL

LAUBACH
LITERACY
ACTION

### Reading Opportunities

Program

Trainer

Executive Director Laubach Literacy Action
Peter A. Waite

President/CEO, Laubach Literacy International
Bill Cowell

Date  06-12-2001

LLA 6

# UNIVERSITY OF CALIFORNIA, LOS ANGELES UCLA EXTENSION

*This is to certify that*

Ivan Von Staich

*has satisfactorily participated*
*in the* ARTSREACH *class: Creative Writing*



Date:  October 10, 1996

*(signature)*

Director, Department of The Arts

## DECLARATION FROM SHELLEY WOOD

I, Shelly Wood, do declare the following is true and correct:

A) I am currently engaged to be married to Ivan Von Staich. Ivan is a wonderful man who is talented, artistic and has great plans for the future. I have personally written to the California Board of Prison Terms commissioners on several occasions, regarding the parole of Ivan. Ivan and I are currently engaged to be married upon Ivan's release from State Prison. I have a house in Mira Loma California that we plan to make our home. Upon Ivan's release my home is available as his primary residence. Both of my children are excited about our new family. We have plans to be married and begin our lives together as soon as he is paroled. In the past, I have had occasion to speak to Ivan's prison councilors' at CTF-Soledad. I have assured the councilors', in the past, as I am today, that Ivan's parole plans include a stable home environment to begin his new life.

B) I would like to state for the record, that I feel the California Prison System is holding Ivan illegally. He has served over 23 years. I have known Ivan for most of his life and have seen Ivan both educate himself and prepare for his new life. It does not make since for tax payers to continue to pay for his incarceration. Ivan is not a violent man and has stood by his religious beliefs and lived as a peaceful and reasonable man during his incarceration. We all have times in our lives when we may make some decisions that we wish we could change. The fact is, Ivan is a man who only wants to live his life and have a family like all Americans. There just is no justice in his

continued incarceration.    The circumstances that put him in prison occurred nearly 25 years ago.    Ivan deserves to be judged by his actions today and the steps he has taken to improve himself and educate himself into a productive law abiding citizen.    Actions 25 years ago were tried and decided, while important to the issue they are in the past.    Ivan today is what is at issue in 2006.    I mentioned that I have known Ivan for nearly his entire life, therefore I believe its worth mentioning that the records do not properly reflect the actual facts regarding his life as a child.    Ivan in fact had a loving home with good social up bringing.    Ivan's parents and brothers and sisters were brought up to respect each other and family in general.    His family members have homes and businesses and still maintain their relationships with each other.

C)    I believe its important to state what I know about the circumstance around the crime that Ivan was convicted.    The women he was involved with in 1979 had many problems and of course in hindsight it was a bad relationship from the start.    I know that Ivan was a victim of the circumstances before him.    I realize many will not appreciate that opinion, but it is a fact.    Ivan believed the women was in love with him, when in fact she was planning to marry another man named Robert Topper.    Both victims, the women Cindy Sue Topper and Robbert Topper both had other plans and Ivan was in danger and did not know it.    I had occasion to speak with Cindy Sue Topper and she admitted to me that Robert had planned to shoot Ivan.    Both the victims had guns and were waiting for Ivan on the night of the incident.    Ivan did not know that Robert Topper had plans to shoot Ivan and waited for him to arrive.    I am not attempting to try this case again but to make it clear this was not a premeditated crime that Ivan planned to

commit.    That being said Ivan has served nearly 24 years and neither what I say or what the authorities thought mattered. That fact is 24 years have passed and Ivan derserves a chance to start over.

D)    The fact that I have know Ivan all these years allows me to state things as facts I know. The first is Ivan is not and never has been a drug or alcohol user.    He deplores drugs and there physical and psychological effects on the mind and body.    He is deeply religions and has been able to have long standing relationships even with the difficulties of being separated while he is incarcerated.    Ivan's problems in his youth were unfortunate, but like all of us we made choices in the past we wish we could change.

I believe Ivan is ready to come home.    I believe that if this parole board had the opportunity to question Ivan and take the time to read the reports of the Psychological review they would see that Ivan is and should be found suitable for parole.    I am available to testify and provide any other information you may need.    I pray that this Board follows the recommendations of the Professionals in Psychology and his record of being a inmate who works to better himself and improve himself and take the action necessary to free Ivan at this time.    I can be reached at (951) 279-3418 regarding this declaration.

I, Shelley Wood state the above under penalty of perjury and that all the facts stated herein are true and correct, and this declaration was made within all laws of the State of California. This declaration was executed on this 5th day of June 2006, in the city of Mira Loma California.

Shelley Wood

Sept 16-2006

To Whom It may Concern    STAICH
                          E10079

Am writing too let you know We do approve of letting our son out of prison. He can come live with us. We have gotten older now. Mr Staich is ill and cant work anymore. Ivan could help with all the chores here. We do not feel that Ivan is a person that would intentionally go out and harm someone. He simply got involved with a girl that caused him a lot of heartaches. It would please us to see him out in society getting on with his life. My best regards go to those who are helping Ivan to renew his life.

Sincerely
Charlotte Staich

Our phone number is 1-951-927-3312
If you have to reach me

9-18-06

To Whom It may Concern.

I've been writing Ivan
for about 4 yrs. He's a
very nice guy I enjoy
writing to him. I hope
I will get to meet
him in person. my
Aunt is in love with
him. And really wants
to be with him.
So please let him out.

Thank
you
Samantha
Muncker

(951) 274-9219

In reGUARDS TO IVAN Von Staich

8-18-0(

To whom it may concern I have
Known Ivan Vanstalin for about 4 yrs.
I've been writing him to for about
4 yrs. He is a thindy, nicee, honest, respectfu
and giving person. He has been
dating my aunt Shelly for about 4yrs
to. He is suppose to live with her
when he gets out. And I can't
wait for him to get out. Him and my
aunt Shelly are suppose to get married
When he gets out, and comes home
I look forward to Ivan
coming home.

Perrianne Wood

(951) 205-2618

Aug 18, 06

To whom it may Concern my name is norma abercrombie I Reside at 6680 APT B palm ave Riv, Ca 92506 my phone number is (951) 782-0670. I am writing this letter in regards to Ivan Von Staich - E-10679 I Have Known Ivan for 30 yrs I met Ivan in norco, Ca He was about 13 to 14 Ivan very Quickly became part of our Family I considered It Ivan like one of my own Children. Ivan was and always has Been very Respectful, Kind, Caring and has always displayed very High morals and values. Ivan and myself Have Stayed in contact through out The years and the same with my Children. I Recall Ivan when He was Just a Young man haveing goals

and direction for his life
He was one of few children
That I knew that had a
Plan and dreams I speak
To Ivan often and have
noticed He still has the
Same goals and direction
Where he wants his life
To go He has never given
up Hope or the will to
make his dreams Happen.
I Beleive Ivan will no dought
acheive many positive goals
Once given the opportunity and
will very quickly become a
Great member of Society
acheiving many things.
Ivan is always Welcome in
my home and always has
Been I told Ivan I have a
Room in my home waiting
For him to come home.
and that I would help him
acheive His goals and dreams
any way I could that I
Will always be there for

Him Just the way I am
For my own Children.
IF given the opportunity
Ivan will be one of very
Few That will make it and
Wont Be returning. To me
Ivan has displayed truth
In that By never giving up
on his goals or dreams.

    Thank you

   Norma Abercrombie

8-8-06

LIT-C

To Whom it May concern,

My name is Jessica Stiffler, daughter of Michele, Ivan's Fiancé, I have been writing to Ivan for about 4 years now, getting to know Ivan. Ivan has a very mellow, low key personality & is very kind hearted, he sends us pretty drawings & talks about how he would like to grow a vegitable garden & hopefully live the rest of his life simple & peaceful. He just wants to be with the women he loves, so he can make a life for her. He's very loving & respectful to her just like everyone tells me he was in the 70s & beleive me, i've done my research on my mom's behalf. Her getting back in touch with Ivan has made her very happy. I cant wait to meet Ivan in person so we can start a life. My mom misses him very much & would like to start her life with him. Thank you for your time and consideration

Jessica Stiffler

To whom it may concern

My name is Joyce A. Wood
I've known Ivan
Since I was in Jr. High.
My parents know Ivan he
would come over all the
time, Ivan was always
welcomed at our house.
He even helped my Dad
fix things around the
house or work on cars.
My parents always invited
Ivan to eat with us.

Ivan always showed respect and kindness to others or I have tried to stay in touch with Ivan through out the years. He seems like the same old Ivan. When Ivan gets out I've invited him to stay with my self and daughter. I've always trusted Ivan and still do.

Please allow Sven to finish his life with loved ones who care for him.

Thank you for reading this and God Bless you.

Joyce Munden
7-22-56

951-274-9219

8-17-06

Hello my name is Gypsy Sturdevant, I am
12 years old and have known Ivan Von
Staich for, 4 years. He is a very nice,
caring, and giving man. He loves and has
been dating my aunt Shelley for a while
Now. He loves my aunt Shelley and she
loves Ivan. I cant wait till the day he gets
out. He will most likely be living with my
aunt Shelley when he gets out. I love him
very much and hope he gets out very soon.
It is important to my aunt that he gets out
soon hopefully. Ivan Von Staich is close to
being my uncle. I will be very happy the day
he gets out. And hopefully the day he gets
out is soon. Ivan Von Staich is a great and
loving uncle. I think he deserves to get out
some time soon I mean he did his time.
Well I will be very happy when he gets out.
Sincerely, Gypsy Sturdevant.

Ivan Von Staich is a wonderful person. He makes my mother really happy. He's helped her out in numerous ways. My mom really needs his help, support, and love. I can't wait for him to come live with us. He's been very sweet to my mother and treats her with the utmost respect. He is considerate and motivated. I know that he can accomplish great things if given the chance. He has sends us cards on every holiday and always asks how we are doing. He needs my mom as much as she needs him.

Sincerely,

Krissy Fleming

NAME AND NUMBER  STAICH / E10079     CTF CEN  HOUSE- C-137     CDC-128-C.

## "PHYSICAL LIMITATIONS"

1. BASED ON THIS INDIVIDUAL'S:

☑ acute *medical* condition
___ chronic *medical* condition
___ temporary disability
___ permanent disability (see 1845)
___ impacting placement
yes ___  no ___

2. THE FOLLOWING ACTIVITY RESTRICTIONS ARE RECOMMENDED:

*movement/position*

☑ no prolonged standing (not longer than 30 minutes every ___ minutes)
☑ no prolonged sitting (not longer than 15 minutes every ___ minutes)
☑ no climbing
☑ no bending, stooping or twisting
☑ no lifting over 15 pounds
☑ no crawling
☑ no prolonged walking (not more than 200 feet without resting)
___ no use of (R / L / both) arm (s)   Restrictions: ___
___ no weight bearing (R / L) leg
___ limited weight bearing (R / L) leg
___ other

*environment:*

___ may not work around heat
___ may not work around or use machinery
___ may not work at heights
___ may not work with hands in water
___ may not work outdoors
___ may not work in dusty areas
___ other ___

3. START DATE:  6-24-05

4. END DATE:  6-23-06     Duration: (approx) 1 yr.

5. AUTHORITY:  _C L Sinnaco_     6-24-05
              PHYSICIAN     Cesar L. Sinnaco, M.D.     DATE
                            Physician and Surgeon, CTF

ORIG: C-FILE
COPY: UNIT SGT.
      INMATE
      CONTROL
      CCI
      ASSIGN. LT.
      CHIEF NURSE
      MEDICAL FILE
      CHRONO FILE



NAME AND NUMBER: STATER, A CDC-1285-C

Inmate: STATER

DURATION: [3]

due for a medical condition, should be housed in a lower bunk tier.



STAFF PHYSICIAN

Cesar E. Simaco, M.D.
Physician and Surgeon, CTF

ORIG: C-FILE
COPY: UNIT SGT.
       INMATE
       CCI
       ASSIGN. LT.
       CONTROL
       MEDICAL FILE
       CHRONO FILE

DATE: 6-24-05

gw

MEDICAL·PSYCHIATRIC·DENTAL

## RADIOLOGY REPORT

NAME: STAICH, Ivan    NUMBER: E-10079    DATE: 03/17/94

DOCTOR: Tur    HOUSING: 3C

HISTORY:  Old back injury at L5-S1, disc wounded. Old gunshot wound neck. (has bullet in chest).

CT LUMBAR SPINE:

CT scan of the lumbar spine examination has been done with axial sections through the five lumbar vertebral bodies and also sagittal reconstruction. Lumbar spine examination consist of 5 mm bone and soft tissue density settings through the lumbar spine. At the 5-1 level no definite lumbar disc herniation is noted. There is facet arthropathy but this does not narrow the lateral recesses. Minimal ligamentous thickening is noted at the L5 level anterior the laminae. At the 4-5 level there are findings consistent with central disc herniation which obliterates also to the epidural fat on the right side and may contain a small calcified focus. This acutally would be better demonstrated with MRI if indicated clinically. Facet arthropathy is moderate at this level narrowing the lateral recesses. At the 3-4 level there is a small broad based bulge but no significant lumbar spinal stenosis set at the more cephalad levels. No herniation is identified.

IMPRESSION:    1.    At the L5-S1 level minimal facet arthropathy but no definite lumbar disc herniation.
2.    At L4-5 there is moderate facet athropathy slightly narrowed in the lateral recesses combined with the central and slightly right sided disc herniation obliterating epidural fat on the right side.
3.    At the L3-4 level there is a mild broad base disc bulge but no facet arthropathy.

Thomas MacLennan, M.D.

Dictated: 03/17/94 TM:rds
Original: Medical Chart
  cc:  X-Ray Jacket

NAME and NUMBER    STAICH, IVAN    E10079    4B4L-36R    CDC-128-C

Due to his musculoskeletal problem, this inmate needs to be able to stay in a lower bunk on a lower tier. This chrono will be effective for one year, dating from February 25, 1997 through February 25, 1998 at which time he will be reevaluated by the Medical Department.

Khamnung Thirakomen, M.D.

Reviewed by L. Loo, M.D., H.C.M.

ORIG:    Unit Health Record
cc:     C-File
        4BCCII
        Inmate

NAME AND NUMBER:     STAICH, IVAN  E-10079   3C 01 133L        CDC-128-C

Chronic low back pain with facet arthropathy two bulging disc. No
lifting over 15 lbs., stooping, or bending indefinitely.

Juan Tur, M.D.
Staff Physician

CC:   C-FILE
      MEDICAL RECORD
      CC-II
      HOUSING OFFICER
      INMATE
      ASSIGNMENT LT.
      SUPERVISOR
      YVONNE KEIGHER

MEDICAL

## X-RAY REPORT

CORCORAN STATE PRISON HOSPITAL

NAME  STAICH                               NO.  E-10079        DATE  5-6-92

X-RAY OF  Lumbar Spine (2 views)          ORDERED BY   Dr. Burvant

CLINICAL DATA:  C/O low back pain

The bone architecture and alignment are normal. There is a bullet in the left
flank. Small pieces of shrapnel are identified at the level of L-1 in the soft tissue
of the left back. Intervertebral disc narrowing at L-4/L-5 to a moderate degree is seen
and more significantly at L-5/S-1 with an early gas disc change. Posterior elements are
normal.

Impression:  Probable L-4/L-5 intervertebral disc disease and definite L-5/S-1
intervertebral disc disease.

S. Silverbach, M. D.

NAME AND NUMBER  STAICH       E-10079      G 120 L          CTF-Central       CDC-128-C

Inmate STAICH, E-10079, due to a medical condition (herniated lumbar disc and gerd), should be housed in a lower bunk
and lower tier.

DURATION:  12 months.

C. L. [signature]

ORIG:  C-FILE
COPY: UNIT SGT.
      INMATE
      CONTROL
      ASSIGN. LT.

C. SINNACO, M.D.
STAFF PHYSICIAN
CORRECTIONAL TRAINING FACILITY

Saunders
V.
Horn,
959E

LABORATORY REPORTS

# X-RAY REPORT
FOLSOM STATE PRISON HOSPITAL

NAME __STAICH__ NO. __5-10079__ DATE __9-24-91__

X-RAY OF __Upper GI__ ORDERED BY __Dr. Milliman__

CLINICAL DATA _____ Ir

The patient swallowed the barium easily and the structure and function of the esophagus is seen to be normal. A small intermittently-produced uncomplicated sliding axial hiatal hernia with observed reflux is identified. The stomach itself has a normal shape, rugal pattern, and peristalsis. There are a few small fragments of shrapnel noted in the left upper quadrant. There is a question as to whether the patient had a splenectomy. The duodenal cap, loop, sweep, and proximal small bowel are normal.

Impression:  Hiatal hernia with reflux.

Probable splenectomy.

S. Silverbach, M. D.

SS/mrt 9-24-91                    VGA 149

NAME AND NUMBER:    STAICH, IVAN    E10079    3C04-122L    CDC-128

This inmate has chronic allergies.  It would be appreciated if this taken into account when he is transferred to another institution.

Bert Hoffman, M.D.

Reviewed by: Dr. Loo, CMO (A)

CC:  C-FILE
     UNIT HEALTH RECORD

CSP/CORCORAN                    MEDICAL

DATE:  dr    8/9/95

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS

## COMPREHENSIVE ACCOMMODATION CHRONO    C - 137

INSTRUCTIONS: A physician shall complete this form if an inmate requires an accommodation due to a medical condition. Circle P if the accommodation is to be permanent, or T if the accommodation is to be temporary. If the accommodation is temporary, write the date the accommodation expires on the line. A new form shall be generated when a change to an accommodation is required or upon renewal of a temporary accommodation. Any new form generated shall include previous accommodations, if they still apply. Chronos indicating permanent accommodations shall be reviewed annually. This form shall be honored as a permanent chrono at all institutions.

### A. HOUSING

| | | | | |
|---|---|---|---|---|
| None | | Bottom Bunk | P/(T) | 1 yr |
| Barrier Free/Wheelchair Access | P/T | Single Cell (See 128-C date: ____ ) | P/T | |
| Ground Floor Cell | P/T | Permanent OHU / CTC (circle one) | P/T | |
| Continuous Powered Generator | P/T | Other | P/T | |

### B. MEDICAL EQUIPMENT/SUPPLIES

| | | | | |
|---|---|---|---|---|
| None | | Wheelchair: (type) | P/T | |
| Limb Prosthesis | P/T | Contact Lens(es) & Supplies | P/T | |
| Brace | P/T | Hearing Aid | P/T | |
| Crutches | P/T | Special Garment: | | |
| Cane: (type) | P/T | (specify) | P/T | |
| Walker | P/T | Rx. Glasses: | P/T | |
| Dressing/Catheter/Colostomy Supplies | P/T | Cotton Bedding | P/T | |
| Shoe: (specify) | P/T | Extra Mattress | P/T | |
| Dialysis Peritoneal | P/T | Other | P/T | |

### C. OTHER

| | | | | |
|---|---|---|---|---|
| None | | Therapeutic Diet: (specify) | P/T | |
| Attendant to assist with meal access and other movement inside the institution. | P/T | Communication Assistance | P/T | |
| Attendant will not feed or lift the inmate/patient or perform elements of personal hygiene. | | Transport Vehicle with Lift | P/T | |
| | | Short Beard | P/T | |
| Wheelchair Accessible Table | P/T | Other | P/T | |

### D. PHYSICAL LIMITATIONS TO JOB ASSIGNMENTS

Based on the above, are there any physical limitations to job assignments?   ☒ Yes   ☐ No

If yes, specify:   See  attached

| INSTITUTION    CTF | COMPLETED BY (PRINT NAME) | Timothy Friederichs, M.D. | TITLE |
|---|---|---|---|
| | | Physician & Surgeon | |
| SIGNATURE   J. Friederichs | DATE   7-10-06 | CDC NUMBER, NAME (LAST, FIRST, MI) AND DATE OF BIRTH Soledad | |
| HCM/CMO SIGNATURE   C. Lee | DATE   7-17-06 | | |
| (CIRCLE ONE)        APPROVED / DENIED | | E 100 79 | |
| | | Stairl, Ivan | |
| COMPREHENSIVE ACCOMMODATION CHRONO | | 6 - 30 - 56 | |

NAME AND NUMBER  *Staili*  E / 00 79    CTR ON    HOUSE- C - 13 7    CDC-128-C

## "PHYSICAL LIMITATIONS"

1. BASED ON THIS INDIVIDUAL'S:

     ✓     acute *medical* condition
          chronic *medical* condition
          temporary disability
          permanent disability (see 1845)
          impacting placement
          yes       no

2. THE FOLLOWING ACTIVITY RESTRICTIONS ARE RECOMMENDED:

*movement/position*

   ✓    no prolonged standing (not longer than _30_ minutes every _60_ minutes)
   ✓    no prolonged sitting (not longer than _30_ minutes every _60_ minutes)
        no climbing
   ✓    no bending, stooping or twisting
   ✓    no lifting over _20_ pounds
        no crawling
        no prolonged walking (not more than _____ feet without resting)
        no use of (R / L / both) arm (s)  Restrictions _____
        no weight bearing (R / L) leg
        limited weight bearing (R / L) leg
        other

*environment*

        may not work around heat
        may not work around or use machinery
        may not work at heights
        may not work with hands in water
        may not work outdoors
        may not work in dusty areas
        other _____

3. START DATE:  7-10-06

4. END DATE:  7-10-07     Duration: (approx)  1 yr

5. AUTHORITY:  _____     7-10-06
             PHYSICIAN     Timothy Friederichs, M.D.     DATE
                           Physician & Surgeon
                           CTF Soledad

ORIG: C-FILE
COPY: UNIT SGT.
     INMATE
     CONTROL
     CCI
     ASSIGN. LT.
     CHIEF NURSE
     MEDICAL FILE
     CHRONO FILE



von Staich '07



Von Staich '06









STATE OF CALIFORNIA )
COUNTY OF MARIN    )

IN RE: **JERRY RUTHERFORD**

ACTION NO.: **SC135399A**

(PROOF OF SERVICE BY MAIL – 1013A, 2015.5 C.C.P.)

I AM AN EMPLOYEE OF THE SUPERIOR COURT OF MARIN; I AM OVER THE
AGE OF EIGHTEEN YEARS AND NOT A PARTY TO THE WITHIN ABOVE-
ENTITLED ACTION; MY BUSINESS ADDRESS IS CIVIC CENTER, HALL OF
JUSTICE, SAN RAFAEL, CA 94903. ON **March 8, 2007** I SERVED THE WITHIN
*ORDER RE CLASS MEMBER STAICH'S APPLICATION FOR A WRIT OF
HABEAS CORPUS* IN SAID ACTION TO ALL INTERESTED PARTIES, BY
PLACING A TRUE COPY THEREOF ENCLOSED IN A SEALED ENVELOPE WITH
POSTAGE THEREON FULLY PREPAID, IN THE UNITED STATES POST OFFICE
MAIL BOX AT SAN RAFAEL, CA ADDRESSED AS FOLLOWS:

| | |
|---|---|
| *IVAN VON STAICH*<br>*CDC# E-10079*<br>*CORRECTIONAL TRAINING FACILITY*<br>*PO BOX 689*<br>*C-WING – 137 U*<br>*SOLEDAD, CA 93960-0689* | *WARDEN*<br>*CORRECTIONAL TRAINING FACILITY*<br>*PO BOX 689*<br>*SOLEDAD, CA 93960-0689* |
| *ATTORNEY GENERAL*<br>*ATTN: ANYA BINSACCA*<br>*CORRECTIONAL LAW SECTION*<br>*455 GOLDEN GATE AVENUE*<br>*12TH FLOOR*<br>*SAN FRANCISCO, CA 94102* | *UNCOMMON LAW*<br>*1300 CLAY STREET*<br>*SUITE 600*<br>*OAKLAND, CA 94612* |
| *PRISON LAW OFFICE*<br>*2173 EAST FRANCISCO BLVD.*<br>*SUITE M*<br>*SAN RAFAEL, CA 94901* | |

*I CERTIFY (OR DECLARE), UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE
STATE OF CALIFORNIA THAT THE FOREGOING IS TRUE AND CORRECT.*

DATE: 3/8/07

Northern District Federal Court
450 Golden Gate Ave., 94102-3483
San Francisco, Ca. 94102-3483
Attn: Filing Clerk

RECEI

FEB - 

RICHARD
CLERK, U.S.
NORTHERN DIS

Ivan Von Staich
Prison #C-10079, CW
Post Office Box 689
Soledad, Ca. 93960

## PROOF OF SERVICE BY MAIL
### BY PERSON IN STATE CUSTODY
(C.C.P. §§ 1013(A), 2015,5)

I, _____ **Ivan Von Staich** _____, declare:

I am over 18 years of age and I am party to this action.  I am a

resident of CORRECTIONAL TRAINING FACILITY prison, in the County

of Monterrey, State of California.  My prison address is:

> **Ivan Von Staich** ___, CDCR #:**E-10079** ___
> CORRECTIONAL TRAINING FACILITY
> P.O. BOX 689, CELL #: **CW-137L** ___
> SOLEDAD, CA  93960-0689.

On ___ **January** ___, **2007** ___, I served the attached:

### Petition for Writ of Habeas Corpus

on the parties herein by placing true and correct copies

thereof, enclosed in a sealed envelope (verified by prison

staff), with postage thereon fully paid, in the United States

Mail in a deposit box so provided at the above-named institution

in which I am presently confined.  The envelope was addressed as

follows:
**Northern District Federal Court
of California
450 Golden Gate Ave.
San Francisco, Ca. 94102-3483
Attn: Filing Clerk**

**Office of the Attorney General
455 Golden Gate Ave., Suite 11000
San Francisco, Ca. 94102-7004**

I declare under penalty of perjury under the laws of the

State of California that the foregoing is true and correct.

Executed on _____.

**Ivan  Von  Staich  E-10079**   CW-137L
Declarant