1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  JULIE L. GARLAND
   Senior Assistant Attorney General
4  ANYA M. BINSACCA
   Supervising Deputy Attorney General
5  SCOTT C. MATHER, State Bar No. 190912
   Deputy Attorney General
6   455 Golden Gate Avenue, Suite 11000
    San Francisco, CA  94102-7004
7   Telephone:  (415) 703-5709
    Fax:  (415) 703-5843
8   Email:  Scott.Mather@doj.ca.gov

9  Attorneys for Respondent Ben Curry

10

11              IN THE UNITED STATES DISTRICT COURT

12          FOR THE NORTHERN DISTRICT OF CALIFORNIA

13                   SAN FRANCISCO DIVISION

14

   **IVAN VON STAICH,**                        C08-0848 PJH
15
                                Petitioner,
16

17            **v.**

   **BEN CURRY, Warden,**
18
                                              Judge:      The Honorable
                                Respondent.               Phyllis J. Hamilton
19

20

21    **ANSWER TO ORDER TO SHOW CAUSE; MEMORANDUM OF POINTS AND
                          AUTHORITIES**

22

23

24

25

26

27

28

   Answer to OSC; Mem. of P. & A.                          *Von Staich v. Curry*
                                                            C08-0848 PJH

1

# TABLE OF CONTENTS

2                                                                                          **Page**

3   INTRODUCTION                                                                              1

4   ANSWER TO THE ORDER TO SHOW CAUSE                                                         2

5   MEMORANDUM OF POINTS AND AUTHORITIES                                                      9

6        ARGUMENT                                                                             9

7        I.    THE STATE COURT'S DENIAL OF PETITIONER'S HABEAS
               CLAIM WAS NOT CONTRARY TO OR AN UNREASONABLE
8              APPLICATION OF CLEARLY ESTABLISHED FEDERAL LAW,
               NOR BASED ON AN UNREASONABLE DETERMINATION
9              OF THE FACTS.                                                                  9

10             A.   The State Superior Court Decision Was Not Contrary to or an
                    Unreasonable Interpretation of Clearly Established Federal Law.           10
11
                    1.   Petitioner received all process due under the only United States
12                       Supreme Court law addressing due process in the parole
                         context.                                                            10
13
                    2.   The Ninth Circuit's some-evidence test is not clearly
14                       established Supreme Court law.                                       11

15                  3.   Even if the some-evidence standard was clearly established
                         federal law, the standard was correctly applied by the state
16                       court.                                                              14

17             B.   The State Court Decision Upholding the Board's Parole Denial Was
                    Based On a Reasonable Interpretation of the Facts.                       15
18
               C.   Conclusion.                                                              16
19
20       II.   AEPDA'S PROHIBITION AGAINST SUCCESSIVE PETITIONS AND
               THE DOCTRINE OF COLLATERAL ESTOPPEL BAR
21             PETITIONER'S CLAIMS THAT THE BOARD UNLAWFULLY
               FAILED TO (1) APPLY SENTENCING CREDITS AGAINST HIS
               SECOND-DEGREE MURDER SENTENCE AND (2) SET A
22             MAXIMUM TERM AND FIXED PAROLE RELEASE DATE FOR HIS
               SECOND-DEGREE MURDER CONVICTION.                                              16
23
     CONCLUSION                                                                              19
24

25

26

27

28

1

**TABLE OF AUTHORITIES**

2                                                                                          **Page**

3  **Cases**

4  *Ashe v. Swenson*
   397 U.S. 436 (1970)                                                                        18
5
   *Babbitt v. Woodford*
6  177 F.3d 744 (9th Cir. 1999)                                                               17

7  *Bd. of Pardons v. Allen*
   482 U.S. 369 (1987)                                                                          5
8
   *Benny v. U.S. Parole Comm'n*
9  295 F.3d 977 (9th Cir. 2002)                                                                 8

10 *Biggs v. Terhune*
   334 F.3d 910 (9th Cir. 2003)                                                                13
11
   *Cal. Dept. of Corr., et. al. v. Morales*
12 514 U.S. 499 (1995)                                                                          7

13 *Carey v. Musladin*
   __ U.S. __, 127 S. Ct. 649 (2006)                                                   6, 12, 13
14
   *Cooper v. Brown*
15 510 F.3d 870 (9th Cir. 2007)                                                                17

16 *Crater v. Galaza*
   491 F.3d 1119 (9th Cir. 2007)                                                               12
17
   *Foote v. Del Papa*
18 492 F.3d 1026 (9th Cir. 2007)                                                               13

19 *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*
   442 U.S. 1 (1979)                                                                   5, *passim*
20
   *Hernandez v. Small*
21 282 F.3d 1132 (9th Cir. 2002)                                                               15

22 *In re Dannenberg*
   34 Cal. 4th 1061 (2005)                                                                      5
23
   *In re Rosenkrantz*
24 29 Cal. 4th 616 (2002)                                                                    6, 8

25 *Irons v. Carey*
   505 F.3d 846 (9th Cir. 2007)                                                                13
26
   *Jancsek v. Oregon Board of Parole*
27 833 F.2d 1389 (9th Cir. 1987)                                                            11-13

28

**TABLE OF AUTHORITIES**  (continued)

Page

1

2
Juan H. v. Allen
3    408 F.3d 1262 (9th Cir. 2005)                                    15

4    Lockyer v. Andrade
     583 U.S. 63 (2003)                                            9, 16
5
     McQuillion v. Duncan
6    306 F.3d 895 (9th Cir. 2002)                                  12, 13

7    Miller-El v. Cockrell
     537 U.S. 322 (2003)                                           9, 13
8
     Miller-El v. Dretke
9    545 U.S. 231 (2005)                                              10

10   Morales v. Ornoski
     439 F.3d 529 (9th Cir. 2006)                                 17, 18
11
     Nguyen v. Garcia
12   477 F.3d 716 (9th Cir. 2007)                                     13

13   Sandin v. Connor
     515 U.S. 472 (1995)                                              5
14
     Sass v. California Board of Prison Terms
15   461 F.3d 1123 (9th Cir. 2006)                               6, 13, 14

16   Schriro v. Landrigan
     ___U.S.___, 127 S. Ct. 1933 (2007)                             12
17
     Superintendent v. Hill
18   472 U.S. 445 (1985)                             6, 10, 12, 14-16

19   United States v. Allen
     157 F.3d 661 (9th Cir. 1998)                                    17
20
     United States v. Smith-Baltiher
21   424 F.3d 913 (9th Cir. 2005)                                    18

22   Von Staich v. California Dep't of Corrections
     228 Fed. Appx. 780 (9th Cir. 2007)                         7, 17, 18
23
     Wainwright v. Greenfield
24   474 U.S. 284 (1986)                                             13

25   Wilkinson v. Austin
     545 U.S. 2384 (2005)                                           11
26
     Williams (Terry) v. Taylor
27   529 U.S. 362 (2000)                                              9

28

Answer to OSC; Mem. of P. & A.                          *Von Staich v. Curry*
                                                          C08-0848 PJH

TABLE OF AUTHORITIES  (continued)

| | Page |
|---|---|
| *Ylst v. Nunnemaker*<br>501 U.S. 797 (1991) | 10 |

**Constitutional Provisions**

| | |
|---|---|
| Untied States Constitution<br>      Sixth Amendment | 13 |

**Statutes**

| | |
|---|---|
| 28 U.S.C. | |
|     § 2244(b)(1) | 16 |
|     § 2254(d) | 8 |
|     § 2254(d)(1) | 13 |
|     § 2254(d)(1-2) | 9, 16 |
|     § 2254(d)(2) | 15 |
|     § 2254(e) | 8 |
|     § 2254(e)(1) | 10, 15 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Answer to OSC; Mem. of P. & A.

*Von Staich v. Curry*
C08-0848 PJH

1   EDMUND G. BROWN JR.
    Attorney General of the State of California
2   DANE R. GILLETTE
    Chief Assistant Attorney General
3   JULIE L. GARLAND
    Senior Assistant Attorney General
4   ANYA M. BINSACCA
    Supervising Deputy Attorney General
5   SCOTT C. MATHER, State Bar No. 190912
    Deputy Attorney General
6     455 Golden Gate Avenue, Suite 11000
      San Francisco, CA  94102-7004
7     Telephone:  (415) 703-5709
      Fax:  (415) 703-5843
8     Email:  Scott.Mather@doj.ca.gov

9   Attorneys for Respondent Ben Curry

10

11              IN THE UNITED STATES DISTRICT COURT

12            FOR THE NORTHERN DISTRICT OF CALIFORNIA

13                   SAN FRANCISCO DIVISION

14

| | |
|---|---|
| **IVAN VON STAICH,** | C08-0848 PJH |
| Petitioner, | **ANSWER TO ORDER TO SHOW CAUSE; MEMORANDUM OF POINTS AND AUTHORITIES** |
| v. | |
| **BEN CURRY, Warden,** | |
| Respondent. | Judge:   The Honorable Phyllis J. Hamilton |

20                    **INTRODUCTION**

21        Petitioner Ivan Von Staich is a California state inmate at the Correctional Training Facility,

22   proceeding pro se in this habeas corpus action.  Petitioner, currently serving a prison term of

23   thirty years to life for second-degree murder and attempted murder, alleges that the Board of

24   Parole Hearings unconstitutionally denied him parole at his 2007 parole consideration hearing.

25   On February 26, 2008, this Court issued an Order to Show Cause.  Respondent Warden Ben

26   Curry answers as follows:

27   //

28   //

Answer to OSC; Mem. of P. & A.                                    *Von Staich v. Curry*
                                                                  C08-0848 PJH

                                    1

### **ANSWER TO THE ORDER TO SHOW CAUSE**

In response to the Petition for Writ of Habeas Corpus, Respondent admits, denies, and alleges the following:

1.     Petitioner is in the lawful custody of the California Department of Corrections and Rehabilitation following his December 1985 convictions for second-degree murder and attempt murder. (Ex. 1, Abstracts of Judgment; Ex. 2, Parole Hearing Transcript, at 18.) He is currently serving an indeterminate sentence of thirty years to life. (Ex. 2 at 18.) Petitioner does not challenge his underlying conviction or sentence in the current proceeding. Rather, he alleges that the Board unlawfully denied him parole at his May 2007 parole consideration hearing. (*See generally* Pet.)

2.     Petitioner's murder and attempted murder offenses arose out of his relationship with Cynthia Bess, a relationship that was interrupted in 1980 when Petitioner was sentenced to a federal penitentiary. Petitioner and Cynthia continued to communicate by telephone and mail until June 9, 1983, when he was released to a halfway house, at which point Cynthia visited him there. But during this time Cynthia also had met Robert Topper, and as her relationship with Robert proceeded, she "communicated less frequently" with Petitioner.

According to Cynthia, she had reluctantly agreed to pick Petitioner up at the halfway house on June 20, 1983. While she was driving him back to the halfway house, Petitioner "became irate and threatened to 'kill' her because she had 'hurt' him so bad." Petitioner struck Cynthia in the jaw with his fist, after which she said she loved him in order to get him to stop attacking her. After Petitioner left, Cynthia reported the incident to the halfway house and requested that Petitioner not contact her or her family. Later that day, Petitioner arrived at Cynthia's residence and stated, "You're gonna die. You called the halfway house on me and you're gonna get it." Based on these threats, Cynthia took a flight out of state a few days later. (Ex. 3 at 4-5; Ex. 4 at 1-2.)

On June 29, 1983, Petitioner was returned to prison after breaking into Cynthia's former residence in search of her and, based on these circumstances, was denied direct contact with her for the remainder of his sentence. "Frustrated with the uncertainty of the situation," Petitioner

Answer to OSC; Mem. of P. & A.                                                      *Von Staich v. Curry*
                                                                                                        C08-0848 PJH

2

1    sent Cynthia letters "in which he professed his love and threatened to harm her if she left him for

2    another [man]." In an attempt to locate her, Petitioner made at least sixty-seven collect calls to

3    Cynthia's father in July and August 1983. In addition, after learning of Cynthia's relationship

4    with Robert Topper, Petitioner telephoned Robert "on numerous occasions and repeatedly

5    threatened him, warning him to stay away from [Cynthia]."

6        Petitioner was released to parole in November 1983, after which he learned that Cynthia

7    was staying at her grandparent's home. Petitioner was apparently unaware, however, that

8    Cynthia had married Robert. On December 8, 1983, in "the early morning hours," Petitioner

9    went to Cynthia's grandparents' home armed with a hammer. After cutting the telephone wires

10   to the home, Petitioner kicked in the front door, and then located Cynthia and Robert inside the

11   home. Robert was then "brutally slain" by Petitioner, suffering "[n]umerous hammer blows" to

12   his head and being shot four times "at close range in the back of the neck." Cynthia was also

13   assaulted, but survived despite suffering multiple blows to the head—probably from a

14   handgun—which "crushed" her skull (the resulting brain damage rendered Cynthia incompetent

15   to testify).[1] Petitioner was also shot "once or twice" during the confrontation, sustaining wounds

16   "to a hand and arm and the ribcage." (Ex. 2 at 18-20, 86-88; Ex. 3, Probation Officer's Report,

17   at 3-7; Ex. 4, Nov. 2006 Life Prisoner Evaluation Report, at 1; Ex. 5, Oct. 2002 Life Prisoner

18   Evaluation Report, at 1-2.)

19       Following his arrest for the commitment offenses, Petitioner escaped from jail before

20   completion of the criminal proceedings, but was subsequently apprehended. (Ex. 3 at 7, 13.)

21       3.   Petitioner appeared for a Subsequent Parole Consideration Hearing on May 9, 2007.

22   At that time, Petitioner declined the Board's appointment of an attorney, stating that he would

23   proceed in pro per at the hearing. (Ex. 2 at 1-7.) At the conclusion of Petitioner's May 2007

24   hearing, the Board found Petitioner was unsuitable for parole. The Board's decision was based

25   in part on the gravity of Petitioner's commitment offenses. The Board found that Petitioner's

26

---

27       1.  As of the preparation of the Probation Officer's Report in March 1986, Cynthia had
     undergone two lobotomies and her mental ability had been "impaired due to injuries received in this
28   incident." (Ex. 2 at 16; Ex. 3 at 6-7; Ex. 4 at 2.)

1  offenses were carried out in a manner that was "especially cruel," "vicious," "calculated,"

2  "demonstrates callous disregard for human suffering," involved multiple victims, included abuse

3  or mutilation of a victim, and was based on a motive that was "inexplicable and very trivial in

4  relation to the commitment offense." (Ex. 2 at 86-88, 91-92.) The Board also denied parole in

5  part due to Petitioner's prison disciplinary history (*id.* at 30-31, 80-83, 89-90, 92; Ex. 5 at 4-5

6  and attached Disciplinary Sheet); prior criminal history (Ex. 2 at 20-22, 27, 81-82, 89; Ex. 3 at 9-

7  11; Ex. 5 at 3-4); unstable social history, including the fact that all of his "involvement with the

8  law involved women" (Ex. 2 at 84, 88-90; Ex. 3 at 9-11); Petitioner's "superficial" statements

9  and lack of credibility regarding his insight into the "causation factors" of the commitment

10 offenses (Ex. 2 at 50-64, 85-86, 89); and limited participation in self-help therapy and the need

11 for further therapy in order to "face, discuss, understand and cope with stress in a non-destructive

12 manner as well as [to address] relationships with women" (*id.* at 29, 36-38, 90-91, 93-95; Ex. 4

13 at 2-3; Ex. 5 at 4-5). Finally, the Board considered the Orange County District Attorney's

14 opposition to parole. (Ex. 2 at 64-69 [Deputy District Attorney's statement]; ex. 6, District

15 Attorney's Apr. 25, 2007 letter opposing parole.)

16     4.   In finding Petitioner unsuitable for parole, the Board did not issue Petitioner the

17 minimum one-year denial. Rather, in a separate decision the Board deferred further parole

18 consideration for four years, finding that it was "unreasonable to expect that parole would be

19 granted in the next four years." The Board's finding was supported by a statement of the

20 evidence relied on to make this decision, which was substantially similar to the evidence the

21 Board relied on in finding Petitioner unsuitable for parole. (Ex. 2 at 91-93.)

22     5.   Before filing his federal petition, Petitioner sought relief in the state courts, generally

23 raising the same claims raised in his federal petition.[2/] Petitioner initially filed a habeas corpus

24 petition in the Orange County Superior Court, which was denied in a reasoned decision issued on

25 October 15, 2007. The court initially denied the petition on the ground that Petitioner had

26

27     2. Petitioner's state court petitions are attached to this Answer without their supporting
       exhibits because these exhibits appear to be substantially the same as those filed with his federal
28 petition. Respondent will promptly submit these exhibits, however, if ordered to do so by this Court.

Answer to OSC; Mem. of P. & A.                                              *Von Staich v. Curry*
                                                                           C08-0848 PJH

4

1    previously filed three petitions in that court regarding the same Board hearing, and thus his

2    current petition improperly asserted claims that could have been raised in the prior petitions.  The

3    court also denied relief on the merits, however, finding that the Board's decision denying

4    Petitioner parole based on the gravity of his commitment offense, criminal history, and

5    disciplinary history was supported by some evidence.  Finally, the court denied Petitioner's claim

6    for post-sentence credits on the ground that Petitioner had not demonstrated exhaustion of

7    administrative remedies.  (Ex. 7, Super. Ct. Pet.; Ex. 8, Super. Ct. Order.)

8        6.    Petitioner then filed a petition for habeas corpus in the California Court of Appeal,

9    generally raising the same claims as in his federal petition.  The court summarily denied the

10   petition in November 2007.  (Ex. 9, Cal. Ct. Appeal Pet.; Ex. 10, Cal. Ct. Appeal Opn.)

11       7.    Petitioner then filed a petition for review in the California Supreme Court, generally

12   raising the same claims as in his federal petition.  The court summarily denied the petition in

13   January 2008.  (Ex. 11, Cal. Sup. Ct. Pet.; Ex. 12, Cal. Sup. Ct. Order.)

14       8.    Based on the orders issued in his state court proceedings, Petitioner appears to have

15   exhausted his cognizable claims in the instant petition.  Respondent does not admit Petitioner has

16   exhausted his claims to the extent they are more broadly interpreted to encompass any systematic

17   issues beyond this particular parole consideration hearing.

18       9.    Respondent denies that Petitioner has shown that the state court's denial of habeas

19   corpus was contrary to, or involved an unreasonable application of, clearly established Supreme

20   Court law, or that the denial was based on an unreasonable determination of facts in light of the

21   evidence presented.  Petitioner therefore fails to make a case for relief under the Antiterrorism

22   and Effective Death Penalty Act of 1996 (AEDPA).

23       10.   Respondent denies that Petitioner has a federally protected liberty interest in parole;

24   hence, Petitioner fails to assert a basis for federal jurisdiction.  *Greenholtz v. Inmates of Neb.*

25   *Penal & Corr. Complex*, 442 U.S. 1 (1979); *Bd. of Pardons v. Allen*, 482 U.S. 369, 374 (1987)

26   (no federal liberty interest without an expectation of early release); *In re Dannenberg*, 34 Cal. 4th

27   1061, 1087 (2005) (no expectation of early release in California); *Sandin v. Connor*, 515 U.S.

28   472, 484 (1995) (federally protected liberty interest arises only in connection with conditions of

1  confinement that impose a significant or atypical hardship). Respondent acknowledges that the

2  Ninth Circuit came to the opposite conclusion in *Sass v. California Board of Prison Terms*, 461

3  F.3d 1123 (9th Cir. 2006), but preserves the argument.

4      11.  Respondent affirmatively alleges that even if Petitioner has a federally protected liberty

5  interest in parole, Petitioner had an opportunity to appear for his May 2007 hearing and the Board

6  provided him with a detailed explanation as to why he was denied parole. (Ex. 2 at 79-95.)

7  Hence, Petitioner received all the process due under *Greenholtz*, the only clearly established

8  Supreme Court law regarding the due process rights of inmates at parole consideration hearings.

9      12.  Respondent affirmatively alleges that there is no United States Supreme Court decision

10  requiring a state parole decision to be supported by some evidence. Thus, Petitioner's challenge

11  to the sufficiency of the evidence supporting the Board's decision fails to raise a cognizable due

12  process claim for relief under clearly established Supreme Court law, as required by AEDPA.

13  *See Carey v. Musladin*, __ U.S. __, 127 S. Ct. 649, 654 (2006) (holding that the absence of

14  Supreme Court law on a particular issue precludes habeas relief under AEDPA).

15      13.  If an evidentiary standard of review applies, Respondent denies that the state court

16  unreasonably applied the some-evidence standard. *Superintendent v. Hill*, 472 U.S. 445, 455-56

17  (1985); *In re Rosenkrantz*, 29 Cal. 4th 616, 658, 665 (2002) (adopting the some-evidence test and

18  distinguishing it from "considering whether substantial evidence supports the findings underlying

19  a gubernatorial decision").

20      14.  Respondent affirmatively alleges that the state court reasonably determined that the

21  Board's 2007 decision denying Petitioner parole was supported by some evidence.

22      15.  Respondent denies that the Board was precluded from considering Petitioner's

23  disciplinary records on the grounds that his disciplinary offenses were old, non-violent, and

24  involved conduct that did not presently constitute grounds for disciplinary action.

25      16.  Respondent denies that the state court unreasonably rejected Petitioner's claim that the

26  Board acted with bias by failing to give sufficient weight to evidence in favor of parole, such as

27  favorable psychological reports.

28      17.  Respondent denies that the state court unreasonably rejected Petitioner's claim that the

Answer to OSC; Mem. of P. & A.                                    *Von Staich v. Curry*
                                                                  C08-0848 PJH

1    Board failed to apply sentencing credits against his second-degree murder sentence. (*See* Pet. at

2    11-13; Order to Show Cause, at 2 [identified as Petitioner's second claim].)  Respondent also

3    affirmatively alleges that this claim is barred under the doctrine of collateral estoppel and as

4    successive because it was litigated in a prior federal habeas petition that culminated in an April

5    2007 Ninth Circuit Court of Appeal opinion denying Petitioner relief as to this claim. *See Von*

6    *Staich v. California Dep't of Corrections*, 228 Fed. Appx. 780, 781 (9th Cir. 2007) (copy

7    attached as Ex. 13).

8        18.    Respondent denies that the state court unreasonably rejected Petitioner's claims that

9    the Board's failure to set a maximum term and parole release date for his second-degree murder

10   conviction effectively enhanced this conviction and sentence from second-degree to first-degree.

11   (Pet. at 13-18, 28-34; Order to Show Cause, at 2 [identified as Petitioner's third and sixth

12   claims].)  Respondent also affirmatively alleges that these claims are barred under the doctrine of

13   collateral estoppel and as successive claim because they were litigated in a prior federal habeas

14   petition that culminated in a Ninth Circuit Court of Appeal opinion denying Petitioner relief as to

15   these claims. *See Von Staich*, 228 Fed. Appx. at 781.

16       19.    Respondent denies that the Board's decision to deny Petitioner further parole

17   consideration for four years rather than one year violated the Constitution's Ex Post Facto Clause

18   based on Petitioner's allegation that at the time of his murder offense in 1983 California law

19   required annual parole consideration reviews. *Cal. Dept. of Corr., et. al. v. Morales*, 514 U.S.

20   499, 510-02, 504-14 (1995) (holding that retroactive application of California statutory

21   amendment authorizing multi-year parole denials did not violate Ex Post Facto Clause because

22   such the amendment did not increase the prisoner's punishment, but rather only altered the

23   method to be followed in determining parole suitability under identical substantive standards).

24       20.    Respondent denied that the Board's decision to defer further parole consideration for

25   four years was not supported by some evidence or that the "principle reason" for the four-year

26   denial was the Board's finding that Petitioner required additional self-help therapy. (*See* Pet. at

27   23.) Respondent affirmatively alleges that the Board deferred further parole consideration based

28   on multiple factors, each supported by some evidence, which included the gravity of Petitioner's

Answer to OSC; Mem. of P. & A.                                                    *Von Staich v. Curry*
                                                                                  C08-0848 PJH

1  commitment offenses, disciplinary history, need for further self-help therapy, and lack of insight

2  regarding the commitment offenses. (Ex. 2 at 85:20-86:6, 91-95.) Respondent further

3  affirmatively alleges that as with the state court's decision upholding the Board's denial of

4  parole, Petitioner cannot show that state court unreasonably rejected his claims challenging the

5  Board's decision to deny him further parole consideration for four years based on these factors

6  and evidence.

7      21.  Respondent denies that the Board's decision denying parole violated Petitioner's

8  federal due process rights.

9      22.  Respondent affirmatively alleges that Petitioner fails to state or establish any grounds

10  for federal habeas corpus relief. 28 U.S.C. § 2254(d).

11     23.  Respondent affirmatively alleges that if the Petition is granted, Petitioner's remedy is

12  limited to a new parole consideration hearing before the Board that comports with due process.

13  *Benny v. U.S. Parole Comm'n*, 295 F.3d 977, 984-85 (9th Cir. 2002) (finding that the Board must

14  exercise the discretion in determining whether or not an inmate is suitable for parole); *In re*

15  *Rosenkrantz*, 29 Cal. 4th 616, 658 (2002) (finding that the proper remedy if a Board decision

16  lacks some evidence is a new hearing that comports with due process).

17     24.  Respondent does not allege that there is any procedural bar to this action, including

18  statute of limitations or non-retroactivity.

19     25.  Respondent denies that an evidentiary hearing is necessary in this matter. 28 U.S.C. §

20  2254(e).

21     26.  Except as expressly admitted above, Respondent denies, generally and

22  specifically, each and every allegation of the Petition, and specifically denies that Petitioner's

23  administrative, statutory, or constitutional rights have been violated in any way.

24     For the reasons stated in this Answer and in the following Memorandum of Points and

25  Authorities, this Court should deny the Petition.

26  //

27  //

28  //

Answer to OSC; Mem. of P. & A.                                          *Von Staich v. Curry*
                                                                        C08-0848 PJH

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

<u>**ARGUMENT**</u>

3

**I.**

4

5

6

**THE STATE COURT'S DENIAL OF PETITIONER'S HABEAS CLAIM WAS NOT CONTRARY TO OR AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED FEDERAL LAW, NOR BASED ON AN UNREASONABLE DETERMINATION OF THE FACTS.**

7      Under AEDPA, when a state inmate's claim has been adjudicated on the merits in state

8   court, a federal court may grant a writ of habeas corpus on the same claim only if the state court's

9   adjudication was either (1) "contrary to, or involved an unreasonable application of, clearly

10  established Federal law, as determined by the Supreme Court of the United States;" or (2) "based

11  on an unreasonable determination of the facts in light of the evidence presented at the State Court

12  proceeding." 28 U.S.C. § 2254(d)(1-2).

13      "Clearly established federal law, as determined by the Supreme Court of the United States,"

14  refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time

15  of the relevant state-court decision." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412 (2000).  A

16  state court decision is contrary to established federal law if "the state court applies a rule that

17  contradicts the governing law set forth in [United States Supreme Court] cases," or "the state

18  court confronts a set of facts that are materially indistinguishable from a decision of [the United

19  States Supreme] Court and nevertheless arrives at a result different from [the Court's]

20  precedent." *Lockyer v. Andrade*, 583 U.S. 63, 73 (2003) (citations and internal quotation marks

21  omitted).  A state court decision is an unreasonable application of clearly established law "if the

22  state court identifies the correct governing legal principle from [the United States Supreme

23  Court's] decision but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

24  at 75.  It is not enough that the state court applies the law erroneously or incorrectly; rather, the

25  application must be objectively unreasonable. *Id.* at 75-76.

26      In order to find that a state court decision involved an unreasonable determination of the

27  facts, the reviewing court must find that the decision was "objectively unreasonable in light of

28  the evidence presented in the state court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340

Answer to OSC; Mem. of P. & A.                                              *Von Staich v. Curry*
                                                                           C08-0848 PJH

1   (2003).  State court factual determinations are assumed to be correct, and a petitioner bears the

2   burden of rebutting this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1);

3   *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005).

4        When, as here, the California Supreme Court denies a petition for review without

5   comment, the federal court will look to the last reasoned decision as the basis for the state court's

6   judgment.  *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991).  In this case, the last reasoned

7   decision is the Orange County Superior Court's October 15, 2007 decision denying habeas relief.

8   (Ex. 8.)  As this decision is neither contrary to, or an unreasonable application of, clearly

9   established federal law, nor based on an unreasonable interpretation of the facts, Petitioner's

10  claim for habeas relief must be denied.

11  **A.      The State Superior Court Decision Was Not Contrary to or an Unreasonable
            Interpretation of Clearly Established Federal Law.**

12

13       The first standard under AEDPA is that a state court habeas decision must not be contrary

14  to, or an unreasonable interpretation of, clearly established federal law.  Here, Petitioner received

15  all process due under *Greenholtz*, the only clearly established federal law regarding the due

16  process rights of inmates at a parole consideration hearing.  Furthermore, clearly established

17  federal law does not require that the Board's decision be supported by some evidence; however,

18  even if it did, the Board's decision is supported by some evidence per the standard set forth in

19  *Hill*.  Finally, due process does not preclude the Board from relying, in part, on the factors of the

20  commitment offense to deny parole.  As such, the state court decisions denying habeas relief

21  were not contrary to or an unreasonable interpretation of clearly established federal law, and the

22  petition must be denied.

23       **1.      Petitioner received all process due under the only United States Supreme
                  Court law addressing due process in the parole context.**

24

25       In *Greenholtz*, the United States Supreme Court established the due process protections

26  required in a state parole system.  The Court held that the only process due at a parole

27  consideration hearing is an opportunity for the inmate to present his case, and if parole is denied,

28  an explanation for the denial.  *Greenholtz*, 442 U.S. at 16.  Petitioner received both of these

Answer to OSC; Mem. of P. & A.                                          *Von Staich v. Curry*
                                                                         C08-0848 PJH

1  protections in his 2006 hearing. First, Petitioner had the opportunity to fully present his case to

2  the Board, discussing each of the relevant parole consideration addressed by the Board. (Ex. 2 at

3  6-64.) In addition, Petitioner gave a closing statement at the conclusion of the hearing,

4  describing the reasons why he should be found suitable for parole. (*Id.* at 70-78.) Second, when

5  the Board reconvened after a short recess, it provided Petitioner with a thorough explanation as

6  to why he was denied parole and as to why he was denied further parole consideration for four

7  years. (*Id.* at 79-95.)

8      Thus, because Petitioner received an opportunity to present his case and an explanation as

9  to why the Board denied him parole—and does not claim otherwise—he received all process due

10  under *Greenholtz*, the only clearly established Supreme Court law regarding due process at

11  parole consideration hearings. Accordingly, the state court decisions upholding the Board's

12  parole denial are not contrary to clearly established federal law.

13      **2.      The Ninth Circuit's some-evidence test is not clearly established Supreme
             Court law.**

14

15      Petitioner states that this Court must determine whether some evidence supports the

16  Board's decision to deny parole. However, the some-evidence standard is not the proper

17  standard of federal judicial review. In *Greenholtz*, the Supreme Court specifically rejected the

18  idea that a parole board must specify particular evidence in the inmate's file or at his interview to

19  support its decision, as that would transform the parole process into an adversarial proceeding

20  and equate the denial of parole to a guilty verdict. Thus, as a matter of clearly established

21  Supreme Court law, a challenge to a parole decision will fail if the inmate has received the

22  protections required under *Greenholtz*.[3/]

23      The Ninth Circuit, however, has erroneously determined that clearly established federal

24  law requires that a parole decision be supported by some evidence. *Jancsek v. Oregon Board of*

25  _____

26      3. The Supreme Court has cited *Greenholtz* approvingly for the proposition that the "level
    of process due for inmates being considered for release on parole includes an opportunity to be heard

27  and notice of any adverse decision" and noted that *Greenholtz* remained "instructive for [its]
    discussion of the appropriate level of procedural safeguards." *Wilkinson v. Austin*, 545 U.S. 2384,

28  2397 (2005).

1  *Parole*, 833 F.2d 1389, 1390 (9th Cir. 1987); *McQuillion v. Duncan*, 306 F.3d 895, 904 (9th Cir.

2  2002). This standard stems from the decision in *Hill*, in which the United States Supreme Court

3  determined that some evidence must support the decision of a prison disciplinary board to revoke

4  good time credits. 472 U.S. at 455. In *Jancsek*, *McQuillion*, and subsequent cases, the Ninth

5  Circuit held that the some-evidence standard applies not only in the disciplinary context, but the

6  parole context as well. *Id.* However, because these holdings are not clearly established federal

7  law under AEDPA standards, they do not apply in federal habeas proceedings which challenge

8  parole denials.

9          In *Musladin*, the United States Supreme Court reiterated that for AEDPA purposes,

10  "clearly established federal law" refers only to the holdings of the Supreme Court on the specific

11  issue presented. The Supreme Court's opinion in *Musladin* arose from the Ninth Circuit's

12  decision holding that under clearly established federal law, courtroom spectators who wore

13  buttons depicting the victim of a murder inherently prejudiced the murder defendant and denied

14  him a fair trial. *Id.* at 652. In doing so, the Ninth Circuit determined that the prejudice tests used

15  by the Supreme Court in two similar but factually distinct cases constituted clearly established

16  federal law for the purposes of AEDPA. *Id.* The Supreme Court, however, reversed the Ninth

17  Circuit's decision upon review, holding that the highest court had "never addressed a claim that

18  private-actor courtroom conduct was so inherently prejudicial that it deprived a defendant of a

19  fair trial." *Id.* at 653. Hence, the *Musladin* court made it clear that circuit courts may not import

20  a federal standard used for one set of circumstances into a different set of circumstances under

21  the guise of "clearly established federal law." *Id.*; *see also Schriro v. Landrigan*, ___U.S.___,

22  127 S. Ct. 1933, 1942 (2007) (reversing the Ninth Circuit Court of Appeal's decision regarding

23  an ineffective assistance of counsel claim on the ground that the Supreme Court had not

24  previously address the specific claim presented in this case).

25          Several recent Ninth Circuit decisions also emphasize that there can be no clearly

26  established federal law where the Supreme Court has never addressed a particular issue or

27  applied a certain test to a specific type of proceeding. *Crater v. Galaza*, 491 F.3d 1119, 1122-23,

28  1126-27 & n.8 (9th Cir. 2007) (citing *Musladin*, the Ninth Circuit acknowledged that decisions

Answer to OSC; Mem. of P. & A.                                        *Von Staich v. Curry*
                                                                      C08-0848 PJH

12

1    by courts other than the Supreme Court as "non-dispositive" under § 2254(d)(1)); *Foote v. Del*

2    *Papa*, 492 F.3d 1026, 1029-30 (9th Cir. 2007) (affirming district court's denial of petition

3    alleging ineffective assistance of appellate counsel based on an alleged conflict of interest

4    because no Supreme Court case has held that such an irreconcilable conflict violates the Sixth

5    Amendment); *Nguyen v. Garcia*, 477 F.3d 716, 718, 727 (9th Cir. 2007) (holding that state

6    court's decision finding *Wainwright v. Greenfield*, 474 U.S. 284 (1986) did not apply to a state

7    court competency hearing was not contrary to clearly established federal law because Supreme

8    Court had not held that *Wainwright* applied to competency hearings).

9        The *Jancsek* and *McQuillion* courts, however, did exactly what the *Musladin* court

10    warned against—they took the some-evidence standard from the prison disciplinary context and

11    applied it to an entirely different situation.  Although both prison disciplinary hearings and parole

12    consideration decisions affect the duration of an inmate's confinement, the two situations are not

13    identical.  Specifically, prison disciplinary hearings involve a finding of guilt, meaning that the

14    process due in disciplinary hearings is greater than that required in parole hearings.  *Greenholtz*,

15    442 U.S. at 15-16.  Thus, the *Jancsek* and *McQuillion* courts erred in determining that the some-

16    evidence standard should apply in the parole hearing context, and subsequent courts have erred in

17    holding that this standard is clearly established federal law for the purposes of AEDPA.  *See*

18    *Irons v. Carey*, 505 F.3d 846 (9th Cir. 2007); *Sass*, 461 F.3d 1123; *Biggs v. Terhune*, 334 F.3d

19    910 (9th Cir. 2003).

20        Any argument that due process requires a less deferential standard of review is without

21    merit.  Neither the some-evidence standard nor any more stringent standard is necessary to

22    protect Petitioner's due process rights, as three California courts have already evaluated the

23    substantive merits of his claims.  (Exs. 8, 10, 12.)  Therefore, the absence of substantive review

24    under AEDPA does not diminish Petitioner's due process rights—it merely defers to the state

25    court's evaluation of those rights, consistent with AEDPA's stated purpose of "further[ing]

26    comity, finality, and federalism." *Miller-El v. Cockrell,* 573 U.S. 322, 337 (2003).  Thus, neither

27    the some-evidence standard of review nor any higher standard is necessary at the federal level to

28    protect Petitioner's substantive due process rights.

Answer to OSC; Mem. of P. & A.                                        *Von Staich v. Curry*
                                                                      C08-0848 PJH

1    In summary, *Greenholtz* is the only United States Supreme Court authority describing the

2    process due at a parole consideration hearing.  As such, Petitioner is entitled to only those

3    protections provided in *Greenholtz*.  Because he received these protections, the state court

4    decisions upholding his parole denial are not contrary to clearly established federal law.

5        **3.**    **Even if the some-evidence standard was clearly established federal**
         **law, the standard was correctly applied by the state court.**

6

7    Even if the some-evidence standard is clearly established federal law for AEDPA

8    purposes, Petitioner's claim would nonetheless fail because the state court correctly applied the

9    standard.  The some-evidence standard "does not require examination of the entire record,

10   independent assessment of the credibility of witnesses, or weighing of the evidence;" rather, it is

11   satisfied if there is "any evidence in the record that could support the conclusion reached by the

12   [B]oard." *Hill*, 472 U.S. at 455-57; *see also Sass*, 461 F.3d at 1129 (stating that "*Hill's* some

13   evidence standard is minimal").

14   The evidence used by the Board to deny parole was that regarding the egregious nature of

15   Petitioner's commitment offenses, lack of credible insight into the offenses, prior criminal

16   offenses, prison disciplinary history, unstable social history, and limited participation in prison

17   self-help therapy and need for further therapy.  (Ex. 2 at 79-95.)  As to the crime, Petitioner had

18   kicked down the door of the home where the two victims were staying (after first cutting the

19   phone lines) and then confronted the victims with a hammer, murdering Robert Topper and

20   brutally beating his ex-girlfriend Cynthia to the point that her skull was crushed and she

21   sustained permanent brain damage.  (Ex. 2 at 18-20, 86-88; Ex. 3 at 3-7; Ex. 5 at 1-2.)

22   Here, the state court found that the Board's decision to deny Petitioner parole based on

23   the gravity of the commitment offense independently satisfied Petitioner's right to due process

24   based on the Board's review of the facts of that offense.  (Ex. 8 at 2-3.)  Alternatively, the state

25   court found that in addition to the commitment offense, the Board's findings regarding

26   Petitioner's criminal and disciplinary history also adequately supported the Board's decision to

27   deny parole.  (*Id.* at 3.)  Specifically, the state court considered that Petitioner had "incurred a

28   series of disciplinary reports, and that the most recent disciplinary report was 2001." (*Id.*)  The

Answer to OSC; Mem. of P. & A.                                          *Von Staich v. Curry*
                                                                       C08-0848 PJH

1   court also considered the Board's finding that Petitioner's criminal and disciplinary misconduct

2   had continued for 23 years, which the Board characterized as "a long time." (*Id.*) And while

3   Petitioner alleges that the Board should not have denied parole based on old or irrelevant

4   disciplinary reports (Pet. at 18-22), the court further upheld the Board's determination that

5   Petitioner's criminal and disciplinary history showed that "Petitioner had 'a long pattern of

6   violations involving threats to women or members of this family [sic] since [his] involvement in

7   the criminal justice system in 1978 . . . .'" (*Id.* [alterations in original].) Accordingly, the state

8   court concluded that based on the Board's findings and supporting evidence, Petitioner had

9   "fail[ed] to demonstrate the [Board] abused its discretion in denying parole." (*Id.*)[4]

10          In summary, to the extent that the some-evidence test in *Hill* is clearly established federal

11  law, it was reasonably applied by the state court, and Petitioner's claim to the contrary must be

12  denied.

13  **B.    The State Court Decision Upholding the Board's Parole Denial Was Based**
        **On a Reasonable Interpretation of the Facts.**
14

15          The second standard under AEDPA is that a state court habeas decision must be based on

16  a reasonable determination of the facts in light of the evidence presented. 28 U.S.C. §

17  2254(d)(2). Petitioner bears the burden of proving that the state court's factual determinations

18  were objectively unreasonable. 28 U.S.C. § 2254(e)(1); *Juan H. v. Allen*, 408 F.3d 1262, 1270

19  (9th Cir. 2005). Thus, in order to prevail on this claim, Petitioner would need to prove that it was

20  objectively unreasonable for the state courts to conclude that the Board acted in accordance with

21

22      4. The Board's findings regarding Petitioner's lack of insight into the offense (Ex. 2 at 50-
    64, 85-86, 89) and his need for further self-help therapy in order to "face, discuss, understand and
23  cope with stress in a non-destructive manner as well as [to address] relationships with women" (*id.*
    at 29, 36-38, 90-91, 93-95; Ex. 4 at 2-3; Ex. 5 at 4-5) also demonstrate that the state court properly
24  determined that the Board's decision was supported by some evidence. Although these Board
    findings were not explicitly considered by the state court, this Court can still consider them as further
25  support for the state court's decision because under AEDPA this Court is only concerned with
    whether the state court's decision denying relief, as opposed to its reasoning, is contrary to or an
26  unreasonable application of Supreme Court law. *Hernandez v. Small*, 282 F.3d 1132, 1140 (9th Cir.
    2002) (determining in habeas proceedings that "the intricacies of the state court's analysis need not
27  concern us; what matters is whether the *decision* the court reached was contrary to controlling federal
    law").
28

1  due process and that some evidence supported the factual basis of the Board's parole denial.

2  Petitioner fails to meet this burden as he does not show that any of the state court's factual

3  determinations were erroneous.

4  **C.    Conclusion.**

5      In assessing the state court's review of Petitioner's claims, not only should the

6  appropriate deference be afforded under AEDPA to the state court's review, but deference is also

7  due to the underlying Board decision.  The Supreme Court has recognized the difficult and

8  sensitive task faced by the Board members in evaluating the advisability of parole release.

9  *Greenholtz*, 442 U.S. at 9-10.  Therefore, contrary to Petitioner's belief that he should be paroled

10  based on the evidence in support of parole presented at the hearing—such as favorable

11  psychological reports (Pet. at 2-10),[5] the Supreme Court has stated that in parole release, there is

12  no set of facts which, if shown, mandate a decision favorable to the inmate.  *Greenholtz*, 442

13  U.S. at 9-10.  Instead, under the some-evidence standard, the court's inquiry is limited solely to

14  determining whether the state court properly found that the Board's decision to deny parole is

15  supported by some evidence in the record, i.e., any evidence.  *Hill*, 472 U.S. at 455.  Here,

16  because the state court reasonably applied the some-evidence standard to the Board's decision

17  and made a reasonable determination of the facts considered by the Board, Petitioner's claim for

18  federal habeas relief must be denied.  28 U.S.C. § 2254(d)(1-2); *Andrade*, 583 U.S. at 75-76.

19                                              **II.**

20  **AEPDA'S PROHIBITION AGAINST SUCCESSIVE PETITIONS AND
    THE DOCTRINE OF COLLATERAL ESTOPPEL BAR PETITIONER'S**

21  **CLAIMS THAT THE BOARD UNLAWFULLY FAILED TO (1) APPLY
    SENTENCING CREDITS AGAINST HIS SECOND-DEGREE MURDER**

22  **SENTENCE AND (2) SET A MAXIMUM TERM AND FIXED PAROLE
    RELEASE DATE FOR HIS SECOND-DEGREE MURDER CONVICTION.**

23

24      AEDPA provides that "[a] claim presented in a second or successive habeas application

25  under section 2254 that was presented in a prior application shall be dismissed."  28 U.S.C. §

26

27  _____

28      5.  And contrary to Petitioner's assertion, the Board specifically considered at length the
    evidence regarding Petitioner's most recent psychological evaluation.  (Ex. 2 at 32-36.)

Answer to OSC; Mem. of P. & A.                                          *Von Staich v. Curry*
                                                                        C08-0848 PJH

1    2244(b)(1).  Further, a claim in a subsequent petition may still be considered successive even if it

2    is alleged in a different manner than in a prior petition.  Specifically, a claim is "'is successive if

3    the basic thrust or gravamen of the legal claim is the same, regardless of whether the basic claim

4    is supported by new and different legal arguments . . . [or] proved by different factual

5    allegations.'" *Morales v. Ornoski*, 439 F.3d 529, 532 (9th Cir. 2006) (quoting *Babbitt v.*

6    *Woodford*, 177 F.3d 744, 746 (9th Cir. 1999) and *United States v. Allen*, 157 F.3d 661, 664 (9th

7    Cir. 1998)).  Put differently, "[a] claim is not newly presented merely because the petitioner

8    offers new factual bases in support of a legal claim that has already been raised." *Cooper v.*

9    *Brown*, 510 F.3d 870, 918 (9th Cir. 2007).

10        Here, Petitioner has alleged the following successive claims in his instant federal petition:

11   (1) the Board failed to apply sentencing credits against his second-degree murder sentence (*see*

12   Pet. at 11-13; Order to Show Cause, at 2 [identified as Petitioner's second claim]), and (2) the

13   Board's failure to set a maximum term and release date for his second-degree murder conviction

14   effectively enhanced this conviction and sentence from second-degree to first-degree murder

15   (Pet. at 13-18, 28-34; Order to Show Cause, at 2 [identified as Petitioner's third and sixth

16   claims]).  These claims are successive because the same claims were previously presented in a

17   federal habeas corpus action filed by Petitioner, which concluded with the Ninth Circuit's April

18   2007 opinion affirming this Court's decision to deny relief. *Von Staich*, 228 Fed. Appx. at 781-

19   82.  Specifically, Petitioner's claims regarding sentencing credits and a release date were rejected

20   on the ground that these credits had already been applied to his consecutive thirteen-year

21   sentence for attempted murder and Petitioner had "no right to double credits." *Id.* at 781.

22   Petitioner's claims that he was entitled to have the Board set a maximum term for his second-

23   degree murder conviction were rejected on the ground that he had no right to have the Board

24   establish a fixed parole release date until the Board found him suitable for parole. *Id.*

25        Furthermore, while Petitioner may argue that the claims in his current Petition are being

26   brought in the context of a new parole hearing, such an argument does not save his claims from

27   being successive.  Unlike subsequent petitions challenging the evidence considered by the Board

28   at a new parole consideration hearing, which are based on a new evidentiary record, the claims

Answer to OSC; Mem. of P. & A.                                         *Von Staich v. Curry*
                                                                       C08-0848 PJH

17

1    referenced above are not dependent on the Board's findings at any specific hearing. Indeed,

2    Petitioner's prior petition raising these claims did not challenge the outcome of a specific parole

3    consideration hearing, but rather were asserted before he had received his initial parole

4    consideration hearing. *Von Staich*, 228 Fed. Appx. at 781. As a result, Petitioner's repetition of

5    these claims in the current Petition must be denied as successive because they are based on the

6    same underlying generalized challenges rejected in his prior petition regardless of whether his

7    claim is now "supported by new and different legal arguments . . . [or] proved by different factual

8    allegations." *Morales*, 439 F.3d at 532.

9        Additionally, Petitioner's claims identified above are also barred under the doctrine of

10    collateral estoppel. The doctrine of collateral estoppel provides that once an "issue of ultimate

11    fact" has been determined in litigating concluding in a "valid and final judgment" a party may

12    not litigate that issue against the same party in a future lawsuit. *United States v. Smith-Baltiher*,

13    424 F.3d 913, 919 (9th Cir. 2005) (quoting *Ashe v. Swenson*, 397 U.S. 436, 443 (1970)). For

14    collateral estoppel to apply, the following three elements must be satisfied: (1) the issues in the

15    two actions are "sufficiently similar and sufficiently material in both actions to justify invoking

16    the doctrine;" (2) the issue was actually "litigated" in the first action; and (3) the issue was

17    "necessarily decided" in the first action. *Smith-Baltiher*, 424 F.3d at 919.

18        As to the first element, Petitioner is alleging in both actions that the Board failed to

19    provide him with sentencing credits and failed to set a maximum term and parole date regarding

20    his second-degree murder sentence. (*Compare* Pet. at 11-18, 28-34, and Order to Show Cause, at

21    2 [identified as Petitioner's second, third, and sixth claims] with *Von Staich*, 228 Fed. Appx. at

22    781.) As discussed above, these claims are not merely similar in each action, they are nearly

23    identical. As to the second and third elements, the Ninth Circuit's opinion in Petitioner's prior

24    action reflects that Petitioner's claims in that case were litigated on the merits and that these

25    matters were necessarily decided by the court (indeed, they were the only matters decided in the

26    court's opinion). *See Von Staich*, 228 Fed. Appx. at 781. Accordingly, Petitioner is barred under

27    the doctrine of collateral estoppel from attempting to re-litigate these claims against the Board in

28    his current Petition.

## CONCLUSION

Petitioner's disagreement with the Board's decision is not sufficient to overturn three valid state court decisions denying habeas relief. Rather, in order for his claim to succeed, he must prove that the state court holdings were contrary to, or an unreasonable application of, clearly established federal law, or that the decisions were based on an unreasonable determination of the facts. Petitioner fails to make such a showing. First, he received all process due under *Greenholtz*, the only clearly established federal law in the parole hearing context. Second, the some-evidence standard does not apply to Petitioner's case; however, even if it did, the state court reasonably determined that the Board's decision is supported by some evidence of parole unsuitability. Further, Petitioner's claims regarding application of sentencing credits and his challenges regarding the Board's failure to set a maximum parole release date regarding his second-degree murder conviction are barred under AEDPA's prohibition against successive petitions and the doctrine of collateral estoppel. Accordingly, Respondent respectfully requests that the petition for writ of habeas corpus be denied and the Order to Show Cause discharged.

Dated: April 18, 2008

Respectfully submitted,

EDMUND G. BROWN JR.
Attorney General of the State of California

DANE R. GILLETTE
Chief Assistant Attorney General

JULIE L. GARLAND
Senior Assistant Attorney General

ANYA M. BINSACCA
Supervising Deputy Attorney General

SCOTT C. MATHER
Deputy Attorney General
Attorneys for Respondent

40225335.wpd
SF2008400652

Answer to OSC; Mem. of P. & A.

*Von Staich v. Curry*
C08-0848 PJH

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name:    **Von Staich v. Curry**

No.:    **C08-0848 PJH**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age or older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On **April 21, 2008**, I served the attached

### ANSWER TO ORDER TO SHOW CAUSE; MEMORANDUM OF POINTS AND AUTHORITIES

by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the internal mail collection system at the Office of the Attorney General at 455 Golden Gate Avenue, Suite 11000, San Francisco, CA  94102-7004, addressed as follows:

**Ivan Von Staich, E-10079**
**Correctional Training Facility**
**P.O. Box 689**
**Soledad, CA  93960**
In Pro Per

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on **April 21, 2008**, at San Francisco, California.

| J. Palomino | J. Palomino |
|---|---|
| Declarant | Signature |

40244153.wpd

# EXHIBIT 1

Insert name of court, branch court, if any, and mailing address

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** <u>ORANGE</u>

FOR COURT USE ONLY

# FILED

MAY 3 0 1986

GARY L. GRANVILLE, County Clerk

By _____ DEPUTY

**PEOPLE OF THE STATE OF CALIFORNIA**

**DEFENDANT:** STAICH, Ivan          [x] Present   [ ] Not Present

[X] **JUDGMENT OF COMMITMENT TO:**   [X] STATE PRISON   [ ] COUNTY JAIL
[ ] **ORDER GRANTING PROBATION**     [ ] **AND MINUTE ORDER**

CASE NUMBER:

C-53851

| Date of hearing: | Dept. No.: | Judge: ROBERT R. | Clerk: | Reporter: |
|---|---|---|---|---|
| MAY 30, 1986 | 39 | FITZGERALD | R. Weisman | Armella Martin |
| Counsel for People: | | Counsel for defendant: | | Probation Officer: |
| Rick King, DDA | | Jack Earley | | Louise Pritchard |

1. Defendant was convicted of the commission of the following crime on (Date): <u>12/3/85</u>

| Count | Code Section | Crime | Degree | By Jury, Court or Plea (Specify) |
|---|---|---|---|---|
| 1 | 187 PC | Murder | 2nd | Jury |

2. Defendant [ ] was arraigned   [X] waived arraignment for judgment.

3. The court, having read and considered the probation report and no legal cause having been shown why judgment should not be pronounced

   a. [X] Sentences defendant to State Prison for the term prescribed by law. 15 years to life + 2 years for the
   b. [ ] Specifies, pursuant to Pen. C. 1202b, the minimum term of imprisonment shall be six months as to count. enhancement under 12022.5 P.C.
   c. [ ] Sentences defendant to County Jail for the period of (Specify number of days): _____
   d. [ ] Suspends imposition of sentence and defendant is placed on probation for the period of: _____
        [ ] upon conditions set forth in attachment 3d.

4. [X] Defendant, convicted of more than one count, shall

   a. [X] serve the sentence as to each count as follows:   (See attached Abstract of Judgment DSL 290.1)

| Count | Consecutive With | Concurrent with |
|---|---|---|
| 1 + enhancement | Count 2 + enhancement and prior | |

   b. [X] serve the counts made consecutive in the following order: Sentence of 17 years to life as to Count 1 and enhancement under 12022.5 PC is to be served consecutive after sentence of 13 years as to Count 2, the enhancement under 12022.7 PC

5. Defendant shall serve this sentence with respect to any prior uncompleted sentence   a. [X] concurrently.   b. [ ] consecutively.

   c. [ ] as set forth below or in attachment 5c.

6. Execution of sentence is

   a. [ ] stayed on the following count: _____ pending appeal, with the stay to become permanent
        when the sentence is completed as to count: _____
   b. [ ] suspended and defendant is placed on probation for the period of: _____
        [ ] upon conditions set forth in attachment 6b.

7. [ ] No allegation to enhance punishment was made in count: _____

8. [X] It was alleged

   a. [ ] Defendant was armed with a deadly weapon at the time of the commission or attempted commission of the crime charged
        in count: _____ and allegation stricken as to count: _____

**(Continued on reverse side)**

1B2-432 (R 7/76)

This form satisfies the requirements of Penal Code 1213.5 (Abstract of Judgment and Commitment). Singular includes the plural. This form is to be used in judgments other than death. A copy of probation report shall accompany this form pursuant to Penal Code 1203c and a copy of any supplementary probation report shall be transmitted to the Department of Corrections. Attachments may be used but must be incorporated by reference.

Form Approved by the

b. ☒ Defendant used a firearm in co__ __1_____ ☐ and allegation stricke_ to count: _____

c. ☐ Defendant was armed at the time of arrest with a concealed deadly weapon within the meaning of Pen. C. 3024
☐ and allegation stricken.

d. ☐ Other (Specify and indicate if stricken): _____

9. ☒ The Court finds the defendant

a. ☐ was armed at the time of commission or attempted commission of the crime with a deadly weapon within the meaning of
(1) ☐ Pen. C. 3024 as to count: _____ ☐ but strikes the finding as to count: _____
(2) ☐ Pen. C. 12022 as to count: _____ ☐ but strikes the finding as to count: _____
(3) ☐ Pen. C. 1203 (Specify weapon): _____
as to count: _____ ☐ but strikes the finding as to count: _____

b. ☐ was not armed at the time of commission or attempted commission of the crime within the meaning of
(1) ☐ Pen. C. 3024 as to count: _____
(2) ☐ Pen. C. 12022 as to count: _____
(3) ☐ Pen. C. 1203 as to count: _____

c. ☒ did use a firearm as to count: 1 _____ ☐ but strikes the finding as to count: _____
(1) ☒ The use was one use for the following counts: . . _____1_____ The additional penalty shall
run consecutively to the sentence on the last count to be served.

d. ☐ did not use a firearm as to count: _____

e. ☐ was armed at the time of arrest with a concealed deadly weapon within the meaning of Pen. C. 3024 ☐ but strikes
the finding.

f. ☐ was not armed at the time of arrest with a concealed deadly weapon within the meaning of Pen. C. 3024.

g. ☐ Other (Specify and indicate if stricken):

10. ☒ Prior convictions which affect defendant's sentence were alleged and disposed of ☐ as follows ☒ as set forth in
attachment XXX    (See Abstract of Judgment and Information)

| Conviction date | Jurisdiction | Crime and code Section | Applies to Count | Disposition |
|---|---|---|---|---|
| | | | | |

11. The court finds defendant    a. ☐ is    ☒ is not an habitual criminal under Pen. C. 644a.
b. ☐ is    ☒ is not an habitual criminal under Pen. C. 644b.

12. The court pronounced sentence on (Date): __5/30/86_____ . and defendant was held in custody, through and including
the date of pronouncement of sentence for (Total no. of days)' __1,097_____ as follows

| Count | Time other than Dept. of Corrections | Dept. of Corrections Time |
|---|---|---|
| | 878 days | |
| | 219 work time credit | |

(Court specifically disallows any good time credit.)

13. Defendant is remanded to the custody of the Sheriff

a. ☐ For the period of (Specify no. of days),. _____ ☐ upon conditions and recommendations set forth in attachment 13a.

b. ☒ To be delivered    ☒ at the earliest convenient time    ☐ after 48 hours, excluding Saturdays, Sundays and holidays
[Pen C. 1203c] into the custody of the Director of Corrections at
(1) ☐ California Institution for Women—Frontera          (3) ☒ California Institution for Men—Chino
(2) ☐ California Men's Facility—Vacaville                (4) ☐ Other:

14. ☐ The court requests a copy of the diagnostic study and recommendations as provided in Pen C. 1168.

15. The court advised defendant of all appeal rights as required in CRC Rule 250 and defendant acknowledged understanding them.

16. ☐ Other (See attachment 16)

Dated: 5/30/86    ROBERT R. FITZGERALD                    _[signature]_
                  (Type or print name)                   (Signature of Judge of the Superior Court)

TOTAL NO. of boxes checked: __20__

**CLERK'S CERTIFICATE**

I hereby certify that the foregoing is a correct copy of the original on file in my office.

Clerk of the superior Court

[Seal]                                                   By _[signature]_ Deputy

MAY 30 1986

1066695
737-981

**ABSTRACT OF JUDGMENT – COMMITMENT**
**SINGLE OR CONCURRENT COUNT FORM**
(Not to be used for Multiple Count Convictions nor Consecutive Sentences)

FORM DSL 290.1

**FILED**

MAY 30 1986

GARY L. GRANVILLE, County Clerk

By _____ DEPUTY

SUPERIOR COURT OF CALIFORNIA, COUNTY OF **ORANGE**

COURT I.D.  3 0    BRANCH _____

PEOPLE OF THE STATE OF CALIFORNIA    versus
DEFENDANT:  **STAICH, Ivan**    [X] PRESENT  [ ] NOT PRESENT
AKA:

COMMITMENT TO STATE PRISON
ABSTRACT OF JUDGMENT    [ ] AMENDED ABSTRACT    CASE NUMBER  **C-53851**

| DATE OF HEARING (MO)(DAY)(YR) | DEPT. NO. | JUDGE | CLERK |
|---|---|---|---|
| 05 30 86 | 39 | ROBERT R. FITZGERALD | Rosamond C. Weisman |

| REPORTER | COUNSEL FOR PEOPLE | COUNSEL FOR DEFENDANT | PROBATION OFFICER |
|---|---|---|---|
| Armella Martin | Rick King, DDA | Jack Earley | Louise Pritchard |

1. DEFENDANT WAS CONVICTED OF THE COMMISSION OF THE FOLLOWING FELONY:

| COUNT | CODE | SECTION NUMBER | CRIME | YEAR CRIME COMMITTED | DATE OF CONVICTION MO DAY YEAR | CONVICTION BY JURY/TRIAL/COURT TRIAL/PLEA | TERM(L,m,u) | TIME IMPOSED YEARS | MONTHS |
|---|---|---|---|---|---|---|---|---|---|
| 2 | PC | 664/187 | Attempted Murder | 83 | 12 3 85 | X | U | 09 | 0 |

2. ENHANCEMENTS (CHARGED AND FOUND, STRICKEN, TIME IMPOSED):

| COUNT | 12022(a) C/F S I | 12022(b) C/F S I | 12022.3(a) C/F S I | 12022.3(b) C/F S I | 12022.5 C/F S I | 12022.6(a) C/F S I | 12022.6(b) C/F S I | 12022.7 C/F S I | 12022.8 C/F S I | |
|---|---|---|---|---|---|---|---|---|---|---|
| 2 | | | | | | | | X X | | 03 0 |

(See attached Judgment–Commitment form.)

3. OTHER ORDERS: Sentence of 17 years to life as to Count 1 and enhancement under 12022.5 PC is to be served consecutive after sentence of 13 years as to Count 2, the enhancement under 12022.7 PC, and the prior.

4. A. NUMBER OF PRIOR PRISON TERMS:

| § | C/F | S | I |
|---|---|---|---|
| 667.5(a) | | | |
| 667.5(b) | 1 | | X |
| 667.6(b) | | | |

01 0

B. NUMBER OF PRIOR FELONY CONVICTIONS:

| § | C/F | S | I |
|---|---|---|---|
| 667.6(a) | | | |

0 0

5. TIME STAYED §1170.1(f) [DOUBLE BASE LIMIT]:   0 0

6. TOTAL TERM IMPOSED: ————————————→  13 0

7. [X] THIS SENTENCE IS TO RUN CONCURRENT WITH ANY PRIOR UNCOMPLETED SENTENCE(S).

8. EXECUTION OF SENTENCE IMPOSED:
A. [X] AT INITIAL SENTENCING HEARING  B. [ ] AT RESENTENCING PURSUANT TO DECISION ON APPEAL  C. [ ] AFTER REVOCATION OF PROBATION  D. [ ] AT RESENTENCING PURSUANT TO RECALL OF COMMITMENT [PC §1170(d)]

9. DATE SENTENCE PRONOUNCED:  MO 05 DAY 30 YEAR 86   CREDIT FOR TIME SPENT IN CUSTODY: TOTAL DAYS 1097  INCLUDING: ACTUAL LOCAL TIME 878  LOCAL CONDUCT CREDITS 219   STATE INSTITUTIONS [ ] DMH  [ ] CDC

10. DEFENDANT IS REMANDED TO THE CUSTODY OF THE SHERIFF, TO BE DELIVERED:
[X] FORTHWITH  [ ] AFTER 48 HOURS, EXCLUDING SATURDAYS, SUNDAYS AND HOLIDAYS   INTO THE CUSTODY OF THE DIRECTOR OF CORRECTIONS AT THE RECEPTION-GUIDANCE CENTER LOCATED AT:  [ ] CALIF. INSTITUTION FOR WOMEN – FRONTERA  [ ] CALIF. MEDICAL FACILITY – VACAVILLE  [X] CALIF. INSTITUTION FOR MEN – CHINO  [ ] OTHER (SPECIFY):

CLERK OF SUPERIOR COURT
I hereby certify the foregoing to be a correct abstract of the judgment made in this action.
DEPUTY'S SIGNATURE  _Rosamond C. Weisman_   DATE  MAY 30 1986

This form is prescribed pursuant to Penal Code §1213.5 to satisfy the requirements of Penal Code §1213 (Abstract of Judgment and Commitment) for determinate sentences under Penal Code §1170. A copy of probation report... the Department of Corrections' copy of this form pursuant to Penal Code §1203c. A copy of the sentencing proceedings and any supplementary... shall be transmitted to the Department of Corrections pursuant to Penal Code §1203.01. Attachments may be used but must be incorporated...

Form Adopted by the
Judicial Council of California

**ABSTRACT OF JUDGMENT – COMMITMENT**
**SINGLE OR CONCURRENT COUNT FORM**
(Not to be used for Multiple Count Convictions nor Consecutive Sentences)

# EXHIBIT 2

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life    )        CDC Number:   E-10079
Term Parole Consideration    )
Hearing of:                  )
                             )
IVAN STAICH                  )
_____)


CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

MAY 9 & 10, 2007

12:58 P.M.

PANEL PRESENT:

STAN KUBOCHI, Presiding Commissioner
ED ALVORD, Deputy Commissioner

OTHERS PRESENT:

IVAN STAICH, Inmate
MATTHEW LOCKHART, Deputy District Attorney


CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No      See Review of Hearing
_____ Yes     Transcript Memorandum


Sarah M. Collins, Capitol Electronic Reporting

<u>**I N D E X**</u>

<u>Page</u>

Proceedings....................................    3

Case Factors..................................   18

Pre-Commitment Factors........................   20

Post-Commitment Factors.......................   25

Parole Plans..................................   45

Closing Statements............................   64

Recess........................................   78

Decision......................................   79

Adjournment...................................   95

Transcript Certification......................   96

1                      P R O C E E D I N G S

2          PRESIDING COMMISSIONER KUBOCHI:   How you doing,

3   Mr. Staich?

4          DEPUTY COMMISSIONER ALVORD:   We are on the

5   record.

6          INMATE STAICH:   Okay.  How about you?

7          PRESIDING COMMISSIONER KUBOCHI:   Fine, thank you.

8   Thank you for asking.  We're on record for the matter of

9   Ivan Staich, last name is spelled S-T-A-I-C-H, CDC

10  number E-10079.  Mr. Staich, my name is Stan Kubochi,

11  Commissioner, K-U-B-O-C-H-I.  Could you speak, I'll move

12  it over for you.  Could you please state your name and

13  spell your last name?

14         INMATE STAICH:   My name is Ivan Staich,

15  S-T-A-I-C-H.

16         PRESIDING COMMISSIONER KUBOCHI:   Thank you.   In

17  the room is Matthew Lockhart, a representative of the

18  Orange County District Attorney's Office, and also

19  Deputy Commissioner Ed Alvord, A-L-V-O-R-D.  And the

20  purpose of calling your case at this time, sir, is that

21  your Parole Consideration Hearing is scheduled this

22  week.  And I note in looking at the records of your case

23  that you have declined the appointment of a state

24  appointed attorney; is that correct?

25         INMATE STAICH:   That's correct.

1    **PRESIDING COMMISSIONER KUBOCHI:**  And that it is

2  your desire, I would surmise from that, since there is

3  no retained attorney, that you wish to represent

4  yourself at the Parole Consideration Hearing; is that

5  correct?

6        **INMATE STAICH:**  That's correct.

7        **PRESIDING COMMISSIONER KUBOCHI:**  And that is your

8  right.  And the only reason that I called you at this

9  time is to confirm what I call your pro per status.  And

10  it is a right that you are entitled.  And we will

11  proceed tomorrow on the hearing, not Friday.

12        **INMATE STAICH:**  Could I ask a question?

13        **PRESIDING COMMISSIONER KUBOCHI:**  Yes, you could

14  ask a question.

15        **INMATE STAICH:**  Title 15, Division 2, Section

16  2030 --

17        **PRESIDING COMMISSIONER KUBOCHI:**  Yes.

18        **INMATE STAICH:**  -- specifically says that when a

19  guy is in pro per that the District Attorney's Office

20  will not be present.

21        **PRESIDING COMMISSIONER KUBOCHI:**  They are going

22  to make a statement under 3043.5 that allows any member

23  of the public to give a statement.  Under the

24  circumstances I don't allow questions by the DA.

25        **INMATE STAICH:**  Okay.  And the other thing I

1   could put another little thing on there is 3043.5 was

2   enacted, it's the Gary Condit Bill.

3          PRESIDING COMMISSIONER KUBOCHI:   Yes, that's

4   correct.

5          INMATE STAICH:   That was enacted in 1984.

6          PRESIDING COMMISSIONER KUBOCHI:   That's correct.

7          INMATE STAICH:   Hines versus Gomez out of the

8   Ninth Circuit says that any regulation that comes in

9   after the effect of the prisoner's incarceration is a

10  violation of ex post facto.   So as far as that area of

11  law is concerned, I just wanted to put that on the

12  record.

13         PRESIDING COMMISSIONER KUBOCHI:   You have put it

14  on the record, sir.   But any member of the public may

15  give an opinion at a Parole Suitability Hearing.   And

16  that's the sole purpose of the --

17         INMATE STAICH:   Yes, but the statutory law,

18  though, went into effect in 1984.

19         PRESIDING COMMISSIONER KUBOCHI:   I understand

20  that.

21         INMATE STAICH:   I was arrested in '83 on this

22  crime.

23         PRESIDING COMMISSIONER KUBOCHI:   I understand

24  that.

25         INMATE STAICH:   You know, it's just, I know

1  you're going to do it, but you know, if I'm pro per, I

2  have to represent myself.  So I have to put things on

3  the record.

4      PRESIDING COMMISSIONER KUBOCHI:  You are entitled

5  to make your record.  So we will see you tomorrow.

6      INMATE STAICH:  Okay.

7      PRESIDING COMMISSIONER KUBOCHI:  Thank you very

8  much.

9      INMATE STAICH:  Thank you.

10      PRESIDING COMMISSIONER KUBOCHI:  It's now 1:05.

11  And this matter is concluded until tomorrow, May 10th.

12      INMATE STAICH:  Okay.  All right.  Thank you.

13      PRESIDING COMMISSIONER KUBOCHI:  Thank you.

14      DEPUTY COMMISSIONER ALVORD:  We're now going off

15  the record.

16          (Thereupon, a recess was

17          held off the record.)

18      PRESIDING COMMISSIONER KUBOCHI:  -- in that

19  chair.

20      DEPUTY COMMISSIONER ALVORD:  Now we're on the

21  record.

22      PRESIDING COMMISSIONER KUBOCHI:  We're on record

23  for the Subsequent Parole Consideration Hearing for Ivan

24  Staich, last name is spelled S-T-A-I-C-H, CDC number E-

25  10079.  Today's date is May 10th, 2007.  The time is

1   about 12:58 p.m.   We are located at Correctional

2   Training Facility at Soledad, California.   The record

3   should reflect at the outset that Mr. Staich has

4   previously been advised by Correctional Counselor

5   Verdesoto, V-E-R-D-E-S-O-T-O, concerning his rights for

6   a parole suitability hearing.   And that Mr. Staich has

7   elected to represent himself for today's proceedings.

8         Mr. Staich, we're going to go around the room and

9   identify ourselves.   When it is your turn, you're going

10  to state your name, spell your last and give us your CDC

11  number.   And we will start the preliminary issues in

12  regard to your hearing.   My name is Stan Kubochi,

13  K-U-B-O-C-H-I.

14        **DEPUTY COMMISSIONER ALVORD:**   My name is Ed

15  Alvord, A-L-V-O-R-D, Deputy Commissioner.

16        **DEPUTY DISTRICT ATTORNEY LOCKHART:**   Matt

17  Lockhart, L-O-C-K-H-A-R-T, Deputy District Attorney

18  Orange County.

19        **INMATE STAICH:**   Ivan Staich, S-T-A-I-C-H.

20        **PRESIDING COMMISSIONER KUBOCHI:**   And your CDC

21  number is E-10079?

22        **INMATE STAICH:**   That's correct.

23        **PRESIDING COMMISSIONER KUBOCHI:**   And Mr. Staich,

24  I want to review a few preliminary matters with you in

25  that you are acting in your own capacity as a lawyer.

8

1   And that term, I call as pro per status.  And you have

2   been previously advised of your right to have a state

3   appointed attorney and that an attorney would be

4   appointed to you at no cost if you were indigent; is

5   that correct?

6           INMATE STAICH:  That's correct, Sir.

7           PRESIDING COMMISSIONER KUBOCHI:  And you have

8   waived having an attorney.  And you wish to represent

9   yourself?

10          INMATE STAICH:  Yes, Sir.

11          PRESIDING COMMISSIONER KUBOCHI:  And you have

12  also been noticed, given notice of the week of this

13  hearing by your correctional counselor?

14          INMATE STAICH:  Yes, Sir.

15          PRESIDING COMMISSIONER KUBOCHI:  And you, could

16  you tell me about your review of your central file,

17  whether you have reviewed your central file?

18          INMATE STAICH:  Yes, I have reviewed the central

19  file.

20          PRESIDING COMMISSIONER KUBOCHI:  Okay.

21          INMATE STAICH:  Except for anything that was not

22  allowed to be reviewed.  There are restricted materials

23  under the 1030 I believe it is.

24          PRESIDING COMMISSIONER KUBOCHI:  I assure you,

25  Mr. Staich, I don't have anything that you don't have

1  because I don't get any restricted material.

2        INMATE STAICH:  Okay.

3        PRESIDING COMMISSIONER KUBOCHI:  In other words,

4  you get a copy of the Board report package.  That's what

5  I have.  That's what the DA has.  In fact, what I'm

6  going to do here is because we're going over preliminary

7  matters, right at the top of that Board packet, sir, you

8  will see a document checklist.  And from, take for a

9  moment a review of that checklist because these are the

10  documents that I have and the DA has been provided.  I

11  don't have anything more than what has been indicated.

12  And you should have the same form in the first page of

13  your packet.

14        INMATE STAICH:  Let the record reflect that that

15  is 100 percent true.

16        PRESIDING COMMISSIONER KUBOCHI:  Thank you very

17  much, Mr. Staich.  And that is the correct

18  pronunciation, Staich?

19        INMATE STAICH:  Yes, that is.

20        PRESIDING COMMISSIONER KUBOCHI:  I want to assure

21  you that --

22        INMATE STAICH:  It's good that you are able to do

23  that.  Not many people can.

24        PRESIDING COMMISSIONER KUBOCHI:  -- proper

25  respect.  If I slip, it's not out of lack of respect.

1   The correct pronunciation of your name is very important

2   to me.

3        INMATE STAICH:  Okay.  Thank you.

4        PRESIDING COMMISSIONER KUBOCHI:  Mr. Staich, in

5   regard to further rights that you had in regard to this

6   hearing, you have been afforded a copy of the same

7   material that I have and the District Attorney has been

8   presented.  And that's called the Board report.  And are

9   you prepared to proceed with your Parole Suitability

10  Hearing today?

11       INMATE STAICH:  Yes, I am, Sir.

12       PRESIDING COMMISSIONER KUBOCHI:  Sir, I would

13  like to discuss with you your rights pursuant to the

14  American with Disabilities Act.  And I would note that

15  in reviewing your personal and social history before

16  this hearing that you have had different and numerous

17  physical injuries and ailments.  I believe you have an

18  ongoing problem with your back; is that correct?

19       INMATE STAICH:  Yes, that's true, Sir.

20       PRESIDING COMMISSIONER KUBOCHI:  And that your

21  Correctional Counselor Verdesoto, as I've referred to

22  before, reviewed your central file.  And Correctional

23  Counselor Verdesoto noted on a BPT 1073 form, that is

24  commonly known as a notice and request for assistance at

25  Parole Hearings, that you have physical limitations

11

1 caused by the various injuries and physical problems

2 that you have had.  And that those injuries and medical

3 procedures have been documented in what they call a CDC

4 128-C.  As you sit here now, are you in any physical

5 pain that would interfere with your ability to

6 communicate effectively with this Panel?

7      **INMATE STAICH:**  Not to effectively communicate.

8 I do have problems, though, I have to stretch a lot.

9 Other than that, that's all that is really needed to be

10 required.

11      **PRESIDING COMMISSIONER KUBOCHI:**  We will let you

12 stretch if you give us any indication that you need to

13 do so.

14      **INMATE STAICH:**  Okay.  Thank you.

15      **PRESIDING COMMISSIONER KUBOCHI:**  Have you taken

16 any medications that interfere with your ability to

17 think clearly, sir?

18      **INMATE STAICH:**  No, ibuprofen 600 is all that

19 they prescribe for this type of spinal injury, you know.

20 It's prison.  They don't give out any hard type drugs

21 for --

22      **PRESIDING COMMISSIONER KUBOCHI:**  Central nervous

23 type drugs?

24      **INMATE STAICH:**  Yeah, you just have to live with

25 it, you know, pretty much.

1        **PRESIDING COMMISSIONER KUBOCHI:**  And were you

2   able to review your central file?

3        **INMATE STAICH:**  Yes.

4        **PRESIDING COMMISSIONER KUBOCHI:**  I note, sir,

5   that on the most recent BPT 1073 that you have a grade

6   point average of 12.9 on reading; is that correct?

7        **INMATE STAICH:**  Yes, that's probably about right.

8        **PRESIDING COMMISSIONER KUBOCHI:**  And you have

9   received your GED while in an institution; is that

10  correct?

11       **INMATE STAICH:**  Yes, previously, yeah, I did

12  receive that in the CYA when I was 16 years old.

13       **PRESIDING COMMISSIONER KUBOCHI:**  Good, that's

14  good.  Do you believe that you're thinking clearly

15  today?

16       **INMATE STAICH:**  Yes, I am, 100 percent.

17       **PRESIDING COMMISSIONER KUBOCHI:**  Do you have any

18  hearing problems?

19       **INMATE STAICH:**  No, Sir.

20       **PRESIDING COMMISSIONER KUBOCHI:**  I notice you're

21  not wearing any glasses.  You can read and see clearly

22  without glasses?

23       **INMATE STAICH:**  Yeah, I can see and read pretty

24  good.  I do have eye problems, but not enough that would

25  warrant me not to be able to read something or you know,

1    any problems to that degree.

2          PRESIDING COMMISSIONER KUBOCHI:   Good, good, sir.

3    Now this may sound like a silly question, but in the

4    last 24 hours have you ingested or consumed anything

5    that could affect your ability to think clearly today?

6          INMATE STAICH:   No, I have not, Sir.

7          PRESIDING COMMISSIONER KUBOCHI:   Thank you very

8    much.   And could you briefly state the physical

9    disabilities that you have?

10          INMATE STAICH:   The physical disabilities I have

11   is I sustained a 357 magnum colt round through the left

12   side of my body, which entered the left bicep area, went

13   into the shoulder, the copper jacket and that blew

14   apart.   The main round bounced off my neck, went down

15   and blew a hole through my lung, shattered 11 ribs.   And

16   it's stuck down here.   All the pieces of metal that

17   broke apart are all up in the upper chest.   So I have

18   problems with gripping, you know, due to the nervous

19   damage and real bad neck problems.

20          And also, because of all that, it related to my

21   spinal column.   And there is severe damage down there,

22   herniated disc, four bulging discs, herniations in

23   there.   You name it, as far as the back is concerned,

24   it's pretty bad shape.

25          PRESIDING COMMISSIONER KUBOCHI:   Okay.   Thank you

14

1   for clarifying these things and explaining.  I just want

2   to reiterate, if you're in any pain or if you feel the

3   need to stretch to get more comfortable, just let us

4   know.

5           **INMATE STAICH:**  Okay.  Thank you, Sir.

6           **PRESIDING COMMISSIONER KUBOCHI:**  Okay.  These are

7   not formal judicial proceedings.  It's a hearing simply

8   to gather facts and discuss your suitability for parole

9   at this time.  Sir, this is a Subsequent Parole

10  Suitability Hearing.  And this hearing is being

11  conducted pursuant to the Penal Code and the Rules and

12  Regulations of Title 15 of the California Code of

13  Regulations.

14          The purpose of today's hearing is to, once again,

15  consider your suitability for parole.  In doing so, we

16  will consider the number and nature of the crimes for

17  which you were committed.  I will be discussing your

18  prior criminal history, your prior personal and social

19  history before incarceration and your parole plans.

20          Commissioner Alvord will be discussing your

21  behavior and programming since your commitment.  And I

22  would like to advise you that if at any time during

23  these proceedings, if you have documents that you

24  believe would support a finding of suitability, you have

25  a right to present those documents for consideration.

15

```
1          We will reach a decision today, sir, and inform
2   you of whether or not we find you suitable for parole
3   and the reasons for our decision.  If you are found
4   suitable for parole, the length of your confinement will
5   be explained to you.  Before we recess for
6   deliberations, the Panel may ask you questions.
7          And as I indicated to you yesterday, and I will
8   go into that a little bit further, I'm going to restrict
9   the District Attorney's participation today to giving us
10  a closing statement.  And you will be allowed to make a
11  statement on your behalf telling us why you believe you
12  are suitable for parole.
13          We will then recess, clear the room and
14  deliberate.  Once we have completed our deliberations,
15  we will resume the hearing and announce our decision.
16  Sir, the record should reflect that yesterday on May
17  9th, the Panel noted that you were representing yourself
18  and that we called you into the hearing room to discuss
19  what I call reconsideration of the right to represent
20  yourself, that is the reconsideration that you wished a
21  state appointed attorney at no cost if you were
22  indigent.  And during yesterday's brief proceedings, you
23  clarified that it is your continued wish to represent
24  yourself.  It is a right that these Panel honors because
25  that is a right that you are entitled to.  And therefore
```

1   we will proceed as indicated.

2        The California Code of Regulations states that,

3   regardless of time served, a life inmate shall be found

4   unsuitable for and denied parole if, in the judgment of

5   the Panel, the inmate would pose an unreasonable risk of

6   danger to society.  Parole may be denied if you, excuse

7   me.  You have certain rights.  We discussed notice of

8   this hearing.  We have also discussed your right to

9   central file.  You have a right, sir, to have your case

10  heard by an impartial Panel.  Are you prepared to

11  proceed this afternoon?

12        INMATE STAICH:  Yes, I am, Sir.

13        PRESIDING COMMISSIONER KUBOCHI:  Sir, we will

14  reach a decision today, as I've indicated.  We will give

15  you a copy of that decision in writing.  That decision

16  becomes final within 120 days.  A copy of the decision

17  and a copy of the transcript will be given to you.

18  Since you are acting as your own attorney, you are

19  responsible for any issues in regard to appeal.  The

20  Panel does not give any advice on your appeal rights.

21  So you are not required to admit or discuss your

22  offense.  However, this Panel does accept as true the

23  findings of the Orange County Superior Court.  Do you

24  understand that?

25        INMATE STAICH:  Yes, I do.

1        **PRESIDING COMMISSIONER KUBOCHI:**  Commissioner

2    Alvord, is there any confidential material that will be

3    relied upon by this Panel in reaching a decision today?

4        **DEPUTY COMMISSIONER ALVORD:**  There is

5    confidential material.  We will not be using it today.

6        **PRESIDING COMMISSIONER KUBOCHI:**  We have reviewed

7    the hearing checklist of documents.  And you have

8    acknowledged the fact that I have what you have,

9    Mr. Staich.

10        **INMATE STAICH:**  Okay.

11        **PRESIDING COMMISSIONER KUBOCHI:**  I don't have

12    anything else.  Will you be discussing the facts of the

13    homicide with us today?

14        **INMATE STAICH:**  I will discuss any facts that is

15    written in the Appellate Court Decision out of the

16    Fourth Appellate District.

17        **PRESIDING COMMISSIONER KUBOCHI:**  Yes, I was going

18    to read those are the facts of the case and nothing

19    more.

20        **INMATE STAICH:**  I have no problem with discussing

21    those facts.

22        **PRESIDING COMMISSIONER KUBOCHI:**  Okay.  Will you

23    raise your right hand please?  Do you solemnly swear or

24    affirm that the testimony that you give in this hearing

25    will be the truth, the whole truth and nothing but the

1  truth?

2          INMATE STAICH:  I do, Sir, 100 percent.

3          PRESIDING COMMISSIONER KUBOCHI:  Thank you very

4  much.  Based on the Appellate Decision in this case,

5  starting at page two, and I will interweave those facts.

6          A jury convicted Ivan Staich of second degree

7  murder and attempted murder.  A firearm use allegation

8  was found true as to the murder.  And a great bodily

9  injury allegation was sustained as to the attempted

10 murder in violation of Penal Code 664/187 the murder

11 charge would have been PC, Penal Code, 187.  That was

12 murder in the second degree.

13          There was a prior felony conviction alleged on

14 that information that bifurcated and heard separately

15 and considered separately.  And as a result of that

16 conviction in docket number C-53851, you received a

17 sentence of 30 years to life for the violations I have

18 noted, that your life term began on or about September

19 11th, 1983.  And that your minimum eligible parole date

20 was September 11th, 2003.  And I'm just reading right

21 out of the Appellate Decision.

22              "Staich's relationship with Cynthia Bess,

23          B-E-S-S, was interrupted in 1980 when he was

24          convicted of a federal offense and imprisoned in

25          the Terminal Island Federal Penitentiary.  The

1    pair communicated by telephone and mail until

2    1983.  Staich was released to a halfway house in

3    Long Beach on June 9th of that year.  When Bess

4    visited him there on several occasions, she was

5    affectionate.  But in the meantime she had met

6    Robert Topper, spelled T-O-P-P-E-R.

7         "And as her interest in," and I'm going to

8    just state this, paraphrase this for clearer

9    understanding, as her interest in Topper grew,

10   she communicated less frequently with Staich.

11   "He was returned to prison on June 29th after

12   breaking into Bess' former residence in search of

13   her and lost direct contact while serving the

14   balance of his sentence.

15        "Frustrated with the uncertainty of the

16   situation, Staich sent Bess letters in which he

17   alternately professed his love and threatened to

18   harm her if she left him for another man.  He

19   made at least 67 collect telephone calls to Bess'

20   father in July and August, 1983 in a fruitless

21   effort to locate her.  He also telephoned Topper

22   on numerous occasions and repeated threatened

23   him, warning him to stay away from Bess.  He did

24   not discover Bess' whereabouts during this time.

25        "Staich was released from Terminal Island

20

1          on November 14th, 1983 and learned Bess was

2          staying at her grandparents' home.  Although he

3          was apparently unaware she had married Topper.

4          In the early morning hours of December 8th, 1983

5          Staich went to the grandparents' house armed with

6          a hammer.  He cut the telephone wires to the

7          residence and then kicked in the front door.

8               "Topper was brutally slain.  Numerous

9          hammer blows were inflicted to Topper's head.

10         And he was shot four times at close range in the

11         back in the neck.  Bess survived multiple blows,

12         probably with a handgun to her head.  Her skull

13         was crushed, however.  And the resulting brain

14         damage left her incompetent to testify.  Staich

15         himself was shot once or twice suffering wounds

16         to a hand and arm and the ribcage.  He went to a

17         nearby home for help."

18         Mr. Staich, according to the probation report,

19    Cynthia Bess underwent two lobotomy surgeries after this

20    incident.  And in regard to your prior record, I'm

21    looking at the probation report filed in Orange County

22    January 11th, 1974, a peace disturbance.  You were given

23    a fine.  There was summary probation.  There is an entry

24    for December 13th, 1977, escape from Riverside County

25    Jail.  That docket number was CR-15566.  It was a

21

1 conviction for 4532, Subdivision B of the Penal Code,

2 escape from jail.

3       An entry for July 21st, 1978, there was a

4 diagnostic evaluation ordered to be conducted by the

5 Department of Corrections pursuant to Penal Code Section

6 120303.  And that subsequently you received a two-year

7 state prison sentence.  And you were paroled on or about

8 October 29th, 1979.  In April, 1980 your parole was

9 revoked.  On April, excuse me, August 5th, 1980 you were

10 paroled again.

11       There is an entry dated March 6th, 1980, a

12 federal offense, 18 US Code Section 876, mailing

13 threatening communications, Federal Court Eastern

14 District docket 80-00027-01.  There is an entry that

15 shows July 2nd, 1980, five years state prison, five

16 years imprisonment.  That wouldn't be a state

17 imprisonment.  That's imprisonment.

18       There is a caption in the probation report that

19 says on or about November 21st, 1978 Ms. Anna Buckman of

20 Vacaville received a threatening letter addressed to her

21 daughter, Cindy Dustin.  In the letter the defendant,

22 Staich, threatened to kill Cindy Dustin because she

23 intended to testify.

24       It was determined that the letter had been mailed

25 from a jail facility.  And that Staich ultimately

```
1   escaped from the Riverside County Jail.  The defendant

2   continued to send threatening letters to the Buckmans,

3   that Mr. Staich was ultimately arrested in the Vacaville

4   area on the campus of a high school where Cindy Dustin

5   was enrolled.  Probation notes that you received your

6   GED while in the Youth Authority.

7           In the Board report of 2202, and I only selected

8   that, sir, because it has personal factors that you were

9   one of six children raised by your parents in Lake

10  Ellsinore, that you had told a correctional counselor

11  that your parents were abusive towards you as you became

12  older.  That you were in a series of foster homes since

13  about the age of 11 until you were committed to the

14  Youth Authority when you were 16 years old.  Sir, as of

15  this date, have you ever been married?

16          INMATE STAICH:  Yes, I have.

17          PRESIDING COMMISSIONER KUBOCHI:  Okay.  And could

18  you tell me whether or not you're currently married?

19          INMATE STAICH:  No, I'm not.  I'm engaged to be

20  married.

21          PRESIDING COMMISSIONER KUBOCHI:  That's my

22  understanding.  But I would rather just converse with

23  you to fill in everything.

24          INMATE STAICH:  Yeah.

25          PRESIDING COMMISSIONER KUBOCHI:  When were you
```

1    married, sir?

2         INMATE STAICH:   I was married on April 14th, 1990

3    in Folsom State Prison to Paula Rowlin.

4         PRESIDING COMMISSIONER KUBOCHI:   And when did

5    that marriage terminate?

6         INMATE STAICH:   January 27th, 1997.

7         PRESIDING COMMISSIONER KUBOCHI:   And how long

8    have you had your current relationship with your fiancé?

9         INMATE STAICH:   Since 1999 to present date.

10        PRESIDING COMMISSIONER KUBOCHI:   And are you the

11   father of any children?

12        INMATE STAICH:   Not that I'm aware of.

13        PRESIDING COMMISSIONER KUBOCHI:   Okay.  And

14   before the life crime in this case, that would have been

15   in 1983, would you characterize yourself as having a

16   substance abuse problem or no substance abuse problem?

17        INMATE STAICH:   No substance abuse problem.

18        PRESIDING COMMISSIONER KUBOCHI:   Okay.  Thank

19   you.  At this time I'm going to have Commissioner Alvord

20   discuss your post-commitment factors.

21        INMATE STAICH:   Could I put one objection after

22   that statement, though?

23        PRESIDING COMMISSIONER KUBOCHI:   Yes, you may.

24        INMATE STAICH:   People versus Johnson, '83 Cal

25   Reporter 2nd, 4/23/1999, page 425, probation officer's

24

1   reports are only discretionary.  It can't be used as the

2   actual factual basis for denying parole.  There has to

3   be other evidence to substantiate it besides the

4   probation officer's report.

5          PRESIDING COMMISSIONER KUBOCHI:  We're just

6   noting facts surrounding the conviction.

7          INMATE STAICH:  I know.

8          PRESIDING COMMISSIONER KUBOCHI:  Convictions

9   without facts mean very little, Mr. Staich.  It could

10  work both ways.

11         INMATE STAICH:  I understand.  I just wanted to

12  put that on the record.

13         PRESIDING COMMISSIONER KUBOCHI:  Yes, you may.

14         INMATE STAICH:  That's the basis of some type of

15  a long denial.

16         PRESIDING COMMISSIONER KUBOCHI:  Yes, you may.

17         INMATE STAICH:  Okay.

18         PRESIDING COMMISSIONER KUBOCHI:  I'm simply

19  indicating to you that for instance, if there was a ADW

20  245, the facts of the case could be real innocuous or

21  they could be real serious.  Sometimes lack of facts are

22  adverse.  Sometimes they are positive.

23         INMATE STAICH:  That's correct.

24         DEPUTY COMMISSIONER ALVORD:  Good morning,

25  Mr. Staich, once again, good afternoon.

1       INMATE STAICH:  Good afternoon, Sir.

2       DEPUTY COMMISSIONER ALVORD:  We're here to

3   discuss your post-conviction factors as well as some of

4   your prior events, but primarily your post-conviction

5   factors.  I would ask you to listen very carefully.  If

6   I miss something, you be sure to let me know.

7       INMATE STAICH:  Okay.

8       DEPUTY COMMISSIONER ALVORD:  I have tried to go

9   through your C file, but sometimes I don't find

10  everything that is in there.  Okay?

11      INMATE STAICH:  I know, it's kind of thick.

12      DEPUTY COMMISSIONER ALVORD:  Yes.  First of all,

13  let me tell you that you apparently are in custody

14  medium A; is that correct, sir?

15      INMATE STAICH:  That's correct.

16      DEPUTY COMMISSIONER ALVORD:  And your

17  classification score is 19?

18      INMATE STAICH:  Yeah, that's based on the new

19  classification system that anybody with a life top

20  sentence is only allowed to be in a level two prison.

21      DEPUTY COMMISSIONER ALVORD:  Right.  You have a

22  life override of 19 points.

23      INMATE STAICH:  Yeah.

24      DEPUTY COMMISSIONER ALVORD:  You have had that

25  life override since 2002.  I would commend you, sir.

1    That's very good.  We strive to have inmates who get to

2    the minimum eligible point level, which have done.

3    So that is commendable for you.  This is a Subsequent

4    Hearing.  Apparently you did have a previous hearing on

5    November 5th, 2005 that resulted in a four-year denial.

6    There is also an indication in the file that you

7    received a GED.  And I note today that you said you

8    received it in YA?

9         INMATE STAICH:  That's correct.

10        DEPUTY COMMISSIONER ALVORD:  I don't find a copy

11   of that.  Did you happen to see a copy when you did your

12   Olson review?  You may not have cared, but --

13        INMATE STAICH:  It was probably written in some

14   other document, the actual reference to that.  But I

15   have given that to the counselor before.  Where she

16   placed it, you know, as far as, you know how that goes.

17        DEPUTY COMMISSIONER ALVORD:  Yes.

18        INMATE STAICH:  There is a lot of inmates in

19   here.  And the counselors' desks are just backed up with

20   papers.  So --

21        DEPUTY COMMISSIONER ALVORD:  There is

22   reference --

23        INMATE STAICH:  -- sometimes it don't get to

24   where it's supposed to.  But you know, that's just part

25   of our system.

27

1        **DEPUTY COMMISSIONER ALVORD:**  There is enough

2   reference in here that I don't doubt for a moment that

3   you obtained that.  You might try to, next time you see

4   your counselor, give it again.

5        **INMATE STAICH:**  I got a copy if it, yeah.  I'll

6   give her another one.

7        **DEPUTY COMMISSIONER ALVORD:**  Yes.  All right.

8   You also have a TABE score of 12.9.  That's the highest

9   level one can reach in a TABE score as far as your

10  reading ability and comprehension.  So that's very good.

11  Now you also have a global assessment of functioning at

12  80.  And again, that's rather high.  You have two prior

13  prison terms.  The Chair went into some of those.  You

14  also had a revocation apparently in 1977, I'm sorry,

15  1979.  And I wasn't sure, what was that revocation for?

16       **INMATE STAICH:**  In '79?

17       **DEPUTY COMMISSIONER ALVORD:**  Yes.

18       **INMATE STAICH:**  That was based on a walk away

19  escape from the county jail, Riverside County Jail.

20       **DEPUTY COMMISSIONER ALVORD:**  Well that was how

21  you, that was one of your prison terms.

22       **INMATE STAICH:**  That was the only prison term

23  I've had.

24       **DEPUTY COMMISSIONER ALVORD:**  Right.  And then you

25  were on parole.

1      INMATE STAICH:   Yeah, I was on parole.

2      DEPUTY COMMISSIONER ALVORD:   And your parole was

3  revoked.

4      INMATE STAICH:   Correct.   That's what I'm saying.

5  The parole was revoked based on communication with my

6  other fiancé supposedly at the time.

7      DEPUTY COMMISSIONER ALVORD:   All right.

8  That's --

9      INMATE STAICH:   Those charges were subsequently

10  dismissed.

11      DEPUTY COMMISSIONER ALVORD:   All right.   I wasn't

12  sure what that was, but I did note in the file that it

13  indicated that there was a revocation.   And you did

14  about six months on that revocation.

15      INMATE STAICH:   Yeah.

16      DEPUTY COMMISSIONER ALVORD:   And then you were

17  paroled in 1980.   And you remained free until 1983,

18  which is when the life crime occurred.

19      INMATE STAICH:   Yeah.

20      DEPUTY COMMISSIONER ALVORD:   All right.   I just

21  wanted to make sure I had that correct.

22      INMATE STAICH:   Okay.

23      DEPUTY COMMISSIONER ALVORD:   I also had an

24  opportunity to review a current status report.   This was

25  a staff report prepared on 3/26/2007 by Correctional

29

1  Counsel Juan Lopez.  That indicates again, that your

2  custody level is medium A, that you have been assigned

3  as a porter from November 14th, 2006 to the present

4  time.  I could find no CDC 101s for that time period.

5  Is that correct, sir?

6       INMATE STAICH:  Yeah, that's correct.

7       DEPUTY COMMISSIONER ALVORD:  Thank you.  It also

8  didn't indicate that at least from the last time period

9  of the last year that you had participated in any self-

10 help programs.  But I will tell you that then I found in

11 April of 2007 apparently you did participate in a two-

12 week seminar on how to become a sober father and not get

13 angry; is that correct?

14      INMATE STAICH:  There has been way more than

15 that.  But that's correct, too.

16      DEPUTY COMMISSIONER ALVORD:  Okay.

17      INMATE STAICH:  Yeah, there has been --

18      DEPUTY COMMISSIONER ALVORD:  I'll get to all your

19 chronos.

20      INMATE STAICH:  Yeah, there is several of those.

21      DEPUTY COMMISSIONER ALVORD:  All right.  I will

22 get to those.  Then going on with the staff report, and

23 this was the staff report of November, 2006.  And this

24 report was prepared by Correctional Counselor Verdesoto,

25 V-E-R-D-E-S-O-T-O.  And that was done September 1st,

1    2006.  And on that report it indicates that for the most

2    part all of your self-help has remained the same since

3    the previous Board, and that was the Board of 2002, with

4    the exception that you have participated in Anger

5    Management.

6         The report goes on to indicate that you continue

7    to remain disciplinary free.  And pursuant to that, I

8    had an opportunity then to go back and take a look at

9    your discipline history.  And what I found, sir, I found

10   eight 128s.  The most recent being violation of grooming

11   standards.  And I found nine 115s, the most recent being

12   2001.  I will tell you, sir, that of the nine 115s that

13   I found, six were for grooming standards.  And I know

14   that that tends to be in a state of flux within the

15   institution.  And we consider that as such.  I did find

16   three 115s, one in 1999 for disobeying an order, one in

17   1996, which was for threats.  And apparently for that

18   one you received a SHU term?

19        INMATE STAICH:  The SHU term was overturned later

20   on.  And it was reduced down on a modification order.

21        DEPUTY COMMISSIONER ALVORD:  Correct, it stayed

22   as a 115 as I understand it.

23        INMATE STAICH:  Yeah, it did.

24        DEPUTY COMMISSIONER ALVORD:  All right.  I wanted

25   to make sure, because that's what I saw in the file.

1      **INMATE STAICH:**  Yes.

2      **DEPUTY COMMISSIONER ALVORD:**  And then there was a

3  1993 for possession of dangerous property.  And those

4  were the only disciplines that I was able to find.  I

5  then went and reviewed your most recent psychological

6  evaluation.  That was performed on February 4th, 2006 by

7  Dr. McComber.  And again, I'll point out those portions

8  that I thought were particularly salient.

9      **INMATE STAICH:**  Okay.

10      **DEPUTY COMMISSIONER ALVORD:**  One thing that was

11  somewhat interesting is there was an introduction by the

12  doctor which described why the, that particular

13  evaluation was being done.  And it was being done

14  apparently as a result of a 602 that you filed

15  requesting that your last psychological evaluation by

16  Dr. and it's Gamard, G-A-M-A-R-D, at CTF Soledad, dated

17  2/25/02 be corrected.

18      Apparently on page seven of that evaluation,

19  Dr. Gamard stated that you had a pattern of possessive

20  jealousy towards girlfriends and an inability to

21  tolerate being rejected by them or to allow them to be

22  possessed by any other man.  You stated that the

23  psychologist was not aware of the true facts of your

24  relationship with women.  And as a result, he

25  erroneously concluded that there is a pattern there when

1  the facts do not substantiate that.  And as a result,

2  that appeal was granted in part.  And a new

3  psychological evaluation was ordered.

4          INMATE STAICH:  Correct.

5          DEPUTY COMMISSIONER ALVORD:  All right.  I'm not

6  going to go through all of the facts and materials that

7  were provided to the psychologist.  You have that report

8  as does the Board.

9          INMATE STAICH:  Yeah.

10         DEPUTY COMMISSIONER ALVORD:  I will go on though,

11  to the psychologist's assessment.  He first of all found

12  that you were well oriented throughout the interview.

13  He says you do wear a beard.  Is this the same beard?

14         INMATE STAICH:  Yeah.

15         DEPUTY COMMISSIONER ALVORD:  Okay.

16         PRESIDING COMMISSIONER KUBOCHI:  I hope so.  It's

17  the same person.

18         DEPUTY COMMISSIONER ALVORD:  Yes, but it doesn't,

19  the reason I say that is that is it looks more to me

20  like a goatee.  But he makes reference to a beard.

21         INMATE STAICH:  Well, you know, he, I don't know.

22  This is the way I've had it.

23         DEPUTY COMMISSIONER ALVORD:  So it's the same?

24         INMATE STAICH:  This is the way that I've had it.

25  You can look at my ID.  It's been like that for years.

1    **DEPUTY COMMISSIONER ALVORD:**  Okay.  I certainly

2    believe you.  I just was curious because when I read it,

3    it says, that you wear a beard.

4    **INMATE STAICH:**  Yeah.

5    **DEPUTY COMMISSIONER ALVORD:**  And when you came in

6    here today, well that didn't look like a beard to me.

7    But anyway, so be it.

8    **INMATE STAICH:**  Yeah.

9    **DEPUTY COMMISSIONER ALVORD:**  All right.

10    **PRESIDING COMMISSIONER KUBOCHI:**  Let's call it a

11    difference in grammar.

12    **INMATE STAICH:**  It's pretty much close to the one

13    that you're wearing.

14    **DEPUTY COMMISSIONER ALVORD:**  Yes, yes.

15    **INMATE STAICH:**  Let's put it that way.

16    **PRESIDING COMMISSIONER KUBOCHI:**  Facial hair.

17    **DEPUTY COMMISSIONER ALVORD:**  I thought it was a

18    goatee.

19    **INMATE STAICH:**  Maybe a little bit longer.

20    **PRESIDING COMMISSIONER KUBOCHI:**  Facial hair.

21    **DEPUTY COMMISSIONER ALVORD:**  And he said that you

22    wear that as a result of your Nazarite religious beliefs

23    that require that you not cut your beard.  He said that

24    your thinking was rational and coherent.  Your speech

25    was normal, fluent and goal oriented.  Eye contact was

1  very good.  Intellectually he found you functioning in

2  the average range.  Affect was appropriate.  He found no

3  evidence of anxiety or depression.

4      He, meaning you, related during the interview in

5  an earnest, sincere, concerned matter because you wanted

6  to get the facts of your case straight.  Your judgment

7  was intact.  Your memory was intact.  Your insight and

8  self-awareness appears to be very good.  He then

9  performed a Minnesota Multi-phasic Personality Inventory

10 and found that all of your scores were in the average

11 range.

12     He then noted his diagnostic impressions.  Axis

13 I, he found no mental disorder.  Axis II, no personality

14 disorder.  Axis III, there is a history of gunshot

15 wounds and lower back and neck pain.  Axis V, IV, I'm

16 sorry, his life term incarceration.  And he found a

17 global assessment of functioning at 90, higher than the

18 previous one, which was at 80.

19     He went on then to discuss your life crime.  And

20 he found that you fully accepted responsibility for the

21 victim's death.  You openly accepted the fact that you

22 had acted irresponsibly and impulsively and that you

23 caused hurt, pain and the death of the victim.  He felt

24 you were very remorseful about your past behavior.

25     He then did an assessment.  He did note that you

35

1   received the SHU term in 1996 for mailing a threatening

2   letter, a threatening sounding letter, excuse me,

3   threatening sounding letter to your wife.  That you have

4   matured socially, morally and spiritually since your

5   incarceration.  You are a much different individual now

6   than at the time of the commitment offense.

7           Your potential for violence in the institution is

8   definitely below average in comparison to other inmates.

9   In dealing with your violence potential in a free

10  community, he states your potential for dangerous

11  behavior if released to the community is estimated to be

12  no higher to the average citizen in the community.  This

13  is based on the fact that his recent MMPI-Two, shows him

14  to be a very non-aggressive, thoughtful, pro-social

15  individual who does not have any evidence of personality

16  disorder or antisocial thinking or values.

17          Although again, this needs to be interpreted with

18  some caution, as you openly admit making mistakes when

19  you were younger and have been remorseful for them.  He

20  then performed a Level of Service Inventory revised

21  test.  He goes on to describe that basically what he

22  found was that your score places you in the 1.8

23  cumulative frequency for prison inmates.  What that

24  means is if 100 men are released from parole, it is

25  anticipated that you would do better than 98 of them.

1    And that he feels, is an extremely low risk level.

2         He goes on to conclude that there is no mental or

3    emotional problems in this case that would interfere

4    with parole planning.  You have obtained vocational

5    training in vocational motorcycle repair, vocational

6    welding and vocational woodshop.  He has worked

7    throughout his life and has a strong work ethic.

8         You currently have some physical problems due to

9    your gunshot wound and the bullet fragment that you

10   still carry in your back.  He felt you were very

11   interested in working when you are released and you have

12   strong family support as well as a fiancé.  And he felt

13   that you have valid residence placement as well as some

14   job offers.

15        The prognosis for successful adjustment in the

16   community is excellent.  I went on then, and as I

17   indicated to you, I did review your disciplinary history

18   within the institution.  And we discussed that.  I also

19   found in February 23rd, 2006 there is a laudatory chrono

20   that you have completed Healing for the Angry Heart

21   video series.  I found another chrono dated for December

22   8th, 2005 that you completed a 12-week Anger Management

23   class that was conducted in the Protestant chapel.

24        And then I found a certificate for your

25   completion of the Anger Management program and another

1    certificate.  I should distinguish those two.  One is

2    dated February, 2006.  And the other was dated December

3    22nd, 2005, both for Anger Management.  And then there

4    was one dated October 1st, 2005 also for participation

5    in Anger Management.

6         And then I found a certificate for apparently

7    volunteering in a tutoring program.  It's the Volunteer

8    Tutor Workshop.  You did a 12-hour workshop with an

9    emphasis on tutoring and literacy.  And that is dated

10   June 7th, 2001.  That's actually before your last Board.

11   But I did see that.  And I wanted to bring that up.

12        And then I found a Set Free Prison Ministries

13   certificate that you have completed 32 units of study.

14   And that was in October of 2002.  And then there is a,

15   not really a certificate, but a document I should say,

16   from the University of California at Los Angeles that

17   certifies that you successfully participated in the Art

18   Search class called Creative Writing.  And you completed

19   that apparently in October 10th of 1996.

20        I found, and I think I may have mentioned this

21   chrono already, that, yes, I did.  This is the April

22   9th, 2007, the chrono from the Muslim chaplain when you

23   took the class, two-week seminar on how to become a

24   sober father and not get angry.  And then the Healing

25   Heart, I covered that.  I covered the Anger Management.

1    And I believe those were all of the laudatory chronos

2    that I could find going back at least to the early '90s.

3         I did not find, and I noted that the psychologist

4    in his report, let me just find that, one moment please.

5    I was unable to locate vocational certifications in this

6    file.  Do you have vocational certifications?

7         INMATE STAICH:  No, I don't have, not the ones

8    that I previously done before I became disabled.  I do

9    not have any verification other than the records to

10   where I have taken those, which are federal records, you

11   know --

12        DEPUTY COMMISSIONER ALVORD:  Okay.

13        INMATE STAICH:  -- that I don't have a copy of.

14   I tried to obtain them before I came in here.  But

15   getting through the bureaucracy and red tape of getting

16   a federal, you know, all these courses that I took when

17   I was young and that I was a certified mechanic in two

18   different areas, I wasn't able to obtain them.  So other

19   than what is documented in the file that you have read

20   is all we have to work with on that area.

21        DEPUTY COMMISSIONER ALVORD:  Okay.

22        INMATE STAICH:  But that is before the

23   disabilities had occurred.

24        DEPUTY COMMISSIONER ALVORD:  And that's what I

25   was looking for.  Is because when he mentioned that you

1   had vocational training in motorcycle repair, welding

2   and woodshop and I couldn't find that in here, but

3   obviously he had something that led him to believe that.

4         INMATE STAICH:  Yes.

5         DEPUTY COMMISSIONER ALVORD:  So apparently you

6   did have some training in the '80s.

7         INMATE STAICH:  Well the counselor verified this

8   before, when I first came into the system by contacting

9   the federal parole people that had my file.  So that's

10  how that got placed into the file.

11        DEPUTY COMMISSIONER ALVORD:  So those are

12  vocational trainings that you did, would have been

13  between 1978 probably and 1980.

14        INMATE STAICH:  That's correct.

15        DEPUTY COMMISSIONER ALVORD:  All right.

16        INMATE STAICH:  Actually 1982, up to 1982.

17        DEPUTY COMMISSIONER ALVORD:  Okay.  I thought you

18  were let free in '82.  But whatever it is, in the '80s.

19        INMATE STAICH:  Yeah, right there is when I got

20  out.  But that was before I got released.

21        DEPUTY COMMISSIONER ALVORD:  And those were

22  obviously vocational trainings that you obtained prior

23  to this life crime?

24        INMATE STAICH:  Prior to the injuries I've

25  sustained here and the disabilities, correct.

1       **DEPUTY COMMISSIONER ALVORD:** All right. So am I

2  correct that since the life crime I didn't see any

3  vocational chronos.

4       **INMATE STAICH:** No.

5       **DEPUTY COMMISSIONER ALVORD:** All right.

6       **INMATE STAICH:** But I can explain that if you

7  would like.

8       **DEPUTY COMMISSIONER ALVORD:** Sure. I just wanted

9  to make sure that I wasn't missing something in the

10  file.

11       **INMATE STAICH:** Okay. Well when you come into

12  the prison system, you're assessed point scales. And

13  for every year it's three points. So any inmate that

14  comes in with a second degree murder, something in that

15  range right there, you're automatically going to be 45

16  points. That inmate is going to be housed in a level

17  four housing.

18       Now the particular one that I was sent to was new

19  Folsom. That prison right there, I mean, the first day

20  I was on the yard out there they had a riot, I mean,

21  just nothing but chaos, guys being shot, stabbed. It

22  was just horrible to be in that environment. But that

23  limits your access because the guards are more worried

24  about security and trying to take care of all the

25  problems inside the prison. And inmates ain't getting

41

1   out to do anything.

2        It wasn't until I actually got to this prison

3   here that I've been able to do anything, you know, just

4   to be honest with you, because after that, when I

5   finally got level three points and went to Corcoran,

6   Corcoran isn't any better.  I mean, you guys know some

7   of the statistics on that place.  And you're never

8   getting out of your cell.

9        They got these north and south guys that just

10  every time they open up the doors, they go at each

11  other.  And the white guys just try to stay out of the

12  way.  So pretty much, you are very limited on what you

13  get to do inside the prison system.

14        And even at this prison here, which can be

15  verified through all the documentation is they have had

16  a lot of problems here with these inmates filing or

17  filling in the mailboxes kites that threaten the

18  officers.  And the officers have to protect themselves.

19  So they lock down the prison to investigate this.  This

20  goes on constantly.  It's maybe within the last six

21  months that we haven't had that problem in a while,

22  luckily.

23        But because this occurs inside the prison system,

24  there is nothing that we can do.  Our hands are tied,

25  the lifers.  We sit in here, you know, wanting to do as

1    much as we can. I've gotten all these stress

2    management, I've done everything possible that I could

3    do within the boundaries of my limitations. And the

4    problems that go on inside the prison, I mean, even

5    these guards that are in here know that this is

6    occurring all the time.

7         And so they have to protect themselves. They

8    lock the prison down. This goes on. They have to

9    search every wing, go through everybody's property.

10   This takes, you know, maybe a month's time. There is a

11   lot of people in here. It's overcrowded. So that's

12   part of the reason why we don't get much access to doing

13   things and being able to bring more to you guys that

14   would show that we're suitable for parole, you know, in

15   that particular area.

16        But that doesn't mean that I've been inactive as

17   far as doing things that are productive towards my

18   release into the community. And I have other things

19   that I do that I wanted to show you here that go along

20   with that same line right here. In the prison system I

21   have become an artist.

22        **DEPUTY COMMISSIONER ALVORD:**  If you will give

23   that to --

24        **INMATE STAICH:**  Yeah.

25        **DEPUTY COMMISSIONER ALVORD:**  -- correctional

1   staff, we will certainly take a look at that.

2          INMATE STAICH:  Okay.

3          DEPUTY COMMISSIONER ALVORD:  Anything you have

4   that indicates --

5          INMATE STAICH:  Yeah.

6          DEPUTY COMMISSIONER ALVORD:  -- that you have

7   done positive things, we definitely want to look at it.

8   I will tell you, sir, that I'm looking at --

9          INMATE STAICH:  Also --

10          DEPUTY COMMISSIONER ALVORD:  Go ahead.

11          INMATE STAICH:  I have a letter here for you that

12   was sent to me directly from the counselor.  And here is

13   her envelope that she sent it to me so it is in the file

14   somewhere indicating that I'm going to be working at as

15   a custom painter in a new business that is opening up in

16   the Riverside area.  And that I've already been working

17   with these people here.  I do a lot of patterns and

18   stuff for motorcycles, cars.  It's all custom stuff,

19   whatever they want done on there.  I do pin striping

20   work.

21          And I have a lot of talent when it comes to

22   artwork.  And so pretty much I haven't been inactive

23   just because, so I guess you can call me an autodidact,

24   which is a person that is self-taught.  So I have no

25   been completely inactive because of what the security

1   problems here in the prison.

2        And so I wanted you to know that, reflect that on

3   to the record, too, as well.  A lot of things that we do

4   in here, you know, is stuff that we do in our cell area

5   that you guys really don't ever really get to know about

6   because they're not through the institution.  They're

7   not sanctioned.  And there is no chronos written on

8   them.  So basically it's just stuff that you do in the

9   presence of your cell are on these long lockdowns.

10       **DEPUTY COMMISSIONER ALVORD:**  I will say, sir,

11   that I have reviewed your classification.  And I did

12   note that you reduced from 29 points down to double 2

13   points in 1995.  And you have been that level since that

14   date.

15       **INMATE STAICH:**  Yeah, also that it has been

16   mentioned by the Ninth Circuit in the Johnson Decision

17   that level two is the lowest position that an inmate can

18   get himself to inside the prison system.  And the

19   inmates that stay in this environment right here are

20   considered non-violent as far as the prison setting is

21   concerned.  They're not causing any problems with the

22   other inmates.

23       **DEPUTY COMMISSIONER ALVORD:**  Right.  We are well

24   aware of the override.

25       **INMATE STAICH:**  Okay.

45

1      **DEPUTY COMMISSIONER ALVORD:**  Well aware, believe

2  me.

3      **INMATE STAICH:**  All right.

4      **DEPUTY COMMISSIONER ALVORD:**  All right.  Did I

5  miss anything, sir?

6      **INMATE STAICH:**  No.  That's all I wanted to bring

7  up on that area right there.

8      **DEPUTY COMMISSIONER ALVORD:**  All right.  That

9  being the case, we will turn it back over to the Chair.

10  Thank you.

11      **PRESIDING COMMISSIONER KUBOCHI:**  Thank you.

12      **INMATE STAICH:**  Okay.

13      **PRESIDING COMMISSIONER KUBOCHI:**  Mr. Staich, in

14  November, 1983 you were, excuse me, let's back up a

15  little bit.  Could you tell me what your parole plans

16  are right now in regards to residence?

17      **INMATE STAICH:**  I will be living with my fiancé.

18  And I also have a documentation in there that I can live

19  with my mother as well if you don't feel that's

20  suitable.  But --

21      **PRESIDING COMMISSIONER KUBOCHI:**  We don't make

22  those determinations.

23      **INMATE STAICH:**  I know there is two places there

24  that I could go.

25      **PRESIDING COMMISSIONER KUBOCHI:**  And that would

1  be Shelley Wood?

2      INMATE STAICH:  Yes.  And the other one is my

3  mother.

4      PRESIDING COMMISSIONER KUBOCHI:  Right.  I

5  remember seeing that.

6      INMATE STAICH:  So, yeah, so I have two

7  residences to go to, you know.  I realize you guys do

8  have a lot to do with Penal Code Section 3003, which has

9  all different areas on parole and special restrictions.

10 And the Board has the right to do stuff like that.  So I

11 only bring that up in that context right there.

12     PRESIDING COMMISSIONER KUBOCHI:  What city does

13 Ms. Wood live in today?

14     INMATE STAICH:  She lives in Mira Loma.

15     PRESIDING COMMISSIONER KUBOCHI:  And what does

16 she do for a living?

17     INMATE STAICH:  She works at Lowe's in the, she

18 works, well different areas, but basically she's in the

19 nursery.

20     PRESIDING COMMISSIONER KUBOCHI:  And how long has

21 she worked at that establishment?

22     INMATE STAICH:  It's brand new.  She just started

23 working there from her last employment.

24     PRESIDING COMMISSIONER KUBOCHI:  What type of

25 residence, does she rent or own?

1    **INMATE STAICH:**  She owns a double-wide mobile

2    home on a two-acre lot that's pretty large.   It's nice.

3    It's well equipped.

4    **PRESIDING COMMISSIONER KUBOCHI:**  Who else resides

5    with her?

6    **INMATE STAICH:**  She resides with her and her

7    daughter is living there right now with her new baby.

8    **PRESIDING COMMISSIONER KUBOCHI:**  And how old is

9    the daughter?

10   **INMATE STAICH:**  The daughter is 21 years old and

11   is engaged to be married and will be moving out soon

12   with her husband.

13   **PRESIDING COMMISSIONER KUBOCHI:**  And you have

14   indicated that your employment plans are to work in some

15   type of art-related field that may ultimately be

16   connected to vehicles?

17   **INMATE STAICH:**  Yeah, just auto spraying stuff

18   because I'm limited with what I can do as far as my

19   disabilities.   So that's something that is not really

20   too strenuous on the body as far as spray guns and

21   mixing paints.   You just have to have the right

22   apparatus, the breathing apparatus.   And I've studied up

23   on all this right here.   And I've done this before I

24   came in here.   My dad was an auto mechanic.   And he has

25   owned quite a few different little shops in that area

1    there.   So I've learned a lot about painting and how to

2    spray.

3              PRESIDING COMMISSIONER KUBOCHI:   You were 27 at

4    the time of the homicide?

5              INMATE STAICH:   Uh-hmm.

6              PRESIDING COMMISSIONER KUBOCHI:   And then you had

7    been sent to federal prison in what was that, '79?

8              INMATE STAICH:   In 1980.

9              PRESIDING COMMISSIONER KUBOCHI:   In 1980?  And so

10   that would have been, and then you had also this escape

11   in '77, you were in jail.  So the escape you were about

12   21 years old back in Riverside County?

13             INMATE STAICH:   Twenty.

14             PRESIDING COMMISSIONER KUBOCHI:   Twenty.  Then

15   you went to prison.  And then you later got this, you

16   later got this federal charge.  What periods were you

17   employed from the time of turning 20?

18             INMATE STAICH:   Anytime that I was released, I

19   worked the whole time at different, I either worked for

20   my father directly or I worked for Eddy's Tree Service

21   in Orange County.

22             PRESIDING COMMISSIONER KUBOCHI:   In 1983,

23   November specifically, when you were paroled on the

24   federal charge, what city were you paroled to?

25             INMATE STAICH:   I was paroled to Orange County.

49

1    I was staying at my brother-in-law's house in Silverado

2    Canyon.   That's where I was working when this crime

3    occurred.

4         PRESIDING COMMISSIONER KUBOCHI:   And then you,

5    when you were paroled, you contacted your federal parole

6    officer?

7         INMATE STAICH:   Yeah.

8         PRESIDING COMMISSIONER KUBOCHI:   And that would

9    have been in Orange County?

10        INMATE STAICH:   Actually I think they had me in,

11   because of my mother's residence, they had put me, but

12   they allowed me to live in Orange County because that's

13   where my employment was.

14        PRESIDING COMMISSIONER KUBOCHI:   Okay.

15        INMATE STAICH:   So the parole agent was out of

16   the, I think he was even further out than that because

17   they don't have the regions back then.   He was in San

18   Bernardino.

19        PRESIDING COMMISSIONER KUBOCHI:   By my

20   mathematics, and tell me if I'm wrong, is the murder

21   happened about a month after you were paroled?

22        INMATE STAICH:   Twenty-one days.

23        PRESIDING COMMISSIONER KUBOCHI:   Twenty-one days.

24   And how did you find out where Cynthia was living?

25        INMATE STAICH:   My brother saw her at a gas

50

1    station about a week before that.  And he had testified

2    this to the trial.  It's part of the transcripts.  That

3    she told him that we were still engaged to be married at

4    that time and that the relationship was still going.

5          PRESIDING COMMISSIONER KUBOCHI:  Now I just want

6    to ask you a real simple question, would you have been

7    in violation of parole if your parole officer knew that

8    you had went to where Ms. Bess was living once you were

9    paroled in November of '83?

10         INMATE STAICH:  Well probably yes, but there is a

11   little bit of a question here.  He testified at the

12   trial that when he saw me and interviewed me, I asked

13   him about my fiancé at the time.  And he told me that he

14   didn't want me to go around her.  He wasn't ordering me

15   not to.  But he told me he didn't want me to go around

16   her.  And he wouldn't tell me anything else.  And she

17   had my car, all my clothes, everything.  A lot of my

18   stuff was with her.  So plus I was young, you know.

19         PRESIDING COMMISSIONER KUBOCHI:  This was all

20   covered in your trial.  But why did you --

21         INMATE STAICH:  Yeah.

22         PRESIDING COMMISSIONER KUBOCHI:  -- go over

23   there?  What time did you go over there to that

24   grandparent's place?

25         INMATE STAICH:  I went over there at, well I

51

1    lived up in the mountains.  So it took about, I left

2    after work and everything and cleaning up and

3    everything.  We don't get done until about 10 o'clock

4    and put all the stuff back in the sheds.  And so it was

5    probably approximately 11 o'clock when I took off.  And

6    I didn't get over there until 12 o'clock at night.

7         PRESIDING COMMISSIONER KUBOCHI:   Twelve p.m.?

8         INMATE STAICH:  Yeah.

9         PRESIDING COMMISSIONER KUBOCHI:   Twelve a.m.  And

10   then who was your employer?

11        INMATE STAICH:  Eddy.

12        PRESIDING COMMISSIONER KUBOCHI:   Ed?

13        INMATE STAICH:  Bill Eddy.

14        PRESIDING COMMISSIONER KUBOCHI:  Bill Edny?  And

15   that was --

16        INMATE STAICH:  Eddy's Tree Service.

17        PRESIDING COMMISSIONER KUBOCHI:   Edny's Tree

18   Service?

19        INMATE STAICH:  Yeah, E-D-D-Y.

20        PRESIDING COMMISSIONER KUBOCHI:   E-D-D-Y, oh,

21   Eddy's Tree Service.

22        INMATE STAICH:  Yeah, Eddy's Tree Service.

23        PRESIDING COMMISSIONER KUBOCHI:  Okay.  And what

24   county was that?

25        INMATE STAICH:  That's Orange County in Silverado

52

1  Canyon.

2      PRESIDING COMMISSIONER KUBOCHI:  And you claim

3  that you worked on the day of December 7th, 1983?

4      INMATE STAICH:  That's correct.

5      PRESIDING COMMISSIONER KUBOCHI:  Okay.  And as

6  far as you knew, Eddy's Tree Service was a business that

7  was in the yellow pages and --

8      INMATE STAICH:  It is in the yellow pages.

9  They're contracted with the city of Orange County to do

10  all the high wire, when the winds blow, the Santa Ana

11  winds down there and the trees get all caught up in

12  there.  The city contacts them to do most of their major

13  work for removing trees and hot wires.

14      PRESIDING COMMISSIONER KUBOCHI:  And what was

15  your reason in kicking, cutting the phone wires?

16      INMATE STAICH:  Because I never got along before,

17  the grandparents didn't like me because I had long hair.

18      PRESIDING COMMISSIONER KUBOCHI:  Well how old

19  were they?

20      INMATE STAICH:  Probably in their 60s.

21      PRESIDING COMMISSIONER KUBOCHI:  Couldn't have

22  been much of a threat to you as a 27 year old man, could

23  they?

24      INMATE STAICH:  They weren't no threat to me at

25  all.  But they didn't want me associating with her.

53

```
 1        PRESIDING COMMISSIONER KUBOCHI:  And then why did

 2   you kick in the door?

 3        INMATE STAICH:  Well as part of the transcripts

 4   show that, me and that man had an argument at the door.

 5   I rang the doorbell.

 6        PRESIDING COMMISSIONER KUBOCHI:  You and the

 7   grandfather?

 8        INMATE STAICH:  No, I didn't have nothing to do

 9   with the grandfather.  There is none of that in there.

10        PRESIDING COMMISSIONER KUBOCHI:  You and

11   Mr. Topper?

12        INMATE STAICH:  Me and Mr. Topper had an argument

13   at the front door.  That's when I found out.  I didn't

14   even know he was over there.

15        PRESIDING COMMISSIONER KUBOCHI:  And what was

16   your reason in having a hammer at the door after you,

17   because you kicked it in, what was your reasoning for

18   having a hammer?

19        INMATE STAICH:  The only reason I took a small

20   hammer with me is because I used it to pull the phone

21   line off the wall.  They got little metal brackets that

22   fit into the wall.  It holds a phone line down.  I used

23   the back of the claw hammer and pulled the wire loose

24   from the wall.  But they don't talk about it, I had

25   black electrical tape with me, too, in my truck to put
```

54

1   the wires back together.  I thought that maybe after I

2   went to the door and everything that she would come and

3   answer it.  And we would talk.  And I would get my

4   little bit of property or whatever, everything would

5   have went smooth.  But it didn't work out that way

6   unfortunately.

7        PRESIDING COMMISSIONER KUBOCHI:  Well isn't it

8   unexpected to not be smooth when you kick in somebody's

9   door at 12 a.m.?

10       INMATE STAICH:  But you're not taking into

11  consideration that me and him argued at the door before

12  the door got kicked in.  There was a verbal

13  confrontation back and forth where he threatened me.

14       PRESIDING COMMISSIONER KUBOCHI:  Well wouldn't it

15  be pretty foreseeable that if somebody kicked in your

16  door at 12 a.m., you would respond and be a little upset

17  at whoever was at the front door, who kicked it in?

18       INMATE STAICH:  Yeah, but if you were engaged to

19  be married to somebody that was living in that house and

20  you had not had any information from that party that

21  they were severing that relationship with you --

22       PRESIDING COMMISSIONER KUBOCHI:  No, I'm putting

23  you on the guy who responded to the door.  You're the

24  guy at the door.

25       INMATE STAICH:  I'm at the door and he is at the

1  door.  Okay.  But you got to look at the reasoning why

2  an individual went to the door to begin with and what he

3  was doing.

4       **PRESIDING COMMISSIONER KUBOCHI:**  Do you think

5  that the homeowner had, and you're the guy at the door

6  now --

7       **INMATE STAICH:**  Well I'm going to tell you this,

8  and they changed the law in 1984.  Up until then the law

9  stated that the homeowner had to show just cause to use

10  aggressive force against anybody that broke into the

11  home.  That was later changed in a 1984 amendment.  But

12  this crime happened in '83.  So the law that would apply

13  at that time, the homeowner had to show that I was

14  trying to harm him.

15       Now, if he, if you want to say because the door

16  got kicked in, that doesn't mean I was going to harm

17  him.  He threatened me through the door.  He had the

18  gun.  I didn't have no gun.  And it should be taken into

19  consideration that my brother-in-law at the tree service

20  in the room that I was staying in, that they found this

21  out later, that he is a bear hunter and that he had over

22  30 guns in that room loaded.  There was handguns and

23  everything in the same area where I was staying at that

24  house.

25       All this evidence came out at the trial.  I

1    wasn't planning on harming anybody that night.  I didn't

2    have any, you know, sure there is stuff in there like I

3    had said I would talk about anything that was in there

4    as far as the second degree murder is concerned.  But

5    you know, I didn't know that guy had a loaded 357

6    magnum.

7           PRESIDING COMMISSIONER KUBOCHI:  Well if you --

8           INMATE STAICH:  It came out that he had been

9    shooting it at the range.  Why are you out shooting a

10   gun at the range and getting ready for somebody?

11          PRESIDING COMMISSIONER KUBOCHI:  If you, if

12   you --

13          INMATE STAICH:  He did a lot of things, too, that

14   led up to the situation.

15          PRESIDING COMMISSIONER KUBOCHI:  If you --

16          INMATE STAICH:  I'm not saying that I'm not

17   remorseful.  I'm very remorseful.  This should have

18   never happened.

19          PRESIDING COMMISSIONER KUBOCHI:  Well tell us

20   about your remorse then.

21          INMATE STAICH:  I am remorseful.  And I have

22   insight into this crime.  And it's a sad situation that

23   this man had to die.  Nobody should die over a

24   relationship with a female.  But I can't take back time.

25   It has been almost 25 years I've been in here, you know.

57

```
 1   I'm very remorseful for this.  If there is anything I
 2   could do to make that person's family or anybody better
 3   off, if there was any way when I get into the community
 4   and I start making a lot of money that I could do
 5   something to some type of victim's rights group to help
 6   out so this never occurs again, I would do it.
 7            PRESIDING COMMISSIONER KUBOCHI:  One final
 8   question.  If you went over there not to intend any
 9   harm, got in an argument, why didn't you just leave?
10            INMATE STAICH:  And that's the key question.  Why
11   didn't I leave?  Okay.  And that's where the passion
12   comes in.  I was so in love with this woman.  She sent
13   photographs to me the whole time I was incarcerated.
14   This all came out at the trial.  She sent nude
15   photographs, stating and professing her love for me.
16            I had already been with this woman, had a sexual
17   relationship with her before I was incarcerated.  So as
18   far as I was knowing that at the time, that this woman
19   wanted to be with me and that he was the intruder.  And
20   she didn't really want to be with him.  You know, so I
21   didn't really, you know, I had a lot of emotions.  And I
22   was young.  I made a mistake.
23            I shouldn't have kicked the door open.  But after
24   I kicked the door open, he made another statement that
25   I'm down.  And that's when I entered into the home.  He
```

1  goes I'm down here.  And when I went down there, he
2  didn't pull a bible on me.  He came right around the
3  corner and he opened fire.  He blew this finger off
4  first.  That's a defensive wound that I had to block the
5  gun like that.

6      **PRESIDING COMMISSIONER KUBOCHI:**  Clarify one
7  thing for me.  Where were you when that first shot was
8  fired?

9      **INMATE STAICH:**  I was in the hallway, at the very
10 end of the hallway where he had called me that he was
11 down there.

12     **PRESIDING COMMISSIONER KUBOCHI:**  Okay.

13     **INMATE STAICH:**  So he is luring me deep into the
14 house.  Okay.  So I went down there.  And when I got
15 down there, he came right around the corner.  And he
16 fired.  He didn't say one word to me.  And I just went
17 like that, the natural reaction, and the finger was
18 blown off.  Blood, meat, everything went into my face.
19 The next thing I know he shoots again.  He catches me in
20 this arm.  Okay.

21     Out of a natural reaction, yeah I had the hammer
22 in my back pocket.  I pulled the hammer out of my
23 pocket.  And I started waling on him, everything I could
24 do to save my life because this man was trying to kill
25 me.  And I pushed him.  And we fought through that whole

1    time.

2         And the hammer slipped out of the thing, which

3    came in part of the trial, the hammer flew out.  So I

4    had nothing.  And he still got control of the gun.  And

5    we're fighting.  During that whole wrestling match is

6    when that gun went off.  And then the third one, another

7    one went through and just barely skinned between the

8    middle of my legs, which they showed bruising and

9    everything.  So I was barely missed by another round

10   during the wrestling match when the gun went off.

11        He was never, this whole, every wound that he

12   sustained was during the wrestling match with me during

13   this whole confrontation.  After that, I was in such a

14   state of shock because first of all, this vein is blown

15   open, your main artery.  And there is blood squirting

16   out everywhere.  You know, I feel like I'm dying.  A

17   bullet just went through my chest.  My lungs collapsed.

18        And I come around the corner and come down and

19   there she is waiting with a, she had a pistol, a starter

20   pistol.  And instead of just telling me to get out of

21   there or whatever, she fires at me.  Unbeknownst to me,

22   it's a zephyr starter pistol, some kind of a, for

23   scaring birds.  But it shot a flame out the end of it.

24        So I thought she was shooting me in the face or

25   you know.  And I just reacted to it.  And I reacted

60

1  wrong and I took the but of the gun after the wrestling

2  match with him; I got the gun.  I was running out just

3  to get rid of it.  And that's when I waled on her.

4  There is no excuse for it.

5          PRESIDING COMMISSIONER KUBOCHI:  And then what

6  happened next?

7          INMATE STAICH:  She fell down in the kitchen.  I

8  obtained the gun that she was firing.  And I just tried

9  to go get help.  I was in shock.  I was bleeding.  I

10  mean, I don't know if you guys can understand that.  But

11  you know, that's what happened.

12          PRESIDING COMMISSIONER KUBOCHI:  Now after all of

13  this was done, what property was returned to you?

14          INMATE STAICH:  From this whole situation,

15  nothing.

16          PRESIDING COMMISSIONER KUBOCHI:  Nothing, okay.

17          INMATE STAICH:  I got a life sentence for it.

18  And I've been in here 25 years.

19          PRESIDING COMMISSIONER KUBOCHI:  Okay.

20          INMATE STAICH:  A very bad mistake on my part,

21  you know.

22          PRESIDING COMMISSIONER KUBOCHI:  Okay.

23          INMATE STAICH:  But I can't change what has

24  occurred.  And I'm very remorseful for it happening.

25  And I wish it never did happen.

1        **PRESIDING COMMISSIONER KUBOCHI:**  Okay.  Thank

2  you.  Commissioner, do you have any questions?

3        **DEPUTY COMMISSIONER ALVORD:**  Just two that I

4  wanted to make sure that I have clarification on the

5  record.  Since '78, that's when you went and did two

6  years for the escape, correct?

7        **INMATE STAICH:**  Uh-hmm.

8        **DEPUTY COMMISSIONER ALVORD:**  Then you were out

9  six months on parole.  And then you were revoked for the

10  threats.  Then you went back into custody.  You were

11  released in the first part of 1980.  And then you went

12  into the federal system.  So it appears to me that

13  between 1978, I'm sorry, I left out this, the life

14  crime.  You were paroled then in 1983 from the federal

15  system.  And 23 days later the life crime occurs.  So

16  from '78 to '83 it appears you were only loose or on the

17  streets for six months.

18        **INMATE STAICH:**  That's probably a correct

19  prognosis there.

20        **DEPUTY COMMISSIONER ALVORD:**  Okay.  And that's

21  the time period when you were doing the motorcycle

22  mechanic and the landscaping?

23        **INMATE STAICH:**  Whatever, yeah, I never really

24  got to really utilize all that, you know, because of the

25  problems I had with the, you know, look guys.  I didn't

1  know this was going to happen.

2      **DEPUTY COMMISSIONER ALVORD:**  Of course.

3    **INMATE STAICH:**  I'm just being honest with you.

4      **DEPUTY COMMISSIONER ALVORD:**  And the other

5  question I simply had is I'm not sure that I fully

6  understand why you were at the house at midnight.

7    **INMATE STAICH:**  And as I told him, I was working

8  at the time.  And we didn't get the yard cleaned up

9  until 10 o'clock.  It's a tree business, chainsaws,

10 climbing ropes, all those apparatus.

11     **DEPUTY COMMISSIONER ALVORD:**  Sure, but there are

12 other days.

13    **INMATE STAICH:**  What?

14     **DEPUTY COMMISSIONER ALVORD:**  There are other

15 days.  That's what I don't understand, frankly, is it

16 didn't have to be that day.  Midnight is a strange

17 hour --

18     **INMATE STAICH:**  I know.  I understand that.

19     **DEPUTY COMMISSIONER ALVORD:**  No, no.  Let me

20 finish.

21    **INMATE STAICH:**  Okay.

22     **DEPUTY COMMISSIONER ALVORD:**  Midnight is a very

23 strange hour to go calling.  And I was wondering why you

24 chose to go that late.

25    **INMATE STAICH:**  Okay.  Here is another thing,

1   too, is my fiancé at that time that is the victim in

2   this crime worked graveyard shift at the Roadrunner

3   Restaurant.  And she stayed up on those days that were

4   off.  And according to what my brother told me, those

5   were her days off.  So she is a graveyard shift worker,

6   though, you know, that's still not an excuse for what

7   happened.  But that's part of the reasoning why I went

8   late at night is because that's when her days are off

9   and she is up all night because she sleeps during the

10  day.

11       **DEPUTY COMMISSIONER ALVORD:**  Okay.  That's all I

12  had.

13       **PRESIDING COMMISSIONER KUBOCHI:**  Well I have one

14  question.  Your trial transcript indicates that there

15  were 67 collect calls to Bess' father in July and August

16  of '83 in an attempt to locate her.  Okay.  That's in

17  your Appellate transcript.  Didn't the 67 calls kind of

18  tell you that she didn't want to be in the relationship

19  anymore when none of that, none of those calls resulted

20  in affirmative response by her?

21       **INMATE STAICH:**  Well when you're having a sexual

22  relationship with someone and you're still receiving

23  mail inside the prison up through those calls right

24  there and she tells me that I can contact her at her

25  father's house, and those letters are part of the

1  evidence in the trial, I think there is mitigating

2  factors there on that issue right there, Sir.

3        **PRESIDING COMMISSIONER KUBOCHI:**  Okay.  Thank

4  you.  At this time, sir, we are going to have closing

5  statements by the District Attorney's representative

6  followed by your opportunity to tell us why you believe

7  you are suitable for parole at this time.

8        **INMATE STAICH:**  Okay.

9        **PRESIDING COMMISSIONER KUBOCHI:**  Mr. Lockhart?

10        **DEPUTY DISTRICT ATTORNEY LOCKHART:**  Thank you.

11  The circumstances of this crime do not warrant release.

12  The simple fact is I'm not saying that the inmate

13  intended to shoot Mr. Topper when he went over there.

14  However, something was going to go down.  It indicates

15  planning and calculation.  He armed himself with a

16  hammer.  It was in the middle of the night.  We have

17  been discussing these at great, well, the Board has been

18  discussing these at great length in the last several

19  minutes.

20        He cut the phone wires, broke the door down,

21  attacked his ex-girlfriend and her husband.  What I find

22  interesting is there seems to be so many, just in the

23  last couple of minutes that the inmate has been talking

24  about the crime, it just seems that there was so many

25  times when this crime could have been averted.

1        What just jumped out in my head about 90 seconds

2   ago is when he said she worked graveyards at this

3   restaurant.  Well if he just wanted to get his property

4   back and you know, kind of resolve things, why not go to

5   the restaurant during one her graveyard shifts at a

6   neutral site when he knows that he is not gaining access

7   to this girl through her grandfather as the 67

8   unanswered phone calls indicate.  Why not go to this

9   neutral location?

10       The crime indicates overkill, the multiple blows

11  to the husband's head.  He was shot three times

12  including once in the back.  There was brain damage to

13  his ex-girlfriend because of the multiple blows.  It

14  seems that the motive for the crime is extremely

15  trivial.  He was obsessed with this woman.  He was

16  stalking her.  He threatened her.  He threatened her

17  husband.

18       The file indicates that he had called Robert

19  Topper.  He knew, the inmate knew that Robert Topper was

20  in the picture.  He had called him and threatened him as

21  well.  It's obvious that the inmate has longstanding

22  issues with women given the many times he has threatened

23  women including the woman for which he, the woman he

24  threatened for which he was serving the federal

25  commitment.  And even after he was committed for this

1    crime in 1996 he threatened his ex-wife as well.

2         Moreover, the prior grants of parole and

3    probation have been failures for the inmate. He was on

4    that federal parole for the crime that I just talked

5    about when he began his obsession with Cynthia Bess.

6    That parole was revoked because of his obsessive and

7    threatening behavior. And he was paroled again with the

8    promise, the file indicates, that he would stay away

9    from Cynthia Bess.

10         In other words, he was ordered by as a condition

11   of parole to stay away from her, which is why he told

12   the Board that it would have been a violation of his

13   parole to even go and talk to her. Obviously, he did

14   not obey that promise when he committed the instant or

15   excuse me, the commitment offense while on parole.

16         There is a huge, the inmate says he has insight.

17   I would respectfully disagree. I think there is a huge

18   lack of insight and a lack of acceptance of

19   responsibility. When I was reviewing the file last

20   night, as the Board knows, I wasn't planning on doing

21   this hearing. So I reviewed the file last night. The

22   2006 Board report says, which is the most current Board

23   report, says that the inmate's version of the crime is

24   the same as in the last Board report, which was the 2002

25   report.

1           And in that 2002 report the inmate is quoted as

2    saying that his case is quote, not egregious due to the

3    fact that he was found guilty of second degree murder

4    and the fact that Robert Topper was the original

5    aggressor by firing the weapon at the inmate.  He also

6    said that Cynthia was in possession of a handgun and

7    fired two rounds at the inmate before he defended

8    himself against her aggressive assault.

9           The inmate stalks this woman, breaks into her

10   house in the middle of the night, kills her husband and

11   suddenly she is the aggressor.  He says today that he

12   didn't know that she didn't want him.  And as the Board

13   astutely questioned the inmate, how could those 67 phone

14   calls not indicate that she didn't want him.  How could

15   the fact that she's the one that called his parole

16   officer, his federal parole officer in 1983, and it was

17   that call where she said, I'm being threatened by the

18   inmate and he had threatened Robert Topper by that

19   point.  And therefore his federal parole was revoked

20   because she ratted him out for what was going on at the

21   halfway house.

22           So I don't understand how, there is a huge chasm

23   of understanding, at least from my perspective, where I

24   don't get how he can say I didn't understand that she

25   didn't want to be with me.  She is getting his parole

1    revoked.  She is ignoring 67 phone calls.  And then
2    suddenly because they are, when he breaks down the door,
3    cuts the phone wires, and they are defending themselves
4    and their property, suddenly they are the aggressors.  I
5    mean, how can the inmate under these facts of this crime
6    claim the mantle of victim-hood?  I mean, it's kind of
7    outrageous.
8          Moreover, the Board talked about the, I think
9    this was Deputy Commissioner Alvord, talked about the
10   psychological evaluations and the huge difference
11   between the 2002 psych evaluation and the 2006.  I don't
12   understand what was wrong with Dr. Gamard's assessment
13   that the inmate is possessive of women and that he does,
14   he becomes jealous when they're with someone else.  I
15   don't understand how the facts of the long sordid
16   history of this case do not support that assessment.
17         The 2006 evaluation by Dr. McComber is
18   problematic for a number of reasons.  Number one, how
19   can anyone say that a convicted murderer is no more
20   likely to be violent than any other member of society?
21   That is a ridiculous statement.  Number two,
22   Dr. McComber uses no critical analysis and accepts what
23   the inmate tells him as gospel.  And I wonder why.
24         He claims that the inmate's prognosis for
25   successful adjustment is excellent.  However, he accepts

1  the inmate's version of what happened in spite of what

2  the record of the case is.  Dr. McComber talks about the

3  inmate, quote, trying to set the record straight and

4  tell a story.  But no questions are asked by

5  Dr. McComber, no discussion of how the inmate's version

6  is not supported by the evidence.

7       Dr. Gamard, on the other hand has an opposite

8  assessment.  This evaluator is critical of the inmate's

9  version of the events.  He says that the inmate's

10  potential for violence is high.  What has changed about

11  the inmate between 2002 and 2006 to warrant

12  Dr. McComber's change from Dr. Gamard's opinion.  And

13  that is nothing.

14       One doctor, Dr. McComber, believes the inmate

15  hook, line and sinker.  And the other, Dr. Gamard, is

16  rightfully skeptical of what the inmate is telling him.

17  For all the reasons stated, for the, especially for the

18  fact that there seems to be a disconnect between the

19  objective facts of this case and what the inmate says

20  occurred showing a lack of insight into the crime, for

21  all those reasons, the inmate is not suitable for parole

22  and would be an unreasonable risk to the community.  And

23  I would urge the Board to deny him a parole date at this

24  time.  Thank you.

25       **PRESIDING COMMISSIONER KUBOCHI:**  Thank you.

1  Mr. Staich, before giving your statement, you are not

2  obligated to respond to anything the DA says.  As I

3  indicated at the outset, this is not an adversarial

4  proceeding.  We are not here to retry your guilt or

5  innocence.  We are here to gather facts as to why you

6  are suitable for parole.

7       And I want you to address us and tell us why you

8  are suitable for parole.  Not responding to anything the

9  DA says is not held against you because you are

10  representing yourself.  And we want to hear why you

11  believe you are suitable for parole.

12       INMATE STAICH:  Well not objecting on the record

13  to something leaves the record without any objection,

14  you know.  And --

15       PRESIDING COMMISSIONER KUBOCHI:  No, you can make

16  your record.

17       INMATE STAICH:  I just can't go like that because

18  everything he is stating right there goes totally

19  against what I'm about.

20       PRESIDING COMMISSIONER KUBOCHI:  You can make

21  your record.  But then in telling us why you believe you

22  are suitable for parole, there is no need to respond to

23  what he says.

24       INMATE STAICH:  That's fine.  If you don't want

25  me to, I won't.

1    **PRESIDING COMMISSIONER KUBOCHI:**  No, I'm not

2    saying --

3        **INMATE STAICH:**  You're conducting this.

4        **PRESIDING COMMISSIONER KUBOCHI:**  I'm not saying I

5    don't want you to.  I'm just saying don't feel

6    obligated.  You could make your record because you're

7    representing yourself.

8        **INMATE STAICH:**  Yeah.

9        **PRESIDING COMMISSIONER KUBOCHI:**  You make your

10   record and then you go on to tell us why you believe you

11   are suitable for parole.  This is not a retrial.  This

12   is not a judicial proceeding.

13       **INMATE STAICH:**  Yeah, I understand that.  And

14   that's why I put in an objection to begin with under

15   2030 of the Title 15, Division Two to his presence in

16   here because this is a boiler plate statement that comes

17   from every District Attorney on anybody convicted of

18   murder.  They do this every time.  It's nothing but a

19   pro form of hearing to them.  It's a sub rosa.  They're

20   involved in this constantly.

21       They're probably taught or go through some kind

22   of course to learn to go after the inmates, make all

23   these adverse statements against them regardless of the

24   amount of time that has been served and the

25   accomplishments by the inmate inside the prison.  And I

1    will leave it at that on that issue.

2           **PRESIDING COMMISSIONER KUBOCHI:**   Yes.   Thank you

3    very much.

4           **INMATE STAICH:**   Okay.   All right.   Now as far as

5    me being suitable for parole, I feel that I have

6    accomplished a lot on my own with my disabilities, what

7    I could do in this environment.   I've been in prison for

8    25 years.   You have made a lot of statements on the

9    record here that I have never really been a part of the

10   community for very long.   So I've never really had a

11   chance to be a productive citizen because when I was

12   young I got involved with women.   And things didn't go

13   the right way.   And it led to this.   So that's where

14   we're at right now.

15          But during all these years, you know, there is

16   insight into this crime whether anyone wants to believe

17   it or not.   I know it's wrong.   It should have never

18   occurred.   You know, it's just so hard when you're that

19   young at the time and you just don't see things when you

20   get older that you would see when you're younger.   And

21   on that aspect right there I still think I'm suitable,

22   that I could be a productive citizen in the community.

23   I have a lot of good qualities about me.

24          Other than this crime right here I have no prior

25   violence inside the prison system.   I've conducted

1    myself with respect.  I give all the officers in the

2    prison respect.  And they give me respect back.  I've

3    never had any problems with anybody.  I've been in this

4    prison for several years.  And I obey the rules to the

5    best of my ability with the exception of the one where

6    I'm a Nazarite.  And I do have religious beliefs that

7    have conflicted with the system a little bit.  But other

8    than that I've caused no major disturbances.

9         I think that I've earned my parole after nearly

10   25 years in here.  This was a crime that occurred when a

11   person was very young.  And the other person was young.

12   And I made a lot of wrong decisions that you have

13   brought out on the record.  You can't change those

14   things.  They happened.  They occurred.  They're

15   history, not that we are going to leave them in the past

16   and not reflect upon them to make our self better in the

17   future.  That's what we do when we do things wrong.  We

18   look at the wrongs and we have to evaluate the future so

19   that we don't have this happen again.

20        My fiancé now is 50 something years old, you

21   know, close to my age.  And she doesn't take drugs like

22   any of these other women I've been involved with.  She's

23   a productive citizen in the community.  She works at the

24   animal shelter as well.  She takes in stray animals that

25   are going to be, you know, euthanized.  She does a lot

74

1  of things, everything that she can.  And I just want to

2  go out there and try to be a part of that and help her

3  in her life and get on with mine and be a good,

4  productive citizen in the community and do everything I

5  can to help people.

6      I never wanted to turn out this way.  And I

7  wasn't born to be some kind of a killer.  And I never

8  wanted to kill nobody that night.  I don't know what

9  happened after that man shot me.  Yes, I made a big

10  mistake cutting the phone line, kicking the door open

11  and confronting the situation that way.  I was young.

12  Before all these injuries happened, I used to be a

13  weightlifter and I was real big.  You know, but I've had

14  a lot of damage to my body.

15      And I've learned, you know, that being that kind

16  of an aggressive individual is not the way that you get

17  through in life.  You just can't do that.  You don't use

18  physical violence or anything like that.  And I think

19  these 25 years have shown that, that I do have remorse

20  in me and that I don't want to hurt people or do

21  anything bad to anyone.

22      I haven't touched any person in this prison

23  system.  Remember I'm living amongst all kinds of gangs,

24  every kind of corruption you can think that is going on

25  in here, gambling and everything else.  And it goes on

1   in all these prisons. I've kept myself away from all of

2   it. I don't take drugs. I don't do anything wrong at

3   all. I just do my artwork that I've showed you there.

4   And I mind my own business.

5         I've seen several cases, though I realize this is

6   me, where the same situation has occurred where the

7   District Attorney is opposed and other people. And

8   these crimes, you know, not to say that my crime is not

9   a bad crime, it is, but when you see other people out on

10   the streets that only served 20 years and they took an

11   armed, you know, they had a machine gun and shot a man

12   10 times.

13         This Rosenkrantz case where he is free now

14   because his father is a big trial attorney. He has a

15   lot of money behind him. He spent over a million

16   dollars on his different writs throughout the courts.

17   There is five different Rosenkrantz decisions, I mean,

18   just hundreds and hundreds of hours of people being

19   involved in this including Board members that have had

20   to make statements and depositions to different Attorney

21   Generals based on the case.

22         I mean, there is just so much effort that goes in

23   that opposes these things, but in the end, even inmates

24   like that have been released back into the community.

25   And he has been doing fine out there. And this man went

1    to a shooting range a week before, fired that gun, did

2    everything he could to plan this murder.  But he's

3    walking the streets right now.  And he's doing good out

4    there from what I understand.

5         I'm just showing you that there is other people

6    that have committed these kinds of crimes that are back

7    in the community.  Another one is an Asian man that went

8    into a restaurant here, Mr. Lee, and had a problem with

9    the guy because he wouldn't pay him for his restaurant.

10   He opened fire in there and one of the bullets went

11   through the owner of the restaurant's wife's head,

12   killing her instantly.  He shot a couple of people in

13   there, too, as well.  He had attempted murders, guns,

14   all kinds of stuff.  This man was released back into the

15   community.

16        Now they have made some interesting

17   determinations in here as far as the law in being

18   suitable to the parole issues as far as some evidence is

19   concerned.  And basically what they're saying is the sum

20   evidence has to be something that was received or it's

21   part of what you have done in here that would reflect

22   that you're a threat to the community now.

23        I mean, we can go back into the crime that the

24   District Attorney has expressed his views about here.

25   And we can find all kinds of little things to tear it

1  apart and make me look like the big bad guy again.

2  Whether you consider that a retrial or not, it's still,

3  that's the same type of evidence that was put on at the

4  trial by the prosecution.  So, I mean, this can just go

5  on forever.

6      And we can spend millions of dollars on

7  taxpayers' money and having these hearings or we can let

8  a guy that's not a threat to the community get on with

9  his life.  It's costing taxpayers 53,000 dollars a year

10  for us to be in here.  The lifers are getting older.

11  There is lots of us in here.  The medical, you know, I

12  need all kinds of surgeries right now.  You know, it's

13  going to cost thousands of dollars.

14      I would rather go out in the community with my

15  artwork and make money and pay for my own stuff.  Why

16  should the taxpayers have to keep paying for me?

17  Everybody knows it's overcrowded.  They're trying all

18  these ways to effectively fix it.  There is hardly any,

19  you can't go to anything here, even these Anger

20  Management classes.

21      If I had a camera and took pictures, the lifers

22  are just stuffed in there.  It's hot.  You go through a

23  lot sitting in there.  But I went through all this

24  because that's what the last Board asked me to do.  I've

25  done everything that I could possibly do to show respect

1  for that Board and what they asked me to do.

2      And I'm not taking away that this crime was

3  committed by saying I done that. I'm not trading that

4  for what I did. What I did was what I did. And it was

5  wrong. And it's never going to occur again. I can tell

6  you that. Whether you keep me in here or not, I'm still

7  going to be a good person inside this prison or out on

8  the streets. So I will leave it at that.

9      **PRESIDING COMMISSIONER KUBOCHI:** Thank you very

10  much, sir. It is now 2:27. We're going to be in

11  recess.

12      **DEPUTY COMMISSIONER ALVORD:** And we are off the

13  record.

14                  R E C E S S

15                   --oOo--

16

17

18

19

20

21

22

23

24

25

```
 1              CALIFORNIA BOARD OF PAROLE HEARINGS

 2                      D E C I S I O N

 3         DEPUTY COMMISSIONER ALVORD:  Okay.  We're back on

 4  the record.  The time is 3:12.

 5         PRESIDING COMMISSIONER KUBOCHI:  We're back on

 6  record on the Subsequent Parole Consideration Hearing of

 7  Ivan Staich.  And Mr. Staich, I want to advise you that

 8  we reviewed all information received from the public.

 9  And before giving our decision I want you to know that

10  we seriously considered all the facts that you have told

11  us.  And in reviewing Section 2281, I think it's

12  informative in regard to the factors that we consider

13  because you have repeatedly indicated the static nature

14  of the crime that happened in 1983.  And you are correct

15  in that those facts could never change.

16         And it has been many, many years since your

17  commitment to state prison.  And I'm sure that that time

18  has weighed heavily on you.  And Section 2281 talks

19  about and describes determination of suitability in

20  Subdivision A it says, regardless of the length of time

21  served, a life prisoner shall be found unsuitable for

22  and denied parole if, in the judgment of the Panel, the

23  prisoner will pose an unreasonable risk of danger to

24  society if released from prison.

25  IVAN STAICH      E-10079      DECISION PAGE 1      5/9-10/07
```

1    Subdivision B talks about information considered.

2  And we have honored all of your objections. And we

3  believe that we have only relied on relevant, reliable

4  information. And that in looking at the information

5  considered the ending sentence of that paragraph says

6  that circumstances, which taken along may not firmly

7  establish unsuitability for parole, may contribute to a

8  pattern which results in a finding of unsuitability.

9    And Subdivision C lists factors in a specifically

10  designated circumstances tending to show unsuitability.

11  And before getting into that Section and all the

12  subdivisions under Subdivision C or subsections,

13  Subdivision D is entitled Circumstances Tending to Show

14  Suitability. And we have, you have talked about how

15  many years have gone by and how since 2001 you have not

16  had a 115. And institutional behavior is but one of

17  eight factors listed, in fact, circumstances tending to

18  show suitability.

19    But even in looking at the institutional behavior

20  there have been 115s as recently as 2001. Albeit you

21  have explanations for that because they were a series of

22  115s, the most recent of which was in 2001 for grooming

23  violations that this Panel is aware of federal

24  decisions. But at the time of those 115s the

25  **IVAN STAICH    E-10079    DECISION PAGE 2    5/9-10/07**

1  regulations did support findings by staff here of the

2  violation of institutional rules. And it is your lack

3  of 115s commence from 2001.

4  Of significant importance to this Panel is a 115

5  in 1996 that involved threats to your former wife or

6  girlfriend who is not the victim of the assault in this

7  case. It's a very serious assault. And if we look

8  back, throughout your, all of your brushes with the law,

9  you have had several different violations of the law

10  including a federal convictions for making threats by

11  the U.S. mail

12  And I would also like to point out that in 1977

13  the victims in that case received a threatening letter.

14  And that ultimately you received a prison sentence for

15  escape. Now although the escape has nothing to do with

16  threatening letters, it is documented that you were

17  making threats as early as 1977 against either the

18  family of women or women.

19  That this, the life crime involved threats to

20  Ms. Bess, whose married name was Topper. And that the

21  crime, that murder was in 1983. And then, if we go

22  further in more recent time, you had a 115 for

23  threatening letters.

24  INMATE STAICH: Yeah, but the psych indicated all

25  IVAN STAICH    E-10079    DECISION PAGE 3    5/9-10/07

1    through there, he went through every little of area that

2    you're talking about.

3         PRESIDING COMMISSIONER KUBOCHI:  Sir --

4         INMATE STAICH:  And he discussed all that in the

5    psych report.

6         PRESIDING COMMISSIONER KUBOCHI:  Sir, I'm talking

7    about, I'm not talking about the psych report.

8         INMATE STAICH:  I know.  But he went through all

9    that.  And he's the only professional that has evaluated

10   me.  And he has recommended released.

11        PRESIDING COMMISSIONER KUBOCHI:  I'm not talking

12   about the psychological impact, sir.  What I'm finding

13   is that in 1978 you got a conviction for escape.  And

14   you received a prison, state prison sentence.  Later you

15   got a federal commitment.  This crime resulted in a

16   commitment in 1983 --

17        INMATE STAICH:  Yeah, I understand.

18        PRESIDING COMMISSIONER KUBOCHI:  -- to state

19   prison.  And in 1996 you received a 115 for making a

20   threat.  And there is a long pattern of violations

21   involving threats to women or members of their family

22   since your involvement in the criminal justice system in

23   1978 that had the prison commitment to your last 115 in

24   2001.  That's 23 years.

25   IVAN STAICH    E-10079    DECISION PAGE 4    5/9-10/07

1          INMATE STAICH:  Anyway I've never threatened

2     anybody's family.  Anything that was directly related to

3     a threat was within the person itself.  And there is

4     explanations for that as well in the psych report as

5     well if you would have read the whole thing.

6          PRESIDING COMMISSIONER KUBOCHI:  Mr. Topper was

7     threatened by you.  He was the wife (sic) of the woman,

8     Cynthia.  By your own admission you had an argument at

9     the door, sir.

10          INMATE STAICH:  There is no, I had an argument at

11     the door.  And he threatened me.

12          PRESIDING COMMISSIONER KUBOCHI:  And he's dead.

13          INMATE STAICH:  He threatened to kill me.

14          PRESIDING COMMISSIONER KUBOCHI:  We find --

15          INMATE STAICH:  He initiated a threat towards me

16     first.

17          PRESIDING COMMISSIONER KUBOCHI:  We find over the

18     period of your first state prison sentence in '78 all

19     the way through your life commitment that included the

20     series of 115s, that's a period of 23 years.  That's a

21     long time.  And so your institutional behavior has not

22     been that good.  And that's in a factor of suitability.

23          Going back over the factors of suitability, you

24     have no juvenile record.  That has been deleted by court

25     IVAN STAICH       E-10079      DECISION PAGE 5     5/9-10/07

1   order.  We don't know what that record is.  So that's

2   kind of an even thing.  We're not holding anything

3   against you.  But it was deleted by court order.  So

4   that's kind of not in the mix.

5        Stable social history, I find that your, all of

6   your involvement with the law involved women.  And I

7   would find that you have a very unstable history of

8   relationships with others.  In this particular case, an

9   example of the 67 calls you made while incarcerated to

10  the father of Ms. Bess.

11       In regard to motivation for the crime, which is

12  in the factors of suitability, there is not motivation

13  for you to have been involved in this murder and

14  attempted murder on Ms. Bess that could be within the

15  realms of society.  So the motivation for the crime is

16  not in your favor.  Lack of criminal history is not in

17  your favor because you have been in, you have two

18  separate imprisonments.  You have all --

19       INMATE STAICH:  Those are unchanging factors that

20  are never ever going to change.

21       PRESIDING COMMISSIONER KUBOCHI:  You have all had

22  violations of parole, sir.

23       INMATE STAICH:  I know.  But they're, those

24  things you are talking are ancient history that are

25  IVAN STAICH    E-10079    DECISION PAGE 6    5/9-10/07

1   never ever going to change.

2        **PRESIDING COMMISSIONER KUBOCHI:**  Understanding --

3        **INMATE STAICH:**  So what you're doing is changing

4   the crime to first degree murder.

5        **PRESIDING COMMISSIONER KUBOCHI:**  -- and plans for

6   the future, well we have considered that and --

7        **INMATE STAICH:**  Well the federal courts have

8   already said in Biggs that you have a limit.  It's a

9   second degree murder.  And you're not going to get away

10  with this.  I know what you're doing.  You're trying to

11  set the record to establish that there is some kind of a

12  jealousy pattern.  That was already overruled in the

13  psych report.  And he is the only professional person

14  that has evaluated me in this whole case.

15       **PRESIDING COMMISSIONER KUBOCHI:**  Sir, you're

16  arguing.  I'm announcing the decision.  There is a

17  factor --

18       **INMATE STAICH:**  I know that.  But I can see where

19  you're going with it.

20       **PRESIDING COMMISSIONER KUBOCHI:**  -- and

21  circumstances tending to show suitability and signs of

22  remorse.  In that regard, the factor there is whether

23  you have given indication that you understand the nature

24  and the magnitude of the offenses.  Although, you

25  **IVAN STAICH    E-10079    DECISION PAGE 7    5/9-10/07**

1  verbally state that you're sorry for the crime you

2  committed, the insights as to your involvement, the

3  justifications for your involvement, the statements as

4  to the causation factors lack credibility at this time,

5  sir.  We feel that you need more time to consider why

6  you would have such a fixation on this woman.  Once

7  again, the calls --

8       INMATE STAICH:  That's ancient history.  I've had

9  several, I've been with over 10 women inside the prison

10  system since then.  So how can you even say that?

11       PRESIDING COMMISSIONER KUBOCHI:  I'm talking --

12       INMATE STAICH:  One woman?

13       PRESIDING COMMISSIONER KUBOCHI:  I'm talking

14  about before the life crime.

15       INMATE STAICH:  Well this is almost 25 years ago.

16       PRESIDING COMMISSIONER KUBOCHI:  In regards to

17  the circumstances tending to show unsuitability, factor

18  one, the commitment of the crime.  The prisoner

19  committed the offense in an especially cruel manner.  In

20  this case here, the two victims were asleep inside

21  Cynthia Bess' grandfather's home.  You kicked in the

22  door.  You had cut the phone lines.  And one person

23  ended up shot and killed after being struck with a

24  hammer.

25  IVAN STAICH    E-10079    DECISION PAGE 8    5/9-10/07

1        INMATE STAICH:  That's why I was shot because he

2  was sleeping.  The gun just got up and pointed at me and

3  shot me.

4        PRESIDING COMMISSIONER KUBOCHI:  Ms. Bess was

5  struck by you in such a vicious manner that she has two

6  brain surgeries and suffered irreparable brain damage.

7  Multiple victims were attacked in this particular case,

8  one killed, one seriously injured by you.  The jury

9  verdict was attempted murder on the second victim.

10 Another factor, whether the offense was carried out in a

11 calculated manner, in this particular case, you had made

12 calls while incarcerated.

13       INMATE STAICH:  Over 25 years ago.

14       PRESIDING COMMISSIONER KUBOCHI:  You were

15 released on parole in November.  Less than 22 days

16 later, one person ended up dead.  And one person ended

17 up with irreparable brain damage.  You went over there.

18 You had a, you brought a hammer.  You cut the phone

19 lines.  This was all calculated, sir.  The victim was

20 abused or mutilated during the offense.  There was no

21 justification to leave Ms. Bess in such a damaged

22 condition.  You could have easily stopped.  You could

23 have easily ceased after kicking in the door.

24       INMATE STAICH:  I was all shot up at the time in

25 IVAN STAICH    E-10079    DECISION PAGE 9    5/9-10/07

1  complete disarray of my own life and my survival.

2        PRESIDING COMMISSIONER KUBOCHI:  And kicking

3  in --

4        INMATE STAICH:  And I was being shot at again.

5        PRESIDING COMMISSIONER KUBOCHI:  After kicking in

6  the door of a house, after cutting the phone lines,

7  sir --

8        INMATE STAICH:  You can keep saying that, 25

9  years ago, go ahead.

10       PRESIDING COMMISSIONER KUBOCHI:  The offense was

11 carried out in a manner which demonstrates a callous

12 disregard for human suffering.  There is no doubt that

13 Ms. Bess suffered horrible, horrible pain and damage.

14       INMATE STAICH:  That's what happened in the

15 Weider Decision right here.

16       PRESIDING COMMISSIONER KUBOCHI:  The motive --

17       INMATE STAICH:  The Board did the same to him.

18       PRESIDING COMMISSIONER KUBOCHI:  The motive for

19 your crime was inexplicable and very trivial in relation

20 to the commitment offense.  Two, previous record of

21 violence, though in this case here you had threats of

22 violence that resulted in a federal prison --

23       INMATE STAICH:  I served my time for that.

24       PRESIDING COMMISSIONER KUBOCHI:  Unstable social

25 IVAN STAICH     E-10079     DECISION PAGE 10    5/9-10/07

1  relationships again.  You have demonstrated that with

2  the women in your life you have had very unstable

3  relationships prior to your incarceration and conviction

4  for the murder charge.  And as far as institutional

5  behavior, we find 115s as recently as 2001.

6      INMATE STAICH:  I'm a Nazarite.  We won that in

7  the United States Supreme Court, the Cutter Decision.

8      PRESIDING COMMISSIONER KUBOCHI:  Back to the

9  decision, sir, I've listed the factors.  And clearly,

10  the factors that tend to show unsuitability far outweigh

11  the factors of suitability.  The factors of suitability

12  do include many dynamic factors.  And we find that in

13  regard to your signs of remorse, we find the words

14  lacking in credibility and meaning on your part.  We

15  find them superficial in regard to the causative factors

16  in this case and the way that this crime was committed.

17  These are dynamic factors that you control, sir.

18      In regard to your prior record, as I've indicated

19  you have had a record of threats of violence to other

20  people.  You have an escalating pattern of criminal

21  conduct before the life crime.  You have a history --

22      INMATE STAICH:  So you're going to change my

23  crime to life without because you're making these

24  statements?

25  IVAN STAICH   E-10079   DECISION PAGE 11   5/9-10/07

1       **PRESIDING COMMISSIONER KUBOCHI:**  -- of unstable

2   and tumultuous relationships with others.  And you

3   failed to profit from society's previous attempts to

4   correct your criminality --

5       **INMATE STAICH:**  (Indiscernible.)

6       **PRESIDING COMMISSIONER KUBOCHI:**  -- especially in

7   the federal parole and the federal conviction for making

8   threats.  Your institutional behavior includes 115s,

9   especially the 1996 threat to your threat to a woman.

10      **INMATE STAICH:**  That's over 11 years ago.  That's

11  ancient history.

12      **PRESIDING COMMISSIONER KUBOCHI:**  And you have

13  participated in a limited manner in group therapy, self-

14  help, self-study.

15      **INMATE STAICH:**  I've taken every program that's

16  available in this prison.

17      **PRESIDING COMMISSIONER KUBOCHI:**  We make a

18  finding that you need therapy in order to face, discuss,

19  understand and cope with stress in a non-destructive

20  manner as well as relationships with women.  Until

21  progress is made, you continue to be unpredictable and a

22  threat to others.

23      **INMATE STAICH:**  How you going to gain this

24  progress?

25  IVAN STAICH     E-10079     DECISION PAGE 12     5/9-10/07

1          **PRESIDING COMMISSIONER KUBOCHI:**  Therapy in a

2    controlled setting is needed.  But motivation and

3    amenability are questionable.  In a separate decision,

4    the Hearing Panel finds that the prisoner has been

5    convicted of a very serious murder and attempted murder

6    that involved multiple victims.  And therefore, it is

7    unreasonable to expect that parole would be granted in

8    the next four years.

9           In this particular instance the crime was carried

10   out in a calculated manner.  You had made 67 calls

11   during your incarceration for the federal offense that

12   involved making threats --

13          **INMATE STAICH:**  Over 25 years ago.

14          **PRESIDING COMMISSIONER KUBOCHI:**  -- through the

15   U.S. Postal Service, notwithstanding those collect

16   calls.  Upon your release in November, you immediately

17   implemented a plan to go over, locate this woman --

18          **INMATE STAICH:**  I've not been convicted of making

19   no plan.

20          **PRESIDING COMMISSIONER KUBOCHI:**  You cut --

21          **INMATE STAICH:**  Of second degree murder, no

22   premeditation.

23          **PRESIDING COMMISSIONER KUBOCHI:**  You cut the

24   phone lines.  You kicked in the door.  And thereafter,

25   **IVAN STAICH      E-10079      DECISION PAGE 13      5/9-10/07**

1    one person ended up murdered.  One person ended up with

2    permanent brain damage.

3         INMATE STAICH:  After they opened fire with a gun

4    on me first.

5         PRESIDING COMMISSIONER KUBOCHI:  The second

6    victim was mutilated in that you --

7         INMATE STAICH:  Nobody was mutilated.  They were

8    firing a gun at me.

9         PRESIDING COMMISSIONER KUBOCHI:  -- struck her

10   repeatedly with --

11        INMATE STAICH:  In self-defense.

12        PRESIDING COMMISSIONER KUBOCHI:  -- one of the

13   handguns with such veracity that she suffered

14   irreparable brain damage.  The offense was carried out

15   in a manner that demonstrates a callous disregard for

16   human suffering in that you had many opportunities to

17   cease your involvement with the entire conduct and

18   refused to do so.

19        Your motive for the crimes was inexplicable or

20   very trivial in relation to the offense.  We have also

21   considered the 1996 115 as well as the series of 115s

22   that demonstrate an attitude toward following

23   institutional rules and behavior, the most recent of

24   which was in 2001.  Sir, that is the decision of this

25   IVAN STAICH     E-10079     DECISION PAGE 14    5/9-10/07

1    Panel.  And we're denying parole for four years.

2    Commissioner?

3         DEPUTY COMMISSIONER ALVORD:  Very briefly.  Sir,

4    it's readily apparent to me that you think that the key

5    to being released from this facility lies within the

6    courts through some type of legal means.

7         INMATE STAICH:  It does. . You can't keep second

8    degree murder in for life without.  That's what you're

9    doing.

10        DEPUTY COMMISSIONER ALVORD:  Sir, I'm going to

11   put my statement on the record either --

12        INMATE STAICH:  You are using this as a court

13   trial.

14        DEPUTY COMMISSIONER ALVORD:  -- with you here or

15   without you here.

16        INMATE STAICH:  I know.  That's fine.  Go ahead.

17        DEPUTY COMMISSIONER ALVORD:  Well I'm not going

18   to do it if you interrupt me.

19        INMATE STAICH:  I won't.  Go ahead.

20        DEPUTY COMMISSIONER ALVORD:  Quite frankly, I

21   feel you would be far better served by taking more self-

22   help classes.  What I see is a very bright fellow who

23   has adjusted to the prison environment.  And that's

24   clear by the fact that your disciplines have been fairly

25   IVAN STAICH      E-10079      DECISION PAGE 15     5/9-10/07

```
 1   good within the facility.  The problem is I also see in

 2   the same fellow that committed the life crime 25 years

 3   ago.  I don't see any change in you.  What I see is a

 4   complete lack of insight.  And that's reinforced, in my

 5   mind at least, through the 1996 115 that's almost

 6   identical to the events of 25 years ago.

 7          INMATE STAICH:  Yeah, but you're --

 8          DEPUTY COMMISSIONER ALVORD:  I would --

 9          INMATE STAICH:  -- not letting me expound on

10   that.  You guys --

11          DEPUTY COMMISSIONER ALVORD:  I thought you

12   weren't going to interrupt me.

13          INMATE STAICH:  I'm not.  I'm just telling, I

14   have to put facts --

15          DEPUTY COMMISSIONER ALVORD:  I thought what, what

16   I would suggest you do --

17          INMATE STAICH:  -- for my own attorney.

18          DEPUTY COMMISSIONER ALVORD:  What I would

19   suggest, I strongly suggest that what you should do is

20   get self-help.  Go to the library.  Get as many books as

21   you can on self-help to try to change who you are

22   within.  I think that's the key to your eventual

23   release.

24          INMATE STAICH:  I have done that, Sir, whether

25   IVAN STAICH      E-10079      DECISION PAGE 16      5/9-10/07
```

1  you want to recognize that or not, that's up to you.

2      **DEPUTY COMMISSIONER ALVORD:**  With that I wish you

3  good luck.

4      **INMATE STAICH:**  Can I put some stuff on the

5  record here?

6      **DEPUTY COMMISSIONER ALVORD:**  It's 3:30 p.m.  This

7  hearing is concluded.

8      **INMATE STAICH:**  That's what I thought.

9      **DEPUTY COMMISSIONER ALVORD:**  And we are off the

10  record.

11      **INMATE STAICH:**  You never gave me a chance to put

12  any objection on the record, did you?  We'll see how the

13  Court likes that.

14                          --oOo--

15

16

17

18

19

20

21  PAROLE DENIED FOUR YEARS

22  THIS DECISION WILL BE FINAL ON:_____

23  YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

24  DATE, THE DECISION IS MODIFIED.

25  IVAN STAICH      E-10079      DECISION PAGE 17      5/9-10/07

96

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

    I, Sarah M. Collins, as the Official Transcriber,

hereby certify that the attached proceedings:

```
In the matter of the Life      )        CDC Number:  E-10079
Term Parole Consideration      )
Hearing of:                    )
                               )
IVAN STAICH                    )
_____)
```

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

MAY 9 & 10, 2007

12:58 P.M.

were held as herein appears.  Further, this transcript

is a true, complete and accurate record, to the best of

my ability, of the recorded material provided for

transcription.



```
_____
Sarah M. Collins
July 16, 2007
Capitol Electronic Reporting
```

# EXHIBIT 3

ORANGE COUNTY
PROBATION DEPARTMENT

SUPERIOR COURT

**COURT, Dept./Div.** 39    **Time** 9 a.m.

| | |
|---|---|
| **Defendant's Full Name:** | STAICH, Ivan (nmn) |
| **AKA:** | Ivan Von Staich |
| **Address:** | 219 Matich  (last known) |
| | Lake Elsinore, CA |
| **Present Whereabouts:** | Escaped from OCJ 1-26-86 |
| **Telephone:** | 674-9125 |

**P & S Date:** 3-7-86

**C -** 53851      **A -** 147250

**DPO:** Michael E. Carr/dw

**Attorney:** Jack Early

**COURT STATUS**
Ct 1, 459 PC(Resid. Burg.);Ct 2, 187
**Present Offense** PC(Murder);Ct 3, 664/187 PC(Att. Murder)

Ct 2 Enhanced by 12022.5 PC Allegation(UFA) **Date of Offense** 12-8-83

**Arresting Agency** Santa Ana

**Date of Arrest** 12-8-83

**Inf./Comx.t. Filed** 6-14-84    Guilty by Jury-Ct 2 fixed at 2nd deg; UFA + GBI found true **Date**

**Days in Custody** 755    **Codefendants** None

**DESCRIPTION**

**Age** 29  **DOB** 6-30-56  **POB** Torrance, CA    **Ethnic Background** Cauc.  **Sex** Male

**Height** 6'2"  **Weight** 210  **Hair** Brown  **Eyes** Blue  **Complexion**

**Identifying Marks** Tattoos: abdom; R/arm; chest; R/shoulder    **Social Security No.** 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

**Date of Arrival in California** Birth    **Date of Arrival in Orange County** Riverside Co. resid.

**FBI** 0922910K2  **CII** A04573091    **OCSO** 260 286    **Operator's License** N7337109

**Expiration Date** 6-30-84

| **PRIOR PROBATION GRANTS** | | None | **PRIOR PAROLE GRANTS** | | See report |
|---|---|---|---|---|---|
| Year | County | Term | Year | State | Term |

**EMPLOYMENT HISTORY**

**Last or Present Employer** Unknown    **Address**    **City**

**Date Began**    **Date Terminated**    **Reason**

**Type of Work**    **Work Phone**    **Salary**

**Previous Employment:**

| | Dates | | | | | |
|---|---|---|---|---|---|---|
| **From** | **To** | **Employer** | **Type** | **Salary** | **Reason Terminated** |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**MARITAL HISTORY**

**Present Spouse** None  **Home Address**    **DOB**    **Date & Place of Marriage**    **Status**

**Occupation**    **Employment Address**

| **Children** | **Address** | **DOB** | **Sex** | **Other Parent** |
|---|---|---|---|---|
| None | | | | |

Ct 3 enhanced by 12022.7 PC Allegation (GBI)
+ 2 prior convictions (Fed. & State)
Ct 1 & determination of priors was continued to 2-7-86
before another jury.  (The matter having been severed)

| **Previous Marriages** | **Address** | **Date Married** | **Terminated** |
|---|---|---|---|
| None | | | |

**PRE-SENTENCE REPORT**

**CONFIDENTIAL**

Per Sec. 11142 P.C. The Furnishing of this Report, or Information Contained within, to an Unauthorized Person is a misdemeanor.

F0602-1020.8 (A) (6/79)

## FAMILY DATA

Died_____

Father ___Robert Staich_____ Age _____ DOB _____ POB _____

Address ___Unknown_____ Telephone _____ Ethnic Background _____

Occupation _____ Religion _____

Marriage Date _____ Status _____

Died_____

Mother ___Charlotte Staich_____ Age _____ DOB _____ POB _____

Address ___Unknown_____ Telephone _____ Ethnic Background _____

Occupation _____ Religion _____

Other Marriages: Father

| Name | Dates | Status of Marriage | Date of Termination |
|------|-------|--------------------|--------------------| 
| Unknown | | | |
| | | | |
| | | | |

Other Marriages: Mother

| Name | Dates | Status of Marriage | Date of Termination |
|------|-------|--------------------|--------------------| 
| Unknown | | | |
| | | | |
| | | | |

| Brothers & Sisters | Age | Address | | | | Occupation |
|--------------------|-----|---------|---|---|---|------------|
| | | No. | Street | City | State | |
| Unknown | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

| Former Residences | Dates | |
|-------------------|-------|---|
| | From | To |
| | | |
| | | |
| | | |
| | | |

## EDUCATIONAL BACKGROUND

Highest grade completed _____ Where _____ Degrees held ___GED___

## MILITARY RECORD

Branch ___None_____ Dates of Service _____ Service No. _____

Highest rate or rank _____ Type of Discharge _____ Job Classification _____

Duty Assignments _____ Honors & Benefits _____

## PERSONAL INFORMATION

Health ___Good_____   Health Problems ___None_____   Organizations—Religion _____

Hobbies and Interests

___Unknown_____

Habits

Tobacco: ___Unknown_____

Liquor: ___"_____

Drugs: ___"_____

Vehicle License No. ___Unknown_____ Firearms owned / possessed: ___Unknown_____

Type _____

Color _____

Year _____

Additional Data:

F0602-1020.9 (6) (8/79)

STAICH, Ivan (nmn)

Page 3

COURT STATUS:

On June 14, 1984, an Information was filed alleging Count I: violation of Section 459 of the Penal Code (Residential Burglary); Count II: a violation of Penal Code Section 187 (Murder); and Count III: violation of Section 664/187 of the Penal Code (Attempted Murder). Count II is enhanced by a 12022.5 Penal Code allegation (Use of a Firearm) and Count III is enhanced by a 12022.7 Penal Code allegation (Great Bodily Injury). Two prior felony convictions are also alleged. Count I was severed, as well as the determination of priors, and the matter was continued to February 7, 1986, before another jury. The probation officer was ordered to include disposition of that matter in this report. On December 3, 1985, the jury found the defendant guilty of Count II, which was fixed in the second degree, and the use allegation was found to be true. The defendant was also found guilty of Count III and the great bodily injury allegation was also found true. The matter was continued to the present date for presentence report.

COLLATERAL INFORMATION:

On January 26, 1986, the defendant and another inmate over-powered an unarmed guard and escaped from Orange County Jail by repelling from the roof. The defendant's whereabouts are unknown as of the dictation of this report. It should be noted that the defendant has not been interviewed by the probation officer as he refused interview on December 26, 1985.

*found not guilty by jury trial - see minute order dated 2-17-89*

CIRCUMSTANCES OF THE OFFENSE:

On December 8, 1983, the defendant was arrested by the Santa Ana Police Department and he was booked for the murder of Robert Topper, Jr., and the attempted murder of Cynthia Sue Topper

STAICH, Ivan (nmn)

1   (nee Bess).  The Court, having heard testimony at the trial, is

2   familiar with the circumstances of the offense.  The following account

3   is taken from information contained in the District Attorney file and

4   may differ from testimony.

5        The defendant and the former Cynthia Bess met about January,

6   1980.  At that time, the defendant was a state parolee, but in

7   February, 1980, he was arrested for a federal offense (see prior

8   record section).  After 30 days in custody, Cynthia Bess posted bail

9   for the defendant, but he was ultimately sentenced to five years in

10  federal prison.  For the next several years Miss Bess corresponded

11  with the defendant while he was in several federal prisons.  Federal

12  records and information contained in letters from the defendant to

13  Cynthia Bess indicate that he was a potential witness for the

14  prosecution to a federal prison murder of an inmate.  He apparently

15  agreed to be a witness but wanted a release but instead was transferred

16  to another institution.  This matter was evidently resolved without

17  the need of the defendant's testimony but the tone of the letters

18  indicate that he was in fear and felt somewhat abandoned and threatened.

19  The letters contained veiled threats against the defendant's own

20  family and there are references to "A. B.", which apparently refers

21  to the Aryan Brotherhood.  Through correspondence, Miss Bess attempted

22  to terminate the relationship with the defendant and he was eventually

23  parolled in June, 1983, to a halfway house in Long Beach.  On June 20,

24  1983, Cynthia Bess reluctantly agreed to meet the defendant and

25  picked him up at the halfway house.  While she was driving the

26  defendant back to the halfway house, he became irate and threatened

27  to "kill" her because she had "hurt" him so bad.  He struck her one

28

STAICH, Ivan (nmn)

Page 5

1  time in the jaw with his fist and in order to get him to stop, she

2  said that she loved him.  In a letter later submitted to the Federal

3  Parole Board, she indicates that she was "pleading for my life".  She

4  reported this incident to the Orange County Sheriff's Department but

5  failed to follow through on a Long Beach Police Department report

6  because "I was afraid due to intimidation by Ivan over several years."

7  She did, however, report the incident to the halfway house and asked

8  that the defendant not contact her or her family.  Later, she was

9  contacted by halfway house personnel and told that a counselor would

10 be picking up some of the defendant's pictures from her residence.

11 A few minutes later, the defendant arrived at the residence, saying

12 "You're gonna die . . . You called the halfway house on me . . .

13 You're gonna get it."  She was able to talk the defendant into going

14 to her pastor to discuss the incident.  The pastor could not resolve

15 the situation and the defendant did not like him because he said that

16 "Ivan needed to seek counseling."  A few days later, Miss Bess drove

17 the defendant to his mother's residence and then she went to the

18 Los Angeles Airport for a flight out of state because she was afraid

19 of the defendant.  On June 26, 1983, about 2:15 a.m., the defendant

20 was discovered in Miss Bess' residence in Mission Viejo (this refers

21 to Count I).  The defendant apparently entered the residence through

22 an unlocked door and was confronted by Miss Bess' roommate.  Some

23 photographs of the defendant was the only property taken.  The defendant

24 was aware that Cynthia Bess had established a relationship with Robert

25 Topper, Jr., and the defendant began making telephone calls to him.

26 On June 26, 1983, about 5:20 a.m., Mr. Topper received a telephone call

27 from the defendant, during which he said that Miss Bess was "going down"

28

STAICH, Ivan (nmn)

1  and that he (Topper) was "going down".  The victim took this as a

2  death threat and he also indicated to a sheriff's deputy that the

3  defendant had threatened to kill Miss Bess.  During the telephone

4  conversation, the defendant described the victim's house to him, as

5  well as his vehicles.  The defendant's parole was ultimately revoked

6  and he was returned to custody in a federal institution because

7  of these threats.  While in custody, the defendant continued to

8  send Miss Bess letters.  He complained initially of how he had been

9  treated by her, but ultimately attempted to gain her favor because

10  he was apparently aware that her accusations might affect his eventual

11  parole.  He promised to leave her alone if she helped him out but

12  wrote, "If you don't, you better run for the hills."  Bess, however,

13  submitted a letter to the Federal Parole Board complaining of the

14  defendant's past threats and her great fear of him.  While in custody,

15  the defendant continued to call Robert Topper, Jr., and Cynthia Bess'

16  family.  The defendant was ultimately re-paroled on November 14, 1983

17  (mandatory parole).  On November 17, 1983, the defendant's release

18  conditions were modified and he was instructed to have no contact

19  or communication with Cynthia Topper.  Mr. Robert Topper, Jr. and

20  Cynthia Bess were married while the defendant was in custody and

21  they had moved in with her grandfather in Santa Ana.  On December 8,

22  1983, about 1 a.m., the defendant drove to that residence and parked

23  down the street.  He then proceeded to cut the outside telephone

24  wire with wire cutters and kicked open the front door.  The defendant,

25  armed with two hammers and wearing gloves, then proceeded to the

26  bedroom where Cynthia and Robert Topper were staying.  He apparently

27  struck Mrs. Topper, who then ran to the kitchen.  The defendant began

28

STAICH, Ivan (nmn)

1  struggling with Robert Topper, who armed himself with a .357 magnum.
2  The defendant was shot one time, fracturing a finger and rib during
3  the struggle, but gained possession of the handgun.  Robert Topper, Jr.
4  received several blows to the head, causing skull fractures, and
5  was shot five times at close range in the head, chest, and neck.
6  These gunshots were all fired while the victim was lying face down
7  on the floor.  Cynthia Topper was then confronted in the kitchen
8  where she had obtained a gun that fired blanks.  The defendant took
9  that gun from her and pistol-whipped her about the head with the .357
10 magnum.  The defendant then left the residence and sought assistance
11 from neighbors.  He had deposited the two handguns and other evidence
12 in the bed of the pickup truck.  In an interview with a police
13 officer, the defendant maintained that he had gone to the residence to
14 talk with Cynthia about their relationship and he was unaware that
15 she was married.  He cut the telephone wire because he wanted to
16 prevent anyone from calling the police.  He maintains that he had no
17 intention to injure anyone, but had only acted in self-defense when
18 he was confronted by Mr. Topper with the gun.
19 DEFENDANT'S STATEMENT:
20      As previously indicated, the defendant refused an interview
21 with the undersigned on December 26, 1985.  The defendant has subsequent-
22 ly escaped from jail and his whereabouts are unknown.
23 VICTIM INFORMATION:
24      Following the escape of the defendant from jail, an appointment
25 to interview Cynthia Topper was canceled because she has been moved
26 to an undisclosed location.  According to information contained in the
27 District Attorney file, she has undergone two lobotomies and her mental
28

STAICH, Ivan (nmn)

1   ability has been impaired due to injuries received in this incident.

2       Other contacts of interested parties concerning the

3   victims were also canceled following the defendant's escape.

4   STATEMENT OF REFERENCES AND INTERESTED PARTIES:

5       Richard King, District Attorney, states that due to the

6   aggravated nature of the offense, he believes that consecutive

7   sentencing is appropriate.

8       Jack Early, defendant's attorney, was contacted concerning

9   the defendant's refusal of the interview and he expressed an indication

10  to contact the defendant in order to determine his desire to be

11  interviewed.  There were no subsequent contacts with the attorney.

12      R. M. Gomez, the defendant's last Youth Authority Parole

13  Agent, was contacted for comment concerning this matter.  He submitted

14  a letter which he had sent to the District Attorney (attached to

15  this report), which indicates that the defendant is an extremely

16  dangerous individual.  The letter also indicates that the defendant

17  had been assaultive toward his family members when he was younger.

18      Timothy Hernandez (federal probation) states that since the

19  defendant is an extremely vicious individual, with no regard for

20  humanity, he deserves the maximum sentence because he carried through

21  on his threat.  He maintains that the defendant has no known enemies

22  in the prison system and he is considered to be a prime candidate

23  for recruitment in a prison gang.  He believes that the defendant

24  probably has serious pathological disorders and is an extremely

25  dangerous individual.

26      Detective Joe Munoz (Vacaville Police Department) states

27  that the family which the defendant threatened in that area, leading

28

STAICH, Ivan (nmn)

1  to a federal prison commitment, remain . frightened to this day that

2  the defendant will carry through on past threats to them.  He

3  maintains that anybody who has had contact with the defendant, be they

4  civil or police personnel, have been threatened by the defendant in

5  the past.

6  PRIOR RECORD:

7        According to information received from the California Bureau

8  of Criminal Identification, the Federal Bureau of Investigation, and

9  a review of federal and state records, the defendant has the following

10  prior record:

11  Juvenile History:

12  Deleted per Court Order  alp

13  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

14  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

15  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

16  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

17  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

18  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

19  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

20  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

21  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

22  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

23  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

24  ▬▬▬▬▬▬▬▬▬▬

| DATE | AGENCY | CHARGE | DISPOSITION |
|------|--------|--------|-------------|
| 7-11-74 | Riverside SO | Disturb. Peace | 1 yr. summ. prob., $50 fine susp. |

STAICH, Ivan (nmn)                                                Page 10

    According to information received from the CYA, the defendant
was out of control at home and had torn up a local bar.  He had
threatened his parents on numerous occasions and had used physical
violence on his sister.  When confronted by the police, the defendant
fled and was also cited for resisting arrest.

| | | | |
|---|---|---|---|
| 1-30-76 | Riverside SO | 148 PC (Resist. Arrest) | Corona MC case #27767-04, on 2-19-76, conv. by plea, 21 days jail. |

*Deleted per Ct. Order* [handwritten]

[redacted lines]

| | | |
|---|---|---|
| 12-13-77 | Escaped from Riverside Co. Jail; | Riverside SC case # CR15566, conv. 4532b PC (Escape from Jail); 7-21-78, 1203.03 PC, 90-day diag. ordered; 11-22-7 2 yrs. st. pris.; paroled 10-29-79; 4-80, parole rvkd.; 8-5-80, re-paroled. |
| 3-14-78 | Arrested by Vacaville PD | |

*DCN* [handwritten]

    While in jail on the above [redacted], the defendant used
the identity of another inmate and was released from custody.  During
this time he reportedly made threats against the family of Cindy Dustin
of Vacaville and was ultimately arrested there.

| | | | |
|---|---|---|---|
| 3-6-80 | U.S.Marshal | 18USC876 (Mailing Threatening Communications) | Fed. Ct., Eastern Dist., docket #80-00027-01; 7-2-80, 5 yr. impris. |

*FED* [handwritten]

    On November 21, 1978, Mrs. Anna Buchman of Vacaville
received a threatening letter addressed to her daughter, Cindy Dustin.
In the letter, the defendant threatened to kill Cindy Dustin because
she intended to testify concerning the above arson matter.  It was
determined that the letter had been mailed from a jail facility and

STAICH, Ivan (nmn)

1    the defendant had ultimately escaped from Riverside County Jail. The
     defendant continued to send threatening letters to the Buchmans. The
2    defendant had met Cindy Dustin when she was approximately 15 years of
     age, and at one point had kidnapped her. He had brought her back to
3    the Corona area where she remained until she was able to escape from
     the defendant. The defendant continued to threaten her family members
4    and indicated that he intended to kill Cindy Dustin. The defendant
     was ultimately arrested in the Vacaville area on the campus of a high
5    school where Cindy Dustin was enrolled.

6 SOCIAL HISTORY:

7          According to the available information, the defendant is

8 one of six children raised by his parents in the Lake Elsinore area.

9 His parents are discribed as having emotional and mental problems.

10 The family was reportedly dependent on welfare benefits since the

11 father had been disabled. The parents were abusive and when the

12 defendant became older, he began to physically abuse other family

13 members. The defendant was in a series of foster homes since about

14 age 11 until he was committed to the Youth Authority when he was 16

15 years of age.

16          There is no indication that the defendant ever graduated

17 from high school, but he apparently received his GED while in Youth

18 Authority.

19          The defendant has never been married and there is no indication

20 that he has ever fathered any children. The defendant has excellent

21 health and is reportedly in excellent physical condition.

22          The defendant has had only limited employment as a motorcycle

23 mechanic and landscaper. There is no indication of substance abuse

24 and it is noted that the defendant was not under the influence of

25 narcotics or alcohol when he committed the current offense.

26 EVALUATION:

27          There are no mitigating circumstances pertaining to the

28

STAICH, Ivan (nmn)

1    crimes committed by this now 29-year-old defendant.

2       The offense is heavily aggravated, in that there is over-

3 whelming indication of premeditation (Rule 421a8). This tragic

4 offense occurred following many months of threats by the defendant

5 on both victims. Armed with a hammer, a very intimidating weapon,

6 the defendant approached the victims' home during the nighttime hours

7 (vulnerability - Rule 421a3), and cut the telephone wires. He then

8 kicked open the door and stormed the bedroom, killing Robert Topper, Jr.

9 with his own gun and seriously injuring Cynthia Topper. The defendant's

10 choice of weapons (hammer), and the fact that he shot Robert Topper

11 in the back and head after rendering him unconscious indicates a high

12 degree of cruelty and callousness (Rule 421a1). Following this

13 murder, the defendant severely beat Cynthia Topper (multiple victims -

14 Rule 421a4), causing great bodily injury. She apparently was spared

15 death since the defendant was wounded at the time, but there is every

16 indication that he intended to kill her also.

17       Aggravating factors relating to the defendant are that

18 he has engaged in conduct for many years indicating that he is a

19 definite danger to society (Rule 421b1). He has prior convictions

20 involving threats to a past girlfriend and her family and appears to

21 have taken steps to carry through on those threats. The defendant's

22 prior record is therefore viewed as being of increased seriousness

23 (Rule 421b2). During the commission of the current offense, the

24 defendant was on federal parole with a specific condition not to

25 contact Cynthia Topper (Rule 421b4). Additionally, the defendant has

26 two prior felony convictions which have not been addressed since he

27 has escaped from jail.

28

STAICH, Ivan (nmn)                                      Page 13

1          Due to the use of a firearm allegation being found true,

2    the defendant is ineligible for probation pursuant to Penal Code

3    Section 1203.06(a)(1).  There are other Penal Code sections which

4    speak to the defendant's ineligibility (i.e., infliction of great

5    bodily injury), and a determination of prior convictions also would

6    affect eligibility and enhance the sentence.  The defendant escaped

7    from jail prior to the jury trial of February 7, 1985, concerning

8    severed Count I (459 Penal Code violation), and the priors would have

9    been addressed and presumably a bench warrant has been issued.

10   (Attempts to contact the District Attorney for verification have

11   been unsuccessful).  The circumstances of this offense and the

12   defendant's past history indicate that he is a serious danger to

13   society and consideration should be given to consecutive sentencing.

14          Since the defendant will not likely be sentenced at this

15   hearing, it is recommended that a supplemental report be considered

16   at that time to allow for available information concerning the victims.

17   RECOMMENDATION:

18          It is respectfully recommended that probation be denied.

19                                       Respectfully submitted,

20                                       MICHAEL SCHUMACHER
                                         Chief Probation Officer
21

22                                       Michael E. Carr
                                         Deputy Probation Officer
23                                       834-8076

24   Dated this 7th day of March, 1986.

25   I have read and considered the foregoing
     report of the Chief Probation Officer.

26

27   _____
     JUDGE OF THE SUPERIOR COURT

28

# EXHIBIT 4

**LIFE PRISONER EVALUATION REPORT**
**SUBSEQUENT PAROLE CONSIDERATION HEARING**
**NOVEMBER 2006 CALENDAR**

STAICH                                                                    E10079

I.    **COMMITMENT FACTORS:**

A.    **Life Crime:** Remains the same as stated in previous hearings.

1.    **Summary of Crime:** All relevant documents have been considered and that information remains the same.

2.    **Prisoner's Version:** All relevant documents have been considered and that information remains the same.

3.    **Aggravating/Mitigating Circumstances:**

a.    **Aggravating Factors:** All relevant documents have been considered and that information remains the same.

b.    **Mitigating Factors:** All relevant documents have been considered and that information remains the same.

B.    **Multiple Crime(s):** N/A.

1.    **Summary of Crime:** N/A.

2.    **Prisoner's Version:** N/A.

II.    **PRECONVICTION FACTORS:**

A.    **Juvenile Record:** All relevant documents have been considered and that information remains the same.

B.    **Adult Convictions and Arrests:** All relevant documents have been considered and that information remains the same.

C.    **Personal Factors:** All relevant documents have been considered and that information remains the same.

Sent to Inmate on 9/08/06

III.   **POSTCONVICTION FACTORS:**

    A.   **Special Programming/Accommodations:** N/A.

    B.   **Custody History:** All relevant documents have been considered and that information remains the same. Since his last board appearance Staich has not been assigned. He has remained at CTF in the general population with Medium A Custody. (See Post Conviction Progress Report)

    C.   **Therapy and Self-Help Activities:** Documents from previous hearings remain valid. Staich has participated in Anger Management. (See Post Conviction Progress Reports)

    D.   **Disciplinary History:** Documents from previous hearings remain valid. Staich continues to remain disciplinary free.

    E.   **Other:** Staich attended his Initial Parole Consideration Hearing on November 5, 2002. Parole was denied for 4 years. The Board recommended that Staich remain disciplinary free; upgrade vocationally and educationally; and participate in self-help programs.

IV.   **FUTURE PLANS:**

    A.   **Residence:** All relevant documents have been considered and all information remains the same.

    B.   **Employment:** All relevant documents have been considered and all information remains the same. Staich claims he is totally disabled due to 20 Code Federal Regulations, Section 404.

    C.   **Assessment:** In review of Staich parole plans, this counselor does not foresee any problems, however, it is recommended that Staich update his support letters prior to his hearing.

V.   **USINS STATUS:**

VI.   **SUMMARY:**

    A.   Prior to release the prisoner could benefit from:

        1.   Continuing to be disciplinary free.

    2. Participation in self-help and therapy programs.
    3. Upgrading vocationally and educationally.

**B.**    This report is based upon a thorough review of Staich's Central File and a one hour interview with Staich.

**C.**    Per the Olson Decision, Staich was afforded an opportunity to examine his Central File. On 8/27/06 Staich did examine his Central File. (Refer to CDC 128-B dated 8/27/06 in the General Chrono Section of the Central File.)

**D.**    No accommodation was required per the Armstrong vs. Davis BPH Parole Proceedings Remedial Plan (ARP) for effective communication.

Case 3:08-cv-00848-PJH    Document 4-4    Filed 04/21/2008    Page 19 of 42

_____     9-1-06
T. Verdesoto                          Date
Correctional Counselor I


_____  CCII  9-1-06
D. Carnazzo                            Date
Correctional Counselor II


_____  FC(A)  9-1-06
I. Guerra                               Date
Facility Captain


_____  C&PR  9-7-06
D. S. Levorse                          Date
Classification and Parole Representative


STAICH            E10079            CTF-SOLEDAD        NOV/2006

BOARD OF PRISON TERMS                                                           STATE OF CALIFORNIA
LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐  DOCUMENTATION HEARING

☒  PAROLE CONSIDERATION HEARING

☐  PROGRESS HEARING

INSTRUCTIONS
    TO CDC STAFF:  DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
    TO BPT STAFF:  FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
        ESTABLISHED, i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 6/02 to 6/03 | | | **PLACEMENT**:  Remained at CTF in the general population.<br>**CUSTODY**:  Medium A.<br>**VOC. TRAINING**:  None noted this period.<br>**ACADEMICS**:  Staich completed 32 units of study from Emmaus Correspondence School for "Set Free Prison Ministry."  Certificate dated October 2, 2002.<br>**WORK RECORD**:  None noted this period.<br>**GROUP ACTIVITIES**:  Staich did not participate in any groups this period.<br>**PSYCH. TREATMENT**:  None noted during this period.<br>**PRISON BEHAVIOR**:  Staich remained discipilinary free during this period.<br>**OTHER**: N/A. |

CORRECTIONAL COUNSELOR'S SIGNATURE

DATE  9-1-06

STAICH                E10078              CTF-SOLEDAD              NOV/2006

BPT 1004 (REV 7/86)                     Page _1_

BOARD OF PRISON TERMS                                                                 STATE OF CALIFORNIA

CONTINUATION SHEET: LIFE PRISONER : POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 6/03 to 6/04 | | | **PLACEMENT:** Remained at CTF in the general population. **CUSTODY:** Medium A. **VOC. TRAINING:** None noted this period. **ACADEMICS:** None noted this period. **WORK RECORD:** None noted this period. **GROUP ACTIVITIES:** Staich did not participate in any groups this period. **PSYCH. TREATMENT:** None noted during this period. **PRISON BEHAVIOR:** Staich remained disciplinary free during this period. **OTHER:** N/A. |

ORDER:
- ☐ BPT date advanced by ____ months.
- ☐ PBR date advanced by ____ months.
- ☐ BPT date affirmed without change.
- ☐ PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:
- ☐ Previously imposed conditions affirmed.
- ☐ Add or modify

☐ Schedule for Progress Hearing on appropriate institutional calendar

| STAICH | E10079 | CTF-SOLEDAD | NOV/2006 |
|---|---|---|---|

BOARD OF PRISON TERMS                                                                 STATE OF CALIFORNIA

BPT 1004 (REV 7/86)                          Page _2_

BOARD OF PRISON TERMS                                                                                    STATE OF CALIFORNIA

CONTINUATION SHEET: LIFE PRISONER : POSTCONVICTION PROGRESS REPORT

| STCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 6/04 to 6/05 | | | **PLACEMENT:** Remained at CTF in the general populaton.<br>**CUSTODY:** Medium A.<br>**VOC. TRAINING:** None noted this period.<br>**ACADEMICS:** None noted this period.<br>**WORK RECORD:** None noted this period.<br>**GROUP ACTIVITIES:** Staich did not participate in any groups this period.<br>**PSYCH. TREATMENT:** None noted during this period.<br>**PRISON BEHAVIOR:** Staich remained disciplinary free during this period.<br>**OTHER:** N/A. |

ORDER:
- ☐ BPT date advanced by        months.            ☐ BPT date affirmed without change.
- ☐ PBR date advanced by        months.            ☐ PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:
- ☐ Previously imposed  conditions affirmed.
- ☐ Add or modify

☐ Schedule for Progress Hearing on appropriate institutional calendar

| STAICH | E10079 | CTF-SOLEDAD | NOV/2006 |
|---|---|---|---|

BOARD OF PRISON TERMS                                                                                    STATE OF CALIFORNIA

BOARD OF PRISON TERMS                                                                                    STATE OF CALIFORNIA

BPT 1004 (REV 7/86)                                         Page _3_

CONTINUATION SHEET: LIFE PRISONER : POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 6/05 to 8/06 | | | **PLACEMENT**: Remained at CTF in the general population. **CUSTODY**: Medium A. **VOC. TRAINING**: None noted this period. **ACADEMICS**: None noted this period. **WORK RECORD**: None noted this period. **GROUP ACTIVITIES**: Staich participated in Anger Management as verified by CDC 128B's dated 12/8/05 and 2/23/06. The certificates in Anger Management are as follows:Anger Management/Fatherhood dated 10/1/05; 12 weeks of studies in the class of Anger Management dated 12/22/05; and "Healing for the Angry Heart"Video series dated February 2006. The Anger Management courses are based on principles rooted in Interfaith Religious Scriptures. **PSYCH. TREATMENT**: None noted during this period. **PRISON BEHAVIOR**: Staich remained disciplinary free during this period. **OTHER**: On 2/17/06 Staich's WG/PG was restored to A1A effective 9/22/00 per Religious Land Use and Institionalized Persons Act (RLUIPA). |

ORDER:

- ☐ BPT date advanced by     months.
- ☐ PBR date advanced by     months.
- ☐ BPT date affirmed without change.
- ☐ PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:

- ☐ Previously imposed  conditions affirmed.
- ☐ Add or modify

☐ Schedule for Progress Hearing on appropriate institutional calendar

| STAICH | E10079 | CTF-SOLEDAD | NOV/2006 |

BOARD OF PRISON TERMS

STATE OF CALIFORNIA

BPT 1004 (REV 7/86)

# EXHIBIT 5

LIFE PRISONER EVALUATION REPORT
INITIAL PAROLE CONSIDERATION HEARING
OCTOBER 2002 CALENDAR


STAICH, IVAN                                                      E-10079


I.    **COMMITMENT FACTORS:**

A.    **Life Crime:**  PC 187 (a), Murder 2nd Degree, weapon used firearm, Count 1, PC
187 (a), Murder 2nd Degree, weapon inflicting great bodily injury.  Sentenced to
30 Years to Life with a PC 12022.5 Enhancement, Use of a Firearm.  Case #C-
53851.  Victims:  Robert Topper, Jr. age unknown and Cynthia Sue Topper, age
unknown.  (Note:  Cynthia Sue Topper survived and is the victim of the
Attempted Murder.)

1.    **Summary of Crime:**  Staich and the victim, Cynthia Sue Topper met
about January 1980.  At this time, the defendant was a state parolee, but in
February, 1980, he was arrested for a federal offense.  After 30 days in
custody, Cynthia Bess posted bail for Staich, but he was sentenced to 5
years in federal prison.  For the next several years Miss Bess corresponded
with Staich while he was in several federal prisons.  Federal records and
information contained in letters from the defendant to Cynthia Bess
indicated that he was a potential witness for the prosecution to a federal
prison murder of an inmate.  He agreed to be a witness but wanted a
release but instead was transferred to another institution.  This matter was
resolved and without the need of Staich's testimony but the tone of the
letters indicated that he was in fear and felt somewhat abandoned and
threatened.  The letters contained veiled threats against the defendant's
own family and there are references to "A.B.," which apparently refers to a
"white gang" referred to as the Aryan Brotherhood.  Through
correspondence, Miss Bess (Cynthia Sue Topper) attempted to terminate
the relationship with Staich and he was paroled in June, 1983, to a halfway
house in Long Beach.  On June 20, 1983, Cynthia Bess reluctantly agreed
to meet with Staich and pick him up at the halfway house.  While she was
driving Staich back to the halfway house, he became irate and threatened
to "kill" her because she had "hurt" him so bad.  He struck her one time in
the jaw with his fist and in order to get him to stop, she said that she loved
him.  In a letter later submitted to the Federal Parole Board, she indicated
that she was "pleading for her life."  She also wrote, "I was afraid due to
intimidation by Ivan over several years."  She reported the incident to the
halfway house and requested that Staich would not contact her or her

family. Later that day, the defendant arrived at her residence, saying "You're gonna die. You called the halfway house on me and you're gonna get it." A few days later, Cynthia Bess took a flight out of state because she was afraid of Staich. Staich became aware that she had established a relationship with Robert Topper, Jr. On June 26, 1983, Mr. Topper received a telephone call from Staich, during which he said that Miss Bess was "going down" and that he (Topper) was going down. Mr. Topper considered this as a death threat and reported this to the Sheriff Deputy. Staich's parole was revoked and he returned to prison. In the mean time he continued to send Cynthia Bess letters expressing his complaints on how he was treated by her. He realized that her accusations would effect his parole. So he promised to leave her alone if she helped him out but wrote, "If you don't you better run for the hills." Bess, however, submitted a letter to the Federal Parole Board complaining of Staich's past threats and her great fear of him. Staich continued to make calls to Bess and Topper while in custody. On November 17, 1983, he was released with parole conditions of no contact or communication with Bess. In the meantime, she married Robert Topper. They moved in with her grandfather. On December 8, 1983, about 1 a.m., Staich, armed with two hammers and wearing gloves, proceeded to the bedroom where Cynthia and Robert Topper were staying. He apparently struck Mrs. Topper, who ran to the kitchen. Staich began struggling with Robert Topper, who armed himself with a .357 magnum. Staich was shot one time, fracturing his finger and a rib during the struggle, however, Staich managed to gain possession of the gun. Robert Topper received several blows to the head and was shot 5 times at close range in the head, chest and neck. These gunshots were all fired while the victim was lying face down on the floor. Cynthia Topper was then confronted in the kitchen where she had obtained a gun that fired blanks. Staich took that gun from her and pistol whipped her about the head with the .357 magnum. Staich left the residence. (See the POR pages, 3-7, dated 3/7/86).

2.    **Prisoner's Version:** Staich stated, "Inmate Staich was found guilty of 2nd degree Murder. The Probation Officer's Report is written in error. As if Inmate Staich was convicted of 1st degree Murder. The prosecution theory is reflected in the Probation Officer's Report where it is alleged that the victim Robert Topper, was shot at close range 5 times in the head. The facts of the case actually revealed that Inmate Staich was shot two times in the upper torso chest area and another third shot was fired which went between his legs. These shots were fired by Mr. Topper who was in possession of his own .357 magnum Remington revolver and therefore, there is no possible way that Mr. Topper could have received 5 bullets in the head at close range. For this reason alone, Mr. Staich's jury found that they believed that Mr. Staich did not shoot Mr. Topper 5 time at close

range and therefore acquitted him of 1st degree Murder.  In accordance
with the Appellate Court Decision of "In re. Ramirez which was upheld by
the California Supreme Court that 2nd degree Murder of Prisoners must
have a parole date set within the gravity of the current offense and similar
felony offenses of the same gravity and likewise must be found to
committed a egregious.  Mr. Staich's case is not egregious due to the fact
he was found guilty of 2nd degree Murder and the fact that Robert Topper
was the original aggressor by firing the weapon into Mr. Staich's body.
This case evolves around a female which is the victim of an attempted
murder who likewise on the night of December 7, 1983, was in possession
of a handgun and did fire two rounds directly at Mr. Staich before he
defended himself against her aggressive assault."

**B.**     **Aggravating/Mitigating Circumstances:**

    **1.**     **Aggravating Factors:**

        **a.**     During the commission of the crime, the inmate had a clear
opportunity to cease but instead continued.

        **b.**     The inmate engaged in other reliably documented criminal conduct
which is an integral part of the crime for which he is currently
committed.

    **2.**     **Mitigating Factors:**  None.

**II.**     **PRECONVICTION FACTORS:**

**A.**     **Juvenile Record:**  Note:  Information in the Probation Officer's Report regarding
Staich's juvenile history has been deleted per court order.  (See page 9 of the POR
dated 3/7/86).  The only information available is listed below.

| | | |
|---|---|---|
| 7/11/74 | Riverside SO | Disturbing the Peace, 1 year summary Probation $50 fine suspension. |
| 1/30/76 | Riverside SO | Resisting Arrest, 21 days jail |
| 12/13/77 | Riverside SO | Escape from County Jail, 90 days diagnose ordered.  2 years state prison. |
| 3/6/80 | U.S. Marshal | Mailing Threatening Communications, 5 years imprisonment. |

B. **Adult Convictions:** Instant offense.

C. **Personal Factors:** According to the available information, Staich is one of six children raised by his parents in Lake Elsinore area. His parents are described as having emotional and mental problems. The family was reportedly dependent on welfare benefits since the father had been disabled. The parents were abusive and when Staich became older, he began physically abusing his other family members. The defendant was in a series of foster homes since about age 11 until he was committed to the Youth Authority when he was 16 years of age. There is no indication that Staich ever graduated from high school, but he apparently received his GED while in Youth Authority. Staich has never been married and there is no indication that he has ever fathered any children. Staich has had only limited employment as a motorcycle mechanic and landscaper. There is no indication of substance abuse and it is noted that Staich was not under the influence of narcotics or alcohol when he committed the current offense. (See POR date 3/7/87, page 11).

III. **POSTCONVICTION FACTORS:**

A. **Special Accommodations/Disability:** No 1845 currently in file. Staich refuses to request an 1845 from the medical department. Per Staich, he is ADA (per CDC 128C dated 3/31/94 and CDC 128C date unknown) accommodations have been made so he did not pursue it on a "1845."

B. **Custody History:** Staich was received into CDC on 2/21/89, at the CIM-RC for 2 counts of the instant offense. At that time he was Close A custody and has since reduced his custody to Medium A during his incarceration. Staich's last appearance before the BPT was on 5/10/99 for his documentation hearing. The BPT noted that he needs a Vocational trade, needs to enroll in "Life Skills" program and noted his disciplinaries.

C. **Work, Education, Vocation, Therapy & Self-Help Activities:** On 12/5/01, subject was placed on work group/privilege group "C" status due to his refusal to comply to the "Grooming Standards." On 6/6/01, he was interviewed in reference to his "C" status. Staich did not want to be removed from that status. (See CDC 128B dated 6/6/01 in the chrono section of the Central File). Note: During this period of observation, Staich did not participate in any vocational, therapy or self-help groups.

D. **Disciplinary History:** On 9/14/99, he received a CDC 115, Log # I-09-99-14 for "Disobeying Orders" (Administrative). On 10/23/01, he received a CDC 115, Log #10/0108 for "Refusing to Comply with Inmate Grooming Standards," on 10/8/01, he received a CDC 115, Log #11-01-07 for "Refusing to Comply with

Inmate Grooming Standard," and on 11/15/01, he received a CDC 115, Log #I-11-01-10 for "Refusing to Comply with Inmate Grooming Standard." (See attached disciplinary sheet for details).

## IV.   FUTURE PLANS:

**A.**   <u>Residence:</u>  Staich plans on paroling to Mira Loma, California, and residing with his fiance, Shelly Wood at 1163 65th St., Mira Loma, CA 97152 (phone number pending).

**B.**   <u>Employment:</u>  Staich stated that he will collect Social Security benefits due to his permanent disability which he states fall under the "American Disability Act." He does not have any employment plans at this time.

## V.   USINS STATUS:  None.

## VI.   SUMMARY:

**A.**   Considering the commitment offense, prior record and prison adjustment, the writer believes Staich would probably pose a high degree of threat to the public at this time if released from prison; due to his arrest history consisting of threatening past girlfriends including the victim of his instant offense as well as recent threatening letters to his ex-wife, Ms. Paula Staich. (See CDC 128B dated 10/24/96. Subject appears to have not participated in any anger management classes to deal with his anger appropriately other than writing or making verbal threats.

**B.**   Prior to release the prisoner could benefit from:

   **1.**   Maintaining a disciplinary free record.

   **2.**   Participate in self-help and therapy programs as well as anger management control classes if available at CTF.

   **3.**   Participate in a Vocational Training Program.

**C.**   This report is based on a thorough review of his Central File as well as a personal interview of Staich.

**D.**   Inmate Staich was afforded the opportunity to review his Central File on 6/20/02. The inmate did review his file.

STAICH, IVAN                E-10079                CTF-Soledad                OCT/2002

E.   No accommodation for the purposes of effective communication was required per the Armstrong Remedial Plan.

_L.N. Vucina_ _____ _MM Vucina, CCI_
L.N. Vucina
Correctional Counselor I


_R. Leach_ _____
R. Leach
Correctional Counselor II


4) _____
J. Wiggins
Facility Captain


_D.S. Levorse_ _____
D.S. Levorse
Classification and Parole Representative


STAICH, IVAN            E-10079            CTF-Soledad            OCT/2002

BOARD OF PRISON TERMS                                                                 STATE OF CALIFORNIA

## LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐ DOCUMENTATION HEARING

☒ PAROLE CONSIDERATION HEARING

☐ PROGRESS HEARING

### INSTRUCTIONS
TO CDC STAFF:  DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
TO BPT STAFF:  FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
ESTABLISHED, i.e., 0-2  MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 5/10/99 to 5/10/00 | | | **PLACEMENT:**  Subject remained at CTF. **CUSTODY:** MED A. **CLASSIFICATION SCORE:** 21. **ACADEMIC:**  During this period of observation he did not participate in any academic program due to work group/privilege group "C" status. **WORK:** Noted under Academic. **VOCATION:** Noted under Academic **GROUP ACTIVITIES:**  During this period of observation he did not participate in any self-help therapy group. **PSYCH TREATMENT:**  Noted under Group Activities. **PRISON BEHAVIOR:**  He received a CDC 115 # Log I-09-99-14 dated 9/14/99 for "Disobeying Orders" (Administrative). |

| CORRECTIONAL COUNSELOR'S SIGNATURE | DATE |
|---|---|
| *AM Nurina, CCI* | 9-25-02 |
| STAICH, IVAN              E-10079              CTF-SOLEDAD | OCT/2002 |

BOARD OF PRISON TERMS                                                                              STATE OF CALIFORNIA

CONTINUATION SHEET: LIFE PRISONER : POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 5/10/00 to 5/10/01 | | | **PLACEMENT:** CTF.<br>**CUSTODY:** MED A.<br>**CLASSIFICATION SCORE:** 13<br>**ACADEMIC:** Dueint this period of observation he did not participate in any acadmic program due to work group/privilege group "C" status.<br>**WORK:** Noted under Academic.<br>**VOCATION:** Noted under Academic<br>**GROUP ACTIVITIES:** During this period of observation he did not participate in any self-help therapy group.<br>**PSYCH TREATMENT:** Noted under Group Activities.<br>**PRISON BEHAVIOR:** He remained disciplinaryt free during this period of observation. |

ORDER:
- ☐ BPT date advanced by _____ months.
- ☐ PBR date advanced by _____ months.
- ☐ BPT date affirmed without change.
- ☐ PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:
- ☐ Previously imposed conditions affirmed.
- ☐ Add or modify

- ☐ Schedule for Progress Hearing on appropriate institutional calendar

STAICH, IVAN                E-10079                CTF-SOLEDAD                OCT/2002

BOARD OF PRISON TERMS                                                                              STATE OF CALIFORNIA

BPT 1004 (REV 7/86)                                Page _2_

BOARD OF PRISON TERMS                                                                                    STATE OF CALIFORNIA

CONTINUATION SHEET: LIFE PRISONER : POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 5/10/01 to 5/10/02 | | | **PLACEMENT:** CTF. <br> **CUSTODY:** MED A. <br> **CLASSIFICATION SCORE:** 13. <br> **ACADEMIC:** During thsi period of observation he did not participate in any academic program due to work group/privilege group "C" status. <br> **WORK:** Noted under Academic. <br> **VOCATION:** Noted under Academic. <br> **GROUP ACTIVITIES:** During this period of observation he did not participate in any self help therapy group. <br> **PSYCH TREATMENT:** Noted under Group Activities. <br> **PRISON BEHAVIOR:** He received two CDC 115's Log # I-10-01-08 and Log # I-11-01-10, dated 10/23/01 and 11/15/01 (respectively) for "Refusing to Comply with Inmate Grooming Standards". |

ORDER:

☐ BPT date advanced by _____ months.        ☐ BPT date affirmed without change.
☐ PBR date advanced by _____ months.        ☐ PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:

☐ Previously imposed conditions affirmed.
☐ Add or modify

☐ Schedule for Progress Hearing on appropriate institutional calendar

STAICH, IVAN            e-10079                    CTF-SOLEDAD                    OCT/2002

BOARD OF PRISON TERMS                                                                                    STATE OF CALIFORNIA

CONTINUATION SHEET: LIFE PRISONER : POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 5/10/02 to 6/02 | | | **PLACEMENT:** CTF. |

**PLACEMENT:** CTF.
**CUSTODY:** MED A.
**CLASSIFICATION SCORE:** 13.
**ACADEMIC:** During this period of observation he did not participate in any academic program due to work group/privilege group "C" status.
**WORK:** Noted under Academic.
**VOCATION:** Noted under Academic.
**GROUP ACTIVITIES:** During this period of observation he did not participate in any self-help therapy group.
**PSYCH TREATMENT:** Noted under Group Activities.
**PRISON BEHAVIOR:** Subject remained disciplinary free during this period of observation.

ORDER:

☐ BPT date advanced by    months.
☐ PBR date advanced by    months.

☐ BPT date affirmed without change.
☐ PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:

☐ Previously imposed conditions affirmed.
☐ Add or modify

☐ Schedule for Progress Hearing on appropriate institutional calendar

STAICH, IVAN      E-10079      CTF-SOLEDAD      OCT/2002

BOARD OF PRISON TERMS          STATE OF CALIFORNIA

# DISCIPLINARY SHEET

## CDC 128A's:

05/09/90     Refusing a Direct Order.

08/11/91     Destroying State Property (Reduced to 128-A).

08/31/93     Unauthorized Phone calls.

05/03/98     Violation of Grooming Standards.

09/20/99     Disobeying Orders.

## CDC 115's:

04/14/93     #A-93-04-0858     Dangerous Property. Guilty: Div. F.

12/07/96     #96-FC-11-006     Mailing Threatening and Intimidating,
                              Correspondence and Stalking. Guilty Div. B.

05/17/98     #3c-98-05-119     Grooming Standards.  (Administrative).

06/28/98     #3c-98-06-72      Grooming Standards. Guilty:  Division F.

09/14/98     #I-9-98-9         Grooming Standards.  Guilty:  Division F.

09/14/99     #I-09-99-14       Disobeying Orders. Guilty:  Administrative.

10/23/01     #I-10-01-08       Grooming Standards.  Guilty:  Administrative.

10/08/01     #I-11-01-07       Grooming Standards.  Guilty:  Administrative.

11/15/01     #I-11-01-10       Grooming Standards.  Guilty:  Division F.

STAICH, IVAN          E-10079              CTF-SOLEDAD          OCT/2002

BOARD OF PRISON TERMS                                                    STATE OF CALIFORNIA

# LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

- [x] DOCUMENTATION HEARING
- [ ] PAROLE CONSIDERATION HEARING
- [ ] PROGRESS HEARING

**INSTRUCTIONS**
TO CDC STAFF:  DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT.
TO BPT STAFF:  FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
ESTABLISHED, i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 02/95 TO 02/96 | | | **POSTCONVICTION PROGRESS REPORT** <br><br> **PLACEMENT:** Remained at California State Prison-Corcoran (CSP-Corcoran) on 11-10-95 Staich was transferred to Pleasant Valley State Prison (PVSP) and remained for this period. **CUSTODY:** His custody remained at Medium A for this period. **CLASSIFICATION SCORE:** Staich's Classification Score was reduced to 25 points during this period due to positive programming. **ACADEMIC:** None noted this period. **WORK:** Staich was assigned to the Dining Hall receiving one (1) Work Supervisor's Report dated 04-05-95 reflecting average ratings. **VOCATION:** During this period, Staich was assigned to Vocational Janitorial from 11-27-95 to 12-29-95 with satisfactory ratings per 128-E dated 01-03-96. **GROUP ACTIVITIES:** None noted this period. **PSYCH TREATMENT:** None noted this period. **PRISON BEHAVIOR:** He remained disciplinary free. |
| 02/96 TO 02/97 | | | **PLACEMENT:** Remained at Pleasant Valley State Prison and on February 4, 1997 Staich was transferred to the California State Prison Corcoran. **CUSTODY:** His custody increased from Medium A to Maximum B due to Administrative Segregation placement. **CLASSIFICATION SCORE:** Staich's Classification Score increased to 27 points during this period due to receipt of a disciplinary. **ACADEMIC:** None noted this period. **WORK:** Assigned to Yard Maintenance 02-24-96 and removed 03-27-96 due to restricted light duty/no heavy lifting. Reader refer to 128-C dated 12-06-95. There are no Work Supervisor's Reports noted in file. **VOCATION:** None noted this period. **GROUP ACTIVITIES:** None noted this period. **PSYCH TREATMENT:** None. **PRISON BEHAVIOR:** During this period he received one (1) CDC 115 for Mailing Threatening and Intimidating Correspondence and Stalking. |

CORRECTIONAL COUNSELOR SIGNATURE  *CCI A.M. Gibson*    CCI D. GIBSON                    DATE  3-3-99

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| STAICH, IVAN | E10079 | CTF | 05/99 | 05/10/99 |

BPT 1004 (REV. 7/86)                          PAGE 1 of 3

BOARD OF PRISON TERMS                                                STATE OF CALIFORNIA

## CONTINUATION SHEET: LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 02/97 TO 02/98 | | | **PLACEMENT:** Remained at California State Prison-Corcoran for this period. **CUSTODY:** His custody was reduced from Maximum B to Medium A during this period. **CLASSIFICATION SCORE:** Staich's Classification was reduced from 27 points to 25 points for 1 period of positive programming. **ACADEMIC:** None noted this period. **WORK:** During this period, Staich was assigned to the Kitchen on 07-17-97 and was removed 08-27-97 due to Restricted Light Duty no heavy lifting refer to 128-C dated 12-06-95. He received two (2) Work Supervisor's Report dated 10-04-97, 12-22-97 reflecting satisfactory and above average ratings. **VOCATION:** None noted this period. **GROUP ACTIVITIES:** None noted this period. **PSYCH TREATMENT:** None noted this period. **PRISON BEHAVIOR:** During this period he received one (1) Custodial Counseling Chrono. On June 18, 1997 for Excessive Amounts of Expired Medication. |
| 02/98 TO PRESENT | | | **PLACEMENT:** On 09-01-98 Staich was transferred to the Correctional Training Facility (CTF) and remained for this period. **CUSTODY:** His custody remained at Medium A for this period. **CLASSIFICATION SCORE:** Staich's Classification Score increased to 25 due to receipt of a serious CDC-115 dated 9-14-98 whereas, "S" was found guilty and assessed 30 day FOC. **ACADEMIC:** None noted during this period. **WORK:** During this period, Staich was assigned to culinary there are no Work Supervisor's Reports noted in the file. **VOCATION:** None noted during this period. **GROUP ACTIVITIES:** None noted during this period. **PSYCH TREATMENT:** None noted during this period. **PRISON BEHAVIOR:** During this period he received three (3) CDC 115's. |

**ORDER:**

☐ BPT date advanced by _____ months.          ☐ BPT date affirmed without change.

☐ PBR date advanced by _____ months.          ☐ PBR date affirmed without change.

**SPECIAL CONDITIONS OF PAROLE:**

☐ Previously imposed conditions affirmed.

☐ Add or modify _____

_____

☐ Schedule for Progress Hearing on appropriate institutional calendar.

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| STAICH, IVAN | E10079 | CTF | 05/99 | 05/10/99 |

BOARD OF PRISON TERMS                                                                    STATE OF CALIFORNIA

## CONTINUATION SHEET: LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 02/98 TO PRESENT(CON'T) | | | On 5-17-98 Administrative CDC-115 for Grooming Standards, 6-28-98 CDC-115 reduced to Administrative for Failure to Comply with Grooming Standards, and on 09-14-98 serious CDC-115 for Hair and Beard not in Compliance with Grooming Standards.  He received one (1) Custodial Counseling Chrono for Failure to Comply with Grooming Standards. |

**ORDER:**

☐ BPT date advanced by _____ months.          ☐ BPT date affirmed without change.

☐ PBR date advanced by _____ months.          ☐ PBR date affirmed without change.

**SPECIAL CONDITIONS OF PAROLE:**

☐ Previously imposed conditions affirmed.

☐ Add or modify _____

☐ Schedule for Progress Hearing on appropriate institutional calendar.

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| STAICH, IVAN | E10079 | CTF | 05/99 | 05/10/99 |

BPT 1004 (REV. 7/86)                          PAGE _3_ of _3_                          PERMANENT ADDENDA

BOARD OF PRISON TERMS                                                   STATE OF CALIFORNIA
## LIFE PRISONER:POSTCONVICTION PROGRESS REPORT

[X] DOCUMENTATION HEARING  # 1

[ ] PAROLE CONSIDERATION HEARING

[ ] PROGRESS HEARING

**INSTRUCTIONS**
TO CDC STAFF:  DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT.
TO BPT STAFF:  FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY ESTABLISHED, i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTH FOR BPT.  SEE BPT §§2290-2292, 2410 AND 2439.

| POST | CONVICTION | CREDIT | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| | | | STAICH WAS RECEIVED FROM ORANGE COUNTY CASE # 53851 TO THE DEPARTMENT OF CORRECTIONS, RCC-CIM FOR 2 CTS PC 664/187 ATTEMPTED MURDER 15-LIFE + ENHANCEMENTS 15 TOTAL TERM 30-LIFE, MEPD 05/25/2003. |
| 02/21/89 TO 02/20/90 | | | REMAINED AT CIM WITH MAX A CUSTODY IN AD/SEG.  03/01/89 RELEASED TO G.P.  05/12/89 TRANSFERRED TO CSP-SAC WITH CLO A CUSTODY IN G.P.  02/01/90 ASSIGNED SERVER JOB. 02/16/90 ANNUAL REVIEW.  CS ADJUSTED TO 65 CPP.  NO DISCIPLINARY REPORTS, NO LAUDATORY CHRONOS OR SELF-HELP THIS PERIOD. |
| 02/21/90 TO 02/21/91 | | | REMAINED AT CSP-SAC WITH CLO A CUSTODY IN G.P. CONTINUED LINE SERVER ASSIGNMENT.  05/09/90 RECEIVED CDC-128A FOR DISOBEYING A DIRECT ORDER.  NO LAUDATORY CHRONOS OR SELF-HELP THIS PERIOD. CS: 65. |
| 02/21/91 TO 02/20/92 | | | REMAINED AT CSP-SAC WITH CLO A CUSTODY IN G.P. 07/11/91 ANNUAL REVIEW REDUCED CS TO 49.  REFERRED TO CSR RX TX TO RJD.  07/26/91 TRANSFER DENIED.  10/18/91 ASSIGNED SERVER/LABORER.  RECEIVED SATISFACTORY WORK PERFORMANCE MARKS.  NO DISCIPLINARY REPORTS, LAUDATORY CHRONOS OR SELF-HELP THIS PERIOD. CS: 45. |

| CORRECTIONAL COUNSELOR | SIGNATURE | DATE |
|---|---|---|
| L. FARLEY    CCI | *[signature]* | 2/29/96 |

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| STAICH, IVAN | E-10079 | PVSP | 05/96 | 05/06/96 |

BPT 1004 (REV. 7/88)                      PAGE   **1**   of   **3**

BOARD OF PRISON TERMS                                                    STATE OF CALIFORNIA

## CONTINUATION SHEET: LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

| POST · CONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 02/21/92 TO 02/20/93 | | | REMAINED AT CSP-SAC WITH CLO A CUSTODY IN G.P.  03/11/92 ASSIGNED 2ND COOK POSITION. 04/09/92 ANNUAL REVIEW CS: 41. REFERRED TO CSR RX TX RJD ALT CVSP/CAL-IV.  04/23/92 TX DEFERRED.  05/07/92 RE-REFERRED TO CSR WITH RX TX RJD ALT CMC-E.  05/22/92 COR-III ENDORSED.  06/01/92 ARRIVED AT CSP/COR FOR LEVEL III HOUSING, CUSTODY CLO B P/O IS W/L.  08/26/92 ENDORSED CMC-E MEDICAL AND RETURN. 08/27/92 ASSIGNED DINING ROOM SERVER.  ARRIVED CMC-E ON 09/15/92.  NO DISCIPLINARIES, LAUDATORY CHRONOS OR SELF-HELP THIS PERIOD. CS: 41. |
| 02/21/93 TO 02/20/94 | | | REMAINED AT CMC-E WITH CLO B CUSTODY.   04/14/93 RECEIVED CDC-115 FOR DANGEROUS PROPERTY.   04/21/93 ANNUAL REVIEW, REDUCE CS TO 37.  08/31/93 ARRIVED BACK TO CSP-COR.  12/22/93 UCC REFERRED CASE TO ICC FOR CUSTODY REDUCTION.  NO LAUDATORY OR SELF-HELP THIS PERIOD. CS: 37. |
| 02/21/94 TO 02/20/95 | | | REMAINED AT CSP-COR CLO B CUSTODY IN G.P.   03/11/94 APPEARED BEFORE ICC CUSTODY REDUCED TO MED-A. 03/19/94 ASSIGNED  BLDG. PORTER JOB.  04/27/94 ANNUAL REVIEW ADJUSTED TO CS 33 CPP.  RECEIVED SATISFACTORY TO ABOVE AVERAGE JOB PERFORMANCE THIS PERIOD.  NO DISCIPLINARIES, LAUDATORY CHRONOS TO SELF-HELP THIS PERIOD. CS: 33. |

**ORDER:**

☐  BPT date advanced by _____ months.        ☐  BPT date affirmed without change.

☐  PBR date advanced by _____ months.        ☐  PBR date affirmed without change.

**SPECIAL CONDITIONS OF PAROLE:**

☐  Previously imposed conditions affirmed.

☐  Add or modify _____

☐  Schedule for Progress Hearing on appropriate institutional calendar.

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| STAICH, IVAN | E-10079 | PVSP | 05/96 | 05/06/96 |

BPT 1004 (REV. 7/88)                 PAGE    2    of    3                PERMANENT ADDENDA

BOARD OF PRISON TERMS                                    STATE OF CALIFORNIA
## CONTINUATION SHEET: LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

| POST | CONVICTION | CREDIT | REASONS |
|------|-----------|--------|---------|
| YEAR | BPT | PBR | |
| 02/21/95 TO PRESENT | | | REMAINED AT CSP-COR MED A CUSTODY IN G.P. 03/16/95 ANNUAL REVIEW REDUCE CS TO 29 CPP. 10/11/95 APPEARED BEFORE UCC FOR TX CONSIDERATION DUE TO POPULATION PRESSURE, REFER TO CSR RX TX RJD ALT HDSP 10/19/95. PVSP-III ENDORSED. 11/10/95 RECEIVED PVSP PLACED IN VOC. JANITORIAL. 11/28/95 UNASSIGNED 12/30/95 PER MEDICAL CHRONO DATED 12/06/95. NO DISCIPLINARY, LAUDATORY CHRONOS OR SELF-HELP THIS PERIOD. CS: 25. |

**ORDER:**

☐ BPT date advanced by _____ months.      ☐ BPT date affirmed without change.

☐ PBR date advanced by _____ months.      ☐ PBR date affirmed without change.

**SPECIAL CONDITIONS OF PAROLE:**

☐ Previously imposed conditions affirmed.

☐ Add or modify _____

☐ Schedule for Progress Hearing on appropriate institutional calendar.

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|------|-----------|-------------|----------|--------------|
| STAICH, IVAN | E-10079 | PVSP | 05/96 | 05/06/96 |

BPT 1004 (REV. 7/88)            PAGE ___3___ of ___3___            PERMANENT ADDENDA

# EXHIBIT 6



OFFICE OF THE

# DISTRICT ATTORNEY

ORANGE COUNTY, CALIFORNIA
**TONY RACKAUCKAS, DISTRICT ATTORNEY**

**JIM TANIZAKI**
SENIOR ASSISTANT D.A.
VERTICAL PROSECUTIONS/
VIOLENT CRIMES

**WILLIAM FECCIA**
SENIOR ASSISTANT D.A.
SPECIAL PROJECTS

**MARY ANNE MCCAULEY**
SENIOR ASSISTANT D.A.
BRANCH COURT OPERATIONS

**JOSEPH D'AGOSTINO**
SENIOR ASSISTANT D.A.
GENERAL FELONIES/
ECONOMIC CRIMES

**DONALD BLANKENSHIP**
CHIEF
BUREAU OF INVESTIGATION

**LISA BOHAN - JOHNSTON**
DIRECTOR
ADMINISTRATIVE SERVICES

April 25, 2007

D.S. Levorse, C&PR
Board of Prison Terms
CTF Soledad
P.O. Box 686
Soledad, CA 93960

Re: Ivan Staich, CDC No. E-10079

Dear Commissioners:

I appreciate the opportunity to express our adamant opposition to the setting of a parole date for inmate Staich. A representative from our office will be attending the Life Prisoner Subsequent Parole Consideration Hearing on May 11, 2007 at 10:30am at Soledad State Prison.

It is our position that the inmate still poses a high degree of threat to the public if released. The inmate's commitment offense illustrates his brutality and callous disregard for human life. After threatening victim Cynthia Topper numerous times, the inmate went to her house armed with two claw hammers. When the inmate kicked in the front door of the residence, he was met by Robert Topper, Cynthia's husband. The inmate attacked Robert, beating him several times in the head with the claw hammer. The inmate then murdered Robert, shooting him numerous times while he lay face down on the floor. The inmate then savagely beat Cynthia, crushing her skull and inflicting permanent brain damage.

In sum, it is our position that the gravity of this crime is so great that this inmate is not an acceptable candidate for parole at this time. It should be noted that the inmate has a long and continued history of threatening people, both before and after committing the instant offenses.

We appreciate the opportunity to express our views in this matter and will do so in greater detail at the hearing.

Respectfully,

Christopher R. Duff
Deputy District Attorney
Orange County District Attorneys Office

REPLY TO: ORANGE COUNTY DISTRICT ATTORNEY'S OFFICE                    WEB PAGE: www.OrangeCountyDA.com

| ☒ MAIN OFFICE | ☐ NORTH OFFICE | ☐ WEST OFFICE | ☐ SOUTH OFFICE | ☐ HARBOR OFFICE | ☐ JUVENILE OFFICE | ☐ CENTRAL OFFICE |
|---|---|---|---|---|---|---|
| 401 CIVIC CENTER DR W | 1275 N. BERKELEY AVE. | 8141 13TH STREET | 30143 CROWN VALLEY PKWY, | 4601 JAMBOREE RD, | 341 CITY DRIVE SOUTH | 700 CIVIC CENTER DR. W. |
| P.O. BOX 808 | FULLERTON, CA 92631 | WESTMINSTER, CA 92683 | LAGUNA NIGUEL, CA 92677 | NEWPORT BEACH, CA 92660 | ORANGE, CA 92668 | P.O. BOX 808 |
| SANTA ANA, CA 92701 | (714) 773-4480 | (714) 896-7284 | (949) 248-5020 | (949) 476-4650 | (714) 935-7624 | SANTA ANA, CA 92701 |
| (714) 834-3600 | | | | | | (714) 834-3600 |

# EXHIBIT 7

FEDERAL AND STATE DUE PROCESS VIOLATION

| | |
|---|---|
| Name | **IVAN VON STAICH** |
| Address | **Central Training Facility** |
| | **Post Office Box 689** |
| | **Soledad, California 93960-0689** |
| CDC or ID Number | **E-10079 (C-Wing-137u)** |

**FILED**

SUPERIOR COURT OF CALIFORN
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

SEP 12 2007 JV

ALAN SLATER, Clerk of the Court

*J. Villanueva*
BY J. VILLANUEVA

## IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

### IN AND FOR THE COUNTY OF ORANGE

(Court)

| |
|---|
| **IVAN VON STAICH,** |
| Petitioner |
| vs. |
| **Ben Curry, Warden, et al.,** |
| Respondent |

PETITION FOR WRIT OF HABEAS CORPUS

No. _____

*(To be supplied by the Clerk of the Court)*

**DUE PROCESS VIOLATION BY BPH COMMISSIONERS ON MAY 10, 2007, WHEN THEY FAILED TO GRANT PETITIONER DUAL CREDITS ON HIS ISL SECOND DEGREE . . . MURDER CONVICTION.**

INSTRUCTIONS

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order. **See Exhibit "G" for May 9,10 BPH transcripts.**
- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rule 60 of the California Rules of Court [as amended effective January 1, 2005]. Subsequent amendments to Rule 60 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Page one of six

Form Approved by the Judicial Council of California
MC-275 [Rev. July 1, 2005]

**FEDERAL AND STATE DUE PROCESS VIOLATION**

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rule 60(a)
American LegalNet, Inc.
www.USCourtForms.com

This petition concerns:

| | | | |
|---|---|---|---|
| ☐ A conviction | ☒☒ Parole | |
| ☐ A sentence | ☒☒ Credits | |
| ☐ Jail or prison conditions | ☐ Prison discipline | |
| ☒☒ Other (specify) | | |

**Resentenced to life in prison by BPH Commissioners on May 10, 2007, when Commissioners used the Commitment offense and immutable old CDC disciplinary reports to deny parole after 24 years.**

**The sentencing Court granted dual credit on Petitioner's attempted murder and second degree murder, which the BPH Commissioners refused to grant towards the M2d sentence.**

1. Your name: **IVAN VON STAICH**

2. Where are you incarcerated? **Level-II low security CTF-Soledad.**

3. Why are you in custody? ☒ Criminal Conviction    ☐ Civil Commitment

Answer subdivisions a. through i. to the best of your ability. **See Exhibit "G" for May 9,10 transcripts.**

a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

**Petitioner is currently serving his one count (1983) second degree murder conviction. See In re Weider (2006) 52 Cal.Rptr.3d 147, 155.**

b. Penal or other code sections: **Cal. Penal Code §§190, 2932(b). See People v. Rowland (1982) 134 Cal.App.3d 1, 12.**

c. Name and location of sentencing or committing court:
**Orange County Superior Court**
**700 Civic Center Dr., West**
**Santa Ana, Ca. 92702-2024**

d. Case number: **C-53851.**

e. Date convicted or committed: **Arrested Dec. 7, 1983; convicted Dec. 2, 1985.**

f. Date sentenced: **May 30, 1986.**

g. Length of sentence: **15 years determinate with half time and 15 years indeterminate with 1/3 credit. See People v. Carpenter (1979) 99 Cal.App.3d 527, 535-36.**

h. When do you expect to be released? **Never, BPH has resentenced Petitioner to life in prison...**

i. Were you represented by counsel in the trial court? ☒ Yes.  ☐ No.  If yes, state the attorney's name and address:

**Jack Earley, current address unknown.**

4. What was the LAST plea you entered? (check one)

☒ Not guilty    ☐ Guilty    ☐ Nolo Contendere    ☐ Other:

5. If you pleaded not guilty, what kind of trial did you have?

☒ Jury    ☐ Judge without a jury    ☐ Submitted on transcript    ☐ Awaiting trial
**See Exhibits.**

6. GROUNDS FOR RELIEF
   Ground 1: State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

SEE ATTACHED PAGES

a. Supporting facts:
   Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who did exactly what to violate your rights at what time (when) or place (where). (If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

SEE ATTACHED PAGES.

b. Supporting cases, rules, or other authority (optional):
   *(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

SEE ATTACHED PAGES.

7. Ground 2 or Ground _____ *(if applicable)*:

SEE ATTACHED PAGES

a. Supporting facts:

SEE ATTACHED PAGES

b. Supporting cases, rules, or other authority:

SEE ATTACHED PAGES

MC-275 [Rev. January 1, 1999]                    PETITION FOR WRIT OF HABEAS CORPUS

GROUNDS

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF GROUNDS PRESENTED

1

2   A. The Board Commissioners refused to accept Petitioner's Correctional
Psychologist Report written by M. Macomber Ph.D., dated Feburary 3, 2006.
3   The Board Commissioners gave Petitioner's Confidential 2006 Psychological
Report to the Deputy District Attorney in violation of Cal. Penal Code
4   §1543(a)(1), who during the "Court Ordered" late hearing used the
Psychological Report as the sole basis for recommending denial of parole
5   and stated the 2006 Psych Report was written in error and the report was
nothing more then rubbish, and also suggested that his layman opinion in
6   Psychology should be accepted over the professional state licensed
Correctional Psychologist M. Macomber, Ph.D., which recommended Petitioner
7   be released on parole; and the end result from the May 10, 2007 parole
hearing was Petitioner being denied parole for four (4) years; and that
8   Petitioner must be given a new Psychological evaluation by the Board's
own personal Board Psychologist, which violates Petitioner's right to have
9   the 2006 Psych Report fairly considered by an impartial panel.

10      Petitioner absolutely maintains that his "Court Ordered"

11  late parole hearing held on May 10, 2007 was nothing more then

12  a pro forma predetermined retaliatory hearing, resulting in

13  a unsubstantiated four (4) year parole denial. The Board

14  Commissioners completely failed to assess any weight to the

15  State licensed Correctional Psychologist M. Macomber, Ph.D.,

16  and his report dated Feburary 3, 2006. This report rendered

17  by Dr. Macomber was based upon 2 separate 2 hour-interviews

18  plus review of all the information in Petitioner's C-File and

19  separate medical file. The evaluation was conducted due to

20  Petitioner filing a CDC 602 appeal, which after a thorough

21  review of all the evidence by the Senior Psychologist B. Zika,

22  Ph. D., it was ordered that Petitioner receive a NEW

23  Psychological Evaluation and based solely on these facts the

24  previously written report based on false information was

25  overruled, and the reevaluation by M. Macomber, Ph.D. was

26  conducted. The ordered reevaluation involved extensive specify

27  testing within the functioning ranges set forth under the

28

4a

1  Minnesota Multiphasic Personality Inventory test, which
2  consisted of 500 question, multi-choice questionnaire.
3      Petitioner was also required to submit several written
4  documents regarding all areas of his prison life and his future
5  plans for release into the community. After M. Macomber
6  evaluated all the evidence he rendered his psychological
7  evaluation report dated February 3, 2006. However, during
8  the May 10, 2007 late "Court Ordered" subsequent parole hearing
9  the Board Commissioners totally disregarded this extensive
10 psychologist report from this State licensed professional with
11 nearly 40 years of prior experience and the Board stated that
12 Petitioner needs a new Psych Report, which the Board
13 Commissioners have expressed in a written document that
14 improperly dictates exactly what the new board psychologist
15 must write about when conducting the new evaluation report.
16 The reason the Board Commissioners want a new Psych Report
17 is because the previous mentioned report recommends Petitioner
18 should be released. However, Petitioner maintains that
19 allowing the Board Commissioners to order a new evaluation
20 report conducted exclusively by their own psychologist is
21 nothing more than a oligarchy and does violate the principles
22 of due process during the administrative hearing process.
23 The Board Commissioners sole purpose for ordering a new
24 psychological evaluation is to obtaining an unfavorable report
25 that can be used at Petitioner's next parole hearing to justify
26 keeping Petitioner in prison for the rest of his life, thereby,
27 changing Petitioner's jury verdict from second degree murder
28                                  4b

1  to first degree murder special circumstances under Cal. Penal
2  Code §190.2., which violates the mandate set forth in the
3  United States Supreme Court decision of <u>Green v. United States</u>,
4  355 U.S. 184, 190 (1957); <u>also see</u> <u>Herron v. Straub</u>, 138
5  Fed.Appx. 753, 756 (6th Cir.2005) ("More specifically, the
6  Supreme Court has held that an implicit acquittal can be
7  determined by jury silence; when a jury is instructed to find
8  a defendant guilty of either first or second degree murder,
9  a defendant will be implicit acquitted of first degree murder."
10 (Quoting Green).)

11     This action by the Board Commissioners was in the purist
12 form arbitrary and capricious which reveals a pattern by the
13 Board Commissioners who are ex-prosecutors to use the parole
14 hearing as a second trial where the inmate is now convicted
15 of first degree murder.  The end result of the "Court Ordered"
16 late hearing was a four (4) year parole denial showing a
17 prepensed outcome.  By the Board Commissioners refusal to
18 accept the 2006 extensively detailed Psychological Report
19 and the Commissioners ordering a new Psychological Report
20 by their own Psychologist is prejudicial per se and absolutely
21 violates Petitioner's due process right to a fair and impartial
22 parole hearing. The Commissioners have set forth a written
23 document alluding to precisely what areas in Petitioner's
24 C-file their own Board appointed Psychologist must consider.
25 The current Board Commissioners tyrannical power is endless.
26 (See Exhibit "A" for reference to Board document dated May
27 10, 2007).  Petitioner asserts the Board Commissioners are
28                                    4c

1  effectively controling the evaluation outcome process. This
2  extramural action shows beyond a shadow of a doubt that
3  Petitioner's "Court Ordered" late hearing was nothing more
4  then a sham.

5       This incongruous action does not comport with
6  Petitioner's federal liberty interest due process requirements
7  exspoused in the United States Supreme Court decision of
8  <u>Greenholtz v. Inmates of Nebraska Penal and Correctional</u>
9  <u>Complex</u>, 442 U.S. 1, 12 (1979). See <u>In re SANDRA DAVIS</u>
10 <u>LAWRENCE</u> (2007) 59 Cal.Rptr.3d 537, 2007 WL 1475283 (Cal.App.
11 2 Dist.) at page 16: "Two United States Supreme Court decisions
12 Greenholtz v. Inmate of Nebraska Penal and Correctional Complex
13 decided in 1979 and Board of Pardons v. Allen decided in 1987,
14 held the federal due process clause creates a constitutional
15 liberty interest for convicted persons in certain juridictions.
16 The existence of this right depends on whether the state
17 employs "mandatory language" indicating parole will be granted
18 if certain findings are made. In 2002, the Ninth Circuit
19 examined the California parole scheme in McQuillion v. Duncan,
20 306 F.3d 895, 901-903 and found it "uses mandatory language
21 and is largely parallel to the schemes found in Greenholtz
22 and Allen." Accordingly, the McQuillion court found a "liberty
23 interest" was created under the federal Constitution for state
24 prisoners in California." Id. Lawrence (2007).

25      When the Board Commissioners refused to accept the
26 professional findings of state Correctional Psychologist
27 Macomber and decided to side with the Deputy District Attorney
28

                                4d

1  who extensively argued against the 2006 Psych Report, they

2  violated several areas of state and federal statutory law.

3  First, the Board Commissioners gave Petitioner's 2006

4  Psychological Report to the "Deputy District Attorney" from

5  Orange County without any State statutory authorization under

6  the California Penal Code, Evidence Code, Bus. & Profession

7  Code, Welfare & Institutional Code or the State Government

8  Code. The Board Commissioners had no legal right to turnover

9  Petitioner's 2006 Psychological Report to the Deputy District

10 Attorney, but did so anyway. Cal. Penal Code §1543(a)(1)

11 requires: "Records of the identity, diagnosis, prognosis,

12 or . . . treatment of any patient maintained by the health care

13 facility which are not privileged records required to be

14 secured by the special master procedure in §1524, or records

15 required by law enforcement agencies pursuant to this section:

16 (1) In accordance with the prior written consent of the

17 patient. (In relevant part, emphasis added.)

18    The California Orange County Deputy District Attorney

19 is part of law enforcement and needed my concent before

20 obtaining my 2006 Psychological Report and, therefore, the

21 Board Commissioners had no legal authority to override Cal.

22 Penal Code §1543(a)(1), which they have deliberately done

23 in this case. Furthermore, Petitioner's 2006 Psychological

24 Report was secured in Petitioner's medical file. Obviously

25 the Board Commissioners are authorized to review Petitioner's

26 2006 Psychological Report, however, the Deputy District

27 Attorney is not a Board Commissioner and should have never

28

4e

1  seem Petitioner's 2006 Psychological Report. Moreover, the

2  Deputy District Attorney is not a licensed Psychologist and

3  had no professional background in Psychology to analyze the

4  2006 Psychological Report and by the Board Commissioners

5  allowing him to do so during the May 10, 2007 parole hearing

6  violates well-established principles set forth in **Packer v.**

7  **Board of Medical Examiners** (1974) 112 Cal.Rptr. 76, 80 "The

8  purpose of the Psychology Licensing Law (Bus. & Prof. Code

9  §§2900-2996.9), as declared by the Legislature, is "to protect

10  the public from the unauthorized and unqualified practice

11  of psychology." Id.

12      Furthermore, the Deputy District Attorney or the Board

13  Commissioners are not Licensed Psychologist and had no legal

14  authority to override the 2006 Psychological Report written

15  by M. Macomber Ph.D. Correctional Psychologist or the authority

16  to disregard the professional opinion for that of their own.

17  See **Kelley v. Callahan**, 133 F.3d 583, 589 (8th Cir.1998) ("The

18  Commissioner is encouraged to give more weight to the opinion

19  of a specialist about medical issues related to his or her

20  area of specialty **than to the opinion of a source who is not**

21  **a specialist**") citing Metz v. Shalala, 49 F.3d 374, 377 (8th

22  Cir.1995). Also the treating physician rule, is codified

23  at 20 C.F.R. §404.1527(d)(2), and is widely accepted. See

24  **Mason v. Shalala**, 994 F.2d 1058 (3d Cir.1993). These federal

25  regulations have been applied to state actions which address

26  the weight to be given a treating source's opinion on the

27  issue(s) and when there is **no** other **substantial evidence** in

28

4f

1  the case, the court will give it controlling weight. 20 C.F.R.

2  §416.927(d)(2).     The    judge    [in    this    case    the    Board

3  Commissioners  and  the  Deputy  District  Attorney]  may  not  make

4  "speculative  inferences  from  medical  reports  and  may  only

5  disregard a medical opinion based on **substantial** contradictory

6  evidence  and  may  not  due  to  his  own  credibility  judgments,

7  speculation  or  lay  opinion."  **Morales v. Apfel**,  225  F.3d  310,

8  317 (**3rd Cir**.2000).

9     Furthermore,  this  is  not  the  first  time  the  Board

10 Commissioners  refused  to  follow  the  recommandations  of  the

11 Correctional  Psychologist,  as  set  forth  in  the  recent  case

12 of **In re DAVID BARKER**, May 29, 2007  DJDAR 7548, at 7555 we

13 read: "More on point is Dr. Glines assessment in her September

14 15,  2005  report,  which  could  not  be  clearer:  "[t]here  are

15 no  therapeutic  recommendations  at  this  time."  And,  as  noted,

16 she concluded that the risk Barker would commit another violent

17 crime  is  low";  **see also In re BERNARD JOHN WEIDER**,  December

18 6,  2006  DJDAR  15795,  at  page  15798  "The  "Life  Prisoner

19 Evaluation  Report,"  dated  May  2004,  concluded  that  Weider

20 had  satisfactory  post-release  plans  and  a  circle  of  family

21 and  friends  outside  of  prison  for  support.  The  report  stated

22 that the seriousness of the crime could not be over emphasized.

23 "Today,  however,  Weider  appears  to  be  a  low  risk  to  society

24 if he were released from prison."

25     However,  in  both  Barker  and  Weider  the  Board  Commissioners

26 refused  to  follow  the  Correctional  Psychologist  findings  in

27 the  reports  which  stated  that  the  inmate  would  not  pose  a

28

1  threat to the community and that the inmate should be released.
2  In both cases the state appellate courts reversed the Board's
3  denial of parole and ordered the Board Commissioners to grant
4  a parole date. Likewise, in the recent federal district court
5  case of **Willis v. Kane**, ___F.Supp.2d___, April 26, 2007 WL
6  1232060 (N.D.Cal.) at page *5 we read: "In light of the
7  favorable psychological reports and the absence of any mention
8  therein of a need for further self-help or therapy programming,
9  there was not some evidence to support the BPH's determination
10 that Willis had not sufficiently participated in beneficial
11 self-help and therapy programming." In the Willis case the
12 federal court ordered the BPH to set a parole date within
13 30 days. Id. at page *8. (See Exhibit "B" for reference to
14 Petitioner's 2006 Psychological Report.)

15     Bottom line, the Board Commissioners retaliated against
16 Petitioner because he file a habeas corpus in this Court
17 forcing the Board to hold a late hearing. However, during
18 that hearing the Deputy District Attorney was allowed to
19 extensively argue against Petitioner's favorable Psychological
20 evaluation, when Petitioner did not consent or authorize the
21 Deputy District Attorney to have a copy of his confidential
22 Psychological examination dated Feburary 3, 2006 and,
23 therefore, the Deputy District Attorney had no just cause
24 to argue against this favorable report. Furthermore, by giving
25 the Deputy District Attorney this medical report positively
26 violates the confidential medical information requirements
27 set forth in Cal. Penal Code §1543(a)(1). See **Burkert v.**
28

1  *Equitable Life Assur. Soc. of America*, 287 F.3d 293, 299 (3rd

2  Cir.2003). The end result was Petitioner received a four

3  year denial without just cause, Petitioner has now served

4  nearly 24 straight years and with all presentence and post-

5  sentence "Court Ordered" credits applied, total credits add

6  up to over 33 years in prison for the one count second degree

7  murder. Petitioner absolutely maintains that his May 10,

8  2007 "Court Ordered" late parole hearing was nothing more

9  then a sham and did violate Petitioner's due process rights

10  to a fair and impartial hearing and does violate the arbitrary

11  and capricious standard set forth in *Superintendent v. Hill*,

12  472 U.S. 445, 455-56 (1985). As stated in *Sass v. California*

13  *Board of Prison Terms*, 461 F.3d 1123 (9th Cir.2006) ("The

14  'Some Evidence' standard is minimal, and assures that the

15  record is not so devoid of evidence that the fidings of the

16  . . . board were without support or otherwise arbitrary."

17  *Id.* at 1129 (quoting *Superintendent v. Hill*, 472 U.S. at 457).

18  (See Exhibit "C" for reference to four year denial).

19      In addition, as stated in *In re Lawrence*, supra, 59

20  Cal.Rptr.3d at 543 ("The rationale for these findings gave

21  primary credence to the earlier psychological reports and

22  tests reflecting various psychological disorders *as opposed*

23  *to the more recent reports finding no current evidence Lawrence*

24  *still was subject to those problems*.") As in Lawrence

25  Petitioner was dissatisfied with the earlier written 2002

26  psychological report based on unsupported evidence and filed

27  his appeal, which was granted by the Senior Psychologist.

28                              4i

## GROUND TWO

**B.** Petitioner was denied dual "Court Ordered" credit by the BPH Commissioners during his recent May 10, 2007 parole sentencing hearing.

Petitioner, Ivan Von Staich, hereby notifies this Honorable Superior Court, that on May 30, 1986 during his sentencing hearing the Court granted dual presentence credits on both counts, which is fully reflected on page 2, Judgment of Commitment. Petitioner was granted 1097 days of presentence credit on his one count second degree murder sentence. (See Exhibit "D" for reference to Judgment of Commitment, page 2.) Petitioner maintains that in addition to the 1097 days of presentence credit he served 997 actual days in the Orange County Jail before he was transferred to Chino State Prison on Febuary 21, 1989. This post-sentence credit must also be applied to Petitioner's one count second degree murder. However, during the May 10, 2007 parole hearing the BPH Commissioners refused to apply this dual "Court Ordered" credit to Petitioner's indeterminate term. (See Exhibit "E" for reference to 997 days served in the Orange County Jail.)

Petitioner argues that dual credit is authorized under Cal. Penal Code §2900.5 (b) and that the sentencing Court on May 30, 1986 was following the statutory law when the Court granted Petitioner 1097 days of presentence credit on his separately calculated indeterminate second degree murder sentence in accordance with Cal. Rules of Court, Rule 451(a)(1983). Furthermore, dual credit is warranted when

4j

the defendant seeks credit which is attributable to the same conduct which is the basis of the criminal conviction. In this case Petitioner was convicted of second degree murder and attempted murder, when the two crimes occurred within seconds of each other and are the sole basis for Petitioner's incarceration.

As stated in **People v. Rutledge** (1983) 88 Cal.Rptr. 846, 849 we read: "The prerequisite for dual credit is that the custody must relate to both matters. Time served on a sentence in one case while awaiting trial on [139 Cal.App.3d 626] another [case] cannot be the basis for dual credit. Time spent in custody prior to commencement of sentence is credited only where the custody is attributable to proceedings relating to the same conduct for which the defendant has been convicted." (Quoting In re Rojas (1979) 23 Cal.3d 152, 155-157, 151 Cal.Rptr. 649.)

Indeed the sentencing judge was right to grant Petitioner dual credit on his two crimes which occurred within seconds of each other. In accordance with **People v. Brown** (1980) 166 Cal.Rptr. 144, 148, "Penal Code section 2900.5 requires credit against the San Bernardino sentence only where the Los Angeles custody is attributable to San Bernardino proceedings. We are satisfied that the statute requires a relationship between the custody and the proceedings in which credit is sought"; also see **In re Jordan** (1975) 50 Cal.App.3d 155, 157-58 ("The dual status of the act may be said to provide the required "reasonable relationship" which would permit

4k

1  [dual] presentence credits"); **and In re Smith** (1978) 146

2  Cal.Rptr. 304, 306 ("It seems obvious to us that in this case

3  Smith's custody in the Los Angeles county jail was on a dual

4  basis and that one of the two **bases** qualified under the

5  aforementioned Penal Code section 2900.5, subdivision (b).

6  As our Supreme Court stated in In re Watson (1977) 19 Cal.3d

7  646, 651, 131 Cal.Rptr. 609, 612, 566 P.2d 243, 246, the

8  crucial element of the statute is not where or under what

9  conditions the defendant has been deprived of his liberty

10  but rather whether the custody to which he has been subjected

11  is attributable to the charges arising from the same criminal

12  [181 Cal.App.3d 328] act or acts for which the defendant has

13  been convicted. ([Penal Code §] 2900.5, subd. (b).) We believe

14  that Smith's custody was in part so attributed.")

15  Petitioner maintains that on May 10, 2007 the BPH

16  Commissioners refused to consider any of Petitioner's

17  presentence credits on his one count second degree murder

18  conviction and, therefore, did violate his due process right

19  to have this presentence credit applied to his one count second

20  degree murder sentence.

**GROUND THREE**

21  C. The BPH Commissioners have effectively resentenced Petitioner
    to life in prison for his one count second degree murder

22  when they refused to calculate his minimum sentence under
    the matrix guidelines for second degree murder and this

23  refusal to act was unreasonable under **United v. Booker**,
    543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005)

24  considering Petitioner has now served nearly 24 straight
    years.

25

26  The Supreme Court extended the holding of Blakely v.

27  Washington, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403

28                          41.

(2004), to the Federal Sentencing Guidelines, concluding that the Sixth Amendment requires that "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." Booker at p. 243-244. Petitioner has not yet had his sentence calculated by the BPH Commissioners and, therefore, the Supreme Court decision in Booker which mandates sentencing review for reasonableness based on factors used to extend or enhance a prisoner punishment for the set degree of the crime committed, would apply in this case. See Booker at 261. As stated in **U.S. v. Maese**, 146 Fed.Appx. 276, 279 (10th Cir.2005) we read: "However, both before and after Booker, the degree of departure from the applicable guidelines range is reviewed for reasonableness." Likewise in **U.S. v. Carlton**, 442 F.3d 802, 809 (2nd Cir.2006) we read: "Such proceeding arise after the end of the criminal prosecution, **including the imposition of sentence** . . . Revocation deprives an individual, not of the absolute liberty to which every citizen is entitled, but only of the conditional liberty properly dependent on observance of special parole restriction," Gagnon, 411 U.S. at 781, 93 S.Ct. 1756 (quoting Morrissey, 408 U.S. 480, 92 S.Ct. 2593); **see also** Knights, 534 U.S. at 119, 122 S.Ct. 587.) (Emphasis added.)

Petitioner has not been sentenced yet by the BPH Commissioners and, therefore, is entitled to the full canopy

4m

of sentencing due process federal constitutional rights set forth in Booker and the recent United States Supreme Court case of **Cunningham v. California**, 127 S.Ct. 856, 857–859 (2007), which reaffirmed those rights to apply in California prisoner's cases that have not had their sentence calculated. These constitutional rights are applicable to Petitioner's May 10, 2007 parole sentencing hearing where the Commissioners relied on the alleged factors from old prison non-violent misconduct to extend Petitioner's parole sentencing hearing for four more years. Petitioner's jury did not hear the prison misconduct violations under the reasonable doubt standard and, therefore, the BPH Commissioners had no legal right to enhance Petitioner's sentence to first degree murder punishments based on this evidence. The Board Commissioners refused to set any minimum matrix guidelines to the second degree murder crime for four (4) more years, thereby forcing Petitioner to serve an illegal first degree murder sentence.

We must now review the legal landscape in California regarding undetermined sentences. The California Supreme Court in **In re Roberts** (2005) 36 Cal.4th 575, 589–590, ruled that parole is an integral part of the overall process of sentencing. (See **also In re Sena** (2002) 94 Cal.App.4th 836, at 839. Under California Law, the sentencing process is not complete until the term is set and the inmate released. Roberts, supra, 36 Cal.4th at 589–590; Sena, supra, 94 Cal.App.4th at 839.) As such, the Board is an entity that wears two (2) hats, serving as part of the executive branch,

4n

but discharging certain judicial functions as an extension of the sentencing process. This was precisely the conclusion of the court of appeal in the case of **In re Hogan** (1986) 187 Cal.App.3d 819, 824 ["Board, in setting a release date for an indeterminate sentence, performs the same function as does the trial court in ordering a determinate sentence - it fixes a term of definite duration."] See **also People v. Enriquez** (1977) 137 Cal.Rptr. 171, 177 (The Superior Court has delegated its responsibility of sentencing to the Board Commissioners.)

The effect of these cases is to hold that the Board is still discharging part of the sentencing function, acting in the place of the trial court in determining minimum parole date guideline setting. This required duty leaves the BPH Commissioners no room for refusal to set Petitioner's second degree murder within the applicable matrix guidelines. When the Board engages in the fact finding process and makes a determination that "public safety" exception of Cal. Penal Code §3041 subd. (b) apples, they must consider all the unless factors, such as only misconduct within the last six months. See Greenholtz, 99 S.Ct. at 2109. Moreover, when those facts are new disciplinary reports which the jury did not hear in their deliberation finding, the crime committed by Petitioner cannot be enhanced from second degree murder to first degree murder. The Board Commissioners in this case have illegally delegated themselves as a second jury and have effectively changed Petitioner's parole hearing into a mini-trial and have used the alleged misconduct evidence to render a new

4o

1  verdict in violation of the Sixth Amendment of the United States

2  Constitution.   Using  the  old  prison  misconduct  facts  which

3  the Board determines relevant removes the jury verdict process

4  and  places  Petitioner's  second  degree  murder  outside  the

5  appropriate matrix guideline range thereby violating the Booker

6  jury  trial  requirements,  recently  reaffirmed  in  Cunningham.

7  Thus, under California Law, the fact - finding does impact

8  the right to a term under the appropriate sentencing matrix

9  guidelines.   This  is  clearly  the  type  of  delegated  judicial

10  fact  -  finding  "beyond  a  reasonable  doubt"  jury  trial

11  requirement that Justice Scalia was addressing in Blakely,

12  which was found to contravene the right to a jury trial.

13  As such, the Board on May 10, 2007 deliberately refused to

14  set any matrix guideline range and in doing so set off

15  Petitioner's parole sentencing hearing for four (4) years,

16  which will force Petitioner to serve over 28 straight years

17  of incarceration without any added A-1-A prison credits, which

18  is absolutely beyond the minimum 10 year sentence set forth

19  in proposition 7 (1978) voters initiative for one count second

20  degree murder. (See **People v. Duran** (1983) 140 Cal.App.3d

21  485, 503.)

22      The sole factors found by the Board Commissioners on

23  May 10, 2007 to set off the parole sentencing hearing process

24  under the matrix guidelines was 6 disciplinary reports for

25  violating the prison grooming standards in 2001, which occurred

26  before Petitioner's first parole hearing held on November

27  5, 2002, which was one of the factors used to set off the

28

4p

November 5, 2002 sentencing hearing for four (4) years. The older disciplinary report is from 1996, which is now 11 years old and was for sending a somewhat threatening letter to Petitioner's ex-wife. These disciplinary reports were fully discussed in the February 3, 2006 Correctional Psychological Report and are now fully discussed below.

**GROUND FOUR**

D. Petitioner's May 10, 2007 parole sentencing hearing was illegally set off for four (4) years based on old non-violent prison disciplinary reports, which violates the mandates set forth in the United States Supreme Court citation of **Greenholtz v. Inmates of the Nebraska Penal & Correctional Complex**, 442 U.S. 1, 99 S.Ct. 2100, 2109 (1979).

Petitioner maintains that the United States Supreme Court citation of Greenholtz, 99 S.Ct. at 2109 must be followed by California Board Commissioners during all liberty interest parole sentencing hearings under Cal. Penal Code §3041(b). Indeed this evidence is supportive of Petitioner's contention that he is a Nazarite Christian prisoner following his religious vow in accordance with the Holy Bible Numbers ch. 6, verse 5. The Board Commissioners on May 10, 2007 disregarded these factors and that another prisoner convicted of second degree murder who was denied parole for following his religious beliefs was later ordered to be released by the federal Eastern District Court. See **Saif'ullah v. Carey**, 2005 WL 1555389 (E.D.Cal.2005). **Also see Rosenkrantz v. Marshall**, 444 F.Supp.2d 1063, 1087 (C.D.Cal.2006), which quotes Saif'ullah as follows: "Saif'ullah, 2005 WL 1555389 at *13-16 (granting habeas relief where the record contained no evidence supporting the BPT's decision that petitioner was a danger

1   to society and unsuitable for parole based upon (a) his
2   commitment offense, (b) his prior criminal history, and (c)
3   a rules violation which resulted when, based upon his regilious
4   beliefs, petitioner refused to cut his hair)." Also the United
5   States Supreme Court set forth in **Cutter v. Wilkinson**, 125
6   S.Ct. 2113, 2117 (2005), that prisoners are allowed to practice
7   their individual religious beliefs in the institutional
8   setting.   The United States Supreme Court Cutter decision
9   reenforces the federal statutory provisions of Title 42 U.S.C.
10  §2000cc 1-7 (RLUIPA), which applys equally to all religions
11  throughout the United States.   The Ninth Circuit in 2005
12  reenforced these same religious rights for California State
13  Prisoners in the case of **Warsoldier v. Woodford**, 418 F.3d
14  1062 (9th Cir.2005).

15      Bottom line the BPH Commissioners on May 10, 2007 during
16  the late parole sentencing hearing had no legal right to use
17  Petitioner's disciplinary reports for violating the prison
18  grooming standards, when the Board Commissioners knew
19  Petitioner was following his vow of the Nazarite in accordance
20  with the Holy Bible Numbers ch. 6, verse 5.   In addition,
21  the Board Commissioners used an eleven (11) year old
22  disciplinary report where Petitioner was punished for writing
23  a somewhat threatening letter to his wife at that time, who
24  Petitioner divorced in February of 1997 for irreconcilable
25  differences.   Petitioner wrote this letter after he found
26  out that his supposed loving wife was actually a prostitute
27  and a drug addict.   Petitioner met this woman from another
28                                  4r

1  prisoner and had no background knowledge of her drug and

2  promiscuity before he married her in 1990. Petitioner has

3  had no further communications with his ex-wife and has been

4  with a new girlfriend for the last 7 years. Petitioner is

5  happily engaged to marry this beautiful christian woman, who

6  does support my release back to the community. (See Exhibit

7  "T" for reference to letter from Petitioner's fiance Shelley

8  Woods and other documents supporting parole after 24 straight

9  years.)

10  Moreover, several inmates with serious disciplinary

11  reports have recently been ordered released by the state and

12  federal courts. **See Willis v. Kane,**[485] F.Supp.2d [1126], 2007

13  WL 1232060 (N.D.Cal.) where second degree "baby" murderer

14  Willis was ordered released after he received a serious CDC-

15  115 for refusing to transfer to another prison yard and also

16  received three CDC-128s (i.e., counselling memoranda) Willis

17  at *7; **also see Martin v. Marshall,** 431 F.Supp.2d 1038, 1042

18  (N.D.Cal.2006) where inmate Martin was convicted of two murders

19  and one attempted murder and received twenty (20) serious

20  CDC-115 disciplinary reports, which included "possession of

21  drugs; weapons materials and gambling paraphernalia and that

22  inmate Martin was involved an a altercation with another inmate

23  who supposedly stabbed Martin. See Martin at p.1042. However,

24  after Martin's Attorney filed a modification order, Martin

25  was ordered released; **see In re Elkins** (Cal.App.1 Dist.2006)

26  50 Cal.Rptr.3d 503, 508 where inmate Elkins was convicted

27  of first degree murder and robbery, for beating a man to death

28

1   with a baseball bat and dumping his body in the remote area

2   of Truckee, California.   Inmate Elkins also received two

3   serious CDC-115 disciplinary report were he was charged with

4   force and violence.   The state court ordered the Board to

5   release Elkins forthwith. Id. Elkins at 523; see **Sandra Davis**

6   **Lawrence**, 59 Cal.Rptr.3d 537, 2007 WL 1475283 (Cal.App.2 Dist.)

7   at *6 where first degree murder Lawrence received a CDC-115

8   for stealing excess food from the kitchen, however, the State

9   Court of Appeals ordered the Board to release Lawrence

10  forthwith. Id. Lawrence at *43; **and In re David Barker**,

11  Tuesday, May 29, 2007 DJDAR 7548, at pp. 7549-50 where inmate

12  Barker was convicted of three (3) murders two (2) second degree

13  murders and one first degree murder.   Inmate Barker also

14  received six (6) CDC-115s, which consist of possessing 12

15  marijuana joints; having another inmate in his cell; possessing

16  contraband; manipulating staff; for smoking in bed; possession

17  of contraband (pornography, sugar, and a bottle of unidentified

18  "flammable liquid substance"); and the State Court of Appeals

19  ordered the Board to find Petitioner suitable for parole under

20  the current regulations. Id. at p. 7560.

21      Petitioner maintains that in accordance with Greenholtz,

22  99 S.Ct. at 2109 subsection (K)(1) that prison misconduct

23  which is within the last **six months should be considered during**

24  **the initial or subsequent protected liberty interest parole**

25  **hearing.**   Therefore, the old immutable CDC-115s should not

26  be used by the Board Commissioners to refuse suitability

27  indefinitely.                         **4t**

28

## GROUND FIVE

1  E. The Board Commissioners denied parole for four (4) years
2  stating that Petitioner needed more self-help and that he
   needed to get this self-help by reading some books in the
3  prison library, but failed to state why Petitioner cannot
   attain this self-help by reading books in the prison library
4  in one year and, therefore, have violated Petitioner's due
   process and "some evidence" rights set forth in **In re Lozano**,
5  C.A.3 no. C051792, 2007 WL 117709.

6      Petitioner maintains that the Board Commissioners on

7  May 10, 2007 during a "Court Ordered" late parole hearing

8  denied parole for four more years after 24 years of

9  incarceration. The principal reason for denying parole

10 suitability for four (4) years was that Petitioner needed

11 more self-help and after Petitioner ask the Board Commissioners

12 where he was to obtain this self-help the Commissioner stated

13 that Petitioner needed to visit the prison library and read

14 some books. (Petitioner would have quoted the exact transcript

15 page number where this was stated, however, Petitioner's

16 transcripts have not arrived within the 30 day statutory

17 required time limit under Cal. Penal Code §3042 et seq.).

18     In the recent State Appellate Court citation of **In re**

19 **Lozano**, C.A.3 no. C051792, 2007 WL 117709, the Third Appellate

20 District denied Fidel Jessie Lozano's claim that the BPH

21 panel's grounds for unsuitability were supported by **no evidence**

22 and also held that the panel's reasons for the 3-year deferral

23 on his subsequent parole hearing denied due process and failed

24 to satisfy the "some evidence" standard because the panel

25 cited no evidence suggesting that Lozano could not be found

26 parole suitable **in one year**. Id. Petitioner maintains that

27 the ruling in Lozano supports his contention herein.

28

## GROUND SIX

F. Petitioner has been illegally resentenced to life in Prison.

1   Petitioner is currently serving a one count second degree

2   murder based on his 1983 arrest and jury conviction for one

3   count second degree murder. (See Exhibit "D" for reference

4   to Judgment of Commitment second degree murder.) Petitioner

5   was received by the California Department of Corrections

6   (heretoafter CDC&R) on February 21, 1989 and granted

7   presentence credits by the superior court as set forth on

8   page two of the Judgment of Commitment. Petitioner also served

9   an additional 997 days in the county jail before being

10  transferred to CDC&R to serve his sentence.

11  On May 10, 2007, Petitioner received a subsequent parole

12  hearing and was denied parole for four more years. (See

13  Exhibit "C" for reference to four (4) year denial.) Petitioner

14  maintains that he has now served 33 years with 1/3 credit

15  and has now served over the minimum for first degree murder.

16  Keeping Petitioner in prison for 33 years violates the

17  principles set forth in In re Weider (Cal.App. 6 Dist 2006)

18  52 Cal.Rptr.3d 147, 155, which states:

19      "The court noted that Weider "has served so much
        time that, with custody credits, he is within the
20      matrix for first degree murder . . . It should be
        self evident that after an inmate has served the
21      equivalent of 25 years, whether his actions were
        more than minimally necessary for second degree
22      conviction . . . is no longer the appropriate
        question. The Board position, that inmates who
23      were only convicted of second degree [murder] may
        forever be denied parole based on modicum of evidence
24      that their acts rose to the level of a first degree
        [murder], without acknowledging the fact that they
25      have already served the time [145 Cal.App.4th 583]
        for a first [degree murder], should be seen as so
26      ridiculous that simply to state it is to refute
        it." Id. at 155.

27                                  4v

28

1    Petitioner absolutely maintains that he has served more
2    than enough time for this one count second degree murder and
3    that he has exceeded the time limits for this indeterminate
4    crime. As stated in U.S. v. Martin, 63 F.3d 1422, 1433 (7th
5    Cir.1995) we read: "Although the judge and not the jury
6    ultimately sentences the defendant, the judge may only impose
7    life imprisonment "if the jury so direct." If the jury does
8    not so direct, the sentence is limited to a term of years."
9    Also in Lynch v. U.S. Parole Com'n, 768 F.2d 491, 496 (2nd
10   Cir.1985), which states: "It has been held that the Commission
11   may not confine a prisoner beyond the applicable guideline
12   range is based upon the severity of the offense, because that
13   factor was used to select the guideline in the first place."
14   See also United States v. Nono-Para, 887 F.2d 1409, 1412 (9th
15   Cir.1989).

16   Petitioner asserts that he is now serving a sentence
17   beyond the guideline matrices for second degree murder and
18   that CDC&R officials and the BPH Commissioners have violated
19   his due process rights. Moreover, state officials are forcing
20   Petitioner to serve life in prison based on the multi-year
21   denial process. However, as stated in U.S. v. Paster, 173
22   F.3d 206, 218 (3rd Cir.1999) we read: "Yet the sentence levied
23   in this second degree murder case is equal to what would be
24   a heavy first degree murder sentence. This aspect of the
25   sentence here imposed gives us pause." The Paster case also
26   states: "Second degree murder has a base offense level 33,
27   produces an incarceration range of 135-168 months; the range

28

4w

1  drops to 108-135 months when the offense level is adjusted

2  two levels for acceptance of responsibility. Id at fn. 8 pg.

3  218.

4      Moreover, "the term "maximum" ordinarily means the upper

5  end of the range. Where a statute provides two tiers of

6  punishment, common sense dictates that the maximum must fall

7  at the high end of the two tiers. U.S. v. Fountain, 83 F.3d

8  946, 952 (8th Cir.1996); and U.S. v. Quinonez, 86 F.3d 382,

9  383 (5th Cir.1996) ("We begin by noting an indeterminate

10  sentence is defined as, "A sentence to imprisonment for the

11  maximum period defined by law, subject to termination . .

12  . at any time after service of the minimum period").

13      Indeed, the recent Ninth Circuit decision in IRONS v.

14  CAREY, (9th Cir. Mar. 6, 2007) 479 F.3d 658, Lexis 5198, at

15  *11 support Petitioner's contentions when the Court stated:

16  "We hope that the Board will come to recognize that in some

17  cases, indefinite detention based on an inmate's commitment

18  offense, regardless of the extent of his rehabilitation, will

19  at some point violate due process, given the liberty interest

20  in parole that flows from the relevant California statutes."

21  Id.   In addition the case of Jones v. Smith, 231 F.3d 1227,

22  1232-33 (9th Cir.2001) is supportive of Petitioner contentions

23  as follow: "Since the ruling in Apprendi, supra, the Court

24  has made it clear that any fact that increases the penalty

25  for a crime beyond a reasonable doubt, as set forth Apprendi,

26  expands the range of discrepancies that will amount to a

27  constructive amendment. Such a change is a constructive

28
                                4x

1  amendment and is prejudicial per se." Likewise, "we do note,

2  however, that principles of due process require an agency

3  to follow its own regulation, which have the force of law."

4  Marshall v. Lansing, 839 F.2d 933, 943 (3rd Cir.1988). See

5  Government Code §11342.2, all regulations must strictly follow

6  the enabling statute. California Penal Code §3041.5 states

7  suitability or term setting and does not state whether

8  Petitioner's second degree murder is under suitability or

9  term setting. However, if we are going to punish California

10  law breakers under the different degrees, we must not force

11  second degree murderers to serve life in prison when second

12  degree murder is the lesser included offense of first degree

13  murder. 1/

14                          CONCLUSION

15      Petitioner has presented ample evidence in support of

16  his arguments and, therefore, this Court must now enforce the

17  recent Sixth Appellate Court's In re Weider decision and that

18  Petitioner has now served 33 years with all his credits and

19  should be ordered released on parole forthwith.

20  Dated this 19th day of August, 2007.

21                              Respectfully Submitted,

22

23                              IVAN VON STAICH
                                Petitioner In Pro Per
24                              Without Bar Licensed Counsel

25  1/ See IRONS v. WARDEN OF CALIFORNIA STATE PRISON-SOLANO, (E.D.
    Cal. 2005) 358 F.Supp.2d 936, 951, "BPH should be ordered to
26  calculate petitioner's release date."

27

28

                              4y

8. Did you appeal from the conviction, sentence, or commitment? ☐ Yes. ☐ No.   If yes, give the following information:

   a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):

   _____

   b. Result: _____   c. Date of decision: _____

   d. Case number or citation of opinion, if known: _____

   e. Issues raised:   (1) _____

      (2) _____

      (3) _____

   f. Were you represented by counsel on appeal? ☐ Yes. ☐ No.  If yes, state the attorney's name and address, if known:

   _____

9. Did you seek review in the California Supreme Court? ☐ Yes. ☐ No.   If yes, give the following information:

   a. Result: _____   b. Date of decision: _____

   c. Case number or citation of opinion, if known: _____

   d. Issues raised:   (1) _____

      (2) _____

      (3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

    NOT APPLICABLE.
    _____

11. Administrative Review:

    a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

    California Code of Regulations, Title 15 § 2050 sets forth criteria for appealing the Board of Prison Terms

    actions: "Any person under the board's jurisdiction may appeal any decision of the board which affects that

    person except the decision to schedule a hearing." There being no administrative remedy available to

    petitioner, this Court has jurisdiction to hear this case.

    _____

    _____

    _____

    b. Did you seek the highest level of administrative review available? ☒ Yes. ☐ No.
       *Attach documents that show you have exhausted your administrative remedies.*

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or issue in any court?  ☐ Yes. If yes, continue with number 13.  ☒ No. If no, skip to number 15.

13. a. (1) Name of court: _____

   (2) Nature of proceeding (for example, "habeas corpus petition"): _____

   (3) Issues raised: (a) _____

       (b) _____

   (4) Result (Attach order or explain why unavailable): _____

   (5) Date of decision: _____

   b. (1) Name of court: _____

   (2) Nature of proceeding: _____

   (3) Issues raised: (a) _____

       (b) _____

   (4) Result (Attach order or explain why unavailable): _____

   (5) Date of decision: _____

   c. For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

   **None.**

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.)

   I have not delayed this filing and, therefore, this question is not relevant, with the exception that Petitioner has not received his BPH transcripts on time under Penal Code § 3042 (30 day rule).

16. Are you presently represented by counsel?  ☐ Yes.  ☒ No. If yes, state the attorney's name and address, if known:

   _____

17. Do you have any petition, appeal, or other matter pending in any court?  ☐ Yes.  ☒ No. If yes, explain:

   _____

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

   This Honorable Superior Court holds jurisdiction over this May 10, 2007 Board hearing and this is the Court of original conviction.

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: 8-19-07                                    ▶ _____
                                                 (SIGNATURE OF PETITIONER)
                                                 Ivan Von Staich, In Propria Persona

# EXHIBIT 8

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

OCT 15 2007

ALAN SLATER, Clerk of the Court

BY: _____, DEPUTY

# SUPERIOR COURT OF THE STATE OF CALIFORNIA
# FOR THE COUNTY OF ORANGE

| | |
|---|---|
| In re | CASE NO. **M-11506** |
| **IVAN VON STAICH,** | |
| Petitioner, | **ORDER** |
| ON HABEAS CORPUS. | |

TO THE PETITIONER AND THE OFFICE OF THE ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, HAVING RECEIVED THE PETITION FOR WRIT OF HABEAS CORPUS, THE COURT FINDS AND ORDERS AS FOLLOWS:

I

In 1986, in Case No. C-53851, Petitioner was convicted by a jury of second degree murder. The murder victim was Petitioner's ex-girlfriend's new husband. Petitioner attacked him with a hammer and shot him four times. Petitioner also attacked the ex-girlfriend with the hammer. She survived but the resulting brain damage left her incompetent to testify. Petitioner was sentenced to 15 years to life for the crime. A subsequent parole hearing was held before the Board of Parole Hearings (hereafter individually and collectively referred to as "the BPH") in May 2007 and parole was denied for four years. Petitioner has filed three previous petitions for writ of habeas corpus challenging the BPH denial, Case Nos. M-11405, M-11415, and M-11420 respectively. All have been denied. Petitioner has now filed a fourth petition.

1

II

Petitioner argues the BPH "refused to accept" a 2006 psychological report, refused to calculate his sentence according to the "matrix," illegally "set off" his parole for four years, failed to state why he could not obtain self-help within one year, and illegally resentenced him to life in prison. He also contends he should be credited with post-sentence time spent in local custody before being transferred to prison in 1989.

III

The petition is denied on the following separate and independent grounds:

A court generally will not consider repeated applications for habeas corpus presenting claims previously rejected. (*In re Clark* (1993) 5 Cal.4th 750, 767-768.) Nor should the court consider newly presented grounds for relief which were known to the petitioner at the time of a previous habeas petition. (*Ibid.*) Petitioner has filed three previous petitions in this court regarding the same BPH hearing. All were denied. Petitioner fails to justify his failure to raise all issues in a single, timely petition. (*Id.* at p. 779.) The petition is denied on that basis. (*Ibid.*)

The California Supreme Court in *In re Dannenberg* (2005) 34 Cal.4th 1061 held that the BPH "may protect public safety" by "considering the dangerous implications" of the commitment offense. (*Id.* at p. 1071; see also Pen. Code, § 3041, subd. (b).) Thus, while the BPH must point to factors "beyond the minimum elements of the crime . . . it need engage in no further comparative analysis before concluding that the particular facts of the offense make it unsafe, at that time, to fix a date for the prisoner's release." (*In re Dannenberg, supra*, at p. 1071.) In other words, if the BPH determines the gravity of the commitment offense "is such that consideration of the public safety requires a more lengthy period of incarceration," it may deny parole without proceeding to consider and analyze the "matrix," or the other suitability factors such as prison behavior and parole plans. (*Ibid.*) Moreover, a BPH parole decision is subject to a limited judicial review, and the applicable standard is whether "some evidence" supports it. (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 626; *In re Powell* (1988) 45 Cal.3d 894, 902-904; *In re Van Houten* (2004) 116 Cal.App.4th 339, 347.)

*Dannenberg* makes plain that if the BPH "determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of

2

incarceration for this individual," it need not set a parole date. (Pen. Code, § 3041, subd. (b); *In re Dannenberg, supra*, at p. 1071.) Here, the BPH reviewed the facts of the commitment offense. It therefore was not required to engage in a further analysis. (*In re Dannenberg, supra*, at p. 1071.) Nevertheless it did, noting that Petitioner had first been sentenced to state prison in 1978, that Petitioner had incurred a series of disciplinary reports, and that the most recent disciplinary report was 2001. It characterized Petitioner's criminal history as "a period of 23 years . . . a long time." Additionally, the BPH stated that Petitioner had "a long pattern of violations involving threats to women or members of their family [sic] since [his] involvement in the criminal justice system in 1978 . . . ." The BPH used these facts to support its conclusion that Petitioner would pose an unreasonable risk of danger to society if he were released from prison at this time. Petitioner therefore fails to show "some evidence" did not support the BPH decision. (*In re Rosenkrantz, supra; In re Powell, supra; In re Van Houten, supra.*) He thus fails to demonstrate the BPH abused its discretion in denying parole. (*In re Dannenberg, supra.*) The petition is denied on that basis. (*Ibid.*)

Petitioner also contends he should be credited with post-sentence time spent in local custody before being transferred to prison in 1989. Any postsentence credits are to be calculated by the California Department of Corrections and Rehabilitation (CDCR) and Petitioner must apply to the CDCR for those custody credits. Petitioner does not demonstrate he has exhausted his administrative remedies in that regard as is required. (*In re Reina* (1985) 171 Cal.App.3d 638, 642; see also *In re Muszalski* (1975) 52 Cal.App.3d 500; see also *In re Mabie* (1984) 159 Cal.App.3d 301, 304.) The petition is denied on that basis. (*Ibid.*)

IV

The petition for a writ of habeas corpus is DENIED.

DATED: ___10-15-07___

___K Maluno___

JUDGE OF THE SUPERIOR COURT

3

# EXHIBIT 9

MC-275

Name          IVAN VON STAICH
            Central Training Facility
Address      Post Office Box 689
            Soledad, Ca. 93960-0689

COURT OF APPEAL 4TH DIST DIV 3
FILED

NOV 0 2 2007

CDC or ID Number   # E-10079 (CW-137L)

FOURTH APPELLATE DISTRICT

Deputy Clerk  ᴮ

DIVISION THREE

(Court)

---

| IVAN VON STAICH | PETITION FOR WRIT OF HABEAS CORPUS |
|---|---|
| Petitioner | G039495 |
| vs. | No. _____ |
| Ben Curry Warden et al., | (To be supplied by the Clerk of the Court) |
| Respondent | "STATE AND FEDERAL DUE PROCESS VIOLATION" |

THE ORANGE COUNTY SUPERIOR COURT REFUSED TO ANSWER EACH CLAIM IN DIRECT VIOLATION OF People v. Russel (1968) 69 Cal.2d 187, 195; Small v. Superior Court (2000) 94 Cal.Rptr.2d 550, 559.

## ISSUES PRESENTED TO SUPERIOR COURT:

1. The Parole Board Commissioners refused to consider Petitioner's 2006 Correctional Psychologist Report because the report was favorable and recommended that Petitioner be released on parole;

2. The Board Commissioners illegally gave the Deputy District Attorney a copy of the 2006 psych report in violation of Cal. Penal Code §1543(a)(1);

3. The Board Commissioners used Petitioner's old psych report from 2002 which contained false information and that the Board failed to follow the published case of In re Lawrence (2007) 59 Cal.Rptr.3d 537, 543, which requires the Board to rely on the recent psych report over any older psych report;

4. The Board failed to calculate all Petitioner's "Court Ordered" pre-sentence and post-sentence credits on Petitioner's second degree murder in violation of People v. Carpenter (1979) 99 Cal.App.3d 527, 535-36;

5. The Board has resentenced Petitioner to serve the punishments for first degree murder when you calculate all "Court Ordered" presentenced credits now served with all prison time, which when calculated correctly adds up to over 25 years at 1/3 rate, in direct violation of In re Weider (2006) 52 Cal.Rptr.3d 147, 155; U.S. v. Martin, 63 F.3d 1422, 1433;

6. The Board Commissioners used immutable factors, such as the commitment crime, old CDC disciplinary reports in violation of the principles set forth in Rosenkrantz v. Marshall, 444 F.Supp.2d 1063, 1087, finding that reliance on: a) his commitment offense, b) his criminal history, c) prison disciplinary for failure to cut hair under the old repealed grooming standards; and that all the following cases involved inmates convicted of murder who also received prison disciplinary reports, but where granted habeas relief, Martin v. Marshall, 431 F.Supp.2d 1038, 1042 (N.D.Cal.2006) (20 serious disciplinary reports); Willis v. Kane, 485 F.Supp.2d 1126, 1135 (N.D.Cal.2007) (serious disciplinary, ordered released); In re Elkins (2006) 144 Cal.App.4th 475, 50 Cal.Rptr.3d at 508 (two serious disciplinary reports, force and violence, ordered suitable for parole); In re Barker (2007) 151 Cal.App.4th 346, 59 Cal.Rptr.3d at 752 (six serious disciplinary reports, but order for the board to find Barker suitable for parole;

7. The Board Commissioners four year denial violated the findings in In re Lozano, C.A. 3 No. C051792, 2007 WL 117709.

Form Approved for Optional Use
Judicial Council of California
MC-275 [Rev. January 1, 2007]

**PETITION FOR WRIT OF HABEAS CORPUS**

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rule 8.380
www.courtinfo.ca.gov

American LegalNet, Inc.
www.FormsWorkflow.com

This petition concerns:

☐ A conviction     ☒ XX Parole

☐ A sentence     ☒ XX Credits

☐ Jail or prison conditions     ☐ Prison discipline

☒ XX Other (specify) attempted murder and second degree murder, which the BPH Commissioners refused to grant towards the M2d sentence.

Resentenced to life in prison by BPH Commissioners on May 10, 2007, when Commissioners used the Commitment offense and immutable old CDC disciplinary reports to deny parole after 24 years. The sentencing Court granted dual credit on Petitioner's

1. Your name: IVAN VON STAICH

2. Where are you incarcerated? Level-II low security CTF-Soledad.

3. Why are you in custody? ☒ Criminal Conviction    ☐ Civil Commitment

*Answer subdivisions a. through i. to the best of your ability* See Exhibit "G" for May 9,10 transcripts.

a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

Petitioner is currently serving his one count (1983) second degree murder conviction. See *In re Weider* (2006) 52 Cal.Rptr.3d 147, 155.

b. Penal or other code sections: Cal. Penal Code §§190, 2932(b). See *People v. Rowland* (1982) 134 Cal.App.3d 1, 12.

c. Name and location of sentencing or committing court: Orange County Superior Court
700 Civic Center Dr., West
Santa Ana, Ca. 92702-2024

d. Case number: C-53851.

e. Date convicted or committed: Arrested Dec. 7, 1983; convicted Dec. 2, 1985.

f. Date sentenced: May 30, 1986.

g. Length of sentence: 15 years determinate with half time and 15 years indeterminate with 1/3 credit. See *People v. Carpenter* (1979) 99 Cal.App.3d 527, 535-36.

h. When do you expect to be released? Never, BPH has resentenced Petitioner to life in prison...

i. Were you represented by counsel in the trial court? ☒ Yes.    ☐ No. If yes, state the attorney's name and address:

Jack Earley, current address unknown.

4. What was the LAST plea you entered? *(check one)*

☒ Not guilty    ☐ Guilty    ☐ Nolo Contendere    ☐ Other:

5. If you pleaded not guilty, what kind of trial did you have?

☒ Jury    ☐ Judge without a jury    ☐ Submitted on transcript    ☐ Awaiting trial

See attached Exhibits in support of this petition.

6. GROUNDS FOR RELIEF                                                    **MC-275**

**Ground 1:** State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(if you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

THE SUPERIOR COURT ABSOLUTELY REFUSED TO ANSWER ANY OF PETITIONER'S

CLAIMS AND, THEREFORE, VIOLATED THE PRINCIPLE SET FORTH IN <u>People</u>

<u>Russel</u> (1968) 69 Cal.2d 187, 195; <u>Small v. Superior Court</u> (2000)

94 Cal.Rptr.2d 550, 559.

a. Supporting facts: (See Exhibit "BB" for reference to Superior Court denial of this petition.)
Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where)*. (If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)

The Superior Court stated in the third Petition filed, that "Without

a transcript, this court cannot determine on what basis the BPH

decision was made.  Petitioner therefore fails to satisfy his initial

burden of pleading adequate grounds for relief.(Ibid.)  The petition

is denied <u>on that</u> basis." (Ibid.)  (See Exhibit AA, for reference

to 8-15-07 order denying the petition.)  However, Petitioner had

explained in detail that he had not received the board transcripts

and that the BPH officials had violated Cal. Penal Code §3042(b)

and had not given Petitioner a copy of the transcripts within the

30 day time limit.  The Superior Court refused to hear this claim

on the merits, which now required Petitioner to wait until he

received the transcript to present his claims.  Thereafter,

Petitioner did finally receive the "Court Ordered" 2007 board hearing

transcripts and thereafter filed this petition.

b. Supporting cases, rules, or other authority (optional):
*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)* Discretion must be "guided and controlled by fixed legal principles, exercised in conformity with the spirit of the law, and in a manner to serve and <u>not to impede or defeat the ends of substantial justice." People v. Warner</u> (1978) 20 Cal.3d 678, 683.  In a legal sense, discretion is abused whenever in the exercise thereof the court exceeds the bounds of reason, all of the circumstances before it being considered.  See <u>State Farm Inc. v. Superior Court</u> (1956) 47 Cal.2d 428, 432.  However, this Appellate Court should be guided and controlled by fixed legal principles, exercised in conformity with the spirit of the law.

7. Ground 2 or Ground _____ (*if applicable*):

SEE ATTACHED PAGES

a. Supporting facts:

SEE ATTACHED PAGES

b. Supporting cases, rules, or other authority:

SEE ATTACHED PAGES

GROUNDS

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF GROUNDS PRESENTED

1

2   A. The Board Commissioners refused to accept Petitioner's Correctional Psychologist Report written by M. Macomber Ph.D., dated Feburary 3, 2006.
3   The Board Commissioners gave Petitioner's Confidential 2006 Psychological Report to the Deputy District Attorney in violation of Cal. Penal Code
4   §1543(a)(1), who during the "Court Ordered" late hearing used the Psychological Report as the sole basis for recommending denial of parole
5   and stated the 2006 Psych Report was written in error and the report was nothing more then rubbish, and also suggested that his layman opinion in
6   Psychology should be accepted over the professional state licensed Correctional Psychologist M. Macomber, Ph.D., which recommended Petitioner
7   be released on parole; and the end result from the May 10, 2007 parole hearing was Petitioner being denied parole for four (4) years; and that
8   Petitioner must be given a new Psychological evaluation by the Board's own personal Board Psychologist, which violates Petitioner's right to have
9   the 2006 Psych Report fairly considered by an impartial panel.

10       Petitioner absolutely maintains that his "Court Ordered"

11  late parole hearing held on May 10, 2007 was nothing more then

12  a pro forma predetermined retaliatory hearing, resulting in

13  a unsubstantiated four (4) year parole denial. The Board

14  Commissioners completely failed to assess any weight to the

15  State licensed Correctional Psychologist M. Macomber, Ph.D.,

16  and his report dated Feburary 3, 2006. This report rendered

17  by Dr. Macomber was based upon 2 separate 2 hour-interviews

18  plus review of all the information in Petitioner's C-File and

19  separate medical file. The evaluation was conducted due to

20  Petitioner filing a CDC 602 appeal, which after a thorough

21  review of all the evidence by the Senior Psychologist B. Zika,

22  Ph. D., it was ordered that Petitioner receive a NEW

23  Psychological Evaluation and based solely on these facts the

24  previously written report based on false information was

25  overruled, and the reevaluation by M. Macomber, Ph.D. was

26  conducted. The ordered reevaluation involved extensive specify

27  testing within the functioning ranges set forth under the

28

4a

1  Minnesota  Multiphasic  Personality  Inventory  test,  which
2  consisted of 500 question, multi-choice questionnaire.

3      Petitioner was also required to submit several written
4  documents regarding all areas of his prison life and his future
5  plans  for  release  into  the  community.  After  M.  Macomber
6  evaluated  all  the  evidence  he  rendered  his  psychological
7  evaluation report dated February 3, 2006.  However,  during
8  the May 10, 2007 late "Court Ordered" subsequent parole hearing
9  the  Board  Commissioners  totally  disregarded  this  extensive
10 psychologist report from this State licensed professional with
11 nearly 40 years of prior experience and the Board stated that
12 Petitioner  needs  a  new  Psych  Report,  which  the  Board
13 Commissioners  have  expressed  in  a  written  document  that
14 improperly dictates exactly what the new board psychologist
15 must write about when conducting the new evaluation report.
16 The reason the Board Commissioners want a new Psych Report
17 is because the previous mentioned report recommends Petitioner
18 should  be  released.  However,  Petitioner  maintains  that
19 allowing the Board Commissioners to order a new evaluation
20 report conducted exclusively by their own psychologist is
21 nothing more than a oligarchy and does violate the principles
22 of  due  process  during  the  administrative  hearing  process.
23 The  Board  Commissioners  sole  purpose  for  ordering  a  new
24 psychological evaluation is to obtaining an unfavorable report
25 that can be used at Petitioner's next parole hearing to justify
26 keeping Petitioner in prison for the rest of his life, thereby,
27 changing Petitioner's jury verdict from second degree murder
28                              4b

1  to first degree murder special circumstances under Cal. Penal

2  Code §190.2., which violates the mandate set forth in the

3  United States Supreme Court decision of <u>Green v. United States</u>,

4  355 U.S. 184, 190 (1957); <u>also see</u> <u>Herron v. Straub</u>, 138

5  Fed.Appx. 753, 756 (6th Cir.2005) ("More specifically, the

6  Supreme Court has held that an implicit acquittal can be

7  determined by jury silence; when a jury is instructed to find

8  a defendant guilty of either first or second degree murder,

9  a defendant will be implicit acquitted of first degree murder."

10  (Quoting Green).)

11      This action by the Board Commissioners was in the purist

12  form arbitrary and capricious which reveals a pattern by the

13  Board Commissioners who are ex-prosecutors to use the parole

14  hearing as a second trial where the inmate is now convicted

15  of first degree murder.  The end result of the "Court Ordered"

16  late hearing was a four (4) year parole denial showing a

17  prepensed outcome.  By the Board Commissioners refusal to

18  accept the 2006 extensively detailed Psychological Report

19  and the Commissioners ordering a new Psychological Report

20  by their own Psychologist is prejudicial per se and absolutely

21  violates Petitioner's due process right to a fair and impartial

22  parole hearing. The Commissioners have set forth a written

23  document alluding to precisely what areas in Petitioner's

24  C-file their own Board appointed Psychologist must consider.

25  The current Board Commissioners tyrannical power is endless.

26  (See Exhibit "A" for reference to Board document dated May

27  10, 2007).  Petitioner asserts the Board Commissioners are

28                          4c

1  effectively controling the evaluation outcome process.  This
2  extramural action shows beyond a shadow of a doubt that
3  Petitioner's "Court Ordered" late hearing was nothing more
4  then a sham.

5       This incongruous action does not comport with
6  Petitioner's federal liberty interest due process requirements
7  exsposued in the United States Supreme Court decision of
8  Greenholtz v. Inmates of Nebraska Penal and Correctional
9  Complex, 442 U.S. 1, 12 (1979).  See In re SANDRA DAVIS
10 LAWRENCE (2007) 59 Cal.Rptr.3d 537, 2007 WL 1475283 (Cal.App.
11 2 Dist.) at page 16: "Two United States Supreme Court decisions
12 Greenholtz v. Inmate of Nebraska Penal and Correctional Complex
13 decided in 1979 and Board of Pardons v. Allen decided in 1987,
14 held the federal due process clause creates a constitutional
15 liberty interest for convicted persons in certain juridictions.
16 The existence of this right depends on whether the state
17 employs "mandatory language" indicating parole will be granted
18 if certain findings are made.  In 2002, the Ninth Circuit
19 examined the California parole scheme in McQuillion v. Duncan,
20 306 F.3d 895, 901-903 and found it "uses mandatory language
21 and is largely parallel to the schemes found in Greenholtz
22 and Allen."  Accordingly, the McQuillion court found a "liberty
23 interest" was created under the federal Constitution for state
24 prisoners in California." Id. Lawrence (2007).

25      When the Board Commissioners refused to accept the
26 professional findings of state Correctional Psychologist
27 Macomber, and decided to side with the Deputy District Attorney
28

1  who extensively argued against the 2006 Psych Report, they
2  violated several areas of state and federal statutory law.
3  First, the Board Commissioners gave Petitioner's 2006
4  Psychological Report to the "Deputy District Attorney" from
5  Orange County without any State statutory authorization under
6  the California Penal Code, Evidence Code, Bus. & Profession
7  Code, Welfare & Institutional Code or the State Government
8  Code.  The Board Commissioners had no legal right to turnover
9  Petitioner's 2006 Psychological Report to the Deputy District
10 Attorney, but did so anyway.  Cal. Penal Code §1543(a)(1)
11 requires: "Records of the identity, diagnosis, prognosis,
12 or ... treatment of any patient maintained by the health care
13 facility which are not privileged records required to be
14 secured by the special master procedure in §1524, or records
15 required by law enforcement agencies pursuant to this section:
16 (1) In accordance **with** **the** **prior** **written** **consent** **of** **the**
17 **patient**. (In relevant part, emphasis added.)

18    The California Orange County Deputy District Attorney
19 is part of law enforcement and needed my concent before
20 obtaining my 2006 Psychological Report and, therefore, the
21 Board Commissioners had no legal authority to override Cal.
22 Penal Code §1543(a)(1), which they have deliberately done
23 in this case. Furthermore, Petitioner's 2006 Psychological
24 Report was secured in Petitioner's medical file. Obviously
25 the Board Commissioners are authorized to review Petitioner's
26 2006 Psychological Report, however, the Deputy District
27 Attorney is not a Board Commissioner and should have never

28

4e

1    seen Petitioner's 2006 Psychological Report. Moreover, the
2    Deputy District Attorney is not a licensed Psychologist and
3    had no professional background in Psychology to analyze the
4    2006 Psychological Report and by the Board Commissioners
5    allowing him to do so during the May 10, 2007 parole hearing
6    violates well-established principles set forth in Packer v.
7    Board of Medical Examiners (1974) 112 Cal.Rptr. 76, 80  "The
8    purpose of the Psychology Licensing Law (Bus. & Prof. Code
9    §§2900-2996.9), as declared by the Legislature, is "to protect
10   the public from the unauthorized and unqualified practice
11   of psychology." Id.

12       Furthermore, the Deputy District Attorney or the Board
13   Commissioners are not Licensed Psychologist and had no legal
14   authority to override the 2006 Psychological Report written
15   by M. Macomber Ph.D. Correctional Psychologist or the authority
16   to disregard the professional opinion for that of their own.
17   See Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998) ("The
18   Commissioner is encouraged to give more weight to the opinion
19   of a specialist about medical issues related to his or her
20   area of specialty than to the opinion of a source who is not
21   a specialist") citing Metz v. Shalala, 49 F.3d 374, 377 (8th
22   Cir.1995).  Also the treating physician rule, is codified
23   at 20 C.F.R. §404.1527(d)(2), and is widely accepted.  See
24   Mason v. Shalala, 994 F.2d 1058 (3d Cir.1993).  These federal
25   regulations have been applied to state actions which address
26   the weight to be given a treating source's opinion on the
27   issue(s) and when there is no other substantial evidence in
28

4f

1   the case, the court will give it controlling weight. 20 C.F.R.

2   §416.927(d)(2).   The   judge   [in   this   case   the   Board

3   Commissioners and the Deputy District Attorney] may not make

4   "speculative inferences from medical reports and may only

5   disregard a medical opinion based on **substantial** contradictory

6   evidence and may not due to his own credibility judgments,

7   speculation or lay opinion." <u>Morales v. Apfel</u>, 225 F.3d 310,

8   317 **(3rd Cir.**2000).

9      Furthermore, this is not the first time the Board

10  Commissioners refused to follow the recommandations of the

11  Correctional Psychologist, as set forth in the recent case

12  of **In re DAVID BARKER**, May 29, 2007 DJDAR 7548, at 7555 we

13  read: "More on point is Dr. Glines assessment in her September

14  15, 2005 report, which could not be clearer: "[t]here are

15  no therapeutic recommendations at this time." And, as noted,

16  she concluded that the risk Barker would commit another violent

17  crime is low"; <u>see also</u> **In re BERNARD JOHN WEIDER**, December

18  6, 2006 DJDAR 15795, at page 15798 "The "Life Prisoner

19  Evaluation Report," dated May 2004, concluded that Weider

20  had satisfactory post-release plans and a circle of family

21  and friends outside of prison for support. The report stated

22  that the seriousness of the crime could not be over emphasized.

23  "Today, however, Weider appears to be a low risk to society

24  if he were released from prison."

25      However, in both Barker and Weider the Board Commissioners

26  refused to follow the Correctional Psychologist findings in

27  the reports which stated that the inmate would not pose a

28

1  threat to the community and that the inmate should be released.

2  In both cases the state appellate courts reversed the Board's

3  denial of parole and ordered the Board Commissioners to grant

4  a parole date.  Likewise, in the recent federal district court

5  case of **Willis v. Kane**, ___ F.Supp.2d___, April 26, 2007 WL

6  1232060 (N.D.Cal.) at page *5 we read: "In light of the

7  favorable psychological reports and the absence of any mention

8  therein of a need for further self-help or therapy programming,

9  there was not some evidence to support the BPH's determination

10  that Willis had not sufficiently participated in beneficial

11  self-help and therapy programming."  In the Willis case the

12  federal court ordered the BPH to set a parole date within

13  30 days. Id. at page *8. (See Exhibit "B" for reference to

14  Petitioner's 2006 Psychological Report.)

15  Bottom line, the Board Commissioners retaliated against

16  Petitioner because he file a habeas corpus in this Court

17  forcing the Board to hold a late hearing.  However, during

18  that hearing the Deputy District Attorney was allowed to

19  extensively argue against Petitioner's favorable Psychological

20  evaluation, when Petitioner did not consent or authorize the

21  Deputy District Attorney to have a copy of his confidential

22  Psychological examination dated Feburary 3, 2006 and,

23  therefore, the Deputy District Attorney had no just cause

24  to argue against this favorable report.  Furthermore, by giving

25  the Deputy District Attorney this medical report positively

26  violates the confidential medical information requirements

27  set forth in Cal. Penal Code §1543(a)(1).  See **Burkert v.**

28

4h

1   Equitable Life Assur. Soc. of America, 287 F.3d 293, 299 (3rd
2   Cir.2003).  The end result was Petitioner received a four
3   year denial without just cause, Petitioner has now served
4   nearly 24 straight years and with all presentence and post-
5   sentence "Court Ordered" credits applied, total credits add
6   up to over 33 years in prison for the one count second degree
7   murder.  Petitioner absolutely maintains that his May 10,
8   2007 "Court Ordered" late parole hearing was nothing more
9   then a sham and did violate Petitioner's due process rights
10  to a fair and impartial hearing and does violate the arbitrary
11  and capricious standard set forth in Superintendent v. Hill,
12  472 U.S. 445, 455-56 (1985).  As stated in Sass v. California
13  Board of Prison Terms, 461 F.3d 1123 (9th Cir.2006) ("The
14  'Some Evidence' standard is minimal, and assures that the
15  record is not so devoid of evidence that the fidings of the
16  .  .  .  board were without support or otherwise arbitrary."
17  Id. at 1129 (quoting Superintendent v. Hill, 472 U.S. at 457).
18  (See Exhibit "C" for reference to four year denial).

19  In addition, as stated in In re Lawrence, supra, 59
20  Cal.Rptr.3d at 543 ("The rationale for these findings gave
21  primary credence to the earlier psychological reports and
22  tests reflecting various psychological disorders as opposed
23  to the more recent reports finding no current evidence Lawrence
24  still was subject to those problems.")  As in Lawrence
25  Petitioner was dissatisfied with the earlier written 2002
26  psychological report based on unsupported evidence and filed
27  his appeal, which was granted by the Senior Psychologist.
28
                              4i

## GROUND TWO

B. Petitioner was denied dual "Court Ordered" credit by the BPH Commissioners during his recent May 10, 2007 parole sentencing hearing.

Petitioner, Ivan Von Staich, hereby notifies this Honorable Superior Court, that on May 30, 1986 during his sentencing hearing the Court granted dual presentence credits on both counts, which is fully reflected on page 2, Judgment of Commitment. Petitioner was granted 1097 days of presentence credit on his one count second degree murder sentence. (See Exhibit "D" for reference to Judgment of Commitment, page 2.) Petitioner maintains that in addition to the 1097 days of presentence credit he served 997 actual days in the Orange County Jail before he was transferred to Chino State Prison on Febuary 21, 1989. This post-sentence credit must also be applied to Petitioner's one count second degree murder. However, during the May 10, 2007 parole hearing the BPH Commissioners refused to apply this dual "Court Ordered" credit to Petitioner's indeterminate term. (See Exhibit "E" for reference to 997 days served in the Orange County Jail.)

Petitioner argues that dual credit is authorized under Cal. Penal Code §2900.5 (b) and that the sentencing Court on May 30, 1986 was following the statutory law when the Court granted Petitioner 1097 days of presentence credit on his separately calculated indeterminate second degree murder sentence in accordance with Cal. Rules of Court, Rule 451(a)(1983). Furthermore, dual credit is warranted when

4j

the defendant seeks credit which is attributable to the same conduct which is the basis of the criminal conviction. In this case Petitioner was convicted of second degree murder and attempted murder, when the two crimes occurred within seconds of each other and are the sole basis for Petitioner's incarceration.

As stated in **People v. Rutledge** (1983) 88 Cal.Rptr. 846, 849 we read: "The prerequisite for dual credit is that the custody must relate to both matters. Time served on a sentence in one case while awaiting trial on [139 Cal.App.3d 626] another [case] cannot be the basis for dual credit. Time spent in custody prior to commencement of sentence is credited only where the custody is attributable to proceedings relating to the same conduct for which the defendant has been convicted." (Quoting In re Rojas (1979) 23 Cal.3d 152, 155-157, 151 Cal.Rptr. 649.)

Indeed the sentencing judge was right to grant Petitioner dual credit on his two crimes which occurred within seconds of each other. In accordance with **People v. Brown** (1980) 166 Cal.Rptr. 144, 148, "Penal Code section 2900.5 requires credit against the San Bernardino sentence only where the Los Angeles custody is attributable to San Bernardino proceedings. We are satisfied that the statute requires a relationship between the custody and the proceedings in which credit is sought"; **also** **see** In re Jordan (1975) 50 Cal.App.3d 155, 157-58 ("The dual status of the act may be said to provide the required "reasonable relationship" which would permit

**4k**

1  [dual] presentence credits"); and In re Smith (1978) 146

2  Cal.Rptr. 304, 306 ("It seems obvious to us that in this case

3  Smith's custody in the Los Angeles county jail was on a dual

4  basis and that one of the two bases qualified under the

5  aforementioned Penal Code section 2900.5, subdivision (b).

6  As our Supreme Court stated in In re Watson (1977) 19 Cal.3d

7  646, 651, 131 Cal.Rptr. 609, 612, 566 P.2d 243, 246, the

8  crucial element of the statute is not where or under what

9  conditions the defendant has been deprived of his liberty

10 but rather whether the custody to which he has been subjected

11 is attributable to the charges arising from the same criminal

12 [181 Cal.App.3d 328] act or acts for which the defendant has

13 been convicted. ([Penal Code §] 2900.5, subd. (b).) We believe

14 that Smith's custody was in part so attributed.")

15 Petitioner maintains that on May 10, 2007 the BPH

16 Commissioners refused to consider any of Petitioner's

17 presentence credits on his one count second degree murder

18 conviction and, therefore, did violate his due process right

19 to have this presentence credit applied to his one count second

20 degree murder sentence.

### GROUND THREE

21 C. The BPH Commissioners have effectively resentenced Petitioner
   to life in prison for his one count second degree murder
22 when they refused to calculate his minimum sentence under
   the matrix guidelines for second degree murder and this
23 refusal to act was unreasonable under United v. Booker,
   543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005)
24 considering Petitioner has now served nearly 24 straight
   years.
25

26 The Supreme Court extended the holding of Blakely v.

27 Washington, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403

28                                  4L

1    (2004), to the Federal Sentencing Guidelines, concluding that

2    the Sixth Amendment requires that "[a]ny fact (other than

3    a prior conviction) which is necessary to support a sentence

4    exceeding the maximum authorized by the facts established

5    by a plea of guilty or jury verdict must be admitted by the

6    defendant or proved to a jury beyond a reasonable doubt."

7    Booker at p. 243-244.    Petitioner has not yet had his sentence

8    calculated by the BPH Commissioners and, therefore, the Supreme

9    Court decision in Booker which mandates sentencing review

10   for reasonableness based on factors used to extend or enhance

11   a prisoner punishment for the set degree of the crime

12   committed, would apply in this case. See Booker at 261.    As

13   stated in **U.S. v. Maese**, 146 Fed.Appx. 276, 279 (10th Cir.2005)

14   we read: "However, both before and after Booker, the degree

15   of departure from the applicable guidelines range is reviewed

16   for reasonableness." Likewise in **U.S. v. Carlton**, 442 F.3d

17   802, 809 (2nd Cir.2006) we read: "Such proceeding arise after

18   the end of the criminal prosecution, **including the imposition**

19   **of sentence** . . . Revocation deprives an individual, not of

20   the absolute liberty to which every citizen is entitled, but

21   only of the conditional liberty properly dependent on

22   observence of special parole restriction," Gagnon, 411 U.S.

23   at 781, 93 S.Ct. 1756 (quoting Morrissey, 408 U.S. 480, 92

24   S.Ct. 2593); **see also** Knights, 534 U.S. at 119, 122 S.Ct.

25   587.) (Emphasis added.)

26       Petitioner has not been sentenced yet by the BPH

27   Commissioners and, therefore, is entitled to the full canopy

28                              4m

of sentencing due process federal constitutional rights set forth in Booker and the recent United States Supreme Court case of **Cunningham v. California**, 127 S.Ct. 856, 857-859 (2007), which ~~reaffirmed~~ those rights to apply in California ~~prisoner's~~ cases that have not had their sentence calculated. These constitutional rights are applicable to Petitioner's May 10, 2007 parole sentencing hearing where the Commissioners relied on the alleged factors from old prison non-violent misconduct to extend Petitioner's parole sentencing hearing for four more years. Petitioner's jury did not hear the prison misconduct violations under the reasonable doubt standard and, therefore, the BPH Commissioners had no legal right to enhance Petitioner's sentence to first degree murder punishments based on this evidence. The Board Commissioners refused to set any minimum matrix guidelines to the second degree murder crime for four (4) more years, thereby forcing Petitioner to serve an illegal first degree murder sentence.

We must now review the legal landscape in California regarding undetermined sentences. The California Supreme Court in **In re Roberts** (2005) 36 Cal.4th 575, 589-590, ruled that parole is an integral part of the overall process of sentencing. (See **also In re Sena** (2002) 94 Cal.App.4th 836, at 839. Under California Law, the sentencing process is not complete until the term is set and the inmate released. Roberts, supra, 36 Cal.4th at 589-590; Sena, supra, 94 Cal.App.4th at 839.) As such, the Board is an entity that wears two (2) hats, serving as part of the executive branch,

4n

1   but discharging certain judicial functions as an extension

2   of the sentencing process. This was precisely the conclusion

3   of the court of appeal in the case of In re Hogan (1986) 187

4   Cal.App.3d 819, 824 ["Board, in setting a release date for

5   an indeterminate sentence, performs the same function as does

6   the trial court in ordering a determinate sentence - it fixes

7   a term of definite duration."] See also People v. Enriquez

8   (1977) 137 Cal.Rptr. 171, 177 (The Superior Court has delegated

9   its responsibility of sentencing to the Board Commissioners.)

10      The effect of these cases is to hold that the Board is

11  still discharging part of the sentencing function, acting

12  in the place of the trial court in determining minimum parole

13  date guideline setting. This required duty leaves the BPH

14  Commissioners no room for refusal to set Petitioner's second

15  degree murder within the applicable matrix guidelines. When

16  the Board engages in the fact finding process and makes a

17  determination that "public safety" exception of Cal. Penal

18  Code §3041 subd. (b) apples, they must consider all the unless

19  factors, such as only misconduct within the last six months.

20  See Greenholtz, 99 S.Ct. at 2109. Moreover, when those facts

21  are new disciplinary reports which the jury did not hear in

22  their deliberation finding, the crime committed by Petitioner

23  cannot be enhanced from second degree murder to first degree

24  murder. The Board Commissioners in this case have illegally

25  delegated themselves as a second jury and have effectively

26  changed Petitioner's parole hearing into a mini-trial and

27  have used the alleged misconduct evidence to render a new

28

4o

1    verdict in violation of the Sixth Amendment of the United States

2    Constitution.  Using the old prison misconduct facts which

3    the Board determines relevant removes the jury verdict process

4    and places Petitioner's second degree murder outside the

5    appropriate matrix guideline range thereby violating the Booker

6    jury trial requirements, recently reaffirmed in Cunningham.

7    Thus, under California Law, the fact - finding does impact

8    the right to a term under the appropriate sentencing matrix

9    guidelines.  This is clearly the type of delegated judicial

10   fact - finding "beyond a reasonable doubt" jury trial

11   requirement that Justice Scalia was addressing in Blakely,

12   which was found to contravene the right to a jury trial.

13   As such, the Board on May 10, 2007 deliberately refused to

14   set any matrix guideline range and in doing so set off

15   Petitioner's parole sentencing hearing for four (4) years,

16   which will force Petitioner to serve over 28 straight years

17   of incarceration without any added A-1-A prison credits, which

18   is absolutely beyond the minimum 10 year sentence set forth

19   in proposition 7 (1978) voters initiative for one count second

20   degree murder.  (See **People v. Duran** (1983) 140 Cal.App.3d

21   485, 503.)

22         The sole factors found by the Board Commissioners on

23   May 10, 2007 to set off the parole sentencing hearing process

24   under the matrix guidelines was 6 disciplinary reports for

25   violating the prison grooming standards in 2001, which occurred

26   before Petitioner's first parole hearing held on November

27   5, 2002, which was one of the factors used to set off the

28

4p

November 5, 2002 sentencing hearing for four (4) years. The older disciplinary report is from 1996, which is now 11 years old and was for sending a somewhat threatening letter to Petitioner's ex-wife. These disciplinary reports were fully discussed in the February 3, 2006 Correctional Psychological Report and are now fully discussed below.

D. Petitioner's May 10, ~~2007 parole~~ **GROUND FOUR** sentencing hearing was illegally set off for four (4) years based on old non-violent prison disciplinary reports, which violates the mandates set forth in the United States Supreme Court citation of **Greenholtz v. Inmates of the Nebraska Penal & Correctional Complex**, 442 U.S. 1, 99 S.Ct. 2100, 2109 (1979).

Petitioner maintains that the United States Supreme Court citation of Greenholtz, 99 S.Ct. at 2109 must be followed by California Board Commissioners during all liberty interest parole sentencing hearings under Cal. Penal Code §3041(b). Indeed this evidence is supportive of Petitioner's contention that he is a Nazarite Christian prisoner following his religious vow in accordance with the Holy Bible Numbers ch. 6, verse 5. The Board Commissioners on May 10, 2007 disregarded these factors and that another prisoner convicted of second degree murder who was denied parole for following his religious beliefs was later ordered to be released by the federal Eastern District Court. See **Saif'ullah v. Carey**, 2005 WL 1555389 (E.D.Cal.2005). **Also see Rosenkrantz v. Marshall**, 444 F.Supp.2d 1063, 1087 (C.D.Cal.2006), which quotes Saif'ullah as follows: "Saif'ullah, 2005 WL 1555389 at *13-16 (granting habeas relief where the record contained no evidence supporting the BPT's decision that petitioner was a danger

1  to society and unsuitable for parole based upon (a) his
2  commitment offense, (b) his prior criminal history, and (c)
3  a rules violation which resulted when, based upon his regilious
4  beliefs, petitioner refused to cut his hair)." Also the United
5  States Supreme Court set forth in **Cutter v. Wilkinson**, 125
6  S.Ct. 2113, 2117 (2005), that prisoners are allowed to practice
7  their individual religious beliefs in the institutional
8  setting.  The United States Supreme Court Cutter decision
9  reenforces the federal statutory provisions of Title 42 U.S.C.
10  §2000cc 1-7 (RLUIPA), which applys equally to all religions
11  throughout the United States.  The Ninth Circuit in 2005
12  reenforced these same religious rights for California State
13  Prisoners in the case of **Warsoldier v. Woodford**, 418 F.3d
14  1062 (9th Cir.2005).

15  Bottom line the BPH Commissioners on May 10, 2007 during
16  the late parole sentencing hearing had no legal right to use
17  Petitioner's disciplinary reports for violating the prison
18  grooming standards, when the Board Commissioners knew
19  Petitioner was following his vow of the Nazarite in accordance
20  with the Holy Bible Numbers ch. 6, verse 5.  In addition,
21  the Board Commissioners used an eleven (11) year old
22  disciplinary report where Petitioner was punished for writing
23  a somewhat threatening letter to his wife at that time, who
24  Petitioner divorced in February of 1997 for irreconcilable
25  differences.  Petitioner wrote this letter after he found
26  out that his supposed loving wife was actually a prostitute
27  and a drug addict.  Petitioner met this woman from another

28                          4r

1 prisoner and had no background knowledge of her drug and
2 promiscuity before he married her in 1990.  Petitioner has
3 had no further communications with his ex-wife and has been
4 with a new girlfriend for the last 7 years.  Petitioner is
5 happily engaged to marry this beautiful christian woman, who
6 does support my release back to the community.  (See Exhibit
7 "P" for reference to letter from Petitioner's fiance Shelley
8 Woods and other documents supporting parole after 24 straight
9 years.)

10      Moreover, several inmates with serious disciplinary
11 reports have recently been ordered released by the state and
12 federal courts.  See **Willis v. Kane,** 485 F.Supp.2d 1126 2007
13 WL 1232060 (N.D.Cal.) where second degree "baby" murderer
14 Willis was ordered released after he received a serious CDC-
15 115 for refusing to transfer to another prison yard and also
16 received three CDC-128s (i.e., counselling memoranda) Willis
17 at *7; **also see Martin v. Marshall**, 431 F.Supp.2d 1038, 1042
18 (N.D.Cal.2006) where inmate Martin was convicted of two murders
19 and one attempted murder and received twenty (20) serious
20 CDC-115 disciplinary reports, which included "possession of
21 drugs; weapons materials and gambling paraphernalia and that
22 inmate Martin was involved an a altercation with another inmate
23 who supposedly stabbed Martin. See Martin at p.1042.  However,
24 after Martin's Attorney filed a modification order, Martin
25 was ordered released; **see In re Elkins** (Cal.App.1 Dist.2006)
26 50 Cal.Rptr.3d 503, 508 where inmate Elkins was convicted
27 of first degree murder and robbery, for beating a man to death

28

1  with a baseball bat and dumping his body in the remote area

2  of Truckee, California. Inmate Elkins also received two

3  serious CDC-115 disciplinary report were he was charged with

4  force and violence. The state court ordered the Board to

5  release Elkins forthwith. Id. Elkins at 523; see **Sandra Davis**

6  **Lawrence**, [59] Cal.Rptr.3d [537], 2007 WL 1475283 (Cal.App.2 Dist.)

7  at *6 where first degree murder Lawrence received a CDC-115

8  for stealing excess food from the kitchen, however, the State

9  Court of Appeals ordered the Board to release Lawrence

10 forthwith. Id. Lawrence at *43; **and In re David Barker**,

11 Tuesday, May 29, 2007 DJDAR 7548, at pp. 7549-50 where inmate

12 Barker was convicted of three (3) murders two (2) second degree

13 murders and one first degree murder. Inmate Barker also

14 received six (6) CDC-115s, which consist of possessing 12

15 marijuana joints; having another inmate in his cell; possessing

16 contraband; manipulating staff; for smoking in bed; possession

17 of contraband (pornography, sugar, and a bottle of unidentified

18 "flammable liquid substance"); and the State Court of Appeals

19 ordered the Board to find Petitioner suitable for parole under

20 the current regulations. Id. at p. 7560.

21      Petitioner maintains that in accordance with Greenholtz,

22 99 S.Ct. at 2109 subsection (K)(1) that prison misconduct

23 which is within the last **six months should be considered during**

24 **the initial or subsequent protected liberty interest parole**

25 **hearing**. Therefore, the old immutable CDC-115s should not

26 be used by the Board Commissioners to refuse suitability

27 indefinitely.                              4t

28

## GROUND FIVE

E. The Board Commissioners denied parole for four (4) years stating that Petitioner needed more self-help and that he needed to get this self-help by reading some books in the prison library, but failed to state why Petitioner cannot attain this self-help by reading books in the prison library in one year and, therefore, have violated Petitioner's due process and "some evidence" rights set forth in **In re Lozano**, C.A.3 no. C051792, 2007 WL 117709.

Petitioner maintains that the Board Commissioners on May 10, 2007 during a "Court Ordered" late parole hearing denied parole for four more years after 24 years of incarceration. The principal reason for denying parole suitability for four (4) years was that Petitioner needed more self-help and after Petitioner ask the Board Commissioners where he was to obtain this self-help the Commissioner stated that Petitioner needed to visit the prison library and read some books. (Petitioner would have quoted the exact transcript page number where this was stated, however, Petitioner's transcripts have not arrived within the 30 day statutory required time limit under Cal. Penal Code §3042 et seq.).

In the recent State Appellate Court citation of **In re Lozano**, C.A.3 no. C051792, 2007 WL 117709, the Third Appellate District denied Fidel Jessie Lozano's claim that the BPH panel's grounds for unsuitability were supported by **no evidence** and also held that the panel's reasons for the 3-year deferral on his subsequent parole hearing denied due process and failed to satisfy the "some evidence" standard because the panel cited no evidence suggesting that Lozano could not be found parole suitable **in one year**. Id. Petitioner maintains that the ruling in Lozano supports his contention herein.

4u

<u>GROUND SIX</u>

F. Petitioner has been illegally resentenced to life in Prison.

1    Petitioner is currently serving a one count second degree

2   murder based on his 1983 arrest and jury conviction for one

3   count second degree murder. (See Exhibit "D" for reference

4   to Judgment of Commitment second degree murder.) Petitioner

5   was received by the California Department of Corrections

6   (heretoafter CDC&R) on February 21, 1989 and granted

7   presentence credits by the superior court as set forth on

8   page two of the Judgment of Commitment. Petitioner also served

9   an additional 997 days in the county jail before being

10   transferred to CDC&R to serve his sentence.

11    On May 10, 2007, Petitioner received a subsequent parole

12   hearing and was denied parole for four more years. (See

13   Exhibit "G" for reference to four (4) year denial.) Petitioner

14   maintains that he has now served 33 years with 1/3 credit

15   and has now served over the minimum for first degree murder.

16   Keeping Petitioner in prison for 33 years violates the

17   principles set forth in In re Weider (Cal.App. 6 Dist 2006)

18   52 Cal.Rptr.3d 147, 155, which states:

19        "The court noted that Weider "has served so much
          time that, with custody credits, he is within the
20        matrix for first degree murder . . . It should be
          self evident that after an inmate has served the
21        equivalent of 25 years, whether his actions were
          more than minimally necessary for second degree
22        conviction . . . is no longer the appropriate
          question. The Board position, that inmates who
23        were only convicted of second degree [murder] may
          forever be denied parole based on modicum of evidence
24        that their acts rose to the level of a first degree
          [murder], without acknowledging the fact that they
25        have already served the time [145 Cal.App.4th 583]
          for a first [degree murder], should be seen as so
26        ridiculous that simply to state it is to refute
          it." Id. at 155.

27                                4v

28

1    Petitioner absolutely maintains that he has served more

2    than enough time for this one count second degree murder and

3    that he has exceeded the time limits for this indeterminate

4    crime. As stated in U.S. v. Martin, 63 F.3d 1422, 1433 (7th

5    Cir.1995) we read: "Although the judge and not the jury

6    ultimately sentences the defendant, the judge may only impose

7    life imprisonment "if the jury so direct." If the jury does

8    not so direct, the sentence is limited to a term of years."

9    Also in Lynch v. U.S. Parole Com'n, 768 F.2d 491, 496 (2nd

10   Cir.1985), which states: "It has been held that the Commission

11   may not confine a prisoner beyond the applicable guideline

12   range is based upon the severity of the offense, because that

13   factor was used to select the guideline in the first place."

14   See also United States v. Nono-Para, 887 F.2d 1409, 1412 (9th

15   Cir.1989).

16   Petitioner asserts that he is now serving a sentence

17   beyond the guideline matrices for second degree murder and

18   that CDC&R officials and the BPH Commissioners have violated

19   his due process rights. Moreover, state officials are forcing

20   Petitioner to serve life in prison based on the multi-year

21   denial process. However, as stated in U.S. v. Paster, 173

22   F.3d 206, 218 (3rd Cir.1999) we read: "Yet the sentence levied

23   in this second degree murder case is equal to what would be

24   a heavy first degree murder sentence. This aspect of the

25   sentence here imposed gives us pause." The Paster case also

26   states: "Second degree murder has a base offense level 33,

27   produces an incarceration range of 135-168 months; the range

28                                 4w

1   drops to 108-135 months when the offense level is adjusted

2   two levels for acceptance of responsibility. Id at fn. 8 pg.

3   218.

4       Moreover, "the term "maximum" ordinarily means the upper

5   end of the range. Where a statute provides two tiers of

6   punishment, common sense dictates that the maximum must fall

7   at the high end of the two tiers. U.S. v. Fountain, 83 F.3d

8   946, 952 (8th Cir.1996); and U.S. v. Quinonez, 86 F.3d 382,

9   383 (5th Cir.1996) ("We begin by noting an indeterminate

10  sentence is defined as, "A sentence to imprisonment for the

11  maximum period defined by law, subject to termination . .

12  . at any time after service of the minimum period").

13      Indeed, the recent Ninth Circuit decision in IRONS v.

14  CAREY, (9th Cir. Mar. 6, 2007) 479 F.3d 658, Lexis 5198, at

15  *11 support Petitioner's contentions when the Court stated:

16  "We hope that the Board will come to recognize that in some

17  cases, indefinite detention based on an inmate's commitment

18  offense, regardless of the extent of his rehabilitation, will

19  at some point violate due process, given the liberty interest

20  in parole that flows from the relevant California statutes."

21  Id.  In addition the case of Jones v. Smith, 231 F.3d 1227,

22  1232-33 (9th Cir.2001) is supportive of Petitioner contentions

23  as follow: "Since the ruling in Apprendi, supra, the Court

24  has made it clear that any fact that increases the penalty

25  for a crime beyond a reasonable doubt, as set forth Apprendi,

26  expands the range of discrepancies that will amount to a

27  constructive amendment. Such a change is a constructive

28

                                4x

1  amendment and is prejudicial per se." Likewise, "we do note,

2  however, that principles of due process require an agency

3  to follow its own regulation, which have the force of law."

4  <u>Marshall v. Lansing</u>, 839 F.2d 933, 943 (3rd Cir.1988). See

5  Government Code §11342.2, all regulations must strictly follow

6  the enabling statute. California Penal Code §3041.5 states

7  suitability or term setting and does not state whether

8  Petitioner's second degree murder is under suitability or

9  term setting. However, if we are going to punish California

10  law breakers under the different degrees, we must not force

11  second degree murderers to serve life in prison when second

12  degree murder is the lesser included offense of first degree

13  murder. 1/

14                          CONCLUSION

15      Petitioner has presented ample evidence in support of

16  his arguments and, therefore, this Court must now enforce the

17  recent Sixth Appellate Court's In re Weider decision and that

18  Petitioner has now served 33 years with all his credits and

19  should be ordered released on parole forthwith.

20  Dated this 28 day of Oct., 2007.

21                          Respectfully Submitted,

22

23                          IVAN VON STAICH
                            Petitioner In Pro Per
24                          Without Bar Licensed Counsel

25  1/ See <u>IRONS v. WARDEN OF CALIFORNIA STATE PRISON-SOLANO</u>, (E.D.
    Cal. 2005) 358 F.Supp.2d 936, 951, "BPH should be ordered to
26  calculate petitioner's release date."

27

28

                            4y

8. Did you appeal from the conviction, sentence, or commitment? ☐ Yes. ☐ No.    If yes, give the following information:

   a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):

   b. Result: _____    c. Date of decision: _____

   d. Case number or citation of opinion, if known: _____

   e. Issues raised: (1) _____

      (2) _____

      (3) _____

   f. Were you represented by counsel on appeal? ☐ Yes. ☐ No.  If yes, state the attorney's name and address, if known:

      _____

9. Did you seek review in the California Supreme Court? ☐ Yes. ☐ No.  If yes, give the following information:

   a. Result: _____    b. Date of decision: _____

   c. Case number or citation of opinion, if known: _____

   d. Issues raised: (1) _____

      (2) _____

      (3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

                    NOT APPLICABLE.

11. Administrative Review:

    a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

       California Code of Regulations, Title 15 § 2050 sets forth criteria for appealing the Board of Prison Terms

       actions: "Any person under the board's jurisdiction may appeal any decision of the board which affects that

       person except the decision to schedule a hearing." There being no administrative remedy available to

       petitioner, this Court has jurisdiction to hear this case.

    b. Did you seek the highest level of administrative review available? ☒ Yes. ☐ No.
       *Attach documents that show you have exhausted your administrative remedies.*

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or issue in any court? ☐ Yes. If yes, continue with number 13. ☒ No. If no, skip to number 15.

13. a. (1) Name of court: _____

(2) Nature of proceeding (for example, "habeas corpus petition"): _____

(3) Issues raised: (a) _____

    (b) _____

(4) Result (Attach order or explain why unavailable): _____

(5) Date of decision: _____

b. (1) Name of court: _____

(2) Nature of proceeding: _____

(3) Issues raised: (a) _____

    (b) _____

(4) Result (Attach order or explain why unavailable): _____

(5) Date of decision: _____

c. For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

**None.**

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.)

**I have not delayed this filing and, therefore, this question is not relevant, with the exception that Petitioner has not received his BPH transcripts on time under Penal Code § 3042 (30 day rule).**

16. Are you presently represented by counsel? ☐ Yes. ☒ No. If yes, state the attorney's name and address, if known:

_____

_____

17. Do you have any petition, appeal, or other matter pending in any court? ☐ Yes. ☒ No. If yes, explain:

_____

_____

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

**This Honorable Superior Court holds jurisdiction over this May 10, 2007 Board hearing and this is the Court of original conviction.**

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: 10-28-07

▶ _Ivan Von Staich_ (SIGNATURE OF PETITIONER)

Ivan Von Staich, In Propria Persona

MC-275 [Rev. July 1, 2005]    PETITION FOR WRIT OF HABEAS CORPUS    Page six of six

# EXHIBIT 10

COURT OF APPEAL-4TH DIST DIV 3
FILED

NOV 0 8 2007

Deputy Clerk_____

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

In re IVAN VON STAICH

on Habeas Corpus.

G039495

(Super. Ct. No. M11506)

O R D E R

THE COURT:*

The petition for a writ of habeas corpus is DENIED.

SILLS, P.J.
_____
SILLS, P. J.

*  Before Sills, P. J., Aronson, J., and Fybel, J.

# EXHIBIT 11

FEDERAL  D STATE DUE PROCESS VIOLA  N

MC-275

Name     IVAN VON STAICH

Address  Central Training Facility

         Post Office Box 689

         Soledad, California 93960-0689

CDC or ID Number  E-10079  (C-Wing-137u)

**S158383**

RECEIVED
NOV 16 2007
FRK SUPREME COUR

SUPREME COURT
FILED
NOV 19 2007
Frederick K. Ohlrich Clerk
Deputy

### IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

(Court)

| IVAN VON STAICH, | PETITION FOR REVIEW |
|---|---|
| Petitioner | No. G039495 |
| vs. | (To be supplied by the Clerk of the Court) |
| Ben Curry, Warden, et al., | DUE PROCESS VIOLATION BY BPH COMMISSIONERS |
| Respondent | ON MAY 10, 2007, WHEN THEY FAILED TO GRANT |
| | PETITIONER DUAL CREDITS ON HIS ISL SECOND |
| INSTRUCTIONS | DEGREE . . . MURDER CONVICTION. |

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order. **See Exhibit "G" for May 9,10 BPH transcripts.**

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined. **See Exhibit "AA" for Fourth Appellate Court denial.**

- Read the entire petition *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rule 60 of the California Rules of Court [as amended effective January 1, 2005]. Subsequent amendments to Rule 60 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

### PETITION FOR REVIEW

**FEDERAL AND STATE DUE PROCESS VIOLATION**

Form Approved by the
Judicial Council of California
MC-275 [Rev. July 1, 2005]

Penal Code, § 1473 at seq.;
Cal. Rules of Court, rule 60[a];
American LegalNet, Inc.
www.USCourtForms.com

This petition concerns:

- [ ] A conviction
- [ ] A sentence
- [ ] Jail or prison conditions
- [x] Other (specify)

- [XX] Parole
- [XX] Credits
- [ ] Prison discipline

Resentenced to life in prison by BPH Commissioners on May 10, 2007, when Commissioners used the Commitment offense and immutable old CDC disciplinary reports to deny parole after 24 years. The sentencing Court granted dual credit on Petitioner's attempted murder and second degree murder, which the BPH Commissioners refused to grant towards the M2d sentence.

1. Your name:
   IVAN VON STAICH
2. Where are you incarcerated?  Level-II low security CTF-Soledad.

3. Why are you in custody?  [x] Criminal Conviction    [ ] Civil Commitment

   Answer subdivisions a. through i. to the best of your ability. See Exhibit "C" for May 9,10 transcripts.

   a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

   Petitioner is currently serving his one count (1983) second degree murder conviction. See In re Weider (2006) 52 Cal.Rptr.3d 147, 155.

   b. Penal or other code sections: Cal. Penal Code §§190, 2932(b). See People v. Rowland (1982) 134 Cal.App.3d 1, 12.

   c. Name and location of sentencing or committing court:
   Orange County Superior Court
   700 Civic Center Dr., West
   Santa Ana, Ca. 92702-2024

   d. Case number: C-53851.

   e. Date convicted or committed: Arrested Dec. 7, 1983; convicted Dec. 2, 1985.

   f. Date sentenced: May 30, 1986.

   g. Length of sentence: 15 years determinate with half time and 15 years indeterminate with 1/3 credit. See People v. Carpenter (1979) 99 Cal.App.3d 527, 535-36.

   h. When do you expect to be released? Never, BPH has resentenced Petitioner to life in prison...

   i. Were you represented by counsel in the trial court? [x] Yes.  [ ] No. If yes, state the attorney's name and address:

   Jack Earley, current address unknown.

4. What was the LAST plea you entered? (check one)

   [x] Not guilty  [ ] Guilty  [ ] Nolo Contendere  [ ] Other:

5. If you pleaded not guilty, what kind of trial did you have?

   [x] Jury  [ ] Judge without a jury  [ ] Submitted on transcript  [ ] Awaiting trial
   See Exhibits.

6.  GROUNDS FOR RELIEF
    Ground 1: State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

SEE ATTACHED PAGES

_____

_____

_____

a.  Supporting facts:
    Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: who did exactly what to violate your rights at what time *(when)* or place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

SEE ATTACHED PAGES.

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

b.  Supporting cases, rules, or other authority (optional):
    *(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

SEE ATTACHED PAGES.

_____

_____

_____

7. Ground 2 or Ground _____ (if applicable):

SEE ATTACHED PAGES

a. Supporting facts:

SEE ATTACHED PAGES

b. Supporting cases, rules, or other authority:

SEE ATTACHED PAGES

GROUNDS

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF GROUNDS PRESENTED

1

2   A. The Board Commissioners refused to accept Petitioner's Correctional
Psychological Report written by M. Macomber Ph.D., dated Feburary 3, 2006.
3   The Board Commissioners gave Petitioner's Confidential 2006 Psychological
Report to the Deputy District Attorney in violation of Cal. Penal Code
4   §1543(a)(1), who during the "Court Ordered" late hearing used the
Psychological Report as the sole basis for recommending denial of parole
5   and stated the 2006 Psych Report was written in error and the report was
nothing more then rubbish, and also suggested that his layman opinion in
6   Psychology should be accepted over the professional state licensed
Correctional Psychologist M. Macomber, Ph.D., which recommended Petitioner
7   be released on parole; and the end result from the May 10, 2007 parole
hearing was Petitioner being denied parole for four (4) years; and that
8   Petitioner must be given a new Psychological evaluation by the Board's
own personal Board Psychologist, which violates Petitioner's right to have
9   the 2006 Psych Report fairly considered by an impartial panel.

10      Petitioner absolutely maintains that his "Court Ordered"

11   late parole hearing held on May 10, 2007 was nothing more then

12   a pro forma predetermined retaliatory hearing, resulting in

13   a unsubstantiated four (4) year parole denial.   The Board

14   Commissioners completely failed to assess any weight  to the

15   State licensed Correctional Psychologist M. Macomber, Ph.D.,

16   and his report dated Feburary 3, 2006.  This report rendered

17   by Dr. Macomber was based upon 2 separate 2 hour-interviews

18   plus review of all the information in Petitioner's C-File and

19   separate medical file.  The evaluation was conducted due to

20   Petitioner filing a CDC 602 appeal, which after a thorough

21   review of all the evidence by the Senior Psychologist B. Zika,

22   Ph. D., it was ordered that Petitioner receive a NEW

23   Psychological Evaluation and based solely on these facts the

24   previously written report based on false information was

25   overruled, and the reevaluation by M. Macomber, Ph.D. was

26   conducted.  The ordered reevaluation involved extensive specify

27   testing within the functioning ranges set forth under the

28

4a

1 | Minnesota Multiphasic Personality Inventory test, which
2 | consisted of 500 question, multi-choice questionnaire.
3 |     Petitioner was also required to submit several written
4 | documents regarding all areas of his prison life and his future
5 | plans for release into the community. After M. Macomber
6 | evaluated all the evidence he rendered his psychological
7 | evaluation report dated February 3, 2006. However, during
8 | the May 10, 2007 late "Court Ordered" subsequent parole hearing
9 | the Board Commissioners totally disregarded this extensive
10 | psychologist report from this State licensed professional with
11 | nearly 40 years of prior experience and the Board stated that
12 | Petitioner needs a new Psych Report, which the Board
13 | Commissioners have expressed in a written document that
14 | improperly dictates exactly what the new board psychologist
15 | must write about when conducting the new evaluation report.
16 | The reason the Board Commissioners want a new Psych Report
17 | is because the previous mentioned report recommends Petitioner
18 | should be released. However, Petitioner maintains that
19 | allowing the Board Commissioners to order a new evaluation
20 | report conducted exclusively by their own psychologist is
21 | nothing more than a oligarchy and does violate the principles
22 | of due process during the administrative hearing process.
23 | The Board Commissioners sole purpose for ordering a new
24 | psychological evaluation is to obtaining an unfavorable report
25 | that can be used at Petitioner's next parole hearing to justify
26 | keeping Petitioner in prison for the rest of his life, thereby,
27 | changing Petitioner's jury verdict from second degree murder

28

1    to first degree murder special circumstances under Cal. Penal

2    Code §190.2., which violates the mandate set forth in the

3    United States Supreme Court decision of <u>Green v. United States</u>,

4    355 U.S. 184, 190 (1957); <u>also see</u> <u>Herron v. Straub</u>, 138

5    Fed.Appx. 753, 756 (6th Cir.2005) ("More specifically, the

6    Supreme Court has held that an implicit acquittal can be

7    determined by jury silence; when a jury is instructed to find

8    a defendant guilty of either first or second degree murder,

9    a defendant will be implicitly acquitted of first degree murder."

10    (Quoting Green).)

11       This action by the Board Commissioners was in the purist

12    form arbitrary and capricious which reveals a pattern by the

13    Board Commissioners who are ex-prosecutors to use the parole

14    hearing as a second trial where the inmate is now convicted

15    of first degree murder. The end result of the "Court Ordered"

16    late hearing was a four (4) year parole denial showing a

17    prepensed outcome. By the Board Commissioners refusal to

18    accept the 2006 extensively detailed Psychological Report

19    and the Commissioners ordering a new Psychological Report

20    by their own Psychologist is prejudicial per se and absolutely

21    violates Petitioner's due process right to a fair and impartial

22    parole hearing. The Commissioners have set forth a written

23    document alluding to precisely what areas in Petitioner's

24    C-file their own Board appointed Psychologist must consider.

25    The current Board Commissioners tyrannical power is endless.

26    (See Exhibit "A" for reference to Board document dated May

27    10, 2007). Petitioner asserts the Board Commissioners are

28                           4c

1  effectively controling the evaluation outcome process.  This
2  extramural action shows beyond a shadow of a doubt that
3  Petitioner's "Court Ordered" late hearing was nothing more
4  then a sham.

5      This incongruous action does not comport with
6  Petitioner's federal liberty interest due process requirements
7  exspoused in the United States Supreme Court decision of
8  Greenholtz v. Inmates of Nebraska Penal and Correctional
9  Complex, 442 U.S. 1, 12 (1979). See In re SANDRA DAVIS
10  LAWRENCE (2007) 59 Cal.Rptr.3d 537, 2007 WL 1475283 (Cal.App.
11  2 Dist.) at page 16: "Two United States Supreme Court decisions
12  Greenholtz v. Inmate of Nebraska Penal and Correctional Complex
13  decided in 1979 and Board of Pardons v. Allen decided in 1987,
14  held the federal due process clause creates a constitutional
15  liberty interest for convicted persons in certain juridictions.
16  The existence of this right depends on whether the state
17  employs "mandatory language" indicating parole will be granted
18  if certain findings are made.  In 2002, the Ninth Circuit
19  examined the California parole scheme in McQuillion v. Duncan,
20  306 F.3d 895, 901-903 and found it "uses mandatory language
21  and is largely parallel to the schemes found in Greenholtz
22  and Allen."  Accordingly, the McQuillion court found a "liberty
23  interest" was created under the federal Constitution for state
24  prisoners in California." Id. Lawrence (2007).

25      When the Board Commissioners refused to accept the
26  professional findings of state Correctional Psychologist
27  Macomber  and decided to side with the Deputy District Attorney
28

4d

1  who extensively argued against the 2006 Psych Report, they
2  violated several areas of state and federal statutory law.
3  First, the Board Commissioners gave Petitioner's 2006
4  Psychological Report to the "Deputy District Attorney" from
5  Orange County without any State statutory authorization under
6  the California Penal Code, Evidence Code, Bus. & Profession
7  Code, Welfare & Institutional Code or the State Government
8  Code. The Board Commissioners had no legal right to turnover
9  Petitioner's 2006 Psychological Report to the Deputy District
10 Attorney, but did so anyway. Cal. Penal Code §1543(a)(1)
11 requires: "Records of the identity, diagnosis, prognosis,
12 or ... treatment of any patient maintained by the health care
13 facility which are not privileged records required to be
14 secured by the special master procedure in §1524, or records
15 required by law enforcement agencies pursuant to this section:
16 (1) In accordance <u>with the prior written consent of the</u>
17 <u>patient</u>. (In relevant part, emphasis added.)

18      The California Orange County Deputy District Attorney
19 is part of law enforcement and needed my concent before
20 obtaining my 2006 Psychological Report and, therefore, the
21 Board Commissioners had no legal authority to override Cal.
22 Penal Code §1543(a)(1), which they have deliberately done
23 in this case. Furthermore, Petitioner's 2006 Psychological
24 Report was secured in Petitioner's medical file. Obviously
25 the Board Commissioners are authorized to review Petitioner's
26 2006 Psychological Report, however, the Deputy District
27 Attorney is not a Board Commissioner and should have never

28                              4e

1   seem Petitioner's 2006 Psychological Report. Moreover, the
2   Deputy District Attorney is not a licensed Psychologist and
3   had no professional background in Psychology to analyze the
4   2006 Psychological Report and by the Board Commissioners
5   allowing him to do so during the May 10, 2007 parole hearing
6   violates well-established principles set forth in Packer v.
7   Board of Medical Examiners (1974) 112 Cal.Rptr. 76, 80 "The
8   purpose of the Psychology Licensing Law (Bus. & Prof. Code
9   §§2900-2996.9), as declared by the Legislature, is "to protect
10  the public from the unauthorized and unqualified practice
11  of psychology." Id.

12      Furthermore, the Deputy District Attorney or the Board
13  Commissioners are not Licensed Psychologist and had no legal
14  authority to override the 2006 Psychological Report written
15  by M. Macomber Ph.D. Correctional Psychologist or the authority
16  to disregard the professional opinion for that of their own.
17  See Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir.1998) ("The
18  Commissioner is encouraged to give more weight to the opinion
19  of a specialist about medical issues related to his or her
20  area of specialty than to the opinion of a source who is not
21  a specialist") citing Metz v. Shalala, 49 F.3d 374, 377 (8th
22  Cir.1995). Also the treating physician rule, is codified
23  at 20 C.F.R. §404.1527(d)(2), and is widely accepted. See
24  Mason v. Shalala, 994 F.2d 1058 (3d Cir.1993). These federal
25  regulations have been applied to state actions which address
26  the weight to be given a treating source's opinion on the
27  issue(s) and when there is no other substantial evidence in
28

4f

1  the case, the court will give it controlling weight. 20 C.F.R.
2  §416.927(d)(2).    The    judge    [in    this    case    the    Board
3  Commissioners and the Deputy District Attorney] may not make
4  "speculative inferences from medical reports and may only
5  disregard a medical opinion based on **substantial** contradictory
6  evidence and may not due to his own credibility judgments,
7  speculation or lay opinion." **Morales v. Apfel**, 225 F.3d 310,
8  317 (3rd Cir. 2000).

9      Furthermore, this is not the first time the Board
10  Commissioners refused to follow the recommandations of the
11  Correctional Psychologist, as set forth in the recent case
12  of **In re DAVID BARKER**, May 29, 2007 DJDAR 7548, at 7555 we
13  read: "More on point is Dr. Glines assessment in her September
14  15, 2005 report, which could not be clearer: "[t]here are
15  no therapeutic recommendations at this time." And, as noted,
16  she concluded that the risk Barker would commit another violent
17  crime is low"; see also **In re BERNARD JOHN WEIDER**, December
18  6, 2006 DJDAR 15795, at page 15798 "The "Life Prisoner
19  Evaluation Report," dated May 2004, concluded that Weider
20  had satisfactory post-release plans and a circle of family
21  and friends outside of prison for support. The report stated
22  that the seriousness of the crime could not be over emphasized.
23  "Today, however, Weider appears to be a low risk to society
24  if he were released from prison."

25      However, in both Barker and Weider the Board Commissioners
26  refused to follow the Correctional Psychologist findings in
27  the reports which stated that the inmate would not pose a
28

4g

1   threat to the community and that the inmate should be released.

2   In both cases the state appellate courts reversed the Board's

3   denial of parole and ordered the Board Commissioners to grant

4   a parole date.  Likewise, in the recent federal district court

5   case of Willis v. Kane, ___ F.Supp.2d___, April 26, 2007 WL

6   1232060 (N.D.Cal.) at page *5 we read: "In light of the

7   favorable psychological reports and the absence of any mention

8   therein of a need for further self-help or therapy programming,

9   there was not some evidence to support the BPH's determination

10  that Willis had not sufficiently participated in beneficial

11  self-help and therapy programming."  In the Willis case the

12  federal court ordered the BPH to set a parole date within

13  30 days. Id. at page *8. (See Exhibit "B" for reference to

14  Petitioner's 2006 Psychological Report.)

15     Bottom line, the Board Commissioners retaliated against

16  Petitioner because he file a habeas corpus in this Court

17  forcing the Board to hold a late hearing.  However, during

18  that hearing the Deputy District Attorney was allowed to

19  extensively argue against Petitioner's favorable Psychological

20  evaluation, when Petitioner did not consent or authorize the

21  Deputy District Attorney to have a copy of his confidential

22  Psychological examination dated Feburary 3, 2006 and,

23  therefore, the Deputy District Attorney had no just cause

24  to argue against this favorable report. Furthermore, by giving

25  the Deputy District Attorney this medical report positively

26  violates the confidential medical information requirements

27  set forth in Cal. Penal Code §1543(a)(1).  See Burkert v.

28

1   Equitable Life Assur. Soc. of America, 287 F.3d 293, 299 (3rd
2   Cir.2003).    The end result was Petitioner received a four
3   year denial without just cause, Petitioner has now served
4   nearly 24 straight years and with all presentence and post-
5   sentence "Court Ordered" credits applied, total credits add
6   up to over 33 years in prison for the one count second degree
7   murder.    Petitioner absolutely maintains that his May 10,
8   2007 "Court Ordered" late parole hearing was nothing more
9   then a sham and did violate Petitioner's due process rights
10  to a fair and impartial hearing and does violate the arbitrary
11  and capricious standard set forth in Superintendent v. Hill,
12  472 U.S. 445, 455-56 (1985).    As stated in Sass v. California
13  Board of Prison Terms, 461 F.3d 1123 (9th Cir.2006) ("The
14  'Some Evidence' standard is minimal, and assures that the
15  record is not so devoid of evidence that the fidings of the
16  . . . board were without support or otherwise arbitrary."
17  Id. at 1129 (quoting Superintendent v. Hill, 472 U.S. at 457).
18  (See Exhibit "C" for reference to four year denial).
19      In addition, as stated in In re Lawrence, supra, 59
20  Cal.Rptr.3d at 543 ("The rationale for these findings gave
21  primary credence to the earlier psychological reports and
22  tests reflecting various psychological disorders as opposed
23  to the more recent reports finding no current evidence Lawrence
24  still was subject to those problems.")    As in Lawrence
25  Petitioner was dissatisfied with the earlier written 2002
26  psychological report based on unsupported evidence and filed
27  his appeal, which was granted by the Senior Psychologist.
28                              4i

## GROUND TWO

**B.** Petitioner was denied dual "Court Ordered" credit by the BPH, Commissioners during his recent May 10, 2007 parole sentencing hearing.

Petitioner, Ivan Von Staich, hereby notifies this Honorable Superior Court, that on May 30, 1986 during his sentencing hearing the Court granted dual presentence credits on both counts, which is fully reflected on page 2, Judgment of Commitment. Petitioner was granted 1097 days of presentence credit on his one count second degree murder sentence. (See Exhibit "D" for reference to Judgment of Commitment, page 2.) Petitioner maintains that in addition to the 1097 days of presentence credit he served 997 actual days in the Orange County Jail before he was transferred to Chino State Prison on Febuary 21, 1989. This post-sentence credit must also be applied to Petitioner's one count second degree murder. However, during the May 10, 2007 parole hearing the BPH Commissioners refused to apply this dual "Court Ordered" credit to Petitioner's indeterminate term. (See Exhibit "E" for reference to 997 days served in the Orange County Jail.)

Petitioner argues that dual credit is authorized under Cal. Penal Code §2900.5 (b) and that the sentencing Court on May 30, 1986 was following the statutory law when the Court granted Petitioner 1097 days of presentence credit on his separately calculated indeterminate second degree murder sentence in accordance with Cal. Rules of Court, Rule 451(a)(1983). Furthermore, dual credit is warranted when

4j

1   the defendant seeks credit which is attributable to the same
2   conduct which is the basis of the criminal conviction. In
3   this case Petitioner was convicted of second degree murder
4   and attempted murder, when the two crimes occurred within
5   seconds of each other and are the sole basis for Petitioner's
6   incarceration.

7       As stated in **People v. Rutledge** (1983) 88 Cal.Rptr. 846,
8   849 we read: "The prerequisite for dual credit is that the
9   custody must relate to both matters. Time served on a sentence
10  in one case while awaiting trial on [139 Cal.App.3d 626]
11  another [case] cannot be the basis for dual credit. Time
12  spent in custody prior to commencement of sentence is credited
13  only where the custody is attributable to proceedings relating
14  to the same conduct for which the defendant has been
15  convicted." (Quoting In re Rojas (1979) 23 Cal.3d 152, 155-
16  157, 151 Cal.Rptr. 649.)

17      Indeed the sentencing judge was right to grant Petitioner
18  dual credit on his two crimes which occurred within seconds
19  of each other. In accordance with **People v. Brown** (1980)
20  166 Cal.Rptr. 144, 148, "Penal Code section 2900.5 requires
21  credit against the San Bernardino sentence only where the
22  Los Angeles custody is attributable to San Bernardino
23  proceedings. We are satisfied that the statute requires a
24  relationship between the custody and the proceedings in which
25  credit is sought"; **also see In re Jordan** (1975) 50 Cal.App.3d
26  155, 157-58 ("The dual status of the act may be said to provide
27  the required "reasonable relationship" which would permit

28                          **4k**

1    [dual] presence credits"); and In re Smith (1978) 146

2    Cal.Rptr. 304, 306 ("It seems obvious to us that in this case

3    Smith's custody in the Los Angeles county jail was on a dual

4    basis and that one of the two bases qualified under the

5    aforementioned Penal Code section 2900.5, subdivision (b).

6    As our Supreme Court stated in In re Watson (1977) 19 Cal.3d

7    646, 651, 131 Cal.Rptr. 609, 612, 566 P.2d 243, 246, the

8    crucial element of the statute is not where or under what

9    conditions the defendant has been deprived of his liberty

10   but rather whether the custody to which he has been subjected

11   is attributable to the charges arising from the same criminal

12   [181 Cal.App.3d 328] act or acts for which the defendant has

13   been convicted. ([Penal Code §] 2900.5, subd. (b).) We believe

14   that Smith's custody was in part so attributed.")

15       Petitioner maintains that on May 10, 2007 the BPH

16   Commissioners refused to consider any of Petitioner's

17   presence credits on his one count second degree murder

18   conviction and, therefore, did violate his due process right

19   to have this presence credit applied to his one count second

20   degree murder sentence.

                         GROUND THREE

21   C.  The BPH Commissioners have effectively resentenced Petitioner
         to life in prison for his one count second degree murder
22       when they refused to calculate his minimum sentence under
         the matrix guidelines for second degree murder and this
23       refusal to act was unreasonable under United v. Booker,
         543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005)
24       considering Petitioner has now served nearly 24 straight
         years.

25

26       The Supreme Court extended the holding of Blakely v.

27   Washington, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403

28                              41

1    (2004), to the Federal Sentencing Guidelines, concluding that

2    the Sixth Amendment requires that "[a]ny fact (other than

3    a prior conviction) which is necessary to support a sentence

4    exceeding the maximum authorized by the facts established

5    by a plea of guilty or jury verdict must be admitted by the

6    defendant or proved to a jury beyond a reasonable doubt."

7    Booker at p. 243-244.  Petitioner has not yet had his sentence

8    calculated by the BPH Commissioners and, therefore, the Supreme

9    Court decision in Booker which mandates sentencing review

10   for reasonableness based on factors used to extend or enhance

11   a prisoner punishment for the set degree of the crime

12   committed, would apply in this case. See Booker at 261.  As

13   stated in **U.S. v. Maese**, 146 Fed.Appx. 276, 279 (10th Cir.2005)

14   we read: "However, both before and after Booker, the degree

15   of departure from the applicable guidelines range is reviewed

16   for reasonableness." Likewise in **U.S. v. Carlton**, 442 F.3d

17   802, 809 (2nd Cir.2006) we read: "Such proceeding arise after

18   the end of the criminal prosecution, **including the imposition**

19   **of sentence** . . . . Revocation deprives an individual, not of

20   the absolute liberty to which every citizen is entitled, but

21   only of the conditional liberty properly dependent on

22   observence of special parole restriction," Gagnon, 411 U.S.

23   at 781, 93 S.Ct. 1756 (quoting Morrissey, 408 U.S. 480, 92

24   S.Ct. 2593); **see also** Knights, 534 U.S. at 119, 122 S.Ct.

25   587.) (Emphasis added.)

26       Petitioner has not been sentenced yet by the BPH

27   Commissioners and, therefore, is entitled to the full canopy

28                                    4m

of sentencing due process federal constitutional rights set forth in Booker and the recent United States Supreme Court case of **Cunningham v. California**, 127 S.Ct. 856, 857-859 (2007), which ~~reaffirmed~~ those rights to apply in California ~~prisoner's~~ cases that have not had their sentence calculated. These constitutional rights are applicable to Petitioner's May 10, 2007 parole sentencing hearing where the Commissioners relied on the alleged factors from old prison non-violent misconduct to extend Petitioner's parole sentencing hearing for four more years. Petitioner's jury did not hear the prison misconduct violations under the reasonable doubt standard and, therefore, the BPH Commissioners had no legal right to enhance Petitioner's sentence to first degree murder punishments based on this evidence. The Board Commissioners refused to set any minimum matrix guidelines to the second degree murder crime for four (4) more years, thereby forcing Petitioner to serve an illegal first degree murder sentence.

We must now review the legal landscape in California regarding undetermined sentences. The California Supreme Court in **In re Roberts** (2005) 36 Cal.4th 575, 589-590, ruled that parole is an integral part of the overall process of sentencing. (See **also In re Sena** (2002) 94 Cal.App.4th 836, at 839. Under California Law, the sentencing process is not complete until the term is set and the inmate released. Roberts, supra, 36 Cal.4th at 589-590; Sena, supra, 94 Cal.App.4th at 839.) As such, the Board is an entity that wears two (2) hats, serving as part of the executive branch,

4n

1 but discharging certain judicial functions as an extension

2 of the sentencing process. This was precisely the conclusion

3 of the court of appeal in the case of **In re Hogan** (1986) 187

4 Cal.App.3d 819, 824 ["Board, in setting a release date for

5 an indeterminate sentence, performs the same function as does

6 the trial court in ordering a determinate sentence — it fixes

7 a term of definite duration."] See **also People v. Enriquez**

8 (1977) 137 Cal.Rptr. 171, 177 (The Superior Court has delegated

9 its responsibility of sentencing to the Board Commissioners.)

10     The effect of these cases is to hold that the Board is

11 still discharging part of the sentencing function, acting

12 in the place of the trial court in determining minimum parole

13 date guideline setting. This required duty leaves the BPH

14 Commissioners no room for refusal to set Petitioner's second

15 degree murder within the applicable matrix guidelines. When

16 the Board engages in the fact finding process and makes a

17 determination that "public safety" exception of Cal. Penal

18 Code §3041 subd. (b) applies, they must consider all the unless

19 factors, such as only misconduct within the last six months.

20 See Greenholtz, 99 S.Ct. at 2109. Moreover, when those facts

21 are new disciplinary reports which the jury did not hear in

22 their deliberation finding, the crime committed by Petitioner

23 cannot be enhanced from second degree murder to first degree

24 murder. The Board Commissioners in this case have illegally

25 delegated themselves as a second jury and have effectively

26 changed Petitioner's parole hearing into a mini-trial and

27 have used the alleged misconduct evidence to render a new

28

1  verdict in violation of the Sixth Amendment of the United States

2  Constitution.  Using the old prison misconduct facts which

3  the Board determines relevant removes the jury verdict process

4  and places Petitioner's second degree murder outside the

5  appropriate matrix guideline range thereby violating the Booker

6  jury trial requirements, recently reaffirmed in Cunningham.

7  Thus, under California Law, the fact - finding does impact

8  the right to a term under the appropriate sentencing matrix

9  guidelines.  This is clearly the type of delegated judicial

10  fact - finding "beyond a reasonable doubt" jury trial

11  requirement that Justice Scalia was addressing in Blakely,

12  which was found to contravene the right to a jury trial.

13  As such, the Board on May 10, 2007 deliberately refused to

14  set any matrix guideline range and in doing so set off

15  Petitioner's parole sentencing hearing for four (4) years,

16  which will force Petitioner to serve over 28 straight years

17  of incarceration without any added A-1-A prison credits, which

18  is absolutely beyond the minimum 10 year sentence set forth

19  in proposition 7 (1978) voters initiative for one count second

20  degree murder. (See **People v. Duran** (1983) 140 Cal.App.3d

21  485, 503.)

22    The sole factors found by the Board Commissioners on

23  May 10, 2007 to set off the parole sentencing hearing process

24  under the matrix guidelines was 6 disciplinary reports for

25  violating the prison grooming standards in 2001, which occurred

26  before Petitioner's first parole hearing held on November

27  5, 2002, which was one of the factors used to set off the

28

1  November 5, 2002 sentencing hearing for four (4) years. The

2  older disciplinary report is from 1996, which is now 11 years

3  old and was for sending a somewhat threatening letter to

4  Petitioner's ex-wife. These disciplinary reports were fully

5  discussed in the February 3, 2006 Correctional Psychological

6  Report and are now fully discussed below.

**GROUND FOUR**

7  D. Petitioner's May 10, 2007 parole sentencing hearing was

   illegally set off for four (4) years based on old non-violent

8  prison disciplinary reports, which violates the mandates set

   forth in the United States Supreme Court citation of **Greenholtz**

9  **v. Inmates of the Nebraska Penal & Correctional Complex**, 442

   U.S. 1, 99 S.Ct. 2100, 2109 (1979).

10

11  Petitioner maintains that the United States Supreme Court

12  citation of Greenholtz, 99 S.Ct. at 2109 must be followed

13  by California Board Commissioners during all liberty interest

14  parole sentencing hearings under Cal. Penal Code §3041(b).

15  Indeed this evidence is supportive of Petitioner's contention

16  that he is a Nazarite Christian prisoner following his

17  religious vow in accordance with the Holy Bible Numbers ch.

18  6, verse 5. The Board Commissioners on May 10, 2007

19  disregarded these factors and that another prisoner convicted

20  of second degree murder who was denied parole for following

21  his religious beliefs was later ordered to be released by

22  the federal Eastern District Court. See **Saif'ullah v. Carey**,

23  2005 WL 1555389 (E.D.Cal.2005). **Also see Rosenkrantz v.**

24  **Marshall**, 444 F.Supp.2d 1063, 1087 (C.D.Cal.2006), which quotes

25  Saif'ullah as follows: "Saif'ullah, 2005 WL 1555389 at *13-16

26  (granting habeas relief where the record contained no evidence

27  supporting the BPT's decision that petitioner was a danger

28

4q

1  to society and unsuitable for parole based upon (a) his

2  commitment offense, (b) his prior criminal history, and (c)

3  a rules violation which resulted when, based upon his regilious

4  beliefs, petitioner refused to cut his hair)." Also the United

5  States Supreme Court set forth in **Cutter v. Wilkinson**, 125

6  S.Ct. 2113, 2117 (2005), that prisoners are allowed to practice

7  their individual religious beliefs in the institutional

8  setting.  The United States Supreme Court Cutter decision

9  reenforces the federal statutory provisions of Title 42 U.S.C.

10  §2000cc 1-7 (RLUIPA), which applys equally to all religions

11  throughout the United States.  The Ninth Circuit in 2005

12  reenforced these same religious rights for California State

13  Prisoners in the case of **Warsoldier v. Woodford**, 418 F.3d

14  1062 (9th Cir.2005).

15      Bottom line the BPH Commissioners on May 10, 2007 during

16  the late parole sentencing hearing had no legal right to use

17  Petitioner's disciplinary reports for violating the prison

18  grooming standards, when the Board Commissioners knew

19  Petitioner was following his vow of the Nazarite in accordance

20  with the Holy Bible Numbers ch. 6, verse 5.  In addition,

21  the Board Commissioners used an eleven (11) year old

22  disciplinary report where Petitioner was punished for writing

23  a somewhat threatening letter to his wife at that time, who

24  Petitioner divorced in February of 1997 for irreconcilable

25  differences.  Petitioner wrote this letter after he found

26  out that his supposed loving wife was actually a prostitute

27  and a drug addict. Petitioner met this woman from another

28

4r

prisoner and had no background knowledge of her drug and
promiscuity before he married her in 1990. Petitioner has
had no further communications with his ex-wife and has been
with a new girlfriend for the last 7 years. Petitioner is
happily engaged to marry this beautiful christian woman, who
does support my release back to the community. (See Exhibit
"F" for reference to letter from Petitioner's fiance Shelley
Woods and other documents supporting parole after 24 straight
years.)

Moreover, several inmates with serious disciplinary
reports have recently been ordered released by the state and
federal courts. See Willis v. Kane, 485 F.Supp.2d 1126, 2007
WL 1232060 (N.D.Cal.) where second degree "baby" murderer
Willis was ordered released after he received a serious CDC-
115 for refusing to transfer to another prison yard and also
received three CDC-128s (i.e., counselling memoranda) Willis
at *7; also see Martin v. Marshall, 431 F.Supp.2d 1038, 1042
(N.D.Cal.2006) where inmate Martin was convicted of two murders
and one attempted murder and received twenty (20) serious
CDC-115 disciplinary reports, which included "possession of
drugs; weapons materials and gambling paraphernalia and that
inmate Martin was involved an a altercation with another inmate
who supposedly stabbed Martin. See Martin at p.1042. However,
after Martin's Attorney filed a modification order, Martin
was ordered released; see In re Elkins (Cal.App.1 Dist.2006)
50 Cal.Rptr.3d 503, 508 where inmate Elkins was convicted
of first degree murder and robbery, for beating a man to death

1  with a baseball bat and dumping his body in the remote area
2  of Truckee, California.     Inmate Elkins also received two
3  serious CDC-115 disciplinary report were he was charged with
4  force and violence.     The state court ordered the Board to
5  release Elkins forthwith. Id. Elkins at 523; see **Sandra Davis**
6  **Lawrence**, [59] Cal.Rptr.3d [537], 2007 WL 1475283 (Cal.App.2 Dist.)
7  at *6 where first degree murder Lawrence received a CDC-115
8  for stealing excess food from the kitchen, however, the State
9  Court of Appeals ordered the Board to release Lawrence
10 forthwith.  Id. Lawrence at *43; **and In re David Barker**,
11 Tuesday, May 29, 2007 DJDAR 7548, at pp. 754950 where inmate
12 Barker was convicted of three (3) murders two (2) second degree
13 murders and one first degree murder.     Inmate Barker also
14 received six (6) CDC-115s, which consist of possessing 12
15 marijuana joints; having another inmate in his cell; possessing
16 contraband; manipulating staff; for smoking in bed; possession
17 of contraband (pornography, sugar, and a bottle of unidentified
18 "flammable liquid substance"); and the State Court of Appeals
19 ordered the Board to find Petitioner suitable for parole under
20 the current regulations. Id. at p. 7560.
21       Petitioner maintains that in accordance with Greenholtz,
22 99 S.Ct. at 2109 subsection (K)(1) that prison misconduct
23 which is within the last **six months should be considered during**
24 **the initial or subsequent protected liberty interest parole**
25 **hearing.**     Therefore, the old immutable CDC-115s should not
26 be used by the Board Commissioners to refuse suitability
27 indefinitely.                         4t
28

## GROUND FIVE

1   E. The Board Commissioners denied parole for four (4) years
2 stating that Petitioner needed more self-help and that he
  needed to get this self-help by reading some books in the
3 prison library, but failed to state why Petitioner cannot
  attain this self-help by reading books in the prison library
4 in one year and, therefore, have violated Petitioner's due
  process and "some evidence" rights set forth in **In re Lozano**,
5 C.A.3 no. C051792, 2007 WL 117709, also the 4 year denial . . .
  violates the Ex Post Facto Clause under **Brown v. Palmateer**, 379
6 F.3d 1089, 1094-95 (9th Cir.2004).

     Petitioner maintains that the Board Commissioners on

7 May 10, 2007 during a "Court Ordered" late parole hearing

8 denied parole for four more years after 24 years of

9 incarceration. The principal reason for denying parole

10 suitability for four (4) years was that Petitioner needed

11 more self-help and after Petitioner ask the Board Commissioners

12 where he was to obtain this self-help the Commissioner stated

13 that Petitioner needed to visit the prison library and read

14 some books. (Petitioner would have quoted the exact transcript

15 page number where this was stated, however, Petitioner's

16 transcripts have not arrived within the 30 day statutory

17 required time limit under Cal. Penal Code §3042 et seq.).

18     In the recent State Appellate Court citation of **In re**

19 **Lozano**, C.A.3 no. C051792, 2007 WL 117709, the Third Appellate

20 District denied Fidel Jessie Lozano's claim that the BPH

21 panel's grounds for unsuitability were supported by **no evidence**

22 and also held that the panel's reasons for the 3-year deferral

23 on his subsequent parole hearing denied due process and failed

24 to satisfy the "some evidence" standard because the panel

25 cited no evidence suggesting that Lozano could not be found

26 parole suitable **in one year**. Id. Petitioner maintains that

27 the ruling in Lozano supports his contention herein. Also, the

28 denial violates the Ex Post Facto Clause under Brown, 379 F.3d
  at 1094-95.[1/]                       4u.

---

[1/] The 4 year denial violates the law in effect when Petitioner was arrested, as stated in **In re Jackson** (1985) 39 Cal.3d 469, fn. 4, one year denials for single murder.

## GROUND SIX

F.  Petitioner has been illegally resentenced to life in Prison.

Petitioner is currently serving a one count second degree murder based on his 1983 arrest and jury conviction for one count second degree murder. (See Exhibit "D" for reference to Judgment of Commitment second degree murder.)  Petitioner was received by the California Department of Corrections (heretoafter CDC&R) on February 21, 1989 and granted presentence credits by the superior court as set forth on page two of the Judgment of Commitment.  Petitioner also served an additional 997 days in the county jail before being transferred to CDC&R to serve his sentence.

On May 10, 2007, Petitioner received a subsequent parole hearing and was denied parole for four more years. (See Exhibit "G" for reference to four (4) year denial.)  Petitioner maintains that he has now served <u>33</u> years with 1/3 credit and has now served over the minimum for first degree murder. Keeping Petitioner in prison for <u>33</u> years violates the principles set forth in <u>In re Weider</u> (Cal.App. 6 Dist 2006) 52 Cal.Rptr.3d 147, 155,  which states:

> "The court noted that Weider "has served so much time that, with custody credits, he is within the matrix for first degree murder . . . It should be self evident that after an inmate has served the equivalent of 25 years, whether his actions were more than minimally necessary for second degree conviction . . . is no longer the appropriate question.  The Board position, that inmates who were only convicted of second degree [murder] may forever be denied parole based on modicum of evidence that their acts rose to the level of a first degree [murder], without acknowledging the fact that they have already served the time [145 Cal.App.4th 583] for a first [degree murder], should be seen as so ridiculous that simply to state it is to refute it." Id. at 155.

Petitioner absolutely maintains that he has served more than enough time for this one count second degree murder and that he has exceeded the time limits for this indeterminate crime. As stated in U.S. v. Martin, 63 F.3d 1422, 1433 (7th Cir.1995) we read: "Although the judge and not the jury ultimately sentences the defendant, the judge may only impose life imprisonment "if the jury so direct." If the jury does not so direct, the sentence is limited to a term of years." Also in Lynch v. U.S. Parole Com'n, 768 F.2d 491, 496 (2nd Cir.1985), which states: "It has been held that the Commission may not confine a prisoner beyond the applicable guideline range is based upon the severity of the offense, because that factor was used to select the guideline in the first place." See also United States v. Nono-Para, 887 F.2d 1409, 1412 (9th Cir.1989).

Petitioner asserts that he is now serving a sentence beyond the guideline matrices for second degree murder and that CDC&R officials and the BPH Commissioners have violated his due process rights. Moreover, state officials are forcing Petitioner to serve life in prison based on the multi-year denial process. However, as stated in U.S. v. Paster, 173 F.3d 206, 218 (3rd Cir.1999) we read: "Yet the sentence levied in this second degree murder case is equal to what would be a heavy first degree murder sentence. This aspect of the sentence here imposed gives us pause." The Paster case also states: "Second degree murder has a base offense level 33, produces an incarceration range of 135-168 months; the range

4w

drops to 108-135 months when the offense level is adjusted two levels for acceptance of responsibility. Id at fn. 8 pg. 218.

Moreover, "the term "maximum" ordinarily means the upper end of the range. Where a statute provides two tiers of punishment, common sense dictates that the maximum must fall at the high end of the two tiers. U.S. v. Fountain, 83 F.3d 946, 952 (8th Cir.1996); and U.S. v. Quinonez, 86 F.3d 382, 383 (5th Cir.1996) ("We begin by noting an indeterminate sentence is defined as, "A sentence to imprisonment for the maximum period defined by law, subject to termination . . . at any time after service of the minimum period").

Indeed, the recent Ninth Circuit decision in IRONS v. CAREY, (9th Cir. Mar. 6, 2007) 479 F.3d 658, Lexis 5198, at *11 support Petitioner's contentions when the Court stated: "We hope that the Board will come to recognize that in some cases, indefinite detention based on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from the relevant California statutes." Id. In addition the case of Jones v. Smith, 231 F.3d 1227, 1232-33 (9th Cir.2001) is supportive of Petitioner contentions as follow: "Since the ruling in Apprendi, supra, the Court has made it clear that any fact that increases the penalty for a crime beyond a reasonable doubt, as set forth Apprendi, expands the range of discrepancies that will amount to a constructive amendment. Such a change is a constructive

4x

amendment and is prejudicial per se." Likewise, "we do note, however, that principles of due process require an agency to follow its own regulation, which have the force of law." Marshall v. Lansing, 839 F.2d 933, 943 (3rd Cir.1988). See Government Code §11342.2, all regulations must strictly follow the enabling statute. California Penal Code §3041.5 states suitability or term setting and does not state whether Petitioner's second degree murder is under suitability or term setting. However, if we are going to punish California law breakers under the different degrees, we must not force second degree murderers to serve life in prison when second degree murder is the lesser included offense of first degree murder.1/

                        CONCLUSION

     Petitioner has presented ample evidence in support of his arguments and, therefore, this Court must now enforce the recent Sixth Appellate Court's In re Weider decision and that Petitioner has now served 33 years with all his credits and should be ordered released on parole forthwith.

Dated this 14th day of Nov. 2007.

                        Respectfully Submitted,

                        _____
                        IVAN VON STAICH
                        Petitioner In Pro Per
                        Without Bar Licensed Counsel

1/ See IRONS v. WARDEN OF CALIFORNIA STATE PRISON-SOLANO, (E.D. Cal. 2005) 358 F.Supp.2d 936, 951, "BPH should be ordered to calculate petitioner's release date."

                        4y

8. Did you appeal from the conviction, sentence, or commitment?  ☐ Yes.  ☐ No.  If yes, give the following information:
   a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):
   _____

   b. Result: _____  c. Date of decision: _____

   d. Case number or citation of opinion, if known: _____

   e. Issues raised:  (1) _____

      (2) _____

      (3) _____

   f. Were you represented by counsel on appeal?  ☐ Yes.  ☐ No.  If yes, state the attorney's name and address, if known:
   _____
   _____

9. Did you seek review in the California Supreme Court?  ☐ Yes.  ☐ No.  If yes, give the following information:

   a. Result: _____  b. Date of decision: _____

   c. Case number or citation of opinion, if known: _____

   d. Issues raised:  (1) _____

      (2) _____

      (3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:                NOT APPLICABLE.
   _____

11. Administrative Review:
   a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

   California Code of Regulations, Title 15 § 2050 sets forth criteria for appealing the Board of Prison Terms

   actions: "Any person under the board's jurisdiction may appeal any decision of the board which affects that

   person except the decision to schedule a hearing." There being no administrative remedy available to

   petitioner, this Court has jurisdiction to hear this case.

   _____
   _____
   _____

   b. Did you seek the highest level of administrative review available?  ☒ Yes.  ☐ No.
      *Attach documents that show you have exhausted your administrative remedies.*

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or issue in any court?  ☐ Yes. If yes, continue with number 13.  ☒ No. If no, skip to number 15.

13. a. (1) Name of court: _____

   (2) Nature of proceeding (for example, "habeas corpus petition"): _____

   (3) Issues raised: (a) _____

        (b) _____

   (4) Result (Attach order or explain why unavailable): _____

   (5) Date of decision: _____

   b. (1) Name of court: _____

   (2) Nature of proceeding: _____

   (3) Issues raised: (a) _____

        (b) _____

   (4) Result (Attach order or explain why unavailable): _____

   (5) Date of decision: _____

   c. For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

   **None.**

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.)

   I have not delayed this filing and, therefore, this question is not relevant, with the exception that Petitioner has not received his BPH transcripts on time under Penal Code § 3042 (30 day rule)

16. Are you presently represented by counsel?  ☐ Yes.  ☒ No. If yes, state the attorney's name and address, if known:

   _____

   _____

17. Do you have any petition, appeal, or other matter pending in any court?  ☐ Yes.  ☒ No. If yes, explain:

   _____

   _____

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

   This Honorable ____ Court holds jurisdiction over this May 10, 2007 Board hearing and this is the Court of original conviction.

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: 11-14-07

_Ivan Von Staich_
(SIGNATURE OF PETITIONER)
Ivan Von Staich, In Propria Persona

# EXHIBIT 12

# CALIFORNIA APPELLATE COURTS

### Case Information



| **Supreme Court** | Change court ▼ |
|---|---|

Court data last updated: 03/04/2008 01:53 PM

**Case Summary**   **Docket**   **Briefs**
**Disposition**   **Parties and Attorneys**   **Lower Court**

## Docket (Register of Actions)

**VON STAICH (IVAN) ON H.C.**
**Case Number S158383**

| Date | Description | Notes |
|---|---|---|
| 11/19/2007 | Petition for review filed | Ivan Von Staich, petitioner, in pro per |
| 11/21/2007 | Record requested | |
| 01/09/2008 | Time extended to grant or deny review | to and including February 15, 2008 |
| 01/23/2008 | Petition for review denied | |

**Click here** to request automatic e-mail notifications about this case.

© 2007 Judicial Council of California

Supreme Court
Welcome
Search
E-mail
Calendar
Help
Opinions
C|C
home

# EXHIBIT 13

228 Fed.Appx. 780                                                                                    Page 1
228 Fed.Appx. 780, 2007 WL 1171533 (C.A.9 (Cal.))
**(Cite as: 228 Fed.Appx. 780)**

**H**
Von **Staich** v. California Dept. of Corrections
C.A.9 (Cal.),2007.
This case was not selected for publication in the
Federal Reporter.Not for Publication in West's Fed-
eral Reporter See Fed. Rule of Appellate Procedure
32.1 generally governing citation of judicial de-
cisions issued on or after Jan. 1, 2007. See also
Ninth Circuit Rule 36-3. (Find CTA9 Rule 36-3)
United States Court of Appeals,Ninth Circuit.
Ivan VON **STAICH**, Petitioner-Appellant,
v.
CALIFORNIA DEPARTMENT OF CORREC-
TIONS, Respondent-Appellee,
andJohn V. Briggs, Respondent.
No. 06-15577.

Submitted April 16, 2007.[FN*]

> FN* This panel unanimously finds this
> case suitable for decision without oral ar-
> gument. SeeFed. R.App. P. 34(a)(2).
> Filed April 20, 2007.

**Background:** State inmate filed petition for
writ of habeas corpus. The United States District
Court for the Northern District of California, Phyl-
lis J. Hamilton, J., 2006 WL 213750, denied peti-
tion, and petitioner appealed.

**Holdings:** The Court of Appeals held that:

(1) determination that state did not violate in-
mate's due process rights by failing to set maximum
term for his murder conviction prior to being
deemed suitable for parole was reasonable, and

(2) determination that state did not violate in-
mate's due process and equal protection rights when
he was not given sentencing credits for his murder
conviction after already having those credits ap-
plied to his attempted murder sentence was reason-
able.

Affirmed.

West Headnotes

**[1] Habeas Corpus 197 ⟶516.1**

197 Habeas Corpus
    197II Grounds for Relief; Illegality of Restraint
        197II(B) Particular Defects and Authority for
Detention in General
            197k516 Pardon and Parole
                197k516.1 k. In General. Most Cited
Cases
State court's determination that California Depart-
ment of Corrections and Board of Prison Terms did
not violate inmate's due process rights by failing to
set maximum term for his second-degree murder
conviction prior to being deemed suitable for parole
was not contrary to, and did not represent unreason-
able application of clearly established federal law,
and thus did not warrant federal habeas relief.
U.S.C.A. Const.Amend. 14; 28 U.S.C.A. § 2254(d);
West's Ann.Cal.Penal Code § 3041(b).

**[2] Habeas Corpus 197 ⟶510(2)**

197 Habeas Corpus
    197II Grounds for Relief; Illegality of Restraint
        197II(B) Particular Defects and Authority for
Detention in General
            197k503 Judgment, Sentence, or Order
                197k510 Computation
                    197k510(2) k. Credits. Most Cited
Cases
State court's determination that state did not violate
inmate's due process and equal protection rights
when he was not given sentencing credits for his
murder conviction after already having those cred-
its applied to his consecutive sentence for attemp-
ted murder was not contrary to, and did not repres-
ent unreasonable application of clearly established
federal law, and thus did not warrant federal habeas
relief, absent evidence of discriminatory intent in
denying         him         double         credits.         U.S.C.A.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

228 Fed.Appx. 780
228 Fed.Appx. 780, 2007 WL 1171533 (C.A.9 (Cal.))
**(Cite as: 228 Fed.Appx. 780)**

Page 2

Const.Amend. 14; 28 U.S.C.A. § 2254(d); West's Ann.Cal.Penal Code § 2900.5(b).

**\*781** Ivan Von **Staich**, Soledad, CA, pro se.
Diann Sokoloff, Esq., AGCA-Office of the California Attorney General, Oakland, CA, for Respondent-Appellee.

Appeal from the United States District Court for the Northern District of California; Phyllis J. Hamilton, District Judge, Presiding. D.C. No. CV-02-02321-PJH.

Before: O'SCANNLAIN, CLIFTON, and BEA, Circuit Judges.

MEMORANDUM FN**

FN** This disposition is not appropriate for publication and is not precedent except as provided by 9th Cir. R. 36-3.

**\*\*1** California state prisoner Ivan Von **Staich** appeals pro se from the district court's judgment denying his 28 U.S.C. § 2254 petition for a writ of habeas corpus. We have jurisdiction pursuant to 28 U.S.C. § 2253, and we affirm.

[1] Von **Staich** contends that, even though he had not yet had a parole consideration hearing and had not been deemed suitable for parole, the California Department of Corrections and the Board of Prison Terms violated his due process rights by failing to set a maximum term for his second degree murder conviction. We disagree. See Cal.Penal Code § 3041(b); In re Dannenberg, 34 Cal.4th 1061, 1071, 1098 n. 18, 23 Cal.Rptr.3d 417, 104 P.3d 783 (2005) (holding that a California prisoner has no right to a release date prior to being deemed suitable for parole because state law does not provide such a right); see also Sass v. California Board of Prison Terms, 461 F.3d 1123, 1132 (9th Cir.2006). Therefore, the California Supreme Court's denial of this claim was not contrary to, or an unreasonable application of, clearly established

United States Supreme Court authority. See 28 U.S.C. § 2254(d).

[2] Von **Staich** also contends that his due process and equal protection rights were violated when he was not given sentencing credits for his second-degree murder conviction after already having those credits applied to his consecutive thirteen-year sentence for attempted murder. We disagree. Von **Staich** has no right to double credits and he provides no evidence of a discriminatory intent in denying him double credits. See Cal.Penal Code § 2900.5(b); People v. Bruner, 9 Cal.4th 1178, 1183-84, 1191-93, 40 Cal.Rptr.2d 534, 892 P.2d 1277 (1995) (holding that purpose of § 2900.5 was not to provide dual credit windfalls, but to ensure that person held in pretrial custody would not serve a longer overall period of confinement than that of another person who received an identical sentence but did not suffer pre-conviction custody); McLean v. Crabtree, 173 F.3d 1176, 1185 (9th Cir.1999) (holding that proof of discriminatory intent is required to show that state action having a disparate impact violates the Equal Protection Clause). Therefore, the California Supreme Court's denial of this claim was not contrary to, or an unreasonable application of, clearly established United States Supreme Court authority. See 28 U.S.C. § 2254(d).

To the extent Von **Staich** raises additional claims not raised in his petition before the district court, these claims are not cognizable on appeal. See **\*782** Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir.1994).

**AFFIRMED.**

C.A.9 (Cal.),2007.
Von Staich v. California Dept. of Corrections
228 Fed.Appx. 780, 2007 WL 1171533 (C.A.9 (Cal.))

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.