IVAN VON STAICH
E-10079 CW-137L
CENTRAL TRAINING FACILITY
P. O. Box 689
Soledad, Ca. 93960-0689

**E-filing**

(Petitioner In Pro Se)

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

\* \* \*

|  |  |
|---|---|
| IVAN VON STAICH,<br><br>Petitioner,<br><br>v.<br><br>BEN CURRY, Warden,<br><br>Respondent. | Case No. C08-0848 PJH<br><br><br><br><br>Judge: The Honorable<br>Phyllis J. Hamilton |

**PETITIONER'S TRAVERSE TO THE RESPONDENT'S ANSWER TO ORDER TO SHOW
CAUSE ON FEDERAL HABEAS CORPUS PETITION**

EXHAUSTION OF DISTRICT COURT REMEDIES BEFORE FILING

---NINTH CIRCUIT APPEAL---

Von Staich v. Curry,
C08-0848 PJH

TOPOGRAPHICAL INDEX

Page

INTRODUCTION.................................................1

TRAVERSE TO RESPONDENT'S
ANSWER TO SHOW CAUSE ORDER...................................2

MEMORANDUM OF POINTS AND AUTHORITIES
ARGUMENTS IN SUPPORT OF PETITION............................15

I.
THE STATE COURT'S DENIAL OF ALL THE GROUNDS SET
FORTH IN THIS PETITION WERE UNREASONABLE AND CONTRARY
TO THE APPLICATION OF CLEARLY ESTABLISHED FEDERAL
LAW AND IS A DELIBERATE VIOLATION OF PETITIONER'S
DUE PROCESS RIGHTS..........................................15

A.
The State Superior Court Decision Was Contrary
to or an Unreasonable Interpretation of Clearly
Established Federal Law.....................................16

B.
The Respondent Failed to Present Any Case Citation or
Argument Against Ground One, The Psychological Report
Supporting Parole And That Petitioner's Threat to The Public
is "Extremely Low," And That Petitioner Would do Better Than
98% of The Murderers Released on Parole.....................20

1.
The Board Commissioners Deliberately Violated Cal. Penal
Code §1543(a)(1) And Should be Charged With a Crime.........20

2.
Because The Respondent Fails to Present Any Relevant
Argument Against Ground One, Which Request The Correctional
Psychological Report Must be Followed, Which Supports
Petitioner's Release on Parole And Therefore, This Court Should
Follow The Recommendations of The Correctional Psychologist........21

C.
Petitioner Maintains Ground Two of The Federal Petition
That he Was Denied "Court Ordered" Dual Credits by The BPH
Commissioners During His Recent May 10, 2007 Parole Hearing
Should be Granted, Because The 2007 Board Commissioners Had
no Relevant Reason Not to Grant These Credits And The Law
Presented in This New Challenge is Different From The Previous
Filed Petition..............................................23

Continued Topographical Index

Page

B.
Petitioner Maintains That Ground Three of The Federal
Petition Must Not be Dismissed Under Collateral Estoppel
Because Petitioner's Previously Filed Petition Was Not Based
on Any Relevant Parole Hearing, as The Case Herein, And Due
to The Relevant Fact That Petitioner Has Served Over The
Matrices For Second Degree Murder, Petitioner Maintains This
Action is Unreasonable And Does Violate The Line of Federal
Cases Such as **United States v. Booker**, 543 U.S. 220, 125 S.Ct.
738, 160 L.Ed.2d 621 (2004)...........................................25

C.
Petitioner Maintains His May 10, 2007 Parole Hearing
Was Illegally Deferred For Four (4) Years Based Primarily
on Old Non-violent Prison Disciplinary Reports, The Last One
Written in 2001, Which Petitioner Believes Violates The
Mandates Set Forth In **Greenholtz v. Inmates of The Nebraska
Penal & Correctional Complex**, 442 U.S. 1, 99 S.Ct. 2100, 2109
(1979) And **Martin v. Marshall**, 431 F.Supp.2d 1038, 1042, Which
Both Place a Time Limit on The Use of Prison Misconduct............27

D.
Petitioner Maintains That The Board Commissioners on May
10, 2007 Illegally Assessed a Four (4) Year Parole Denial
on Petitioner's One Count Second Degree Murder, When The United
States Supreme Court in **Garner v. Jones**, 529 U.S. 244, 257,
120 S.Ct. 1362, 1371, 146 L.Ed.2d 236 (2000) Explained Its
Mandate In Morales, That California is Limited to Apply The
Multi-Year Parole Deferral Process to Only Prisoners Convicted
of Multiple Murders. ................................................30

E.
Petitioner Maintains That Ground Six Should Not be Dismissed
For Any Reason, That Ground Six is Based on The Fact
The Board Commissioners on May 10, 2007 Used Petitioner's
Commitment Offenses And Other Immutable Factors to Enhance
His Second Degree Murder For 4 More Years in Violation of
**Jones v. Smith**, 231 F.3d 1227, 1232-33..........................31

F.
Petitioner Asserts The Respondent in His Answer Relies
Heavily on The POR Based on How The Commitment Offenses
Occurred, Which Petitioner Absolutely Maintains Contains
Unsubstantiated Crime Information, And That Several Statements
Within The POR Are Based on The Probation Officer's Own
Information Source With no Authenticity Within The Court of
Law................................................................34

CONCLUSION.........................................................43

TOPOGRAPHICAL INDEX

Continued:                                                   Page

In re Jackson (1985)
39 Cal.3d 646.....................................................5,31

Greenholtz v. Inmates of Neb. Penal & Corr. Complex (1979)
442 U.S. 1........................................................5, passim

Garner v. Jones (2000)
529 U.S. 244......................................................5,30,

Hayward v. Marshall (9th Cir.2008)
512 F.3d 536......................................................5,passim

California Dept. of Corr. v. Morales (1995)
514 U.S. 499......................................................6,30

Doe v. Pataki (1996)
904 F.Supp. 603...................................................6

United States v. Booker (2005)
542 U.S. 296......................................................7,25

U.S. v. Maese (10th Cir.2005)
146 Fed.Appx. 276.................................................7,25

Von Staich v. California Dep't of Corr. (9th Cir.2007)
288 Fed.Appx. 780.................................................8

People v. Carpenter (1979)
99 Cal.App.3d 527.................................................9,24

Hamdi v. Rumsfled (2004)
542 U.S. 507......................................................10

Superintendent v. Hill (1985)
472 U.S. 445......................................................10

Maddox v. U.S. Parole Comm'n (5th Cir.1987)
821 F.2d 997......................................................10

United States v. Watts (1997)
519 U.S. 148......................................................10

U.S. v. Engs (5th Cir.1989)
884 F.2d 894......................................................10

Delrose v. Sullivan (8th Cir.1991)
922 F.2d 480......................................................12

People v. Burroughs (2005)
32 Cal.Rptr.3d 729................................................13

Continued Topographical Index

Page

Turner v. Safley (1987)
482 U.S. 78.................................................................14

Procunier v. Martinez (1974)
416 U.S. 396...............................................................14

Dunn v. U.S. Parole Com'n (10th Cir.1987)
818 F.2d 742..............................................................15

Benny v. U.S. Parole Com'n (9th Cir.2002)
295 F.3d 977..............................................................15

In re Rosenkrantz (2002)
29 Cal.4th 616............................................................15

Ylst v. Nunnemaker (1991)
501 U.S. 797..............................................................16

In re Deluna (2005)
126 Cal.App.4th 585......................................................18

Sprinkle v. Carey (E.D.Cal. 2008)
WL 564995..............................................................18,33

In re Cortinas (Cal.App. 6 Dist 2004)
13 Cal.Rptr.3d 401.......................................................18

Marshall v. Garrison (4th Cir.1981)
659 F.2d 440.............................................................18

In re Dannenberg (Cal.App. 6 Dist 2007)
68 Cal.Rptr.3d 188.....................................................20,19

Rosenkrantz v. Marshall (C.D.Cal.2006)
444 F.Supp.2d 1063.......................................................19

Saif'ullah v. Carey (E.D.Cal.2005)
WL 1555389...............................................................19

Chapman v. Nichols (10th Cir.1993)
989 F.2d 393.............................................................21

Ouintero v. Ncarnacion (10th Cir.2000)
242 F.3d 390.............................................................21

Morales v. Apfel (3rd Cir.2000)
225 F.3d 310.............................................................22

Kelley v. Callahan (8th Cir.1989)
133 F.3d 583.............................................................22

Metz v. Shalala (8th Cir.1995)
49 F.3d 374..............................................................22

Continued Topographical Index                    Page

Bland v. California Department of Corrections (9th Cir.1994)
20 F.3d 1469..........................................................22

In re Sixth (1989)
48 Cal.3d 1247........................................................22

In re Lawrence (2007)
59 Cal.Rptr.3d 537....................................................23

People v. Rutledge (1983)
88 Cal.Rptr. 846......................................................23

People v. Brown (1980)
166 Cal.Rptr. 144.....................................................23

In re Smith (1978)
146 Cal.Rptr. 304.....................................................23

In re Watson (1977)
19 Cal.3d 646.........................................................23

U.S. v. Carlton (2nd Cir.2006)
442 F.3d 802..........................................................25

Austin v. U.S. Parole Com'n (2nd Cir.2006)
448 F.3d 197..........................................................25

In re Roberts (2005)
36 Cal.4th 575........................................................25

In re Sena (2002)
94 Cal.App.4th 836....................................................25

United States v. Mezas de Jesus (9th Cir.2000)
217 F.3d 638..........................................................26

United States v. Kikumura (3rd Cir.1990)
918 F.2d 1084.........................................................26

United States v. Restrepo (9th Cir.1991)
945 F.2d 654..........................................................26

U.S. v. Ossa-Gallegos (6th Cir.2006)
453 F.3d 371..........................................................27

Jones v. Smith (9th Cir.2001)
231 F.3d 1227.........................................................31

Lynce v. Mathis (1997)
519 U.S. 433..........................................................31

v

Continued Topographical Index

Page

People v. Enriquez (1977)
137 Cal.Rptr. 171.................................................32

Strum v. California Adult Authority (9th Cir.1967)
395 F.2d 446....................................................32

Farkas v. United States (1984)
744 F.2d 37....................................................33

Zant v. Stephens (1983)
462 U.S. 862...................................................33

McCleskey v. Kemp (1987)
481 U.S. 279...................................................34

United States v. Staten (9th Cir.2006)
450 F.3d 384..................................................34

United States v. Dare (9th Cir.2005)
425 F.3d 634..................................................34

People v. Santana (1982)
184 Cal.Rptr. 733.............................................38

People v. Romero (1977)
137 Cal.Rptr. 675.............................................39

Craford v. Jackson (C.A.D.C.2003)
329 F.3d 123..................................................39

Townsend v. Burke (1984)
334 U.S. 736..................................................41

Franklin v. Shield (1977)
569 F.2d 784..................................................41

Moore v. United States (3rd Cir.1978)
571 F.2d 179..................................................41

United States v. Weston (9th Cir.1971)
448 F.2d 626..................................................41

Paine v. Barker (4th Cir.1979)
595 F.2d 197..................................................42

Sellers v. Bureau
959 F.307.....................................................42

California Rules of Court, Rule 451(a) (1983).................1,2

Federal Statute:
42 U.S.C. §1983...............................................12

Continued Topographical Index

Page

Federal Statutes Continued:

42 U.S.C. §2000cc subds. 1-7.......................................12

28 U.S.C. §2254(d)................................................16

18 U.S.C. §4106A..................................................26

5 U.S.C. §552a(e)(5), (g)(4).....................................42

California Penal Code:

§1543(a)(1)....................................................20,21

§134..............................................................34

Exhibits Attached Hereto:

A. Dr. Fukumoto testified that victim only received 3 shots and the injury to the victim's hand was a reentry wound, also testifies that all 3 shots to the victim body were from different angles which backs up Petitioner's statement that all 3 shots entered the victim's body during the struggle with Petitioner, Page 3 of this Traverse;

B. Dr. Fukumoto testimony that the victim did struggle during all the head wounds and was not unconscious and shot in head, neck and back 5 times page 4 of this Traverse;

C. Proof that Petitioner filed a previous administrative appeal with the prison officials regarding his presentence credits, page 9 of this Traverse;

D. Copy of previously filed Ninth Circuit Appeal, which proves Petitioner's current arguments regarding presentence credits and the unreasonableness of the Board Commissioners failure to follow the matrices for second degree murderers are different claims, page 23 of this Traverse;

E. CDC&R Memorandum ordering prison officials to remove all CDC 115 disciplinary reports from religious inmates C-file, page 28 of this Traverse;

F. Testimony from defense witness Andrew Calvin Worley, who testified that the female victim did visit Petitioner two times and that the female victim was touching, embracing and kissing Petitioner at the halfway house in Long Beach, page 40 of this Traverse;

G. Transcripts from Petitioner's 1985 trial showing that the female victim was sending Petitioner nude photographs of her holding a gun, and writing on the back of the picture that she love me, and that these nude pictures were send to Petitioner only a few months before he was released to the halfway house, page 41 of this Traverse;

Continued Topographical Index

Page

H. Copy of the POR showing deleted section, which was ordered by the sentencing court because the information in the POR was false, which backs up Petitioner's argument that there is much more false information in the POR that needs to be removed, page 41 of this Traverse;

I. Testimony form the witness Henry Harazim, who in the bedroom adjacent to hallway of the house where the crime occurred, and that Mr. Harazim heard 3 shots in rapid succession, which backs up Petitioner's statement that he was shot first before defending himself with the small hammer, page 42 of this Traverse;

J. Testimony from Petitioner's Brother-In-Law, who testified that he had several loaded guns in his house, which shows this Court that if Petitioner real wanted to hurt someone that night he would have taken a gun to the crime scene, but did not, page 43 of this Traverse;

K. Proof that the female victim was not incompetent to run her own affairs, and should have been allowed to testify during Petitioner's jury trial, page 43 of this Traverse;

L. Declaration from the female victim sent to Petitioner's appellate counsel showing that she was not to incompetent to testify, page 43 this Traverse;

viii

1  IVAN VON STAICH
   CENTRAL TRAINING FACILITY
2  P.O. Box 689
   Soledad, Ca. 93960-0689
3

4  (Petitioner In Pro Se)

5           IN THE UNITED STATES DISTRICT COURT

6        FOR THE NORTHERN DISTRICT OF CALIFORNIA

7              SAN FRANCISCO DIVISION

8

9  _____ )   **Case No. C08-0848 PJH**
                                    )
10 IVAN VON STAICH,                 )   **PETITIONER'S TRAVERSE**
                                    )   **TO RESPONDENT'S ANSWER**
11                  Petitioner,     )   **TO ORDER TO SHOW CAUSE**
                                    )   **ON FEDERAL HABEAS CORPUS**
12        v.                        )   **PETITION;**
                                    )
13 BEN CURRY, Warden,               )   **MEMORANDUM OF POINTS AND**
                                    )   **AUTHORITIES SUPPORT ALL**
14                  Respondent.     )   **6 GROUNDS FILED HEREWITH**
   _____ )
15

16       TRAVERSE TO ANSWER TO ORDER TO SHOW CAUSE
            MEMORANDUM OF POINTS AND AUTHORITIES

17                  **INTRODUCTION**

18     Petitioner is currently serving a term of 15 years to

19 life for one count second degree murder. Petitioner is not

20 serving 30 years to life as stated by the Respondent page

21 1 answer. Petitioner was sentenced in accordance with

22 California Rules of Court (1983) Rule 451(a), which requires

23 all determinate sentences to be totally calculated separately

24 from any indeterminate sentence. Petitioner already served

25 all of his determinate term many years ago, and is now only

26 serving out his one count second degree murder sentence.

27 Petitioner absolutely maintains that he did not receive a

28                  **Page-1-Traverse**

1   fair and impartial parole hearing on May 9-10, 2007 at CTF-
2   Soledad State Prison. On February 26, 2008, this Court issued
3   an order to show cause, which the Respondent has now answered
4   and therefore, Petitioner files this affirmative traverse.

5                **TRAVERSE TO RESPONDENT'S ANSWER TO SHOW CAUSE ORDER**

6       In this traverse Petitioner states in response to the
7   Respondent's answer that admits, denies, and alleges, as
8   follows:

9   1. Petitioner disagrees with the Respondent's statement that
10  he is serving an indeterminate 30 years to life sentence.
11  As stated above, Petitioner was sentenced in accordance with
12  California Rules of Court, Rule 451(a), which requires
13  indeterminate sentences to be calculated separately from
14  determinate sentences, and neither sentence is considered
15  the principle or the subordinate. Id.

16  2. Petitioner's agrees that his murder and attempted murder
17  offenses were based on an ongoing relationship with Cynthia
18  Bess from 1979 to 1983. However, the Respondent's reliance
19  on the Probation Officer's Report (heretoafter POR) is done
20  in error. The circumstances of the crime and alleged incidents
21  with Cynthia Bess are written without any corroborating indicia
22  or a shred of evidence, and is based solely on the Probation
23  Officer's own unknown sources. There was no evidence submitted
24  during the trial that revealed that Petitioner had a previous
25  incident with Cynthia Bess or any evidence that she was hit
26  by Petitioner. Also, there is no evidence that the murder
27  victim was shot five or four times in the head; and that the

28                              **Page-2-Traverse**

1  victim was lying face down during this time. (Id. POR pgs.

2  4-5.) Petitioner submits the trial transcripts regarding

3  the testimony from Dr. Fukumoto the pathologist a forensic

4  science who conducted the autopsy on the victim Robert Topper.

5  Dr. Fukumoto testified during the preliminary hearing that

6  the victim received 3 gun-shot wounds from three separate

7  angles. Dr. Fukumoto testified that the fourth gunshot wound

8  was a reentry wound to the right hand. (See Exhibit "A" for

9  reference to April 23, 1984 Dr. Fukumoto testimony pgs. 14-15.)

10  Furthermore, based on the angle of the gun-shot wounds the

11  victim received during the struggle reveals "beyond a shadow

12  of a doubt," that the victim was standing and fighting with

13  Petitioner during the entire time, and the gun-shots entered

14  the victims body during the struggle over the gun. Also,

15  the Respondent relies on the POR for assessing what weapons

16  Petitioner had in his possession during the commitment

17  offenses.

18     The POR states Petitioner was armed with two hammers.

19  (Id. POR pg. 6.) This statement is in error, there is no

20  evidence that Petitioner had two hammers when the crime was

21  committed, but only had one small hammer in his back pocket,

22  which Petitioner only used after the victim shot him twice

23  triggering flight or fight fear, and self-preservation.

24  Petitioner was fighting for his own life after receiving two

25  shots from a 357 mag. pistol belonging to the victim, one

26  shot entering Petitioner's left chest blowing a large hole

27  through the left lung and fracturing several ribs. Petitioner

**Page-3-Traverse**

28

1  also had a large hole through the entire left upper arm, and

2  the left index finger. (See Exhibit "B" for reference to

3  Dr. Fukumoto's testimony that the victim was struggling during

4  all the head wounds.)    To the contrary, the POR fails to

5  mention any source of information relating to the way the

6  crime was committed.    Petitioner maintains the statements

7  written in the POR are done with deliberate error.    There

8  are absolutely no eye-witness or crime scene specialist backing

9  up all the crime factors mentioned in the POR, and none of

10  this information has been authenticated through any state

11  court hearing.    The only statement in the POR that is true

12  is the fact that Petitioner cut the phone wire, and that

13  Petitioner kicked the front door open, however, this was after

14  Petitioner had a heated argument with the victim at the front

15  door.

16      The POR is solely based on unsubstantiated rumor or

17  caprice.    This unsubstantiated crime information is being

18  repeatedly used as a source of information to keep Petitioner

19  in prison forever.    The Respondent does not present a shred

20  of evidence supporting the crime information set forth in

21  the POR and therefore, the POR is an unreliable source for

22  evaluating the way this crime occurred and should not be

23  considered by this Court in resolving the merits of this

24  federal petition.

25  3.  The Respondent states on pages 3-4 of the answer that

26  the Board's decision denying parole based on the commitment

27  offenses; Petitioner's old disciplinary history; prior criminal

28  history consisting of one 1978 walkaway escape; and a

**Page-4-Traverse**

1  history, including the involvement with women; limited
2  participation in self-help therapy; and the Deputy District
3  Attorney's statement opposing parole forever is
4  unsubstantiated, and the denial of parole in this case is
5  unwarranted. To the contrary, Petitioner disagrees with the
6  Respondent and this is based solely on the fact that nearly
7  every reason used to deny parole in this case is based solely
8  on immutable factors, which will never change.

9  4. Petitioner disagrees with the Respondent's statement that
10 the Board can deny parole for 4 years when at the time of
11 Petitioner's 1983 arrest the law required one year denials.
12 See **In re Jackson** (1985) 39 Cal.3d 464, 469 fn. 4. Petitioner
13 maintains that if you consider that now California inmates
14 have a mandatory liberty interest in receiving a parole date
15 after serving their minimum terms as set forth in **Hayward**
16 **v. Marshall**, 512 F.3d 536, 547 (9th Cir.2008); and that
17 allowing the Board Commissioners to deny parole for any
18 immutable factors for up to 5 years; and to repeatly deny
19 parole up to 5 years during each subsequent parole hearing,
20 would allow the Board to convert Petitioner's **ONE** second degree
21 murder into an illegal unwarranted straight life sentence
22 without the possibility of parole; and do away with any liberty
23 interest set forth in **Greenholtz v. Inmates of Neb. Penal**
24 **& Corr. Complex**, 442 U.S. 1 (1979); which absolutely violates
25 the Ex Post Facto laws set forth by the United States Supreme
26 Court. (See **Garner v. Jones**, 529 U.S. 244, 257, 120 S.Ct.
27 1362, 1371, 146 L.Ed.2d 236 (2000), which made very clear
                              Page-5-Traverse
28

1  that "only a limited class of inmates convicted of **multiple**
2  **murders**" can receive unlimited year parole hearing deferrals,
3  at the initial or subsequent parole hearing.)

4      However, the Respondent completely fails to present any
5  United States Supreme Court citation that allows California
6  Parole Officials to enforce up to five (5) parole denials
7  for inmates only convicted of **ONE** second degree murder.   To
8  the contrary, Petitioner has presented several federal cases
9  that explicitly state that only inmates convicted of **"multiple**
10 **murders**" can receive up to several different maximum year
11 denials in the different states; and that all of these cases
12 quote **California Dept. of Corrections v. Morales**, 514 U.S.
13 499, 509, 115 S.Ct. 1597, **1600 fn. 1**, 131 L.Ed.2d 588 (1995).
14 See **Doe v. Pataki**, 904 F.Supp. 603, 619 (1996) (only inmates
15 convicted of **more than one murder** can receive multi-year parole
16 hearing deferrals.)

17 5.   Petitioner disagrees with Respondent that his claims are
18 exactly the same as that set forth in his prior petition before
19 this Court.   First, in this federal habeas petition on page
20 11, Petitioner asserts that he was denied dual "Court Ordered"
21 credits by the BPH Commissioners.   Respondent does not refute
22 the fact that the sentencing court granted presentence credits
23 on the second degree murder, nor does the Respondent argue
24 any law against the sentencing court granting presentence
25 credits in this case.   (See Respondent's Answer Exhibit "1"
26 for reference to Judgment of Commitment page 2, presentence
27 credits granted on Petitioner's second degree murder

**Page-6-Traverse**

28

1   conviction.)  The Respondent is simply attempting to manipulate
2   this Court by stating the arguments are identical to the prior
3   petition, however, Petitioner is only arguing that the Board
4   must grant the credits awarded in the Judgment of Commitment
5   page 2, which is based solely on the one count second degree
6   murder charge.

7        Petitioner has now served beyond his minimum 15 year
8   term and there is no "current dangerousness" being shown that
9   meets the "some evidence" requirements; and the Board currently
10  has  no  valid  reason  not  to  grant  the  "Court  Ordered"
11  presence  credits  and  Petitioner's  parole  release.    In
12  addition, the Respondent argues on page 18 of his answer that
13  Petitioner  is  collaterally  estopped  from  presenting  his
14  argument regarding the "Court Ordered" credits being granted
15  towards the minimum term because Petitioner previously argued
16  he  should  be  granted  these  credits,  however,  at  that  time
17  Petitioner  did  not  have  his  minimum  term  served  and  did
18  prematurely  present  the  argument  to  this  Court  in  error.
19  Respondent  collateral  estoppel  argument  is  misplaced,
20  Petitioner has now served nearly 25 straight years and when
21  you  calculated  all  presence  1/3  credits,  Petitioner  has
22  served  beyond  the  matrix  guildlines  for  second  degree
23  murderers in California, which is unreasonable in accordance
24  with the Supreme Court in **United States v. Booker**, 542 U.S.
25  296,  124  S.Ct.  2531,  159  L.Ed.2d  403  (2005);  and  as  stated
26  in **U.S. U.S. v. Maese**, 146 Fed.Appx. 276, 279 (10th Cir.2005)
27  ("However,  both  before  and  after  Booker,  the  degree  of
28                              **Page-7-Traverse**

1 departure from the applicable guidelines range is reviewed
2 for reasonableness.")  The United States Supreme Court has
3 made clear that "unreasonable punishments" that exceed beyond
4 the sentencing guidelines can be presented in a federal
5 petition therefore, the Respondent's collateral estoppel
6 argument must fail.  Furthermore, the citation of **Von Staich**
7 **v. California Dep't of Corrections**, 288 Fed.Appx. 780 (9th
8 Cir.2007) is supportive of Petitioner's contention regarding
9 the unreasonableness of the guideline claim, because the Ninth
10 Circuit rejected all additional claims for failure to exhaust
11 in the state courts.  However, this is not the case this time
12 around.  Petitioner has fully exhausted all state remedies
13 regarding the unreasonableness of the parole matrix guidelines
14 and his "Court Ordered" credit claim.

15 Also, the state superior court answer to the "Court
16 Ordered" credit claim was as follow: "Petitioner also contends
17 he should be credited with post-sentence time spent in local
18 custody before being transferred to prison in 1989.  Any
19 postsentence credits are to be calculated by the California
20 Department of Corrections and Rehabilitations (CDCR) and
21 Petitioner must apply to the CDCR for those custody credits."
22 (In relevant part, see Respondent's answer Exhibit 8, for
23 reference.)  Obviously, the superior court did not state that
24 Petitioner was not entitled to the presentence "Court Ordered"
25 credits or post-sentence credits, but merely suggest that
26 Petitioner should ask the prison officials to grant these
27 "Court Ordered" credits.  Petitioner has previously filed
**Page-8-Traverse**
28

1  an administrative appeal, however, prison officials refuse
2  to grant any "Court Ordered" credits towards Petitioner's
3  second degree murder sentence. (See Exhibit "C" attached
4  hereto for reference.) Petitioner maintains that CDCR officials
5  are not responsible for applying these "Court Ordered"
6  presentence credits in accordance with **People v. Carpenter**
7  (1979) 99 Cal.App.3d 527, 535-36. The Carpenter case is the
8  only California case which set forth the appropriate procedure
9  to be followed when applying presentence credits to an
10 indeterminate sentence. Petitioner's argument is when will
11 he ever be granted the "Court Ordered" presentence credits
12 on his indeterminate sentence.

13     Petitioner maintains that there is no controversy over
14 the relevant reason why the superior court granted presentence
15 credits on the separately calculated second degree murder
16 sentence, but the argument is when will this Court enforce
17 the superior court's order granting presentence credits in
18 accordance with Board's deliberate violation of federal due
19 process.

20 6.   Petitioner maintains the Respondent argument regarding
21 the "some evidence" application in the parole hearing process
22 is deliberately misleading and certainly misplaced. The
23 Respondent states that the United States Supreme Court did
24 not authorize "some evidence" to be used in the administrative
25 parole hearing process. However, the United States Supreme
26 Court has stated that administrative hearings in the United
27 States must be conducted under the "preponderance of evidence"

28                        **Page-9-Traverse**

1   standard in accordance with **Hamdi v. Rumsfeld**, 542 U.S. 507,
2   550 (2004) (all administrative hearings are to be conducted
3   under the "preponderance of evidence" standard in accordance
4   with Superintendent v. Hill.)

5       The United States Supreme Court thoroughly explained
6   in Hamdi that **Superintendent v. Hill**, 472 U.S. 445, 449 (1985)
7   (requires all administrative hearings to be conducted under
8   the "Preponderance of Evidence" standard, and that all
9   reviewing courts are ordered to use the "some evidence" process
10  to substantiate the administrative hearing findings; which
11  should have been followed during the May 9-10, 2007 administrative
12  parole hearing evidentiary requirements. Therefore, the
13  Respondent's argument in his answer is frivolous and should
14  fail. See **Maddox v. U.S. Parole Comm'n**, 821 F.2d 997, 999
15  (5th Cir.1987) (requiring the parole commission to use the
16  "preponderance of evidence" standard based on disputed
17  information accuracy); **and see United states v. Watts**, 519
18  U.S. 148, 157, 117 S.Ct. 633, 637-38 (1997) (per curiam) (The
19  Supreme Court has held that during the administrative hearing
20  process the "**Perponderence of Evidence**" standard provides
21  sufficient safeguards to satisfy the requirements of due
22  process); and **U.S. v. Engs**, 884 F.2d 894, 896 (5th Cir.1989)
23  (the accuracy of information used at the parole hearing must
24  be resolved under the "**Preponderance of Evidence**" standard).
25  The Respondent fails to mention the above cases for some
26  unknown reason, but Petitioner will quote them for the Court's
27  review.

28                          **Page-10-Traverse**

7.  Respondent completely fails to present any state or federal United States Supreme Court citation regarding Petitioner's arguments against the Board Commissioners failure to give any weight to the favorable 2006 psychological report. Moreover, the Respondent fails to present any current evidence that would override the 2006 psychological report that Petitioner's current dangerousness level assessments, if released into the community are extremely low; and that Petitioner would do better than 98% of all murderers released back into the community. The Respondent is required to present current evidence that Petitioner has done something that shows he is a danger to public safety. However, the Respondent only shows an unsubstantiated POR and old non-violent disciplinary reports, and most important, six of the disciplinary reports were written because Petitioner is a religious inmate following the precepts of his holy vow in accordance with Numbers ch. 6, verse 5, and several other chapters of the Holy Bible. See **Hayward v. Marshall**, supra, 512 F.3d at 543 "the test is not whether some evidence supports the reasons the Governor cites for denying parole, but whether some evidence indicates a parolee's release unreasonably endangers public safety." The only professional to evaluate Petitioner based on his current dangerousness was the 2006 psychologist report.

Petitioner maintains it would be inconsistent with federal law to allow the Board Commissioners and the Respondent to substitute their own unprofessional opinions for that of the

**Page-11-Traverse**

1 | treating physician. See **Delrose v. Sullivan**, 922 F.2d 480,
2 | 484 (8th Cir.1991).
3 | 8. Respondent fails to address why several state and federal
4 | courts have released first and second degree murderers on
5 | parole that have committed in prison egregious disciplinary
6 | incidents, which make Petitioner look like a saint. See **Martin**
7 | **v. Marshall**, 431 F.Supp.2d 1038, 1042 (N.D.Cal.2006)
8 | (muti-murderer received 20 serious disciplinary reports and
9 | was granted parole.)
10 | 9. The Respondent argues the Board was right to rely on the
11 | series of 6 disciplinary reports for violating the prison
12 | grooming standards as recent as 2001, when the Ninth Circuit
13 | Court of Appeals recently ordered a reversal of Petitioner's
14 | 42 U.S.C. §1983 complaint against the prison official.
15 | Petitioner's religious rights under RLUIPA 42 U.S.C. §2000cc
16 | subds. 1-7, in accordance with the Ninth Circuit Memorandum
17 | decision dated October 16, 2007 Docket No. 06-16011, which
18 | requires the removal of all 6 disciplinary reports from
19 | Petitioner's C-file. The Board Commissioners made very clear
20 | that they were relying on the series of disciplinary reports
21 | where Petitioner violated the prison grooming standards.
22 | The Board Commissioners believed these 6 nonviolent
23 | disciplinary reports were enough to meet the dangerousness
24 | to public safety "some evidence" standard; and that Petitioner
25 | was a danger to public safety currently. However, Respondent
26 | fails to explain how these 6 non-violent disciplinary reports,
27 | which were written for having hair over three (3) inches long
28 |

1  poses a current danger to public safety; nor does the
2  Respondent explain how any of Petitioner's other older
3  disciplinary reports made Petitioner a current danger to public
4  safety. See **People v. Burroughs**, 32 Cal.Rptr.3d 729, 731,
5  131 Cal.App.4th 1401, 1405 (California law requires for a
6  current threat to be within the last year to substantiate
7  a person's danger to public safety, not decades old bad
8  relationships with women, as the case herein.)

9      Because the Respondent has failed to correlate past
10  disciplinary reports to a "**present behavior or incident showing**
11  **a present danger to public safety**," the Respondent has failed
12  to substantiate Petitioner's May 10, 2007 parole denial.
13  There is presently "no evidence" that Petitioner poses any
14  type of danger to public safety; and this Court should not
15  hesitate to enforce the Ninth Circuit's Hayward decision,
16  which endorses several state court decisions. See **Hayward**,
17  512 F.3d at 543 quoting In re Elkins, 144 Cal.App.4th 475,
18  499, 50 Cal.Rptr.3d 503 (Cal.Ct.App.2006) (holding that the
19  "governor, in reviewing a suitability determination, must
20  remain focused . . . on facts indicating that release **currently**
21  poses 'an unreasonable risk of danger to society.'")

22  10. Petitioner agrees with Respondent that this Court must
23  order a new parole hearing with special instructions not to
24  use the old disciplinary reports; not to use Petitioner's
25  POR which contains false information to deny a set parole
26  date; order the Board not to use Petitioner commitment offense,
27  which is an immutable factor; order the Board not to use

**Page-13-Traverse**

28

Petitioner's non-violent prior convictions or old criminal history, which are also immutable factors; order the Board not to use unsubstantiated prior relationships with women, which are immutable factors; order the Board to stop using old non-violent CDC 115's to deny a set parole date; order the Board to follow the professional recommendation of the correctional psychologist 2006 report; order the Board to grant all "Court Ordered" presentence and post-sentence credits when calculating Petitioner's second degree murder; order the Board not to punish Petitioner in anyway for filing this petition; order the Board not to deny parole unless the Board has new and present evidence that Petitioner poses a danger to public safety and if the Board finds a present danger that parole only be denied for one year because Petitioner is not a multiple murderer.

If this Court grants the following due process mandates Petitioner will receive all the process that is due in this case. **Hayward**, 512 F.3d at 545 (extensive juvenile and "long criminal history," social history, commitment offense are not "some evidence" of current danger to public safety); "Prison walls do not form a barrier separating prison inmates from the protections of the constitution." **Turner v. Safley**, 482 U.S. 78, 84, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987); "When a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights." **Procunier v. Martinez**, 416 U.S. 396, 405-06, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974);

**Page-14-Traverse**

1  see **Dunn v. U.S. Parole Com'n**, 818 F.2d 742, 745 (10th
2  Cir.1987) ("Reliance on an acquittal arising from events
3  occurring approximately eighteen years ago to retard
4  petitioner's parole date was arbitrary and capricious and
5  an abuse of discretion.")  In Dunn the 10th Circuit Court
6  ordered a new parole hearing consistent with due process as
7  quoted in Respondent's answer p. 8, quoting **Benny v. U.S.**
8  **Parole Comm'n**, 295 F.3d 977, 98485 (9th Cir.2002); and **In**
9  **re Rosenkrantz**, 29 Cal.4th 616, 658 (2002).

10  11. Except as stated above, Petitioner opposes each and every
11  argument against the granting of this petition in its entirety.

12      For all the **reasons** set forth above and in the accompanying
13  Memorandum of Points and Authorities, this Court should grant
14  all the grounds set forth in this federal petition.

15                **MEMORANDUM OF POINTS AND AUTHORITIES**

16                **ARGUMENTS IN SUPPORT OF PETITION**

17                            **I.**

18      **THE STATE COURT'S DENIAL OF ALL THE GROUNDS SET
       FORTH IN THIS PETITION WERE UNREASONABLE AND CONTRARY
19     TO THE APPLICATION OF CLEARLY ESTABLISHED FEDERAL
       LAW AND IS A DELIBERATE VIOLATION OF PETITIONER'S
20     FEDERAL DUE PROCESS RIGHTS.**

21      See **Hayward**, supra, 512 F.3d at 541: "Because Hayward
22  is in custody pursuant to a state court adjudication and
23  because Hayward filed his habeas petition after the effective
24  date of the Antiterrorism and Effective Death Penalty Act
25  ("AEDPA"), we cannot grant a writ of habeas corpus unless
26  the state court's adjudication of Hayward's due process claim
27  resulted in a decision that (a) was contrary to, or involved
                        **Page-15-Traverse**
28

1  an  unreasonable  application  of  clearly  established  federal
2  law  as  determined  by  the  United  States  Supreme  Court  or  (b)
3  was  based  on  an  unreasonable  determination  of  the  facts  in
4  light  of  the  evidence  presented.   28  U.S.C.  §2254(d).   Because
5  there  was  a  reasoned  state  court  judgment  rejecting  Hayward's
6  federal  claims, the  Superior  Court  judgment-we  look  through
7  the  later  unexplained  order  of  the  California  Supreme  Court
8  and  analyze  whether  the  reasoned  state  judgment  was  erroneous
9  under  the  standard  of  §2254(d).   See  Ylst  v.  Nunnemaker,  501
10 U.S.  797,  804,  111  S.Ct.  2590,  115  L.Ed.2d  706  (1991)."

11     Petitioner  maintains  the  California  Supreme  Court  failed
12 to  explain  their  denial  or  to  explain  why  the  Superior  Court's
13 decision  did  not  violate  clearly  established  federal  law  and
14 therefore,  this  Court  now  must  look  through  to  the  state
15 Superior  Court  judgment  to  see  if  the  decision  was  conducted
16 within  the  parameters  of  the  constitution,  as  done  in  Hayward.
17 In  this  case  the  state  Superior  Court  decision  was  erroneous,
18 and  did  violate  all  the  grounds  set  forth  in  this  federal
19 petition.

20     **A.   The State Superior Court Decision Was Contrary**
        **to  or  an  Unreasonable  Interpretation  of  Clearly**
21      **Established Federal Law.**

22     Under  the  "AEDPA"  the  state  court  decisions  must  be
23 contrary  to,  or  an  unreasonable  interpretation  of  clearly
24 established  federal  laws.   In  this  case,  the  Superior  Court
25 decision  clearly  violated  Petitioner's  right  to  a  fair  and
26 impartial  evaluation  of  the  evidence  presented  during
27 Petitioner's  May  10,  2007  parole  hearing.   First,  the  Superior

28                        **Page-16-Traverse**

Court failed to hear the merits of the claims based on Petitioner's earlier filed three petitions, where Petitioner earnestly pleaded with the Court to order the Board to turnover a copy of the May 10, 2007 transcripts. However, after chastising Petitioner for filing his fourth petition, the Superior Court stated its reasoning for denial of the fourth petition. The Superior Court stated that Petitioner was denied parole because he had receive a series of CDC-115 disciplinary reports for violating the grooming standards, and that these disciplinary reports presented "some evidence" that Petitioner was a danger to public safety; the Superior Court also stated that parole was denied because Petitioner had some old tumultuous relationships with his previous girlfriends, which shows a pattern of bad relationships with women.

The Orange County Superior Court failed to address all of Petitioner's individual claims and therefore, Petitioner maintains the Orange County Superior Court decision violated clearly established federal laws. In addressing the Board and Superior Court's reliance on prior bad relationships with women, Petitioner absolutely maintains these brief and old relationships with women are currently not a valid reason, after 25 years of incarceration to keep Petitioner in prison for the remainder of his life. Moreover, these relationships with different women are now prehistoric immutable factors, which will never change. Also, Petitioner is much older now and has a very stable relationship with his best friend a woman, which he has known since 1970. Most important, these

Page-17-Traverse

old relationships should not be used to convert Petitioner's second degree murder into a straight life sentence. Petitioner maintains that none of his prior relationships with women involved serious injury or any attempted injury. See **In re Deluna**, 126 Cal.App.4th 585, 598 (2005) ("inmate's previous arrest record did not constitute "some evidence" of a threat to public safety because the alleged acts did not involve serious injury to a victim"); see **Sprinkle v. Carey**, E.D.Cal. 2008 WL 564995 *15 "stale and static factors" to deny parole violates petitioner's due process rights.")

Also, see **In re Cortinas**, 13 Cal.Rptr.3d 401, 415 (Cal.App. 6 Dist 2004) ("Section 2402, subdivision (c)(2) of the Regulations makes a defendant's criminal history a factor showing unsuitability insofar as it reveals that "on previous occasions [he or she] inflicted or attempted to inflict serious injury on a victim, particularly if [he or she] demonstrated serious assaultive behavior at an early age." Petitioner has no prior convictions for violence, and has had no violent CDC 115's for fighting with other inmates, which is remarkable considering that the California Prison System is overcrowded and that violence takes place nearly everyday.

In addition, Petitioner has never been convicted for having a bad relationship with a woman. As stated in the Fourth Circuit in **Marshall v. Garrison**, 659 F.2d 440, 446 (4th Cir.1981) (that "short of some relevant, reasonably reliable evidence of the commission of another crime, the

**Page-18-Traverse**

1  district court may not permit the parole commission to deny
2  or postpone the granting of parole on the basis of a prisoner's
3  commission of other crimes"); **and see In re Dannenberg**, 68
4  Cal.Rptr.3d 188, 196 (Cal.App. 6 Dist.2007) ("The test is
5  not whether some evidence indicates a parolee's release
6  unreasonably endangers public safety." [Citation.] "Some
7  evidence of the existence of a particular factor does not
8  necessarily equate to some evidence the parolee's release
9  unreasonably endangers public safety." [Quoting] (In re Lee
10 (2006) 143 Cal.App.4th 1400, 1408, 49 Cal.Rptr.3d 931 (Lee).)

11      The second reason relied on by the Board and the Superior
12 Court was the 6 CDC-115 disciplinary reports Petitioner
13 received for violating the prison grooming standards, the
14 last report written in 2001. Petitioner again maintains that
15 these 6 non-violent disciplinary reports should not be used
16 to deny parole under the current danger to public safety "some
17 evidence" standards. In support of the Board and the Superior
18 Court violating clearly established federal law, Petitioner
19 relies on **Rosenkrantz v. Marshall**, 444 F.Supp.2d 1063, 1087
20 (C.D.Cal.2006) (granting habeas corpus relief where the record
21 contained no evidence supporting the BPT's decision that
22 petitioner was a danger to society and unsuitable for parole
23 based upon (a) his commitment offense, (b) his criminal
24 history, and (c) "a **rules** **violation** **which** **resulted** **when,** **based**
25 **upon** **his** **religious** **beliefs,** **petitioner** **refused** **to** **cut** **his**
26 **hair**"); quoting Saif'ullah v. Carey, 2005 WL 1555389
27 (E.D.Cal.2005), (emphasis added.)

28                          **Page-19-Traverse**

1    The Board and the Orange County Superior Court relied
2  on Petitioner's 25 year old commitment offenses to deny parole.
3  However, Petitioner again maintains that the commitment offense
4  cannot be used as "some evidence" in 2007 during his parole
5  hearing to show current dangerousness to public safety. See
6  **In re Dannenberg**, supra, 68 Cal.Rptr.3d at 197 ("the predictive
7  value of the commitment offense may be very questionable after
8  a long period of time.")[Citation.]  Petitioner's commitment
9  offenses are now nearly 25 years old, and is an immutable
10  factor that will never go away.  "After nearly twenty years
11  of rehabilitation, the ability to predict a prisoner's future
12  dangerousness based simply on the circumstances of his  **or**
13  her crime is nil."  In re Dannenberg, supra, 68 Cal.Rptr.3d
14  at 196.

15  **B.  The Respondent Failed to Present Any Case Citation or**
16  **Argument Against Ground One, The Psychological Report**
    **Supporting Parole And That Petitioner's Threat to The Public**
17  **is "Extremely Low," And That Petitioner Would do Better Than**
    **98% of The Murderers Released on Parole.**
18  **1. The Board Commissioners Deliberately Violated Cal. Penal**
    **Code §1543(a)(1) And Should be Charged With a Crime.**

19    Petitioner absolutely maintains that the Respondent has
20  completely failed to present any argument against Ground One
21  of the federal petition.  In Ground One of this federal
22  petition, and Petitioner alleges several areas of law violated
23  during the Board's May 10, 2007 parole hearing.  The Board
24  refused to give any weight to the 2006 correctional evaluation
25  report.  Petitioner also argued under Ground One that the
26  Board Commissioners illegally gave a copy of Petitioner's
27  2006 psych report to the Deputy D.A., who extensively argued
28                    **Page-20-Traverse**

against the 2006 psych report because the correctional psychologist recommended Petitioner be released. Petitioner maintains that Cal. Penal Code §1543(a)(1) does not allow law enforcement to obtain a medical doctor's written report without written consent from the patient. Petitioner did not give the Board Commissioners any such consent and therefore, Petitioner's state and federal constitutional rights to a fair and impartial hearing have been violated. In addition, Cal. Penal Code §1543(a)(1) is a statutory law which must be followed, and if violated must be prosecuted. Moreover, this law was reasonably established, and defendants reasonably would have known that this law governed their conduct. cf. **Chapman v. Nichols**, 989 F.2d 393, 397 (10th Cir.1993) ("[a] reasonably competent public official should know the law governing his conduct.") see also **Quintero v. Wncarnacion**, 242 F.3d 390 (10th Cir.2000).

**2. Because The Respondent Fails to Present Any Relevant Argument Against Ground One, Which Request The Correctional Psychological Report Must be Followed, Which Supports Petitioner's Release on Parole. And Therefore, This Court Should Follow The Recommendations of The Correctional Psychologist.**

Petitioner maintains that the Respondent completely failed to present any state or federal authorities indicating Petitioner's 2006 correctional psychological evaluation report should not be followed. Because the Respondent failed to present a shred of evidence against the correctional psychologist report, the recommendations therein should be followed. As stated on pgs. 7-8 of the petition, the Board Commissioners and Deputy District Attorney cannot disregard

**Page-21-Traverse**

1   the opinion of the medical specialist without **substantial**

2   **contradictory** evidence, and may not override the medical

3   opinion due to his own credibility judgments, speculation

4   or lay opinion. **Morales v. Apfel**, 225 F.3d 310, 317 (3rd

5   Cir.2000); **Kelley v. Callahan**, 133 F.3d 583, 589 (8th

6   Cir.1998); **Metz v. Shalala**, 49 F.3d 374, 377 (8th Cir.1995).

7   The Respondent has presented no opposition to these authorities

8   and therefore, has acquiesced to these citations and **thereby,**

9   this Court should grant Ground One of the federal petition

10  in its entirety.

11      The Ninth Circuit quoted the law in California regarding

12  the Respondent's failure to challenge the grounds set forth

13  in the federal petition. See **Bland v. California Dept. of**

14  **Corrections**, 20 F.3d 1469, 1474 (9th Cir.1994) ("In a habeas

15  proceedings, the state responds by return to a habeas petition

16  only after the Court issues an order to show cause. See In

17  re Sixth, 48 Cal.3d 1247, 259 Cal.Rptr. 491, 492, 774 P.2d

18  164, 165 (1989). The state's return must allege facts tending

19  to establish the legality of the petitioner's detention.

20  The petitioner then responds by filing a traverse. Id. When

21  the state's return fails to dispute the factual allegations

22  contained in the petition and traverse, it essentially **admits**

23  **those allegations**." "Id. 259 Cal.Rptr. at 492-93, 774 P.2d

24  at 165-66.") Because the 2006 Correctional Psychological

25  evaluates report discusses all the CDC 115's, how the crime

26  was committed, and that there is no pattern of bad

27  relationships **currently shown...**and that Petitioner should be

**Page-22-Traverse**

28

1  released on parole, the Respondent has acquiesced to all of
2  this relevant evidence.    Judgment should be rendered in
3  Petitioner favor based on Ground One.    In addition, the state
4  recently ruled that the recent psychological reports must
5  be followed, over any older report.    See **In re Lawrence** (2007)
6  59 Cal.Rptr.3d 537, 543.

7
8  **B. Petitioner Maintains Ground Two of The Federal Petition**
   **That he Was Denied "Court Ordered" Dual Credits by The BPH**
   **Commissioners During His Recent May 10, 2007 Parole Hearing**
9  **Should be Granted, Because The 2007 Board Commissioners Had**
   **no Relevant Reason Not to Grant These Credits And The Law**
10 **Presented in This New Challenge is Different From The Previous**
   **Filed Petition.**
11
12      The Respondent argues that Petitioner cannot argue in
13 this federal petition about his "Court Ordered" presentence
14 credits because Petitioner filed a previous federal petition
15 based on the same argument.    Petitioner maintains that
16 Respondent is wrong.    The previous petition N.D.Cal. No. CV-
17 02-2321 PHJ, Petitioner primary argument was that he was denied
18 these credits by the Department of Corrections, and Petitioner
19 did not refer to any set parole hearing as this argument is
20 centered on.    (See Exhibit "D" for reference to Petitioner's
21 Ninth Circuit appeal pgs. 25-29, attached hereto.)    Also,
22 Petitioner was not relying on the state cases of **People v.**
23 **Rutledge** (1983) 88 Cal.Rptr. 846, 849; **People v. Brown** (1980)
24 166 Cal.Rptr. 144, 148; **In re Jordan** (1975) 50 Cal.App.3d
25 155, 157-158; and **In re Smith** (1978) 146 Cal.Rptr. 304, 306,
26 quoting **In re Watson** (1977) 19 Cal.3d 646, 651, 131 Cal.Rptr.
27 609, 612, 566 P.2d 243, 246.    All these cases are not quoted

28                          **Page-23-Traverse**

1   or relied on in Petitioner's previous filed case.   In Ground
2   Two of this federal petition Petitioner shows this Court why
3   the Orange County Superior Court granted presentence credits
4   to both the determinate and indeterminate sentences.   The
5   Respondent does not present any argument against this line
6   of cases authorizing the State Superior Court to grant dual
7   presentence credits when the crimes are directly related to
8   one course of conduct.   The one count second degree murder
9   occurred within 3 minutes at most of the attempted murder
10  charge.   Therefore, the Superior Court granted dual presentence
11  credits.   The argument in Ground Two is based directly on
12  the inaction of the May 10, 2007 parole Commissioners failure
13  to apply these "Court Ordered" credits after Petitioner had
14  served beyond the matrices guidelines for second degree
15  murder.

16      In accordance with **People v. Carpenter** (1979) 99 Cal.Rptr.
17  527, 535-36, the Board Commissioners are responsible for
18  calculating all "Court Ordered" presentence credits, not CDC&R,
19  therefore, the argument presented in Ground Two is not the
20  same as that presented in the earlier filed petition.   The
21  Respondent's Collateral Estoppel argument must fail.
22  Petitioner has the constitutional right to challenge each
23  individual parole hearing on the merits and the credits already
24  served must be calculated to prove Petitioner has served over
25  his 15 years minimum term set forth in Hayward, 512 F.3d at
26  447.

27  C.   **Petitioner Maintains That Ground Three of The Federal**
                            **Page-24-Traverse**
28

1   Petition Must Not be Dismissed Under Collateral Estoppel
2   Because Petitioner's Previous Filed Petition Was Not Based
    on any Relevant Parole Hearing, as The Case Herein, And Due
3   to The Relevant Fact That Petitioner Has Served Over The
    Matrices For Second Degree Murder, Petitioner Maintains This
4   Action is Unreasonable And Does Violate The Line of Federal
    Cases Such as United States v. Booker, 543 U.S. 220, 125 S.Ct.
    738, 160 L.Ed.2d 621 (2004).

5

6       Petitioner maintains that he had served over 30 years
    on his one count second degree murder, with all credits
7   correctly calculated.  The guideline matrices for second degree
8   murder maximum is 21 years.  Petitioner has served over 21
9   years on his second degree murder, and Petitioner believes
10  this action is unreasonable.  In support of Ground Three
11  Petitioner quotes U.S. v. Maese, 146 Fed.Appx. 276, 279 (10th
12  Cir.2005) ("However, both before and after Booker, the degree
13  of departure from the applicable guideline range is reviewed
14  for reasonableness.")  Petitioner also argues that because
15  the Board Commissioners had never calculated his sentence
16  and because under California law the sentencing process is
17  not complete until the term is set and the inmate released,
18  see In re Roberts (2005) 36 Cal.4th 575, 589-90 and In re
19  Sena (2002) 94 Cal.App.4th 836, at 839; and that in accordance
20  with U.S. v. Carlton, 442 F.3d 802, 809 ("Such proceeding
21  arise after the end of the criminal prosecution, including
22  the imposition of sentencing,") (in relevant part); and because
23  Board Commissioners have not set any sentence, which is
24  required after serving the minimum term, that Booker and those
25  line of cases do  govern the Board inaction in the case.
26  Moreover, Petitioner believes the law set forth in Austin
27  v. U.S. Parole Com'n, 448 F.3d 197, 199 (2nd Cir.2006) gives

28                      Page-25-Traverse

1  this Court guidance. In Austin the Circuit Court stated:
2  "In effect, [18 U.S.C.] §4106A gives the Parole Commission
3  the authority and the responsibility of a district court at
4  sentencing, although its ability to set a release date in
5  accordance with the Guideline range for a similar offense
6  under the U.S. Code is constrained by the prohibition against
7  lengthening the term of imprisonment imposed by the sentencing
8  state."

9  As the Parole Commission was constrained to follow the
10 appropriate guideline for that murderer, Petitioner maintains
11 the California Board Commissioners are also constrained to
12 follow the set guideline ranges for second degree murderers.
13 Moreover, Petitioner maintains that because he is now over
14 the set maximum guideline range for second degree murderers,
15 that the Board Commissioners need "clear and convincing
16 evidence" to continue this severe punishment. See **United**
17 **States v. Kikumura**, 918 F.2d 1084, 1101-02 (3rd Cir.1990)
18 ("concluding that, "at a minimum, findings leading to a
19 "twelve-fold, 330 month departure from the median of an
20 applicable guideline range must be made by clear and convincing
21 evidence"); also see **United States v. Mezas de Jesus,** 217
22 F.3d 638, 642-45 (9th Cir.2000) (Citing United States v.
23 Restrepo, 946 F.2d 654, 659-60 (9th Cir.1991) (adopting
24 Kikumura) and requiring an uncharged kidnapping to be found
25 by clear and convincing evidence when such a finding would
26 result in a nine-level Guidelines enhancement and the resulting
27 sentencing range to increase from 27-31 months to 57-71

**Page-26-Traverse**

28

1  months.)

2      Also, see U.S. v. Ossa-Gallegos, 453 F.3d 371, 375 (6th

3  Cir.2006) ("A prime objective of the sentencing Guidelines

4  was to eliminate or, at least reduce, disparity in the

5  sentencing of similarly situated defendants," quoting United

6  States v. Paster, 173 F.3d 206, 220 (3rd Cir.1999) (other

7  citations omitted.) Petitioner could list several over

8  murderers in California such as Martin v. Marshall, 431

9  F.Supp.2d 1049, 1045 (N.D.Cal.2006) where the murderer

10  committed several serious CDC 115 disciplinary reports, but

11  was granted a set parole date. Petitioner has presented

12  several inmates convicted of second degree murder that have

13  received far worse CDC 115 disciplinary reports, but now are

14  released serving out their parole terms. Petitioner maintains

15  that Respondent's collateral estoppel argument must fail and

16  Ground Three should not be dismissed for any reason.[1/]

17  D. Petitioner  Maintains His May 10, 2007 Parole Hearing
   Was Illegally Deferred For Four (4) Years Based Primarily
18  on Old Non-Violent Prison Disciplinary Reports, The Last One
   Written in 2001, Which Petitioner Believes Violates The
19  Mandates Set Forth In Greenholtz v. Inmates of the Nebraska
   Penal & Correctional Complex, 442 U.S. 1, 99 S.Ct. 2100, 2109
20  (1979) And Martin v. Marshall, 431 F.Supp.2d 1038, 1042, Which
   Both Place a Time Limit on The Use of Prison Misconduct.
21

22      Petitioner asserts that the May 10, 2007 Board

23  Commissioners misused 6 non-violent CDC 115 disciplinary

24  reports to defer his parole release hearing for 4 years.

25  Petitioner maintains that the CDC officials in Sacramento

26  sent a memorandum to all the prison staff ordering them to

27  remove all CDC 115 disciplinary reports from all the inmates

28  1/ See Exhibit "N" for other inmates with misconduct that received a set
   parole date.              Page-27-Traverse

1  C-Files in February of 2006, however, prison officials at

2  CTF-Soledad refused to comply with the memorandum, and refused

3  to remove the CDC 115s from Petitioner's C-File. (See Exhibit

4  "F" for reference to CDC Memorandum ordering the removal of

5  all disciplinary reports.)

6       Petitioner maintains that in accordance with **Greenholtz**,

7  99 S.Ct. 2100, at 2109 (K)(1) that misconduct that is over

8  **six months** should not be considered by the Parole Board during

9  the initial or subsequent protected liberty interest parole

10 hearings. The **Greenholtz** Court was given guidance to all

11 the states in regard to the time limits for using prison

12 misconduct reports, and just because California law or

13 administrative rules do not set forth a time limit does not

14 mean that the time limit specified in **Greenholtz** does not

15 apply. Therefore, the 6 CDC 115 disciplinary reports and

16 all other non-violent disciplinary reports written against

17 this religious inmate, should not be used to deny parole,

18 and to defer Petitioner's parole for 4 more years.

19      Also, the federal Court in **Martin v. Marshall**, supra,

20 431 F.Supp.2d at 1045, states that 8 years of positive

21 institutional behavior overrides the use of the very serious

22 20 disciplinary reports written against Martin. This is the

23 only case state or federal, which places a time limit on the

24 use of old CDC 115 disciplinary reports used as "some evidence"

25 to endlessly deny a set parole date. In this case, the Board

26 primarily was fixated on the 6 CDC 115 disciplinary reports

27 for violating the grooming standards and a letter written

28

Page-28-Traverse

1   to Petitioner ex-wife that was considered some-what threatening
2   to my ex-wife, which Petitioner absolutely maintains contained
3   "no threat" of harm to my ex-wife what-so-ever.  The letter
4   was written 13 years ago when Petitioner was going through
5   divorce proceeding, and was upset with his ex-wife because
6   she was addicted to drugs, and was selling her body as a
7   prostitute to support her drug habit.  Petitioner is not trying
8   to made excuses for writing the letter, but is only explaining
9   the circumstance at the time the letter was written.  There
10  is no relevant reason for the Board Commissioners to fixate
11  on the 13 year old letter to Petitioner ex-wife, other than
12  to find some immutable factor to justify keeping Petitioner
13  in prison for the rest of his life.  Further, there is no
14  parole regulation that authorities the Board Commissioners
15  to use CDC 115 disciplinary reports to keep a prisoner in
16  prison for the rest of his life.

17      As stated in **Greenholtz**, prison misconduct that is beyond
18  6 months must not be used to deny a set parole date.
19  Currently, Petitioner has been with his Fiance for 7 years,
20  and has been friends with her since 1970.  Petitioner and
21  his fiance only wish the best for Petitioner's ex-wife, and
22  hope that she has resulted her drug problems.  Petitioner
23  has long moved on with his own life, and is deeply devoted
24  to his religious beliefs as a Christian Nazarite.  Petitioner
25  is truly remorseful for his prior criminal record, but can
26  only promise this Court that he will never be involved in
27  another bad relationship with any person in the community.
28
                          Page-29-Traverse

1    Petitioner is now nearly 52 years old, and has several medical

2    conditions which are debilitating. Petitioner absolutely

3    maintains he is not a threat to anyone in the public, and

4    only hopes this Court will see through the Board's endless

5    cycle of parole denial for any immutable factor it can find.

6    As stated above, "some evidence" of the existence of a

7    particular factor does not necessarily equate to some evidence

8    the parolee's release unreasonably endangers public safety.

9    In re Dannenberg, supra, 68 Cal.Rptr.3d at 196.

10   E.  Petitioner Maintains That The Board Commissioners on May
     10, 2007 illegally Assessed a Four (4) Year Parole Denial
11   on Petitioner's One Count Second Degree Murder, When The United
     States Superior Court in Garner v. Jones, 529 U.S. 244, 257,
12   120 S.Ct. 1362, 1371, 146 L.Ed.2d 236 (2000) Explained Its
     Mandate In Morales, That California is Limited to Apply the
13   Multi-Year Parole Deferral Process to Only Prisoners Convicted
     of Multiple Murder.

14

15   Petitioner asserts that the Respondent does not explain

16   on page 19 of his answer, why or how, the California Board

17   Commissioners can apply the multi-year parole deferral process

18   to a one count second degree murderer. Petitioner to the

19   contrary, explains in full detail why the Board Commissioners

20   cannot defer his parole hearings for over one year.  The

21   Respondent simply quotes Cal. Dept. of Corr., et al., v.

22   Morales, 541 U.S. 499, 510-02 (1995), as if, the statement

23   on those pages overrules any argument from Petitioner.

24   However, Respondent is not following or does he mention that

25   all the federal cases that have spoken on the same subject

26   matter, have repeatedly stated that only multiple murderers

27   can be denied parole for multi-years, not a one count second

28

degree murderer. See **In re Jackson** (1985) 39 Cal.3d 464, 469 fn. 4 in its entirety. Furthermore, as Petitioner stated above pages 5 and 6, "the mandate of Morales that inmates convicted of **more then one murder** can receive up to 5 year parole deferrals." **Doe v. Pataki**, supra, 904 F.Supp. 603, 619. Also, see **Lynce v. Mathis**, 519 U.S. 433, 443, 117 S.Ct. 891, 897, 137 L.Ed.2d 63 (1997) ("The amendment at issue in Morales allowed the parole board, after holding initial parole hearing, to defer for up to three years subsequent parole suitability hearings **for prisoners convicted of multiple murders** if the board found that it was unreasonable to expect that parole would be granted at a hearing during the subsequent years.") (Justice Thomas concurred in part and concurred in Judgment with opinion in which Justice Scalia joined.) The United States Supreme Court made absolutely clear that "**only multiple murderers**" can receive maximum multiple year denials, "**not one count second degree murder.**" Therefore, the Respondent argument must fail and Ground Five must be granted.

**F. Petitioner Maintains That Ground Six Should Not Be Dismissed For Any Reason, That Ground Six Is Based Solely on the Fact The Board Commissioners on May 10, 2007 Used Petitioner's Commitment Offenses And Other Immutable Factors To Enhance His Second Degree Murder For 4 More Years in Violation of Jones v. Smith, 231 F.3d 1227, 1232-33.**

Petitioner asserts that the Board Commissioners on May 10, 2007 illegally used immutable factors not before the jury who only convicted Petitioner of one count second degree murder, not first degree murder life without parole. As stated in **Jones v. Smith**, supra, 231 F.3d 1227, 1232-33 ("Since the

1  ruling in Appredi, supra, the Court has made clear that any
2  fact that increases the penalty for a crime beyond a reasonable
3  doubt, as set forth Apprendi, expands the range of
4  discrepancies that will amount to a constructive amendment.
5  Such a change is a constructive amendment and is prejudicial
6  per se.") Petitioner asserts that the Board Commissioners
7  on May 10, 2007, used the immutable factors of the commitment
8  offense; old CDC 115 disciplinary reports; 15 to 40 year old
9  bad relationships with women; need for further self-help
10  therapy, read more books in the prison library; lack of insight
11  regarding the commitment offenses, without specifying exactly
12  what insight the board is looking for. All these reasons
13  were used to enhance Petitioner's one count second degree
14  murder for 4 more years, which at the next hearing the Board will
15  just use the same things again; and that this unwarranted
16  action will go on until Petitioner dies of old age or
17  infirmities.

18      Petitioner absolutely maintains this action by the Board
19  Commissioners using all these immutable factors violates his
20  due process rights to a fair and impartial hearing, and
21  definitely is an unjustifiable action. The Board has been
22  delegated to set an appropriate sentence for Petitioner's
23  one count second degree murder. See People v. Enriquez (1977)
24  137 Cal.Rptr. 171, 176-77; Strum v. California Adult Authority,
25  395 F.2d 446, 449 (9th Cir.1967). However, this does not
26  mean the Board Commissioners can repeatedly use the gravity
27  of Petitioner's commitment offenses; non-violent disciplinary
28                          Page-32-Traverse

1  history; need for self-help therapy by reading books at the

2  prison library; lack of insight regarding the commitment

3  offenses; bad relationships with women to enhance Petitioner's

4  punishment 4 more years. As stated in **Farkas v. United States**,

5  744 F.2d 37, 39-40 (1984) ("the parole commission cannot alter

6  terms of any judicially imposed sentence or penalty provision

7  of criminal law upon which such sentence is based.")  By

8  allowing the Board Commissioners unlimited discretion which

9  allows the Board Commissioners to never set a parole date

10 for any reason they want, does convert Petitioner's second

11 degree murder into life without the possibility of parole.

12 In this respect, "a state's sentencing procedures must suitably

13 direct and limit the decision maker's discretion so as to

14 minimize the risk of wholly arbitrary and capricious action."

15 **Zant v. Stephens**, 462 U.S. 862, 874, 103 S.Ct. 2733, 77 L.Ed.2d

16 859 (1983); see also **Sprinkle v. Carey**, (E.D.Cal.) 2008 WL

17 564995 *16:

18      "The court also finds that the Board's 2004 decision
         to deny parole to be unsupported by the evidence.
19      In that decision the Board relied exclusively on
         unchangeable and dated factors, specifically,
20      petitioner's offense of commitment, the manner in
         which it was carried out, and a single incident
21      that occurred prior to his offense.  Petitioner
         "cannot change the past" and denying him parole
22      based solely on these immutable facts "effectively
         changes his sentence" from fifteen years to life
23      "into life imprisonment without the possibility
         of parole." **Martin v. Marshall**, 431 F.Supp.2d 1038,
24      1046 (N.D.Cal.2006).  The Board's decision relied
         solely on "stale and static factor[s]" in violation
25      of petition's due process rights and the factors
         cited therein fail to demonstrate that petitioner
26      would pose a danger to public safety if released
         from prison. See **Hayward, 512 F.3d at 546-47**."

27
                          Page-33-Traverse
28

1    Also see **McCleskey v. Kemp**, 481 U.S. 279, 305, 107 S.Ct.
2    1756, 1774, 95 L.Ed.2d 262 (1987) ("States must properly
3    establish a threshold below which the penalty cannot be
4    imposed"); and see **United States v. Staten**, 450 F.3d 384,
5    392-393 (9th Cir.2006) ("Where an extremely disproportionate
6    sentence results from the application of an enhancement, the
7    government may have to satisfy a clear and convincing
8    standard," (citing United States v. Dare, 425 F.3d 634, 642
9    (9th Cir.2005) (stating same rule in context of mandatory
10   minimums.)).  Petitioner again maintains that Ground Six should
11   be granted in its entirety.

12   G. Petitioner Asserts The Respondent in His Answer Relies
     Heavily on The POR Based on How The Commitment Offenses
13   Occurred, Which Petitioner Absolutely Maintains Contains
     Unsubstantiated Crime Information, And That Several Statements
14   Within The POR Are Based on The Probation Officer's Own
     Information Source With no Authenticity Within The Court of
15   Law.

16   Petitioner asserts that Respondent is trying to prejudice
17   the outcome of this federal petition by fixating on the 25
18   year old immutable Probation Officer's Report (POR).
19   Petitioner absolutely maintains there are several areas in
20   the POR that contain false information in violation Cal. Penal
21   Code §134 et seq., and that the trail transcripts contradict
22   these false statements. (See Respondent's Answer Exhibit 3,
23   for reference to POR.)  The Respondent relies on pages 4-5,
24   as follows: "Through correspondence, Miss Bess attempted to
25   terminate the relationship with the defendant and he was
26   eventually paroled in June, 1983; On June 20, 1983, Cynthia
27   Bess reluctantly agreed to meet the defendant and picked him

28                    Page-34-Traverse

1  up at the halfway house.  While she was driving the defendant
2  back to the halfway house, he became irate and threatened
3  to "kill" her because she had "hurt" him so bad.  He struck
4  her one time in the jaw with his fist and in order to get
5  him to stop, she said that she loved him"; "She reported this
6  incident to the Orange County Sheriff's Department but failed
7  to follow through on a Long Beach Police Department report
8  because 'I was afraid due to intimidation by Ivan over several
9  years.'" "She did, however, report the incident to the halfway
10 house and asked that the defendant not contact her or her
11 family." "Later she was contacted by halfway house personnel
12 and told that a counselor would be picking up some of the
13 defendant's pictures from the residence"; "A few minutes later,
14 the defendant arrived at the residence, saying "You're gonna
15 die . . . You called the halfway house on me . . . You're
16 gonna die . . . You called the Halfway house on me . . . You're
17 gonna get it." "She was able to talk the defendant into going
18 to her pastor to discuss the incident."  "The pastor could
19 not resolve the situation and the defendant did not like him
20 because he said that 'Ivan needed to seek counseling.'" "A
21 few days later, Miss Bess drove the defendant to his mother's
22 residence and she went to the Los Angeles Airport for a flight
23 out of the state because she was afraid of the defendant."
24     "On June 26, 1983, about 2"15 a.m., the defendant was
25 discovered in Miss Bess' residence in Mission Viejo"; "The
26 defendant apparently entered the residence through an unlocked
27 door and was confronted by Miss Bess' roommate." "Some
28                        Page-35-Traverse

1   photographs of the defendant was the only property taken."
2   "The defendant was aware that Cynthia Bess had established
3   a relationship with Robert Topper, Jr., and the defendant
4   began making telephone calls to him." "On June 26, 1983, about
5   5:20 a.m., Mr. Topper received a telephone call from the
6   defendant, during which he said that Miss Bess was "going
7   down" and that he (Topper) was "going down". "The victim
8   took this as a death threat and he also indicated to a
9   sheriff's deputy that the defendant had threatened to kill
10  Miss Bess. During the telephone conversation, the defendant
11  described the victim's house to him, as well as the vehicles."
12  All this information is unsubstantiated lies with no factual
13  support.

14      Further, the Probation Officer stated several key factors
15  wrong, as "He then proceeded to cut the outside telephone
16  wire with wire cutters and kicked the door open." This is
17  not the way the crime occurred. Petitioner did cut the one
18  phone line, however, rang the doorbell, thereafter, the victim
19  and Petitioner had an argument at the door, and only after
20  the victim say he was going to kill Petitioner did I kick
21  the door open. The Probation Officers deliberately left out
22  this part of the evidence. In addition, the Probation Officer
23  states that Petitioner was armed with two hammers, however,
24  the evidence shows that only one small hammer was found at
25  the crime scene.

26      The Probation Officer goes on to state: "then proceeded
27  to the bedroom where Cynthia and Robert Topper were staying."
28                      Page-36-Traverse

1   "He **apparently** struck Mrs. Topper, who then ran to the
2   kitchen." "The defendant began struggling with Robert Topper,
3   who armed himself with a .357 magnum." This statement is
4   wrong.  The true story is after Petitioner kicked open the
5   door Petitioner stated to the victim, where are you, and the
6   victim say I am down here, come down here, after that
7   Petitioner walk into the hallway of the house where the victim
8   was waiting with his 357 magnum pistol.  Thereupon, the victim
9   open fire on Petitioner's nearly blowing off his left index
10  finger, and shot Petitioner again, and the second bullet
11  entered Petitioner's left chest area causing flight or fight
12  fear.  The Probation Officer completely fails to state the
13  crime as it actually happen.  The Probation Officer further
14  states in his report that "Robert Topper Jr. received several
15  blows to the head, causing skull fractures, and was shot five
16  times in the head, chest, and neck." "These gunshots were
17  all fired while the victim was lying face down on the floor."
18      Petitioner absolutely maintains the victim was not shot
19  5 times in the head, chest, and neck, and the victim was not
20  lying face down on the floor when these shots were received.
21  The true facts are as follows: The victim Robert Topper Jr.
22  shot Petitioner twice as stated above, after, and only after
23  the victim shot Petitioner, he pulled the small hammer from
24  his back pocket and started hitting the victim in the head
25  to stop him from shooting anymore shots into my body, as the
26  evidence shows the victim was on his feet throughout the entire
27  fight and did not fall until all the shots were fired during

28                          Page-37-Traverse

1   the struggle. Petitioner never had possession of the victim's
2   gun when any of the shots entered his body, the victim received
3   all the shots during the struggle with Petitioner. (See
4   Exhibit "A" for reference to testimony from Dr. Fukumoto the
5   pathologist a forensic scientist who conducted the autopsy
6   on the victim Robert Topper Jr.). Also, as stated above,
7   the victim received 3 shots from different angles. As the
8   Pathologist autopsy report states: Bullet # 1, "the trajectory
9   is from front-to-back with a slight superior angulation. (Note:
10  slight superior means from high to low.) Bullet #2 has a
11  right-to-left direction with a superior and posterior
12  angulation through a slight superior angulation. Bullet #3,
13  this bullet has a front-to-back direction and a right-to-left
14  direction. Also the injury to the right hand is a re-entery
15  wound from one of the 3 shots the victim received.

16      Petitioner asserts that the false information in the
17  POR is being relied on continuously by the Board Commissioners
18  and prison officials, to keep Petitioner in prison for the
19  rest of his life. See **People v. Santana** (1982) 184 Cal.Rptr.
20  733, 737 ("The key problem, however, is that the probation
21  report contains police contacts not leading to arrests or
22  convictions in some instances without full supporting
23  information. Also arrests are set forth which did not lead
24  to an adjudication and they are set forth in the section of
25  the report which deals with past convictions. In these
26  respects the probation report contained improper information
27  presented in an improper manner"); see also **People v. Romero**
28                          Page-38-Traverse

1    (1977) 137 Cal.Rptr. 675, 677-78 ("Appellant's second

2    contention is meritorious. In People v. Calloway, 37 Cal.App.3d

3    905, 112 Cal.Rptr. 745, the defendant contended that . . .

4    'the inclusion in the Probation report of the seven police

5    contacts' in connection with which he was neither convicted

6    or charged prejudicially associates him with seven serious

7    crimes and so infected his probation hearing as to deny him

8    due process of law." )"(People v. Calloway, supra, at 908,

9    112 Cal.Rptr. at 746.) The court agreeing in part, indicated,

10   such record, without supporting factual information, should

11   not be included in a probation report.  They are unreliable,

12   highly prejudicial, and under any circumstances could result

13   in a fundamentally unfair hearing.")

14       In addition, see **Craford v. Jackson**, 323 F.3d 123, 128

15   (C.A.D.C.2003) ("Courts are properly more concerned with

16   whether the evidence considered as a whole, including the

17   hearsay evidence, was both sufficient in quantity and

18   reliability to ensure fundamental due process rights.   For

19   example, in Taylor v. U.S. Parole Commission, 734 F.2d 1152

20   (6th Cir.1984), the Sixth Circuit eschewed any concern about

21   the admissibility or consideration of the hearsay pre se in

22   reviewing a Parole Commission decision for abuse of discretion.

23   Id. at 1155.  Rather, the court's concern arose from "the

24   paucity of reliable evidence of [the parolee's] criminal

25   conduct when based solely on a probation officer's summary

26   of an arrest report. Id. at 1155-56.  Such a finding "is but

27   a step away from a finding of criminal conduct base solely

28                         Page-39-Traverse

1   upon evidence of a parolee's arrest with **"no account of**
2   **underlying circumstances.**" Id. at 1156.")

3       The **Craford** decision also made clear under "United States
4   v. Comito, 177 F.3d 1166, 1171, 1173 (9th Cir.1999) with United
5   States v. Kindred, 918 F.2d 485, 487 (5th Cir.1990).   This
6   approach raises a red flag for parole authorities to ensure,
7   before relying on hearsay, that there are sufficient indicia
8   of reliability under the circumstances at hand to protect
9   the prisoner's due process rights." Id. **Craford**, 323 F.3d
10  at 129.   Petitioner maintains the POR contains information
11  that is not true and is being used as a source of information
12  to deny parole forever.   Petitioner needs an order of this
13  Court to remove all the statements that are not backup with
14  reliable information.

15      Furthermore, the only witness that testified about the
16  events that occurred at Beach Haven Lodge, was Andrew Calvin
17  Worley, who stated that Petitioner and the female Cynthia
18  Bess were touching, embracing and kissing on two separate
19  occasions.   If Petitioner had done any of the alleged
20  information in the POR surely Cynthia Bess would have not
21  have been so affectionate to Petitioner's during the two visits
22  at Beach Haven Lodge. (See Exhibit "**F**" for reference to trial
23  transcripts of testimony from Andrew Calvin Worley.)   Also
24  the Probation Officer completely fails to mention any of the
25  evidence that favored Petitioner's trial defense, such as,
26  the Court admitted into evidence several photographs from
27  the female Cynthia Bess, which showed her holding a gun in

               Page-40-Traverse
28

1  the nude.   These photographs were received through the U.S.

2  Mail 12 months before Petitioner was released from federal

3  prison. (See Exhibit "G" for reference to trial court admitting

4  several nude photographs of Cynthia Bess, where she is holding

5  a gun in her hand.)  Again, the Probation Officer did not talk

6  about this evidence in his report.

7       The Probation Officer stated in his report page 4 as

8  follows: "The following account is taken from information

9  contained in the **District Attorney** file and **may differ** from

10 testimony."  Also, the Court discovered several areas of the

11 POR that contained false information and ordered his clerk to

12 blacken-out those areas. (See Exhibit "H" for reference to page

13 4 and areas the judge ordered removed from the POR.)  However,

14 the sentencing court should have blacked-out much more, but failed

15 to do so.   In accordance with the United States Supreme Court

16 Petitioner holds a due process right to petition this Court

17 for removal of false evidence in the POR, which the Respondent

18 is relying on to prejudice the case before this Court.   See

19 **Townsend v. Burke**, 334 U.S. 736, 740 (1948) (false information

20 in a sentencing report should be ordered removed); also see

21 **Franklin v. Shield**, 569 F.2d 784, 789-90 (1977) (relying on

22 false information violated petitioner's right to a fair and

23 impartial hearing based on genuine facts); see **Moore v. United**

24 **States**, 571 F.2d 179, 183 (3rd Cir.1978) (relying on false

25 information in the POR violated petitioner's due process right

26 and a hearing based on the correct facts); and **United States**

27 **v. Weston**, 448 F.2d 626, 633-34 (9th Cir.1971) (false information

Page-41-Traverse

28

1    in the POR violated petitioner's due process right to a fair

2    and impartial hearing); see **Paine v. Barker**, 595 F.2d 197, 201

3    (4th Cir.1979) (Petitioner has a constitutional right to

4    challenge false information in his prison file.)

5        Furthermore, "as long as information contained in agency's

6    files is capable of being verified, then, under Privacy Act,

7    agency willfully or intentionally fails to maintain its records

8    in that way, and consequently makes determination adverse to

9    individual, it will be liable to that person for money damages.

10   5 U.S.C.A. §552a(e)(5), (g)(1)(C), (g)(4)." **Sellers v. Bureau**,

11   959 F.2d 307, 308 [Hn. 4]. Petitioner maintains the information

12   about the one count second degree murder is incorrect, and

13   therefore, must be overruled as a true source of information

14   regarding Petitioner's commitment offense, and should be ordered

15   blacked out, so that no future parole board hearing will be

16   based on this inaccurate, faulty Probation Officer's Report.

17   (See Exhibit "H" for reference to Fourth Appellate Court decision

18   page 4.) Petitioner maintains the State of California Fourth

19   Appellate Court, Division Three, placed in the decision that

20   the victim was shot during the struggle, therefore, the state

21   court did recognize there was evidence the victim was not shot

22   lying face down on the floor, as stated by the Probation Officer

23   in his report. (See Exhibit "I" for reference to witness Henry

24   Harazim, who heard 3 shots in rapid succession fired by the

25   victim at Petitioner, which backs-up Petitioner's trial evidence

26   that the victim shot Petitioner first, hitting Petitioner with

27   two shots and missing him with one, which occurred before

                            Page-42-Traverse

28

1  Petitioner defended himself with the small hammer.)

2  Likewise, the Probation Officer did not mention that

3  Petitioner's Brother-In-Law William Edney was a hunter, and

4  had several guns at his house, including a loaded 357 between

5  the mattress Petitioner was sleeping on. Petitioner could

6  have taken a gun to the crime scene, but did not. This

7  evidence shows that Petitioner did not harbor the intent to

8  kill, as the Probation Officer would have you thinking after

9  reading his unsubstantiated sentencing **report.** (See Exhibit

10  "J" for reference to testimony from Petitioner's

11  Brother-In-Law.)

12  In addition, the Respondent states that the female victim

13  was incompetent to testify, however, Petitioner would disagree

14  with this assessment. On May 20, 1986, the Orange County

15  Superior Court issued an order to terminate conservatorship

16  on the female victim. (See Exhibit "K" for reference to page

17  2.) Also, Petitioner maintains the female victim should have

18  testified in this case, but was not allowed by the trail court.

19  However, the real reason the court and prosecutor did not

20  want the female victim to testify, was because she was going

21  to make favorable statements for Petitioner, which could have

22  caused the jury to find Petitioner not guilty or only guilty

23  of manslaughter. (See Exhibit "L" for reference to declaration

24  sent to Petitioner's appellate counsel in 1989.)

25  **CONCLUSION**

26  Based on the foregoing facts, the Respondent's sole

27  reliance on the incorrect (POR) must be found in error, and

28  Page-43-Traverse

1  based on all the genuine evidence, and correct case
2  information, and not immutable old information, this Court
3  should render a favorable decision for Petitioner. Also,
4  Petitioner should be ordered released on parole based on the
5  professional opinion of the 2006 psychologist report, and
6  as ordered by the Ninth Circuit Court of Appeals in the recent
7  Hayward decision, who also had several untrue crime factors
8  of over 120 alleges crimes used against him to deny parole
9  forever, or this Court should order a new parole hearing that
10 is restricted to evidence within the last year showing
11 Petitioner is a current danger to public safety.
12 Dated this 6ᵗʰ day of May, 2008.

                              Respectfully Submitted,



                              IVAN VON STAICH
                              Petitioner in Pro Se
                              Without Bar Licensed Counsel

                         Page-44-Traverse

EXHIBIT    "A"

# No. G004351

# COURT OF APPEAL — FOURTH DISTRICT COPY
## DIVISION THREE
## STATE OF CALIFORNIA

THE PEOPLE OF THE STATE
OF CALIFORNIA,

               Plaintiff

            **vs.**                            **NO.** C-53851

IVAN VON STAICH,

               Defendant

---

### APPEAL FROM THE SUPERIOR COURT OF ORANGE COUNTY

HONORABLE ROBERT R. FITZGERALD,
**JUDGE/COMMISSIONER**

## CLERK'S TRANSCRIPT

## A P P E A R A N C E S

For Plaintiff & Respondent
                      Attorney General
                      110 West "A" St.
                      San Diego, Ca 92101

For Defendant & Appellant
                      Appellate Defenders
                      233 "A" St.
                      San Diego, Ca 92101

VOLUME I of II
Pages 1-457

F0182-107.2 (8/77)

15

A   Yes.

MR. MOSELEY:   Thank you.   Your Honor, at this time,
People would offer Photographs Numbers 1 through 12 into
evidence.

MR. ORTIZ:   No objection.

THE COURT:   That will be received.

BY MR. MOSELEY:   Q   Doctor, would you state for the
record the injuries that were revealed during the course
of your autopsy.

A   Okay.   The gunshot wound of entry from the back
of the left chest wall has perforated both lobes of the left
lung and then exited to the front.

The bullet which has entered the back of the
neck has just barely grazed the occipital portion of the
skull, but did not enter the skull, and then exited
on the back of the right earlobe and also through the
right earlobe.  That, in my opinion, is essentially a
nonfatal type of gunshot wound.

The third bullet which has entered the right
neck area has gone through the skin and soft tissue, has
gone through the cervical spinal canal, vertebral column,
and has partially severed the spinal cord and then
exited on the opposite side, at the same time lacerating
a major vein on the left side of the neck resulting in
bleeding and then exiting out of the skin.

And then, of course, there is the gunshot wound

# EXHIBIT "B"

23

1      A   No, sir, I don't.

2      Q   If the gunshot occurred to the back of the head

3   first, would that render him unconscious?

4      A   It would stun him.   Whether it would render him

5   unconscious, I think I'll be speculating.

6      Q   How about the gunshot to the side of the neck?

7   Would that render him unconscious?

8      A   He would be, I would say, instantly paralyzed

9   where he is unconscious -- I would say he probably would

10   be -- he would lose some consciousness.

11      Q   How soon?

12      A   I would say instantly.

13      Q   How about the shot to the back?   Would that render

14   him unconscious?

15      A   No, sir.

16      Q   Do you know with any certainty whether or not the

17   decedent was dead prior to the head trauma?

18      A   Could you repeat that question?

19      Q   Yes.   Do you know whether the subject was dead

20   before the blows to the head were administered?

21      A   No question in my mind that the decedent was

22   alive when the head trauma was inflicted because there is

23   extensive subarachnoid hemorrhage.   So he has to be alive

24   for the subarachnoid hemorrhage to occur.

25      Q   But you don't know which occurred first, the

26   gunshots or the head trauma?

1    A   That's correct.

2    Q   If, say, Dr. Fukumoto, that the decedent was

3    erect and struggling with someone else and he was, say,

4    hit on the head first time, could he still struggle with his

5    assailant, be hit again?

6    A   Well, yes. Some of the blows to the head were

7    small. In other words, I said they range anywhere from

8    half an inch. So it is the smaller, you know, if the

9    first blow resulted in a smaller wound, those wounds, in my

10   opinion, probably will not render him unconscious that he

11   could continue to struggle.

12   Q   So under those conditions, the decedent could have

13   been struggling and sustained a number of blows to the

14   head and still be able to struggle?

15   A   Yes.

16   Q   Somewhere at the time the heavier trauma was

17   inflicted, there would be some mention of unconsciousness

18   after some measure of time?

19   A   Yes, sir.

20   Q   And can you tell from the head trauma wound if the

21   minor ones or the major ones occurred first?

22   A   No, sir.  All I can say, they appear to have

23   occurred at or approximately the same time.

24   MR. ORTIZ:  Thank you, Dr. Fukumoto.

25   THE COURT:  Anything further?

26   MR. MOSELEY:  Nothing further, your Honor.

# EXHIBIT   "C"

boilerplate at top partially illegible

EXHAUSTION OF REMEDIES BEFORE COURT

STATE OF CALIFORNIA — DEPARTMENT OF CORRECTIONS

**INMATE/PAROLEE APPEAL FORM**

**2ND LEVEL**

Location _____ Log No. _____ Category _____ 01 - 0 2 2 3 1

You may appeal any policy, action or decision which has a significant adverse effect upon you. With the exception of Serious CDC 115s, classification committee actions, and classification and staff representative decisions, you must first informally seek relief through discussion with the appropriate staff member, who will sign your form and state what action was taken. If you are not then satisfied, you may send your appeal with all the supporting documents and not more than one additional page of comments to the Appeals Coordinator within 15 days of the action taken. No reprisals will be taken for using the appeals procedure responsibly.

| NAME | NUMBER | ASSIGNMENT | UNIT/ROOM NUMBER |
|---|---|---|---|
| IVAN VON STAICH | E-10079 | WG/C | C-120 |

**A. Describe Problem:** This inmate served an additional 997 days in the Orange County jail before being transferred to State Prison. However, I did not receive as required by law 1/3 good/time work/time credits on this actual time. The trial court ordered separate credits on counts 1 and 2, count 1 was the indeterminate sentence where court ordered 1097 days of total credit, See exhibit "A". Count 1 was the determinate sentence where the court ordered 1097 days of total credit, See exhibit "B". The CDC has absolutely "no legal right" to deny these credits towards this inmate's separate sentences. (See exhibit "C" for info regarding 997 days (Continued next page attached.)

If you need more space, attach one additional sheet.

**B. Action Requested:** 1) That I receive as required by law 1/3 good/time work/time on the actual 997 days served in the Orange County jail. 2) That these credits be awarded towards both counts separately as required by and as ordered by the Superior Court in this case within the provision of statutory state laws. (Continued next page attached.)

Inmate/Parolee Signature: _Ivan Von Staich_  Date Submitted: 8-20-2001

**C. INFORMAL LEVEL (Date Received):** 8/20/01
**Staff Response:** Appeal granted! Attached is a calculation worksheet showing your credits of 2094 total and vested credits of 493. Also attached is your legal status summary.

Staff Signature: _R Hudson - CCII A_  Date Returned to Inmate: _____

**D. FORMAL LEVEL** See exhibit "A" Judgment of Commitment, page 2.
If you are dissatisfied, explain below, attach supporting documents (Completed CDC 115, Investigator's Report, Classification chrono, CDC 128), and submit to the Institution/Parole Region Appeals Coordinator for processing within 15 days of receipt of response.
Absolutely dissatisfied, if you are going to follow the statutory law of PC 2900.5 and dual credit requirement set forth in in re Joyner, where the Supreme Court stated that defendants are entitled to dual credit on both counts. Please give me all my pre-sentence and post-sentence credits on my 15 to life sentence as ordered on JUDGMENT OF COMMITMENT, page 2.

Signature: _Ivan Von Staich_  Date Submitted: 9/13/01
CDC Appeal Number: _____

Note: Property/Funds appeals must be accompanied by a completed Board of Control form BC-1E, Inmate Claim.

Appeals Office
SEP 17 2001

01 - 02231

First Level    ☐ Granted    ☐ P. Granted    ☐ Denied    ☐ Other

E. REVIEWER'S ACTION (Complete within 15 working days) Date assigned    SEP 1 7 2001    Due Date    OCT 3 0 2001

Interviewed by CCI/etc per telephone conversation on 10-9-01.
Mr. Stevens your case and maximum minimum
eligible parole date has been reviewed per
Operation Manual Section 73010.6.15.4 (see attached)
There was no error found however your case will be
referred to Legal Processing Unit (LPU) for review
regarding in prison credits.

Staff Signature: C. Sybert    Title: CCCS    Date Completed: 10-9-01

Division Head Approved
Signature: Rivera    Title: CCPR    Returned: OCT 16 2001    Date to Inmate:

F. If dissatisfied, explain reasons for requesting a Second-Level Review, and submit to Institution or Parole Region Appeals Coordinator within 15 days of receipt of response.

100% dissatisfied, the DOM's § 73010.6.15.4 does not allow the CDC to
deny pre-sentence credits ordered by the court on both sentences
separately because one sentence is served before the other. The CDC
must deduct all post prison and pre-sentence (from my MEPD) credits

Signature: Ivan Van Hauch    Date Submitted: 10-22-01

Second Level    ☐ Granted    ☐ P. Granted    ☒ Denied    ☐ Other

G. REVIEWER'S ACTION (Complete within 10 working days) Date assigned    OCT 2 6 2001    Due Date    NOV 2 8 2001

☒ See Attached Letter

Signature: (?) Melody Jorm B.A. M.S. A.D.    Date Completed: 11-13-01

Warden/Superintendent Signature:    Date Returned to Inmate:

H. If dissatisfied, add data or reasons for requesting a Director's Level Review, and submit by mail to the third level within 15 days of receipt of response.    NOV 16 2001

In accordance with In Re Joyner, supra, this inmate is entitled to dual credit for multiple
restraints and due to this Supreme Court case my Trial Court sentenced me to two (2) complete
separate cases, with their own ABSTRACTS WITH CREDITS GIVEN IN BOTH CASES per Rules of Court
§451(a), now the CDC must given me the exact credits specified in the separate Abstract and
Judgment of Commitment, these written documents and court orders that the CDC can not deny
based on the DOM or Administrative law. See Gov. Code § 11414(a) the credits must taken from
this start of my life Sentence.

Signature: Ivan Van Hauch    Date Submitted: Nov 21/01

For the Director's Review, submit all documents to: Director of Corrections
P.O. Box 942883
Sacramento, CA 94283-0001
(Attn: Chief Inmate Appeals)

Third Level    ☐ Granted    ☐ P. Granted    ☐ Denied    ☐ Other

I. ___    Address:    Date:

CONTINUATION PAGE ONE:

(Describe problem continued):  served in county jail.)

In accordance with In re Joyner, (1989) 256 Cal.Rptr. 785, at page 790: "The defendant is none-the-less "entitled to dual credit for multiple restraints before he begins serving a term; the defendant need only show that the charge as to which he seeks credit was a basis, not necessarily the exclusive basis for the custody."  (In re Atiles, (1983) 33 Cal.3d 805, Id at p. 810, 191 Cal.Rptr. 452.)

The Orange County Superior Court granted credits on both counts, and forwarded a copy of both Judgment of Commitment on indeterminate sentence and Abstract of Judgment on the determinate sentence, however, when Petitioner finished his determinate sentence the CDC failed to give Petitioner any credit on his 15 to life sentence.  The Judgment of Commitment stated on page 2 that the court allows a total of 1097 to be credited to Petitioner's 15 to life sentence.  Further, Petitioner was held in the County jail on a unrelated escape charge for an additional 997 days.  Petitioner was found not guilty of the escape charge and thereafter was transferred to state prison to start serving his two sentences, however, the CDC failed to give Petitioner any credit for the additional 997 days served after sentencing on the two original charges. Petitioner should have received 1/3 good/time work/time credits on the additional 997 actual days served before entering CDC to serve out his two sentences.  (See People v. Rowland, (1982) 134 Cal.App.3d 1, Id. 13-14, 184 Cal.Rprt. 346.

Further, Penal Code §2657 states that Petitioner can not be punished for an alleged crime when he has been acquitted in a court of law.  There is absolutely no reason that the CDC can use to deny Petitioner all his pre-prison county jail credits on his 15 to life sentence. The murder crime was the only reason Petitioner was being held without bail and is the sole reason why he was sentenced to State Prison.

**SEE JUDGMENT OF COMMITMENT AND SEPARATE ABSTRACT OF JUDGMENT ATTACHED.**

Continued Action Requested:   3) Further, the "Credits Auto Re-Vested Per PC-2934 of 318 days "is wrong" regarding the determinate count 2 sentence. I served 997 actual post-sentence days in custody and the CDC must grant me credits ½ of the actual 997 days served, which would be 498 days. Likewise, I am entitled to separately on the indeterminate sentence 1/3 credit added to the actual 997 days served in the O.C. jail.

RESPECTFULLY  SUBMITTED: By Ivan VonStaich
Additional Page

STATE OF CALIFORNIA
DEPARTMENT OF CORRECTIONS
INMATE APPEALS BRANCH
P. O. BOX 942883
SACRAMENTO, CA  94283-0001

# DIRECTOR'S LEVEL APPEAL DECISION

Date:   **FEB 2 5 2002**

In re:      STAICH, E-10079
            Correctional Training Facility
            P.O. Box 686
            Soledad, CA  93960

IAB CASE NUMBER:        0105097
LOCAL LOG NO.:          CTF 01-02231

This matter was reviewed on behalf of the Director of the California Department of
Corrections (CDC) by Appeals Examiner J. G. Arceo, Facility Captain.

## ISSUE

Whether or not staff acted appropriately on the appellant's request.

## ARGUMENTS

### I

It is the appellant's position that he did not receive one-third credits on his actual time as
required by law.  The department is denying him separate court ordered credits, which
should be applied to the indeterminate sentence and the determinate sentence.  However,
the appellant contends he has completed his determinate term and is now due pre and post
sentence credits on his 15 to life sentence.

The appellant requests on appeal that he receive the one-third credit on the actual 997
days served in the Orange County Jail and that the credits be separately awarded on both
counts.

### II

It is staff's position in the Informal Level of response to grant the appellant's request.  The
appellant was provided with a calculation worksheet reflecting that the 2094 and 498
vested credits were deducted from his term.  The Second Level of response denied the
appellant's appeal and indicated that the 997 days post sentence time is not considered
county jail time and therefore he did not earn one third credit for this period.

## FINDINGS

The rule governing this issue is:

> **California Penal Code Section (PC) 2900.5.  Credit for time in custody
> upon term of imprisonment or fine**

0105097

(a) In all felony and misdemeanor convictions, either by plea or by verdict, when the defendant has been in custody, including, but not limited to, any time spent in a jail, camp, work furlough facility, halfway house, rehabilitation facility, hospital, prison, juvenile detention facility, or similar residential institution, all days of custody of the defendant, including days served as a condition of probation in compliance with a court order, and including days credited to the period of confinement pursuant to Section 4019, shall be credited upon his or her term of imprisonment, or credited to any fine on a proportional basis, including, but not limited to, base fines and restitution fines, which may be imposed, at the rate of not less than thirty dollars ($30) per day, or more, in the discretion of the court imposing the sentence. If the total number of days in custody exceeds the number of days of the term of imprisonment to be imposed, the entire term of imprisonment shall be deemed to have been served. In any case where the court has imposed both a prison or jail term of imprisonment and a fine, any days to be credited to the defendant shall first be applied to the term of imprisonment imposed, and thereafter the remaining days, if any, shall be applied to the fine on a proportional basis, including, but not limited to, base fines and restitution fines.

(b) For the purposes of this section, credit shall be given only where the custody to be credited is attributable to proceedings related to the same conduct for which the defendant has been convicted. Credit shall be given only once for a single period of custody attributable to multiple offenses for which a consecutive sentence is imposed.

(c) For the purposes of this section, "term of imprisonment" includes any period of imprisonment imposed as a condition of probation or otherwise ordered by a court in imposing or suspending the imposition of any sentence, and also includes any term of imprisonment, including any period of imprisonment prior to release on parole and any period of imprisonment and parole, prior to discharge, whether established or fixed by statute, by any court, or by any duly authorized administrative agency.

(d) It shall be the duty of the court imposing the sentence to determine the date or dates of any admission to, and release from, custody prior to sentencing and the total number of days to be credited pursuant to this section. The total number of days to be credited shall be contained in the abstract of judgment provided for in Section 1213.

(e) It shall be the duty of any agency to which a person is committed to apply the credit provided for in this section for the period between the date of sentencing and the date the person is delivered to the agency.

(f) If a defendant serves time in a camp, work furlough facility, halfway house, rehabilitation facility, hospital, juvenile detention facility, similar residential facility, or home detention program in lieu of imprisonment in a county jail, and the statute under which the defendant is sentenced requires a mandatory minimum period of time in jail, the time spent in these facilities or programs shall qualify as mandatory time in jail.

(g) Notwithstanding any other provision of this code as it pertains to the sentencing of convicted offenders, nothing in this section is to be construed as authorizing the sentencing of convicted offenders to any of the facilities or programs mentioned herein.

(h) This section shall become operative on January 1, 1999.

All submitted documentation and supporting arguments of the parties have been considered.    The documentation and arguments presented are persuasive that the

STAICH, E-10079
CASE NO. 0105097
PAGE 3

appellant has failed to support his appeal issue with sufficient evidence or facts to warrant a modification of the Second Level response.

The department's Case Records staff reviewed the appellant's issues for a second time to clear up any discrepancies. It was determined that even though the appeal was denied at the second level regarding the one third credit issue these credits were correctly calculated into the appellant's Minimum Eligible Parole Date. The pre and post sentence credits are only applied once according to the California Penal Code (PC) Section 2900.5, and they determined that these were also applied. The Computation Review Hearing Decision reflects an appropriate outcome. A comprehensive and thorough review of the issues has been conducted and no further response is required.

## DECISION

The appellant's request was appropriately denied.

The appeal is denied.

## ORDER

No changes or modifications are required by the institution.

This decision exhausts the administrative remedy available to the appellant within CDC.

LINDA L. RIANDA, Chief
Inmate Appeals Branch

cc:     Warden, CTF
        Appeals Coordinator, CTF

# EXHIBIT   "D"

CA NO. 06-15577

## IN THE UNITED STATES COURT OF APPEALS

### FOR THE NINTH CIRCUIT

* * *

IVAN VON STAICH                )    N.D.C. No. CV-02-022321-PJH
                               )    (Northern District of California,
        Petitioner-Appellant,  )    San Francisco Division)
                               )
    v.                         )
                               )
CALIFORNIA DEPARTMENT OF       )
                               )
CORRECTIONS,                   )
                               )
    and                        )
                               )
JOHN V. BRIGGS,                )
                               )
        Respondent-Appellee.   )
_____).

Appeal From the United States District Court

For the Northern District of California

A P P E L L A N T ' S   O P E N I N G   B R I E F

IVAN VON STAICH
E-10079 C/Wing 137u
P.O.Box 689
Soledad, Ca. 93960-0689

Petitioner Solely
In Propria Persona

## TABLE OF CONTENTS

**PAGE**

I. APPELLANT'S OPENING BRIEF..................................1-33

    A. Statement of Jurisdiction and
       Standard of Review.....................................1

    B. Course of Proceedings..................................1

    C. Nature of Case........................................4

    D. Had Appellant Received his Presentence Post-Sentence
       Credits he Would Have Been Before the Board Five (5)
       Years Three Months Earlier............................6

CONCLUSION·····················································33

II.  A R G U M E N T:

    THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND/OR THE
    BOARD OF PRISON TERMS ACTION DENYING A SET TERM ON
    APPELLANT'S M2d CRIME AND THE DENIAL OF COURT ORDER
    PRESENTENCE AND POST-SENTENCE CREDITS WAS ARBITRARY
    AND CAPRICIOUS........................................6

    A. California M2d Inmates Have A Liberty Interest
       Protected by the United States Due Process Clause.......7

    B. The California Department of Corrections and/or the
       Board of Prison Terms Officials Refuse to Acknowledge
       that Indeterminately Sentenced Inmates Have a Protected
       Liberty Interest Which Requires a Set Parole Date Under
       GreenHoltz v. Nebraska, 442 U.S. 1 (1979) Mandatory
       Unless Language and Have Failed to Follow Other States
       With Similar Greenholtz Mandatory Language.............8

    C. Appellant Maintains He is Entitled to Have his
       Indeterminate M2d Term Converted to a Determinate
       Sentence in Accordance With the Mandatory Language
       Set Forth in Cal. Penal Code §1170.2 and in Compliance
       State and Federal Citations...........................10

    D. Appellant Maintains the California Department of
       Corrections and the Board Commissioners Have Resentenced
       him to Straight Life in Prison Based Solely on the Facts
       Related to the Jury Second Degree Murder Verdict, When
       Second Degree Murderers in California in (1983) Cannot be
       Punished by the Court With Straight Life Under Cal.
       Penal Code §190......................................11

## CONTINUED TABLE OF CONTENTS

PAGE

E. California Department of Corrections and the Board
   Commissioners Have Violated Appellant's Fifth and
   Fourteenth Amendment Rights in Accordance With the
   Double Jeopardy Clause, Based Solely on the Fact
   That Appellant has now Served Nearly 24 Years,
   Which is Well-Over his MEPD Under California Penal
   Code §3041(a) and is now Serving an Illegal First
   Degree Murder Sentence and Punishment..........................16

F. Appellant Maintains the Department of Corrections
   and Parole Board Officials Have Continuously Violated
   United States Constitution Under the Fourteenth
   Amendment Due Process Clause by Enforcing the
   Unconstitutionally Vague California Parole Statute
   Section 3041(a) and That State & Federal Courts are
   in Disarray Over This Statute, and That When any State
   Statute is Written so Ambiguously, the Statute Must be
   Read in the Light Most Favorable to the Defendant............. 18

G. Appellant Maintain the BPH Commissioners Administrative
   Regulations Under Cal. Code Regs. tit. 15 Div. 2, §§2400-
   2411 are Being Used to Override the Statutory Liberty
   Interest Language in Accordance With Cal. Penal Code
   §3041(b) and These Regulations are Being Used by the
   Board Commissioners to Override Upper Term Setting Under
   Cal. Penal Code §1170.2(a)(e) and (f) and Cal. Penal Code
   §3041(a), Which Directly Violates Government Code §11342.2.....25

H. Appellant Maintains That California Department Corrections
   Officials and Board Commissioners Have Failed to Grant
   Presentence and Post-Sentence Court Ordered Credits on his
   Indeterminate M2d Term and That Appellant has a Liberty
   Interest Directly Related to These Court Ordered Credits
   in Accordance With Toussaint v. McCarty, 801 F.2d 1080,
   1094 (9th Cir.1986)...........................................26

I. Appellant Maintains his United States Constitutional
   Rights Under the Fifth and Fourteenth Amendments Were
   Violated In Accordance With Equal Protection, When Other
   Similarly Situated Indeterminate and Determinate Sentenced
   California Inmates Have Received all their County Jail
   Credits, When the State and Federal Courts Granted Their
   Habeas Corpus Petitions and Ordered These Inmates be
   Released Forthwith............................................30

# TABLE OF CONTENTS

PAGE

**S T A T U T E S:**

**28 United States Code:**

§2254.........................................................1,4

§1291...........................................................1

§2253...........................................................1

**California Penal Code:**

§669...........................................................28

§1168(b)...........................................7,8,11,16,19

§1170 et seq...................................................22

§1170(a)(1)....................................................19

§1170.1 (a)....................................................26

§1170.2 et seq.................................................23

§1170.2(a)......................................10.12,13,24,25

§1170.2(e)......................................11,12,13,24,25

§1170.2(f)......................................11,12,13,24,25

§3000(a).......................................................12

§3000(b).......................................................12

§3000(d).......................................................12

§3001..........................................................12

§3041(b)..........................................7,8,9,10,17,25

§3041(a)..................................................PASSIM

§3041.5..........................................5,19,23,25

§5075.5........................................................23

§5075.6(F)(2)..................................................23

§2932(b).......................................................26

§12022.5.......................................................31

# TABLE OF CONTENTS

PAGE

Government Code:

§9605.............................................................24

§11342.2..........................................................25

California Rules of Court:

Rule 451(a)...............................................26,27,30

California Code of Regulation:

§2403(c)..............................................6,15,16,17,24

§2400-2411.....................................................8,25


E X C R E P T S   O F   R E C O R D:

ER-1, Appellant's statement to Santa Ana Police Department
      filed separately...........................................3

ER-2, Appellant's Judgment of Commitment based on indeterminate
      term presentence credits, page 2, filed separately..........3

ER-3, Document verifying Appellant  served 997 actual days of
      post-sentence credits in the county jail....................3

ER-4, Document showing M2d Cal. inmate Mikael Schiold was granted
      a maximum release date by Cal. officials, when he was never
      found suitable for parole...................................5

ER-5, Document verfying M2d Swedish inmate Mikael Schiold was
      not suitable for parole under Cal. Penal Code §3041(a), but
      did receive a maximum release date..........................5

ER-6, Superior Court order granting **In re Rosenkrantz**, Case
      No. BH003529 (2006) release date, when Rosenkrantz was not
      found suitable for parole by the BPH under Cal. Penal Code
      §3041......................................................5

ER-7, Document showing four (4) year parole denial................6

ER-8, Reference to District Court denial.........................27

ER-9, Court Order releasing M2d inmate Martin N.D. Cal............31

# TABLE OF CONTENTS

PAGE

S T A T E   A N D   F E D E R A L

CASES:

White v. Lambert, 370 F.3d 1002 (9th Cir.2004)....................1

Dyer v. Calderon, 113 F.3d 927 (9th Cir.1997)....................1

Tran v. Lindsey, 212 F.3d 1143 (9th Cir.2000)....................1

Yist v. Nunnemaker, 501 U.S. 797 (1991)..........................3

In re Dannenberg, 34 Cal.4th 1061 (2005)......................21,4

McQuillion v. Duncan, 306 F.3d 895 (9th Cir.2002)........7,17,25,32

Biggs v. Terhune, 334 F.3d 910 (9th Cir.2003)....................7

Greenholtz v. Nebraska, 442 U.S. 1 (1979)........................8

Watson v. Disabto, 933 F.Supp. 390 (D.N.J. 1996)...............8,9

Felce v. Fiedler, 947 F.2d 1484 (7th Cir.1992)...................8

People v. Duran (1983) 140 Cal.App.3d 485.......................11

In re Neal (1980) 114 Cal.App.3d 141............................12

In re Carabes (1983) 193 Cal.Rptr. 65...........................12

In re Hogan (1986) 323 Cal.Rptr. 90.............................13

McGinnis v. Royster, 410 U.S. 263 (1973)........................13

People v. Austin (1981) 30 Cal.3d 155...........................14

In re Eric J., (1979) 25 Cal.3d 522.............................14

U.S. v. Martin, 63 F.3d 1422 (7th Cir.1995).....................14

United States v. Marco, L., 868 F.2d 1121 (9th Cir.1989)........14

United States v. Nono-Para, 877 F.2d 1409 (9th Cir.1989)........14

People v. Hinojosa (1980) 162 Cal.Rptr. 793.....................15

People v. Jefferson (1999) 86 Cal.Rptr.2d 893...................15

Strirone v. United States, 361 U.S. 212 (1960)..................15

IVAN VON STAICH V. CDC, JOHN BRIGGS,    v
U.S. Docket No. 06-15577

## TABLE OF CONTENTS

PAGE

S T A T E   A N D   F E D E R A L

CASES:

United States v. Vea, 867 F.2d 783 (3d Cir.1989)................15

Jones v. Smith, 231 F.3d 1227 (9th Cir.2001)....................16

U.S. v. Booker, 125 S.Ct. 742 (2005)............................16

United States v. Green, 355 U.S. 184 (1957)....................16

Mayner v. Callahan, 873 F.2d 1300 (9th Cir.1989)...............17

Dixon v. Haden, 550 F.Supp. 157 (1982).........................17

People v. Gottman (1977) 134 Cal.Rptr. 834.....................17

Montero v. Travis, 171 F.3d 757 (2d Cir.1999)..................18

Kolender v. Lawson, 75 L.Ed.2d 903 (1983)......................18

In re Greenwood (1978) 87 Cal.App.3d 777.......................20

Sass v. Cal. Bd. of Prison Terms, 376 F.Supp.2d 975
(N.D. Cal.2005).................................................20

Rosenkrantz v. Marshall,____F.Supp.2d___(C.D. Cal. 2006)
WL 2327085......................................................20

In re Dannenberg (2002) 125 Cal.Rptr.2d 458....................20

People v. Ralph (1944) 24 Cal.2d 575...........................21

In re Tartar (1959) 52 Cal.2d 250..............................21

Keeler v. Superior Court (1970) 2 Cal.3d 619...................21

People v. Baker (1968) 69 Cal.2d 44............................21

Connally v. General Const. Co., 269 U.S. 385 (1962)............21

Bowland v. Municipal Court (1976) 18 Cal.3d 479................21

United States v. Doremus, 88 F.3d 630 (9th Cir.1989)...........21

Schwartzmiller v. Gardner, 752 F.2d 1341 (9th Cir.1984)........21

In re Stanworth (1982) 33 Cal.3d 176...........................22

# TABLE OF CONTENTS

PAGE

S T A T E   A N D   F E D E R A L

Continued Cases:

Chatman v. Marquez, 754 F.2d 1531 (9th Cir.1985)....................23

San Joaquin, Etc. TRR. Co. v. Stevinson (1922) 164 Cal. 221........24

Rudley v. Tobias (1948) 84 Cal.App.2d 454..........................24

Federoff v. Birks Bros. (1925)  75 Cal.App. 345....................24

People v. Hall (1995) 44 Cal.Rptr.2d 11............................24

People v. Overstreet (1986) 42 Cal.3d 891..........................24

U.S. v. Bass, 404 U.S. 336 (1971)..................................24

Sach v. Zenk, 439 F.3d 61 (2d Cir.2006)............................24

Chapman v. U.S., 500 U.S. 453 (1991)...............................24

Esberg v. Union Oil Co. (2002) 121 Cal.Rptr.2d 203.................25

American Ins. Ass'n v. Garamendi (2005) 24 Cal.Rptr.3d 905.........25

People v. Rowland (1983) 134 Cal.App.3d 1...........................1

In re Reeves (2005) 28 Cal.Rptr.3d 4.....................26,28,29,30

People v. Reyes (1989) 260 Cal.Rptr. 846...........................27

Toussaint v. McCarty, 801 F.2d 1080 (9th Cir.1986).............28,26

Johnson v. Florida, 348 F.3d 1334 (11th Cir.2003)..................27

In re Nickles (1991) 231 Cal.App.3d 415............................28

In re Joyner (1989) 256 Cal.Rptr. 785..............................28

Little Rock School Dist. v. Polaski Cty. Sp. School,
56 F.3d 904 (8th Cir.1995).........................................28

People v. Day (1981) 173 Cal.Rptr. 9...............................28

People v. Romos (1996) 50 Cal.App.4th 810..........................29

In re Cowen (1946) 27 Cal. 637.....................................29

## TABLE OF CONTENTS

PAGE

S T A T E   A N D   F E D E R A L

Continued Cases:

In re Albori (1933) 218 Cal. 34...................................29

Ex Parte Dulton (1875) 49 Cal. 463..............................29

United States v. Bishop, 959 F.2d 823 (9th Cir.1992)..........30,31

People v. Lions (1999) 85 Cal.Rptr.2d 581.......................30

Brown v. Poole 337 F.3d 1155 (9th Cir.2003).....................32

Harlen v. Inc. Vill. of Mineola, 273 F.3d 494 (2d Cir.2001)......32

City of Cleburne v. Cleburne Ctr., 473 U.S. 432 (1985)..........32

Cardena v. Dretke, 405 F.3d 244 (5th Cir.2005)..................33

Simmons v. South Carolina, 512 U.S. 154 (1994).................33

Ramdass v. Angelone, 530 U.S. 156 (2000).......................33

IVAN VON STAICH V. CDC, JOHN BRIGGS,
U.S. Docket No. 06-15577

## M A I N   I S S U E S   P R E S E N T E D

Whether Appellant's due process rights were violated when the Department of Corrections officials and the Board of Prison Terms Commissioners failed to set a maximum term on Appellant's one count second degree murder conviction after serving nearly 24 straight years in prison;

Whether Appellant's due process rights were violated when the Department of Corrections officials and the Board of Prison Terms Commissioners refused to grant Appellant five (5) years three (3) months presentence, post-sentence county jail credits on his indeterminate term.

ix

I.

STATEMENT OF THE CASE

A. Statement of Jurisdiction and Standard of Review

This is an appeal from the denial of a petition for writ of habeas corpus by state prisoner Ivan Von Staich (hereatofter Appellant). The District court had jurisdiction pursuant to 28 U.S.C. §2254. This Honorable Court has jurisdiction pursuant to 28 U.S.C. §1291 and §2253.

The district court judgment denied the writ on January 26, 2006. This appeal is timely, Appellant having filed his Notice of Appeal on February 20, 2006. As this Court stated in the September 01, 2006, order, no certificate of appealability is required in a habeas case where the prisoner is not challenging a state court judgment regarding his conviction. **Rosa v. Nielsen**, 428 F.3d 1229 (9th Cir.2005) (per curiam); **White v. Lambert**, 370 F.3d 1002 (9th Cir.2004).

This Court reviews the denial of a petition for writ of habeas corpus de novo, although it reviews the district court's findings of the fact for clear error. **Dyer v. Calderon**, 113 F.3d 927, 933-34 (9th Cir.1997). See **Tran v. Lindsey**, 212 F.3d 1143, 1152-54 (9th Cir.2000) (28 U.S.C. §2254(d)(1) applies to both questions of law and mixed questions of law and fact).

B. Course of Proceedings

Ivan Von Staich is a California state prisoner. He was arrested for second degree murder (hereatofter M2d) and attempted murder in 1983. Appellant was convicted by a jury in the Orange County Superior Court on December 2, 1985, for one count M2d and attempted murder.

1.

This crime occurred after a four (4) year relationship between Appellant and the female victim Cynthia Sue Topper nee Bess. The female victim sent Appellant several love letters and nude photographs before he was released from federal prison. Twenty-one (21) days after being released from federal prison Appellant went to the house where the female victim lived. Appellant did not know the female victim had married Robert Topper, the male victim, who was living with the female victim. Appellant rang the door bell and was confronted by the male victim at the front door of the house and after repeated threats from the male victim Appellant became fearful for his life and kicked the door open. Upon kicking the door open to the house the male victim called out for Appellant to enter the house, wherein the male victim was hiding in the bedroom at the end of the hallway. Appellant entered the hallway and after hearing the male victim state "I'm down here," Appellant moved forward a few steps and the male victim fired his 357 magmum pistol from around the corner of the bedroom hitting Appellant in the left hand index finger, which was nearly severed from his hand. The male victim fired another shot hitting Appellant in the left bicep, which entered the left chest area after ricocheting off the shoulder bone and the upper spinal column and, thereafter, entering the left lung doing severe damage to Appellant's body.

At this time Appellant reached for a small hammer he had in his back pocket of his pants and began striking the male victim in the head area. After fighting with the male victim and pushing the gun barrel away from Appellant's direction, the gun discharged 2 times into the neck area of the male victim and one time in the upper

IVAN VON STAICH V. CDC, JOHN BRIGGS,     2.
U.S. Docket No. 06-15577

shoulder (back area), during this struggle, as a direct result the male victim died from his gunshot wounds. Thereafter, Appellant was in complete shock and grabbed the gun and proceeded to exit the house to get help for his own injuries. However, the female victim confronted Appellant at the end of the hallway leading into the kitchen and fired a pistol directly at his face, after Appellant begged for the female victim to stop shooting him, she fired again and Appellant defended himself by hitting the female victim in the head area. (Unknown to Appellant, the female victim was firing blanks). After the female victim was knocked out, Appellant grabbed her gun and exited the home and later collapsed in someone's driveway and was later transported to the hospital for treatment. ( See ER-1, attached separately for reference to Appellant's statement to police at the hospital).

Appellant was sentenced to state prison on May 30, 1986, in accordance with California Rules of Court, Rule 451(a), which mandates the sentencing court to calculate Appellant's indeterminate 15 year sentence from his 15 year determinate term. (See ER-2, for reference to Judgment of Commitment on M2d 15 to life term). Appellant was held in the county jail for an additional 997 actual days and this charge was unrelated to Appellant's M2d conviction. However, Appellant was later found not guilty by jury trial. (See ER-3, for reference to proof of 997 days of post-sentence credits).

Appellant exhausted all his claims presented herein in the California Supreme Court, which denied the petition without citation. Therefore, the United States Supreme Court decision in **Yist v. Nunnemaker**, 501 U.S. 797, 801 (1991) applies here, ("If the last

state court to be presented with a particular federal claim reached the merits, it removes any bar to federal court review that might otherwise have been available."). Appellant maintains the California Supreme Court did not rely on **In re Dannenberg**, 34 Cal.4th 1061 (2005) and, therefore, the district court had no legal right to rely on Dannenberg to deny some of Appellant's claims. Furthermore, Dannenberg did not address all of Appellant's maximum term setting arguments and certainly did not overturn any of the citations set forth therein in support of M2d term setting.

The district court further relied on the state citation of **People v. Bruner**, 9 Cal.4th 1178 (1995), in the court's denial of presentence and post-sentence credit granting. However, the Bruner citation does not address Appellant's contentions based on his indeterminate presentence and post-sentence credits and only deals with credits based on a state parole violator's credits. Therefore, Appellant presents his federal district court claims to this Honorable Ninth Circuit Appeals Court, as set forth below.

C. Nature of the Case

This 28 U.S.C. §2254 case is about whether Appellant Ivan Von Staich, can be denied a set parole term on his indeterminate 15 years to life term and that he should be granted all presentence and post-sentence credits on his separately calculated indeterminate term. Appellant alleges the State courts unfairly and unreasonably denied his petitions, and that the district court's finding and decision on the claims presented were clearly erroneous and objectively unreasonable. The gravamen of claims are: The California Department of Corrections and/or the Board of Prison Terms officials

have denied Appellant a maximum set parole date on his indeterminate M2d term and that after 23 years in prison it is unreasonable to refuse Appellant a maximum term when the jury **did** **not** sentence Appellant to life in prison and to additionally deny all court ordered presentence and post-sentence credits on his indeterminate term and based on these facts, prison officials have violated Appellant's federal due process rights.

Appellant asks the Court to reverse the district court's decision and grant the writ of habeas corpus and order the Respondents to set a maximum term on his M2d conviction as the California State officials recently did in the case of In re Mikael Schiold, Case No. A103107, who was granted a maximum release date on his M2d conviction and that he **was** **not** found suitable for parole as stated in Dannenberg, by the Board of Prison Terms officials. (See ER-4, for reference to First Appellate District, Division Five, Case No. A103107 and see ER-5, for reference to letter from Paula Wolf, Chief, International Transfer Treaty, Washington D.C., pg. 4, which reveals M2d inmate Schiold **was** **not** found suitable for release, but did receive a maximum term on his M2d conviction). Furthermore, see ER-6, for reference to recent decision of In re Rosenkrantz, Los Angeles Superior Court No. BH003529 (2006), for reference to another court decision to release an M2d inmate, when the Board, nor the Governor approved of this release and centainly did not find Rosenkrantz suitable for release. In addition, it should be noted the A.G. filed an appeal to the State Appellate Court and the Supreme Court, who both refused to overturn the Superior Court decision ordering Rosenkrantz's release.

IVAN VON STAICH V. CDC, JOHN BRIGGS,    5.
U.S. Docket No. 06-15577

Based on the above cases and on all the information contained throughout this appeal, Appellant asks this Court to reverse the district court's decision and to grant the writ of habeas corpus and order the California Department of Corrections records officials and/or the Board of Prison Terms (now renamed the Board of Prison Hearings), to immediately set a maximum term on the M2d indeterminate sentence and to grant all presentence and post-sentence credits of five (5) years and three (3) months on the 15 year indeterminate term and to follow the sentencing matrices under Cal. Code Regs. tit. 15 Div. II §2403(c) when setting the maximum term.

D. Had Appellant Received his Presentence Post-sentence Credits he Would Have Been Before the Board Five (5) Years Three (3) Months Earlier.

Appellant maintains that had the Department of Corrections record officials granted his presentence and post-sentence separately calculated court ordered credits on his indeterminate term, he would have been before the Board of Prison Terms in 1997. However, based on the denial of these credits, he did not go before the board until November 5, 2002 and during this hearing the board refused to set any term and denied a set parole date and, therein, denied Appellant another parole hearing for 4 years. (See ER-7, for reference to November 5, 2002, and the 4 year denial, which undoubtedly will occur over and over again, until Appellant dies in prison, based on the current board's 99% "no parole policy.").

II.

A R G U M E N T

THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND/OR THE BOARD OF PRISON TERMS ACTION DENYING A SET TERM ON APPELLANT'S M2d CRIME AND THE DENIAL OF COURT ORDER PRESENTENCE AND POST-SENTENCE CREDITS WAS ARBITRARY AND CAPRICIOUS

A.  California M2d Inmates Have A Liberty Interest
    Protected by the United States Due Process Clause.

It is now well-established in this Circuit that California M2d
Cal. Penal Code §1168(b) indeterminately sentenced inmates have a
protected liberty interest under the federal laws protected by the
the Due Process Clause. See **McQuillion v. Duncan**, 306 F.3d 895,
901-903 (9th Cir.2002).

However, the open question not resolved by either court is
whether California Penal Code §1168(b) indeterminately sentenced
inmates have a protected liberty interest to the explicit language
set forth in Cal. Penal Code §3041(b), but not (a) and the multitude
of unsuitability rules used to deny parole endlessly, or whether
the indeterminately sentenced inmate **must** have his parole term set
unless the current or past crime or crimes are so grave, that a
release date cannot be set at the initial hearing. However, what
this Court failed to state is exactly how many parole hearing(s)
does an indeterminately sentenced inmate need to have before this
mandatory "shall" language in §3041(b) kicks in, or before the board
has effectively circumvented the jury's M2d verdict and has thereby
resentenced the inmate in accordance with Cal. Penal Code §190.2
(Special Circumstances, which is the only way in California an inmate
can legally be sentenced to straight life in prison, without parole).

This Court stated in **Biggs v. Terhune**, 334 F.3d 910, 914 (9th
Cir.2003), that the board can use the crime at the initial hearing.
However, after this one time, the board must set the parole term
or show evidence that the inmate has engaged in violent misbehavior
in the prison setting. This inmate has never had any acts of violence
in the prison system and maintains there is absolutely no relevant

reason to deny a set parole date on Appellant's M2d crime, after
serving nearly 24 years of actual custody.

B.   The California Department of Corrections and/or the Board
     of Prison Terms Officials Refuse to Acknowledge that
     Indetermnately Sentenced Inmates Have a Protected Liberty
     Interest Which Requires a Set Parole Date Under Greenholtz
     v. Nebraska, 442 U.S. 1, (1979) Mandatory Unless Language
     and Have Failed to Follow Other States With Similar
     Greenholtz Mandatory Language.

Appellant maintains the California Department of Corrections
and the Board of Prison Terms officials refuse to acknowledge that
§1168(b) indeterminately sentenced inmates have a protected liberty
interest under Cal. Penal Code §3041(b). Most importantly, almost
every M2d case which comes before prison officials or the board
commissioners, is denied a set parole term on his M2d crime, based
solely on the "normally unfounded some evidence" suitability criteria.
Suitability is set forth under Cal. Code Reg. tit. 15 Div. II
§§2400-2411. The board commissioners repeatedly use different
regulations, such as an inmate's prior social relationships, juvenile
record, prior adult record, current M2d crime to egregious, old CDC
disciplinary reports, which will never change, to endlessly refuse
the M2d inmate a maximum parole date. The board commissioners during
these hearings usually set the M2d inmate's next parole hearing from
1 to 5 years, but usually set the future hearing at 4 years.
Therefore, the M2d inmate is caught in the board's endless suitability
cycle, with "no end" in sight.

However, **all** other states with identical mandatory "shall unless"
language are granting maximum release dates, as stated in **Watson**

**v. DiSabto**, 933 F.Supp. 390 (D.N.J. 1996) ("New Jersey parole statute providing inmate shall be released on parole unless information indicates **substantial** likelihood the inmate will commit another crime if released on parole, creates a due process liberty interest in parole release."). Also, see **Felce v. Fiedler**, 947 F.2d 1484, 1491 (7th Cir.1992) ("As we already have noted, in Greenholtz and Allen the Supreme Court made clear that a state may create a liberty interest in parole by using mandatory language (e.g., "shall") to create a presumption that parole will be granted when objective criteria are met. Wisconsin's mandatory release statute clearly creates such an interest. Wis. Stat. Ann. §302.11, leaves no room for uncertainty: all state inmates are entitled to mandatory release on parole when they have completed two-thirds of their sentence, unless they have violated prison regulations so as to extend the date of their mandatory release.")

Appellant argues that California indeterminately sentenced inmates must serve two-thirds of their sentences, before receiving a mandatory MEPD parole hearing, and that California's Penal Code §3041(b) is written very closely to that of Wisconsin's mandatory liberty interest release law. However, the only difference between Wisconsin and California's §3041(b) mandatory liberty interest release law, is that California inmates are **never released** after serving two-third's of their sentences. Also, at least $\frac{1}{2}$ of all M2d California inmates have now served nearly 25 to 30 years in prison and still have not been released. If this is not a blatant violation of Appellant's federal due process rights, what is? I do believe there are still law-abiding judges left in the Ninth Circuit Court,

who are willing to order the State of California prison officials
to follow their own parole laws and to start releasing aging inmates
who are no longer any threat to society.

Furthermore, if the language in Cal. Penal Code §3041(b) is
mandatory, but **only** inmates found suitable by the board commissioners
are to be released, why did the Courts in California allow some M2d
inmates to be released, such as Schiold and Rosenkrantz... without
being found **suitable** for release by the board?  Moreover, if Schiold
and Rosenkrantz were not released based on **suitability factors**, then
obviously they were released based on term setting factors.

C.  Appellant Maintains He is Entitled to Have his indeterminate
    M2d Term Converted to a Determinate Sentence in Accordance
    With the Mandatory Language Set Forth in Cal. Penal Code
    §1170.2 and in Compliance With State and Federal Citations.

Appellant maintains that in 1983 California Penal Code §1170.2
still applied to his M2d arrest and conviction and that after serving
two-thirds of his M2d 15 year sentence, the California Department
of Corrections and/or the Board of Prison Terms officials were
mandated by law to set Appellant's maximum term.

Appellant must first take this Court back to the beginning,
so this Court will fully understand why his 1983 M2d indeterminate
crime must be converted and/or his maximum parole term set.  In
accordance with the language set forth in Cassou & Tougher, Pacific
Law Journal/ Vol. 9, (1978) Determinate Sentencing, page 96, we read:
"Clearly the first impact of the new law will be on the calculation
of terms under retroactivity provisions of Section  1170.2(a) and

challenges to the serious-offender hearing provisions of 1170.2(b) involving persons currently in prison. Section 1170.2, however, **also affects inmates who will continue to have indeterminate sentences under Penal Code Section 1168(b)**, and it has an effect on persons already on parole. The retroactivity section states that the inmates whose sentences would still be indeterminate **under the new law receive the release procedures of the new law**." (See Cal. Penal Code §1170.2(e)). "This would appear to require that the procedures of Penal Code Section 3041 and related sections be followed for setting the parole release date of inmates serving life sentences and the other few, still indeterminately sentenced inmates."

This analysis of California statutory law is supportive of case citations previously rendered before the unconstitutionally rendered Dannenberg decision. In the state case of **People v. Duran** (1983) 140 Cal.App.3d 485, **502**, the court explicitly set forth the law at that time, "Generally, **all** prison sentences, including those previously imposed under ISL, **must** now be for a fixed term of imprisonment and a specific parole release date set." (§1170.2, subds. (a), (e) and (f); [citation].) Duran goes on to state: "Once this figure has been determined, a defendant would be released as soon as his term expires. It is not impossible to add an enhancement to the term decided upon so long as that term is not life." "In re Neal, supra, and People v. McNeill, supra, **are to be followed**."

Now Appellant quotes directly from In re Neal, as follows: "Generally, **all** prison sentences, including those previously imposed under the ISL, **must** now be for a fixed term of imprisonment and a specific parole release date set. (§1170.2 subds. (a),(e) and (f);

[citation])." Upon completion of such fixed term of imprisonment, the prisoner **must** be released on parole for a prescribed number of years (§3000, subds. (a), (b)) and thereafter fully discharged (§3000, subd. (d), 3001). Id. 114 Cal.App.3d 141, **144** (1980). It should be noted that inmate Duran was a Proposition 7, (1978) indeterminate 15 years to life inmate and, as stated above, the board commissioners are statutorily required to set the maximum term at less than life. However, the current board commissioners do not follow the statutory law in accordance Cal. Penal Code §1170.2 (a),(e) and (f), which in fact, directly applies to all inmates sentenced to M2d 15 year indeterminate terms.

No court in California after the advent of Proposition 7, (1978), has ruled that M2d inmates are serving straight life sentences, but have only made statements to the contrary and this point was well-stated in **In re Carabes** (1983) 193 Cal.Rptr. 65, 67, we read: "While a sentence of 15 years to life has been characterized as indeterminate for the purpose of holding that a minor convicted of murder must be first referred to the California Youth Authority for evaluation pursuant to Welfare and Institution Code section 707.2 [citation omitted] for parole purposes, a person in the position of petitioner herein is similarly situated to a person sentenced under the Determinate Sentencing Act. Thus, he must be held in prison for a certain minimum period, and then his eligibility for release on parole is at the discretion of the parole authorities. The minimum term is in reality a minimum parole release date." Also, in the case of **In re Hogan** (1986) 232 Cal.Rptr. 90, **92**, stated very clearly that an M2d indeterminately sentenced inmate must be sentenced at

their MEPD parole hearing to a maximum term of confinement, the same
as inmates sentenced under Cal. Penal Code §1170 et seq.

The United States Supreme Court in **McGinnis v. Royster**, 410
U.S. 263, 93 S.Ct. 1055, at <u>1057</u> (1973), stated that indeterminately
sentenced inmates are afforded a minimum eligibility date where the
parole board can deny early parole at their discretion and a **mandatory**
maximum parole date where the inmate **must** be released. California's
Indeterminate Sentencing Law as set forth under Cal. Penal Code
§1170.2 (a)(e) and (f) require the board commissioners to set a
maximum release date. Moreover, California's ISL is written identical
to that mentioned in **McGinnis**, but the only real difference is the
board commissioners in California persistently refuse to follow any
statutory parole setting law, as set forth in the above citations.
These parole setting laws require the current board commissioners
to set a release date on Appellants M2d sentence. However, the
likelihood of that ever happening is very remote. This Court is
now aware of the problems with California's parole board
commissioners, and their continuous violation of inmates' due process
rights, based on the large number of cases pending in this Court
and the district courts throughout the state. The board commissioners
actions are deliberate and capricious. The board commissioners need
to be ordered by this Court to follow the mandatory term setting
laws, otherwise, Appellant will end up serving the rest of his life
in prison.

Furthermore, "[u]nder California law, a prisoner serving an
indeterminate term is entitled to have the **upper** limits of the term
set at a length proportionate to the prisoner's individual culpability,

IVAN VON STAICH V. CDC, JOHN BRIGGS,        13.
U.S. Docket No. 06-15577

and to challenge the length of the term by way of habeas corpus."
Id. at **Sellars v. Procunier**, 641 F.2d 1295, 1303 (9th Cir.1981).

The courts in California have repeatedly stated "the Determinate
Sentencing Act specifically reciting that it "finds and declares
that the purpose of imprisonment for crime is **Punishment.**" **People
v. Austin** (1981) 30 Cal.3d 155, 163. Likewise, the court went on
to state: "We Stressed in **In re Eric J.** (1979) 25 Cal.3d 522, that,
"under the Determinate Sentencing Act rehabilitation is no longer
the standard for term fixing (25 Cal.3d at 532) in adult sentencing."
Id. 30 Cal.3d at 164.

This Court can see that Appellant should have a maximum term
set on his M2d sentence, based on the above citations. To the
contrary would authorize these state officials to illegally
resentence Appellant. Appellant was convicted of M2d, **not** first
degree "special circumstances" and should not be punished by the
Department of Corrections and/or the parole board officials, during
what Appellant considers a whimsical, arbitrary and capricious parole
board mini-trial. Moreover, "Although the judge and not the jury
ultimately sentences the defendant, the judge may only impose life
imprisonment "**if the jury so directs.**" If the jury does not so
direct, the sentence is limited to a term of years." **U.S. v. Martin**,
63 F.3d 1422, 1433 (7th Cir.1995).1/

---

1/ This Court reviews the legality of a criminal sentence de nova
**United States v. Marco L.**, 868 F.2d 1121, 1123 (9th Cir.1989). The
sentencing court may impose a sentence that departs court from the
sentencing guidelines, but the sentencing guidelines "are a
comprehensive set of rules that are designed to limit the sentencing
court's discretion." **United States v. Nono-Para**, 877 F.2d 1409,
1412 (9th Cir.1989) and contemplate departure "only in the unusal
case." Id. at 1413 (citing Sentencing Guidelines) ch. 1, part A,

Appellant maintains he is entitled under state law to have his indeterminate term converted to a determinate maximum term, somewhere between 15 and 21 years in accordance with the suggested M2d base term matrices under Cal. Code Regs. tit. 15 Div. II §2403(c). See **People v. Hinojosa** (1980) 162 Cal.Rptr. 793, **798**. Appellant, in accordance with the California Supreme Court is sentenced under the same laws as a person sentenced to a determinate term. See **People v. Jefferson** (1999) 86 Cal.Rptr.2d 893, 899.

    D.    <u>Appellant Maintains the California Department of Corrections and the Board Commissioners Have Resentenced him to Straight Life in Prison Based Solely on the Facts Related to the Jury Second Degree Murder Verdict, When Second Degree Murderers in California in (1983) Cannot be Punished by the Court With Straight Life Under Cal. Penal Code §190.</u>

The California Department of Corrections and the board commissioners have collectively resentenced Appellant to straight life in prison, based solely on his one count M2d conviction. Appellant believes the **respondents'** actions have violated the principles set forth in **Stirone v. United States**, 361 U.S. 212, 218 (1960), "when a defendant is convicted of crime and where the grand jury never charges the defendant with an essential element of the crime a "constructive amendment" has occurred and reversal is warranted. Since the ruling in **Apprendi**, supra, the Court has made it clear that any fact that increases the penalty for a crime beyond a

---

Fn.1, continued/

Introduction 4 (b). See **United States v. Vea**, 867 F.2d 783, 787 (3d Cir.1989) (Legislative history of Sentencing Reform Act "repeatedly state[s] that departures are to be the exception . . . not the rule.") (citing S.Rep. No. 225 98th Cong., 2d Sess. 1, 52, reprinted in 1984 U.S. Code Cong. & Admin. News 3182, 3235).

reasonable doubt, as set forth in **Apprendi**, expands the range of discrepancies that will amount to a constructive amendment. Such a change is a constructive amendment and is prejudicial per se. **Jones v. Smith**, 231 F.3d 1227, 1232, 1233 (9th Cir.2001).

When the Respondents failed to set Appellant's M2d sentence within the parameters of the sentencing guidelines set forth under Cal. Code Regs. tit. 15 Div. II §2403(c) matrices for M2d crimes, after nearly 24 years of straight incarceration, they have effectively changed Appellant's M2d jury verdict and, therefore, have constructively amended that verdict. **Apprendi** has been continuously upheld as set forth in the more recent case of **U.S. v. Booker**, 125 S.Ct. 738, **742** (2005).

E. The California Department of Corrections and the Board Commissioners Have Violated Appellant's Fifth and Fourteenth Amendment Rights in Accordance With the Double Jeopardy Clause, Based Solely on the Fact That Appellant has now Served Nearly 24 Years, Which is Well-Over his MEPD Under California Penal Code §3041(a) and is now Serving an Illegal First Degree Murder Sentence and Punishment.

The United States Supreme Court has made clear in **United States v. Green**, 355 U.S. 184, 190, 78 S.Ct. 221, 225 (1957), that "no person" can **arbitrarily** change a prisoner's jury verdict from second degree murder to first degree murder and arbitrarily force that prisoner to serve the additional punishments associated with first degree murder. Appellant maintains the California Department of Corrections and the board commissioners have deliberately resentenced this prisoner to first degree murder, when Appellant's jury refused to do so. Most importantly, this

Court in **Mayner v. Callahan**, 873 F.2d 1300, 1301 (9th Cir.1989) refused a challenge under the Double Jeopardy Clause against the parole board in Washington, however, as this Court stated: "In re Ayers, 105 Wash.2d. 161, 162-64, 713 P.2d 88, 89 (1986) (R.C.W. 9.96.115 does not violate due process because prisoners do not have a right to parole). Because Washington has created no right to parole for its prisoners and because the state legislature has extended only a conditional privilege to mandatory life prisoners to qualify for parole consideration." Id. at 1301.

However, this California M2d inmate has a protected liberty interest, as set forth in **McQuillion**, supra, at pp. 901-903. Appellant is relying on his liberty interest under Cal. Penal Code §3041(b) and the case of **Green**, also that of **Dixon v. Haden**, 550 F.Supp. 157, 158-59 (1982), where the "Parole Commission is limited by the due process protections of the Fifth Amendment." Appellant has now been incarcerated for nearly 24 years, without any set term on his M2d conviction and California Department of Corrections officials and the board commissioners continuously refuse to set a definitive upper limit on the M2d crime. Therefore, Appellant maintains the respondents have violated his double jeopardy rights under the Fifth and Fourteenth Amendments of the United States Constitution.

Even the State of California does **not** allow anyone, including the judicial system to alter the jury verdict. See **People v. Gottman** (1977) 134 Cal.Rptr. 834, 835-836. Now this Court must reinforce these long-standing principles and must order the respondents to **stop** this illegal jury verdict altering practice, through the administrative board process.

Furthermore, as stated in **Montero v. Travis**, 171 F.3d 757, 761 (2d Cir.1999) (finding absolute immunity bars §1983 claims for injunctive relief against parole board officials); Federal Courts Improvement Act of 1996, §309(c), Pub.L.No. 104-317, 110 Stat, 3847, 3853 (1996) (amending 42 U.S.C. §1983 to state that "in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable."). If parole officials are considered judicial officers, then surely this Court would **not** allow the Department of Corrections and parole board officials to deliberately alter the jury verdict.

 F. Appellant Maintains the Department of Corrections and Parole Board Officials Have Continuously Violated the United States Constitution Under the Fourteenth Amendment Due Process Clause by Enforcing the Unconstitutionally Vague California Parole Statute Section 3041 (a) and That State & Federal Courts are in Disarray Over This Statute, and That When any State Statute is Written so Ambiguously, the Statute Must be Read in the Light Most Favorable to the Defendant.

Appellant maintains that Board of Prison Terms (now hearings), have deliberately misinterpreted the unconstitutionally vague language set forth in Cal. Penal Code §3041 (a). Appellant asserts this parole statute violates the principles articulated in **Kolender v. Lawson**, 75 L.Ed.2d 903, 909 (1983). Appellant maintains there are several areas in this parole statute that can be interpreted in different ways, such as: 1) "Two commissioners of the Board

IVAN VON STAICH V. CDC, JOHN BRIGGS, 18.
U.S. Docket No. 06-15577

of Prison Terms shall again meet with the inmate and shall normally
set a parole release date as provided in Section 3041.5. (Id.
§3041(a)).   Appellant asserts there is no explanation written
in this parole section defining what the word "**normally**" means
when aggregated to state, "**shall normally set**." 2) 3041(a) goes
on to state: "The release date shall be set in a manner that will
provide uniform terms for offenses of similar gravity and magnitude
in respect to their threat to public, and that will comply with
the sentencing rules that the Judicial Council may issue and any
sentencing information relevant to the setting of parole release
dates.   What uniform terms and similar crimes are they talking
about?  Does this mean the board commissioners must set uniform
terms as stated in Cal. Penal Code §1170(a)(1)?

Section 1170(a)(1) is the only penal provision in the
California codes that explicitly requires uniform term setting
and is solely under the determinate sentencing laws.  However,
Cal. courts now refuse to follow these statutory indeterminate
term setting laws. Based solely on the CCPOA (Prison Guards Union)
and other powerful political activist victim rights groups, who's
sole purpose is to keep all M2d convicted inmates in prison for
the rest of their life's. 3) What sentencing information is
section 3041(a) talking about?  Does this mean the parole board
commissioners must use the same Rules of Court that California
judges use during determinate sentencing cases? Has the California
Judicial Council ever actually written any rule for the board
commissioners to follow? If so, where are they located and why
doesn't the board commissioners use them when conducting parole

hearings? The only case in California that directs the board commissioners to follow the superior court rules is **In re Greenwood** (1978) 87 Cal.App.3d 777, 781 fn.2. Greenwood instructs the board commissioners to set terms on or after July 1, 1977, for ISL indeterminately sentenced prisoners and to follow the Cal. Rules of Court sentencing rules. However, Appellant asserts that none of the current board commissioners will follow the mandates of this case or any other state case mandating term setting for M2d prisoners. Currently there are at least five hundred cases now pending in the federal district courts.

To name just a few, such as **Machado v. Kane**, 2005 WL 3299885, (N.D. Cal. 2005); **Saif'ullah v. Carey**, 2005 WL 1555389, at *8 (N.D. Cal. 2005); **Murillo v. Perez**, 2005 WL 2592420, at *3, n.1 (C.D. Cal. 2005); **Devries v. Schwarzenegger**, 2005 WL 2604203 (E.D. Cal. 2005); **Sanchez v. A.P. Kane, Warden**, Case No. 04-9403-AHS (RC) (C.D. Cal. 2006); **Rosenkrantz v. Marshall __ F.Supp.2d___(C.D. Cal. 2006) WL 2327085 and also **Sass v. Cal. Bd. of Prison Terms**, 376 F.Supp.2d 975, 982 (E.D. Cal. 2005, which was recently heard in this Court. Tuesday, Sept. 5, 2006 DJDAR 11931, at pp. 11933-11940, Hon. Reinhart, Circuit Judge, dissenting. All of these cases have different opinions as to what the language in Cal. Penal Code §3041(a) actually means. Most important, it must be considered that the originally published case of **In re Dannenberg** (2002) 125 Cal.Rptr.2d 458, stated that section 3041(a) M2d inmates have a proportional upper term coming, which must be set at the inmate's MEPD hearing. However, the California

Supreme Court overturned this decision in **In re Dannenberg** (2005) 232 Cal.Rptr.3d 417 and therein stated: "The Legislature has thus acquiesced in the board's construction." Id. at 417.    All these cases show that the state and federal courts are in disarray over exactly what section 3041(a) actually means.    However, "when language which is reasonably susceptible of two constructions is used in a penal law ordinarily that construction which is more favorable to the offener will be adopted. (**People v. Ralph** (1944) 24 Cal.2d 575, 581.)    "The accused violator is entitled to the benefit of every reasonable doubt . . . as to the construction of language used in a statute."    (**In re Tartar** (1959) 52 Cal.2d 250, 257, and see **Keeler v. Superior Court** (1970) 2 Cal.3d 619, 631; **People v. Baker** (1968) 69 Cal.2d 44, 46.

This principle is of constitutional concern.    "It is an established principle of constitutional law that . . . a statute that either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." (**Connally v. General Const. Co.**, 269 U.S. 385, 391 (1962); **Bowland v. Municipal Court** (1976) 18 Cal.3d 479, 491. A statute or regulation is void for vagueness "if it invites arbitrary and discriminatory enforcement." **United States v. Doremus**, 888 F.3d 630, 634 (9th Cir.1989).    "The threshold question in a vagueness challenge on its face or whether to do so only as the statute is applied in a particular case." **Schwartzmiller v. Gardner**, 752 F.2d 1341, 1346 (9th Cir.1984).

Appellant argues that both are implicated here, but that

this Court must view this parole statute more favorable to all M2d crimes in California and that is, how did Appellant's M2d crime go from 5, 6 or 7 determinate years in prison to straight life with the inception of Prop. 7, (1978) general election? The current board commissioners are going to keep using suitability to override term setting, even when they know M2d inmates must have their crimes set at a maximum upper limit, as stated in Duran, supra, 140 Cal.App. at 502. Where the meaning of section 3041(a) has been the subject of disagreement by reasonable men and the justices of this Honorable Court, as previously discussed in Sass, dissenting opinion, and the 100% illegal **no** term setting underground policy for all California M2d inmates, reveals the current arbitrary and capricious acts being perpetrated by the board commissioners.

In addition, we must review the First District State Appellate Court decision in Dannenberg, where that court stated: "While section 1170 et seq., apply to determinate sentences, the current provisions of section 3041 governing parole for inmates serving indeterminate terms were added as part of the bill enacting the Determinate Sentencing Law, and were intended to serve the same purpose as the determinate sentencing provisions. (stats. 1976 (S.B. 42) ch.1139, §281, p.5151; **In re Stanworth** (1982) 33 Cal.3d 176, 182. Id. Dannenberg, 125 Cal.Rptr.2d at 470. Furthermore, what does §3041(a) mean by the gravity and magnitude in respect to their threat to the public? Does this mean Appellant will be evaluated against the whole State of California or in accordance

IVAN VON STAICH V. CDC, JOHN BRIGGS,
U.S. Docket No. 06-15577

22.

with Wesbster's Dictionary (2005), p.1001: "The Community or public
is a whole." Appellant could go on and on over section 3041(a)
and the ambiguous language therein, however, section 3041(a) was
written exactly as it was in 1985, when this Court upheld term
setting for ISL prisoners in **Chatman v. Marquez**, 754 F.2d 1531
(9th Cir.1985). In Chatman this Court also upheld Stanworth p.
1533 and In re Neal, p. 1534. As previously states in Appellant's
term setting argument, Duran stated that In re Neal is to be
followed. Id. 140 Cal.App.3d at 503. Surely, this Court would
not now state that only Chatman can have a term set under section
3041(a)? Moreover, section 1170.2 et seq., is still in the 2006
California Penal Code? If these term setting laws were just for
old ISL inmates convicted before July 1, 1977, why is this language
still in the California Penal Code? Answer: Because the California
Legislature has **not** repealed this ISL uniform similarity term
setting conversion formula.

In addition, why does section 3041.5 also require setting
terms separate for suitability and revocation procedures and why
does Cal. Penal Code §5075.5 state: "Or the setting of parole
release dates for prisoners." Term setting is mentioned again
in Cal. Penal Code §5075.6(F)(2). If the parole board commissioners
had "no authority" to set release dates for M2d inmates convicted
back in 1983, why did the Legislature explicitly place term setting
procedures separately from suitability and revocation hearings,
in sections 3041.5, 5075.5 and 5075.6(F)(2)? Also, it should be
noted that M2d Cal. prisoners were totally removed from Cal. Penal

Code §1168(a) and that section 3041(a) was exclusively written for inmates convicted for first degree murder, not M2d.  Stats. 1976, ch.1139, p.5151, §281, referring to §3041(a) and M2d repealed by Stats. 1976, ch.1139, §272.5.  California Goverment §9605 mandates have been set forth in several older state cases.  In **San Joaquin, Etc. IRR. Co. v. Stevinson**, 164 Cal. 221, 234, 128 P. 924, 929 (1922) ("Where a statute is amended, the parts which are not altered are considered as having been the law from the time when they were enacted.").  See **Rudley v. Tobias** (1948) 84 Cal.App.2d 454, 456) ("amendment of statute repeals parts of the statute which are not re-enacted.").  (**Federoff v. Birks Bros**. (1925) 75 Cal.App.345, 347) ("parts not altered by amendment were considered as having been law from time of enactment.").

If this Court finds the language is ambiguous in section 3041(a), this court should consider the language therein most favorable to Appellant.  See **People v.Hall** (1995) 44 Cal.Rptr.2d 11, **14**, quoting **People v. Overstreet** (1986) 42 Cal.3d 891, **896**. Also, review **U.S.v. Bass**, 404 U.S. 336, 347(1971).  Because Prop.7, general election November 8, 1978, only mentioned M2d punishment from 5, 6 or 7 years to 15 years indeterminate, this changed only the amount of punishment and not the sentencing structure under 1170.2(a)(e) and (f).  1983 Second degree murderers still have a statutory right to have their upper term set at a definitive number of years, which does **not** exceed the maximum base terms under Cal. Code Regs. tit. §2403(c). See **Sach V. Zenk**, 439 F.3d 61, 65, (2d Cir.2006) (quoting **Chapman v. U.S.**, 500 U.S. 453, 463 (1991)).

G.  Appellant Maintains the BPH Commissioners Administrative
Regulations Under Cal. Code Regs. tit. 15 Div. 2, §§2400-
2411 are Being Used to Override the Statutory Liberty
Interest Language in Accordance With Cal. Penal Code
§3041(b) and these Regulations are Being Used by the Board
Commissioners to Override Upper Term Setting Under Cal.
Penal Code §1170.2(a)(e) and (f) and Cal. Penal Code
§3041(a), Which Directly Violates Government Code §11342.2.

Appellant assert the BPT and the renamed "BPH" commissioners
are using the administrative regulations under CCR tit. 15 Div.
2, §§2400-2411, regarding the nearly impossible to meet suitability
requirement, to override Cal. Penal Code §3041(a) and the term
setting requirements under Cal. Penal Code §1170.2(a)(e) and (f).
Appellant also asserts that these suitability regulations are being
used to override Cal. Penal Code §3041(b) and the statutory due
process liberty interest set forth therein. See **McQuillion**, supra,
306 F.3d at pp. 901-903. However, Appellant maintains the board
commissioners actions are directly in conflict with the statutory
requires set forth over Government Code §11342.2 et seq. Government
Code §11342.2 mandates that all administrative regulations in
California must be written in conjunction with the enabling statute
and **any** administrative regulation which is not written in
conformity, should be voided. See **Esberg v. Union Oil Co.** (2002)
121 Cal.Rptr.2d 203, **208**; and **American Ins. Ass'n v. Garamendi**
(2005) 24 Cal.Rptr.3d 905, 910.

H.  Appellant Maintains that California Department of
Corrections Officials and Board Commissioners have Failed
to Grant Presentence and Post-Sentence Court Ordered
Credits on His Indeterminate M2d Term and That Appellant

has a Liberty Interest Directly Related to These Court
Ordered Credits **in Accordance With Toussaint v. McCarty,**
801 F.2d 1080, 1094 (9th Cir.1986).

Appellant asserts that his separately calculated presentence
and post-sentence credits are not being applied to his indeterminate
term of imprisonment. The CDC officials and board commissioners
have refused to grant these credits against Appellant's
indeterminate Cal. Penal Code §1168(b) 15 year MEPD sentence, when
**People v. Rowland** (1983) 134 Cal.App.3d 1, 13-14 authorize these
credits in accordance with Cal. Penal Code §2932(b), showing
Legislative intent. The problem here is the respondents are
overriding the Court Order granting these credits, based on the
fact that under CDC administrative procedures all inmates have
their indeterminate and determinate terms aggregated into one term
and all presentence and post-sentence credits are removed from
the top. Due to CDC officials statutorily unauthorized aggregated
term procedures, Appellant did not receive any court ordered
presentence and post-sentence credits on his indeterminate term.
Appellant maintains that CDC officials have **no** legal authority
to aggregate his indeterminate and determinate terms into one term.
Cal. Penal Code §1170.1, subd. (a) **only** allows CDC record officials
to aggregate multiple consecutive **"determinate"** terms into a single
term, **not indeterminate and determinate terms.** See **In re Reeves**
(2005) 28 Cal.Rptr.3d 4, at p. **9**. Furthermore, Appellant was
sentenced in accordance California Rules of Court, Rule **451(a)**,
which mandates that all indeterminate terms be calculated separately
from all determinate terms. In this case, the Superior Court

separately calculated all presentence credits, as required in accordance with Sentencing Rule 451(a). See **People v. Reyes** (1989) 260 Cal.Rptr. 846, 849.

Appellant maintains that CDC record officials have **no** statutory authority to disregard the sentencing court's order granting presentence credits as set forth on page 2, of the Judgment of Commitment. As set forth in **Johnson v. Florida**, 348 F.3d 1334, 1336 (11th Cir.2003), we read:

> "Before turning to the substance of this argument, we address the threshold matter of the burden of proof. We reject the State's suggestion that the burden of proof should be placed on the Class Plaintiff. To the contrary, the Supreme Court in Rufo clearly held that the burden of proof is on the party seeking modification of a consent decree. Rufo, 502 U.S. at 393, 112 S.Ct. at 765 ("[A] party seeking modification of a consent degree must establish that a significant change in facts or law warrants revision of the decree and that the proposed modification is suitably tailored to changed circumstance."); accord City of Miami, 2 F.3d at 1504 (quoting Rufo, in relevant part.)

Appellant asserts that there has been absolutely no evidence presented by the prison officials here at CTF-Soledad State Prison showing "just cause" to deny the "court ordered" presentence and post-sentence credits. The district court simply states that Appellant must show he could have been out on bail, if not for these charges. (See ER-8, for reference to district court denial pg. 6.) The district court fails to address the fact that the sentencing court granted Appellant these credits. The district

court additionally failed to address the CDC officials refusal
to grant these court ordered presentence and post-sentence credits.
The district court relies on **In re Nickles** (1991) 231 Cal.App.3d
415, in support of the court's denial. However, In re Nickles,
nor any of the other cases quoted by the district court have
anything to do with aggregated indeterminate and determinate
sentences and the appropriate application of presentence and
post-sentence credits against each sentence separately.

Furthermore, dual credits are allowed in California based
on the **attributable** factors and that the charge as to which he
seeks credit was a basis, **not** necessarily the exclusive basis for
the custody credits. See **In re Joyner** (1989) 256 Cal.Rptr. 785,
**790**. Also, as stated above, the respondents must show "just cause"
to refuse these court ordered credits. See **Little Rock School
Dist. v. Pulaski Cty. Sp. School**, 56 F.3d 904, **914** (8th Cir.1995).

Indeed, California inmates have a federally protected liberty
interest in receiving all presentence and post-sentence credits
on their indeterminate and determinate sentences, in accordance
with **Toussaint v. McCarty**, supra, 801 F.2d at **1014**. Under Cal.
Penal Code §669 et seq., and **People v. Day** (1981) 173 Cal.Rptr.
9, 12, all that is required of CDC officials is to make sure that
Appellant serves his determinate term first and that he **not** be
credited with any of this time on his separately calculated
indeterminate term. As stated in **In re Reeves**, supra, 28
Cal.Rptr.3d at 10, "the term of imprisonment fixed by the judgment
. . . commences to run only upon the actual delivery of the

defendant into custody of the Department of Correction." 2/ However, this does not mean that Appellant does not receive his court ordered presentence and post-sentence credits when the time arrives for CDC officials to start Appellant's indeterminate term. As stated in **In re Reeves**, supra, 28 Cal.Rptr.3d at 11: "A period of presentence confinement is indivisibly attributable to **all** of the offenses with which the prisoner is charged and of which he is eventually convicted." (Quoting **People v. Ramos** (1996) 50 Cal.App.4th 810, 817.)

Furthermore, the California Supreme Court recognizes that "the Penal Code, by use of the plural form terms, implicitly recognizes that prisoners can have multiple terms that **do not merge**." See **In re Reeves**, 28 Cal.Rptr.3d at p.10 fn.10, in relevant part. The Legislative intent was that every defendant sentenced to prison under a determinate and indeterminate term must have each term separately calculated and shall not mention the indeterminate term when calculating the determinate term on the Abstract of Judgment, and must not mention the determinate term when calculating the indeterminate term on the Judgment of Commitment sentencing form. This is because neither the determinate or the indeterminate term is the principle or subordinate term

_____

/2 The dissent relying on older decisions interpreting the specific language of sentencing schemes that have long since been repealed, unsuccessfully attempt to construct a non-statutory general rule to the effect that all of a prisoner's terms merge for purposes of credits. (See dis. opn. of Chin, J., post, 28 Cal.Rptr.3d at p.19, 110 P.3d at pp. 1230-1231, citing In re Cowen (1946) 27 Cal.2d 637, 166 P.2d 279, In re Albori (1933) 218 Cal. 34, 21 P.2d 423, Ex Parte Dulton (1875) 49 Cal. 463. In relevant part, **In re Reeves**, supra, 28 Cal.Rptr.3d at p.10 fn.11.

of two separately calculated terms.  See **People v. Lions** (1999) 85 Cal.Rptr.2d 581, 583.  California Rules of Court, Rule 451(a) mandates that all indeterminate and determinate terms be calculate totally separate from each other.  Likewise, the CDC officials here at CTF-Soledad State Prison have no authority to override Appellant's court ordered presentence and post-sentence credits on his indeterminate term.  In relevant part, "the Department [of Corrections] has no power to adopt a regulation or practice that conflicts with a final, authoritative judicial interpretation of [Cal. Rules of Court, Rule 451(a)].)  See **In re Reeves**, 28 Cal.Rptr.3d at p. 14 fn.16 (second paragraph).

    I.    <u>Appellant Maintains his United States Constitutional Rights Under the Fifth and Fourteenth Amendments Were Violated In Accordance With Equal Protection, When Other Similarly Situated Indeterminate and Determinate Sentenced California Inmates Have Received all Their County Jail Credits, When the State and Federal Courts Granted Their Habeas Corpus Petitions and Ordered These Inmates be Released Forthwith.</u>

Appellant asserts that other similarly situated inmates convicted of murder have had their release dates set by the courts and during this court ordered process have received all their county jail credits on their determinate and indeterminate terms. Appellant maintains that allowing these inmates to receive all their accumulated county jail credits on their separately calculated determinate and indeterminate terms, does violate his individual right in accordance with the Equal Protection Clause to receive all his county jail court ordered credits on his indeterminate term.  See **United States v. Bishop**, 959 F.2d 820, 823 fn.4 (9th

Cir.1992).

In the case of **In re Rosekrantz**, Los Angeles County Superior Court Case No. BH003529 (2006), Rosenkrantz was ordered released after serving 20 years, 8 months. However, Rosenkrantz had all kinds of separate determinate term charges, such as Cal. Penal Code §12022.5 (possession of a firearm during the commission of a crime), and his M2d indeterminate charge which carried a separate mandatory 15 year MEPD sentence. However, the state court released Rosenkrantz based on the all his county and prison time credits. (See ER-6, for reference to Rosenkrantz case). Also, Swedish M2d inmate Mikael Schiold who was convicted for one count M2d, with a separate determinate term weapon use charge and his indeterminate M2d term. California State officials set his term for January 1, 2007. This was not a suitability term, this was a maximum determinate term based on all his county jail and prison time credits. (See ER-4, for reference to Mikael Schiold M2d maximum release date.)

Furthermore, in support of this equal protection claim on county jail credits M2d inmate Eulogio Martin was just ordered released by the Northern District Federal Court, Case No. C 05-3486 MHP. Martin was convicted of killing one person and the attempted murder of another person, when he open fire in a restaurant full of innocent bystanders. Martin was convicted of several different determinate crimes and one indeterminate crime. The Northern District Court ordered his release on all his crimes based on the amount of time served, which included Martin's county jail time. (See ER-9, for reference to N.D. "court order" releasing inmate

Martin and time credits page 3, dated July 21, 2006.) Also, this
Court in **McQuillion v. Duncan**, 342 F.3d 1012, 1015 (2003), released
McQuillion based on double first degree murder and several other
determinate charges. This Court obviously considered the overall
amount of time McQuillion served, including his county jail credits.
This Court also ordered in **Brown v. Poole**, 337 F.3d 1155, 1159-
1161, that M2d inmate Brown be released without being found suitable
by the board commissioners and ordered inmate Brown be immediately
released. This release was based in part on inmate Brown's county
jail credits and her prison credits, which exceeded her maximum
release date based on a plea bargain. Inmate Brown was sentenced
to a determinate firearm charge and the M2d indeterminate term,
but this Court granted credits towards both the determinate and
indeterminate terms. Poole at 1161 (2003).

As stated above, "the Equal Protection Clause requires that
the government treat all similarly situated people alike." **Harlen
v. Inc. Vill. of Mineola**, 273 F.3d 494, 499 (2d Cir.2001) (citing
**City of Cleburne v. Cleburne Ctr.**, 473 U.S. 432, 439 (1985).
Moreover, the "Fourteenth Amendment's Equal Protection Clause
guarantees that no State shall deny to any person within its
jurisdiction the equal protection of the laws, a guarantee that
the Supreme Court has characterized as a requirement that all
persons similarly situated . . . be treated alike." Citing City
of Cleburne, supra, at 439.

Appellant is only asking for all his presentence and post-
sentence credits be applied equally to his indeterminate term as all
the other above inmates received in regards to their separately
calculated determinate and indeterminate prison terms.

## CONCLUSION

For the foregoing reasons, Appellant believes the requested appeal should be granted. Also, it should be noted that Appellant will serve the rest of his life in a very unsafe over crowded California prison, **if this petition is denied**, based on the board commissioners extremely stringent suitability requirements. Appellant has now served 24 years for his crimes and is very remorseful for his actions. Appellant's crimes are directly related to a bad relationship with the female victim, however, Appellant is **not** a criminal and has never committed any other violent crime in his entire life and for the above stated reasons should not be illegally forced to serve a straight life sentence, especially since his jury was not informed that he would be serving life in prison. See **Cardenas v. Dretke**, 405 F.3d 244, 250 (5th Cir.2005) (quoting **Simmons v. South Carolina**, 512 U.S. 154, 168-169 (1994); **Ramdass v. Angelone**, 530 U.S. 156, 166 (2000).

Respectfully Submitted,

_____

Ivan Von Staich
Appellant in Pro Se

# EXHIBIT "E"

# Memorandum

*cc : CDW's*
*AW's*
*Lit. Coor.*
*Appeals*
*Coor.*
*CPSM*

Date  :   February 27, 2006

To    :   Associate Directors-Division of Adult Institutions
          Wardens

Subject :   **EMERGENCY REGULATIONS REGARDING INMATE GROOMING STANDARDS
            AND ACCESS TO RELIGIOUS PROGRAMS**

Attached for your immediate use and implementation is a copy of the Notice of
Change to the Directors Rules (NCDR) Number 06/02 effective January 17, 2006.
The NCDR 06/02 modifies the California Code of Regulations (CCR) Section 3062
and authorizes inmates to wear their hair any length and/or wear short beards
(no longer than one-half inch) consistent with the policy as specified.

Therefore, any Rules Violation Report (RVR), California Department of Corrections
and Rehabilitation Form 115, written after January 17, 2006, for violating the prior
grooming standards (hair longer than 3 inches and/or having a beard shorter than
one-half inch) shall be voided upon written request by the inmate. This does not
apply to inmates whose noncompliance was wearing a beard longer than one-half
inch.

Inmates who were found guilty of grooming standard violations and placed on
program failure status prior to January 17, 2006, are to be removed from program
failure status effective January 17, 2006, upon written request as described in CCR
Section 3044 (unless otherwise ineligible based on disciplinary actions not related to
grooming standard violations). Except as provided for below or otherwise prohibited
(i.e., inmate housed in Administrative Segregation or Security Housing Unit for other
non-associated reasons), these inmates are to be placed on Work Group A2 and
placed on a waiting list.

Upon written request by the inmate, an inmate not in compliance with the grooming
standards based on previously stated religious beliefs and subsequently found guilty
of RVRs, are to receive full restoration of all credits lost for grooming standard
violations occurring on or after September 22, 2000. Inmates who were
subsequently placed on Work Group C status due to these RVRs, are to be returned
to their previously assigned Work Group status (i.e., original A1 or A2 unless
otherwise ineligible based on disciplinary actions not related to grooming standard
violations). Proof of noncompliance based on religious beliefs can include, but is not
limited to: documented statements at a disciplinary hearing; investigative employee
report; inmate appeal; classification chronological; other document maintained in the
inmate's Central File; or any other verifiable document (i.e., writ of habeas corpus or
court files).

Associate Directors-Division of Adult Institutions
Wardens
Page 2

Inmates who cannot verify their decision to violate the grooming standards based on religious beliefs shall not be entitled to have their Work Group status restored or have any unrestroable credit returned in conformance with CCR Sections 3327 or 3328 (Restoration process) for violations occurring prior to January 17, 2006.

In instances where eligible inmates have paroled prior to restoration of any of the above noted actions, upon the parolee's written request, Case Records staff shall restore credits and modify/correct Work Group credit earning assignments as described above and adjust the parolee's parole period as appropriate.

If you have any further questions, please contact Frank Lopez, Facility Captain, Standardization and Policy Liaison Unit, at (916) 323-4242.

JOHN DOVEY
Director
Division of Adult Institutions

Attachments

cc:    D. L. Runnels
       Brigid Hanson
       Kathleen Dickinson
       Frank Lopez

# EXHIBIT "F"

1    SANTA ANA, CALIFORNIA — TUESDAY NOVEMBER 19, 1985

2                      AFTERNOON SESSION

3

4              (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN

5    COURT IN THE PRESENCE OF THE JURY:)

6         THE COURT:  EVERYONE HAS RETURNED.  CALL YOUR

7    WITNESS.

8         MR. EARLEY:  MR. WORLEY.

9         THE CLERK:  PLEASE STEP TO THE END OF THE TABLE

10   AND RAISE YOUR RIGHT HAND.

11                 ANDREW CALVIN WORLEY,              *

12   CALLED AS A DEFENSE WITNESS, WAS DULY SWORN, EXAMINED,

13   AND TESTIFIED AS FOLLOWS:

14        THE CLERK:  DO YOU SOLEMNLY SWEAR THAT THE

15   TESTIMONY YOU ARE ABOUT TO GIVE IN THE CASE NOW PENDING

16   BEFORE THIS COURT, IS THE TRUTH, THE WHOLE TRUTH, AND

17   NOTHING BUT THE TRUTH, SO HELP YOU GOD?

18        THE WITNESS:  YES, I DO.

19        THE CLERK:  PLEASE STATE YOUR FULL NAME AND SPELL

20   YOUR LAST NAME.

21        THE WITNESS:  ANDREW CALVIN WORLEY, W-O-R-L-E-Y.

22        THE CLERK:  YOU MAY BE SEATED.

23                  DIRECT EXAMINATION              *

24   BY MR. EARLEY:

25        Q    YOU'RE PRESENTLY IN CUSTODY; IS THAT

26   CORRECT?

1      A    YES, IT IS.

2           Q    AND ARE YOU FAMILIAR WITH A PLACE CALLED

3    BEACH HAVEN LODGE IN LONG BEACH?

4           A    YES, I AM.

5           Q    WERE YOU IN CUSTODY THERE IN JUNE OF 1983?

6           A    YES, I WAS.

7           Q    AND YOU HAVE BEEN CONVICTED OF FELONIES,

8    HAVE YOU NOT?

9           A    QUITE A FEW OF THEM.

10          Q    THOSE FELONIES INVOLVE ROBBERY?

11          A    YES.

12          Q    WHEN YOU WERE AT BEACH HAVEN LODGE, DID YOU

13   KNOW SOMEONE THERE BY THE NAME OF IVAN STAICH?

14          A    YES.

15          Q    DO YOU RECOGNIZE IN COURT SOMEONE WHO WAS

16   IN THE BEACH HAVEN LODGE WITH YOU?

17          A    GENTLEMAN AT THE TABLE THERE.

18          Q    WAS MR. STAICH IN BEACH HAVEN LODGE VERY

19   LONG?

20          A    NO, HE WASN'T.

21          Q    HOW LONG WERE YOU THERE?

22          A    A LITTLE OVER A YEAR.

23          Q    NOW, WHEN YOU WERE AT THE BEACH HAVEN

24   LODGE, DID YOU EVER SEE MR. STAICH IN THE COMPANY OF

25   ANYBODY?

26          A    YES.

```
1            Q      AND WAS IT MALE OR FEMALE?

2            A      FEMALE.

3            Q      DID YOU KNOW WHO THAT PERSON WAS?

4            A      YES, I WAS INTRODUCED TO THE LADY ONCE.

5            Q      SHOWING YOU WHAT'S BEEN MARKED AS PEOPLE'S

6     3, LOOKING AT A PHOTOGRAPH OF A YOUNG WOMAN IN NO. 3, DO

7     YOU RECOGNIZE THAT WOMAN AS THE ONE YOU SAW AT THE BEACH

8     HAVEN LODGE?

9            A      YES.  SHE SEEMS TO BE QUITE A BIT YOUNGER

10    THERE, YOU KNOW.

11           Q      NOW, WHERE DID YOU SEE THEM?  YOU KNOW,

12    BEACH HAVEN LODGE, DOES IT HAVE A -- THE WAY IT'S SET

13    UP, IS THERE AN INSIDE AND OUTSIDE PART OF BEACH HAVEN?

14           A      YEAH, IT'S SORT OF A PRIVATE BACKYARD,

15    WOODED AREA BACK THERE.

16           Q      IS BEACH HAVEN, I TAKE IT, IS ON A PUBLIC

17    THOROUGHFARE?

18           A      YES, ON PACIFIC AVENUE.

19           Q      WHEN YOU SAW THEM, THE TWO OF THEM

20    TOGETHER, WERE THEY ON THE PUBLIC THOROUGHFARE OUTSIDE,

21    OR WERE THEY INSIDE?

22           A      INSIDE.  I SAW THEM OUTSIDE ONCE, BUT

23    INSIDE, USUALLY.

24           Q      DO YOU REMEMBER HOW MANY TIMES YOU SAW HER

25    THERE WITH MR. STAICH?

26           A      TWICE.
```

```
 1              Q      WAS THERE ANY PHYSICAL CONTACT BETWEEN HER
 2    AND MR. STAICH WHEN YOU SAW HER THERE?
 3              A      YES, THERE WAS.
 4              Q      COULD YOU DESCRIBE THAT CONTACT?
 5              A      REUNION TYPE.  HE WAS JUST OUT OF PRISON
 6    AND SHE CAME TO SEE HIM.
 7              MR. KING:  OBJECTION; NONRESPONSIVE.
 8              THE COURT:  OVERRULED.  ANSWER REMAINS.
 9    BY MR. EARLEY:
10              Q      CAN YOU GIVE US -- WAS THERE ANY PHYSICAL
11    TOUCHING BETWEEN THE TWO?
12              A     .YES.
13              Q      AND WHAT KIND OF PHYSICAL TOUCHING?
14              A      THEY EMBRACED.
15              Q      WAS THIS ON ONE OCCASION OR BOTH OCCASIONS
16    YOU SAW THEM?
17              A      ON BOTH OCCASIONS, YES.
18              Q      DID YOU EVER SEE ANY KISSING?
19              A      YES.
20              Q      AND WOULD THEY REMAIN SEPARATE, HOLD HANDS
21    WHAT WAS ...
22              A      WELL, ONE TIME THEY WERE STANDING, ONE TIME
23    THEY WERE SITTING.  WHEN THEY WERE SITTING, THEY WERE
24    HOLDING HANDS.
25              Q      DO YOU KNOW HOW LONG ON THESE OCCASIONS
26    THEY WOULD BE TOGETHER, OR YOU SAW THEM TOGETHER?
```

# EXHIBIT "G"

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF ORANGE

DEPARTMENT 39

THE PEOPLE OF THE )
STATE OF CALIFORNIA, )
                                                )
                            PLAINTIFF, )
        VS.                                )            NO. C-53851
                                                )
IVAN VON STAICH, )
                                                )
                            DEFENDANT. )
_____)

HONORABLE ROBERT R. FITZGERALD, JUDGE PRESIDING

REPORTER'S TRANSCRIPT

NOVEMBER 18, 19 & 20, 1985

APPEARANCES OF COUNSEL:

FOR THE PEOPLE:                    CECIL HICKS, DISTRICT ATTORNEY
                                          BY:  RICHARD M. KING, DEPUTY

FOR THE DEFENDANT:              JACK M. EARLEY
                                          ATTORNEY AT LAW

                                                    M. ARMELLA MARTIN, CSR #2115
                                                    OFFICIAL COURT REPORTER
VOLUME VII
PAGES 1196 THRU 1456

1   REASON IN THE WORLD WHY THIS SUGGESTIVE POSE OF HERS
2   SHOULD COME IN.

3           AND THAT GETS US NOW TO THE SELF-DEFENSE.
4   SHE'S GOT THE GUN IN THERE.   THERE HAS BEEN AMPLE
5   TESTIMONY, THROUGH WITNESSES, THAT CYNTHIA TOPPER HAD,
6   OR CINDI BESS, HAD A GUN.

7           I MEAN, THEY EVEN CALLED THE DEFENDANT'S
8   BROTHER-IN-LAW, WHO COULD PROBABLY QUALIFY AS AN EXPERT,
9   AND HE GAVE US THE LENGTH OF THE GUN BARREL, THE SIZE OF
10  THE GUN, MAKE OF THE GUN.  SO THIS IS JUST CUMULATIVE.

11          THE PREJUDICIAL EFFECT IS THAT THE JURY IS
12  GOING TO BE BACK THERE AND LOOKING AT THIS PICTURE, AND
13  WE ALL KNOW IT, THEN THEY'RE GOING TO SAY, "WHAT KIND OF
14  A WOMAN WAS SHE, WHO WOULD SEND THIS KIND OF A PICTURE
15  TO SOMEONE THROUGH THE U.S. MAIL, TO SOMEONE WHO IS IN
16  PRISON?

17          AND I THINK IF WE CAN'T LET THE JURY SEE
18  THE BLOOD, OR NATURE OF THE WOUNDS ON SOMETHING THAT
19  THIS WHOLE LAWSUIT IS ABOUT, I DON'T THINK WE SHOULD
20  ALLOW THEM TO SEE THESE PICTURES.

21          THE COURT:  W AND S?
22          MR. KING:  WELL, MY ARGUMENT --
23          THE COURT:  SAME?
24          MR. KING:  -- GOES FOR J, K, AND L, AND IT WOULD
25  BE X, W, AND S.  AND THESE ARE THE SUGGESTIVE POSES OF
26  CINDI, AND ALSO SHOWING HER WITH A GUN.

M. ARMELLA MARTIN, C.S.R., OFFICIAL COURT REPORTER

1          THE COURT:  THANK YOU.

2              ANY RESPONSE?

3          MR. EARLEY:  YES, YOUR HONOR.

4              I WISH I WOULD HAVE HAD MR. KING TO ARGUE

5     FOR ME WHEN WE WERE TALKING ABOUT PRISON.  AND I THINK

6     THAT THE ARGUMENTS THAT HE MAKES AS FAR AS PHOTOGRAPHS

7     AS THE SURGERY PHOTOGRAPHS ARE NOT EVEN THE SAME AS

8     WE'RE TALKING ABOUT HERE.

9              WHAT THE DISTRICT ATTORNEY IS TALKING ABOUT

10    IS THAT SOMEONE WHO IS ON TRIAL, THE JURY CAN SEPARATE

11    THE FACT OF WHETHER HE'S BEEN IN PRISON AS NOT BEING

12    CHARACTER EVIDENCE, BUT THEY COULD NOT SEPARATE THIS

13    EVIDENCE AS NOT BEING CHARACTER EVIDENCE.  AND SOMEHOW

14    THIS WOULD AFFECT THEM MORE THAN THE FACT OF SOMEONE

15    BEING IN PRISON.

16             I THINK IF THE COURT WAS -- SOMEONE WAS ON

17    TRIAL AND THEY HAD TO CHOOSE BETWEEN HAVING THESE

18    PHOTOGRAPHS AND THEIR PRISON RECORDS TO BE BEFORE THE

19    JURY, AND THEY COULD CHOOSE WHICH ONE THEY WOULD RATHER

20    THAT THE JURY SEE, THEY WOULD OBVIOUSLY CHOOSE THE

21    PHOTOGRAPHS.

22             I THINK IF YOU ASSUME THE JURY CAN DEAL

23    WITH THE FACT OF PRISON, THESE PHOTOGRAPHS ARE NOT OF

24    THE NATURE OF PRISON RECORDS.

25             THERE'S ONE OTHER PROBLEM THE DISTRICT

26    ATTORNEY CREATED.  IN HIS CROSS EXAMINATION OF EVERY

1     SINGLE WITNESS I CALLED, HE CROSS EXAMINED, "WAS IVAN

2     STAICH EVER PRESENT WHEN THE GUN WAS PULLED?" AND THE

3     ANSWER WAS NO, HE WASN'T.

4            HE WASN'T PRESENT, BUT HE HAD THESE

5     PICTURES IN HIS POSSESSION. WE'VE HAD PLENTY OF

6     WITNESSES HERE, BUT HE CROSS-EXAMINED THE WITNESSES AND

7     HE CAUSED THE PROBLEM HERE, AND HE SAYS THE SOLUTION IS,

8     LET HIM CROSS ON IT, BUT THEN DON'T LET ME HAVE THE

9     PICTURES IN. HE CREATED A PROBLEM ON THOSE, THAT'S HIS

10     PROBLEM TO LIVE WITH.

11            THE OTHER PHOTOS, I WOULD JUST MAKE THE

12     SAME ARGUMENTS I DID BEFORE. THEY'RE ANSWERS TO A

13     RELATIONSHIP. THEY WERE PHOTOS THAT HE HAD AND I THINK

14     IT FURTHER EXPLAINS THE RELATIONSHIP THEY HAD.

15          THE COURT: MARY POPPINS DOES NOT DATE IVAN

16     STAICH. OBJECTIONS ARE OVERRULED. EXHIBITS ADMITTED.

17          (DEFENDANT'S J,K,L,S,W,X = IN EVIDENCE)

18          MR. KING: MY NEXT ARGUMENTS, THEN, WOULD BE

19     EXHIBITS M, N, O, AND P, AND BEFORE I GO ON, WOULD THE

20     COURT, SINCE YOU'RE ADMITTING THESE PHOTOS, WOULD THE

21     COURT AGREE THAT THEIR ONLY RELEVANCY IS TO THE STATE OF

22     MIND OF THE DEFENDANT?

23          THE COURT: THAT'S THE ONLY MEANS THAT THEY WERE

24     OFFERED FOR THAT I KNOW ABOUT.

25          MR. KING: IF I CAN PREPARE A LIMITING

26     INSTRUCTION, THEN, TO GIVE TO THE JURY, WILL THE COURT

# EXHIBIT "H"

ORANGE COUNTY
**PROBATION DEPARTMENT**

SUPERIOR COURT     COURT, Dept./Div. __39__   Time __9 a.m.__

| | | | |
|---|---|---|---|
| **Defendant's Full Name:** | STAICH, Ivan (nmn) | **P & S Date:** | 3-7-86 |
| **AKA:** | Ivan Von Staich | | |
| **Address:** | 219 Matich (last known) | **C -** 53851 | **A -** 147250 |
| | Lake Elsinore, CA | | |
| **Present Whereabouts:** | Escaped from OCJ 1-26-86 | **DPO:** Michael E. Carr/dw | |
| **Telephone:** | 674-9125 | **Attorney:** Jack Early | |

**COURT STATUS**

Present Offense PC(Murder);Ct 3, 664/187 PC(Att. Murder)
Ct 1, 459 PC(Resid. Burg.);Ct 2, 187

Arresting Agency __Santa Ana__

Ct 2 Enhanced by 12022.5 PC Allegation(UFA) Date of Offense __12-8-83__   Date of Arrest __12-8-83__

found true

Inf./Compl. Filed __6-14-84__ Guilty by Jury-Ct 2 fixed at 2nd deg; UFA + GBI   Date _____

Days in Custody __755__ Codefendants __None__

**DESCRIPTION**

Age __29__ DOB __6-30-56__ POB __Torrance, CA__   Ethnic Background __Cauc.__ Sex __Male__

Height __6'2"__ Weight __210__ Hair __Brown__ Eyes __Blue__ Complexion _____

Identifying Marks __Tattoos: abdom; R/arm; chest; R/shoulder__ Social Security No. __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__

Date of Arrival in California __Birth__   Date of Arrival in Orange County __Riverside Co. resid.__

FBI __0922910K2__ CII __A04573091__ OCSO __260 286__ Operator's License __N7337109__

Expiration Date __6-30-84__

| PRIOR PROBATION GRANTS | | | None | PRIOR PAROLE GRANTS | | See report |
|---|---|---|---|---|---|---|
| Year | County | Term | Year | State | | Term |

**EMPLOYMENT HISTORY**

Last or Present Employer __Unknown__ Address _____ City _____

Date Began _____ Date Terminated _____ Reason _____

Type of Work _____ Work Phone _____ Salary _____

Previous Employment:

| Dates | | | | | |
|---|---|---|---|---|---|
| From | To | Employer | Type | Salary | Reason Terminated |
| | | | | | |
| | | | | | |

**MARITAL HISTORY**

| Present Spouse | Home Address | DOB | Date & Place of Marriage | Status |
|---|---|---|---|---|
| None | | | | |

Occupation       Employment Address

| Children | Address | DOB | Sex | Other Parent |
|---|---|---|---|---|
| None | | | | |

Ct 3 enhanced by 12022.7 PC Allegation (GBI)
+ 2 prior convictions (Fed. & State)
Ct 1 & determination of priors was continued to 2-7-86
before another jury. (The matter having been severed)

| Previous Marriages | Address | Date Married | Terminated |
|---|---|---|---|
| None | | | |

**CONFIDENTIAL**

Per Sec. 11142 P.C. The Furnishing of this Report, or Information Contained within, to an Unauthorized Person is a misdemeanor.

**PRE-SENTENCE REPORT**

F0602-1020.8 (A) (8/79)

# FAMILY DATA

Died_____

Father ___Robert Staich_____ Age _____ DOB _____ POB_____

Address ____Unknown_____ Telephone _____ Ethnic Background _____

Occupation_____ Religion _____

Marriage Date _____ Status _____

Died _____

Mother _Charlotte Staich____ Age _____ DOB _____ POB_____

Address _____Unknown_____ Telephone _____ Ethnic Background _____

Occupation_____ Religion _____

**Other Marriages: Father**

| Name | Dates | Status of Marriage | Date of Termination |
|------|-------|--------------------|---------------------|
| Unknown | | | |

**Other Marriages: Mother**

| Name | Dates | Status of Marriage | Date of Termination |
|------|-------|--------------------|---------------------|
| Unknown | | | |

| Brothers & Sisters | Age | Address | | | | Occupation |
|--------------------|-----|---------|--|--|--|------------|
| | | No. | Street | City | State | |
| Unknown | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

| Former Residences | Dates | |
|-------------------|-------|--|
| | From | To |
| | | |
| | | |

# EDUCATIONAL BACKGROUND

Highest grade completed _____    Where _____    Degrees held    GED

# MILITARY RECORD

Branch____None_____ Dates of Service _____ Service No._____

Highest rate or rank _____ Type of Discharge _____ Job Classification _____

Duty Assignments _____ Honors & Benefits _____

# PERSONAL INFORMATION

Health    Health Problems    Organizations—Religion
Good    None

Hobbies and Interests

Unknown

Habits
Tobacco:    Unknown
Liquor:        "
Drugs:         "

Vehicle License No. _Unknown_____    Firearms owned / possessed:    Unknown

Type _____

Color _____

Year _____

Additional Data:

F0602-1020.8 (6) (8/79)

STAICH, Ivan (nmn)

Page 3

1  COURT STATUS:

2       On June 14, 1984, an Information was filed alleging Count I:
3  violation of Section 459 of the Penal Code (Residential Burglary);
4  Count II:  a violation of Penal Code Section 187 (Murder); and Count
5  III:  violation of Section 664/187 of the Penal Code (Attempted Murder).
6  Count II is enhanced by a 12022.5 Penal Code allegation (Use of a
7  Firearm) and Count III is enhanced by a 12022.7 Penal Code allegation
8  (Great Bodily Injury).  Two prior felony convictions are also alleged.
9  Count I was severed, as well as the determination of priors, and the
10 matter was continued to February 7, 1986, before another jury.  The
11 probation officer was ordered to include disposition of that matter
12 in this report.  On December 3, 1985, the jury found the defendant
13 guilty of Count II, which was fixed in the second degree, and the
14 use allegation was found to be true.  The defendant was also found guilty
15 of Count III and the great bodily injury allegation was also found true.
16 The matter was continued to the present date for presentence report.

17 COLLATERAL INFORMATION:

18      On January 26, 1986, the defendant and another inmate over-
19 powered an unarmed guard and escaped from Orange County Jail by re-
20 pelling from the roof.  The defendant's whereabouts are unknown as
21 of the dictation of this report.  It should be noted that the defendant
22 has not been interviewed by the probation officer as he refused
23 interview on December 26, 1985.                  found not guilty on
                                                  Jury trial - see minute
24 CIRCUMSTANCES OF THE OFFENSE:                   order dated 2-17-89

25      On December 8, 1983, the defendant was arrested by the
26 Santa Ana Police Department and he was booked for the murder of
27 Robert Topper, Jr., and the attempted murder of Cynthia Sue Topper

28

1  (nee Bess). The Court, having heard testimony at the trial, is

2  familiar with the circumstances of the offense. The following account

3  is taken from information contained in the District Attorney file and

4  may differ from testimony.

5          The defendant and the former Cynthia Bess met about January,

6  1980. At that time, the defendant was a state parolee, but in

7  February, 1980, he was arrested for a federal offense (see prior

8  record section). After 30 days in custody, Cynthia Bess posted bail

9  for the defendant, but he was ultimately sentenced to five years in

10  federal prison. For the next several years Miss Bess corresponded

11  with the defendant while he was in several federal prisons. Federal

12  records and information contained in letters from the defendant to

13  Cynthia Bess indicate that



21                              Through correspondence, Miss Bess attempted

22  to terminate the relationship with the defendant and he was eventually

23  parolled in June, 1983, to a halfway house in Long Beach. On June 20,

24  1983, Cynthia Bess reluctantly agreed to meet the defendant and

25  picked him up at the halfway house. While she was driving the

26  defendant back to the halfway house, he became irate and threatened

27  to "kill" her because she had "hurt" him so bad. He struck her one

28

STAICH, Ivan (nmn)                                                    Page 5

1  time in the jaw with his fist and in order to get him to stop, she
2  said that she loved him.  In a letter later submitted to the Federal
3  Parole Board, she indicates that she was "pleading for my life".  She
4  reported this incident to the Orange County Sheriff's Department but
5  failed to follow through on a Long Beach Police Department report
6  because "I was afraid due to intimidation by Ivan over several years."
7  She did, however, report the incident to the halfway house and asked
8  that the defendant not contact her or her family.  Later, she was
9  contacted by halfway house personnel and told that a counselor would
10 be picking up some of the defendant's pictures from her residence.
11 A few minutes later, the defendant arrived at the residence, saying
12 "You're gonna die . . . You called the halfway house on me . . .
13 You're gonna get it."  She was able to talk the defendant into going
14 to her pastor to discuss the incident.  The pastor could not resolve
15 the situation and the defendant did not like him because he said that
16 "Ivan needed to seek counseling."  A few days later, Miss Bess drove
17 the defendant to his mother's residence and then she went to the
18 Los Angeles Airport for a flight out of state because she was afraid
19 of the defendant.  On June 26, 1983, about 2:15 a.m., the defendant
20 was discovered in Miss Bess' residence in Mission Viejo (this refers
21 to Count I).  The defendant apparently entered the residence through
22 an unlocked door and was confronted by Miss Bess' roommate.  Some
23 photographs of the defendant was the only property taken.  The defendant
24 was aware that Cynthia Bess had established a relationship with Robert
25 Topper, Jr., and the defendant began making telephone calls to him.
26 On June 26, 1983, about 5:20 a.m., Mr. Topper received a telephone call
27 from the defendant, during which he said that Miss Bess was "going down"
28

1  and that he (Topper) was "going down".  The victim took this as a
2  death threat and he also indicated to a sheriff's deputy that the
3  defendant had threatened to kill Miss Bess.  During the telephone
4  conversation, the defendant described the victim's house to him, as
5  well as his vehicles.  The defendant's parole was ultimately revoked
6  and he was returned to custody in a federal institution because
7  of these threats.  While in custody, the defendant continued to
8  send Miss Bess letters.  He complained initially of how he had been
9  treated by her, but ultimately attempted to gain her favor because
10 he was apparently aware that her accusations might affect his eventual
11 parole.  He promised to leave her alone if she helped him out but
12 wrote, "If you don't, you better run for the hills."  Bess, however,
13 submitted a letter to the Federal Parole Board complaining of the
14 defendant's past threats and her great fear of him.  While in custody,
15 the defendant continued to call Robert Topper, Jr., and Cynthia Bess'
16 family.  The defendant was ultimately re-paroled on November 14, 1983
17 (mandatory parole).  On November 17, 1983, the defendant's release
18 conditions were modified and he was instructed to have no contact
19 or communication with Cynthia Topper.  Mr. Robert Topper, Jr. and
20 Cynthia Bess were married while the defendant was in custody and
21 they had moved in with her grandfather in Santa Ana.  On December 8,
22 1983, about 1 a.m., the defendant drove to that residence and parked
23 down the street.  He then proceeded to cut the outside telephone
24 wire with wire cutters and kicked open the front door.  The defendant,
25 armed with two hammers and wearing gloves, then proceeded to the
26 bedroom where Cynthia and Robert Topper were staying.  He apparently
27 struck Mrs. Topper, who then ran to the kitchen.  The defendant began
28

STAICH, Ivan (nmn)                                                    Page 7

1   struggling with Robert Topper, who armed himself with a .357 magnum.
2   The defendant was shot one time, fracturing a finger and rib during
3   the struggle, but gained possession of the handgun.  Robert Topper, Jr.
4   received several blows to the head, causing skull fractures, and
5   was shot five times at close range in the head, chest, and neck.
6   These gunshots were all fired while the victim was lying face down
7   on the floor.  Cynthia Topper was then confronted in the kitchen
8   where she had obtained a gun that fired blanks.  The defendant took
9   that gun from her and pistol-whipped her about the head with the .357
10  magnum.  The defendant then left the residence and sought assistance
11  from neighbors.  He had deposited the two handguns and other evidence
12  in the bed of the pickup truck.  In an interview with a police
13  officer, the defendant maintained that he had gone to the residence to
14  talk with Cynthia about their relationship and he was unaware that
15  she was married.  He cut the telephone wire because he wanted to
16  prevent anyone from calling the police.  He maintains that he had no
17  intention to injure anyone, but had only acted in self-defense when
18  he was confronted by Mr. Topper with the gun.

19  DEFENDANT'S STATEMENT:

20          As previously indicated, the defendant refused an interview
21  with the undersigned on December 26, 1985.  The defendant has subsequent-
22  ly escaped from jail and his whereabouts are unknown.

23  VICTIM INFORMATION:

24          Following the escape of the defendant from jail, an appointment
25  to interview Cynthia Topper was canceled because she has been moved
26  to an undisclosed location.  According to information contained in the
27  District Attorney file, she has undergone two lobotomies and her mental

28

STAICH, Ivan (nmn)

Page 8

1 | ability has been impaired due to injuries received in this incident.

2 |       Other contacts of interested parties concerning the

3 | victims were also canceled following the defendant's escape.

4 | STATEMENT OF REFERENCES AND INTERESTED PARTIES:

5 |       Richard King, District Attorney, states that due to the

6 | aggravated nature of the offense, he believes that consecutive

7 | sentencing is appropriate.

8 |       Jack Early, defendant's attorney, was contacted concerning

9 | the defendant's refusal of the interview and he expressed an indication

10 | to contact the defendant in order to determine his desire to be

11 | interviewed.  There were no subsequent contacts with the attorney.

12 |       R. M. Gomez, the defendant's last Youth Authority Parole

13 | Agent, was contacted for comment concerning this matter.  He submitted

14 | a letter which he had sent to the District Attorney (attached to

15 | this report), which indicates that the defendant is an extremely

16 | dangerous individual.  The letter also indicates that the defendant

17 | had been assaultive toward his family members when he was younger.

18 |       Timothy Hernandez (federal probation) states that since the

19 | defendant is an extremely vicious individual with no regard for

20 | humanity, he deserves the maximum sentence because he carried through

21 | on his threat.  He maintains that the defendant has no known enemies

22 | in the prison system and he is considered to be a prime candidate

23 | for recruitment in a prison gang.  He believes that the defendant

24 | probably has serious pathological disorders and is an extremely

25 | dangerous individual.

26 |       Detective Joe Munoz (Vacaville Police Department) states

27 | that the family which the defendant threatened in that area, leading

28 |

STAICH, Ivan (nmn)                                      Page 9

1   to a federal prison commitment, remain frightened to this day that

2   the defendant will carry through on past threats to them.  He

3   maintains that anybody who has had contact with the defendant, be they

4   civil or police personnel, have been threatened by the defendant in

5   the past.

6   PRIOR RECORD:

7           According to information received from the California Bureau

8   of Criminal Identification, the Federal Bureau of Investigation, and

9   a review of federal and state records, the defendant has the following

10  prior record:

11  Juvenile History:    *Deleted per Court Order*

12

13

14

15

16

17

18

19

20

21

22

23

24

25  DATE      AGENCY          CHARGE              DISPOSITION

26  7-11-74   Riverside SO    Disturb. Peace     1 yr. summ. prob., $50
                                                 fine susp.

27

28

STAICH, Ivan (nmn)                                          Page 10

1        According to information received from the CYA, the defendant
     was out of control at home and had torn up a local bar.  He had
2    threatened his parents on numerous occasions and had used physical
     violence on his sister.  When confronted by the police, the defendant
3    fled and was also cited for resisting arrest.

4    1-30-76   Riverside SO   148 PC (Resist.    Corona MC case #27767-04;
                               Arrest)           on 2-19-76, conv. by plea,
5                                                21 days jail.

     *Deleted per Ct. Order* *eg*

6

7

8

9

10

11

12

13                                                          ✗

14

15

16   12-13-77   Escaped from Riverside Co. Jail;  Riverside SC case #
     3-14-78    Arrested by Vacaville PD          CR15566, conv. 4532b PC
17                                                (Escape from Jail);
                                                  7-21-78, 1203.03 PC, 90-
18   *D C S*                                      day diag. ordered; 11-22-7
                                                  2 yrs. st. pris.; paroled
19                                                10-29-79; 4-80, parole
                                                  rvkd.; 8-5-80, re-paroled.
20

21       While in jail on the above ██████████, the defendant used
     the identity of another inmate and was released from custody.  During
22   this time he reportedly made threats against the family of Cindy Dustin
     of Vacaville and was ultimately arrested there.

23   3-6-80    U.S.Marshal   18USC876 (Mailing    Fed. Ct., Eastern Dist.,
                             Threatening Com-     docket #80-00027-01;
24   *FED*                   munications)         7-2-80, 5 yr. impris.

25       On November 21, 1978, Mrs. Anna Buchman of Vacaville
     received a threatening letter addressed to her daughter, Cindy Dustin.
26   In the letter, the defendant threatened to kill Cindy Dustin because
     she intended to testify concerning the above arson matter.  It was
27   determined that the letter had been mailed from a jail facility and

28

1   the defendant had ultimately escaped from Riverside County Jail.   The
2   defendant continued to send threatening letters to the Buchmans.   The
    defendant had met Cindy Dustin when she was approximately 15 years of
3   age, and at one point had kidnapped her.  He had brought her back to
    the Corona area where she remained until she was able to escape from
4   the defendant.   The defendant continued to threaten her family members
    and indicated that he intended to kill Cindy Dustin.   The defendant
5   was ultimately arrested in the Vacaville area on the campus of a high,
    school where Cindy Dustin was enrolled.

6   SOCIAL HISTORY:

7              According to the available information, the defendant is

8   one of six children raised by his parents in the Lake Elsinore area.

9   His parents are discribed as having emotional and mental problems.

10  The family was reportedly dependent on welfare benefits since the

11  father had been disabled.   The parents were abusive and when the

12  defendant became older, he began to physically abuse other family

13  members.   The defendant was in a series of foster homes since about

14  age 11 until he was committed to the Youth Authority when he was 16

15  years of age.

16             There is no indication that the defendant ever graduated

17  from high school, but he apparently received his GED while in Youth

18  Authority.

19             The defendant has never been married and there is no indication

20  that he has ever fathered any children.   The defendant has excellent

21  health and is reportedly in excellent physical condition.

22             The defendant has had only limited employment as a motorcycle

23  mechanic and landscaper.   There is no indication of substance abuse

24  and it is noted that the defendant was not under the influence of

25  narcotics or alcohol when he committed the current offense.

26  EVALUATION:

27             There are no mitigating circumstances pertaining to the

28

1  crimes committed by this now 29-year-old defendant.

2          The offense is heavily aggravated, in that there is over-
3  whelming indication of premeditation (Rule 421a8).  This tragic
4  offense occurred following many months of threats by the defendant
5  on both victims.  Armed with a hammer, a very intimidating weapon,
6  the defendant approached the victims' home during the nighttime hours
7  (vulnerability - Rule 421a3), and cut the telephone wires.  He then
8  kicked open the door and stormed the bedroom, killing Robert Topper, Jr.
9  with his own gun and seriously injuring Cynthia Topper.  The defendant's
10  choice of weapons (hammer), and the fact that he shot Robert Topper
11  in the back and head after rendering him unconscious indicates a high
12  degree of cruelty and callousness (Rule 421a1).  Following this
13  murder, the defendant severely beat Cynthia Topper (multiple victims -
14  Rule 421a4), causing great bodily injury.  She apparently was spared
15  death since the defendant was wounded at the time, but there is every
16  indication that he intended to kill her also.

17          Aggravating  factors relating to the defendant are that
18  he has engaged in conduct for many years indicating that he is a
19  definite danger to society (Rule 421b1).  He has prior convictions
20  involving threats to a past girlfriend and her family and appears to
21  have taken steps to carry through on those threats.  The defendant's
22  prior record is therefore viewed as being of increased seriousness
23  (Rule 421b2).  During the commission of the current offense, the
24  defendant was on federal parole with a specific condition not to
25  contact Cynthia Topper (Rule 421b4).  Additionally, the defendant has
26  two prior felony convictions which have not been addressed since he
27  has escaped from jail.

28

STAICH, Ivan (nmn)                                                    Page 13

1         Due to the use of a firearm allegation being found true,

2    the defendant is ineligible for probation pursuant to Penal Code

3    Section 1203.06(a)(1).  There are other Penal Code sections which

4    speak to the defendant's ineligibility (i.e., infliction of great

5    bodily injury), and a determination of prior convictions also would

6    affect eligibility and enhance the sentence.  The defendant escaped

7    from jail prior to the jury trial of February 7, 1985, concerning

8    severed Count I (459 Penal Code violation), and the priors would have

9    been addressed and presumably a bench warrant has been issued.

10   (Attempts to contact the District Attorney for verification have

11   been unsuccessful).  The circumstances of this offense and the

12   defendant's past history indicate that he is a serious danger to

13   society and consideration should be given to consecutive sentencing.

14        Since the defendant will not likely be sentenced at this

15   hearing, it is recommended that a supplemental report be considered

16   at that time to allow for available information concerning the victims.

17   RECOMMENDATION:

18        It is respectfully recommended that probation be denied.

19                                        Respectfully submitted,

20                                   MICHAEL SCHUMACHER
                                     Chief Probation Officer
21
22                                   Michael E. Carr
                                     Deputy Probation Officer
23                                   834-8076 WUM

Dated this 7th day of March, 1986.
24
     I have read and considered the foregoing
25   report of the Chief Probation Officer.

26

27   _____
     JUDGE OF THE SUPERIOR COURT

28

# EXHIBIT "I"

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF ORANGE

= = = = = = = = =

THE PEOPLE OF THE STATE OF )          NO. C-53851
CALIFORNIA,                )
                           )   PRE-TRIAL ORAL DEPOSITION
      vs.                  )
                           )            OF
IVAN VON STAICH,           )
                           )        HENRY HARAZIM
            Defendant      )
                           )        October 4, 1985

= = = = = = = = =

A P P E A R A N C E S:

        MR. RICHARD KING, Deputy District Attorney,

   Office of the District Attorney, Orange County,

   700 Civic Center Drive West, Post Office Box 808,

   Santa Ana, California 92702,

                    For The People.

        MR. JACK M. EARLEY, Earley, Egar & Keller,

   1201 Dove Street, Suite 470, Newport Beach, California

   92660,

                    For the Defendant.

---

Reported by Jonathan Gicker, California C.S.R. #6755

ALLEN R. EMERSON & ASSOCIATES
COURT REPORTERS
1226 McGARIGLE
SEDRO WOOLLEY, WA 98284

COPY

```
 1        get out of the bed?

 2   A    Yeah.

 3   Q    You are wearing glasses as we sit here today, right?

 4   A    Right.

 5   Q    Were you wearing glasses, or did you wear glasses during

 6        the normal daytime hours on December 8, 1983?

 7   A    Right.

 8   Q    I take it you don't wear your glasses to bed?

 9   A    No.

10   Q    When you got up after you heard these three (3) bangs

11        from across the hall, were your glasses on or off?

12   A    Off

13   Q    And you indicated you then heard some more noises; is

14        that right?

15   A    Three (3) other pops, yeah.

16   Q    And is that how you describe them, they were three (3)

17        pops?

18   A    They were in rapid succession.

19   Q    Did you notice a difference between these pops in terms

20        of how they sounded and the three (3) loud bangs that

21        you heard from across the hall?

22   A    Yeah, I could detect that there was a difference in the

23        noise.  I assumed that they were two different guns.

24   Q    And you assumed they were two different guns for what

25        reason?
```

-11-

# EXHIBIT    "J"

1        SANTA ANA, CALIFORNIA — MONDAY, NOVEMBER 18, 1985

2                 MORNING SESSION

3             (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN

4   COURT IN THE PRESENCE OF THE JURY:)

5        THE COURT:  WELCOME BACK, LADIES AND GENTLEMEN.

6   EVERYONE HAS RETURNED.  LET'S HAVE A WITNESS IN.

7        MR. EARLEY:  ALL RIGHT.

8           CALL WILLIAM EDNEY TO THE STAND.

9        THE CLERK:  PLEASE STEP TO THE END OF THE TABLE

10  AND RAISE YOUR RIGHT HAND.

11

12            WILLIAM LELAND EDNEY,       *

13  CALLED AS A DEFENSE WITNESS, WAS DULY SWORN, EXAMINED,

14  AND TESTIFIED AS FOLLOWS:

15        THE CLERK:  DO YOU SOLEMNLY SWEAR THAT THE

16  TESTIMONY YOU ARE ABOUT TO GIVE IN THE CASE NOW PENDING

17  BEFORE THIS COURT, SHALL BE THE TRUTH, THE WHOLE TRUTH,

18  AND NOTHING BUT THE TRUTH, SO HELP YOU GOD?

19        THE WITNESS:  I DO.

20        THE CLERK:  STATE YOUR FULL NAME AND SPELL YOUR

21  LAST NAME.

22        THE WITNESS:  WILLIAM LELAND EDNEY, E-D-N-E-Y.

23            DIRECT EXAMINATION       *

24  BY MR. EARLEY:

25        Q    WHAT IS YOUR OCCUPATION?

26        A    TREE TRIMMER.

| 1 | Q | DO YOU WORK FOR A PARTICULAR COMPANY? |
|---|---|---|
| 2 | A | EDNEY TREE SERVICE. |
| 3 | Q | WHO IS THAT COMPANY OWNED BY? |
| 4 | A | MY FATHER GEORGE EDNEY. |
| 5 | Q | WHERE DO YOU LIVE? |
| 6 | A | SILVERADO CANYON. |
| 7 | Q | HOW LONG HAVE YOU LIVED THERE? |
| 8 | A | ALL TOGETHER, AROUND 20 YEARS. |
| 9 | Q | IN NOVEMBER-DECEMBER, 1983, DID YOU LIVE IN |
| 10 | | SILVERADO CANYON? |
| 11 | A | YES. |
| 12 | Q | DO YOU KNOW THE MAN AT THE END OF COUNSEL |
| 13 | | TABLE? |
| 14 | A | SURE DO. |
| 15 | Q | WHAT'S HIS NAME? |
| 16 | A | IVAN STAICH. |
| 17 | Q | ARE YOU RELATED TO THE STAICH FAMILY? |
| 18 | A | HE'S MY BROTHER-IN-LAW. |
| 19 | Q | DID YOU SEE MR. STAICH IN LATE NOVEMBER, |
| 20 | | EARLY DECEMBER OF 1983? |
| 21 | A | I DID. |
| 22 | Q | WHAT WAS HE DOING AT THAT TIME? |
| 23 | A | HE WAS WORKING FOR ME, LIVING WITH ME. |
| 24 | Q | AND WHERE WAS HE STAYING? |
| 25 | A | IN MY HOUSE. |
| 26 | Q | DO YOU KNOW ABOUT AN OCCASION WHERE MR. |

1    STAICH GOT ARRESTED?

2          A     JUST ME --

3          Q     DO YOU KNOW ABOUT AN OCCASION IN DECEMBER

4    WHEN MR. STAICH GOT ARRESTED?

5          A     YOU -- DO I KNOW THE OCCASION?

6          Q     YES.

7          A     YES.

8          Q     HOW LONG HAD HE BEEN LIVING WITH YOU?

9          A     TWO WEEKS, THREE WEEKS, GIVE OR TAKE A FEW

10   DAYS.

11         Q     WHAT WORK SCHEDULE WOULD YOU NORMALLY HAVE?

12   WHAT DAYS WOULD YOU NORMALLY WORK?

13         A     SIX DAYS A WEEK, FROM 7:30 TO 4:30.

14         Q     FROM MONDAY THROUGH SATURDAY?

15         A     UH-HUH, MONDAY THROUGH SATURDAY.

16         Q     DECEMBER 8TH, WOULD YOU HAVE WORKED THAT

17   DAY?

18         A     YES, WE WOULD HAVE.

19         Q     HOW ABOUT THE DAY BEFORE, ON WEDNESDAY, DID

20   YOU WORK THAT DAY?

21         A     EVERYDAY I COULD.

22         Q     DID MR. STAICH HAVE THE RUN OF YOUR HOUSE?

23         A     YES, HE DID.

24         Q     DO YOU HAVE ANY WEAPONS IN YOUR HOUSE?

25         A     QUITE A FEW.

26         Q     WHAT KIND OF WEAPONS DID YOU HAVE?

M. ARMELLA MARTIN, C.S.R., OFFICIAL COURT REPORTER

1199

1        MR. KING:  OBJECTION; RELEVANCY.

2        THE COURT:  OVERRULED. YOU MAY ANSWER.

3        THE WITNESS:  RIFLES HANDGUNS.  WOULD YOU LIKE

4    THE CALIBERS?

5        Q   IF YOU COULD?

6        A   TWO FOUR THREE RIFLE (SIC), 30-30 RIFLE,

7    .44 CALIBER BLACK POWDER, 30.06 RIFLE.

8            SHOTGUNS, FROM 32 GAUGES TO A 410, .44

9    MAGNUM, TWO .44 MAGNUM HANDGUNS, .357 MAGNUM HANDGUN

10   GUN; I HAD A .45 AUTOMATIC AT THE TIME.

11       Q   NOW, SHOWING YOU AND WHAT'S THE NEXT TWO

12   EXHIBITS --

13       THE COURT:  G AND H, SO MARKED.

14           (DEFENDANT'S G, H = FOR I.D.)

15   BY MR. EARLEY:

16       Q   SHOWING YOU WHAT'S MARKED G AND H FOR

17   IDENTIFICATION, CAN YOU LOOK AT THESE AND TELL ME WHAT

18   THEY REPRESENT?

19       A   WHAT DO YOU MEAN BY "REPRESENT"?

20       Q   DESCRIBE WHAT IS IN G?

21       A   OKAY.  FROM LEFT TO RIGHT, HERE --

22       Q   NOT THE PARTICULAR ITEMS BUT IN GENERAL

23   WHAT IS THAT?

24       A   IT'S MINE.

25       Q   WHAT IS IT?

26       A   MY GUN CABINET FULL OF GUNS.

1    Q    WHERE IS THAT LOCATED?

2    A    IN THE LIVING ROOM, FRONT ROOM OF MY HOUSE.

3    Q    IS ANYBODY WHO IS IN THE HOUSE, ARE THEY

4    ABLE TO GET INTO THE CABINET AND GET AT THE GUNS?

5    A    IT'S OPEN ALL THE TIME.

6    Q    DID MR. STAICH HAVE ACCESS TO YOUR HOUSE?

7    A    YES.

8    Q    AND SHOWING YOU WHAT IS DEFENDANT'S H FOR

9    IDENTIFICATION; WHAT IS THAT?

10    A    THIS IS THE BOTTOM DRAWER OF MY GUN CABINET

11    WHERE I KEEP THE AMMUNITION.

12    Q    WAS THAT -- WAS ANY AMMUNITION KEPT IN THE

13    DRAWER ON DECEMBER 8, 1983?

14    A    YES.

15    Q    WERE ANY OF THE GUNS IN THE HOUSE LOADED?

16    A    YES.

17    Q    WHICH ONES?

18    A    AT THE TIME I HAD A .45 THAT WAS UNDER MY

19    PILLOW; THERE WAS A .357 MAGNUM THAT WAS BETWEEN THE

20    MATTRESSES AND WHAT HE SLEPT ON.

21    Q    WHEN YOU SAY "HE," WHO ARE YOU TALKING

22    ABOUT?

23    A    IVAN.

24    Q    WHAT OTHER GUNS WERE THERE IN THAT WERE

25    LOADED?

26    A    THE ONLY ONE I CAN THINK OF WOULD BE THIS

1    ONE, 12 GAUGE.

2         Q    NOW, HAD YOU -- DID YOU KNOW SOMEONE BY THE

3    NAME OF CINDI BESS?

4         A    YES, I DID.

5         Q    APPROXIMATELY HOW LONG DID YOU KNOW HER?

6         A    OFF AND ON, SEEING HER WITH IVAN, OVER A

7    YEAR.

8         MR. KING:  OBJECTION; VAGUE AS TO TIME.

9         THE COURT:  OVERRULED.  ANSWER REMAINS.

10        THE WITNESS:  MORE OR LESS; THAT'S THE BEST I CAN

11   DO.

12   BY MR. EARLEY:

13        Q    HAD YOU EVER SEEN CINDI IN POSSESSION OF

14   ANY WEAPONS.

15        MR. KING:  OBJECTION; RELEVANCY, VAGUE AS TO

16   TIME.

17        THE COURT:  SUSTAINED.

18        MR. EARLEY:  ON WHICH GROUNDS, SO I KNOW WHAT

19   TO --

20        THE COURT:  GO FOR {BOTH|BOAT}.

21        MR. EARLEY:  OKAY.

22   BY MR. EARLEY:

23        Q    WOULD THERE BE TIMES THAT YOU WOULD SEE

24   CINDI PERSONALLY?

25        A    YES, A FEW TIMES SHE'S COME OVER AND

26   VISITED MY WIFE.

1      Q      WERE YOUR WIFE AND CINDI FRIENDS?

2      A      THEY WERE FRIENDS; NOT GREAT FRIENDS;

3    FRIENDS.

4      Q      NOW, DURING THE PERIOD OF TIME UP UNTIL

5    IVAN'S ARREST, CAN YOU GIVE US A TIME FRAME OF WHEN YOU

6    FIRST MET CINDI; YEAR, TWO YEARS?

7      A      I WOULD HAVE TO SAY CLOSE TO TWO YEARS.

8      Q      DURING THAT TIME FRAME THAT YOU SAW CINDI,

9    DID YOU EVER SEE HER WITH A GUN?

10          MR. KING:  OBJECTION; RELEVANCY.

11          THE COURT:  SUSTAINED.

12          MR. EARLEY:  MAY I MAKE AN OFFER OF PROOF, YOUR

13    HONOR?

14          THE COURT:  AT THE BENCH.

15              (THE FOLLOWING PROCEEDINGS WERE HAD AMONG

16    COUNSEL AND THE COURT AT THE BENCH.

17          MR. EARLEY:  THE RELEVANCY IS THAT THE DISTRICT

18    ATTORNEY ARGUED HIMSELF VERY ELOQUENTLY WHEN HE WAS

19    TALKING ABOUT THE NUMBER OF BLOWS TO CINDI BESS'S HEAD

20    AND THE FACT OF HOW MR. STAICH HIT HER.

21              MR. STAICH KNEW THAT CINDI BESS CARRIED A

22    HANDGUN AT ALL TIMES.  IT WOULD AT LEAST GO TO HIS STATE

23    OF MIND.

24          MR. KING:  THERE HASN'T BEEN ANY CONNECTION THAT

25    THE DEFENDANT WAS PRESENT WHEN THIS WITNESS SAW CINDI

26    WITH A GUN.

1   THE COURT: SO? OH, I SEE. HOW ARE YOU GONNA

2   CONNECT IT UP TO THE DEFENDANT'S STATE OF MIND?

3   MR. EARLEY: I'M GOING TO CONNECT IT WITH

4   WITNESSES WHO WOULD TESTIFY AS TO HOW IVAN WOULD KNOW

5   CINDI HAD A GUN.

6   THE COURT: NOT THIS WITNESS.

7   MR. EARLEY: NO, NOT THIS WITNESS THAT WOULD KNOW

8   THAT. I CAN ASK HIM.

9   THE COURT: IS THERE ANYTHING OTHER THAN STATE OF

10   MIND THAT YOU'RE OFFERING IT FOR?

11   MR. EARLEY: AT THIS TIME, NO.

12   THE COURT: OKAY. IF YOU DON'T CONNECT IT UP

13   I'LL HAVE TO STRIKE IT, THIS PORTION OF IT, SO REMIND ME

14   IF IT'S NOT CONNECTED UP. OVERRULED.

15   (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN

16   COURT IN THE PRESENCE OF THE JURY:)

17   BY MR. EARLEY:

18   Q    MR. EDNEY, HAD YOU EVER SEEN CINDI WITH A

19   GUN?

20   MR. KING: OBJECTION; AGAIN, VAGUE AS TO TIME.

21   THE COURT: PRELIMINARY. OVERRULED. EVER?

22   THE WITNESS: YES, I'VE SEEN HER WITH A GUN.

23   BY MR. EARLEY:

24   Q    GOING BACK TO DECEMBER 7TH, THAT EVENING

25   AND INTO THE EARLY MORNING HOURS OF DECEMBER 8TH, DID

26   YOU HAVE AN OPPORTUNITY TO BE WITH IVAN STAICH AT YOUR

1204

1    HOUSE?

2         A    YES.

3         Q    AND WHAT WERE YOU DOING AFTER WORK AND

4    UNTIL YOU WENT TO BED?

5         A    I RENTED A TAPE; HAD DINNER AND WATCHED A

6    MOVIE.

7         Q    WHAT WAS IVAN DOING?

8         A    SITTING IN THE FRONT ROOM WATCHING A MOVIE

9    WITH MY LITTLE GIRL.

10        Q    WHAT WAS HIS DEMEANOR AT THAT TIME?

11        A    QUIET, SOLEMN.

12        MR. KING:  OBJECTION; LEADING AND SUGGESTIVE.

13   BY MR. EARLEY:

14        Q    DID HE TALK ABOUT CINDI AT ALL?

15        THE COURT:  OVERRULED.

16        THE WITNESS:  JUST TALKING ABOUT -- TALKING WITH

17   MY LITTLE GIRL, TALKING ABOUT HAVING A LITTLE GIRL.  I

18   GUESS HE WAS THINKING -- TALKING ABOUT HE HAD WANTED TO

19   DO THAT WITH CINDI --

20        MR. KING:  OBJECTION; NONRESPONSIVE.

21        THE COURT:  SUSTAINED; STRICKEN.

22   BY MR. EARLEY:

23        Q    DID YOU HAVE A CONVERSATION WITH IVAN ABOUT

24   CINDI?

25        A    YES.

26        Q    WHAT WAS THAT CONVERSATION?

M. ARMELLA MARTIN, C.S.R., OFFICIAL COURT REPORTER

1       A       ABOUT LIKING TO HAVE A LITTLE DAUGHTER.

2       Q       HAD IVAN TALKED TO YOU IN THE PRECEDING TWO

3   OR THREE WEEKS ABOUT HIS FEELINGS TOWARD CINDI?

4       A       A FEW TIMES, JUST COMMENTS.

5       Q       AND WHAT WAS HIS ATTITUDE AT THAT TIME?

6       A       GOOD.

7       Q       WHAT DO YOU MEAN?  HOW WOULD HE EXPRESS

8   HIMSELF?

9       A       AS -- AS FAR AS THE SITUATION WITH CINDI?

10      Q       WOULD HE EXPRESS HIMSELF WITH LOVE, HATE,

11  INDIFFERENCE?

12      A       HURT FEELINGS.

13      Q       NOW, DID HE EVER EXPRESS WHEN -- YOU TALK

14  ABOUT HURT FEELINGS, DID HE EXPRESS WHETHER HE LOVED OR

15  HATED HER?

16      A       SAID HE LOVED HER.

17      Q       NOW, DO YOU USE GLOVES IN YOUR TREE

18  TRIMMING SERVICE?

19      A       YES, I DO.

20      Q       HOW MANY GLOVES WOULD YOU SAY WOULD USUALLY

21  BE AROUND IN YOUR TRUCK, YOUR HOUSE?

22      A       QUITE A FEW.

23      Q       WHEN YOU SAY "QUITE A FEW," ARE YOU TALKING

24  ABOUT FIVE, 10, 20?

25      A       I'M TALKING A MINIMUM OF 15 PAIRS LAYING

26  AROUND AT ALL TIMES.

# EXHIBIT "K"

MAY 1 6

F I L E D

(SPACE BELOW FOR FILING STAMP ONLY)

MAY 2 0 1986

GARY L. GRANVILLE, County Clerk

By _____ DEPUTY

DONALD L. DANIELS
ATTORNEY AT LAW
1224 E. KATELLA AVE., SUITE 211
ORANGE, CALIFORNIA 92669
TELEPHONE (714) 633-5750

1

2

3

4

5    Attorney for  Conservator

6

7

8              IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                  IN AND FOR THE COUNTY OF ORANGE

10

11   Conservatorship of the        )        CASE NO. A-121088
     Person and Estate of          )
12                                  )        ORDER FOLLOWING
                                    )        THE SECOND AND FINAL
13   CYNTHIA SUE TOPPER, aka MRS.   )        ACCOUNT AND REPORT
     ROBERT TOPPER, aka CYNTHIA     )        OF CONSERVATORSHIP;
14   SUE BESS, aka CINDI SUE BESS,  )        PETITION FOR ALLOWANCE
                                    )        OF FEE TO CONSERVATOR;
15   _____ Conservatee.   )        PETITION FOR ALLOWANCE
                                             OF ATTORNEY FEES;
16                                           PETITION TO TERMINATE
                                             CONSERVATORSHIP.
17          The second and Final Account and Report of LOREN

18   H. BESS, as Conservator of the person and estate of CYNTHIA

19   SUE TOPPER, aka MRS. ROBERT J. TOPPER, aka CYNTHIA SUE BESS,

20   aka CINDI SUE BEE, Conservatee, coming on regularly to be

21   heard on May 12, 1986, in Department 3 of the above captioned

22   court;  and

23          The court finds from proof made to the satisfaction

24   of the court:

25          1.  All notices of the time and place of the hearing

26   have been duly given as required by law;

27          2.  The statements in the petition and account should

28   be settled;

-9965181

1    3.  That said conservator has his hands, belonging

2  to said estate cash on deposit in the amount of $243,014.46,

3  a 1963 Volkswagon, J. C. Penny microwave oven, air compressor

4  and cigarette lighter, homemade desk and cabnet, miscellaneous

5  household utensils and goods, clothing and personal effects;

6    4.  That DONALD L. DANIELS should be allowed the

7  sum of $3,125.00 for services rendered as attorney for said

8  conservator from January 1, 1985 to December 31, 1985, in

9  the preparation and submission of this Second and Final Account

10  and Report and other matters set forth in said conservator's

11  petition;

12    5.  The said conservator, LOREN H. BESS, should

13  be allowed the sum of $4,000.00 for commissions for services

14  rendered in the transaction and management of the affairs

15  of said estate;

16    6.  That total assessment to Orange County pursuant

17  to Probate Code §1851.5 for the fiscal year 1983-84 is $120.00

18  and for 1984-85 is $145.00 and that the conservator should

19  pay said assessment to the Orange County Clerk, c/o Financial

20  Division, P.o. Box 838, Santa Ana, CA 92701;

21    7.  That it is desirable that the conservatorship

22  be terminated as the conservatee has recovered sufficiently

23  to handle her own affairs.

24    IT IS THEREFORE ORDERED THAT:

25    1.  The Second and Final Account and Report of the

26  conservator be approved, allowed and settled;

27    2.  The conservator is hereby authorized and directed

28  to pay DONALD L. DANIELS the sum of $3,125.00 as compensation

1   for services rendered as attorney for said conservator during

2   the period covered by this accounting;

3           3.  The conservator is hereby authorized and directed

4   to pay himself the sum of $4,000.00 for commissions rendered

5   in the transaction and management of the affairs of said

6   estate;

7           4.  That the conservator is hereby authorized and

8   directed to pay to the Orange County Clerk, c/o Financial

9   Division, P.O. Box 838, Santa Ana, CA 92701 the sum of $120.00

10  for 1983-84 and $145.00 for 1984-85 persuant to Probate Code

11  §1851.5;

12          5.  That the conservatorship is hereby brought to a

13  close and conservator is to deliver all assets to the conservatee.

14

15  Dated MAY 20 1986

16

17                          HENRY T. MOORE JR.,
                            Judge of the Superior Court

18

19

20

21

22

23

24

25

26

27

28

-3-

ATTORNEY OR PARTY WITHOUT ATTORNEY:

DONALD I. DANIELS, ESQ.                                    (714)633-5750
1224 E. Katella Avenue, Suite 211
Orange, CA 92667                                           RECEIVEF I L E/D

ATTORNEY FOR (NAME):  CONSERVATOR
SUPERIOR COURT OF CALIFORNIA, COUNTY OF Orange            APR 23 1986      MAY 13 1986
STREET ADDRESS:  700 Civic Center Drive West
MAILING ADDRESS:                                          GARY L. GRANVILLE GARY L. GRANVILLE, County Clerk
CITY AND ZIP CODE:  Santa Ana, CA 92701           By _____ MLH / , Deputy _____ DEPUTY
BRANCH NAME:

☐ GUARDIANSHIP ☒ CONSERVATORSHIP OF THE ☒ PERSON ☒ ESTATE OF
(NAME): CYNTHIA SUE TOPPER, aka MRS. ROBERT J. TOPPER,
        aka CYNTHIA SUE BESS, aka  ☐ Minor ☒ Conservatee

| | CASE NUMBER |
| NOTICE OF HEARING | A-121088 |
| ☐ Guardianship ☒ Conservatorship ☐ Limited Conservatorship | |

---

This notice is required by law. This notice does not require you to appear in court, but you may attend the hearing if you wish.

1. NOTICE is given that (name): LOREN H. BESS
   (representative capacity, if any): CONSERVATOR
   has filed (specify):     SECOND AND FINAL ACCOUNT AND REPORT OF CONSERVATORSHIP;
                            PETITION FOR ALLOWANCE OF FEE TO CONSERVATOR:  PETITION
                            FOR ALLOWANCE OF ATTORNEY FEES;  PETITION TO TERMINATE
                            CONSERVATORSHIP

reference to which is made for further particulars.

2. ☐ The petition includes an application for the independent exercise of powers under section 2590 of the Probate
   Code. Powers requested are ☐ specified below ☐ specified in attachment 2.

3. A hearing on the matter will be held

| on (date) 5/12/86 | at (time): 10:30 A.M. | in ☒ Dept: 3 | ☐ Div: | ☐ Rm.: |

   located at (address of court):    700 Civic Center Drive West
                                     Santa Ana, CA 92701

Dated: 4/22/86 . . . . . . . . . . . . . ☐ Clerk, by _____ , Deputy

                                         ☒ Attorney _____
                                                    (Signature)

This notice was mailed on (date): 4/22/86 . . . . . , at (place): . . . Orange . . . . . . . . . . ., California.

(Continued on reverse)

☐ GUARDIANSHIP  ☒ CONSERVATORSHIP OF (NAME): CYNTHIA SUE TOPPER, CASE NUMBER:
aka MRS. ROBERT J. TOPPER, aka CYNTHIA ☐ Ward ☒ Conservatee
SUE BESS, aka CINDI SUE BESS

NOTICE OF HEARING—GUARDIANSHIP OR CONSERVATORSHIP                          Page 2
CLERK'S CERTIFICATE OF ☐ POSTING ☐ MAILING

I certify that I am not a party to this cause and that a true copy of the foregoing Notice of Hearing—Guardianship
or Conservatorship
1. ☐ *(for sales under section 2543(c) of the Probate Code only)* was posted at (address):


2. ☐ was mailed, first class, postage fully prepaid, ☐ with a copy of the petition (title):


In a sealed envelope addressed to each person whose name and address is given below.
I certify that the notice was posted or mailed and this certificate was executed on (date):. . . . . . . . . .
at (place): . . . . . . . . . . . . . . . . . . . , California.


Clerk, by _____ , Deputy


PROOF OF SERVICE BY MAIL

I am over the age of 18 and not a party to this cause. I am a resident of or employed in the county where the mailing
occurred. My residence or business address is:   1224 E. Katella Avenue, Suite 211 .
                                                  Orange, CA 92667

I served the foregoing Notice of Hearing—Guardianship or Conservatorship ☐ with a copy of the petition (title):

by enclosing a true copy in a sealed envelope addressed to each person whose name and address is given below
and depositing the envelope in the United States mail with the postage fully prepaid.

(1) Date of deposit: 4/22/86          (2) Place of deposit (city and state):  Orange, CA

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct
and that this declaration is executed on (date):. 4/22/86 . . . . . .at (place): . . .  Orange . . . . . . . . .


MARLA K. LEMASTER . . . . . . . . . .                      _____
      (Type or print name)                                   (Signature of declarant)


NAME AND ADDRESS OF EACH PERSON TO WHOM NOTICE WAS MAILED


LOREN H. BESS
CYNTHIA SUE TOPPER
1531 Elm Drive
Norco, CA 91760


☐ List of names and addresses continued on attachment.

SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE COUNTY OF ORANGE

# MINUTE ORDER

CALENDAR PRO        PROBATE HEARING
DEPT    3          CONVENED AT 10:00 AM                    MAY 12, 1986

JUDGE: HON. HENRY T. MOORE JR.                    DEP. CLERK: J. PABITZKY
BAILIFF:                                          REPORTER: AARON MINTZ
CASE CATEGORY: CONSERVATORSHIP
CONSOLIDATED CASE NUMBERS :

CASE: A 121038   TOPPER CONSERVATEE
REF. FILING: D25  ACCOUNT OF CONSERVATOR
          SECOND AND FINAL ACCOUNT AND REPORT OF CONSER-
          VATORSHIP; PETITION FOR ALLOWANCE OF FEE TO CON-
          SERVATOR; PETITION FOR ALLOWANCE OF ATTORNEY FEES;
          PETITION TO TERMINATE CONSERVATORSHIP
MATTER:     334   334 ACCOUNTS
DISPOSITION

APPEARANCES
(X)PETITIONER          DD1 BESS           LOREN
(X)REPRESENTED BY      DANIELS            DONALD        L

( ) _Cynthia Topper present_
( ) _Bettje Bess present_

(X)PETITION GRANTED AS ( )PRAYED; ( )SUPPLEMENTED; ( )AMENDED.

( )PETITION DENIED WITHOUT PREJUDICE.

( )AT REQUEST OF ATTORNEY FOR PETITIONER ( )ON THE COURT'S MOTION:
   ( )ORDERED OFF CALENDAR.
   ( )ORDERED CONTINUED TO               198   , AT          M. IN DEPT

( )PARTIES SWORN AND TESTIFIED:

(X)CONSERVATOR ORDERED TO PAY AN ASSESSMENT OF $ 20,771.95  PER CIB-13
   FOR FISCAL YEAR 7913 7914 7915 7916 ORANGE COUNTY CLERK, FINANCE DIVISION,
   P.O. BOX 838, SANTA ANA, CA. 92702.

( )STATUS REPORT APPROVED. ESTATE TO CLOSE WITHIN          MONTHS OR
   FURTHER STATUS REPORT REQUIRED. ORDER TO SO REFLECT.

( ) $                    ( )SURETY BOND ( )ADDITIONAL SURETY BOND   REQUIRED.

( )PETITIONER ORDERED DISCHARGED AS TO
   ON              WHICH IS ONE YEAR AFTER WARD ATTAINED MAJORITY.

                                        ENTERED:        MAY 12, 1986

# EXHIBIT    "L"

## DECLARATION OF CYNTHIA SUE TOPPER

I, Cynthia Sue Topper, do declare the following:

That on the night of December 7, 1983, I was involved in the murder of my husband, Robert Topper, Jr., and the attempted murder of Ivan Von Staich. During this incident, which actually occurred on December 8, 1983, at approximately 12:30 a.m., I also received serious injuries which required surgery.

The reason I am typing this declaration is because I am admitting to my guilt. I have committed an offense for which I should be punished. No one knows about this crime but myself, and for that reason, no one has ever suspected me. You see, on the night of December 7, 1983, and the early morning hours of December 8, 1983, I am responsible for, not Ivan.

I guess it was about a week after Ivan had gotten out of Federal Prison (Terminal Island) that I decided I would try to get Ivan to murder my husband, Robert Topper, Jr., for the insurance money. I was sure that I didn't let anyone know that I would receive all that insurance money. It was a sick thing to do, but you see, I planned the whole scheme all by myself.

Now, for some reason, I just can't live with the thought that I am responsible for Ivan going to prison for life. I alone conjured up this scheme. I knew that if my husband was murdered I would receive triple indemnity on his work insurance policy.

Therefore, I wanted Ivan to think I still loved him and then I could manipulate him into a position where he must kill my husband or be killed. It was all just for the big financial

gain. I can't keep it inside me any longer. Ivan is not guilty. Moreover, he is a victim of my own sick greed. I am currently receiving psychological treatment from a California licensed psychiatrist for all my problems. I also want to state again that I called Ivan on the phone the night of December 7, 1983, and did ask him to come over. Also, the declaration that I gave a copy of to the district attorney this last year was completely true. At the time, I told the district attorney that the declaration was a lie because I didn't want my family to hate me. I just hope that someone will believe me after all the problems I have caused.

I, Cynthia Sue Topper, swear under penalty of perjury and under the laws of the State of California, that the above is true and correct.

Executed on this 9th day of January, 1989, at Riverside, California.

Cynthia Sue Topper



STATE OF CALIFORNIA
COUNTY OF Riverside }ss.
On this 9th day of January in the year 89 before me, the undersigned, a Notary Public in and for said County and State, personally appeared Cynthia Sue Topper

personally known to me or proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to this instrument, and acknowledged that he (she or they) executed it.

Signature Darla L Rocovits
Notary Public in and for said County and State
Darla L. Rocovits

FOR NOTARY SEAL OR STAMP

OFFICIAL SEAL
DARLA L. ROCOVITS
NOTARY PUBLIC - CALIFORNIA
RIVERSIDE COUNTY
My Comm. Expires July 31, 1991

TT-1101 REV. 11/87    Individual Acknowledgment

-9965181

# EXHIBIT "M"

# GOVERNOR'S REPORTS

## LIFE TERM PAROLE CONSIDERATION

## SUMMARY 2003

## FOR SECOND DEGREE MURDERERS

1  **D E C L A R A T I O N   O F   I V A N   V O N   S T A I C H**

2

3      I, Ivan Von Staich, does affirmatively depose, as follows:

4      1. Attached hereto is a synopsis of the Governor's Reports

5  regarding **To Life PC §1168(b)** prisoners and their **Parole**

6  **Consideration Hearings Summary 2003, for Second Degree Murderers**

7  and is a true and correct tabulation and synopsis of twenty-eight

8  (28) California prisoners official cases from the Executive

9  Report on Parole Review Decisions 2003, of all term-to-life

10  prisoners convicted of Second Degree Murder that were **granted**

11  **parole dates** by the California Board of Prison Terms and reviewed

12  by Gray Davis between January 1, 2003, through November 14,

13  2003.

14      This legal document was executed on this 10th day of

15  September, 2005, in the city of Soledad, County of Monterey.

16      I, Ivan Von Staich, state under penalty of perjury that

17  the foregoing is true and correct, and this legal document was

18  written within all state and federal statutory laws.

19  Dated this 10th day of September, 2005.

20                                    Declarant Ivan Von Staich

21

22

23

24

25

26

27

28

Table of case factors for

Governor's Life Parole Consideration Report 2003

_____Prisoners with M2d convictions given a parole date by the California BPT commissioners and **all** of this these M2d prisoners had previously committed serious disciplinaries (CDC 115 reports), **within the prison setting.** 28 prisoners found suitable for parole by the BPT commissioners, allegedly have committed violence against correctional officers or other prisoners **and one prisoner named Hunter assaulted and threaten his wife on a family visit,** as follows:

| Name | Number | Disciplinary reports |
|------|--------|----------------------|
| Connally | D-93086 | 6 Serious |
| Tripp | W-15695 | 21 Disciplinaries |
| Catanho | W-15875 | 10 Serious and 50 Minor |
| Kemitch | C-72999 | 60 Disciplinaries |
| McCullough | C-66632 | 30 Disciplinaries |
| Yniguez | W-20689 | 4 Serious and 26 Minor |
| Brannum | C-55187 | 4 Serious |
| Hill | W-20808 | 13 Serious and 32 Minor |
| Flores | C-44235 | 9 Disciplinaries |
| Yambao | C-17329 | 3 Serious and 2 Minor |
| Goldsby | C-97620 | 2 Serious and 6 Minor |
| Capistran | D-12962 | 3 Serious and 1 Minor |
| Holt | C-74385 | 5 Serious and 34 Minor |
| Woodmore | W-26904 | 14 Serious and 80 Minor |
| Box | C-27438 | 5 Serious |
| Johnson | C-51674 | 3 Serious 10 Minor |
| Jackson | C-36360 | 7 Serious 10 Minor |
| Scott | C-30580 | 6 Serious and 11 Minor |
| Hayward | C-18440 | 3 Serious and 16 Minor |
| Hunter | C-32398 | 1 Serious in 1993 |

for striking and threatening his wife during a family visit. Description Synopsis: On Feb. 25, 1985 Astrid Washington, accompanied by her friend Darryl Moon, went to the apartment of her ex-boyfriend, Terrance Hunter, to get her property. An argument broke out, and Hunter retrieved a shotgun. Ms. Washington ran from the apartment calling for Mr. Moon. Hunter and Moon fought, and Hunter shot Moon 2 times with the shotgun, killing him with the second shot. History Synopsis: On probation at the time of the offense. Tumultuous relationships with women and prior arrests and convictions for indecent exposure;

| | | | |
|------|--------|------|------|
| Martin | C-15242 | 3 | Serious |
| Patrick | W-20803 | 3 | Serious |
| Scott | C-30580 | 6 Serious and 11 | **Minor** |
| Scott | C-35230 | 2 | Serious |
| Seiler | E-16869 | 2 Serious and 5 | Minor |
| Shaw | C-47054 | 2 | Serious |
| Summers | C-47252 | 1 Serious for drug | **possession** |
| Hillmon | D-22145 | 1 | Serious |

## PROOF OF SERVICE BY MAIL

(C.C.P. §§1013A, 2015.5)

STATE OF CALIFORNIA )
                  ) SS.
COUNTY OF MONTEREY )

      I, __Ivan Von Staich_____, am a resident of the State of California,

County of Monterey. I am over the age of 18 years and I   am/am not   a party to the within action.

My   business/residence   address is P.O. Box 689, Soledad, California, 93960-0689.

      On _____May 6th_____, 20 08 , I served the foregoing:

**TRAVERSE TO ANSWER TO ORDER TO SHOW CAUSE**

on the parties listed below by placing a true copy thereof enclosed in a sealed envelope with postage

fully prepaid in the United States mail at Soledad, California, addressed as follows:

      **NORTHERN DISTRICT FEDERAL COURT**
      **450 Golden Gate Ave.,**
      **San Francisco, Ca. 94102-3483**

      **Attn: Filing Clerk**

      **Office of the Attorney General  Suite: 11000**
      **455 Golden Gate Ave.     San Francisco, Ca. 94102-7004**
      There is regular delivery service by the U.S. Postal Service between the place of mailing

and the places so addressed.

      I declare under the penalty of perjury under the laws of the State of California that the

foregoing is true and correct.

      Executed this __6th__ day of __May_____, 20 08 , at

Soledad, California.

                    /S/ ___Ivan Von Staich___
                       **Ivan Von Staich**
                       **Declarant**

—

Susan Von Houten
E-10079 CW-137L
Post Office Box 689
Soledad Ca, 93960

Northern District Federal
450 Golden Gate Ave,
San Francisco, Ca, 9410

02 1M
0004229613    MAY 07 2008
MAILED FROM ZIP CODE 93960

UNITED STATES POSTAGE
$ 04.90°
PITNEY BOWES